
Jon B. Fougner (State Bar No. 314097)
Email: Jon@FougnerLaw.com
600 California Street, 11th Fl.
San Francisco, CA 94108
Telephone: (434) 623-2843
Facsimile: (206) 338-0783

[Additional counsel appear on signature page]

*Attorneys for Plaintiff and the Proposed Classes*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| DANIEL BERMAN,<br><br>               Plaintiff,<br><br>      v.<br><br>FREEDOM FINANCIAL NETWORK, LLC, FREEDOM DEBT RELIEF, LLC, FLUENT, INC., and LEAD SCIENCE, LLC<br><br>               Defendants. | Case No. 4:18-cv-01060-DMR<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**Class Action**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Daniel Berman, by his undersigned counsel, for this class action complaint against Defendants Freedom Financial Network, LLC, Freedom Debt Relief, LLC, Fluent, Inc., Lead Science, LLC and their present, former, and future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or related entities, alleges as follows:

## I.   INTRODUCTION

1. <u>Nature of Action</u>: What Plaintiff seeks freedom and relief from isn't debt. It's Freedom Debt Relief itself. Accordingly, Plaintiff, individually and as class representative for all others similarly situated, brings this action against Defendants for sending robotexts and robocalls in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

## II. PARTIES

2. Plaintiff is an individual residing in California, in this District and Division.

3. Defendant Freedom Financial Network, LLC ("Freedom Financial") is a limited liability company organized under the laws of Delaware with its principal place of business at 1875 South Grant Street, Suite 400, San Mateo, California 94402.

4. Defendant Freedom Debt Relief, LLC ("Freedom Debt") is a limited liability company organized under the laws of Delaware with its principal place of business at 1875 South Grant Street, Suite 400, San Mateo, California 94402.

5. Freedom Debt Relief is a wholly owned subsidiary of Freedom Financial (collectively, "Freedom"). Each is the other's alter ego.

6. Defendant Fluent, Inc. ("Fluent") is a corporation organized under the laws of Delaware with its principal place of business at 2650 North Military Trail, Suite 300, Boca Raton, Florida 33431.

7. Fluent's alter egos include "Cogint, Inc." and "Fluent, LLC."

8. Defendant Lead Science, LLC ("Lead Science") is a limited liability company organized under the laws of Ohio with its principal place of business at 24 North High Street, 2nd Floor, Akron, Ohio 44308.

9. Lead Science does business as "Drips."

10. Each of the defendants sued herein was the principal, agent or employee of the other and was acting within the scope of such agency or employment. Each defendant sued herein was the co-conspirator of each other and was acting within the course and scope of a conspiracy formed amongst them all. Each defendant sued herein aided and abetted each other with the intent that each would be successful in their mutual endeavors.

## III. JURISDICTION AND VENUE

11. <u>Jurisdiction</u>: This Court has federal-question subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

12. <u>Personal Jurisdiction</u>: This Court has personal jurisdiction over Defendants because:

a. Freedom is headquartered in California; and

b. Defendants' conduct at issue intentionally targeted Plaintiff, a California resident, while Plaintiff was in California, at Plaintiff's cellular telephone number, which bears a California area code, on the ostensible basis of the submission of a lead generation form from a California IP address and bearing a California address.

13. <u>Venue</u>: Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to Plaintiff's claims—namely, the receipt of the illegal telemarketing—occurred in this District.

14. <u>Intradistrict Assignment</u>: Assignment to this Division is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events or omissions that give rise to Plaintiff's claims—namely, the receipt of the illegal telemarketing—occurred in the County of Alameda.

### IV.   FACTS

**A.   The Enactment of the TCPA and its Regulations**

15. <u>Robocalls Outlawed</u>: Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1). Encouraging individuals to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

16. <u>Rationale</u>: In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only

effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

17. The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

18. <u>Text Messages</u>: For TCPA purposes, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951-52 (9th Cir. 2009).

19. <u>Prior Express Written Consent</u>: In 2013, the Federal Communications Commission ("FCC") made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnotes omitted) (internal quotation marks omitted).

20. <u>Do Not Call Registry</u>: Additionally, the TCPA outlaws unsolicited telemarketing (robocalls or otherwise) to phone numbers on the National Do Not Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). Encouraging individuals to hold telemarketers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(c)(5).

21. <u>Broadly Construed</u>: As a remedial statute that was passed to protect consumers from unwanted automated telephone calls, the TCPA is construed broadly to benefit consumers.

*Lofton v. Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR, 2015 U.S. Dist. LEXIS 34516, at *9 (N.D. Cal. Mar. 18, 2015).

**B.    The Worsening Problem of Robocalls and Spam Texts**

22. Unfortunately, the problems Congress identified when it enacted the TCPA have grown only worse in recent years.

23. "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the TCPA of 1991*, 30 FCC Rcd. 7961, 7991 ¶ 1 (2015).

24. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

25. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the TCPA of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

26. In 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. For every month in the fiscal year, robocalls made up the majority of consumer complaints about Do Not Call violations. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc.

27. The New York Times recently reported extensively on the surging number of robocall complaints filed by consumers with the FTC and widespread consumer outrage about illegal

telemarketing. Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

**C.     Defendant Freedom**

28. Freedom offers debt negotiation and counseling services. It is the largest debt-settlement services provider in the country.

29. Through telemarketing contacts with prospective customers, Freedom learns who their creditors are, the amounts owed to each and the nature of the debts.

30. One of Freedom's marketing strategies involves an automatic telephone dialing system ("ATDS").

31. One of Freedom's marketing strategies involves the use of an ATDS to place telemarketing phone calls.

32. One of Freedom's marketing strategies involves the use of an ATDS to send telemarketing text messages.

33. One of Freedom's marketing strategies involves making telemarketing calls using artificial or prerecorded voices.

34. Freedom uses ATDS equipment that has the capacity to store or produce telephone numbers to be called, that includes autodialers and predictive dialers and that plays a prerecorded message once the calls connect.

35. Freedom advertises a job opening in Tempe, Arizona for an "Inside Sales Representative" to "[r]eceive and work fresh leads daily through outbound and inbound calls," requiring "1+ year of call center experience in a high volume, outbound environment."

36. Recipients of these outbound calls, including Plaintiff, did not consent to receive them.

37. Freedom's telemarketing calls were not necessitated by an emergency.

38. Freedom hired Fluent to place some of its telemarketing calls on Freedom's behalf.

### D. Defendant Fluent

39. Fluent runs sweepstakes websites in order to collect contact information of consumers whom it subsequently barrages with SMS and other advertising.

40. One of Fluent's marketing strategies involves an ATDS.

41. One of Fluent's marketing strategies involves the use of an ATDS to place telemarketing phone calls.

42. One of Fluent's marketing strategies involves the use of an ATDS to send telemarketing text messages.

43. One of Fluent's marketing strategies involves making telemarketing calls using artificial or prerecorded voices.

44. Fluent uses ATDS equipment that has the capacity to store or produce telephone numbers to be called, that includes autodialers and predictive dialers and that plays a prerecorded message once the calls connect.

45. Recipients of Fluent's outbound calls, including Plaintiff, did not consent to receive them.

46. Fluent's telemarketing calls were not necessitated by an emergency.

47. Fluent hired Lead Science to place some of its telemarketing calls on Fluent's and Freedom's behalf.

### E. Defendant Lead Science

48. Lead Science runs SMS telemarketing campaigns for lead generators, such as Fluent.

49. Lead Science's promotional video encourages lead generators to avoid run-ins with "TELEMARKETING LAWS," the "TCPA" and the "TELEPHONE CONSUMER PROTECTION ACT" by using Lead Science and its "A.I."-based telemarketing platform.

50. One of Lead Science's marketing strategies involves an ATDS.

51. One of Lead Science's marketing strategies involves the use of an ATDS to place telemarketing phone calls.

52. One of Lead Science's marketing strategies involves the use of an ATDS to send telemarketing text messages.

53. One of Lead Science's marketing strategies involves making telemarketing calls using artificial or prerecorded voices.

54. Lead Science uses ATDS equipment that has the capacity to store or produce telephone numbers to be called, that includes autodialers and predictive dialers and that plays a prerecorded message once the calls connect.

55. Recipients of Lead Science's outbound calls, including Plaintiff, did not consent to receive them.

56. Lead Science's telemarketing calls were not necessitated by an emergency.

**F.    Plaintiff**

57. Plaintiff resides in Oakland, California.

58. Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

59. Plaintiff owns a phone number that begins "(510) 326." All calls to Plaintiff referenced herein were to that number.

60. Plaintiff's phone number is assigned to a cellular telephone service. Calls to it make his cell phone ring.

61. Plaintiff's phone number has been listed on the National Do Not Call Registry since 2003.

62. Plaintiff never consented to receive phone calls or text messages from Defendants.

63. Plaintiff never gave his phone number to Defendants.

64. Plaintiff never did business with Defendants.

**G.    Defendants' Illegal Telemarketing Robocalls to Plaintiff**

65. On February 14, 2018, Plaintiff received a text message out of the blue.

66. The caller ID was (409) 359-9066.

67. The message said, in its entirety: "Dêbt-Help: Need to pay $10,000 + in cc bills? We're here to help! We can save you a ton of money. Call for more info. Respond no to quit" [sic].

68. Plaintiff inferred that the message had been sent automatically rather than manually typed by a human for the following reasons.

    a.    It was not a response to any action he had taken.

    b.    It came from a caller ID he did not recognize.

    c.    It did not name him.

    d.    It did not name its sender.

    e.    It was not at all personalized to Plaintiff.

    f.    It misspelled the word "Debt" as "Dêbt" and introduced unusual hyphenation between words, in an apparent attempt to evade spam detection.

    g.    It purported to provide mechanical opt-out instructions, something real human beings rarely do when sending each other text messages.

69. Within an hour, Plaintiff received a phone call from the same caller ID, (409) 359-9066.

70. Plaintiff answered. No human promptly came on the other end of the line. Instead, an artificial or prerecorded voice told Plaintiff to press "1" for more information. He did. A male with an American accent promptly came on the line.

71. The male claimed to be calling from a company with two names: "Freedom Financial Network" and "Freedom Debt Relief."

72. The purpose of the call was to advertise the goods or services of Defendants.

73. The male stated that he was in Phoenix, Arizona.

74. Freedom operates a call center in Arizona.

75. Plaintiff said that, should he wish to learn any more about Defendants' products, *he preferred to call them*—rather than vice versa.

76. In response, the male stated that his name was "Cody Longfield" and that his phone number was (602) 732-3664.

77. Before directing their automated telemarketing to him, Defendants never did anything to confirm that Plaintiff has opted in to their telemarketing.

78. It is common practice in internet marketing to pay "affiliates," or third parties, for leads. It is, unfortunately, common that such arrangements financially incentivize the affiliate to submit leads even though the information in the lead is not accurate.

79. The telemarketing alleged herein:

    a.    invaded Plaintiff's privacy and solitude;

    b.    interrupted Plaintiff's train of thought;

    c.    wasted Plaintiff's time;

    d.    annoyed Plaintiff;

    e.    harassed Plaintiff; and

    f.    consumed the battery life of Plaintiff's cellular telephone.

## V. FREEDOM'S LIABILITY FOR THE TELEMARKETING CALLS

80. Each of Freedom Financial and Freedom Debt is a "person," as defined by 47 U.S.C. § 153(39).

81. The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. 227(b)(2).

82. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

83. In a 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

84. In 2013, the FCC confirmed this principle in a declaratory ruling holding that sellers such as Freedom Financial and Freedom Debt may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

85. More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

86. The Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

87. To the contrary, the FCC—armed with extensive data about robocallers and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

88. Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

89. The Ninth Circuit follows the FCC's approach to vicarious liability under the TCPA. *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018).

90. Freedom Financial and Freedom Debt are legally responsible for ensuring that the company who made the telemarketing calls for them complied with the TCPA, even if Freedom Financial and Freedom Debt did not themselves place the calls.

91. Drips, at the direction of Fluent, and as part of its agreement with Freedom Financial and Freedom Debt, called Plaintiff at Freedom Financial and Freedom Debt's instruction and direction in an effort to originate a new customer for Freedom Financial and Freedom Debt.

92. Freedom Financial and Freedom Debt knowingly and actively accepted business that originated through illegal telemarketing.

93. By hiring a company to make calls on its behalf, Freedom Financial and Freedom Debt "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

94. Moreover, Freedom Financial and Freedom Debt maintained interim control over the actions of the party that made the call.

95. For example, Freedom Financial and Freedom Debt had absolute control over whether, and under what circumstances, they would accept a customer.

96. Furthermore, Freedom Financial and Freedom Debt had day-to-day control over the actions of the party that made the calls, including the ability to prohibit it from using an ATDS or pre-recorded messages to contact potential customers of Freedom Financial and Freedom Debt and the ability to require it to respect the National Do Not Call Registry.

97. Freedom Financial and Freedom Debt also gave interim instructions to the company that made the calls by providing the parameters of customers, volume of calling and contracts it would purchase.

98. In this litigation, Freedom caused Fluent to produce a technically detailed affidavit admitting its involvement in the telemarketing at issue. Freedom vouched for the affidavit, Dkt. No. 16 at 2-4, CM/ECF pp. 10-12 (repeatedly citing it with approval), and attached it to a motion filed with the Court, Dkt. No. 16-1.

99. The affidavit admits that Freedom Financial is a "partner" of Fluent and that Fluent holds Freedom Financial out to the public as its partner. Dkt. No. 16-1 at 4 ¶ 12, CM/ECF p. 5.

100. The affidavit implies that Fluent "promot[es] service offerings from Freedom Financial." *Id.* at 5 ¶ 13, CM/ECF p. 6.

101. Freedom Financial and Freedom Debt donned Fluent with apparent authority theory to make the telemarketing calls at issue.

102. Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

103. "[A]pparent authority can arise in multiple ways, and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

104. A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

105. Here, Freedom Debt and Freedom Financial designated Fluent to generate leads for them, which Fluent does via automated telemarketing conducted in concert with its agents, including Drips.

106. Finally, the FCC held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Dish*, 28 FCC Rcd. at 6592-93 ¶ 46. Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

## VI. CLASS ACTION ALLEGATIONS

107. <u>Cellular Telephone Class Definition</u>: Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), Plaintiff brings this case as a member of and on behalf of two classes (each a "Class," collectively, the "Classes"). One Class (the "Cellular Telephone Class") is defined as follows: All persons in the United States to whom:

    a.    Defendants, any of them and/or a third party acting on any of their behalf, made a call or sent a text message;

    b.    to a cellular telephone number;

    c.    using an automated telephone dialing system or an artificial or prerecorded voice;

    d.    in order to market Freedom's products;

    e.    during the period that begins four years before the filing of the original complaint in this matter and ends on the first day of trial.

108. <u>DNC Class Definition</u>: The other Class (the "DNC Class") is defined as follows: All persons in the United States to whom:

    a.    Defendants, any of them and/or a third party acting on any of their behalf made a call or sent a text message;

    b.    to a residential telephone number on the National Do Not Call Registry;

    c.    in order to market Freedom's products;

    d.    during the period that begins four years before the filing of the original complaint in this matter and ends on the first day of trial;

109. <u>Exclusions</u>: Excluded from the Classes are Defendants, any entity in which Defendants (or any of them) have a controlling interest or that has a controlling interest in Defendants (or any of them), Defendants' legal representatives, assignees, and successors, the judge to whom this case is assigned and the judge's immediate family.

110. <u>Numerosity</u>: The Classes are so numerous that joinder of all their members is impracticable. Freedom is the largest debt settlor in the United States. Fluent is publicly traded.

Sending a robotext or placing a robocall costs less than one cent, so Defendants could afford to do so at massive scale. On information and belief, each Class has more than 100 members.

111. <u>Commonality</u>: There are many questions of law and fact common to Plaintiff and members of each Class. Indeed, the very feature that makes Defendants' conduct so annoying—its automated nature—makes this dispute amenable to classwide resolution. These common questions of law and fact include, but are not limited to, the following:

    a. What the relationships between Defendants are;

    b. Whether the text messages were sent en masse (or, instead, individually composed and transmitted to Plaintiff);

    c. Whether the voice referenced above was artificial or prerecorded (or, instead, a live person who sounds robotic and asks people to press buttons);

    d. Whether Defendants' desire to sell debt-negotiation services constitutes an "emergency" within the meaning of the TCPA;

    e. Whether, under the TCPA, one may send automated, nonconsensual, telemarketing text messages to cellular telephone numbers provided that they contain opt-out instructions;

    f. Whether Defendants had a pattern and practice of telemarketing to numbers on the National Do Not Call Registry; and

    g. Whether Defendants' violations were knowing or willful.

112. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Classes. Plaintiff's claims and those of the Classes arise out of the same course of conduct by Defendants and are based on the same legal and remedial theories.

113. <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has retained competent and capable counsel experienced in TCPA class action litigation. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have interests contrary to or conflicting with those of the proposed Classes.

114. <u>Superiority</u>: The common issues arising from this conduct that affect Plaintiff and members of the Classes predominate over any individual issues, making a class action the superior means of resolution. Adjudication of these common issues in a single action has important and desirable advantages, including judicial economy, efficiency for Class members and classwide res judicata for Defendants. Classwide relief is essential to compel Defendants to comply with the TCPA.

    a. <u>Control</u>: The interest of individual members of the Classes in individually controlling the prosecution of separate claims against Defendants is small because the damages in an individual action ($500 to $1,500 per violation) are dwarfed by the cost of prosecution.

    b. <u>Litigation</u>: Plaintiff is not aware of any pending TCPA litigation between Class members and Defendants.

    c. <u>Forum</u>: The forum is a desirable, efficient location in which to resolve the dispute because Plaintiff lives in the District and Freedom is headquartered in it.

    d. <u>Difficulties</u>: No significant difficulty is anticipated in the management of this case as a class action. Management of these claims is likely to present significantly fewer difficulties than are presented in many class actions because the calls at issue are automated (and thus uniform) and because the TCPA articulates bright-line standards for liability and damages.

115. <u>Appropriateness</u>: Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief and corresponding declaratory relief with respect to the Classes appropriate on a classwide basis.

## VII.   FIRST CLAIM FOR RELIEF
**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)—Robocalling)**
**On Behalf of Plaintiff and the Cellular Telephone Class**
**Against All Defendants**

116. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

117. Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to the cellular telephone

numbers of Plaintiff and members of the Cellular Telephone Class using an ATDS and/or artificial or prerecorded voice without prior express written consent.

118. Plaintiff and members of the Cellular Telephone Class are entitled to an award of $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

119. Plaintiff members of the Cellular Telephone Class are also entitled to and do seek an injunction prohibiting Defendants and/or their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to any cellular telephone number using an ATDS and/or artificial or prerecorded voice without prior express written consent.

## VIII. SECOND CLAIM FOR RELIEF
**(Knowing and/or Willful Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)—Robocalling)**
**On Behalf of Plaintiff and the Cellular Telephone Class**
**Against All Defendants**

120. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

121. Defendants and/or their affiliates or agents knowingly and/or willfully violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to the cellular telephone numbers of Plaintiff and members of the Cellular Telephone Class using an ATDS and/or artificial or prerecorded voice without prior express written consent.

122. Plaintiff and members of the Cellular Telephone Class are entitled to an award of up to $1,500 in damages for each such knowing and/or willful violation. 47 U.S.C. § 227(b)(3).

## IX. THIRD CLAIM FOR RELIEF
**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)—Telemarketing)**
**On Behalf of Plaintiff and the DNC Class**
**Against All Defendants**

123. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

124. Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing unsolicited telemarketing calls (including text

messages) to the telephone numbers of Plaintiff and members of the DNC Class even though those numbers were listed on the National Do Not Call Registry.

125. Plaintiff and members of the DNC Class seek an award of $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

126. Plaintiff members of the DNC Class are also entitled to and do seek an injunction prohibiting Defendants and/or their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing unsolicited telemarketing calls (including text messages) to any telephone numbers on the National Do Not Call Registry.

### X.     FOURTH CLAIM FOR RELIEF
**(Knowing and/or Willful Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)—Telemarketing)**
**On Behalf of Plaintiff and the DNC Class**
**Against All Defendants**

127. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

128. Defendants and/or their affiliates or agents knowingly and/or willfully violated the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing unsolicited telemarketing calls (including text messages) to the telephone numbers of Plaintiff and members of the DNC Class even though those numbers were listed on the National Do Not Call Registry.

129. Plaintiff and members of the DNC Class are entitled to and seek an award of up to $1,500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

### XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of all members of the Classes, prays for judgment against Defendants as follows:

A.  Certification of the proposed Classes;

B.  Appointment of Plaintiff as representative of the Classes;

C.  Appointment of the undersigned counsel as counsel for the Classes;

D.  A declaration that actions complained of herein violate the TCPA;

  E. An order enjoining Defendants and their affiliates, agents and related entities from engaging in the unlawful conduct set forth herein;

  F. An award to Plaintiff and the Classes of damages, as allowed by law;

  G. An award to Plaintiff and the Classes of costs and attorneys' fees, as allowed by law, equity and/or California Code of Civil Procedure section 1021.5;

  H. Leave to amend this Complaint to conform to the evidence presented at trial; and

  I. Orders granting such other and further relief as the Court deems necessary, just, and proper.

## XII. DEMAND FOR JURY

Plaintiffs demand a trial by jury for all issues so triable.

## XIII. SIGNATURE ATTESTATION

The ECF user filing this paper attests that concurrence in its filing has been obtained from each of the other signatories.

RESPECTFULLY SUBMITTED AND DATED this 14th day of June, 2018.

By: */s/ Jon B. Fougner*
Jon B. Fougner

Edward A. Broderick
Email: ted@broderick-law.com
*Subject to Pro Hac Vice*
Anthony I. Paronich
Email: anthony@broderick-law.com
*Admitted Pro Hac Vice*
BRODERICK & PARONICH, P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Matthew P. McCue
E-mail: mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3

Natick, Massachusetts  01760
Telephone:  (508) 655-1415
Facsimile:   (508) 319-3077
*Subject to Pro Hac Vice*

*Attorneys for Plaintiff and the Proposed Classes*

- 20 -
FIRST AM. COMPL.
*Berman v. Freedom Fin. Network, LLC*, Case No. 4:18-cv-01060-DMR