Pages 1 - 52

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

| | | |
|---|---|---|
| DANIEL BERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 4:18-cv-01060-YGR |
| | ) | |
| FREEDOM FINANCIAL NETWORK, | ) | |
| LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | San Francisco, California |
| _____ | ) | Wednesday, January 3, 2019 |

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

FTR 2:04 p.m. - 3:03 p.m. =  59 minutes

**APPEARANCES**:


For Plaintiff:          Fougner Law
                        600 California Street, 11th floor
                        San Francisco, California  94108
                   BY:  **JON B. FOUGNER, ESQ.**


For Defendants:         Sheppard, Mullin, Richter
                         & Hampton, LLP
                        333 South Hope Street, 43rd floor
                        Los Angeles, California  90071
                   BY:  **JAY THOMAS RAMSEY, ESQ.**




Transcribed by:         Leo T. Mankiewicz, Transcriber
                        leomank@gmail.com
                        (415) 722-7045

<u>Wednesday, January 3, 2019</u>

2:04 p.m.

P R O C E E D I N G S

(Transcriber's Note:  Due to the failure of counsel to identify themselves when speaking on the record, some speaker identifications were accomplished by best guess.)

---o0o---

**THE CLERK:**  Calling civil action C15-1060, Berman versus Freedom Financial Network.

**THE COURT:**  Before you do that, can you -- well, I guess we can call Lottke after.

**MR. FOUGNER:**  Good afternoon, your Honor.  Jon Fougner for the plaintiff and the proposed classes.

**THE COURT:**  Good afternoon.

**MR. RAMSEY:**  And good afternoon, Jay Ramsey for the defendants.

**THE COURT:**  All right, good afternoon.  So, somebody bring me up to date about what's happened since we were last together.

**MR. FOUGNER:**  Well, your Honor will recall that two weeks ago, your Honor found that the keywords that we were asking about were relevant and that the Boolean searches should have already been --

**THE COURT:**  Let me actually, instead of doing it open-ended, let me do it this way instead.  The first thing

1    I had ordered was for their IT professional to get together

2    with your expert to figure out whether this manual review of

3    each registration was going to be required or whether it could

4    be done sort of electronically.  So did that happen?

5              **MR. FOUGNER:**  Your Honor, there was a

6    meet-and-confer yesterday.  When your Honor ordered that, your

7    Honor had invited defendants to produce an affidavit of the

8    burdensomeness of the request, and that of course has not

9    happened.  We did have the call yesterday, but on the call

10   Fluent refused to discuss affiliate payments, which is one of

11   the items that we had discussed in the past hearing --

12             **THE COURT:**  No, no, no, but what about -- I was very

13   clear that unless the office was closed, your IT expert was to

14   get on -- your IT person was to get on the phone with the

15   plaintiffs.

16             **MR. FOUGNER:**  Yes, your Honor, that call happened

17   yesterday.

18             **MR. RAMSEY:**  The office was closed.

19             **THE COURT:**  Nobody was working.

20             **MR. RAMSEY:**  I mean, the General Counsel was

21   working.  He's a lawyer, I guess, but the office itself was

22   closed.

23             **THE COURT:**  Okay.  So the IT professional was on the

24   call yesterday.

25             **MR. FOUGNER:**  He was.  The General Counsel did most

1    of the speaking, but the IT professional was on the line.

2              **THE COURT:**  Okay, and did your -- who was on the

3    call for you?

4              **MR. FOUGNER:**  Our expert who submitted the expert

5    report in this case, and the CEO of his company.

6              **THE COURT:**  Okay, and so did your expert -- was he

7    able to speak with their IT professional?

8              **MR. FOUGNER:**  He was.

9              **THE COURT:**  Okay, all right.  And so were they able

10   to figure out if the review of the registrations to determine

11   which affiliate referred, right, a particular registration,

12   that had to be done manually or not?

13             **MR. FOUGNER:**  Our expert concluded from that call

14   that it does not have to be done manually.  Our expert

15   concluded that there are at least two possible ways that can be

16   done:  One, the entire database be produced and our expert

17   filter it down, or two, Fluent remove it from archive, filter

18   it down, and then produce a filtered version to us.

19             **THE COURT:**  Okay.

20             **MR. RAMSEY:**  I unfortunately was not on the call,

21   but my co-counsel was.  I did get a report about it.  Here's my

22   understanding of this issue.

23             Fluent maintains all data that it -- comes to it by

24   way of these various registrations, it doesn't use all of that

25   data on a day-to-day, you know, business -- doesn't need it

1    all, right, for day-to-day working.  So what it does is it

2    saves all of this data in sort of an archive, and then it

3    extracts to a separate database the stuff that it uses, and

4    it's from that database that we originally produced.

5              So what we're talking about now are items that

6    Fluent doesn't use on a day-to-day basis, and so therefore,

7    it's on this underlying sort of space.

8              It is my understanding that it can't be searched

9    by -- well, yeah, it cannot searched by affiliate, by campaign.

10   If you give us a phone number, say, the phone number of the

11   plaintiff in this action, we can go into that underlying

12   database, look at the phone number, figure out the affiliate

13   that was paid for that line item.

14             And so -- but we can't -- I can't type up, you know,

15   "Freedom Campaign" and have it --

16        **THE COURT:**  No, no, no, I understand, but what

17   about, their expert said you can just produce them -- that data

18   and they'll do the search?

19        **MR. RAMSEY:**  We would have huge objections to that

20   because it is not data related to the Freedom campaign.  It is

21   data for everything that Fluent does.  The size of the database

22   is enormous.  Fluent receives between 800,000 and 1 million

23   registrations a day.  So for one month alone it would be

24   30 million line items.  They're obviously about numerous

25   customers and campaigns unrelated to this case, and all full of

1    information that's not relevant to this dispute, and obviously,

2    it's confidential and private and --

3           **THE COURT:**  Yeah, but we have a protective order in

4    place, so the question is how they can get the data, and you

5    can do a protective order they can't use the other data for any

6    other purpose whatsoever, it has to be destroyed, returned,

7    whatever, but what is the actual production of the database?

8    What does that involve?

9           **MR. RAMSEY:**  We would have to extract, I mean,

10   probably terabytes of data.

11          **THE COURT:**  So what does it involve?

12          **MR. RAMSEY:**  An incredibly involved process.

13          **THE COURT:**  I don't know.

14          **MR. RAMSEY:**  Sure, okay.  So for example, we did --

15   we're going to get to this issue later, but the ESI search

16   terms come up with something like 30,000, 40,000 e-mails.  That

17   cost us, just to get it onto a database so that we could search

18   it, $10,000.  So when you're talking about a database that is

19   infinitely greater in size, the amount of money is going to be

20   enormous.  I can't give you a number right now, I'm sorry, but

21   I just -- from my experience and given -- and it's also going

22   to take us an extreme amount of time to run the searches in

23   Fluent's database.  It took, you know, people had to run it

24   overnight so that it doesn't affect business operations, you

25   know --

1          **THE COURT:**  That's what we do in TCPA cases.  That's

2     what they do.  It's not my first TCPA case.

3          **MR. RAMSEY:**  I would disagree with that, but we

4     can -- we have given the call log and the lead log.  Now

5     they're asking for information that is far beyond that.

6          **THE COURT:**  Well, now this is about the affiliate

7     leads.  So what is it that you want?

8          **MR. FOUGNER:**  Your Honor, it's items in docket

9     number 103, the five bullet points --

10          **THE COURT:**  No, no, no, talk to me.  You had this

11     meet-and-confer call with your expert yesterday and their

12     expert.  What is it that you want as a result of that call?

13          **MR. FOUGNER:**  They've refused to meet and confer

14     with us on almost everything regarding docket 103 on that call.

15          **THE COURT:**  No, I don't care about docket numbers.

16     You just told me that your expert spoke with their expert,

17     right?  About -- this is what the call was about, about trying

18     to figure out what -- because they had said in a previous

19     hearing that there had to be a manual review.

20          So what is it, after now you've had your call and

21     your expert -- your expert -- says they can do what?  What is

22     it that you want?

23          **MR. FOUGNER:**  They can pull this entire database out

24     of archive, and once it's pulled out of archive, it can be

25     queried in SQL, and so either we can query it in SQL or they

1   can query it in SQL.

2            If they don't want to produce all these irrelevant

3   logs, which we think is a reasonable point of not wanting to

4   produce that, then it's as simple as them performing the query

5   to filter those out.  But they want to have their cake and eat

6   it too and neither produce the whole kit and caboodle nor do

7   the modest amount of work necessary to call it down.

8            **THE COURT:**  Would you be willing to pay for the cost

9   of producing the database?

10           **MR. FOUGNER:**  We're happy to meet and confer with

11  them about that and figure out what costs they're quoting us,

12  but our experts have absolutely dealt with databases this size

13  many times before, terabytes, absolutely.

14           **THE COURT:**  And what does he say or she say it would

15  cost or what it would involve?

16           **MR. FOUGNER:**  We don't have a quote from them on it.

17           **THE COURT:**  Okay.

18           **MR. FOUGNER:**  Because money was not raised by the

19  defendants on the call yesterday.

20           **THE COURT:**  Okay.

21           **MR. RAMSEY:**  May I?

22           **THE COURT:**  Yeah.

23           **MR. RAMSEY:**  Another alternative that we proposed is

24  that we be given a sample of some amount of numbers, so that we

25  can grab the data for those numbers.  I mean, to me, that's far

1    less costly.  It also doesn't get into any of the issues.

2    I mean, they have the entire lead log, right, with all the

3    numbers that are involved.  They can go and pick, you know, 50

4    of them or something, and we can go find -- grab that

5    information for those 50.

6              **THE COURT:**  Well, that's the manual review.

7              **MR. RAMSEY:**  Well, yeah, but that, obviously --

8    I mean, a lead log, you know, is hundreds of thousands, is

9    obviously very burdensome if we had to do a manual review for

10   each one, but if we're talking about a sampling, which, you

11   know, if you're looking at Rule 26 proportionality and needs of

12   the case and class certification, you know, in our view, it

13   would be --

14             **THE COURT:**  Well, 50 would be way too small.

15             **MR. RAMSEY:**  Okay, well, but we could talk about

16   some number, and we proposed that -- we haven't -- you know,

17   it's basically all or nothing.

18             **THE COURT:**  Well, for both sides, that's pretty much

19   what it's been throughout the case, but --

20             **MR. RAMSEY:**  Well, I mean, we're willing to do a

21   sampling, but we haven't -- we can get a number from them.

22   They just want everything.

23             **MR. FOUGNER:**  Your Honor, if I may respond to a few

24   of those comments?

25             **THE COURT:**  Um-hum.

1          **MR. FOUGNER:**  So first, I think it's worth

2     reflecting on the Fluent claims to acquire a million leads a

3     day.  In our expert's opinion, that's quite extraordinary and

4     quite suspicious, and our expert is prepared to submit an

5     affidavit to that effect.

6          **THE COURT:**  Well, so let's say it's 100,000 leads a

7     day instead of a million.  It's still a lot.

8          **MR. FOUGNER:**  This is all structured data, so it's

9     not images or anything like that, and so structured data is

10    extremely efficient to store.

11         And in terms of the all-or-nothing point, I have to

12    say, we have constantly been willing to meet and confer about

13    compromises on this.  We're willing to let them either produce

14    the whole database or filter it down, but if they're not even

15    willing to meet and confer with us about 90 percent of the

16    items, it's really hard to make progress.

17         **MR. RAMSEY:**  I'm sorry, I need to comment on that.

18    When he says that --

19         **THE COURT:**  You know what we're going to do, going

20    forward?  Your meet-and-confers are going to be recorded.

21         **MR. FOUGNER:**  Excellent.  Thank you, your Honor.

22         **THE COURT:**  So then you guys -- you know, so that

23    I can actually hear them instead of you tell them, and I know

24    what, you know --

25         **MR. RAMSEY:**  Can I make one comment on that?

1       **THE COURT:**  Yes.

2       **MR. RAMSEY:**  He's saying we're not meeting and

3   conferring about all of the issues, and it's the same issue.

4   He's asking for, you know, five or six data points for each

5   thing.  They are all on that database.  So when we had a

6   discussion about one of the data points, that applies to all of

7   them.  It's not like --

8       **THE COURT:**  Right.  So I guess what I don't

9   understand is, they say that you can do the query, so that --

10      **MR. RAMSEY:**  No, they're saying we have to download

11  the database, put it on a different system that would allow us

12  to search it.  It is not currently searchable.

13      **THE COURT:**  Okay, you agree with that?

14      **MR. FOUGNER:**  That was what we were told yesterday.

15      **THE COURT:**  Okay, so then -- but you can't tell

16  me -- but you don't know what that would involve.

17      **MR. RAMSEY:**  Well, it would involve downloading a

18  huge amount of data, uploading it into a system that would

19  allow you to search it.

20      **THE COURT:**  Right.

21      **MR. RAMSEY:**  I don't know the cost of that data.

22  I just know from experience that these things cost a lot of

23  money; and especially when you can do a sampling -- well, they

24  have the leads log, lots of information that they need for

25  class certification, and if we can do a sampling on this and

1    they can make a showing after that sampling that they need all

2    of it for all of them, I think that is more -- a more

3    appropriate approach.

4              THE COURT:  Well --

5              MR. RAMSEY:  What do they need this information for?

6    I've never heard of that.

7              THE COURT:  Well, we discussed that last time, but

8    why wouldn't some sampling be the way to start?  I understand

9    about the deadline, but we can work with the deadline.  Why

10   wouldn't a sampling approach -- since you have -- right? -- you

11   can see which ones are the suspicious-looking ones to begin

12   with, and you can give them whatever number -- we can talk

13   about a number to begin with, and if those sort of bear out

14   your theory, then they're sort of left with a choice, which is

15   to either stipulate that that sample is representative or

16   they're going to have to produce everything.

17             MR. FOUGNER:  Well, so two reasons.  One, your

18   Honor, the ultimate class definition may very well end up being

19   key to leads having been provided from a particular affiliate.

20   So we would need to know all of the leads that came from that

21   affiliate.

22             THE COURT:  Well, you may need to know that

23   eventually --

24             MR. FOUGNER:  Yes.

25             THE COURT:  -- but not necessarily for class

1    certification, and remember, I'm talking about an iterative

2    process.  So, okay, so I understand that.  Absolutely, you may

3    need to have it all to identify the class, right?

4              **MR. FOUGNER:**  So we asked -- I asked yesterday on

5    the meet-and-confer, the IT meet-and-confer, whether there is a

6    database that simply shows which affiliates were paid for which

7    leads, and counsel for defendant did not allow Fluent's General

8    Counsel to answer that question, but nevertheless Fluent's

9    General Counsel did say that a database does exist, and there

10   is zero evidence in the record that there's any burden

11   whatsoever in producing it, and our expert is prepared to

12   submit an affidavit --

13             **THE COURT:**  To produce what?

14             **MR. FOUGNER:**  The structured data of which

15   affiliates were paid for which lead, systematically, for the

16   full 750,000-person class size.

17             So to actually do a reasonable sample -- let's say a

18   reasonable sample would be 50,000 -- that would actually be

19   more work than simply doing it at scale and having the

20   computers do it.

21             **THE COURT:**  I don't know what to do other than,

22   frankly, to order your IT people to come here.  I mean, because

23   what do you expect me to do, right?

24             **MR. RAMSEY:**  Well, if I may, one minor point, just

25   so I want to make sure that he knows this in case we're

1    operating under a different understanding of the facts.

2                He keeps referring to leads provided by affiliates,

3    as if the lead is the one entering the registration

4    information.  Affiliates in this instance are paid for people

5    who land on the page.  They're not paid for people who land on

6    the page and then complete the registrations.

7                And I want to be clear about that, because there

8    appears to me that their theory is that these affiliates are,

9    you know, junk affiliates providing junk leads, but that's not

10   how they're paid, and so the affiliate doesn't have to provide

11   the lead all the information -- right? -- the name, the phone

12   number, so on, in order to get paid.  All they have to do is

13   get the person to the website.

14               Anyway, so I don't know that that will affect

15   anything that he does, but I just want to be clear about that,

16   because in our view, this whole affiliate thing is not -- it's

17   sort of a red herring, because yes, if we're paying affiliates

18   for, like, give me your list of things that you went out and

19   got, right, I get that.  Like, give me this list of phone

20   numbers.  It's not the problem.  All they're doing -- that

21   could be a problem.

22               All they're doing, though, here is they're getting

23   them to the websites, and then those people have to fill out

24   Fluent's website.  It's only after they do that and go through

25   Fluent's system that they get on the lead list.  That is

1  ultimately the part that sticks.

2        **THE COURT:**  But you're saying they just get paid for

3  viewing the website page?

4        **MR. RAMSEY:**  Yes.  So if an affiliate is out there

5  and there's a button on there, their page says, you know,

6  "Fluent.com," let's say, and that that that person clicks that

7  and it gets to Fluent.com, they're paid.  They then have to

8  fill out pages and pages of interview questions.  It takes,

9  like -- I mean, you can go do this right now on the website.

10  It takes, like -- it takes multiple minutes in order to do

11  this.  It's not like you just put a name and phone number and

12  click a button and you're done.

13        I don't know if I'm explaining this very well, but

14  that's why we view this whole affiliate thing as just not

15  probative of anything.

16        **THE COURT:**  Okay, I don't know if you had heard that

17  before.

18        **MR. FOUGNER:**  I have, your Honor, and it's

19  interesting, my mind is racing at all the manner of mischief

20  affiliates would create if the threshold for their compensation

21  is so low that all they have to do is cause some browser to

22  show up at the website.

23        As far as the time taken to complete a given

24  registration flow, we have some of the data from the

25  declarations submitted by defendants in this case, and

1  oftentimes it is very, very quick, less than two minutes, which

2  could be a person, could be a bot.  Who knows?

3         **MR. RAMSEY:**  A bot would get through in about two

4  seconds.

5         **MR. FOUGNER:**  Well --

6         **THE COURT:**  I don't know why that matters, but the

7  argument as to why you need the affiliate information is

8  because they may know, or the affiliates -- or you may find

9  that a particular affiliate or affiliates are providing the

10  inaccurate -- the registrations are inaccurate, and that would

11  give rise to the defendants being aware that the leads that

12  they're getting are for the most part not real leads, is that

13  right?

14         **MR. FOUGNER:**  Yes, your Honor.

15         **THE COURT:**  And what he's saying is that....  Well,

16  I'm still wondering why the sample -- I mean, I guess my whole

17  idea of having the people talk didn't seem to resolve anything.

18         **MR. FOUGNER:**  Your Honor, it's really hard to know

19  how to be productive when defense counsel refused to meet and

20  confer on the majority of the bullet points in the relevant

21  item.  And even with respect to --

22         **THE COURT:**  Well, the ITs were supposed to talk

23  about not the bullet points, but about what was technologically

24  feasible.

25         **MR. RAMSEY:**  And that was in --

1      **MR. FOUGNER:**  Right, and that's what I'm referring

2  to, the technological feasibility in producing these items,

3  click streams, exit URLs, error logs, site and server stability

4  metrics.  Defendants simply refused to discuss.

5      It.  Defendant refused to discuss it, and even with

6  respect to the refer URL, which is -- all parties agreed would

7  be discussed on that call, and it appears in the transcript in

8  docket number 121 -- even with respect to that, defendants'

9  counsel refused to allow a discussion of how that information

10  gets into the SQL database as depicted in docket number 16-1,

11  which is where Fluent first, perhaps regrettably in its opinion

12  now, revealed that it has this information in the structured

13  database, easily queried.

14      **MR. RAMSEY:**  I'm sorry, I -- (inaudible).  Yes, your

15  Honor.  It's all on that underlying database.  So really what

16  we're talking about now is, are we going to transfer the whole

17  thing or do a sampling.  I don't -- we'll argue that sampling

18  is more appropriate.

19      **THE COURT:**  Well, I just don't know what the

20  transferring the database involves, right?  That's the problem.

21      **MR. FOUGNER:**  It could just be done via FTP.  It's

22  just like --

23      **THE COURT:**  I don't know what that is.

24      **MR. FOUGNER:**  It's just like downloading an e-mail

25  from your gmail, except it's an extremely large attachment,

```
1    but --
2              THE COURT:  And so how long will it take and how
3    much would it cost?
4              MR. FOUGNER:  Well, obviously, I'm not an expert,
5    but I would be shocked if it takes more than a day to download.
6              MR. RAMSEY:  Well, it's -- I mean, and we could
7    obviously provide more information in that by way of
8    declaration about costs and --
9              THE COURT:  No, we're not going to do it by
10   declaration because that's taking too long.  So the way we're
11   going to do it is they're going to have to come here.  Maybe we
12   can do it by phone.
13             MR. RAMSEY:  But can I just say, those IT people
14   aren't going to know.
15             THE COURT:  Well, who knows?
16             MR. RAMSEY:  An e-discovery firm.  These IT people
17   don't download huge databases.  They don't do this.  They do
18   day-to-day things for the business, right?  So we're talking
19   about --
20             THE COURT:  Well, so do you have any discovery firm
21   for this case?
22             MR. RAMSEY:  Yes, we had to do this for all of the
23   e-mails.  So I can talk to them.  I need the size of the
24   database, so on and so forth.  So that's something we can do.
25             THE COURT:  But you haven't done yet.
```

1      **MR. RAMSEY:**  No, because it's our view downloading

2    the entire database is not even close to appropriate.

3           **THE COURT:**  But I don't know how you can say that

4    when you don't know what it involves.

5           **MR. RAMSEY:**  Because it includes an amount of data

6    that is completely irrelevant to this case.

7           **THE COURT:**  But they say then that you can search

8    it.

9           **MR. RAMSEY:**  Well, no, they don't say that.  They

10   say you have to download it before you can search it.

11          **THE COURT:**  Yes, and then you can search it, so that

12   you don't include that data that you don't want to produce.

13          **MR. RAMSEY:**  Yes, for that I don't know the price.

14          **THE COURT:**  Right, that you don't know how to do

15   that.

16          **MR. RAMSEY:**  And then we have cost issues and who's

17   going to pay for it and whether they really need to do that.

18          **THE COURT:**  Well, what we could do is we could split

19   the cost and then we see how important it is, you know --

20   I would be inclined to think about that, because it is on

21   the -- you know, you do have the call logs.

22          **MR. FOUGNER:**  Your Honor, given the defendant's --

23   in particular Fluent's -- refusal to meet and confer about

24   these topics --

25          **THE COURT:**  I don't know that.  I don't know that.

1   I know you keep saying that, but I don't know that.  Right?

2          **MR. FOUGNER:**  Right, your Honor.  We would suggest a

3   site inspection.

4          **THE COURT:**  Well, I wondered about that.

5          **MR. RAMSEY:**  To do what?

6          **THE COURT:**  Well, you mean that your expert would

7   go --

8          **MR. RAMSEY:**  Fuss around on our computers?

9          **THE COURT:**  No, no.  That's like my least favorite

10   case.

11          **MR. RAMSEY:**  (Laughs).  Well --

12          **THE COURT:**  Just being candid with you.

13          **MR. RAMSEY:**  It's also mine.

14          **MR. FOUGNER:**  I appreciate the feedback, your Honor.

15   (Laughter).

16          **THE COURT:**  I'm really just trying to work with you

17   and trying to figure this out.  I think what we need to do is,

18   and it should have been done before, is get your e-discovery

19   whoever firm that's on there and, you know, if we want, we can

20   do it tomorrow afternoon.  We'll set up a call, and I'll be

21   listening in, and that should alleviate the plaintiff's

22   concerns about your not really meeting and conferring, and you

23   can have -- everyone can have that conversation again, and I'll

24   be listening in, so nobody can refuse to meet and confer and

25   nobody can claim that someone has refused to meet and confer

1    when they have, in fact, met and conferred, because I'll be

2    listening in.

3            Why don't we do that tomorrow afternoon?  You have

4    to contact them.

5            **MR. FOUGNER:**  So, your Honor, I'm in an deposition

6    all day tomorrow, but I believe that my co-counsel would be

7    happy to do that.

8            **MR. RAMSEY:**  I always don't -- the e-discovery firm

9    isn't going to know the size of the database, how long it takes

10   Fluent to download it, what Fluent's -- I mean, there needs to

11   be some discussion there before there's any --

12           **THE COURT:**  Yes, that's why we'll do it in the

13   afternoon.

14           **MR. RAMSEY:**  Okay.  I just can't promise that

15   they're going to know that information at the time.

16           **THE COURT:**  Well, but they'll have to -- I wanted to

17   try to gather that information in time.  This is all what was

18   supposed to have happened already.

19           **MR. FOUGNER:**  Well, I couldn't agree with you more,

20   your Honor, and I'd also point out there's simply no evidence

21   in the record that Fluent's IT people are not competent to

22   assess a transfer of this data.  First of all, they do it every

23   three to four weeks when they --

24           **THE COURT:**  I don't know, I don't know, and I don't

25   know.  I have to tell you guys, what you say, none of you, is

1    evidence of anything.

2            **MR. FOUGNER:**  Of course.

3            **THE COURT:**  And I don't know.  I just don't know.

4    So I'm trying to get straight to the source's mouth.  So let's

5    do a call -- where are they?

6            **MR. RAMSEY:**  Well, Fluent's in New York.  I -- I

7    mean, the IT people are in here -- er, not the IT people,

8    excuse me.  The e-discovery firm, I believe, is in California,

9    the person that we've been dealing with.

10           **THE COURT:**  Well, if we did it later in the day,

11   because they will have just talked with Fluent earlier in the

12   day.

13           **MR. RAMSEY:**  Hopefully.

14           **THE COURT:**  Yeah, so --

15           **MR. RAMSEY:**  I don't know that the right people are

16   at Fluent.  So we will do our best, but I can't --

17           **THE COURT:**  We can have the call at 3:00 p.m. and

18   then you can tell me if this is -- see, I'm not here this week,

19   which is why I want to do it -- that's why I'm pressing you on

20   tomorrow, but I want to have a call at 3:00 p.m., because

21   I just don't know, and we could go through declarations, that's

22   just going to waste time.  So let's just all get on the phone

23   with me.

24           **MR. RAMSEY:**  Okay.

25           **THE COURT:**  And then we'll have this conversation

1   and figure out what it would involve.

2          But as you understand, and what I want the data firm

3   to understand is, all they want to figure out is, for any

4   particular registration, who the lead came from, right?

5          **MR. FOUGNER:**  Yes, your Honor, the referring URL and

6   the business that was paid for it.

7          But to clarify your Honor's question, is your Honor

8   asking whether we are asking about other server-level data from

9   Fluent?

10         **THE COURT:**  No -- what?

11         **MR. FOUGNER:**  When you say, all we're interested in,

12  just to be clear, we believe that the items in docket

13  number 103 are all appropriate for discovery and production, so

14  that's the security and fraud alerts, the performance logs, the

15  destination URL.

16         **THE COURT:**  Right, but I'm talking about what we had

17  talked about at the last hearing was initially was -- the

18  initial thing was about, you wanted to know these affiliate

19  leads.

20         **MR. FOUGNER:**  Yes, your Honor.

21         **THE COURT:**  I'm taking it one step at a time.  So

22  that's where I want to figure out.  Okay, all right.

23         So now let's go to number 2, then, which was the

24  e-mails -- the first thing what I had said was, I wanted to get

25  together to see if it requires manual review, and if it did,

1   you should stipulate to some sort of sample, but if it didn't,

2   then you can do it.  But we don't have an agreement on whether

3   it requires manual review or at least whether the non-manual

4   review would be too expensive or burdensome.  So that's what

5   we're going to try to figure out at 3:00 o'clock tomorrow.

6           Okay, then the next thing was, e-mails with hit

7   counts, needing to search the e-mails.

8           **MR. RAMSEY:**  So a lot has been done on this.  I do

9   think we are at -- we need a little bit of guidance, and to me,

10  there are basically two issues that we would, at least in my

11  view, would like your thoughts on.

12          The first is, we're coming up with search terms

13  going back and forth.  Plaintiffs have said that once we come

14  up with whatever search terms we ultimately use, that they just

15  want all of the documents, without any type of review from us

16  beforehand, except for a privilege review.

17          In our view -- I mean, I've never in my life done

18  that.  We would go through and review the hit counts, the

19  documents, and then produce those -- produce those documents

20  that are representative, er -- responsive, excuse me.

21          So that's sort of one issue:  Is it the search terms

22  and they get everything, or we review?  Because that obviously

23  affects a lot of things.

24          The second thing is burden, and burden, to me, comes

25  down to, we're running search terms in different combinations

1   and how many documents come back, and that -- that comes under

2   the number of documents.  I think we're going back and forth on

3   sort of what the right number of documents are, and then, you

4   know, to the extent it's more than that, you know, who's going

5   to pay for it or share in the cost of that.

6          So it's sort of those two issues.  In our view, we

7   would be reviewing -- you know, we'd run search terms, we would

8   then review the documents for responsiveness and produce that

9   are responsive, and then on the burden issue, we have proposed

10  that, you know, we work on search terms to get to a point where

11  there's, you know, roughly 5,000 documents to review.

12         **THE COURT:**  So then it would be even less actually

13  produced, because if you're going to pull out the nonresponsive

14  documents --

15         **MR. RAMSEY:**  Yes, of course, yes.

16         **THE COURT:**  Okay, so that doesn't -- what matters

17  is, what do those hits turn up, right?  You have to pull up,

18  see, look at this nonresponsive document, right?

19         **MR. RAMSEY:**  Uh-huh.

20         **THE COURT:**  Let's now add another search term so we

21  can eliminate this whole category of nonresponsive documents.

22  That's the way the process is supposed to work.

23         **MR. RAMSEY:**  Sure.  So in -- it is, but in practice

24  that's incredibly difficult because it requires reviewing every

25  document to figure out what's not responsive and how to craft a

```
 1   search term --

 2             THE COURT:  No, it doesn't.  You start -- you run

 3   your search terms and you start looking at it, and you find

 4   some that are nonresponsive, right?  You don't have to look at

 5   every one, and you say, oh, we're going to get this whole

 6   category of nonresponsive documents.  We can eliminate this

 7   category by adding AND this, or NOT this --

 8             MR. RAMSEY:  Sure.

 9             THE COURT:  -- or something.  And then you run it

10   again.  Now your number, your universe, has gone down.  Right?

11             MR. RAMSEY:  Um-hum.

12             THE COURT:  So then you start reviewing again.  You

13   say, oh, I'm getting all these other nonresponsive documents.

14   So then you modify it again --

15             MR. RAMSEY:  I mean, I'm not disagreeing with that,

16   but I think the initial review should be, you know, roughly

17   5,000 documents.  I mean, we've done --

18             THE COURT:  Based on what?

19             MR. RAMSEY:  We've done some --

20             THE COURT:  Based on what?

21             MR. RAMSEY:  Based on the number of hours that

22   that -- well, okay, let me back up.  We have produced a

23   considerable amount of ESI, so this is not a case where we're

24   coming out of this empty.  We've produced all the ESI about the

25   campaign itself.  So now what we're talking about is other --
```

1    other documents, which -- and we can get into this later --

2              **THE COURT:**  We're talking about e-mails here.

3         **MR. RAMSEY:**  Well, that's what I'm saying.  We've

4    produced e-mails about the campaign.  We've also produced the

5    lead logs and the consent flow process, and then a TCPA paste,

6    that's the core of it.  So really what we're talking about is

7    other stuff now, so, you know, we're sort of lower on the

8    probative scale and now we're balancing that against burdens

9    and in our view, you know, getting search terms down to roughly

10   5,000 is the appropriate number.

11             If, after we do the review and production of those

12   documents, the documents that are produced reveal, you know,

13   additional searches that may be run or documents that seem to

14   be coming up there should be more of, then we can, you know,

15   run additional searches.  But that's what our proposal is.

16        **THE COURT:**  Well, what are the search terms that

17   you've agreed to?  Have you agreed to custodians?

18             **MR. RAMSEY:**  It's an incredibly long list.

19        **THE COURT:**  Have you agreed to custodians?

20        **MR. FOUGNER:**  So, your Honor, we have agreed to

21   custodians for Drips, because Drips has the least sophisticated

22   ESI system, so they need custodians.

23             For Fluent and Freedom, they both have sophisticated

24   ESI systems, and so a master search can be run across all

25   custodians.

1    **THE COURT:**  Okay.  All right, and so what are the

2    terms that are coming up that you're getting a lot of hits?

3    **MR. RAMSEY:**  Sure, the largest is TCPA, or Telephone

4    Consumer Protection Act.

5    **THE COURT:**  Okay.

6    **MR. RAMSEY:**  We've then -- we've been going back and

7    forth about how to sort of narrow that.

8    **THE COURT:**  Yeah, what's an example of a hit that

9    you get that's nonresponsive?

10    **MR. RAMSEY:**  Well, I mean, Fluent could have an

11    e-mail that says we, you know -- I mean, it can have in its

12    e-mail signature line the word "TCPA."  I don't --

13    **THE COURT:**  Well, I guess, I mean, is it not

14    possible to, like, just look at one of them?

15    **MR. RAMSEY:**  It is.  We just got to the point to do

16    that.  It cost $10,000 and almost a week and a half to get all

17    the documents off the database onto our system.

18    **THE COURT:**  Okay.

19    **MR. RAMSEY:**  And we don't even yet have Lead

20    Science.  We have Fluent's and Freedom's.

21    **THE COURT:**  I guess what I'm saying, I hear what

22    you're saying, that if it's, like, in the signature line, that

23    would be nonresponsive.  So look and see, it's in the signature

24    line, so we need to -- so "TCPA" by itself is too broad, right?

25    **MR. RAMSEY:**  I understand, but we've gone back and

1    forth on that already and now it's TCPA within 10 of a whole

2    slew of terms.

3            **THE COURT:**  Okay.

4            **MR. RAMSEY:**  I guess the point is, we're going back

5    and forth on this, but we disagree about, you know, what's the

6    ultimate number that we're aiming for here.  Because they also

7    don't want, you know, a slew of documents that are, you know,

8    not about the case.

9            **THE COURT:**  So what are you down to now?

10           **MR. RAMSEY:**  The most recent was 12,672 for Freedom,

11   15,832 for Fluent.  So what is that, 28,000?

12           **THE COURT:**  Are these separate e-mails or pages or

13   what is that?

14           **MR. RAMSEY:**  These are documents, and so when the

15   e-mail -- so I should back up.  So when you run the search

16   term, it will pull back only documents that it hits.  So if you

17   have an e-mail with three attachments but the search term is

18   only in the e-mail, for example, but they have three

19   attachments, you're up to four documents.

20           So the numbers I gave you are -- we call that "with

21   family."  So e-mails with families, total documents, so that's

22   not pages, it's vastly more pages but, you know, you're on a

23   computer, so it's 12,600.  Those are document counts.

24           So we're roughly at 28,000 with Freedom and Fluent.

25   With Drips, the initial hit counts I don't remember, I'm sorry,

1  but we just got a revised search and haven't been able to run

2  that yet, so I can't give you have those numbers.  But Drips,

3  I think both sides are expecting Drips to be the smallest.  So

4  really, Fluent being the largest, Freedom being number two, but

5  close.

6      **THE COURT:**  I guess I don't really now how to do it

7  without, like, randomly looking at some of the documents so

8  that you can actually make an educated decision as to, oops,

9  we're getting this whole swath of nonresponsive documents.

10     **MR. RAMSEY:**  Yeah, I just -- and this is me talking

11  from experience, doing that -- you have to review an enormous

12  amount in order to do that; because I could review 500

13  documents from one custodian, and he may have -- he or she may

14  have one type of document that's causing a bunch of problems,

15  but that may not actually be the issue.  It may be some other

16  issue in some other custodian's documents.

17      And by the way, we've already de-duped anything, so

18  you're not getting duplicates across custodians, and we've also

19  had the system -- what's called de-threading.  So you have an

20  e-mail chain that's 50 long, it's only going to pull the last

21  one, or any interim e-mail in that chain that attached

22  something.  So we're trying to narrow it to -- I can't remember

23  the term -- unique documents.

24      **THE COURT:**  What's your proposal?

25     **MR. FOUGNER:**  Your Honor, we have kept our promise

1    to always get back to them within one business day on any of

2    their keywords.  We've done that twice so far, but I think your

3    Honor hit the nail on the head in focusing in on these false

4    positives, and we've received a series of false positive

5    exemplars from them and only one false positive keyword, which

6    is the keyword "bot," because you get to "both" and things like

7    that.

8           We immediately agreed that it was over-broad.  We

9    immediately agreed to narrow it.  You know, our proposal is

10   reflected in the keywords we've sent back to them.  I can read

11   you the latest set.

12          **MR. RAMSEY:**  It's incredibly long.

13          **THE COURT:**  No, don't -- please don't.

14          **MR. RAMSEY:**  I have it, if you want.

15          **MR. FOUGNER:**  If you want it, sure, but at a broader

16   level here, I think it's important -- I think my opposing

17   counsel hit on a few key points where we do need your Honor's

18   guidance.

19          One, so this question of whether defense counsel

20   should also perform a -- their own subjective review --

21          **THE COURT:**  No, I mean, the point of doing the

22   keywords is so that you get the responsive or as close to the

23   responsive documents as possible.  I mean, a privilege review

24   is a different matter, and you can do that, and I think they

25   proposed to do that by giving the names of the lawyers and

1  excluding all the --

2      **MR. RAMSEY:**  Yeah, that's obviously -- but to do

3  that process that we're contemplating requires review of the

4  documents.  So you either get the search terms down to a number

5  and review them all and then produce them, and then if there

6  are further searches after the documents are actually

7  produced....

8      Here's my thing.  We're going to go through this,

9  and my bet is that he -- plaintiffs are going to find one or

10  two documents that they use that aren't even the most important

11  documents, because we've already sent them everything about the

12  campaign and we've already given them the lead log, which is

13  what the TCPA case is about.

14      And so in my view, we should review 5,000; we will

15  produce those documents that are responsive.  In that review,

16  we can talk about false positives and, you know, better

17  searches, because now we'll have documents that are responsive,

18  and if there is a further need for more searches and more

19  documents, we'll have something to talk about, because right

20  now, we're sort of all flying blind.

21      **THE COURT:**  All right.  Okay, so you're not

22  proposing that be the outer limit, it sort of be the initial,

23  and let's see if there's any reason to do more.

24      **MR. RAMSEY:**  Yes.  I mean, it may become the outer

25  limit, because it becomes --

1          **THE COURT:**  No, no, no, I understand.  I understand.

2          **MR. FOUGNER:**  So Judge, just to be crystal clear, so

3    all three of us are on the same page, your Honor is saying that

4    once we have agreed on this initial set of keywords based on

5    both the quantitative analysis as well as the qualitative

6    analysis exemplar false positive, that there shall be no

7    additional document-by-document subjective review for relevance

8    by defense counsel; is that correct?

9          **THE COURT:**  They should just submit -- they should

10   just produce those 5,000 documents --

11         **MR. FOUGNER:**  Right.

12         **THE COURT:**  -- that you narrowed it down to.

13         **MR. RAMSEY:**  Well, that's my point.  We need to

14   review those 5,000 in order to come up --

15         **THE COURT:**  Well, you can review them at the same

16   time that they're reviewing them.

17         **MR. RAMSEY:**  Right.  Especially given the time lines

18   here --

19                    (Simultaneous colloquy.)

20         **THE COURT:**  What?

21         **MR. FOUGNER:**  I don't know that we can agree to

22   that.  There are documents that are going to come up that are

23   not relevant to the case --

24         **THE COURT:**  Okay, but that happens all the time.

25   That happens all the time --

1    **MR. RAMSEY:**  I have never in my life produced

2    documents without reviewing them first.  Not once.  And I've

3    litigated --

4            **THE COURT:**  That's how we --

5            **MR. RAMSEY:**  This is the first time I've done ESI

6    like this in a TCPA case.

7            **THE COURT:**  Well, I can tell you that lawyers will

8    actually produce documents without even doing privilege

9    reviews --

10           **MR. RAMSEY:**  Well, that's right.

11                        (Laughter.)

12           **THE COURT:**  -- because they'll do a Rule 502, Rule

13    of Evidence 502 clawback provision, because it's less expensive

14    that way.

15           **MR. RAMSEY:**  I know, but that's incredibly

16    dangerous.

17           **MR. FOUGNER:**  Your Honor, if memory serves, we have

18    proposed an ESI order to opposing counsel with maximum clawback

19    under the FRE and the --

20           **THE COURT:**  Well, I'm not going to -- I would never

21    impose a Rule 502.  I'm just saying, counsel said he's never

22    even produced a document without reviewing it, and -- if it

23    were relevant, and I'm saying lawyers do it all the time, even

24    without reviewing for privilege.  So --

25           **MR. RAMSEY:**  Well, I'm just -- (inaudible).

```
 1            THE COURT:  -- and I've never seen it come back and
 2   bite.  Anything that saves their clients a lot of money, but
 3   what I am concerned about doing is because we are talking about
 4   the edges here, right?  We're not -- we're talking about, the
 5   edges e-mail is not the heart of your case, in the sense --
 6            MR. FOUGNER:  You may be right.  I don't know.
 7            THE COURT:  -- but how do we get there in a way
 8   that's reasonable, right?  So, like, what are -- but it's hard
 9   for the plaintiff even to do that and propose responses when
10   you're not telling them sort of an example.  Like, just start
11   reviewing, review a hundred of them.  I don't get that I have
12   to review every page before I can tell you, let's try adding
13   this.  I mean, you did.  You told them "bot" came up too much,
14   right?
15            MR. RAMSEY:  Well, and we also did leads, saying
16   there was one --
17            THE COURT:  Right.  So I don't understand why you
18   can't continue with that process.  Now, I, perhaps -- narrowing
19   it down to 5,000 is a good place to start.
20            MR. RAMSEY:  I do want to say that we did recommend
21   a search that does that.  I haven't reviewed those documents,
22   so I can't tell you if there's a slew of hot positives -- what
23   is that word?
24            THE COURT:  Hot...?
25            MR. RAMSEY:  No, there -- I'm sure it's not that.
```

1    False positives.  But we are -- I don't want there to be a

2    thought that there's not a back-and-forth right now.  There is,

3    but the general plan -- where we're at right now is sort of

4    this concept of, how much.

5         THE COURT:  Right, but the thing is, but -- there's

6    how much, but then you also wanted -- the point of doing the

7    search terms is to get the responsive documents.  It's to get

8    the responsive documents, because see, the problem is, what you

9    think is responsive is going to be different from what the

10   plaintiff thinks is responsive.  That's part of what their

11   concern is.

12        That's perfectly normal.  Of course that's going to

13   be.  And so that's why you actually use search terms, so you

14   can find these documents.

15        So I think if you can narrow it down --

16        MR. RAMSEY:  So can we talk about what's responsive

17   or not?

18        THE COURT:  Well, okay.

19        MR. RAMSEY:  Information about other clients.

20   Information about other campaigns.

21        THE COURT:  No, I read --

22        MR. RAMSEY:  Information about marketing cam- --

23   e-mail marketing.

24        THE COURT:  Well, I went back and read the

25   earlier -- Judge Gonzalez Rogers' transcripts, and she was

1    pretty clear that it should be related to Freedom campaigns.

2            MR. RAMSEY:  Okay, well, in that case, the search

3    terms are pulling tons of stuff.  Right?

4            MR. FOUGNER:  Your Honor, I think we're in agreement

5    with opposing counsel that e-mail marketing is not relevant.

6            THE COURT:  Okay.

7            MR. FOUGNER:  I don't recall that exact context of

8    that comment from the district judge.  I'd be happy to review

9    that transcript.  I've ordered it and I have it in my

10   possession.  But the fact is, the entire gist of the defense in

11   this case is that Fluent has such a systematic lead generation

12   process that it's infallible, that Fluent believes in it so

13   much that it has a patent pending on it, and if all of that is

14   true, then the trials and tribulations of that process, as

15   manifested in campaigns for other clients, are still relevant

16   to this case.

17           THE COURT:  No, what matters in the first instance

18   is what happened with the Freedom campaign.

19           MR. FOUGNER:  Certainly, your Honor.

20           THE COURT:  If it -- and if it was perfect, then it

21   doesn't matter what happened to everyone else, and if it was

22   imperfect, then you got your evidence that it was imperfect,

23   and they can't use evidence from their other campaigns.

24   Remember, anything they don't produce, they can't use.

25           MR. RAMSEY:  Well, if I can jump in, then, if we're

1    going to limit it to Freedom, then -- I mean, those search

2    terms -- first of all, we say we produced all of those

3    information.  Obviously, you know, there could be a random one

4    out there, so that's why we're doing this process, but if we're

5    going to narrow it to that, then we're going to have to go back

6    and this is going to have to be very different.

7        THE COURT:  Let me see.  I read -- went back and

8    read the transcript, and she was talking about summary judgment

9    and because the plaintiff was contacted by Freedom --

10       MR. FOUGNER:  By Drips and Fluent on Freedom's

11   behalf.

12       THE COURT:  Right.

13       MR. FOUGNER:  Could your Honor tell us which

14   document number you're looking at?

15       THE COURT:  No, because I don't know.  My internet

16   has stopped.  I have a meeting at 3:00 o'clock, so I'm going to

17   have to run, but we're going to talk again tomorrow at 3:00,

18   but we'll do it by phone.

19       THE CLERK:  Shall I just e-mail the -- (inaudible).

20       THE COURT:  In any event, I don't know why we

21   shouldn't start there.

22       MR. FOUGNER:  Your Honor, with respect to defense

23   counsel's position that all documents relevant to that campaign

24   have been produced, our discovery request for documents, even

25   relevant to that campaign, all received objections.  They all

1    still have objections pending on them.  So we have not received

2    any supplemental discovery requests.

3            THE COURT:  But I'm not talking about the particular

4    Freedom campaign.  I'm talking about campaigns on behalf of

5    Freedom.

6            MR. FOUGNER:  And I understand, your Honor.

7            THE COURT:  Right?  Right?  Because there were

8    other -- I understood there were other campaigns that maybe

9    didn't sweep it, but if they were by Freedom, within the class

10   period, I think that would be encompassed.

11           MR. FOUGNER:  I understand, your Honor.  I would

12   just point out that the core ways in which Fluent and Drips do

13   business, the way they build their machines of sweepstakes

14   websites or sending SMSs or using the ytel auto-dialer, all of

15   that is relevant to myriad issues in the case, including use of

16   an ATDS, including consent, including knowledge and wilfulness,

17   and --

18           THE COURT:  But maybe, maybe I don't need it.  But

19   maybe if it's not, what if it turns out, for Freedom, all the

20   Freedom people, they did get consent?  Then it's not relevant

21   that they didn't for any other campaign or any other client.

22   Right?

23           MR. FOUGNER:  Certainly, your Honor.

24           THE COURT:  Yeah.  So why don't we start there, with

25   Freedom?

1          **MR. FOUGNER:**  And we have.  Your Honor will recall

2     that one of the discovery items from the hearing two weeks ago

3     was a request from us that defendants, provided that they only

4     took our request for production to be limited to Freedom,

5     produce supplemental responses stating whether or not they're

6     withholding responsive documents, and they haven't done that.

7          **MR. RAMSEY:**  We confirmed several times.  I don't

8     know if it's in the supplemental response.  If it's not, we can

9     do that.  I'm sorry.

10          **THE COURT:**  It's from the -- well, it's document

11    number 122.  And so she's talking about, like at page 5 and 6,

12    limiting to Freedom,

13               "So I'm not going to, at least from looking at

14               your statement, I'm not inclined to let you just,

15               you know, blow the barn doors open and get

16               everything you want.  And it occurred to me that

17               perhaps I need an early summary judgment motion...,"

18    and then you said,

19               "[Well] we...actually have another class

20               representative awaiting in the wings who received

21               spam text from Fluent and not necessarily

22               advertising Freedom,"

23    so now we're going beyond.

24               But we don't have that person here, right?  So it is

25    now, the only named plaintiff is from Freedom.

1          **MR. FOUGNER:** That's right, your Honor.

2          **THE COURT:** Okay. So why should we, in terms of....

3   So you have the call logs for all the Freedom, is that right?

4          **MR. FOUGNER:** Yes, based on what Mr. Astrup said at

5   the hearing two weeks ago, we do.

6          **THE COURT:** Okay. What you don't have is you don't

7   have the -- who the lead -- who the affiliate was that

8   generated the lead for those calls. That's what we're going to

9   discuss on our call tomorrow, about how you can get that

10  information.

11         Do you or don't you have e-mails, then, whether of

12  Fluent or Freedom or another defendant, as to the Freedom

13  campaign and whether there are false leads or all those things

14  you're looking for?

15         **MR. FOUGNER:** We have some such e-mails, but we have

16  no idea whether we have all of them --

17         **THE COURT:** Okay.

18         **MR. FOUGNER:** -- and there's been objections on all

19  of them.

20         **THE COURT:** So the ones that you have, are there

21  things in there that lead you to believe there are others that

22  you don't have?

23         **MR. FOUGNER:** I would have to come back to your

24  Honor on that question.

25         **THE COURT:** Okay, all right. See, that's why you

1  sort of do it in that iterative process.  You've got some, and

2  then is there something in there that leads you to believe

3  there's more out there that would have yield, right, that would

4  be worthwhile to get.

5         MR. FOUGNER:  I'll give you an example of why

6  I think there are, your Honor.  We've seen dozens of e-mails

7  from people within Patrick Kessel's organization at Freedom.

8  He's a senior sales executive.  His line-level workers are

9  e-mailing countless times about telemarketing complaints

10  related to Fluent and Drips, but we've seen precious little of

11  his e-mails either responding to or discussing those

12  complaints.

13         THE COURT:  Okay, so you have e-mails to him, but

14  nothing from him, is that it?

15         MR. FOUGNER:  We do have some things from him.  It's

16  not that we have nothing from him, and of the things I was

17  referring to, some are to him, but some are to other mid-level

18  managers within the organization.

19         THE COURT:  Okay, and so you think there should be

20  more.

21         MR. FOUGNER:  Yes, and this is just one small

22  example.

23         THE COURT:  Okay.  All right, so this is what you

24  should do, is in your discussions, then, you should get the

25  search terms that are really directed at -- getting that stuff,

1    again, related to Freedom.

2               **MR. FOUGNER:**  Your Honor, could I point out one

3    distinction mere procedurally between Freedom on the one hand

4    and Drips and Fluent on the other?  And that distinction is

5    that with Freedom, as pointed out in docket number 114, which

6    the Court did not address last time the Court reminded us that

7    it was not right to be --

8               **THE COURT:**  I have it right here.

9               **MR. FOUGNER:**  Yes, and your Honor reminded us that

10   it having only been filed the night before, it was not even

11   appropriate for us to imagine that your Honor might have looked

12   at it, which we certainly agree with.

13              As pointed out in docket number 114, Freedom had

14   agreed on the record in this court to engage in a

15   meet-and-confer process on keywords, and that was several

16   months ago.  It refused to do that, as we've stated in various

17   papers, and as a result, our position is that Freedom, perhaps

18   in contradistinction to Drips and Fluent, has simply waived the

19   right to now decide that it actually does want to go back and

20   do this 11th-hour meet-and-confer on the Boolean.

21              So our position would be that Freedom in particular

22   should have to produce everything responsive to the Booleans

23   that have been met and conferred on to date, with certainly no

24   review for relevance, and I would also submit, no ex-ante

25   review for privilege.  They, of course, would be subject to a

1    privilege clawback.

2              **THE COURT:**  I told you, I'm not going to impose

3    that.  I don't impose that.  I don't make people produce their

4    privileged stuff without agreement, but then they can't

5    complain about the cost of the privilege review.

6              You identified in this -- in 114, two particular

7    searches.

8              **MR. RAMSEY:**  Those have now been changed.  These are

9    the searches we've been -- we've started with and now are sort

10   of evolved.

11             **THE COURT:**  Okay.  All right.

12             **MR. FOUGNER:**  Well, we have received some

13   meet-and-confer communications from defendants regarding search

14   number 1.  We have not regarding search number 2.

15             **THE COURT:**  Okay, what happened when you did search

16   number 2?

17             **MR. RAMSEY:**  I'm sorry, maybe I misspoke.  So we

18   have Freedom run these two searches and pull every document

19   that those hit.  We now have them.  And when we then run search

20   terms, we -- those are the search term hits that I've been

21   telling you about.  I've been combining them.  I -- (audio

22   noise).

23             **THE COURT:**  That's the 12,000 and the 15,000.

24             **MR. FOUGNER:**  Right.

25             **MR. RAMSEY:**  No, that's our 12,000 just for Freedom.

```
 1   When I was giving search term hits, I was combining them.
 2   Sorry, I wasn't clear, I guess, on that one.  But we did do
 3   both of those searches.
 4              THE COURT:  Okay.  All right, and then I guess my
 5   question is, then, how would you propose, given what you saw,
 6   how would you propose to narrow it?
 7              MR. FOUGNER:  Well, so first --
 8              THE COURT:  No, no, not you, sorry.  Mr. Ramsey.
 9              MR. RAMSEY:  That's my point.  Those search terms
10   came back with something like -- it was like 35,000 hits.
11              THE COURT:  I thought you said it came back with
12   12,000.
13              MR. RAMSEY:  After we narrowed it down.
14              THE COURT:  Okay.
15              MR. RAMSEY:  So I haven't -- I can't tell you what
16   I saw, but I know, okay, this is Freedom, so I can say that.
17   I'm sorry, I can't -- because we've been going back on search
18   terms, we haven't done that.  That was our proposal, to get it
19   down to a point where we could do that.
20              THE COURT:  Well, but what is it that's still coming
21   up with the 12,000?  Because you said the TCPA you were able to
22   do within 10, and then you were able to narrow that down.
23              MR. RAMSEY:  I could get you a --
24              THE COURT:  The names are pretty particular.
25              MR. RAMSEY:  The things that are names and very
```

1    specific come up with a very small number.  It's TCPA -- we

2    have a whole chart here that lists things out -- auto-dialer --

3    where is it?  TCPA is by far the largest, Telephone Consumer

4    Protection Act.  When you add those together, it's something

5    like 35,000 documents.  So it's coming up with ways to narrow

6    that down.

7            THE COURT:  And so what are the examples of

8    nonresponsive that you get with that?

9            MR. RAMSEY:  That's what I'm saying, I can't -- I'm

10   sorry, I can't tell you that number.

11           THE COURT:  Well, see, it's impossible to narrow it

12   down if you don't know what are the non- -- some examples of

13   nonresponsive documents --

14           MR. RAMSEY:  I completely agree.  That's why I'm

15   suggesting that we narrow it to 5,000, we do a review, we then

16   have that process.

17           Right now, we're at, even at the most recent --

18           THE COURT:  Why can't you just pull -- maybe I don't

19   understand how it works.  Can't you just pull one of the

20   documents that had TCPA in it and look at it?

21           MR. RAMSEY:  Sure, but if I look at that and come up

22   with a way to exclude -- first of all, I may not be able to

23   come up with a way to exclude it that then doesn't exclude a

24   whole slew of other relevant documents.  So I can't just look

25   at one.

1       **THE COURT:**  Well, no, it's not -- doesn't have to be

2   perfect, right?  But what it should be is directed, or at least

3   informed.

4       **MR. RAMSEY:**  Sure.

5       **THE COURT:**  Because you just come up with some

6   number, like, we're just going to keep narrowing it until we

7   get to some number without it being -- narrowing it based on

8   information as to what are the nonresponsive documents that are

9   coming up.

10      **MR. RAMSEY:**  I get that, but let's, just as an

11  example, we have a document that says "TCPA," and I want to

12  exclude that document, because for me, it's not responsive.

13  And I then say TCPA -- to exclude it, I need to do NOT

14  something, right?  So TCPA, NOT fill in form.  Well, if I run

15  that search across the whole database, that's going to knock

16  out a whole slew of documents that he may want.

17      So you can't just do that --

18      **THE COURT:**  He doesn't know until you show him that

19  one document.

20      **MR. RAMSEY:**  No, he doesn't know unless he's seen

21  all of the other ones.

22      **THE COURT:**  No, no --

23      **MR. RAMSEY:**  I mean, he would need to see what's

24  excluded by running that exclusion -- excluding term.

25      **THE COURT:**  Well, it's not what you do.  You show

1    him the document.  You show him the document.

2    **MR. FOUGNER:**  Your Honor, beggars can't be choosers.

3    Does your Honor -- I understand your Honor has an appointment

4    at 3:00 o'clock.

5    **THE COURT:**  I do.

6    **MR. FOUGNER:**  Does the Court have an opportunity to

7    hear from us before the end of the day today?

8    **THE COURT:**  No, it goes from 3:00 to 5:00.  So I can

9    hear you again at 3:00 o'clock tomorrow.  We can -- we'll do

10    that by telephone, and since you're here -- I mean, it needs to

11    be focused on Freedom.  So now maybe that will help you get it

12    narrowed down, although we're talking about Freedom --

13    **MR. RAMSEY:**  Sure, well, that's mostly a Fluent

14    issue.

15    Can I -- I know it's a very quick-switch topic, but

16    we submitted a stipulation regarding a subpoena to Comcast.

17    Comcast won't release documents unless there's a court order --

18    **THE COURT:**  I thought I signed it.

19    **MR. RAMSEY:**  Oh, I haven't issued it.  I haven't

20    seen an order.

21    **THE COURT:**  Your recent -- oh.

22    **THE CLERK:**  We intended to, yes.

23    **THE COURT:**  We intended to sign it.

24    **MR. RAMSEY:**  Okay, great.  It's 115.  I would love

25    it if the Court could do that.

1          **THE COURT:**  We intended to, but we didn't.  Okay.

2          **MR. RAMSEY:**  Okay, just so we can get that process

3    going.

4          **THE COURT:**  No, we intended to do that.

5          **MR. RAMSEY:**  All right.  That's fine, then, your

6    Honor.

7          **THE COURT:**  All right.  So, but I want you to think

8    about -- think about -- here's the thing.  This is the reality,

9    though, that we're dealing with, which is when you actually get

10   to trial, if you get to trial, or even summary judgment, the

11   universe of documents that you actually use are like this,

12   right?  Or even less.  At trial, you have three binders of

13   documents.  What actually goes to the jury is, like, half a

14   binder.  Right?  So even those narrowed, and what we want to do

15   is, obviously, you can't just produce those documents, you have

16   to produce more, but we want to limit the "more" as much as

17   possible to get to the heart of the matter.

18          But the plaintiff can't do that in a vacuum, right?

19   There has to be -- you have to show them some of the

20   nonresponsive documents that you're getting.  That's -- I mean,

21   that's the way I've always seen it done.

22          And obviously, some relevant documents are going to

23   be missed and some irrelevant documents are going to be

24   produced, and that's okay.  As long as they're not privileged,

25   that's okay.  You could always use a Rule 502 to claw back if

1    you need to.  That's okay.  It doesn't -- discovery is not

2    perfect.  We're just trying to do it as good as possible.

3         **MR. FOUGNER:**  And I certainly agree with your

4    Honor's half-a-binder analogy.  I would just point out that it

5    would be malpractice for my co-counsel and I to simply accept

6    the first half binder that the defendants hand to us and tell

7    us is what's relevant to the case.

8         **THE COURT:**  No, no, no, I understand.  I understand.

9    That's why I say it has to be -- they have to show you, this

10   is -- this TCPA, by itself, you've now come up with some

11   narrowing and it still is producing this document.  You gave

12   them an example of it in a signature block.

13        Well, if you saw that, then you could share that,

14   and then you could eliminate the name of that person or

15   whatever.  You could get rid of it.  I'm sure that it's not --

16        **MR. RAMSEY:**  I understand.  I would request that it

17   go both ways, then.  If he knows of documents that he thinks

18   are missing, then it needs to go both ways.

19        **THE COURT:**  Absolutely, he should review what he has

20   and he should tell you, this is in particular where I think we

21   could, you know, get at things.

22        **MR. RAMSEY:**  Because when you're in that balancing

23   act of burden and probative, if what he's looking for is

24   something that's, you know, way out on the tangent --

25        **THE COURT:**  No, you're not going to get it.  You're

1   not going to get it, because we're just not going to get those

2   edges, and --

3           **MR. RAMSEY:**  That's what I'm saying, but I don't

4   know that until I know.

5           **THE COURT:**  And he doesn't know that until you show

6   him what are some of the documents.  You don't need to review

7   every one.  You just give an example.  Look, here's the first

8   20 documents that come up that have "TCPA" in it, and 19 of

9   them are nonresponsive.  Look, here they are.  Okay, let's,

10  together, figure out then how we can eliminate those.

11          So it needs to be collaborative in that way as well,

12  all right?

13          **MR. FOUGNER:**  Thank you, your Honor.

14          **MR. RAMSEY:**  Thank you, your Honor.

15          **THE COURT:**  Okay, Ada will give you the call-in

16  number for tomorrow and we'll see where we're at, and I'll be

17  speaking to you gentlemen all the time --

18          **MR. RAMSEY:**  Sorry that I'll miss this one....  Not

19  next week.

20          **MR. FOUGNER:**  Okay, then.

21          **MR. RAMSEY:**  Your vacation.

22          **THE COURT:**  Because I told you, I was working last

23  week.

24          **MR. FOUGNER:**  You did.

25          **THE COURT:**  You could have called me.  Okay, well,

1    we're done with this.  We're calling another case, but they're

2    not here, as you can see.

3         **MR. FOUGNER:**  Thank you, your Honor.

4                                                      <u>3:03 p.m.</u>

5                              ---o0o---

1

2

3                        **CERTIFICATE OF TRANSCRIBER**

4

5            I, Leo Mankiewicz, certify that the foregoing is a

6    true and correct transcript, to the best of my ability, of the

7    above pages of the official electronic sound recording provided

8    to me by the U.S. District Court, Northern District of

9    California, of the proceedings taken on the date and time

10   previously stated in the above matter.

11           I further certify that I am neither counsel for,

12   related to, nor employed by any of the parties to the action in

13   which this hearing was taken; and, further, that I am not

14   financially nor otherwise interested in the outcome of the

15   action.

16

17   _____  01/10/2019

18          Signature of Transcriber          Date

19

20

21

22

23

24

25