SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JAY T. RAMSEY, Cal. Bar No. 273160
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:    310.228.3700
Facsimile:    310.228.3701
jramsey@sheppardmullin.com

KLEIN MOYNIHAN TURCO LLP
BRIAN P. ASTRUP (admitted *pro hac vice*)
450 Seventh Avenue, 40th Floor
New York, New York 10123
Telephone:    212-246-0900
Facsimile:    212-216-9559
bastrup@kleinmoynihan.com

Attorneys for Defendants
FREEDOM FINANCIAL NETWORK, LLC,
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC., and LEAD SCIENCE, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| DANIEL BERMAN,<br><br>        Plaintiff,<br><br>        v.<br><br>FREEDOM FINANCIAL NETWORK, LLC,<br>FREEDOM DEBT RELIEF, LLC, FLUENT,<br>INC., and LEAD SCIENCE, LLC,<br><br>        Defendants. | Case No.: 4:18-CV-01060-YGR<br><br>*Hon. Yvonne Gonzalez Rogers*<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| FREEDOM FINANCIAL NETWORK,<br>LLC and FREEDOM DEBT RELIEF,<br>LLC,<br><br>        Third-Party Plaintiffs,<br><br>        v.<br><br>DOES 1 through 5,<br><br>        Third-Party Defendants. | Date: April 9, 2019<br>Time: 2:00 p.m.<br>Courtroom: 1, 4th Floor |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION....................................................................................................1

II.     BACKGROUND FACTS .......................................................................................2

        A.      Fluent's Business...................................................................................2

        B.      Fluent's Websites ..................................................................................2

        C.      The Freedom Campaign At Issue ..........................................................5

        D.      Plaintiff's Claim ...................................................................................5

        E.      Plaintiff's Putative Class ......................................................................6

III.    PLAINTIFF'S MISSTATEMENTS AND RED HERRINGS.................................6

        A.      Fluent's Websites Are Not "Manipulative" Or "Deceptive," And, Even If
                They Were, Plaintiff's Expert Confirms This Is An Individualized Issue ................6

        B.      Fluent's Websites Comply With The TCPA And The E-Sign Act..........................8

        C.      Fluent's Lead List Is Not Entirely Or Even Substantially Fake..............................10

                1.      Real people registered on Fluent's website, provided TCPA consent,
                        and became Freedom's customers................................................................10

                2.      There is no evidence that bots inputted leads into Fluent's system .............10

                3.      Plaintiff's purported evidence that there are at least some fake leads
                        is legally irrelevant .....................................................................................11

                4.      Plaintiff's purported evidence of fake leads only highlights the
                        individual inquiries that preclude certification...............................................13

        D.      Fluent Did Not Destroy Evidence Of Consent ........................................................16

IV.     THE COURT SHOULD DENY CERTIFICATION ............................................17

        A.      Plaintiff Cannot Establish The Prerequisites Of Rule 23(a)....................................17

                1.      Plaintiff Is Not Typical...............................................................................17

                2.      Plaintiff Is An Inadequate Class Representative .........................................19

                3.      Plaintiff Cannot Establish Commonality.....................................................20

        B.      Plaintiff Cannot Establish The Prerequisites For A Rule 23(b)(3) Class.................20

                1.      Plaintiff cannot establish predominance......................................................20

                2.      Plaintiff cannot establish superiority...........................................................23

1

      C.      Plaintiff Cannot Establish The Prerequisites For A Rule 23(b)(2) Class ................24

V.     CONCLUSION ...................................................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Blair v. CBE Grp., Inc*.
    309 F.R.D. 621 (S.D. Cal. 2015)...................................................................................21

*Briseno v. ConAgra Foods, Inc.*
    844 F.3d 1121 (9th Cir. 2017)......................................................................................23

*Campbell v. Gen. Dynamics Gov't Sys. Corp.*
    407 F.3d 546 (1st Cir. 2005) .........................................................................................9

*Chyba v. First Fin. Asset Mgmt., Inc.*
    2015 U.S. Dist. LEXIS 165276 (S.D. Cal. Nov. 20, 2013)...........................12, 18, 19

*Connelly v. Hilton Grand Vacations Co., LLC*
    294 F.R.D. 574 (S.D. Cal. 2013)..............................................................................23, 24

*Davis v. AT&T Corp.*
    2017 U.S. Dist. LEXIS 46611 (S.D. Cal. Mar. 28, 2017)..........................................15, 20

*Ellis v. Costco Wholesale Corp*.
    657 F3d 970 (9th Cir. 2011)...........................................................................................17

*Feske v. MHC Thousand Trails Ltd. P'ship*
    2013 U.S. Dist. LEXIS 37232 (N.D. Cal. Mar. 18, 2013) ...........................................19

*Fober v. Mgmt. & Tech. Consultants, LLC*
    2016 U.S. Dist. LEXIS 187347 (C.D. Cal. July 29, 2016) ...........................................4

*Gannon v. Network Tel. Servs., Inc.*
    2013 U.S. Dist. LEXIS 81250 (C.D. Cal. Jun. 5, 2013) ..............................................21

*Gene and Gene LLC v. BioPay LLC*
    541 F.3d 318 (5th Cir. 2008)..........................................................................................20

*General Tel. Co. of Southwest v. Falcon*
    457 US 147 (1982) .........................................................................................................17

*Ginwright v. Exeter Fin. Corp.*
    280 F. Supp. 3d 674 (D. Md. 2017) ..............................................................................21

*Gordon v. Caribbean Cruise Line, Inc.*
    2019 U.S. Dist. LEXIS 20604 (N.D. Ill. Feb. 8, 2019).......................................8, 21, 22

*Gutierrez v. Barclays Grp.*
    2011 U.S. Dist. LEXIS 12546 (S.D. Cal. Feb. 9, 2011) ..............................................15

*Hanlon v. Chrysler Corp.*
   150 F.3d 1011 (9th Cir. 1998) .................................................................................................19

*Hanon v. Dataproducts Corp.*
   976 F.2d 497 (9th Cir. 1992) ...................................................................................................17

*Hilton v. Fluent*
   297 F. Supp. 3d 1337 (S.D. Fla. 2018) ...........................................................................7, 22, 24

*Honig v. Doe*
   484 U.S. 305 (1988) .................................................................................................................24

*Jacobs v. Quicken Loans, Inc.*
   2017 U.S. Dist. LEXIS 176469 (S.D. Fla. Oct. 19, 2017) ......................................................15

*Johnson v. Yahoo! Inc.*
   2018 U.S. Dist. LEXIS 23564 (N.D. Ill. Feb. 13, 2018) .........................................................21

*Katz v. Comdisco, Inc.*
   117 F.R.D. 403 (N.D. Ill. 1987) ..............................................................................................17

*Kilgore v. KeyBank, N.A.*
   718 F.3d 1052 (9th Cir. 2013) .................................................................................................25

*Knutson v. Schwan's Home Serv.*
   2013 U.S. Dist. LEXIS 127032 (S.D. Cal. Sept. 5, 2013) ......................................................22

*Labau v. Cellco P'ship*
   2014 U.S. Dist. LEXIS 89602 (E.D. Cal. June 30, 2014) ..................................................18, 19

*Labou v. Cellco P'ship*
   2014 U.S. Dist. LEXIS 26974 (E.D. Cal. Feb. 28, 2014) ........................................................19

*Legg v. PTZ Ins. Agency, Ltd.*
   321 F.R.D. 572 (N.D. Ill. 2017) ..............................................................................................21

*Martinez v. Adir Int'l LLC*
   2015 WL 12670519 (C.D. Cal. July 7, 2015) .........................................................................18

*McMillion v. Rash Curtis & Assocs.*
   2017 U.S. Dist. LEXIS 144403 (N.D. Cal. Sep. 6, 2017) .......................................................21

*Meyer v. Uber Techs., Inc.*
   868 F.3d 66 (2d Cir. 2017) ........................................................................................................7

*Molski v. Gleich*
   318 F.3d 937 (9th Cir. 2003) ...................................................................................................20

*Newhart v. Quicken Loans Inc.*
   2016 U.S. Dist. LEXIS 168721 (S.D. Fla. Oct. 12, 2016) ......................................................21

-iv-

*O'Callaghan v. Uber Corp. of Cal.*
   2018 U.S. Dist. LEXIS 112021 (S.D.N.Y. July 3, 2018)................................................................9

*Pablo v. Servicemaster Global Holdings, Inc.*
   2011 U.S. Dist. LEXIS 87918 (N.D. Cal. Aug. 9, 2011)..........................................................24

*Pritikin v. DOE*
   254 F.3d 791 (9th Cir. 2001)..................................................................................................18

*Rodriguez v. Premier Bankcard, LLC*
   2018 U.S. Dist. LEXIS 149225 (N.D. Ohio Aug. 31, 2018) ....................................................15

*In the Matter of Rules and Regs. Implementing the Tel. Consumer Protection Act*
   30 FCC Rcd. 7961 (2015) ........................................................................................................15

*Satterfield v. Simon & Schuster, Inc.*
   569 F.3d 946 (9th Cir. 2009)....................................................................................................8

*In re SFPP Right - Of – Way Claims*
   2017 U.S. Dist. LEXIS 85973 (C.D. Cal. May 23, 2017)........................................................23

*Stemple v. QC Holdings, Inc.*
   2014 U.S. Dist. LEXIS 125313 (S.D. Cal. Sept. 5, 2014) ......................................................22

*Swift v. Zynga Game Network, Inc.*
   805 F. Supp. 2d 904 (N.D. Cal., 2011) ...................................................................................7

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*
   274 F.R.D. 229 (S.D. Ill. 2011)................................................................................................18

*Wilson v. Badcock Home Furniture*
   2018 U.S. Dist. LEXIS 213792 (M.D. Fla. Dec. 19, 2018) ...............................................15, 23

*Zinser v. Accufix Research Inst., Inc.*
   253 F.3d 1180 (9th Cir. 2001)..................................................................................................20

**<u>Statutes</u>**

E-Sign Act ........................................................................................................................9, 10, 19

TCPA............................................................................................................................ *passim*

1    **I.**      <u>**INTRODUCTION**</u>

2          Defendants do not, and did not, violate the Telephone Consumer Protection Act ("TCPA").

3    Defendant Fluent, Inc. ("Fluent") owns and operates a number of websites on which consumers can

4    register in exchange for an opportunity to win prizes or receive awards or other content. The

5    registrants have the option of consenting to receiving text messages and telephone calls from

6    Fluent's Marketing Partners. In order to participate in the opportunities offered by Fluent, consumers

7    are not required to consent to be contacted and many do not. For those that do, Fluent may contact

8    these registrants on behalf of its Marketing Partners. In this case, Fluent provided information about

9    certain registrants—all of whom consented—to Defendants Freedom Financial Network, LLC and

10   Freedom Debt Relief, LLC (collectively, "Freedom"), and operated a texting and calling campaign

11   in an effort to market Freedom's debt relief services.

12         Plaintiff Daniel Berman and his counsel clearly do not like Fluent's business model. They

13   attack Fluent, calling it a "serial" TCPA offender, and otherwise accuse Defendants of a range of

14   wrongdoing, including even destruction of documents. In doing so, Plaintiff either misstates the

15   facts or cherry picks certain documents or anomalous registrations and presents them out of context.

16   None of these distortions, however, change the basic fact that Fluent obtains TCPA-compliant

17   consent and has presented evidence of that consent here. Plaintiff has not, and cannot, cite a single

18   TCPA case that has been certified where such evidence of consent has been presented.

19         As to Plaintiff, he claims not to have visited one of Fluent's websites, even though he seeks

20   to represent a class of people who did. Defendants have attempted to identify the person who

21   registered Plaintiff's phone number on Fluent's website and provided TCPA consent. They have so

22   far learned that it was someone sitting outside a coffee shop in Alameda, California, on Christmas

23   Eve 2017, using a Samsung J3 Galaxy phone, and registering with an email address that has been

24   active since 2007. This yet-to-be-identified person was the cause of this case and the cause of any

25   harm inflicted on Plaintiff. Plaintiff may not have liked that he was texted and called (although he

26   never complained or opted-out before filing this suit), but that does not mean he is entitled to sue

27   Defendants (as opposed to that third-party individual), let alone sue Defendants on a class-action

28   basis given such peculiar and unique circumstances giving rise to his claim.

## II.   BACKGROUND FACTS

### A.   Fluent's Business

Fluent is a digital marketing company that generates leads for its customers. (Declaration of Daniel Barsky ("Barsky Decl.") at ¶ 5.) Fluent's customers are generally companies that offer one or more services to consumers. (*Id.*) Fluent provides these companies with contact information for consumers who Fluent identifies as individuals who may be interested in the companies' respective products or services. (*Id.*)

In doing this, Fluent does not scrape the Internet or public records for information about consumers. (*Id.* at ¶ 40.) Instead, the information that Fluent provides to its customers is information provided by the individual consumers themselves. (*Id.*) To gather that information, Fluent operates a number of consumer-facing websites on which consumers can register, in exchange for which the consumers are offered the opportunity to obtain rewards, enter into sweepstakes, receive job listings, receive product samples, or receive other content (each a "Website" and collectively, "Websites"). (*Id.* at ¶ 5.) In order to be eligible for these opportunities, consumers provide certain personal information and answer a series of survey questions. (*Id.* at ¶¶ 14, 17.) If the consumer also provides consent to be contacted by text message or autodialed phone call (which is not required to obtain the rewards or other content), Fluent may then contact that consumer's phone number on behalf of one or more of its customers. (*Id.* at ¶¶ 18-19.)

For those consumers who consent to text messages or telephone calls, they will be contacted on behalf of between one and five of Fluent's clients, on average. (*Id.* at ¶ 19.) Which companies receive the information depends on the consumer's answers to the survey questions and which Fluent customers are running advertising campaigns at the time the consumer registers. (*Id.*)

### B.   Fluent's Websites

When consumers visit Fluent's Websites, they are asked to input certain personal information, including their first and last name, email address, phone number, zip code, and

birthday. (*Id.* at ¶ 12.) Once a consumer has completed entering his or her information,[1] a consumer must agree to Fluent's Terms & Conditions, which include a mandatory arbitration clause and a class action waiver. (*Id.* at ¶¶ 14-16.) The consumer will be presented with a screen like the one pictured below, where the statement "I understand and agree to the <u>Terms & Conditions</u>, which includes a mandatory arbitration and <u>Privacy Policy</u>," appears above a button that, depending on the Website, says "Continue," "Enter to Win," "Submit" or something similar. (*Id.*)



The underlined "<u>Terms & Conditions</u>" phrase is a hyperlink that, if clicked, will take the consumer to the Terms & Conditions. Fluent contemporaneously records the date and time when the user agrees to the Terms & Conditions, mandatory arbitration, and class action waiver. (*Id.* at ¶ 14.)

After the consumer agrees to the Terms & Conditions, the Website will generally display a series of survey questions such as: "Do you own a home?"; "Are you interested in saving money on your cellphone plan?"; and so forth. (*Id.* at ¶ 17; Declaration of Mitenkumar Bhadania ("Bhadania Decl.") at ¶ 7, Ex. 1.) Which survey questions are displayed to the user depends on several dynamic factors, including how the consumer answers the initial survey questions and what advertising campaigns Fluent's customers are currently running. (Barsky Decl. at ¶¶ 17-19.) A consumer may

---

[1] If consumers have previously visited a Fluent Website and inputted their information, Fluent's system may recognize them when they return, and the Website may streamline the registration process by pre-populating the consumer's personal information.

be presented with 15 or more survey questions. (*Id.*) The goal is to identify individuals who may want or need the services offered by Fluent's customers.

Once the consumer completes the survey questions, the Website will display a page seeking the consumer's "prior express written consent" within the meaning of the TCPA. (*Id.* at ¶ 18.) That page generally re-states the consumer's personal information, as provided by the consumer earlier in the process. (*See e.g.,* Bhadania Decl., Ex. 1.) The page will then include TCPA consent language, providing for consent to be contacted by autodialed text message or phone call by Fluent or any of its "<u>Marketing Partners</u>." (Barsky Decl. at ¶¶ 18-19.) The underlined phrase "<u>Marketing Partners</u>" is a hyperlink that, if clicked, displays the full list of Fluent's Marketing Partners.[2] (*Id.*) Immediately below the TCPA consent language is an unchecked box, next to which the Website states: "I CONFIRM that all of my information is accurate and consent to be called and texted as provided above." (*Id.* at ¶¶ 18-22; Dkt. No. 16-1 at ¶ 11.) An exemplar of the TCPA consent language and the "I CONFIRM" button follows:



---

[2] Fluent sells a consumer's data on average to only between one and five of its customers, notwithstanding the length of its Marketing Partners list. Courts have found this practice permissible. *Fober v. Mgmt. & Tech. Consultants, LLC*, 2016 U.S. Dist. LEXIS 187347, at *9 (C.D. Cal. July 29, 2016) (finding that defendant's legally sufficient consent was "far-reaching, permitting [defendant] to use *and disclose to others* Plaintiff's phone number for any number of purposes") (emphasis in original) *aff'd* 886 F.3d 789 (9th Cir. 2018).

The consumer may provide consent by checking the <u>unchecked</u> box and clicking the "Continue" button. Fluent will not provide the consumer's phone number to a Marketing Partner unless the consumer checked the TCPA consent box and clicked the "Continue" button. (*Id.* at ¶ 20.) Consumers do not need to check the box in order to obtain the rewards or other content offered by Fluent's Websites. (*Id.*) Roughly 30 percent of users do not check the TCPA consent box. (*Id.*)

## C.   **The Freedom Campaign At Issue**

Freedom provides debt relief services to consumers. (*See* Declaration of Dharma Naik ("Naik Decl.") at ¶ 4.) In an effort to identify potential customers for its services, Freedom engaged Fluent in a marketing campaign to locate potential customers (leads) who had a certain amount of debt. (Barsky Decl. at ¶¶ 7, 32.) A certain number of the leads were then contacted, either by phone call or text. The platform used to send the text messages and telephone calls was provided by Defendant Lead Science, LLC. (Barsky Decl. ¶ 8.) The official marketing campaign ran from about September 2017 to April 2018.

Fluent provided Freedom with potential leads only if those consumers answered survey questions in a manner that identified them as potential Freedom customers and ***only if they provided TCPA consent***. (*Id.* at ¶ 32.) These individuals also agreed to the Terms & Conditions, including the arbitration clause that contains a class action waiver. (*Id.*)

## D.   **Plaintiff's Claim**

Plaintiff's alleged claim ***does not*** arise out of a visit to a Fluent Website, in which he completed a registration, and was then contacted. In fact, Plaintiff states that prior to this lawsuit, he never visited a Fluent Website. (Dkt. No. 17-1 at ¶¶ 6-8.) Instead, someone with Plaintiff's phone number visited a Fluent Website, registered with his phone number, agreed to the Terms & Conditions, responded to survey questions in a manner that identified the individual as a potential Freedom customer, and provided TCPA consent. (Bhadania Decl., Ex. 1.) The information inputted as part of the registration included, among other things, Plaintiff's phone number, the name Dunk Loka, and the email address buffola@gmail.com, which is an email account that has been active since 2007. (*Id.*; *See also* Declaration of Brian P. Astrup ("Astrup Decl."), Ex. 4.) Fluent's records reflect that the registration occurred on December 24, 2017 at 5:39:16 PM Pacific time, and was

completed by an individual using a Samsung Galaxy J3 mobile phone. (Bhadania Decl., Ex. 1; Astrup Decl., Ex. 2.) Fluent's records also reflect the IP address used to complete the registration. Based on information obtained via subpoena to Comcast, the IP address is for the wireless Internet at Wescafe, a coffee shop in Alameda, California. (Astrup Decl., Ex. 3.)

On February 14, 2018, Plaintiff received one text message and one phone call on behalf of Freedom at his cellular phone number (SAC ¶¶ 136-39).[3] Plaintiff did not opt-out or otherwise request not to be contacted again. To the contrary, during the six minute and forty second conversation between Plaintiff and Freedom, Plaintiff (who identified himself as Dan Johnson) claimed to be interested in debt relief and asked about the text message that he received. He never asked why the text message was addressed to "Dunk" and did not complain about being contacted.[4]

**E.      Plaintiff's Putative Class**

Plaintiff seeks to certify a class of "[a]ll persons in the United States to whom: (a) Drips made one or more calls and/or sent one or more text messages [as part of the Freedom campaign] (b) to a cellular telephone (c) through the use of an ATDS or an artificial or prerecorded voice (d) in order to market Freedom's products (e) between February 14, 2018 and April 17, 2018."

Notably, Plaintiff is pursuing a class of all people who were contacted, including those who visited a Fluent Website, agreed to the Terms & Conditions, agreed to arbitrate, and provided TCPA consent to be contacted. He is not seeking to represent a class of individuals only like himself, who purportedly did not visit a Fluent Website, but whose information was inputted by someone else.

**III.      PLAINTIFF'S MISSTATEMENTS AND RED HERRINGS**

**A.      Fluent's Websites Are Not "Manipulative" Or "Deceptive," And, Even If They Were, Plaintiff's Expert Confirms This Is An Individualized Issue**

In an attempt to avoid the import of Fluent's Terms & Conditions (including the arbitration

---

[3] Plaintiff also alleged that he received seventeen earlier text messages, separate and apart from the Freedom campaign, to his cell phone. (SAC ¶¶ 85-135.) All of the text messages sent to Plaintiff arose from the single mismatched registration received by Fluent concerning Dunk Loka (and are based on the same prior express written consent). (Barsky Decl. at ¶ 38.)

[4] Defendants can provide the Court with a copy of the recorded conversation between Plaintiff and Freedom, which has been produced in discovery.

clause and the class action waiver) and that Fluent obtains TCPA consent, Plaintiff argues that Fluent's Websites are "manipulative and deceptive."[5] This argument is based on the opinions of Plaintiff's expert, Benjamin H. Beecher ("BB").

First, BB's experience designing websites does not qualify him to testify about the psychological or behavioral effects of those designs and he also cannot render an opinion about the legal import of those designs. (*See* Motion to Limit Beecher; *see also* Astrup Decl. Ex. 8, Deposition of Benjamin H. Beecher ("BB Dep.") at 28:17-29:1; 70:15-71:17.)

Second, contrary to BB's opinions, Fluent's Website is consistent with other websites that courts have held result in agreement to a set of Terms & Conditions or TCPA consent. *See Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal., 2011); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017).

Third, during his deposition, BB opined that certain aspects of Fluent's Website might be confusing, but he confirmed that he is unaware of any peer reviewed, academic study suggesting that those design aspects would result in actual confusion. (Ex. 8, BB Dep. at 70:13-71:17.)  BB further stated that, in his opinion, those aspects would be potentially confusing to some consumers, but would not be confusing to all consumers. (*Id.* at 45:14-49:16; 73:21-76:9; 77:8-78:8; 140:11-142:4.) He agreed that this was consistent with the generally accepted principle in the website design industry that consumers interact with and understand websites (and therefore registration flows) differently. (*Id.*) He did not perform any type of survey or other analysis to determine what percent of consumers may have been confused by Fluent's Websites, if any. (*Id.*) Even if he had done so, BB confirmed that, in order to have identified who may have been confused and who was not confused, he would have had to interview each person. (*Id.*.) On top of that, BB confirmed that his opinions were based only on his review of screenshots provided in Dkt. No. 16-1, which do not show the complete registration process. To analyze that full flow, BB visited numerous other Fluent Websites and completed the flows. (*Id.* at 110:6-112:11.)  BB admits that these different websites

---

[5] Plaintiff cites to the *Hilton v. Fluent* case as evidence that another group of plaintiffs challenged the validity of Fluent's leads. (Mot. at 21:23-28.) However, once the court questioned whether plaintiffs were telling the truth surrounding their consent on Fluent's websites by ordering a trial, the plaintiffs dropped the case entirely. (*See* Astrup Decl., Ex. 9.)

were designed differently. (*Id.* at 116:3-117:16; 119:18-120:14.) Nevertheless, he limited his opinion because, according to him, if he had included those other Websites, his analysis would reveal further individualized issues. (*Id.*)

As shown in the screenshots reproduced above and below, Fluent's Websites are not manipulative or deceptive. As a result, every person who registered on a Fluent Website agreed to arbitration, waived the right to participate in a class action, and provided TCPA consent. Even if Fluent's Websites were manipulative or confusing, in order to determine who was deceived, who agreed to the Terms & Conditions, and who provided TCPA consent with full knowledge is— according to Plaintiff's own expert—an individual issue.

**B.    Fluent's Websites Comply With The TCPA And The E-Sign Act**

The written consent obtained by Fluent complies with the TCPA, the FCC's rules interpreting the TCPA, and the E-Sign Act.

As to the TCPA, Fluent's TCPA consent language, and form requiring a user to check a box, is nearly identical to language and forms that courts have found satisfy the TCPA's "prior express written consent" requirement. *See Gordon v. Caribbean Cruise Line, Inc.*, 2019 U.S. Dist. LEXIS 20604, at *30 n.5 (N.D. Ill. Feb. 8, 2019) (finding that where the user had to check an unchecked checkbox and "because consent to receive calls and texts 'via autodialer or prerecorded voice' unmistakably references consent to receive advertisements or telemarketing messages, this language is not deficient as a matter of law"); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 949, 955 (9th Cir. 2009) (plaintiff expressly consented to receiving text messages from Nextones affiliates by affirmatively checking a box marked "Yes!" on a form). The consent disclosures in *Gordon* and the consent disclosures that Fluent provides are compliant as a matter of law. Both are shown below (*Gordon* on the left; Fluent on the right):




As to the E-Sign Act, courts have repeatedly affirmed that a website user's act of checking a box is an electronic written signature sufficient to confer consent or agreement. *See, e.g., O'Callaghan v. Uber Corp. of Cal.*, 2018 U.S. Dist. LEXIS 112021, at *15 n.9 (S.D.N.Y. July 3, 2018) (finding that by clicking "YES, I AGREE" the plaintiff "electronically signed the operative agreements" in compliance with the E-Sign Act); *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 557 (1st Cir. 2005) ("Signing an acknowledgment or, in a more modern context, clicking a box on a computer screen, are acts associated with entering into contracts."). Plaintiff's purported reliance on Section 7001(c) of the E-Sign Act is misplaced. That section applies only if the statute at issue "requires that information relating to a transaction or transactions . . . be provided or made available to a consumer in writing." 15 U.S.C. § 7001(c); *see also Bergenstock v. Legalzoom.com, Inc.*, 2015 NCBC LEXIS 66, *15-18 (N.C. Super. Ct. Jun. 23, 2015). Neither the TCPA nor the FCC's Orders implementing the TCPA have this requirement. In fact, throughout the FCC's 2012 Order, the FCC specifically states that the E-Sign Act will ease the burden on companies having to

1  maintain hard paper copies to evidence written consent.[6]

2  **C.**   **Fluent's Lead List Is Not Entirely Or Even Substantially Fake**

3       Without ever directly saying it, Plaintiff's Motion suggests that Fluent's leads are all fake,

4  either made up by bots or inserted into Fluent's system by Fluent itself. Plaintiff does not have

5  evidence substantiating this claim. Even if he did, determining which of the leads were purportedly

6  fake cannot be done on a classwide basis.

7       *1.*   *Real people registered on Fluent's website, provided TCPA consent, and*

8              *became Freedom's customers*

9       Freedom ultimately provided services to numerous real people identified through the Fluent

10 campaign. Earlier in this case, Freedom disclosed six randomly selected persons who had purchased

11 services from Freedom as a result of the Fluent/Freedom campaign and has now disclosed four more

12 (the "Purchasers"). (Naik Decl. at ¶ 9.) For these ten individuals, Fluent's records reflect that each

13 individual registered, agreed to the Terms & Conditions, and provided TCPA consent. (Barsky Decl.

14 at ¶¶ 21-31; Dkt. No. 94-2 at ¶¶ 23-29.) These registrations are obviously not fake.

15       *2.*   *There is no evidence that bots inputted leads into Fluent's system*

16       Plaintiff argues that bots may have infiltrated Fluent's system and systematically inputted

17 hundreds of thousands of fake registrations. (Mot. at 5:4-6:7.) However, Plaintiff's own expert

18 testified that the evidence suggests that bot activity is unlikely to have created leads and, even if

19 there had been such activity, he could not identify any bot-created registration, let alone do so

20 reliably.  (Ex. 8, BB Dep. at 171:14-19; 172:12-17; 201:3-201:12.)  Further, there is absolutely zero

21 evidence to suggest that a bot (rather than a human with a Samsung phone at Wescafe) registered

22 with Plaintiff's phone number. (*Id.* at 178:22-179:16; *see* Supplemental Expert Report by David

23 ("Kalat Supp.") at ¶¶ 43, 60-61.)

24  ───────────────────────

25 [6] "[W]e also allow documentation and signature requirements recognized by the . . . (E-SIGN Act)
    satisfies our rules and avoids the undue burden associated with generating hardcopy documentation
26 to generate written consent." 2012 Order, Appendix C, ¶ 5, 27 FCC Rcd 1830, 1867. "The
    Commission believes that by allowing E-SIGN measures to secure written consent, it relieves all
27 businesses, including small businesses, from the burden of securing paper documents from
    consumers to evidence prior express written consent." 2012 Order, Appendix C, ¶ 12, 27 FCC Rcd
28 1830, 1869; *see id.* at 1873.

Fluent's Websites were not infiltrated by bots. Fluent subscribes to an Internet security service called Cloudflare, which employs a variety of tools to prevent bot activity. (*See* Declaration of Sean Cullen ("Cullen Decl.") at ¶ 17.) Among other things: (1) Cloudflare blocks all non-consumer IP addresses, such as Amazon Web Services, which are the likely sources of bots; and (2) if Cloudflare identifies a possible or known bot, a Browser Challenge is invoked to help determine if the connection is a bot or a real human. (*Id.*; Kalat Supp. at ¶¶ 29-31.) On top of that, Fluent regularly analyzes the traffic it receives from the publishers that it works with. (Barsky Decl. at ¶ 6.) If traffic from certain publishers results in no conversions or the conversion rate is low, Fluent will block the publisher. (*Id.*)[7]

In any event, even if some small percentage of leads on Fluent's website were inputted by bots, those registrations cannot be identified. (Ex. 8, BB Dep. at 171:14-19; 172:12-17.)

### 3. *Plaintiff's purported evidence that there are at least some fake leads is legally irrelevant*

Plaintiff argues that Fluent's registrations (or at least some portion) must be fake given that some of the registrations (i) are incomplete (because they lack some piece of information, though all include a phone number); (ii) appear to employ a pseudonym or fake name (like aaaaaaaa); (iii) include first and last names that, according to Plaintiff's expert Anya Verkhovskaya ("A.V."), do not match records purporting to show the owner of the phone; and (iv) include numeric or other symbols, like {FIRSTNAME}. Plaintiff also argues, without citing any evidence establishing standard rates for opt-outs, complaints, or wrong number claims, that the opt-outs, complaints, and

---

[7] When Fluent produced the lead log, it extracted the information from a database that it uses on a day-to-day basis. That database is a subset of the larger database, and is thus smaller and easier to work with. In certain circumstances, the smaller database did not populate with the IP addresses associated with each registration, and instead substituted an IP address used by Fluent locally. (Bhadania Decl. at ¶¶10-16.) As a result, the lead log included numerous registrations for three local Fluent IP addresses: 127.0.01, 192.168.1.1, and 172.24.32.94. (*Id.*) Mr. Beecher cited this anomaly in his original report, arguing that the existence of local Fluent IP addresses in the database suggested that the registrations were generated by bots or were otherwise fake. Fluent then explained the anomaly, and now Mr. Beecher's Supplemental Report does not cite the IP address issue (and Plaintiff does not raise it in his Motion). Consistent with this, when Fluent pulled the original source data on the 100 registrations identified by Plaintiff as a sample in discovery, that data – pulled from the larger database – was without any of the three internal IP addresses. (*Id.* at ¶ 16.)

"wrong number" claims here were "extraordinary." (Mot. at 4:23-24. *See also* Ex. 8, BB Dep. at 205:22-207:3)

All of this evidence is irrelevant. *First*, the TCPA requires only that an individual provide their cellphone number and "prior express written consent." Fluent asks for (and wants) accurate first and last name and other contact information because it makes that lead more likely to result in business to its customers, but nothing in the TCPA requires Fluent to collect that information or that a consumer's failure to provide accurate information invalidates his or her consent. Consistent with this, "[m]any privacy organizations advocate for and defend the use of pseudonyms online." (Kalat Report at ¶¶ 51, 57.)[8]

*Second*, just because someone opted out, complained, or claimed that Defendants had the wrong number does not mean that consent was not provided. People lie. In fact, of the almost 5,000 individuals that Plaintiff identifies who purportedly sent texts stating that Defendants had the "wrong number," Mr. Kalat was able to show that 80% were from registrations where the registrant's name appeared to trace back to the telephone number. (Kalat Supp. at ¶ 91.) In fact, of the *eight examples* of "wrong number" complaints highlighted in Plaintiff's brief, *every single one* appears to be a lie. (*Id.* at ¶¶ 93-94.) The one example claiming to be from the Raleigh Police Department is false—the number that was contacted is not a number for the Raleigh Police department. (*Id.*) As for the other seven, in *every instance*, the name included in the registration on Fluent's lead log *matches* the name associated with the phone number based on third-party sources. (*Id.*)

*Third*, and important here, once an individual opted-out or otherwise expressed displeasure with being contacted, Defendants placed them on a do not call list and they were not contacted again. This is not a case where Defendants were told they had the wrong number and kept calling.

---

[8] Nevertheless, the vast majority of the registrations have information that can be independently validated. As reflected in the Expert Report of David Kalat, 88.89% of the sampled leads were substantially validated, meaning that the data provided, even if incomplete or anomalous in some respects, was complete enough to allow Mr. Kalat to find some record tying the registrant's information to a real person. (Kalat Report at ¶¶ 59, 62-73, 79-96.)

1

2

       **4.**     ***Plaintiff's purported evidence of fake leads only highlights the individual inquiries that preclude certification***

3

4

5

6

      Even if the Court reviews Plaintiff's purported evidence of fake registrations, that evidence only reinforces the reality that identifying any fake registrations and then determining whether the person called as a result has a valid claim requires extensive individual inquiry and, even then, the inquiry may not be successful. The following demonstration is instructive.

7

8

9

10

11

12

13

      **Step One: Identify the Person Called.** The first step would be to identify the person who was actually contacted. Plaintiff's expert, A.V., proposes a process called "reverse append," wherein she searches for the telephone number in public and private databases, which purport to track the owner of the phone number. This process is inherently unreliable because public and private databases do not accurately set forth who uses a particular cell phone number at any given time. (Expert Report of Jan Kostyun ("Kostyun Report") at ¶¶ 68-75.) As set forth below, each registration would have to be investigated one-by-one. For example:

14

15

16

17

18

19

20

21

22

23

      (a)     For registrations that list a phone number, name, and address (***so purportedly complete registrations***), identifying the person contacted may not be reliable (or possible) because "reverse append" does not always identify a purported owner for the phone number. One registrant identified herself as Kelsey Forsch and entered the phone number ending in 2068. Third-party records tied Ms. Forsch to the physical and email addresses submitted with her registration, but those records were unable to connect Ms. Forsch to the phone number. In fact, those records could not connect the phone number to anyone. (Kalat Supp. at ¶ 62.) The phone number almost certainly belongs to Ms. Forsch (unless she was lying during her registration), but no one can say for certain without asking her. There are other examples where the "reverse append" appears to identify a person, but it cannot be said with any reliability.[9]

24

25

26

      (b)     For registrations with apparent ***pseudonyms*** or ***anonymized names*** (like aaaaaaaa)

27

28

---

[9] For example, one user registered with the name Ashlei Rogers with a phone number ending in 0642. (Kalat Supp. at ¶ 79.) Third-party sources suggest a match with the name and email address. (*Id.* at ¶¶ 79-80; *see also* Dkt. No. 104-2 at ¶¶ 15-16, Ex. C.)

or **anomalous data** (like {FIRSTNAME}),[10] identifying the person contacted is also not reliable (or even always possible). In some cases, the "reverse append" process appears to tie other information associated with the registration (like address) to the phone number, and ultimately results in a name for the potential user of the phone. For example, one user registered with the name Andrea Clay and with the phone number ending in 6114. (*Id.* at ¶ 72.) This user visited Fluent's Websites over 1,000 times and registered with nine different combinations of first/last name, three different home addresses, and four different email addresses. (*Id.* at ¶¶ 73-78.)[11] Notably, of the over 1,000 registrations associated with Andrea Clay, 116 included anomalous data, including pseudonyms (like Eileen or Andrew), anonymized names (like "kc"), or combinations of "undefined" or "{firstname}" or "{last names}." (*Id.* at ¶ 75.) Despite these data variations, third-party sources "assign an 86% likelihood that the [phone] number is connected to" Andrea Clay. (*Id.* at ¶ 72.) But neither sides' experts nor anyone else can say for certain without locating Andrea Clay and asking her. There are other examples like this too where a "reverse append" may or may not assist in locating the person contacted where the registration was incomplete or in some way anomalous. (*See* Kalat Supp. at ¶¶ 65-71.)

(c)     For registrations that appear to be **mismatched** based on a "reverse append" search—meaning the name in the registration does not match the name found by the "reverse append" process—the "reverse append" process is too unreliable to accurately identify the user of the phone. For example, Plaintiff's phone number, which is associated with the "Dunk Loka" registration, does not connect Plaintiff's phone number to Plaintiff. Instead, a "reverse append" connects Plaintiff's

---

[10] A tiny portion of the leads—**less than one third of one percent**—contains anomalous data, like {FIRSTNAME} or other purportedly computer generated placeholders (like %$). (Kalat Supp. at ¶ 47.) To the extent that there are certain data fields in Fluent's lead logs that have a curly bracket around the information or state "first" or "address" in certain data fields, this was either entered by the user or occurred as a result of a merge field being prepopulated when the user went from a publisher's website to Fluent's website. (Cullen Decl. at ¶ 16; Kalat Supp. at ¶¶ 48-58.)

[11] It is not uncommon for users to register on Fluent's websites many, many times. In fact, as Mr. Kalat explains, there are communities of people, sometimes referred to as "sweepers," who register on sweepstakes or rewards websites hundreds, if not thousands, of times. (Kalat Supp. at ¶¶ 6-11.) In fact, Mr. Kalat was able to mimic the behavior of sweepers and could complete a registration in under 20 seconds. (*Id.* at ¶ 84.)

phone number to a person named Ronald Berman. (Kalat Report at ¶¶ 74-78; Kostyun Report at ¶¶ 63, 75.)[12] In a case similar to this one, a court rejected the "reverse append" methodology because of this unreliability. *Wilson v. Badcock Home Furniture*, 2018 U.S. Dist. LEXIS 213792, at *6 (M.D. Fla. Dec. 19, 2018) (finding that "reverse append" "[m]ost glaringly . . . would not even have discovered Plaintiff as a class member"); (Kostyun Report at ¶¶ 63, 75.).

(d)     Finally, even purported opt-out text messages claiming that Defendants contacted the "wrong number" is not a reliable way of identifying fake registrations. As noted above, of the nearly 5,000 individuals that Plaintiff identifies who purportedly sent texts stating that Defendants had the "wrong number," Mr. Kalat confirmed that 80% were from registrations where the name provided appeared to trace back to the phone number. (Kalat Supp. at ¶ 91.) And, of the eight "wrong number" examples that Plaintiff chose to highlight in the text of his Motion, ***all eight chose to lie.***

**Step Two: Investigate Whether The Person Called Visited Fluent's Website Or Otherwise Consented.** The second step would be to interview the individual who was contacted, if that person could ever be found. In that case, various inquiries would be needed to ascertain whether (i) that individual; (ii) someone on that individual's friends or family plan with legal authority to register the number;[13] or (iii) someone with actual or implied authority acting on that individual's behalf,[14] visited Fluent's website, registered, agreed to the Terms & Conditions, and provided TCPA

---

[12] Similarly, when Mr. Kostyun performs a reverse-append to find the owner of his daughter-in-law's cell phone (to which she has been the subscriber and sole user for the past 11 years), the search resulted in the identity of a man named Duane Darling. (Kostyun Report at ¶ 47(e).)

[13] Friends and family plans often employ many different surnames. Moreover, the person who gives TCPA consent to be contacted may be (but is not limited to) the non-subscriber customary user included in the calling plan at the relevant time, in addition to the subscriber. *In the Matter of Rules and Regs. Implementing the Tel. Consumer Protection Act*, 30 FCC Rcd. 7961, 8000-01¶¶ 73-75 (2015); *see also, e.g., Rodriguez v. Premier Bankcard, LLC*, 2018 U.S. Dist. LEXIS 149225, at *11 (N.D. Ohio Aug. 31, 2018) (in a TCPA case where husband, William Hodge, provided his phone number and the phone number of his wife, Adrena Rodriguez, on a credit card application and the account was only in Hodge's name, Hodge could provide consent for both numbers).

[14] *See Jacobs v. Quicken Loans, Inc.*, 2017 U.S. Dist. LEXIS 176469, at *10 (S.D. Fla. Oct. 19, 2017) (finding that "consent could be given by someone other than the subscriber, such as a third-party affiliate, or spouse of a call recipient"); *Gutierrez v. Barclays Grp.*, 2011 U.S. Dist. LEXIS 12546, at *7-9 (S.D. Cal. Feb. 9, 2011) (finding that the husband "possessed 'common authority' over his wife's cellular telephone such that he could give Defendant 'prior express consent' for its use of her cellular number"); *Davis v. AT&T Corp.*, 2017 U.S. Dist. LEXIS 46611, at *15 (S.D. Cal.

-15-

consent. Even if that individual denied visiting a Fluent Website—and otherwise denied that anyone else did acting on his or her behalf—Defendants would be entitled to pursue discovery against that person, including by way of third-party subpoenas, and Defendants would be entitled to cross-examine them. And, if it ultimately turned out that some third-party entered that individual's phone number into Fluent's database without authority, that third-party will be brought into this lawsuit by way of a third-party complaint from Defendants.

### D. Fluent Did Not Destroy Evidence Of Consent

Plaintiff knows that Fluent maintains evidence of consent. Plaintiff knows this because this Court ordered Fluent to produce detailed information related to 100 phone numbers hand selected by Plaintiff. This time intensive investigation provided Plaintiff and his expert with, among other things, the date and time a user landed on a Fluent website and the date and time the user consented (as well as the device/web browser that was used to access the Fluent Website). (Cullen Decl. at ¶¶ 10-14; Bhadania Decl. at ¶¶ 8-9; Astrup Decl., Ex. 2.)[15] Nevertheless, Plaintiff claims that Fluent improperly destroyed its "server logs" and that the Court should, as a result, conclude that Fluent is unable to present evidence of consent. (Mot. at 21:16-22:10.) Not so.

First, Fluent maintains evidence of consent, including any such evidence from the "server logs." Fluent's "server logs" track, in real time, a limited amount of information, including connecting IP address, the user agent, date/time stamp when the user landed on a Fluent Website, success codes, redirect codes, error codes, and html/image files so that the website can display information to the user. (Cullen Decl. at ¶ 8.) All of this information, to the extent pertinent to a registrant's consent, is extracted from the server logs and maintained by Fluent in a separate database. (*Id.* at ¶¶ 10-11.) As a result, all information germane to an individual's consent has been stored and can be presented, but doing so would take a significant amount of time. (*See* Dkt. No. 131 at ¶ 22.) Consistent with this, and as explained above, Fluent has produced the consent

---

Mar. 28, 2017) ("Likewise, if Defendant's customer provided a number belonging to another person, such as a spouse or other family member, an inquiry into that customer's authority to provide consent to call that number would be required.").

[15] In addition, the date and time stamps to which Plaintiff mistakenly claims is destroyed was also provided to Plaintiff in Dkt. No. 16-1 and Dkt. No. 94-2 at ¶¶ 23-29.

information for numerous registrations, including Plaintiff's, the exemplar registrants who became Freedom customers, and the 100 sample leads selected by Plaintiff in discovery.

Second, because Fluent stores relevant information from the server logs, Fluent maintains only 90 days' worth of the logs on a rolling basis. This is consistent with industry practice, which counsels in favor of both discarding server logs and, like Fluent, storing the information on a separate, secure database. (Kalat Supp. at ¶¶ 15-19.)

Third, in light of the foregoing (that the relevant information was stored and provided and Fluent discards server logs in the regular course) any suggestion that Plaintiff would ever be entitled to an issue or evidentiary sanction because the server logs were discarded is baseless. Plaintiff will never be able to show that Fluent "acted with the intent to deprive another party of the information's use." To the contrary, Fluent provided the information, just in a different form, and discarded the server logs because that is its business practice (there is no evidence that Fluent discarded it with the intent of preventing its use in this litigation). *See* Fed. R. Civ. P. 37(e)(2).

## IV.    THE COURT SHOULD DENY CERTIFICATION

### A.    Plaintiff Cannot Establish The Prerequisites Of Rule 23(a)

#### 1.    *Plaintiff Is Not Typical*

Plaintiff cannot satisfy the "typicality" requirement because he does not "possess the same interest and [did not] suffer the same injury" as the unnamed class members. *General Tel. Co. of Southwest v. Falcon*, 457 US 147, 156 (1982).[16] "Typicality" here is lacking because Plaintiff's claim is subject to a unique defense that could not be asserted against other members of the class. *Ellis v. Costco Wholesale Corp*., 657 F3d 970, 984 (9th Cir. 2011).

The "unique defense that precludes [] [P]laintiff from representing a class" here "is lack of standing." *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 407 (N.D. Ill. 1987). As previously explained (*see* Dkt. No. 94 at 11:5-12:7; Dkt. No. 104 at 3:1-4:15), Plaintiff lacks standing because his claim is not fairly traceable to Defendants. Rather, Plaintiff's injury is "the result of the independent action

---

[16] The typicality requirement is intended to avoid the "danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotations omitted).

of some third party not before the court." *Pritikin v. DOE*, 254 F.3d 791, 797 (9th Cir. 2001). The evidence reflects that a yet-to-be identified person, using a Samsung Galaxy J3 phone and while on the Wi-fi network of Wescafe, a coffee shop in Alameda, California (which is roughly 5.9 miles from where Plaintiff lives) visited a Fluent Website, registered Plaintiff's phone number, agreed to the Terms & Conditions, and provided TCPA consent—thereby causing Plaintiff to be contacted.

*Labau v. Cellco P'ship*, 2014 U.S. Dist. LEXIS 89602 (E.D. Cal. June 30, 2014) is instructive on this issue. In *Labau*, the court found that the plaintiff's injury was caused by someone other than the entity that contacted him, specifically the plaintiff's brother-in-law (Cozac), who had entered the plaintiff's information, 2014 U.S. Dist. LEXIS 89602 at *7-8. The court stated: "The purpose of the Telephone Consumer Protection Act is to protect citizens from 'invasion of privacy.' Assuming that any invasion of Plaintiffs privacy occurred here, the culprit is not Defendants, but Plaintiff's former brother-in-law." *Id.* In such a circumstance, the plaintiff's claim should be dismissed and class certification denied. *Id.* (denying certification); *see also Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 236 (S.D. Ill. 2011) (plaintiff is atypical where he did not provide his phone number himself, but where the "proposed class includes a substantial number of people who voluntarily gave their residential telephone numbers to the Casino knowing the Casino would call those numbers to present special commercial offers"); *Martinez v. Adir Int'l LLC*, 2015 WL 12670519, at *6 (C.D. Cal. July 7, 2015) (finding plaintiff atypical where "[p]laintiff's telephone number appeared to make its way into [defendant Curacao's] system by a fluke accident: a Curacao collections employee, against company policy, entered Plaintiff's cellular telephone number ending in 2748 as the primary cellular telephone number for Plaintiff's son's Curacao customer account, and Plaintiff's son had provided express written consent to be contacted for telemarketing purposes").[17]

---

[17] Plaintiff is also subject to Defendants' "reasonable" and "good faith" defense. In *Labau*, after finding that the plaintiff's brother-in-law caused her injury, the court also recognized that Verizon called the phone number that it had on file (provided by plaintiff's brother-in-law) "in reasonable, good faith pursuit." *Id.* In such circumstances, the plaintiff does not have a claim. *See also Chyba v. First Fin. Asset Mgmt., Inc.*, 2015 U.S. Dist. LEXIS 165276, at *32 (S.D. Cal. Nov. 20, 2013).

At the very least, Plaintiff's claims are atypical because he never visited a Fluent Website and therefore has no standing to challenge Fluent's arbitration provision, disclosures, or compliance with the E-Sign Act. As noted above, the putative class includes all people who were contacted, and so is composed of people who visited Fluent's Websites, registered, agreed to the Terms & Conditions and arbitration, and provided TCPA consent.

Even Plaintiff's expert agrees that individuals who visited Fluent's Websites agreed to the Terms & Conditions including mandatory arbitration. (BB Dep. at 137:7-138:5-11.) Plaintiff cannot represent a class of these individuals. *See Labou v. Cellco P'ship*, 2014 U.S. Dist. LEXIS 26974, at *15 (E.D. Cal. Feb. 28, 2014) ("Verizon customers have written contracts containing provisions both for automated calls upon prior written consent and for arbitration. No amount of discovery can erase these plain distinctions between Plaintiff and Verizon customers. Plaintiff's claims are therefore not typical of the class as a whole.").

### 2. *Plaintiff Is An Inadequate Class Representative*

A class may be certified only if the named representative will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). An adequate class representative must satisfy both prongs of a two-part test: (1) the representative's interest must not conflict with the interests of other class members; and (2) the representative must be positioned to prosecute the action vigorously on behalf of the class. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "[I]t is Plaintiff who bears the burden of showing []he is an adequate representative." *See Labau*, 2014 U.S. Dist. LEXIS 26974 at *17.

Plaintiff is inadequate to represent the putative class for at least two reasons. **First**, as with typicality, a named representative that is subject to a unique defense—here, lack of standing—is inadequate to represent the interests of a class of individuals who are not subject to that defense. *Feske v. MHC Thousand Trails Ltd. P'ship*, 2013 U.S. Dist. LEXIS 37232, at *43 (N.D. Cal. Mar. 18, 2013) ("[W]here a plaintiff seeks to represent class members who do not face the same defense, the plaintiff may be atypical and thereby an inadequate representative.").

**Second**, Plaintiff purportedly did not visit Fluent's Website, but is seeking to represent a class comprised of individuals who did. These putative class members must arbitrate their claims

on an individual basis and are subject to consent defenses. *See Molski v. Gleich*, 318 F.3d 937, 955-956 (9th Cir. 2003) (finding inadequate representative where named representative did not "suffer[] in the same manner as others in the class may have") *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 617 (9th Cir. 2010).

### 3.   *Plaintiff Cannot Establish Commonality*

Plaintiff also cannot establish commonality. Here, Plaintiff's claim arises because he did not visit Fluent's Website, but he seeks to represent a class of individuals who did. Trial on Plaintiff's claim would focus on, among other things, whether Plaintiff visited the website (*i.e.*, whether he is lying) and whether someone with Plaintiff's actual or apparent authority registered with Plaintiff's telephone number. The claims of the putative class, by contrast, would focus on whether they agreed to the Terms & Conditions and/or provided TCPA consent. Notably, Plaintiff has not identified a single other person like himself who was contacted as part of the Freedom campaign, but did not visit a Fluent Website. Plaintiff makes arguments that there may be other such individuals, but he has not identified a single other person. Litigation of the unique factual circumstances giving rise to Plaintiff's claim is thus not a common issue.

### B.   <u>Plaintiff Cannot Establish The Prerequisites For A Rule 23(b)(3) Class</u>

### 1.   *Plaintiff cannot establish predominance*

For a class action to be certified under Rule 23(b)(3), common issues of law and fact must predominate. Fed. R. Civ. P. 23(b)(3). In analyzing the balance between individual and common issues, "[t]he predominance inquiry requires a court to consider 'how a trial on the merits would be conducted if a class were certified.'" *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (citation omitted). Where, *as here*, a trial would entail "the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action [is] inappropriate." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001).

In TCPA cases, when the defendant establishes that a large portion of the class is subject to a potential consent defense, courts routinely deny certification. *See Davis v. AT&T Corp.*, 2017 U.S. Dist. LEXIS 46611, at *14-16 (S.D. Cal. Mar. 28, 2017) (denying class certification where

individualized issues of consent predominated); *Blair v. CBE Grp., Inc*., 309 F.R.D. 621, 631 (S.D. Cal. 2015) (denying certification because "Plaintiffs' arguments, including the evidence cited in support of their position, illustrate the need for 'mini-trials' into whether each class member provided his or her phone number to the underlying creditor"); *Gannon v. Network Tel. Servs., Inc.*, 2013 U.S. Dist. LEXIS 81250, at *3 (C.D. Cal. Jun. 5, 2013) (finding that predominance not satisfied where individual issues of consent involved an inquiry into class members' interactions with defendant); *see also McMillion v. Rash Curtis & Assocs.*, 2017 U.S. Dist. LEXIS 144403, at *10 (N.D. Cal. Sep. 6, 2017) (Gonzalez Rogers, J.) (suggesting that where a court must inquire as to whether the individual or third party provided the phone number and consented, will create the need for individualized inquiries).[18]

Indeed, in an almost identical case that was decided last month, a district court refused to certify a class where individual issues as to consent predominated. *Gordon v. Caribbean Cruise Line, Inc.*, 2019 U.S. Dist. LEXIS 20604, at *30 (N.D. Ill. Feb. 8, 2019). In *Gordon*, the defendant submitted a declaration from the lead generation company, Adsource, confirming that it "sent text messages only to those who entered their names and phone numbers on Adsource's landing page and checked the box indicating their consent to receive text messages via an auto-dialer." *Id.* at *29. As part of the certification motion, the *Gordon* plaintiff submitted a chart purporting to show those registrations where the name on the registration did not match the phone number on the registration (based on a "reverse append" search), suggesting that the person contacted was not the person who

---

[18] Courts in other circuits also agree. *See, e.g., Johnson v. Yahoo! Inc.*, 2018 U.S. Dist. LEXIS 23564, at *9 (N.D. Ill. Feb. 13, 2018) (finding that the "defendant does not need to prove consent," the defendant "just needs to show that proving consent requires individualized analysis such that the class does not meet the predominance requirement"); *Newhart v. Quicken Loans Inc.*, 2016 U.S. Dist. LEXIS 168721, at *14 (S.D. Fla. Oct. 12, 2016) (finding that where consent was obtained in different ways, it precluded class certification and that defendant "would be entitled to call the borrowers (and others) to prove its consent for any of the challenged calls and the borrowers could, in turn, attempt to refute records or recordings of consent"); *Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d 674, 688 (D. Md. 2017) (holding that "the individualized issues relating to consent and revocation, on which claims will ultimately turn, predominate over any common issues such that 'myriad mini-trials cannot be avoided' on the issues of consent and revocation"); *Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 578 (N.D. Ill. 2017) (denying certification because "the trial will involve hundreds, if not thousands, of mini-trials on the issue of consent alone.").

1    consented. *Id.* at *29-30. The court rejected this argument, holding that the plaintiff's argument only

2    proved that "individualized factual inquiries will be necessary to determine whether the individuals

3    on the Lead Lists did, in fact, consent, and those issues will predominate the litigation." *Id.* at *30.

4         Here, Fluent has provided specific evidence of consent. Every lead on Fluent's lead logs

5    consented to be contacted. (*See* Barksy Decl. at ¶¶ 32-35.) Fluent also provided specific evidence

6    as to 100 phone numbers for which it had consent. (Cullen Decl. at ¶¶ 10-14; FLUENT_000574;

7    FLUENT_004052.) And Fluent provided specific evidence with respect to ten Freedom customers

8    for whom it had consent to contact, which contact resulted in them becoming Freedom customers.

9    (Barsky Decl. at ¶¶ 21-31; Dkt. No. 94-2 at ¶¶ 23-29.) This evidence of consent precludes any notion

10   that predominance can be satisfied. In fact, Plaintiff has not cited a single case where there was

11   evidence of consent like that presented here and the court certified a class. The cases that Plaintiff

12   cites involve situations where there was no evidence of consent at all.[19]

13        Further, even if Plaintiff had visited Fluent's Website and thus could challenge whether

14   Fluent's TCPA disclosures were unclear or misleading, that issue would be for an arbitrator to

15   decide. As stated above, Plaintiff's expert admitted that users who visited Fluent's Websites agreed

16   to the Terms & Conditions and mandatory arbitration. (BB Dep. at 137:7-138:5-11.) Users who visit

17   Fluent's Websites agree to mandatory arbitration *before* being asked if they want to consent to calls.

18   At a minimum, then, this issue should be addressed by an arbitrator in arbitration.[20]

19        But, even if that were not the case, individualized trials would be necessary to ascertain who,

20   if anyone, was confused by Fluent's websites. Plaintiff's own expert agreed that such a challenge

21

22   ───────────────

     [19] One case cited by Plaintiff involved a defendant who admittedly had <u>no evidence</u> of consent, *see*
23   *Knutson v. Schwan's Home Serv.*, 2013 U.S. Dist. LEXIS 127032, at *5-6 (S.D. Cal. Sept. 5, 2013),
     and the other involved a defendant erroneously calling to collect debt from the phone number
24   provided in the employer section of a loan application. *Stemple v. QC Holdings, Inc.*, 2014 U.S.
     Dist. LEXIS 125313, at *4 (S.D. Cal. Sept. 5, 2014). Moreover, in *Stemple*, there was no proof of
25   underlying consent to call employers like there is in this case. *See id.* at *24.

26   [20] Fluent's arbitration provision has previously been determined to be enforceable. *See Hilton v.
     Fluent*, 297 F. Supp. 3d 1337, 1342-43 (S.D. Fla. 2018) ("Also, to the extent that Plaintiffs claim
27   they should not be bound by the Arbitration Agreement because they did not see or read the
     Terms and Conditions on the Reward Zone websites before checking the box to provide consent, I
28   would be inclined to reject such arguments.").

1    would be individual. (BB Dep. at 48:23-49:16.) *See also Connelly v. Hilton Grand Vacations Co.,*

2    *LLC*, 294 F.R.D. 574, 578 (S.D. Cal. 2013) (finding that predominance is not satisfied where the

3    individual experience of each guest with Hilton factored into consent).

### 2.    *Plaintiff cannot establish superiority*

5         Plaintiff has not demonstrated how trying this case as a class action would be manageable

6    or superior to individual litigation. In an effort to sweep away the individual issues identified above,

7    Plaintiff suggests that the Court can rely on a claims administrator to decide who visited the

8    Websites, agreed to arbitration, and provided consent. (Mot. at 24:6-9.) Those issues, however, are

9    legal determinations ***on liability*** that cannot be handled by a claim administrator. *See e.g., In re*

10   *SFPP Right - Of – Way Claims*, 2017 U.S. Dist. LEXIS 85973, at *39-40 (C.D. Cal. May 23, 2017)

11   (finding that individual issues of property ownership "is a threshold liability concern that requires a

12   legal determination" and that "the Court itself — not claims administrators — must rule on them");

13   *cf. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132-33 (9th Cir. 2017) (finding in a class action

14   for false advertising that no due process rights are affected where the issue involved individualized

15   damages determinations *after* a finding of liability).

16        In addition, the claims administration process is subject to abuse. Putative class members

17   may deliberately lie about their registration information to obtain an award (indeed, as the "wrong

18   number" complaints suggests—many people have already lied). Precluding Defendants from

19   challenging each person would violate Defendants' due process rights. Thus, any suggestion that

20   self-attestation is sufficient to confirm that a putative class member did not visit a Fluent Website,

21   did not agree to arbitration, or did not provide TCPA consent must be rejected. *Wilson*, 2018 U.S.

22   Dist. LEXIS 213792 at *8-9 (recognizing that the defendant could face up to $1,500 per call and

23   that amount of money was "relevant both as an incentive for individuals to improperly enter the

24   class and . . . impacts due process protections for Defendant"). The court in *Wilson* stated that "due

25   process allows Defendant to inquire whether the alleged wrong number belonged to a customer by

26   consulting each individual file, and if not, how the number entered Defendant's records, whether

27   the claimant was actually the one called [and] whether privies or associates might have consented."

28   *Id.* at *13-14. Individual investigations to protect Defendants' due process rights is just another

1   reason why class certification is improper and should be denied. *See Sandusky Wellness*, 863 F.3d

2   at 466 (finding that the "difficulty in identifying class members without fax logs and with sole

3   reliance on individual affidavits was equally sufficient to preclude certification").

4         Finally, where, as here, a significant portion of the class is subject to arbitration agreements

5   with class action waivers, class litigation is not manageable. *Pablo v. Servicemaster Global*

6   *Holdings, Inc.*, 2011 U.S. Dist. LEXIS 87918 at *5 (N.D. Cal. Aug. 9, 2011). In *Pablo*, the court

7   denied certification by reasoning that the court was "faced with evidence that numerous arbitration

8   agreements were signed by defendants and their employees," and that evidence "supports the

9   Court's finding that a class action is not the superior method of adjudication." *Id.* Here, for every

10   putative class member, Defendants intend to file motions to compel arbitration and these individuals

11   will be required to defend and present evidence (via affidavit or otherwise) that they should not be

12   compelled to arbitrate. *See e.g., Hilton v. Fluent*, Hilton, 297 F. Supp. 3d 1337, 1341-42 (S.D. Fla.

13   2018).

14       **C.**     **Plaintiff Cannot Establish The Prerequisites For A Rule 23(b)(2) Class**

15         Rule 23(b)(2) does not "authorize class certification when each class member would be

16   entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360-61. Because

17   Plaintiff primarily seeks monetary damages on behalf of the class, Plaintiff's only option for

18   certification is under Rule 23(b)(3). *See Connelly*, 294 F.R.D. at 579.

19         In addition, each class member must have standing to obtain an injunction to be part of a

20   class under 23(b)(2). *See Dukes*, 564 U.S. at 364-65. In order to have such standing, a plaintiff must

21   demonstrate that he (and each class member) "will again be subjected to a particular action" and

22   "the courts generally have been unwilling to assume that the party seeking relief will repeat the type

23   of activity which was the focus of the judicial complaint [and] that would once again place him or

24   her at risk of that injury." *Honig v. Doe*, 484 U.S. 305, 320 (1988). Here, Plaintiff does not allege

25   that calls or texts have continued. Moreover, Plaintiff's number has been added to Defendants' do-

26   not-call lists, so Plaintiff will not be called again. (Barsky Decl. at ¶ 39; Naik Decl. at ¶ 7;

27   Declaration of Tom Martindale at ¶ 6.) On top of that, the Freedom campaign ended in April 2018,

28   so no member of any proposed class faces any threat of future harm.

1    Finally, even if the marketing campaign was still in effect, in order for a class to be certified,

2   Rule 23(b)(2) requires that Defendants' "conduct is such that it can be enjoined or declared unlawful

3   only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360. With respect to

4   all of the consumers who visited Fluent's Websites, agreed to the Terms & Conditions, and provided

5   TCPA consent, they are entitled to no injunctive relief under the TCPA. Moreover, even if these

6   individuals were entitled to some form of injunctive relief, they must seek that relief in arbitration,

7   not in this Court. *Kilgore v. KeyBank, N.A.*, 718 F.3d 1052, 1061 (9th Cir. 2013) (requiring

8   arbitration of claim seeking private injunctive relief).

9   **V.    CONCLUSION**

10    For the reasons set forth above, Defendants respectfully request that the Court deny

11   Plaintiff's Motion for Class Certification.

12

13   Dated: March 1, 2019                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

14

                                            By    _____
15                                                         */s/ Jay T. Ramsey*
                                                        JAY T. RAMSEY
16
                                            KLEIN MOYNIHAN TURCO LLP
17                                          Brian P. Astrup (admitted *pro hac vice*)

18                                          Attorneys for Defendants Freedom Financial Network,
                                            LLC, Freedom Debt Relief, LLC, Fluent, Inc., and Lead
19                                          Science, LLC

20

21

22

23

24

25

26

27

28