1
2
3
4
5
6
7
8
9
10
11

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
JAY T. RAMSEY, Cal. Bar No. 273160
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:    310.228.3700
Facsimile:     310.228.3701
jramsey@sheppardmullin.com

KLEIN MOYNIHAN TURCO LLP
BRIAN P. ASTRUP (admitted *pro hac vice*)
450 Seventh Avenue, 40th Floor
New York, New York 10123
Telephone:    212-246-0900
Facsimile:     212-216-9559
bastrup@kleinmoynihan.com

Attorneys for Defendants
FREEDOM FINANCIAL NETWORK, LLC,
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC., and LEAD SCIENCE, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| DANIEL BERMAN,<br><br>              Plaintiff,<br><br>      v.<br><br>FREEDOM FINANCIAL NETWORK, LLC,<br>FREEDOM DEBT RELIEF, LLC, FLUENT,<br>INC., and LEAD SCIENCE, LLC,<br><br>              Defendants. | Case No.: 4:18-CV-01060-YGR<br><br>*Hon. Yvonne Gonzalez Rogers*<br><br><br>**DECLARATION OF BRIAN P. ASTRUP,<br>ESQ. IN SUPPORT OF OPPOSITION TO<br>MOTION FOR CLASS CERTIFICATION** |
| FREEDOM FINANCIAL NETWORK,<br>LLC and FREEDOM DEBT RELIEF,<br>LLC,<br><br>              Third-Party Plaintiffs,<br><br>      v.<br><br>DOES 1 through 5,<br><br>              Third-Party Defendants. | |

{00132240;1}

I, Brian P. Astrup, hereby declare:

1.      I am over the age of eighteen and I am an attorney admitted to practice law in the State of New Jersey, the State of New York, and I have been admitted to practice in this Court via *pro hac vice*.

2.      I am co-counsel of record to Defendants Freedom Financial Network, LLC, Freedom Debt Relief, LLC, Fluent, Inc., and Lead Science, LLC (collectively, "Defendants").

3.      I make this Declaration in support of Defendants' Opposition to Motion for Class Certification.

4.      The following facts are based upon my personal knowledge. If called as a witness, I could and would testify competently to such facts under oath.

5.      On February 15, 2019, I produced to Plaintiff's counsel an updated excel spreadsheet containing additional information on the 100 numbers chosen by Plaintiff. That document was originally produced as FLUENT_000574 and the updated spreadsheet was produced as FLUENT_004052.

6.      Attached hereto as **Exhibit 2** is a true and correct copy (reformatted for readability) of a representative sample of the 100-number spreadsheet as it pertains to Plaintiff's registration.

7.      Attached hereto as **Exhibit 3** is a true and correct copy of the response from Comcast to Defendants' third-party subpoena.

8.      Attached hereto as **Exhibit 4** is a true and correct copy of the response from Google to Defendants' third-party subpoena.

9.      Attached hereto as **Exhibit 5** is a true and correct copy of the Expert Report of David Kalat.

10.     Attached hereto as **Exhibit 6** is a true and correct copy of the Supplemental Expert Report of David Kalat.

11.     Attached hereto as **Exhibit 7** is a true and correct copy of the Expert Report of Jan Kostyun.

{00132240;1}

DECLARATION OF BRIAN P. ASTRUP, ESQ.

12.     Attached hereto as **Exhibit 8** is a true and correct copy of selected portions of the deposition transcript of Benjamin H. Beecher.

13.     Attached hereto as **Exhibit 9** is a true and correct copy of the voluntary dismissal filed by plaintiffs in the *Hilton v. Fluent, LLC* (9:17-cv-81270) matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on March 1, 2019.


 */s/ Brian P. Astrup*
Brian P. Astrup, Esq.

DECLARATION OF BRIAN P. ASTRUP, ESQ.

# EXHIBIT 2

| | |
|---|---|
| Phone | 5103269945 |
| Landing DateTime | 12/24/2017 20:39 |
| Landing Domain | signup.electronics-sweepstakes.com |
| Refer Domain | amclicks.com |
| UserAgent | Mozilla/5.0 (Linux; Android 5.1.1; SM-J320P Build/LMY47X) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/63.0.3239.111 Mobile Safari/537.36 |
| IP Address | 73.252.203.130 |
| TCPA consent | yes |
| DateTime TCPA Consent | 12/24/2017 20:41 |
| Email | Buffola@gmail.com |
| Firstname | Dunk |
| Lastname | Loka |
| Address | Grand st |
| City | Alameda |
| State | CA |
| Zippost | 94501 |

# EXHIBIT 3









# EXHIBIT 4

```
                    Account Info - buffola.AccountInfo.txt
############## * Google Confidential and Proprietary * ##############

GOOGLE SUBSCRIBER INFORMATION
Name: ola bello
e-Mail: buffola@googlemail.com
Created on: 2007/02/19-21:59:20-UTC
Terms of Service IP: 82.10.192.86, on 2007/02/19-21:59:19-UTC
Google Account ID: 742075131625

No user IP logs data.

############## * Google Confidential and Proprietary * ##############
```

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DANIEL BERMAN,

Plaintiff,

v.                                          Case No. 4:18-CV-01060-DMR

FREEDOM FINANCIAL NETWORK, LLC,             Hon. Yvonne Gonzalez Rogers
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC, and LEAD SCIENCE, LLC,

Defendants.

**EXPERT REPORT OF DAVID KALAT**

**EXPERT REPORT OF DAVID KALAT** ........................................................................ 1

I.    SUMMARY OF OPINIONS ................................................................. 3

II.    QUALIFICATIONS ........................................................................ 5

III.    DOCUMENTS AND DATA SOURCES CONSIDERED .................................. 8

IV.    ANALYSIS AND OPINIONS ............................................................. 9

    A.    Introduction ........................................................................... 9

V.    ANALYSIS OF ALLEGED "FACIALLY DEFICIENT" LEADS .................................... 12

    A.    Users of Fluent's web forms have different incentives to enter contact information than they do for their name and address ........................................................ 12

    B.    Testing the Integrity of the Registration Information .................................... 14

        1.    Methodology ........................................................................... 17

        2.    Email Verification .................................................................... 17

        3.    The "Dunk Loka" Lead ............................................................ 20

        4.    Duplicate Leads ...................................................................... 22

    C.    Analysis of the IP Address Information Shows No Unexpected Anomalies ................ 23

    D.    Data Security Issues ................................................................. 27

    E.    Bot activity ........................................................................... 28

        1.    Leads With "Placeholder" Variables ............................................. 29

        2.    The Origin of the "Dunk Loka" Lead ............................................ 31

    F.    Identification of Business Numbers ................................................. 32

    G.    Analysis Of Dialer Records To Leads ............................................... 33

## I.      SUMMARY OF OPINIONS

1.  Plaintiff's experts Anya Verkhovskaya and Benjamin Beecher claim to have identified various inconsistencies in the lead data produced by Fluent that they imply or directly allege are indications of suspicious activity, data corruption, or other reasons to distrust the integrity and reliability of the leads. As my analysis herein details, these conclusions rest on faulty assumptions and misleading analysis. Each claim alleging "deficiencies" is meritless and evaporates on closer inspection.

2.  My analysis of a randomly selected statistically valid sample of 16,270 leads found that at least 88.89% were corroborated by information available in the public records provided by LexisNexis, TLO, and the National Change of Address database. Additional investigation is needed to assess the remaining 18% of the leads.

3.  88.7% of the email addresses in the sample of 16,270 leads are verified by their providers to be valid email addresses associated with actual users to whom emails can be directed. Many of the remaining addresses appear to be previously valid email addresses that were likely discontinued by their users prior to my analysis. Additional investigation is needed to assess the remaining 11.3% of the email addresses.

4.  Analyzing the email addresses in the sample of 16,270 leads found no evidence that they had originated from email harvesting, had been generated by email appending or permutations, or showed any evidence of lacking opt-in consent.

5.  The LexisNexis and TLO databases, which plaintiff proposes as an authoritative repository of consumer contact information, do not associate plaintiff Daniel Berman with his own phone number, and as such are "deficient" *in the same way that the Fluent lead records alleged to be*. It does not logically follow to conclude that it is a fatal deficiency that the leads associate the 510-326-9945 number with someone other than Daniel Berman, if the plaintiff's preferred resource of reliable information also associate the 510-326-9945 number with someone other than Daniel Berman.

6.  Ms. Verkhovskaya claims that 132,867 of the leads are duplicated by one or more additional leads that she implies are untrustworthy. I correlated the lead data to the call logs and confirmed that for every one of the 16,270 telephone numbers in my sample, no calls were logged to that number prior to the date on the *earliest* lead. Even if there was a reason to distrust the validity of the additional leads, none of those leads would be relevant to a determination of whether there was documentation of prior express written consent to initiate calls or texts to those numbers. Furthermore, my own testing of Fluent's websites confirmed Fluent's statement that the web forms autofill customer information for returning registrants. This explains the similarities between the duplicate leads that Ms. Verkhovskaya found noteworthy.

7.  Ms. Verkhovskaya's analysis comparing the distance between the physical address recorded in each lead with the geolocation associated with the corresponding IP address is nonsensical, because the geolocation of the IP address identifies the location of the entity that registered the IP address (which is typically a commercial ISP), not the location of the user.

8.  The presence of internal private IP addresses associated with Fluent's network in some of the lead records is not an indication of a "misconfigured system" and is consistent with my prior experience with Fluent's documentation.

9.  The absence of a CAPTCHA toolbar from Fluent's web sites is irrelevant in light of the fact that other attributes of the web site design provide comparable levels of data security.

10. I see no evidence supporting the contention that any leads were submitted by spam bots instead of by actual human visitors to Fluent's web sites.

11. Ms. Verkhovskaya's methodology for identifying business numbers under-identifies business numbers.

12. I compared the Dialer Logs with the Fluent Leads and determined that every call or text documented in the Dialer Logs was placed to a telephone number previously obtained from a lead, with the exception of 20 telephone numbers not contained on either of these data sets.

---

## II.     QUALIFICATIONS

13. I am a Director at Berkeley Research Group, LLC ("BRG"), a leading global strategic advisory and expert services firm that provides independent expert testimony, litigation support, data analytics and other services to major law firms, Fortune 500 corporations, government agencies, and regulatory bodies around the world. I am a member of the firm's Global Investigations + Strategic Intelligence practice group. I lead investigations involving data analytics and forensic computer examinations. I joined BRG in April 2015.[1]

14. I received my Bachelor of Arts from the University of Michigan as a James B. Angell Scholar. I received my Master's Degree in Library and Information Science from the University of Illinois at Urbana-Champaign.

15. I am certified by the International Society of Forensic Computer Examiners (ISFCE) as a Certified Computer Examiner (license number 1666). I am also licensed by the International Information System Security Certification Consortium ((ISC)$^2$) as a Certified Information Systems Security Professional (license number 593527). I am a Certified Fraud Examiner (license number 621469). I am a licensed Private Detective in the states of Illinois (license number 115.002487) and Texas (license number 52430601).

16. I am a non-fiction author with a focus on the history of information technology. For example, I write a monthly column for LegalTech News called "Nervous System" that approaches issues of data privacy and cybersecurity from a historical context.

17. I have been retained as a consulting and/or testifying expert in several TCPA actions including many for which I have either not yet been disclosed or not yet provided any written testimony. I have also provided written and/or verbal testimony in the following matters involving TCPA actions and related claims:

    a. In the case of <u>Revitch v. Citibank</u> in the Northern District of California, I provided an expert report on the technical capacity and functionality of the communication platform used by the Defendant.

---

[1] My Curriculum Vitae is set forth as Exhibit 1.

    b.  In the case of <u>Marcheco v. Jo-Ann Stores, LLC</u> in the Southern District of Florida, I provided an expert report on the technical capacity and functionality of the messaging platform used by the Defendant.

    c.  In the case of <u>Braver *et al*. v. NorthStar Alarm Services, LLC</u> in the Western District of Oklahoma, I conducted data analytics and investigative research on behalf of the defendant in a putative TCPA lawsuit involving the use of soundboard avatar technology.

18. I served on the data analysis teams at the direction of testifying expert Peggy Daley analyzing lead lists and other related data sources in the following TCPA matters:

    a.  <u>Pieterson v. Wells Fargo Bank, N.A.</u>, No: 3:17-cv-02306-EDL (N.D. Cal.)

    b.  <u>McCurley v. Royal Seas Cruises, Inc.</u>, No. 17-cv-1988 AJB (AGS), consolidated with <u>DeForest v. Royal Seas Cruises, Inc.</u>, No. 17-cv-986 AJB (AGS) (S.D. Cal)

    c.  <u>Horton v. Navient Solutions, Inc.</u>, No: 1773cv00200 (Mass. Sup. Ct.)

    d.  <u>Bakov, *et. al* v. Consolidated World Travel Inc. d/b/a Holiday Cruise Line</u>, No. 1-15-CV-02980, consolidated with No. 1-17-CV-973 (N.D. IL)

    e.  <u>Fitzgerald v. Universal Pictures</u>, No: 6:16-cv-01193-CEM-DCI (M.D. Fla)

    f.  <u>Flowers v. Twilio, Inc.</u>, No: RG16804363 (Sup. Ct. Cal.)

    g.  <u>Zaklit v. Nationstar Mortgage LLC, *et al*.</u>, No: 5:15-cv-02190-CAS-KK (C.D. Cal.)

    h.  <u>Lee v. Global Tel * Link Corporation</u>, No.: 2:15- cv-02495-ODW PLA, consolidated with 2:15-cv-03464-ODW-PLA (C.D. Cal.)

    i.  <u>Henderson v. United Student Aid Funds, Inc. D/B/A USA Funds</u>, No. 3:13-cv-1845-JLS-BLM (S.D. Cal.)

    j.  <u>Johnson v. Navient Solutions, Inc. f/k/a Sallie Mae, Inc.</u>, No 1:15-CV-0716 (S.D. Ind.)

    k.  <u>Charvat, *et al*. v. Valente, *et al*.</u>, No. 12-CV-5746 (N.D. Ill.)

19. I have direct experience analyzing dialer systems used by call centers and organizations to manage communications with their customers and prospects. During the course of my work at BRG I have performed a variety of data analysis on numerous putative TCPA class actions as well as similar cases filed under the California Invasion of Privacy Act. My work has included but is not limited to reverse engineering the data schema and design of dialer platforms; forensic examination of web server logs to compare to the URLs and IP addresses in lead lists; analysis in SQL and PostgreSQL of dialer database records, call detail records, and Customer Relationship Management ("CRM") database records; analyzing records produced by the Interactive Marketing Solutions ("IMS") to distinguish wireless telephone numbers from landline telephone numbers; and conducting telephone number reverse lookups using data brokers such as LexisNexis and TLO. I have analyzed the use of dialers from Asteria, Noble Systems, Interactive Intelligence, Genesys, and other vendors. I have also examined the use of soundboard avatar technology by call centers.

20. I provide TCPA compliance consulting services to clients including but not limited to monitoring the use of customer contact databases and/or lead lists to design the recipients of outbound campaigns; scrubbing customer contact databases and/or lead lists to identify and remove cellular telephone numbers; and analyzing post-facto call detail reports to verify cellular telephone numbers were not contacted. In this capacity I have directly accessed the relevant dialer systems to run database queries, extract reports, upload data, and monitor configuration settings.

21. I have also provided prior expert testimony in the following matters:

- Revitch v. Citibank, No. 3:17cv06907 (N.D. Calif., 2017)

- Marcheco v. Jo-Ann Stores, LLC, 1:18cv20564 (S.D. Fla., 2018)

- Kolodziej v. Justice Park District, et al., 2014 L 775 (Cook Cnty. Cir. Ct., 2014)

- Indeck Energy Services v. DePodesta, et al., 14 CH 602 (Lake Cnty. Cir. Ct., 2014)

- Braver et al. v. NorthStar Alarm Services, LLC, 5:17cv00383 (W.D. Okla., 2017)

- <u>C.J. Drilling, Inc. v. Welsh</u>, No. 17 CH 001095 (Kane Cnty. Cir. Ct.)

- <u>Western Union v. Kula</u>, 1:17cv00280 (N.D. Ill.)

- <u>Segerdahl Corp. v. Ferruzza</u>, *et al.,* 1:17cv03015 (E.D. Ill.)

- <u>L&W Supply Corp. v. Banks et al</u>., CV16-00816 (Washoe Cnty. Dist. Ct.)

- <u>Bunnet & Co., Inc. and Energy Feeds International, LLC v. Dores</u>, 1:15cv1104 (W.D. Texas); also <u>In Re: Frank Miranda Dores and Mary Anne Souza Dores</u>, No. 16-10169-B-13 (Bankr. E.D. Calif.)

- <u>Pro Sapiens LLC v. Indeck Power Equipment Co</u>., 14L5730 (Cook Cnty. Cir. Ct.)

- <u>Geophysical Service Inc. v. Anadarko Petroleum Corp. *et al.*,</u> 1201-15228 (Ct. of Queen's Bench of Alberta, 2014)

22. I have been retained by counsel for defense. I am being compensated at my hourly rate of $450.

## III.    DOCUMENTS AND DATA SOURCES CONSIDERED

23. My understanding of the factual matters at issue is based on my review of the documents and data described below. I understand that additional information relevant to my opinions may be disclosed in subsequent productions and depositions. Accordingly, I reserve the right to amend my findings based upon such additional disclosures.

24. Lead/registration records:

    a.  Fluent_00441

    b.  Fluent_00572

25. Call log records:

    a.  LeadScience_000677 (Outbound)

    b.  Freedom_000967 (Inbound)

    c.  Freedom_000968 (Inbound)

    d.  LeadScience_000676 - Call info for Plaintiff Daniel Berman

26. Second Amended Complaint

27. Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery

28. Plaintiff's Production (BERMAN 001-055)

29. Plaintiff's Responses and Objections to Freedom Financial Network, LLC's and Freedom Debt Relief, LLC's First Set of Discovery to Plaintiff

30. Google Account Information for Buffola@gmail.com account

31. Affidavit of TCPA Prior Express Written Consent, by Mitenkumar Bhadania (April 30, 2018)

32. Declaration of Mitenkumar Bhadania in Support of Defendant's Reply Motion (Dec. 4, 2018)

33. Declaration of Brian Astrup (Dec. 4, 2018)

34. Declaration of Dharma Naik in Support of Defendants' Motion to Dismiss (November 13, 2018)

35. Declaration of Daniel J. Barsky in Support of Defendants' Motion to Dismiss (November 13, 2018)

36. Fluent's Supplemental Response to Interrogatory Number 3

37. Expert Report of Anya Verkhovskaya (Dec. 7, 2018)

38. Expert Report of Benjamin Beecher (Dec. 7, 2018)

## IV.   ANALYSIS AND OPINIONS

### A.   Introduction

39. Fluent Inc. ("Fluent") is a digital marketing company that owns and operates consumer-facing websites that offer consumers various opportunities including enrolling in online sweepstakes.[2] These websites collect contact information and first-party data from consumers that Fluent uses to assist advertisers in targeting and potential customers and generating leads for advertisers. Consumers who access a website operated by Fluent are generally prompted to supply their name, address, date of birth, and telephone number ("Registration Information"). The system prompts the consumer to agree to the Terms and Conditions of the website, and to submit their consent to be contacted by one or more of the advertisers ("Marketing Partners")

---

[2] I have encountered Fluent in prior casework and know from experience that their lead generation operations include earning rewards, receiving job listings, obtaining product samples, and other consumer transactions, however the discussion set forth in the pleadings I was provided in this matter specifically reference sweepstakes.

listed on the TCPA consent page displayed by the website. If the consumer checks the boxes to provide their agreement with the Terms and Conditions and their consent to be contacted, then their Registration Information is recorded in Fluent's leads database and may be made available to Fluent's Marketing Partners.[3]

40. On December 24, 2017, customer contact information was submitted through one of Fluent's websites (signup.electronics-sweepstakes.com) that contained the telephone number 510-326-9945, email address buffola@gmail.com, the name "Dunk Loka" and an incomplete street address of "Grand Street" (with no house number).[4]

41. Between December 26, 2017 and February 14, 2018, 18 SMS text messages and three outbound telephone calls were directed to 510-326-9945.[5] These texts and calls were received by plaintiff Daniel Berman, who has stated under oath that he is the sole user of that telephone number.[6]

42. Mr. Berman also stated under oath that he did not submit this Registration Information to Fluent; did not authorize anyone to do it on his behalf; has never used the name "Dunk Loka;" has never used the email address buffola@gmail.com; and has never lived on "Grand Street."[7]

43. Examination of public records databases has failed to yield any records pertaining to anyone by the name of "Dunk Loka." Information supplied by Google has established no connection between Mr. Berman and the buffola@gmail.com address.

44. Based on the evidence that the "Dunk Loka" Registration information does not document Mr. Berman's identity, contact information, or consent, plaintiff proceeds to the conclusion that *all*

---

[3] Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery ("Fluent's Responses") at 3:22-4:24.
[4] Affidavit of TCPA Prior Express Written Consent, by Mitenkumar Bhadania ("Bhadania Affidavit") paragraphs 6-16.
[5] LEADSCIENCE_000676.
[6] Plaintiff's Responses and Objections to Freedom Financial Network, LLC's and Freedom Debt Relief, LLC's First Set of Discovery to Plaintiff ("Plaintiff's Responses"), at 4:24-26.
[7] Second Amended Complaint, paragraph 213.

of the leads collected and supplied by Fluent are "bogus" and "invalid."[8] Plaintiff claims that "the leads contain at least on the order of 100,000 facially deficient leads."[9]

45. Although plaintiff does not define "facially deficient," or clarify exactly how the figure of "100,000" was reached, this appears to represent conclusions from the expert reports of Anya Verkhovskaya and Benjamin Beecher. Together, Ms. Verkhovskaya and Mr. Beecher identify various types of alleged inconsistencies in the lead data produced by Fluent that they imply or directly allege indicate suspicious activity, data corruption, or other reasons to distrust the integrity and reliability of the leads generated by Fluent. The alleged inconsistencies or deficiencies identified in the analysis of Ms. Verkhovskaya and Mr. Beecher are as follows:

   a.  Ms. Verkhovskaya claims that "[m]ore than 50% of names and/or addresses are garbled, invalid, and/or blank."[10]

   b.  Ms. Verkhovskaya claims that 132,867 of the leads are duplicated by one or more additional leads that differ only in the IP address and in some cases the physical address.[11]

   c.  Ms. Verkhovskaya claims that only 84,594 pairs of IP addresses and validated street addresses are within 10 miles of one another, and the others are over 10 miles or even over 300 miles apart.[12]

   d.  Mr. Beecher claims that there are hundreds of examples text strings like {FIRSTNAME} {LASTNAME} in the leads that appear to have been inserted by computer programs instead of people.[13]

---

[8] Second Amended Complaint, paragraphs 9 and 231.
[9] Second Amended Complaint, paragraphs 4-5.
[10] Expert Report of Verkhovskaya, paragraph 54.
[11] Expert Report of Verkhovskaya, paragraph 61.
[12] Expert Report of Verkhovskaya, paragraph 63.
[13] Expert Report of Benjamin Beecher, p. 6-7.

e. Mr. Beecher claims that his analysis of the IP addresses shows that 59.1% of the leads "came from misconfigured systems," and is "either corrupted or maliciously faked, but cannot be real."[14]

46. As my analysis below details, these conclusions rest on faulty assumptions and misleading analysis, and each of these alleged "deficiencies" evaporates on closer inspection.

## V.     ANALYSIS OF ALLEGED "FACIALLY DEFICIENT" LEADS

### A.     <u>Users of Fluent's web forms have different incentives to enter contact information than they do for their name and address</u>

47. Ms. Verkhovskaya opines that "more than 50% of the names and/or addresses are garbled, invalid, and/or blank" and concludes this is "outside of the industry standards."[15] It is unclear here what "industry" Ms. Verkhovskaya means. She is neither a telemarketer nor a lead generator.

48. Ms. Verkhovskaya states that "[w]hile it is common to have a small number of records with garbled or blank data (approximately 3% to 5%), it is uncommon to have greater than 50% of names and/or addresses to be garbled, invalid, and/or blank."[16] She appears to be drawing a comparison between the condition and composition of the leads and her experience with the formatting and quality of public records and similar records provided by data processing vendors such as LexisNexis and TLO. This is an inapt comparison.

49. LexisNexis, TLO, and comparable data vendors compile their databases from a variety of data sources including utility bills, credit applications, bankruptcy filings, property records, corporation filings, driver's licenses, hunting and fishing licenses, marriage and divorce records, motor vehicle registrations, professional licenses, voter registrations, and other documents that might associate names of persons with telephone numbers.[17] The consistency

---

[14] Expert Report of Benjamin Beecher, p. 8.

[15] Expert Report of Anya Verkhovskaya, paragraphs 73 (a) and 54.

[16] Ibid, paragraph 54.

[17] For example, the sources used by LexisNexis' Public Records database are described in the LexisNexis Content Listing, which is available online at https://web.lexis.com/help/research/ContentListing.pdf. The relevant excerpt from this 312-page document is attached as Exhibit 2.

of the data records that Ms. Verkhovskaya observes as "common" or "industry standard" reflects the nature of these source records. These are materially different sources from website forms that consumers fill in to win a prize. The likelihood that certain information will be entered intentionally incorrectly is much higher in records of this nature as opposed to credit applications and utility bills.

50. By contrast, it is my understanding from the pleadings and other documents that leads were only generated when consumers registered online at a website operated by Fluent. From the standpoint of a consumer submitting information to a website in order to enroll in a prize drawing, submitting a valid form of contact (such as phone number and/or email address) is the minimal amount of valid information that one would need to provide to effectively engage in the transaction. Submitting pseudonymous information for their identity and demographic details may hinder the usefulness of the results *from the perspective of the marketer*, but does not impede the ability of the consumer to participate in the drawing.

51. Submitting pseudonymous information also does not impede the ability of the consumer to consent to receive marketing communications. It is not a novel observation that users commonly interact online in pseudonymous or anonymous ways.[18] Many privacy organizations advocate for and defend the use of pseudonyms online.[19] If the use of pseudonymous identities were equated with a lack of consent, then numerous Internet users would be unable to consent to basic services such as signing up for email accounts, submitting online comments, purchasing items from ecommerce sites, and other workaday transactions routinely conducted using pseudonymous online "handles."

52. I personally tested two of the Fluent lead generation websites to examine the user experience for myself. I accessed thedailywinnings.com and nationalconsumercenter.com, and on multiple occasions went through all of the steps necessary to submit a lead on each site. I

---

[18] See, for example, Van der Nagel and Frith, "Anonymity, pseudonymity, and the agency of online identity: Examining the social practices of r/Gonewild," *First Monday* (Vol. 20, No. 3, March 2, 2015), attached as Exhibit 3.

[19] For example, see the Electronic Frontier Foundation's "A Case for Pseudonyms," attached as Exhibit 4.

observed that the web form asked for my email address first, then on a second page asked for my name and zip code, and on a third page asked for my street address, city, state, and telephone number. By treating these different components of the consumer's information as discrete questions, the consumer's state of mind may change as the different data fields are submitted. This is significant in understanding how a given individual may be more or less forthcoming and accurate on different components of the information they submit to the site.

### B.    Testing the Integrity of the Registration Information

53. Fluent's General Counsel and Chief Compliance Officer Daniel Barsky stated in his declaration of November 13, 2018 that "Fluent does not have the capacity to determine whether each consumer has entered a name which matches the subscriber name for a telephone number which has been entered. That is because there is no public database of cell phone subscribers and there is no reverse-cellular telephone number lookup provider that can reliably provide cellphone subscriber information."[20]

54. As a professional investigator who has extensive experience using public records databases such as LexisNexis and TLO, I agree with Mr. Barsky's statement. I am aware of no effective or efficient mechanism by which Fluent could test the validity of the lead registrations as they submitted. That being said, the information available in public records databases can be queried in a post-hoc fashion to look for corroborating evidence supporting the information contained in the leads. As detailed more fully below, this examination entailed consulting multiple data systems and comparing numerous data points, the complexity of which required me to conduct this analysis only on a sample.

55. In order to test the integrity of the leads, I conducted my analysis on a randomly selected sample of 16,270 telephone numbers.[21] This statistically sound sample was randomly selected

---

[20] Declaration of Daniel J. Barsky in Support of Defendants' Motion to Dismiss ("Barsky Declaration"), paragraph 40.

[21] I have been involved in a number of TCPA lawsuits in which Ms. Verkhovskaya has served as the opposing expert, and I know from such prior case experience that Ms. Verkhovskaya has previously disclaimed having any expertise in statistical sampling. When deciding on the size of a statistical sample, I generally use the sample size

from the larger population of telephone numbers[22] that received calls and/or texts from Freedom[23], and for each telephone number in the sample population, all corresponding leads were also included.[24]

56. The information on Fluent's lead records can generally be divided into five types or categories of data:

    a.  Identity: This information provides the consumer's name.

    b.  Contact: This information encompasses the email and/or phone number to which communications will be directed.

    c.  Demographic information: This information includes the address and date of birth, and enables marketers to isolate certain populations based on age or geography for certain types of communications.

    d.  Qualification: The survey questions probe different areas such as finances, education, health, reading habits, politics, and other aspects of the consumer's lifestyle and interests that can be used to identify which leads are of special interest to which advertisers.[25]

    e.  Consent: This information includes the combination of web address, IP, and date documenting the moment when the consumer submitted their information and agreed to the posted terms and conditions.

---

calculator provided by Raosoft. For a master population of 730,274, with a 1% margin of error and a 99% level of confidence, the Raosoft sample size calculator recommends a sample of 16,219. For the purposes of consistency with Ms. Verkhovskaya's analysis, I opted to use the same sample size of 16,270.

[22] Ms. Verkhovskaya stated in her expert report that her analysis identified 730,274 unique telephone numbers that received calls or texts (see paragraph 37). This is contrasted with the figure of 778,548 reported in the Second Amended Complaint (paragraph 228). My own examination of the 5,101,700 rows of data in LEADSCIENCE_000677 found 730,167 unique telephone numbers. I do not have an explanation for these discrepancies. For the purposes of my calculations herein I rely on my own count of 730,167 numbers.

[23] The call logs were searched from the data source LeadScience_000677.

[24] The leads were appended from Fluent_00441 and Fluent_000572.

[25] Based on my testing of the Fluent websites I observed that this type of information was gathered through the survey questions, although it was not produced in the lead lists used for my analysis and was not relevant to my analysis.

57. The distinction between these different categories of data is important, because although they make up a lead registration in the aggregate, the different data categories are collected under different circumstances that have an effect on the completeness of the overall record. Plaintiff's experts make no distinction between instances where the various components of the registration information contain inaccurate information that does not point to a single consumer (such as the "Dunk Loka" lead) from instances where a consumer has submitted substantially correct information but together with inaccurate or pseudonymous information. Plaintiff treats these materially different scenarios as being equal examples of "facially deficient" registrations. As discussed above, a consumer registering to win an online prize drawing has a strong incentive to provide a valid means of receiving that prize, but may be less incented to go beyond the minimal interaction necessary to have a shot at winning. Consequently, it is reasonable to expect that with few exceptions the leads would contain valid, accurate *contact information* even if the data fields for identity and/or address were incomplete and/or inaccurate.[26]

58. For the purposes of my analysis, I considered a lead "substantially valid" if the contact information along with the name and/or address can be supported by public records from one or more sources indicating the same person.

59. Using the methodology set forth below, I determined that 88.89% of the sample leads I tested were substantially validated.

60. Only 11.11% of the leads contained information that could not be substantially validated by public records.

61. My analytical methodology is described in detail below.[27]

---

[26] Issues related to the IP address information are discussed in a separate section below.

[27] In my capacity as a Director in BRG's Global Investigations and Strategic Intelligence practice, I work with a team of professional investigators and data analysts whom I supervise. Throughout this Report, when I use the first-person to describe my analysis, I am referring to work conducted by me or by my staff under my direction.

### 1. *Methodology*

62. I submitted the sample set of 16,270 telephone numbers to both the data vendors LexisNexis and TLO to perform a "reverse append" analysis, and return the names and addresses that these data vendors associate with those phone numbers. This is the same methodology that Ms. Verkhovskaya herself proposes in her expert report as a means of identifying names and contact information of class members for class notification.[28]

63. I am familiar with both of these data vendors and have used their public records databases extensively in my capacity as a professional investigator, both in the context of TCPA litigation and other non-TCPA casework. Both data vendors have a strong reputation in the investigative community.

64. This reverse append process created two sets of records, one from LexisNexis and one from TLO, that contained information about the associations between people's names, addresses, and phone numbers that are documented in the various data sources from which these vendors of public records aggregate their results.[29] These LexisNexis and TLO results were then compared to the information in the sample leads to identify where the lead information could be corroborated.

65. Additionally, I submitted the email and physical addresses reported in the leads to the National Change of Address (NCOA) database. The NCOA results allowed me to create standardized formatting that could be electronically matched to the standardized results reported by LexisNexis and TLO. The NCOA results also provided a third source of public records information against which to verify the information in the leads.[30]

### 2. *Email Verification*

66. The sample set of 16,270 telephone numbers correlates to leads containing 16,297 email addresses. As set forth below, I determined that 88.7% of them are valid email addresses

---

[28] Expert Report of Anya Verkhovskaya, par. 64-68.

[29] The raw results returned by LexisNexis and TLO are attached in native form as Group Exhibit 5.

[30] I know from prior casework that Ms. Verkhovskaya has subscriptions to all of these data vendors as well, and was capable of conducting the same comparative analysis that I did, but chose not to.

verified by their providers to be associated with actual users to whom emails can be directed. I also found no evidence that the corpus of emails in the sample had been obtained through any means other than the direct input by actual users. The methodology underlying this conclusion is set forth below.

67. Kickbox is an email verification service developed for marketers and designed to identify undeliverable email addresses.

68. According to its terms of use, Kickbox will not perform validation on lists it suspects have been gathered through email harvesting methods or which show evidence of including non-opted-in addresses. Kickbox will fine its users or even terminate their accounts if their submissions are suspected of being non-opted-in lists or having been harvested from another sources. Kickbox also prohibits use of its service to:

    a.   verify purchased lists (whether they are opt-in or not)

    b.   verify permutations of email addresses, also known as directory harvesting

    c.   verify email addresses generated via email appending.[31]

69. Kickbox's analysis separates the various email addresses it analyzes into four different buckets. "Deliverable" indicates the recipient's mail server confirmed the recipient mailbox exists and Kickbox's algorithm considers the address safe to send mail. "Risky" covers a range of email addresses that are also confirmed to exist, but which have characteristics indicating they are unlikely to be used successfully for commercial communication.[32] "Unknown" means the verification service was unable to get a timely response from the domain, and can be rechecked at a later time. "Undeliverable" indicates the email address does not exist.[33] For the purposes

---

[31] Kickbox Acceptable Use Policy, is attached as Exhibit 6.

[32] "Risky" addresses include email addresses that are assigned to a role (such as info@domain.com); are addresses set up with a disposable email service provider which are typically intended for one-time use to receive a service communication; and email addresses at a domain that accepts any message sent to it regardless of whether that mailbox is separately defined.

[33] See Kickbox Definition of Terminology, available at https://docs.kickbox.com/v2.0/docs/terminology and attached as Exhibit 7.

of this analysis, I considered "Deliverable" and "Risky" to be valid email addresses, because they were reported by the providers to be existing user-created addresses.

70. As an additional verification, Kickbox scores each lead with a Sendex Email Quality score. As explained on their website, "Just because an email exists and is syntactically correct, does not mean it's quality. For example, john.smith@example.com can generally be seen as a higher quality email address than sdfsdfsdf@example.com. Kickbox uses a number of algorithms, derived from the millions of email transactions it performs each hour, to determine the overall quality of an email address."[34] For the purposes of this analysis, I considered a Sendex score of .7 or higher to be an indicator of a high-quality email list validated for use for telemarketing purposes.

71. I submitted 16,297 email addresses to Kickbox for verification. This analysis identified 13,771 as "Deliverable," and 594 as "Risky." Upon further examination of the results, I determined that many of the email addresses that had been initially returned as "undeliverable" appeared to have minor typographical errors in the domain names, such as "gmail.comp" instead of "gmail.com," or "men.com" instead of "msn.com." In fact, Kickbox's own results had suggested corrections for many of these provisionally undeliverable results. After manually correcting the typos, I resubmitted this subset of records. After taking the typos into account, Kickbox verified an additional 86 records. In total, this analysis found that 14,451 (88.7%) were valid email addresses confirmed by their providers to exist and be capable of receiving email.[35]

72. It should be stressed that although 1,550 (9.5%) were identified as "Undeliverable," this does not necessarily indicate anything about whether those emails were in fact submitted by actual users of the Fluent websites as part of their online registrations. For example, I observed that

---

[34] See Kickbox Sendex Email Quality, available at https://docs.kickbox.com/v2.0/docs/the-sendex and attached as Exhibit 8.
[35] The Kickbox results files for both sets of submissions are attached in native form as Group Exhibit 9. For the purposes of this analysis I did not consider the "Unknown" results as either valid or invalid, as the information returned for them was by definition inconclusive.

586 of these supposedly "undeliverable" email addresses were matched by the National Change of Address (NCOA) database to actual users and addresses, suggesting that these addresses were likely valid and deliverable at the time of submission but disabled by their users at some time prior to my checking them with Kickbox.[36] Further investigation would be required to determine which of the remainder failed verification because the address contained either an accidental or intentional misspelling.

73. In light of the allegations put forth by plaintiff and plaintiff's experts regarding the alleged illegitimacy of the origin of these leads, Kickbox's compliance mechanisms *did not identify any evidence* that the list of email addresses I submitted had originated from email harvesting, had been generated by email appending or permutations, or showed evidence of lacking opt-in consent.[37] The aggregate Sendex score for the entire sample list was .785 ("Good").

### 3. The "Dunk Loka" Lead

74. The circumstances under which the "Dunk Loka" lead was entered into Fluent's database have not been established. Plaintiff Daniel Berman has stated under oath that he did not enter that information, nor direct someone else to do so.

75. I conducted a reverse phone lookup on telephone number 510-326-9945 in the records provided by LexisNexis and TransUnion/TLO, using the same methodology that plaintiff's expert Ms. Verkhovskaya proposes to identify class members for class notification purposes. TLO returned no results for this number at all. The only LexisNexis result for this telephone number indicates it as a wireless number associated with a "Ronald Berman" of Oakland,

---

[36] NCOA results for these 586 matches are attached as Exhibit 10.

[37] One of several mechanisms used by Kickbox to identify suspicious email lists is to scan them for the presence of "spam traps" or "honey traps." These are email addresses that are published online in ways that can only be seen by bots and not by humans, and which are not used for any other purpose. If a list contains one of these "spam trap" email addresses, that is evidence that the list contains addresses that were obtained through harvesting methods, because the email address would not be submitted by a user. The sample of 16,297 emails that I researched contained no spam traps, no examples of directory harvesting, no examples of permuted addresses, and no examples of appended addresses.

California between June 2006 and October 2010. LexisNexis provides no address for this user, and no more recent date of association after 2010.[38]

76. I note that using Ms. Verkhovskaya's proposed methodology, Daniel Berman would not be identified as a class member and would not receive class notification. He is only identified as a class member because he has stepped forward to connect himself with this phone number, a connection that is not evident in public records.

77. I understand Mr. Berman is a private person who is concerned that disclosing contact information can expose him to unwanted marketing communications, and has guarded his phone number as a result.[39] His understandable reluctance to disclose his phone number likely explains why there is no record in LexisNexis or TLO associating him with his own phone number—those data vendors derive their association from documents in which a person has voluntarily submitted that association. To the extent Mr. Berman is representative of similarly situated individuals, these people are unlikely to be identified for class notice using this methodology because of a likely lack of records associating them with their phone numbers.

78. In this context, it is striking to note that the LexisNexis and TLO databases, which plaintiff proposes as an authoritative repository of consumer contact information, do not associate Mr. Berman with his phone number, and do not associate the phone number with him. In this respect, the databases of LexisNexis and TLO are "deficient" *in the same way that the Fluent lead records are alleged to be*. It does not logically follow to conclude that it is a fatal deficiency that the leads associate the 510-326-9945 number with someone other than Daniel Berman, if the plaintiff's preferred resource of reliable information also associate the 510-326-9945 number with someone other than Daniel Berman.[40]

---

[38] The LexisNexis reverse append for phone number 510-326-9945 is attached as Exhibit 11. TLO returned no result so there is no corresponding attachment.

[39] Plaintiff's Responses, p. 4 and p. 6.

[40] TLO records do indicate that Daniel Berman is likely related to a Ronald Hollins Berman of Alameda County. In hindsight it seems reasonable to conclude that this is the "Ronald Berman" identified in the LexisNexis record for this phone number, but this does not change the "deficiency" noted above. Both LexisNexis and TLO fail to associate the phone number with the person who has sworn under oath he is the sole user of that phone, and LexisNexis' association of a "Ronald Berman" is provided without any other identifying information such as an

#### 4. *Duplicate Leads*

79. Ms. Verkhovskaya claims that 132,867 of the leads are duplicated by one or more additional leads that differ only in the IP address and in some cases the physical address.[41] She makes no direct statement about what conclusion she herself draws from this observation, or what conclusions she thinks the reader should draw, leaving the impression this information is adverse or suspicious in some way. The implication appears to be that the duplicative records are untrustworthy.

80. I correlated the lead data to the call logs and confirmed that for every one of the 16,270 telephone numbers in my sample, no calls were logged to that number prior to the date on the *earliest* lead.[42] Even if there was a reason to distrust the validity of the additional leads, none of those leads would be relevant to a determination of whether there was documentation of prior express written consent to initiate calls or texts to those numbers.

81. As noted in Fluent's response to Interrogatory Number 2, "[i]f the System recognizes that a consumer has already registered on a Website, it may streamline the registration process and tie the previously-supplied information to the consumer."[43] In other words, if a consumer attempts to enroll in the same sweepstakes twice, for example, the System will autofill the original registration information, and in such a circumstance it would be fully in line with expectations to see just the IP address change.[44] I personally witnessed this feature during my testing of both thedailywinnings.com and nationalconsumercenter.com, and both sites autofilled the information I had previously entered.

---

address, date of birth, middle name, or other facet that could disambiguate Ronald Hollins Berman from the 251 other Ronald Bermans LexisNexis identifies in California.
[41] Expert Report of Verkhovskaya, paragraph 61.
[42] Out of the entire universe of over five million calls logged in LeadScience_000677, only 20 show calls prior to the earliest recorded lead registration. See Section G below.
[43] Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery ("Fluent's Responses") at 3:28.
[44] Further discussion of how to understand the significance of IP addresses follows below.

### C.     Analysis of the IP Address Information Shows No Unexpected Anomalies

#### a)     How IP Addresses Work

82. Both Ms. Verkhovskaya and Mr. Beecher raise issues related to the IP addresses reported on the leads. Before discussing their specific conclusions, it will be useful to understand what IP addresses are.

83. An "Internet Protocol" or "IP" address is a numerical string that identifies each computing device on a network. However, there are different types of networks that operate on different scales, and this influences how the IP addresses are configured and assigned. To use a crude metaphor, the public IP address is like the physical address where the postal service delivers your mail and the private IP address is your location within your house at any given time. For example, in a situation involving a person on a laptop on their home WiFi, the home WiFi is the network and the laptop is a device connected to that service, with a "private" IP address identifying its place within that WiFi network. When that laptop interacts with the larger Internet, however, the Internet is the network, and the home WiFi itself will be identified on that network by its own "public" IP address.

84. In order to avoid any conflicts between different devices/systems attempting to use the same address on the same network, public IP addresses are managed and assigned through public registration. It is therefore possible to look up the registration record (called the "WHOIS" record) for any public IP address.

85. IP addresses are formatted as a series of numbers set apart by periods or dots between them. Certain ranges of IP addresses are set aside for use as private IP addresses, and the rest are available as public IP addresses. Although this distinction is documented, and allows an analyst to easily distinguish private IP addresses from public ones simply by looking at them, there is otherwise nothing else about the string of numbers that identifies one kind of IP from another. That is to say, whereas certain numerical identifiers like ZIP codes or telephone area codes have geographic boundaries encoded into them, a given public IP address could point to any place on the globe.

b)      *Ms. Verkhovskaya's Geolocation Analysis is Irrelevant and Misleading*

86. In order to conduct the kind of geolocation analysis that Ms. Verkhovskaya reports in paragraphs 62 and 63 of her report, one would search for the "WHOIS" registration record for each IP address in one of the many online databases offering this reverse lookup service. This will identify the person or organization to whom that public address is registered, and where that person or organization is located. In practice, this often means identifying the Internet Service Provider ("ISP") that provides the network connection used to access the Internet, and the physical location of where that ISP is registered. This information has no reliable or consistent connection to the physical geographic location of where that *user* is.

87. By way of example, when I am in my office at BRG's Chicago location, my public IP is 38.140.135.27, and the WHOIS record for that IP identifies the geographic location as Washington, DC. This is not because I have masked or obfuscated my IP in any way, but simply that my employer uses an ISP whose corporate headquarters are located in Washington, DC.[45] Similarly, when I access the Internet from my home office in suburban Chicagoland, my public facing IP appears as 73.50.32.204, which points to a WHOIS record for Mount Laurel, NJ, simply because Comcast's corporate registration is located in Mount Laurel.

88. Ms. Verkhovskaya reported that she compared the IP addresses in the Fluent leads with the street addresses for the corresponding individuals who registered those leads, to identify which ones were within 10 miles of one another and which ones were father apart, including a count of how many appeared to be more than 300 miles apart.[46] She provided no comment on why she had conducted this analysis, other than that it was at the direction of counsel, and she offered no expert opinion of her own to explain what this was meant to demonstrate, or what conclusions the reader should take—it was merely one more vague statement meant to suggest something nefarious to an audience without technical experience in this area. To anyone with

---

[45] Records identifying my public IP and its WHOIS record are attached as Exhibit 12.
[46] Expert report of Anya Verkhovskaya, paragraphs 62-63.

experience in how IP addresses are assigned, her geolocation analysis is nonsensical and intentionally misleading on its face.

89. It is completely in line with expectations that the IP addresses on the lead lists will not always correspond geographically to the physical location of the consumers. A technical expert would know this. Instead, Verkhovskaya was asked to conduct this pointless analysis and report on the results as if this finding contributes anything to understanding the validity or integrity of the lead data.

<em>c)</em>     <u><em>Some Leads Were Produced With Internal IP Addresses</em></u>

90. Mr. Beecher notes that 59.1% of the leads in Fluent's lead lists were attributed to an internal IP address and not to a public IP address as would be expected from external web traffic from consumer transacting with the Fluent server.[47] He characterized this as meaning "at least 59.1% of the provided data came from ***misconfigured systems***" (emphasis added). This overheated hyperbole mischaracterizes the facts. This issue was addressed in discovery, is a not uncommon issue when analyzing lead lists, and is entirely consistent with the expected design of Fluent's databases.

91. The Declaration of Mitenkumar Bhadania addressed this issue and explained that Fluent's database stored customer contact information separately from IP address data, and when the tables were joined to export the records for discovery, the database populated the IP field with the internal address for certain categories of records.[48]

92. I was involved in data analysis on at least one previous matter involving the production of leads from lead generators including Fluent and others, and have witnessed this very issue arise before. In that prior matter, <u>DeForest v. Royal Seas Cruises</u>, not only did this same issue arise but this same explanation was accepted without controversy.

93. In this case, Mr. Beecher rejected Mr. Bhadania's explanation and characterized it as a "misconfiguration of their internal systems." A "misconfiguration" implies a configuration that

---

[47] Expert Report of Benjamin Beecher, pp. 7-8.
[48] Declaration of Mitenkumar Bhadania in Support of Defendant's Reply Motion ("Declaration of Bhadania") paragraphs 6-13.

is not fit for a particular purpose. The purpose in this situation is the storage of data pertaining to the leads, such that it can be retrieved later.

94. Mr. Beecher is wrong when he states that "[s]oftware and data science professionals organize related information together in the same database and then within the same table in that database."[49] In fact, just the opposite is true. Modern database systems use a "relational database" design to optimize data storage and retrieval efficiency. The aspect that characterizes a "relational database" is that data is separated into numerous tables that relate to one another. The greatest efficiency of data storage and speedy data retrieval occurs when the data is stored in *many relatively small* tables, each of which has the fewest possible number of data fields ("columns" in a spreadsheet), but which can be reconstituted together based on their internal relationships.

95. In the case of the lead data, recall that there are five different sub-types of data that were collected. From the standpoint of the marketers who receive the leads, the actionable aspects are the contact points and the consumer's names and demographic information. The contact information and identity information will be the most frequently used types of data, since every communication must involve some component of that data. The demographic and qualification information will likely be used fairly infrequently, as these types of information are most relevant when identifying which leads are of interest to which advertisers, but may not need to be consulted for every communication. The IP address is captured in the course of documenting the consumer's consent, but this is not a data point that will be accessed or searched with the same frequency as the contact information. On a day to day basis, the IP address information serves no further purpose and plays no role in managing customer communications.

96. It is therefore entirely consistent with the principles of good database design that the IP address information be stored in one or more different tables apart from the contact information of the leads. In my opinion, this does not constitute a "misconfiguration," and Fluent has already

---

[49] Expert Report of Benjamin Beecher, p. 3.

provided a satisfactory explanation for why external IP address information is not populated for all the leads as they have been produced to date.

### D.    Data Security Issues

a)    *CAPTCHA*

97. Mr. Beecher argues that the absence of a CAPTCHA tool on Fluent's web forms means that it is "less likely that humans, rather than spam bots, made the submissions than if a CAPTCHA were used."[50]

98. For the purposes of this discussion, a "spam bot" refers to a piece of software that can obtain and extract data from a web site (sometimes called "scraping"), or insert data into web forms. There are a variety of software agents or bots that are a necessary and benign part of the Internet, and which are responsible for such positive benefits as gathering data for Google searches or archiving web pages for posterity, so the essential distinction for a "spam bot" is not its automated nature, but its unwanted and intrusive role.

99. Mr. Beecher is correct that a CAPTCHA tool is an *example* of a tool to "distinguish human from machine inputs to thwart spam and automated extraction of information," but in my opinion as a data security professional he materially overstates its significance. Mr. Beecher notes that Google offers a free CAPTCHA service, but it should be noted in this context that Google's own research determined as long ago as 2014 that software could effectively overcome CAPTCHA puzzles "with over 99% accuracy," rendering those tools essentially useless for their stated purpose and serving only to confound legitimate human users.[51]

100.    The design of Fluent's online survey flow is designed to require the consumer to navigate through a series of multiple choice survey questions, the answers to which dynamically trigger which questions are presented to that consumer, before being able to ultimately complete the submission. This variable sequence of steps serves as its own data security mechanism.

---

[50] Expert Report of Benjamin Beecher, p. 5-6.
[51] See Google Security Blog from April 16, 2014, attached as Exhibit 13.

Expert Report of David Kalat / Berman v. Freedom Financial, *et al.*                    27 | P a g e

101.    I have personally examined the flows on both thedailywinnings.com and nationalconsumercenter.com, and went through those flows multiple times using different responses to the survey questions to observe how the web sites adapted to my actions.

102.    On both sites, it was only *after* I had completed several pages of survey questions that I was presented with the option of providing my final consent to submit the information. In the case of thedailywinnings.com, the survey questions occupied as much as 60 discrete pages that had to be responded to in sequence, one by one, before the opportunity to submit the lead was completed. In both cases, in order for a spam bot to have submitted the form data, it would have needed to navigate through a series of questions as part of the form submission.

### E.    Bot activity

103.    Mr. Beecher makes a variety of statements in his report that suggest that he thinks some significant portion of the leads were submitted not by human activity but by spam bots. Although never explicitly stated as a direct opinion, this is the undercurrent of much of his report. Whether openly stated or implied, this opinion appears to depend substantially on his belief that the appearance of private IP addresses are indications of "corrupted or maliciously faked" data and the absence of a CAPTCHA toolbar is a serious data security liability.[52] I have already addressed why I consider both of these conclusions to be erroneous and founded on misguided assumptions, but I want to also address the underlying question of whether leads were submitted by spam bots as Mr. Beecher implies or by humans as the sworn statements of the defendants contend.

104.    Mr. Barsky submitted a sworn statement listing several examples of Fluent leads that did become customers for Freedom, which is unlikely to have occurred for leads that were invented by some spam bot without any connection to the actual individual.[53]

---

[52] Expert Report of Benjamin Beecher, p. 8.
[53] Barsky Declaration, paragraphs 23-29.

105.    I understand from Fluent's Supplemental Answer To Interrogatory Number 3 that their company is compensated only for actions that occur *prior* to the completion of survey questions and prior to the user consenting to be contacted.[54] As such, Fluent has no financial incentive to operate or allow the operation of a spam bot that involved the additional expense of effort, time, programming, and other resources to be able to complete the survey questions and submit leads with telephone numbers designated for calling.

106.    As discussed in section V. B (2) above, I verified that approximately 88% of the email addresses in the leads are valid email addresses belonging to real consumers, and found no evidence that the email addresses had been scraped, harvested, generated, or obtained from any mechanism other than the organic collection of opt-ins from actual consumers. Therefore, for one or more spam bots to have submitted such leads, it would not have been possible for those bots to be scraping, harvesting, generating, or obtaining these email addresses without detection. Alternatively, a spam bot could have operated if it *already had access* to a database of leads, perhaps obtained from some other lead generation company, and entered that data into Fluent's system. However, this odd idea merely creates a chicken-and-egg dilemma, since whatever characteristics are observed in *Fluent*'s leads must have originated in whatever source database the hypothetical spam bot was deriving its submissions.

### *1.    Leads With "Placeholder" Variables*

107.    Mr. Beecher's report draws attention to the subset of leads that have text strings with characteristics distinctive to computer programming variables, such as {FIRSTNAME}|{LASTNAME}, $ADDRESS1$, {address}, {ADDRESS}, and so on.

108.    I not only agree with Mr. Beecher that these strings are *unlikely* to have been entered by the visitors to the landing pages in this form, in my personal testing of the Fluent web sites I observed that the web form does not even permit the consumer to submit a name that contains the symbol characters {}[]$, nor can a consumer submit a name that is blank.

---

[54] Fluent's Supplemental Response to Interrogatory Number 3.

109.    Because the web form rejects text strings formatted with these characters, it does not follow that the program that entered them was anything outside of Fluent's database system itself. The database process that wrote these entries, for whatever reason, likely occurred within Fluent's systems after the web form accepted a properly formatted entry that was subsequently corrupted or overwritten.

110.    I observed that the various instances of these computer variable names appear in scattershot form across the leads. *Sometimes* a lead may have {FIRSTNAME} for the first name but an actual user-created entry for the last name; *sometimes* a lead may have a complete user-created first and last name but {ADDRESS} entered for the address; *sometimes* a lead may have a user-created first name and address but {LASTNAME} for the last name; and so on for any possible combination. As already discussed, there is no evidence that the leads contain randomly-generated information—to the extent there are pieces of data entered, that data was sourced from somewhere. If these variable names reflect the actions of a spam bot, it is a spam bot that has sourced from somewhere the same patchwork quilt we observe here of names and addresses that are occasionally incomplete, and the software running the spam bot substitutes these curly-bracketed placeholders whenever the source data is missing an entry.

111.    Additionally, it is reasonable to surmise that the actions of a hypothetical spam bot would be expected to result in mass submissions, input at or around the same time. Not only is there no evident pattern to the divergent ways these placeholder names are filled in, there is no pattern to when these entries are logged with respect to other leads.

112.    It is far more likely that whatever software that recognizes a data field is empty and fills it in with a placeholder variable is not an external piece of software, but is part of the Fluent database itself. It is a common feature of database design to have a specific default placeholder value such as "NULL," or field-specific placeholder names like {FIRSTNAME} and {LASTNAME} when a field is missing an entry.[55]

---

[55] This is a complex and sometimes controversial issue in database design, but generally speaking the additional data storage needed to include placeholder values like "NULL" where data is absent is negligible but facilitates easier and more precise querying of the data.

113.    The entire universe of Fluent leads contain a total of 890,595 rows of data, out of which only 2,385 rows contain these placeholder-style entries.[56] In other words, the total occurrence of this phenomenon affects less than one-third of one percent of the leads. 99.74% of the lead data are unaffected by this issue, however it occurred.

## 2.    *The Origin of the "Dunk Loka" Lead*

114.    In this vein, consider the "Dunk Loka" lead itself. Notably, this lead contains a real, valid operating cellular telephone number. It contains an incomplete street address that identifies "Alameda, California" when the actual owner of that real telephone number lives in Alameda County, California. The IP address recorded for the registration shows the submission came from a user of a Hayward, California-based affiliate of Comcast Cable in Alameda County. The lead contains a real, valid email address that Kickbox rates as "Deliverable" and with a high Sendex score of .85. Although there is no indication that the email address is connected to the owner of the phone, and the name "Dunk Loka" appears to be made up, the information submitted in this lead does not appear to have been generated randomly, which is significant. Either a person submitted the information and came up with the fake name "Dunk Loka," or a piece of software was programmed to collect these pieces of *real data* from some other location and submit them. For this to have been the work of a spam bot, the real phone number and email address had to be obtained from some other source, meaning that the mystery of who originally submitted them simply moves to a different place on the Internet. Calling this the work of a spam bot does not answer the ultimate question of where the lead originated. It involves fewer assumptions to conclude that a real person entered this information into Fluent's signup.electronics-sweepstakes.com site on December 24, 2017, exactly as Mr. Bhadania's affidavit states.

---

[56] The count of 890,595 comes from analyzing Fluent_000441 and CTRL0007302 where at least one field in either "LastName" or "Address" contained some kind of data.

115.    I observe that Mr. Barsky's declaration states that Fluent intends to pursue third-party claims against the individual who submitted the false "Dunk Loka" lead.[57] Given that whoever this person is, had access to Mr. Berman's otherwise unpublished wireless number and correctly identified the geographic location (if not the street address) associated with that number, it is reasonable to surmise that this person knows Mr. Berman, even if their actions were unbeknownst to and unsanctioned by Mr. Berman.

### F.    Identification of Business Numbers

116.    Telecommunications providers sometimes offer "business" subscriptions as a different category of account from a personal or household consumer, and this information can be ported from the carrier to data vendors such as LexisNexis, who can then identify which telephone numbers are categorized as business subscribers by that provider.

117.    However, this is not to say that carriers have a foolproof, comprehensive process for tracking when phone numbers are used for business purposes.

118.    For example, it is common in contemporary business for employers to have BYOD policies that allow employees to use their own personal mobile phones for work. In many such situations, the employee may have an existing mobile account that is categorized by their carrier as a personal or household account, but the user is then compensated in whole or in part by their employer for the use of that phone number for business purposes. This is true of my mobile number, for example, which is published by my firm as a contact number for me, it appears on business cards and my email signature block. From the perspective of my employers and clients, this is a business number, but it is listed by my carrier as a family plan.

119.    Many Americans also run businesses from their home, and use their existing consumer phone plans as business contacts, publishing the numbers on web sites, directories, advertisements, and distributing them in other ways.

---

[57] Barsky Declaration, paragraph 41.

120.   Verkhovskaya's search methodology takes none of this nuance into account and under-
identifies business numbers as a result.

## G.   Analysis Of Dialer Records To Leads

121.   The dialer records produced as LEADSCIENCE_000677 ("Dialer Logs") document
5,101,700 rows of data reflecting communications with 730,167 unique telephone numbers.

122.   I understand that the Defendants originally produced two sets of leads, identified as
FLUENT_000441 and FLUENT_000572 ("Fluent Leads").

123.   I compared the Dialer Logs with the Fluent Leads and determined that every call or text
documented in the Dialer Logs was placed to a telephone number previously obtained from a
lead, with the exception of 20 telephone numbers not contained on either of these data sets.[58]


Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and
correct.

1/4/2019

---

[58] These 20 numbers are attached as Exhibit 14.

# Exhibit 1

# Curriculum Vitae



**David Kalat**
BERKELEY RESEARCH GROUP, LLC
70 West. Madison Suite 5000 | Chicago, IL 60602
Direct: 312.429.7907
dkalat@thinkbrg.com

## EDUCATION

| | |
|---|---|
| M.L.I.S | University of Illinois at Urbana-Champaign, 2011 |
| B.A. | University of Michigan, 1992, *James B. Angell Scholar* |

## EMPLOYMENT

Director, Berkeley Research Group (BRG), 2015–present
Director, Disputes and Investigations, Duff & Phelps, 2011-2015

Mr. Kalat is testifying expert in electronic evidence and digital forensic investigations. He leads the Chicago digital forensics lab for BRG's Global Investigations and Strategic Intelligence practice group. Prior to joining BRG, Mr. Kalat was with Duff & Phelps' Disputes and Investigations practice, where he managed an international team of forensic examiners and eDiscovery support specialists. Mr. Kalat has over 20 years of experience in digital video, and has applied this knowledge to the forensic examination of video evidence in a variety of contexts including investigations into alleged police misconduct.

## PROFESSIONAL CERTIFICATIONS AND AFFILIATIONS

- Licensed Private Detective (License No. 115.002487), State of Illinois
- Licensed Private Detective (License No. 52430601), State of Texas
- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners (License No. 621469)
- Certified Computer Examiner (CCE), International Society of Forensic Computer Examiners (ISFCE) (License No. 1666)
- Certified Information Systems Security Professional (CISSP), International Information System Security Certification Consortium (ISC)2 (License No. 593527)
- Access Data Certified Examiner (ACE)
- Member, Association of Certified Fraud Examiners Greater Chicago Chapter
- Member, Forensic Expert Witness Association (FEWA)
- Member, ECube (formerly the Chicago Association of Litigation Support Managers)
- Member, Sedona Conference
  - Working Group 1 (Electronic Document Retention & Production) Member, Brainstorming Group – E-Discovery Best Practices for Small Cases;
  - Working Group 12 (Trade Secrets) - Member



## REPRESENTATIVE CASEWORK

*Digital Forensics*

- <u>Bunnet & Co., Inc. and Energy Feeds International, LLC v. Dores</u>, 1:15cv1104 (W.D. Texas, 2016); also <u>In Re: Frank Miranda Dores and Mary Anne Souza Dores</u>, No. 16-10169-B-13 (Bankr. E.D. Calif.)
  Conducted a forensic investigation of defendant's laptop and webmail in an investigation of theft of trade secrets, and provided trial testimony in Bankruptcy Court that the defendant had taken steps to erase and conceal the evidence that he had misappropriated company documents.
  - o Based in part on my testimony, the Court found "numerous instances of egregious conduct coupled with bad faith" on the part of the debtor and dismissed his bankruptcy case.
- <u>Pro Sapiens LLC v. Indeck Power Equipment Co.</u>, 14L5730 (Cook Cnty. Cir. Ct., 2015)
  Conducted a forensic investigation of plaintiff's laptop and webmail in a breach of contract case on behalf of the defendant to determine whether key evidence in the matter had been deleted.
  - o Relying on my testimony regarding spoliation, the Court granted the defendant's motion for sanctions and dismissed the plaintiff's cause of action with prejudice.

*Video Analysis*

- In a confidential engagement, examined surveillance CCTV and law enforcement dashcam footage in an investigation into a disputed police shooting.
- Examined surveillance footage for prosecutors investigating an alleged assault on a school bus.
  - o My analysis was instrumental in the prosecution's decision not to press charges.

*Electronic Discovery*

- Managed the attorney review and deposition coding on behalf of the testifying expert for Irving Picard, the Trustee in the Bernie L. Madoff Investment Securities liquidation investigation. Responsibilities included selecting and supervising a team of contract attorneys to review a database of over 20 million documents hosted in Relativity.
  - o As of September 2017, the Trustee had recovered approximately $12.7 billion, or more than 72% of the principal he said Madoff defrauded from his customers.

*Data Analytics*

- On behalf of a marketing company accused of violating the TCPA, analyzed the dialer's PostgreSQL database to determine exactly what records existed for the hundreds of millions of predictive and robocalls in question.
  - o Thanks in large part to this analytical work, the case settled for a fraction of the sums other cases with similar fact patterns did.
- <u>Marcheco v. Jo-Ann Stores, LLC</u>, 1:18cv20564 (S.D. Fla., 2018)
  On behalf of a defendant in a putative TCPA class action, submitted an expert report evaluating the "capacity" of the system used to transmit SMS text messages with respect to the TCPA's definition of an "automatic telephone dialing system."
  - o After my report was submitted, the plaintiff withdrew their class claims and settled.

## TESTIMONIAL EXPERIENCE

- <u>Revitch v. Citibank</u>, No. 3:17cv06907 (N.D. Calif., 2017)
- <u>Marcheco v. Jo-Ann Stores, LLC</u>, 1:18cv20564 (S.D. Fla., 2018)
- <u>Kolodziej v. Justice Park District, *et al.*</u>, 2014 L 775 (Cook Cnty. Cir. Ct., 2014)
- <u>Indeck Energy Services v. DePodesta, *et al.*</u>, 14 CH 602 (Lake Cnty. Cir. Ct., 2014)
- <u>Braver *et al.* v. NorthStar Alarm Services, LLC,</u> 5:17cv00383 (W.D. Okla., 2017)
- <u>C.J. Drilling, Inc. v. Welsh</u>, No. 17 CH 001095 (Kane Cnty. Cir. Ct., 2017)
- <u>Western Union v. Kula</u>, 1:17cv00280 (N.D. Ill., 2017)
- <u>Segerdahl Corp. v. Ferruzza, *et al.*,</u> 1:17cv03015 (E.D. Ill., 2017)
- <u>L&W Supply Corp. v. Banks *et al.*</u>, CV16-00816 (Washoe Cnty. Dist. Ct., 2016)
- <u>Bunnet & Co., Inc. and Energy Feeds International, LLC v. Dores</u>, 1:15cv1104 (W.D. Texas, 2016); also <u>In Re: Frank Miranda Dores and Mary Anne Souza Dores</u>, No. 16-10169-B-13 (Bankr. E.D. Calif.)



- <u>Pro Sapiens LLC v. Indeck Power Equipment Co.</u>, 14L5730 (Cook Cnty. Cir. Ct., 2015)
- <u>Geophysical Service Inc. v. Anadarko Petroleum Corp. *et al.*</u>, 1201-15228 (Ct. of Queen's Bench of Alberta, 2014)

## BOOKS AND MONOGRAPHS

- *Day One: The Origin Story of Computer Forensics,* [1] Pratt's Privacy & Cybersecurity Law Report [4] (LexisNexis A.S. Pratt).
- *The Trouble With Mobile Forensics*, ThinkBRGTech.com (October 15, 2015)
- *Anti-Forensics Gets An Upgrade: The Hidden Traps In Today's Latest Technology*, ThinkBRGTech.com (June 27, 2016)
- *Dyn and Dash*, SC Media (December 19, 2016)
- *Understanding the Challenges of Strong Encryption*, Law360 (April 10 & 11, 2017)
- *Outrunning the Lion: Advice for Fighting on the Front Lines of Today's Data Breach Attacks,* (Legal Tech News, December 20, 2017)
- *Fighting on Today's Front Lines*, (InfoSecurity Magazine, Jan. 3. 2018)
- *Nervous System: The Story of the First White Hat Hacker* (Legal Tech News, February 5, 2018)
- *Nervous System: Evaluating TCPA Liability in the Actual Wild West* (Legal Tech News, March 1, 2018)
- *Confronting BIPA Liability in the Blink of an Eye* (ThinkBRG Global I Blog, March 8, 2018)
- *Nervous System: The Boy Who Could Talk to Computers* (Legal Tech News, April 5, 2018)
- *Nervous System: Just the Fax, Ma'am* (Legal Tech News, May 3, 2018)
- *Nervous System: The Small Start of Big Data* (Legal Tech News, June 4, 2018)
- *Nervous System: The AIDS Trojan Makes You WannaCry* (Legal Tech News, July 9, 2018)
- *Nervous System: The Glamour Girl's Secret Privacy Weapon* (Legal Tech News, August 6, 2018)
- *Nervous System: The Tech Revolution is Earlier Than You Think* (Legal Tech News, September 4, 2018)
- *How to Recognize Different Types of Dialers From Quite a Long Way Away* (The Consumer Finance Law Quarterly Report, Volume 72, No. 2 (2018))
- *Nervous System: What Hollywood Has Taught the U.S. Government About Cybersecurity* (Legal Tech News, October 12, 2018)
- *Nervous System: Taking Biometrics at Face Value* (Legal Tech News, November 2, 2018)
- *Nervous System: The Computer That Taught HAL to Sing* (Legal Tech News, December 3, 2018)

## CLE and OTHER LECTURE PRESENTATIONS

- *How to Win Cases Using Digital Forensics and E-Discovery* (CLE, October 24, 2018)
- The Conference on Consumer Finance Law – *TCPA Class Actions* (Panelist, May 31, 2018)
- The DC Circuit Finally Phones In--A Complete Guide to its decision in ACC International v. Federal Communications Commission and what it means for your TCPA case and your business (webinar, Apr. 5, 2018)
- ThinkCLE - *The Art of Settling TCPA Lawsuits* (CLE, Feb. 7, 2018)
- *2017 Lessons Learned - Data Breaches, and Preventing Access Failure Attack* (Presenter on Infosecurity Magazine's Webinar, Dec. 21, 2017)
- P&I DC West Conference – Panelist on *Cybersecurity Track* panel (Oct. 9, 2017)
- ThinkCLE - *Is the Party Over for Professional TCPA Plaintiffs? Challenging the Adequacy & Typicality of Class Representatives* (CLE, Oct. 3, 2017)
- National Business Institute – *How to Get Your Social Media, Email and Text Evidence Admitted (and Keep Theirs Out)* (CLE, June 28, 2017)
- Worldwide Employee Benefits Network Chicago - *What Employee Benefit Plan Professionals Need to Know about Cybersecurity* (May 24, 2017)



- ACFE Chicago - _Digital Forensics is Dead, Long Live Digital Forensics_ (CLE, October 23, 2015)
- ThinkCLE - _How to Realize ROI from your Preservation Efforts_ (CLE, October 22, 2015; July 23, 2015)
- E-Discovery – Issues and Developments (CLE, June 24, 2014)
- National Business Institute – _Find It Fast and Free on the Net: Strategies for Legal Research on the Web_  (CLE, June 25, 2015; April 10, 2014; June 6, 2013; May 23, 2012)

**EXHIBIT 6**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DANIEL BERMAN,

Plaintiff,

v.

FREEDOM FINANCIAL NETWORK, LLC,
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC, and LEAD SCIENCE, LLC,

Defendants.

Case No. 4:18-CV-01060-DMR

Hon. Yvonne Gonzalez Rogers

**SUPPLEMENTAL EXPERT REPORT OF DAVID KALAT**

**SUPPLEMENTAL EXPERT REPORT OF DAVID KALAT** ...................................................... 1

I.     INTRODUCTION .................................................................................................................. 3

II.    DOCUMENTS AND DATA SOURCES CONSIDERED ................................................. 4

III.   FACTUAL BACKGROUND ............................................................................................. 5

   A.   Online Sweepstakes and the Phenomenon of "Sweepers" ........................................... 5

   B.   Bots .............................................................................................................................. 8

   C.   Server Logs and Data Security .................................................................................... 9

IV.   ANALYSIS AND OPINIONS ......................................................................................... 10

   A.   Data Security .............................................................................................................. 11

   B.   Data Privacy and Alleged "Destruction" of Server Logs .......................................... 15

   C.   Reporting of Metadata ............................................................................................... 17

   D.   "Implausibly High" Conversion Rates ...................................................................... 18

   E.   Analysis Relating To Alleged "Facially Deficient And Patently False Names And Addresses" 19

   F.   The Placeholders Account For a Trivial Number of Leads .......................................... 21

   G.   Structured Databases .................................................................................................. 21

   H.   Pattern Analysis ......................................................................................................... 22

   I.   Individual Analysis of Leads ...................................................................................... 24

      1.   Dunk Loka (510) 326-9945 ................................................................................. 24

      2.   Kelsey Forsch ███████ 2068 ....................................................................... 25

      3.   Roger Botts █████-1371 ................................................................................ 26

      4.   Andrea Clay █████-6114 ................................................................................ 28

      5.   Ashlei Rogers ██████-0642 ......................................................................... 30

   J.   Roboform ................................................................................................................... 30

   K.   Analysis of Complaints .............................................................................................. 31

   L.   Analysis of Call Log Records for 100 Sample Numbers ............................................ 37

I respectfully submit this supplemental expert report to supplement the prior expert report I submitted in the above-captioned matter on January 4, 2019. My qualifications are set forth in detail in that January 4, 2019 report and I incorporate them by reference here.[1]

## I.    INTRODUCTION

1.  Plaintiff proposes a class definition that includes *all* recipients of calls and texts involving Defendant Freedom Financial Network, LLC ("Freedom")'s products made to Defendant Fluent, Inc. ("Fluent")'s leads. Plaintiff's position appears to be that the alleged identification of individual issues among *some* of the registrations implicates *all* of them by association.[2] This supplemental report explains why the various technological issues plaintiff raises regarding Fluent's leads do not indicate anything nefarious or fraudulent. Before exploring those issues in depth, it is important to first note how fundamentally trivial they are. After two reports apiece from two separate experts, Plaintiff's contention that Fluent's leads are sourced from anything other than consumers visiting Fluent's websites is based almost entirely upon the observation that some leads contain what appear to be computer-generated "placeholder" data. This issue occurs in *less than one third of one percent* of all the leads. The placeholder issue is not even present in the lead that resulted in calls and texts to the plaintiff, and therefore does not even relate to the circumstances that led to this lawsuit.

2.  According to Fluent, its database is populated with information provided by consumers who voluntarily submitted it to a Fluent-operated website as they enrolled in online sweepstakes or other promotions.[3] For each such registration in the Fluent system, the database contains a mix of human-created (such as a name and address) and machine-created information (metadata including the IP address of the user and the browser agent used to submit the data) that together document the provision of consent.

---

[1] My current and updated Curriculum Vitae is set forth as Exhibit 1.
[2] See Motion for Class Certification at 9:8-13
[3] Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery ("Fluent's Responses") at 3:22-4:24. See also Affidavit of Mitenkumar Bhadania, paragraph 17.

3. On December 7, 2018, Benjamin Beecher and Anya Verkhovskaya submitted expert reports ("Expert Reports") that set forth purported "deficiencies" in the lead data produced by Fluent. On January 4, 2019, I submitted an expert report that rebutted the Expert Reports of Mr. Beecher and Ms. Verkhovskaya and showed that the alleged "deficiencies" they cited evaporate on closer inspection. Mr. Beecher and Ms. Verkhovskaya filed supplemental expert reports on February 8, 2019 ("Supplemental Expert Reports") that do not refute any of my conclusions, or even mention my report at all. All of my conclusions from the January 4, 2019 report are therefore unrefuted, and I incorporate all of them here by reference.

4. The opinions expressed by Mr. Beecher and Ms. Verkhovskaya in their Expert Reports and Supplemental Expert Reports are rooted in observations of Fluent's data that are variously taken out of context, misrepresented, and/or interpreted according to faulty assumptions. The specific facts that they observed are real attributes of Fluent's data and I do not dispute those observations. Where we disagree is in the significance or even relevance of those observations. The starting point for our disagreement is on the baseline set of expectations one should reasonably have for the lead data produced by Fluent. By way of analogy, if one were to observe that a particular group of people had an average height of 6'5", it would not be appropriate to opine whether that was unusually tall without first establishing what type of population was being observed: 6'5" is shorter than the expected average for a group of basketball players, taller than the expected average for a group of kindergarden children, and exactly the expected average for a group of men from the Netherlands. The problem at the core of Mr. Beecher's and Ms. Verkhovskaya's opinions is their failure to consider Fluent's operations *as a lead generator using sweepstakes and other promotions*.

## II.    DOCUMENTS AND DATA SOURCES CONSIDERED

5. My understanding of the factual matters at issue is based on my review of the documents and data described below. I understand that additional information relevant to my opinions may be

disclosed in subsequent productions and depositions. Accordingly, I reserve the right to amend my findings based upon such additional disclosures.

    a.  Fluent_00441 (Lead/Registration Records from 4/27/2017-3/31/2018)

    b.  Fluent_00572 (Lead/Registration Records from 3/31/2018-4/12/2018)

    c.  Fluent 100 Numbers Updated (00132124xCDD31) (Lead/Registration Records for sample of 100)

    d.  LeadScience_000677 (Outbound Call Logs)

    e.  LeadScience_005228 (Opt-Out Responses)

    f.  Fluent_000573 (Metadata Table)

    g.  Second Amended Complaint

    h.  Motion for Class Certification

    i.  Declaration of Jon B. Fougner and Exhibit A: Wrong-Number Complaints

    j.  Expert Report of Anya Verkhovskaya (Dec. 7, 2018)

    k.  Expert Report of Benjamin Beecher (Dec. 7, 2018)

    l.  Supplemental Expert Report of Anya Verkhovskaya (Jan. 8, 2019)

    m.  Supplemental Expert Report of Benjamin Beecher (Jan. 8, 2019)

    n.  Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery

    o.  Affidavit of TCPA Prior Express Written Consent, by Mitenkumar Bhadania

    p.  Declaration of Mitenkumar Bhadania in Support of Defendant's Reply Motion

## III.    FACTUAL BACKGROUND

### A.    <u>Online Sweepstakes and the Phenomenon of "Sweepers"</u>

6. Fluent is a digital marketing company that owns and operates consumer-facing websites that offer various opportunities including enrolling in online sweepstakes.[4] This fact is a critical precondition for understanding the nature and form of the data that has been produced.

---

[4] I have encountered Fluent in prior casework and know from experience that their lead generation operations include earning rewards, receiving job listings, obtaining product samples, and other consumer transactions, however the discussion set forth in the pleadings I was provided in this matter specifically reference sweepstakes.

7. For example, I understand that there are sub-communities of Americans for whom entering online sweepstakes is a hobby. A 2011 television documentary *High Stakes Sweepers* by the cable network TLC publicized the phenomenon of "sweepers."[5] The law firm Thompson Coburn LLP discussed the implications of this hobby in an October 31, 2017 blog. The authors noted that an "extensive cottage industry has sprung up around sweepstakes and other promotions. Clubs, apps, and various online resources curate instant information about all available sweepstakes and provide consumers with a direct line to enter the promotions. The stated goal is to provide access to as many sweepstakes as quickly as possible."

> "Most Sweepers rely on apps created by sweepstakes companies to find promotions they want to enter. These apps list hundreds of sweepstakes and contests throughout the U.S. and allow Sweepers to search for specific types of sweepstakes and contests… A few of the most popular sweepstakes companies include The Balance Sweepstakes Directory, Online-Sweepstakes.com, and Sweepstakes Sweep.

> There are also companies that provide Sweepers with daily lists of sweepstakes and contests consumers may want to enter, which saves the Sweeper a great deal of time finding the sweepstakes on their own. These companies include: Daily Sweep Lists and Lots of Prize Promotions.

> Most Sweepers also use another valuable tool called "auto-fills" that enable them to enter their name, address, phone number, etc., onto an entry form at the push of a button. All Sweepers have to do is to enter their contact information into the autofill app and then they can enter a sweepstakes in a matter of seconds. The most popular autofill companies appear to be Roboform and LastPass.[6]

---

[5] This August 14, 2011 TLC program can be viewed online at https://www.youtube.com/watch?v=eqfBCGyfp8g.
[6] Dale Joerling, "How Consumers 'Sweepstakes' Today: There's An App For That," Thompson Coburn LLP (October 31, 2017), accessible at https://www.thompsoncoburn.com/insights/blogs/sweepstakes-law/post/2017-10-31/how-consumers-sweepstakes-today-there-s-an-app-for-that, and attached as Exhibit 2.

8. In my research I have found there are websites that sweepers use to organize their community, exchange advice; and link to sites that offer sweepstakes. Examples of these sites include Sweepstaking.net, SweepstakesAdvantage.net, SweepstakesWorld.com, OnlineSweepstakes.com, and SweepersChoice.com. These sites provide resources and interactive message boards for sweepstakes enthusiasts.

9. According to the media coverage that these sweepstakes enthusiasts have received, it is not uncommon for sweepers to submit hundreds of online sweepstakes entries every day, in the hopes that increasing the volume of submissions will increase their odds of winning.

   a. In an article in the *Washington Post*, one such enthusiast recommended that sweepers spend up to two hours a day submitting entries ("That's enough to win plenty, but not so much you cut into work, family time and other obligations" she said) and estimated she herself submitted 36,000 entries a year ("It truly is a numbers game," she said. "You can't win if you don't enter. And the more you enter, the more chances you have to win.")[7]

   b. Sweeper Cynthia Kendall told the *Chicago Tribune*: "I get up before the kids and spend half an hour or an hour each morning. I created a separate Gmail account for contesting and a separate Facebook account for contesting, and I just go to these contest sites and put in my information. I enter between 50 and 100 a day. But it's autofill, so it's just hitting my e-mail address and saying "send."[8]

   c. Another "Contest Queen" was profiled by ABC News in 2011 in connection with the afore-mentioned TLC broadcast. This sweeper, Carolyn Wilman, offers sweepstaking advice on her website ContestQueen.com and in her book *You Can't Win If You Don't Enter*. Wilman told ABC News she enters "an

---

[7] Elisabeth Leamy, "Winning Contests and Sweepstakes Isn't Just Luck: Ask the Sweepers," *Washington Post* (September 7, 2017), attached as Exhibit 3.
[8] Anne Ford, "Meet Chicago's Contest Queen: She Enters Up to 100 Sweepstakes a Day—and Once Won $100K," Chicago Tribune (April 2, 2018), attached as Exhibit 4.

average of 100 to 300 contests per day" and offers the advice that "To win, you must enter. The more you enter, the better your odds."[9]

10. Given that Fluent uses social media and other marketing to entice consumers to visit their web pages to enroll in a sweepstakes or other promotion, and enthusiasts actively seek out online sweepstakes, it is reasonable to assume that some number of enthusiasts visited Fluent's web pages. Although the exact proportion of Fluent's leads that originated from sweepstakes enthusiasts is unknown, and difficult to quantify without interviewing the individual consumers themselves, it should reasonably inform the expectations of an analyst observing Fluent's leads to consider the role that enthusiasts may play in shaping that data.

11. In their Expert Reports of December 7, 2018, both Mr. Beecher and Ms. Verkhovskaya draw or imply various adverse conclusions from the observations that Fluent's data contains numerous entries for some of the same names; that some of these multiple leads contain identically formatted information; and that some leads contain artifacts of autofilling processes. In his Supplemental Expert Report, Mr. Beecher questions whether the conversion rate for Fluent's websites appears higher than a supposed "average." Each of these attributes can be explained as the result of a population of especially motivated users being driven to the web sites in question.

## B. **Bots**

12. Mr. Beecher's supplemental expert report asserts that "[m]any of Fluent's leads were driven by computer-generated bots (or inserted directly into the database) rather than real people submitting a form on the website."[10] Mr. Beecher further subdivides this opinion into individual issues, which are addressed in section IV below.

13. A "bot" is a popular colloquial term for a piece of software that is programmed to perform autonomously on a computer network, such as the Internet, to execute some predetermined

---

[9] Sabrina Parise and Jennifer Pereira, "The Contest Queen's Five Tips For Sweepstakes Success," ABC News (August 11, 2011), attached as Exhibit 5.
[10] Supplemental Expert Report of Benjamin Beecher p. 11.

task. The typical purpose of a bot is to perform a simple and repetitive task more efficiently than a human would. The most common form of bot is a "web spider" or "web crawler" that visits web sites and collects information about their content and activity, to be used by search engines such as Google to respond to search queries.[11]

14. If Mr. Beecher's premise that bots are responsible for many of Fluent's leads were true, those leads were created because a software application was programmed to perform the steps that entered that information into Fluent's database. As discussed more fully below, there are a wide variety of different types of leads in that database, with a diverse array of distinctive characteristics. No pattern has emerged to support the inference that bot activity created these diverse types of leads. Rather than concluding that finding hundreds of leads that are all formatted differently from one another means they came from the *same* source, it is more likely their differences resulted from originating from *different* sources—that is, the different consumers who visited those websites.

### C.    Server Logs and Data Security

15. Web servers generate logs of activity that record information about every request made to that server. This information will include the IP address from which the request originated, and the "user agent" (in this context, the web browser), along with other details. Some of this information is relevant to documenting the consumer's consent, and some of the information is relevant to the web site's administrator to maintain its security.

16. Reviewing the logs can identify patterns indicative of malicious bots. For example, if the web logs show that a disproportionate volume of traffic is coming from a single IP address located in China, and the user agent field is blank, that would be a potential red flag. Administrators can review logs to identify such patterns and then take action such as blocking that IP address.

17. In a standard web server scenario, a site administrator hosts web content on a computer that they control. That computer, which is the server, receives requests from users over the Internet

---

[11] See, for example, https://www.incapsula.com/blog/know-your-top-10-bots.html.

and responds by sending data. An alternative scenario is for the web administrator to contract with a "Content Delivery Network" or "CDN." A CDN is a company that operates a network of computers across a large geographic area, and places some or all of the website content from its various customers on those many computers. In this way, the content of a website is not hosted on a single computer but is in fact on many computers. When a consumer on the Internet attempts to visit that web page, some or all of the content will be delivered to them from a computer geographically close(r) to them.

18. One of the advantages of using a CDN system is that it makes the user experience better, because web pages load faster. For web sites that experience heavy traffic or spikes in traffic, distributing that traffic across a number of servers balances the demand and helps avoid traffic jams. As an added advantage, a CDN provider may have superior security resources and technology available to it than the smaller organizations that are its customers.

19. I am informed that Fluent uses the CDN provider Cloudflare for the web sites that gathered the lead data at issue in this case. This has several positive consequences for the security of Fluent's sites, that are discussed more fully below.

## IV.   ANALYSIS AND OPINIONS

20. Mr. Beecher's Supplemental Expert Report expresses two different categories of opinions. The first category concerns the circumstances surrounding Fluent's operations and production of data. Specifically, Mr. Beecher argues that Fluent has inadequate data security measures in place, has produced leads in an unsatisfactory format, did not retain certain types of data, and that the leads overall indicate an atypically high conversion rate. None of these arguments, even if they were valid, serve as direct evidence that any of the Fluent leads were not voluntarily submitted by consumers visiting Fluent's web sites.

21. The second category of opinions presented by Mr. Beecher do present specific examples of lead data that he claims are evidence of bot-driven activity. These examples predominantly

involve the presence of "placeholder" values (such as "{FIRSTNAME} | {LASTNAME}") in some leads instead of human-created Personal Information.

22. I address the circumstantial arguments individually below first, and then the issues related to placeholder values and other specific arguments.

### A. Data Security

23. The first argument that Mr. Beecher puts forth in support of his claim that "[m]any of Fluent's leads were driven by computer-generated bots (or inserted directly into the database) rather than real people submitting a form on the website" is his assertion that the absence of a CAPTCHA toolbar on the Fluent websites constitutes a "failure" to "ensure that a human actually entered the data."[12] This is like arguing that if a house is left unlocked, that constitutes proof that it was robbed. Nevertheless, in this case Fluent has not left the house unlocked.

24. As I noted in my prior report, CAPTCHA toolbars are not an infallible mechanism to differentiate humans from machines. Google determined as long ago as 2014 that software could effectively overcome CAPTCHA puzzles "with over 99% accuracy," rendering those tools essentially useless for their stated purpose and serving only to confound legitimate human users.[13]

25. When web designers and site administrators select the desired security mechanisms, several factors go into that decision. These factors include the nature of the data being protected, the risks posed to that data, and the cost-benefit tradeoffs of different security solutions with respect to the intended use of the web site in question. Although the use of a CAPTCHA toolbar would be one possible mechanism by which to ensure that only humans submit information to the database, it is not the only mechanism nor is it the best. Other mechanisms, such as the requirement to complete a multi-page survey in order to submit information, serves as a barrier to bots.

---

[12] Supplemental Expert Report of Benjamin Beecher paragraph 32. This argument also appeared in Mr. Beecher Expert Report of December 8, 2018, pp. 5-6.
[13] See Google Security Blog from April 16, 2014, attached as Exhibit 13 to my expert report of January 4, 2019.

26. By way of comparison, Mr. Beecher's own software consultancy company Lightmatter permits visitors to submit inquiries without first passing a CAPTCHA test:[14]



Consider also that if a reader of Mr. Beecher's Supplemental Expert Report followed his link to the article "When Websites Won't Take No For An Answer" at the *New York Times* and was motivated to send a letter to the editor in response, that person could easily submit a letter online without confronting a CAPTCHA:[15]



---

[14] https://lightmatter.com/contact.html
[15] https://help.nytimes.com/hc/en-us/articles/115014925288-How-to-submit-a-letter-to-the-editor

If a consumer wishes to submit a complaint to the Consumer Financial Protection Bureau, they can do so by filling out a multi-page online form—and no CAPTCHA is used to verify their humanity first.[16]



27. I do not present these anecdotal examples to suggest that Lightmatter, the *New York Times*, or the CFPB are deficient in their information security, but rather to demonstrate that each site makes security decisions based on its own balance of perceived risks versus perceived benefits, and the use of CAPTCHA is not always the most appropriate tool to manage interactions with users.

28. In the case of Fluent's interactions with sweepstakes entrants, the choice of what security solution to use may have been influenced by the ways in which that particular population has been known to interact with CAPTCHA tools. In reviewing the various online forums identified above, I observed that many people who enter online sweepstakes have publicly

---

[16] https://www.consumerfinance.gov/complaint/

voiced their complaints about having to get past CAPTCHAS in order to submit entries.[17] In fact, at least one of the sweepstakes-enthusiast websites I reviewed actually markets anti-CAPTCHA software to other sweepers. For example, Sweepers Choice advertises its anti-CAPTCHA software to its subscribers as a member benefit as follows:

> Usually the software gets the CAPTCHAs 100% correct. If however, it doesn't - it will try again with a new captcha several times until it figures it out. It does this just like a real human would, except you get to avoid the headaches and enjoy seeing it done for you! As well - as old sweepstakes expire, new ones are added in - so you almost always have up to an additional 400 CAPTCHA sweepstakes, every single day![18]

29. As an alternative to CAPTCHA technology, I understand that Fluent uses the Cloudflare platform to manage access to its websites. Among its various offerings, Cloudflare controls IP access to Fluent's sites to block access to IP addresses known to be associated with bots; and dynamically scores ongoing IP and user agent activity to identify "bad behavior." Cloudflare's analytical tools examine the interactions with incoming IP addresses to update that blocklist over time based on traffic analysis.[19]

30. Mr. Beecher also cited the "failure to use HTTPS" as one of his reasons for concluding that the Fluent leads were created by machines rather than people. HTTPS is a protocol for encrypting the traffic between the user and the website to secure it from eavesdropping or tampering. Although it is generally true that using HTTPS is preferable from a security

---

[17] For example, see the discussions "The darn Captchas…" at Online Sweepstakes.com (accessed at http://forums.online-sweepstakes.com/showthread.php?s=8370dc2cd9c0211fe21788eea270828e&t=1431862) and "Captcha Issues" (accessed at http://forums.online-sweepstakes.com/showthread.php?t=1361952, both discussions are set forth as Exhibit 6.) Also see the article "What to do when CAPTCHAS won't work" at thebalanceeveryday.com (accessed at https://www.thebalanceeveryday.com/what-to-do-when-captchas-dont-work-897057 and set forth as Exhibit 7.)

[18] http://sweeperschoice.com/products-captcha.php, set forth as Exhibit 8.

[19] A Cloudflare whitepaper available on Cloudflare's website (www.cloudlfare.com) is attached as Exhibit 9.

standpoint, there are other factors that play into each web administrator's decision making.[20] For example, use of HTTPS can create challenges for administrators using a single server on a single IP address to host multiple domains. It is an additional relevant factor that Fluent's websites do not exchange financial information with their users.

31. While most security experts would likely agree that using secured, encrypted channels of communication over the Internet is preferable, the fact is that much user activity on the Internet, even on popular and well-established sites, is often not over HTTPS. As of August 2018, just 50% of the Alexa ranked Top 1 Million web sites are served over HTTPS.[21] However, the implementation of Cloudflare as a CDN service means that Fluent's traffic is encrypted over part of its journey. As a CDN, Cloudflare sits between the end user and Fluent's web server, and stores its own local copies of some of Fluent's web site content. The traffic that passes through Cloudflare is encrypted and decrypted on that leg of the journey, even if HTPPS is not configured for the site's web server itself.[22]

### B.   Data Privacy and Alleged "Destruction" of Server Logs

32. Plaintiff accuses Defendants of "intentionally destroying" the server logs, and describes this as "spoliation."[23] In light of this harsh accusation, Fluent's responsibilities towards data privacy are relevant. In order to comply with the variety of data privacy regulations and laws, it is best practices for organization to *only* store data for which there is a direct and specific business need, to *only* store that data for the minimum period of time necessary to serve that need, and to *only* store that data in the form and format that can be best protected from unauthorized disclosure or breach.[24]

---

[20] For example, some older browsers cannot interact with HTTPS encrypted sites, and the process of encrypting and decrypting the traffic slows down performance.

[21] https://scotthelme.co.uk/alexa-top-1-million-analysis-august-2018/ attached as Exhibit 10.

[22] See "Cloudflare, SSL and Unhealthy Security Absolutism" at Troy Hunt's blog, accessible at https://www.troyhunt.com/cloudflare-ssl-and-unhealthy-security-absolutism/ and set forth as Exhibit 11.

[23] Motion for Class Certification at 21:19-26.

[24] My firm, Berkeley Research Group, offers GDPR and data privacy compliance consulting. I have worked alongside these compliance consultants and am familiar with their advice and guidance.

Supplemental Expert Report of David Kalat / <u>Berman v. Freedom Financial, *et al.*</u>   15 | P a g e

33. According to the European Union's General Data Protection Regulation (GDPR), web server logs are classified as protected personal information.[25] The GDPR, and comparable data protection regulations modeled on it such as the California Consumer Privacy Act, A.B. 375, regulate the extent to which companies are permitted to store such information.[26] Each use of personal data requires a legal basis for the processing (Article 6). This includes the *storage* of personal data (Article 4(2)). When all legal bases for using or storing the information have expired, the data *must be deleted*.

34. Fluent has business needs for the information contained in the web server logs, but these needs are bifurcated into security-based needs and marketing-based needs. Fluent's web logs contain far more personal technical information than is required to perform the marketing function for which that data was originally collected. From a security standpoint, some log information is relevant to monitor traffic, prevent fraud, debug systems, and investigate the causes of any attack or a breach. These needs are not indefinite. Once the security-based uses for this additional information have expired, Fluent has an obligation to delete the additional information and only retain the data needed for marketing (and any other ongoing legally justified purposes). In this respect, Fluent copies the specific data needed to support the marketing uses to a more secure location for extended retention.

35. The marketing-based needs require Fluent to maintain records to document the consumer's consent. This does not, however, equate to requiring Fluent to retain this information in its original form if that form is insecure or otherwise violates data privacy protocols. As noted above, the consent information contains personal data that requires protection and which, in accordance with the GDPR and other data privacy regulations, may need to be provided and/or

---

[25] IP addresses are specifically defined as personal data per Article 4, Point 1; and Recital 49. The data regarding the referral and landing page URLs can also be considered personal information in certain circumstances.

[26] The GDPR is extra-territorial, meaning that it applies to the personal data of any European Union subject regardless of whether that data is collected and stored outside of the European Union. Any organization that reasonably expects the possibility that data belonging to Europeans might be obtained is obliged to comply with the GDPR. Because the scope of the GDPR is so expansive, companies that shape their policies to comply with the GDPR are likely to be in compliance with all other data privacy regulations as a result.

destroyed upon request from the individual person. The format of the server logs in which this data is captured is very poor from all of these perspectives—server logs are in unencrypted plaintext and are stored directly on a computer that is connected to the Internet. This makes them more vulnerable to unauthorized access and disclosure than other forms of storage. The logs are also text files not well suited to searching. By transferring the essential data out of the server logs and into a database, Fluent is better suited to manage, document, control, and protect the personal information. The server logs can be purged after whatever time frame meets the needs of the administrator's security management, minimizing the risk of exposure to the personal information they contain and complying with the edict to "Hold on to information only as long as you have a legitimate business need."[27]

### C.   Reporting of Metadata

36. Mr. Beecher accused Fluent of "refus[ing] to produce commonly available data… that would help confirm whether it was indeed obtaining consumer contact data and telemarketing consent from real, unique human beings or not."[28] This information consists of metadata listing the device type and browser associated with each IP address request to Fluent's web servers.[29]

37. This metadata has been produced, for an agreed-upon sample of 100 numbers.[30] I understand that this data sheet contains all of the requested data points for these 100 telephone numbers.

38. Additionally, the prior production of lead data was found to have listed internal IP addresses of Fluent's servers (127.0.0.1, 192.168.100.48 and 172.24.32.94) for a significant portion of the leads, instead of the external IP address from which the user traffic originated. As explained in the Declaration of Mitenkumar Bhadania and which was addressed as unrefuted analysis in my expert report of January 4, 2019, this was a consequence of how the database stored

---

[27] See "Start with Security: A Guide for Business" published by the Federal Trade Commission. This is accessible at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business, and a copy is attached as Exhibit 12.
[28] Supplemental Expert Report of Benjamin Beecher paragraph 38.
[29] Supplemental Expert Report of Benjamin Beecher paragraph 40
[30] Fluent 100 Numbers Updated (00132124xCDD31)

information and how the tables were joined.[31] For the updated production of data of these 100 sample numbers, Fluent has exported the external IP address from which the user traffic was logged, demonstrating that the user IP addresses are maintained in the system and can be produced. I examined the new data production and confirmed that the IP Address field is populated for each of these 100 sample numbers, and does not contain any instances of the IP addresses 127.0.0.1, 192.168.100.48 or 172.24.32.94.

### D.   "Implausibly High" Conversion Rates

39. In paragraph 49 of his Supplemental Expert Report, Mr. Beecher expresses the opinion that the conversion rates represented by Fluent's data (that is, the rate at which visitors to Fluent's websites registered to receive marketing communications) is "implausibly high." To support this opinion, Mr. Beecher cites to a 2017 article by Christine Austin. Mr. Beecher summarized Ms. Austin's article as suggesting the average conversion rate was 2.35% at that time. Mr. Beecher, however, misrepresents the actual conclusions of her article.[32]

40. In fact, Ms. Austin cited that figure in order to *challenge it*. She points out that "Factors like your industry, product or service, and your target audience all weigh in on your ability to convert visitors into leads, and leads into customers." She notes that "[t]he best conversion rate varied significantly across all the industries," and refers her readers to research by Unbounce that studied the performance of 74.5 million visits to more than 64,000 lead generation landing pages. The Unbounce study found that on average a 12% conversion rate is "pretty good for lead generation landing pages," but that for lead generators in the credit and lending space, a conversion rate of 24.3 was possible.[33]

---

[31] Declaration of Mitenkumar Bhadania in Support of Defendant's Reply Motion, paragraphs 6-13

[32] Mr. Beecher cited to this article as his sole support for his conclusion, but did not attach a copy as an Exhibit. The article is accessible online at https://www.impactbnd.com/blog/what-is-a-good-landing-page-conversion-rate, and I have attached a copy as Exhibit 13.

[33] The Unbounce research is accessible online at https://www.conversionbenchmarkreport.com and a copy is set forth as Exhibit 14.

> "The industries that do best at lead gen are Travel, Credit & Lending, Business Consulting and Vocational Studies & Job Training. In these industries, you can realistically target landing page conversion rates over 12%. The very best pages convert over 25% of their visitors."

41. Neither the Austin article nor the Unbounce report directly mentioned the role that sweepstakes offers play in conversion rates, but it is reasonable to conclude that the sweepstakes enthusiasts who regularly submit multiple submissions and repeatedly return to the same lead generation website over time to send additional submissions will boost the conversion rate for certain Fluent websites as compared to lead generators who rely solely on the persuasiveness of their online sales pitch to convince visitors to register.

### E.   Analysis Relating To Alleged "Facially Deficient And Patently False Names And Addresses"

42. This case originated because of communications made to Plaintiff Daniel Berman resulting from a lead registration recorded on December 24, 2017, containing Mr. Berman's telephone number 510-326-9945, along with the apparently unrelated email address buffola@gmail.com, the evidently fictional name "Dunk Loka," and an incomplete street address of "Grand Street" (with no house number).[34] Mr. Berman stated under oath that he did not submit this Registration Information to Fluent; and its disparate contents contain a mix of fictional information and scraps of real but unconnected consumer information.

43. When plaintiff claims that the Fluent leads contain "facially deficient and patently false names and addresses,"[35] and Mr. Beecher claims that "[m]any of Fluent's leads were driven by computer-generated bots (or inserted directly into the database) rather than real people submitting a form on the website,"[36] these statements create the impression that Fluent's lead data is replete with examples similar to the "Dunk Loka" lead. The implication is that the

---

[34] Affidavit of TCPA Prior Express Written Consent, by Mitenkumar Bhadania paragraphs 6-16.
[35] Motion for Class Certification at page 6, footnote 4.
[36] Supplemental Expert Report of Benjamin Beecher p. 11.

database is polluted with leads that cannot have been sourced from consenting consumers because they do not contain real consumer information. However, this is not the case. Indeed, neither Mr. Beecher nor Ms. Vekhovskaya in either one of the two expert reports submitted respectively by each expert identified even a single lead other than the "Dunk Loka" that contained fictional information.

44. The only evidence that Mr. Beecher puts forth to demonstrate what in his estimation are direct examples of machine-submitted leads are the instances of placeholder entries such as {FIRSTNAME} | {LASTNAME} in place of the consumer's name in a trivial number of registrations is the influence of computer-generated bots or comparable software processes at the time the leads were registered.[37] It is Mr. Beecher's personal speculation that ***the only possible explanation*** for the presence of these placeholder entries is that they were written to the database by bots.

45. As I stated in my prior report, while I agree that these entries are likely the result of some kind of software or database process, there is no evidence to suggest that this process or processes *must* be occurring at the time the lead data is registered, as opposed to at any subsequent point in time, nor is there any evidence that the process(es) in question must be malicious software as opposed to technological tools used by humans. Mr. Beecher expresses just his speculative supposition, based on circular logic: he argues that the handful of times he found these {FIRSTNAME} | {LASTNAME}-style entries were evidence that "the computer program likely typically covers its tracks, but failed to do so in these instances."[38] In other words, the times he found these entries are evidence of a bot, and the times he did *not* find them are *also* evidence of a bot.

46. I have conducted an extensive analysis of these entries, as described below, and it is my opinion to a reasonable degree of scientific certainty that these placeholder entries are not indicative of

---

[37] Supplemental Expert Report of Benjamin Beecher paragraphs 45-48.
[38] Supplemental Expert Report of Benjamin Beecher, paragraph 45.

bot activity, but are wholly consistent with the leads being entered by individual consumers as Fluent has stated.

### F.     The Placeholders Account For a Trivial Number of Leads

47. I conducted a search of the 890,595 rows in the lead data produced by Fluent for any instances of so-called "special characters" such as {}[]$#:* and identified that 888,103 of those rows, or 99.72%, do not exhibit any such placeholder values.[39] In other words, the total occurrence of this "placeholder" data issue affects **_less than one-third of one percent_** of the leads. Of the rows of lead data that do contain one or more placeholder values, the majority of these affect only the address field—this occurs in 785 leads, or 0.09% of the total.

### G.     Structured Databases

48. To better understand what these placeholder values are, and what they might represent, some background on relational databases is necessary. The term "structured data" refers to databases designed to be optimized for machine-readability, as distinguished from "unstructured data" designed for human use. Unstructured data has ambiguities that humans resolve through context. For example, "1984" can refer to a number, a year, a book, a movie version of the book…the reader needs context to glean the intended meaning. By contrast, machine-readable databases derive meaning from structure, not context. They sort data values into individual cells whose *position* defines their meaning. Users of spreadsheet programs like Excel will be familiar with the idea that a header row can specify the types of values to be listed underneath in that column, and the data type of the column can be set to only accept certain forms of data.

49.  Databases are electronic software that use special types of binary data to define the boundaries between cells, columns, and rows, and to identify where one row of data ends and another begins. These elements of binary data are used to create and maintain the structure of the database, which is essential to deriving meaning from the values stored in it.

---

[39] My workpapers documenting this analysis are attached in native form as Exhibit 15.

50. All binary data are stored in *physical form* in the system's memory as either electrical or magnetic charges in some kind of media. At the disk level, every 1 and 0 is a physical object. Inevitably, these physical objects sometimes fail or decay. While sophisticated systems employ a variety of error-checking and fail-safe mechanisms to minimize the risk of data loss, some individual physical failure is unavoidable. The technical term for this is "corruption." Depending on the extent and location of the corruption, it may manifest as either garbled data or data that appears in the wrong location.

51. I have experience designing and maintaining various types of relational databases, and in my practice I routinely forensically preserve, extract data from, and analyze data from relational databases. This experience includes open-source systems, proprietary systems, large-scale enterprise systems stored on local data centers, cloud-based database systems, and legacy systems running unusual or obsolete platforms. It is routine and expected to encounter some degree of data corruption in even the best-maintained and up-to-date of systems.

52. Additionally, there is a degree of data distortion that can occur when information is extracted from a database for export. The form in which the database is stored on the database server may be encrypted and/or in a special proprietary file format, with information scattered across multiple tables, and special reserved data elements used to draw the boundaries between cells. When data is extracted from such a system, it may be exported to a common, open-source file format such as a comma-separated-values (csv) spreadsheet. A common problem that I have observed frequently in my case work occurs when the delimiter used for the export file is a character that occurs in the data itself—for example, if a csv file uses commas to separate values, but commas also appear within the fields. This can cause the exported file to show improper data that requires manual scrubbing to correct.

## H.   Pattern Analysis

53. A bot is a software application executing an automated series of steps—it is programmed to do certain things, and so it does those things. By faithfully performing those automated steps

over and over, a bot leaves behind a pattern of activity that can be recognized. One way to identify bot activity is to perform pattern analysis.

54. Mr. Beecher's presumption regarding the placeholder values is that they represent data fields entered by bots. I analyzed the lead data in SQL for patterns evidencing correlations between leads that contained placeholder values and the source IP, the date ranges they were logged, the geographic region of the personal information, or any noteworthy distribution of when and how these placeholder values appear. I found no recognizable pattern.

55. Generally speaking, the most common placeholder values found in Fluent's data are the ones that use curly brackets around capital-letter header names. These are:

    a.  {FIRSTNAME}

    b.  {LASTNAME}

    c.  {ADDRESS}

    d.  {CITY}

    e.  {STATE}

    f.  {ZIPCODE}

56. However, while it is generally the case that in the limited number of leads where a placeholder value is found, it is likelier than not to be one of these, no meaningful pattern emerges. The curly-bracketed placeholders are not associated with any particular time frame, they are not associated with any particular IP address, and they are not even associated with themselves. For example, finding a {FIRSTNAME} in the First Name field does not necessarily mean {LASTNAME} is in the Last Name field, although sometimes it is.

57. The most striking fact about these placeholder values is that there are different types of them in the data. Just considering the types of placeholders that may appear in the Last Name field includes the following:

    a.  *[subscriber_lastname_capitalized]*

    b.  {LASTNAME}

    c.  {last}

    d.  [$LAST_NAME$]

    e.  [last_name]

    f.  *[subscriber_lastname_capitalized]*

    g.  #NAME?

    h.  {lt}

58. If the placeholder values were, as Mr. Beecher argues, the result of bot-entered leads, then the proliferation of these types would mean there were at least eight different types of bots, each programmed differently, that used different placeholders from each other. Accounting for all the many variations of how the placeholders appear in the data would actually tend to suggest that *thousands* of uniquely programmed bots were somehow at work—but that this army of malicious software was used to write less than one-third of one percent of the leads into Fluent's database.

## I.    <u>Individual Analysis of Leads</u>

59. I discuss below five leads to illustrate their diversity in practice. These were selected as representative of key attributes of the data, but are not meant as a comprehensive catalog of the types of data to be found in the leads.

### 1.   *Dunk Loka (510) 326-9945*

60. The "Dunk Loka" lead contains a combination of fictional and incomplete information along with the cellular number used by Mr. Berman. The IP address logged for this lead 73.252.203.130. No other leads are listed as coming from that IP. No other leads use the name "Dunk Loka" or the phone number found on this lead. It is distinctive, even unique.

61. This lead exhibits none of the attributes that Mr. Beecher and Ms. Verkhovskaya listed as signs of bot activity: there are no placeholder values in any of the fields; the IP address is not one of Fluent's internal servers and is geographically consistent with the physical address used in the lead; and it is a single lead with no duplicate entries. If these attributes are, as plaintiff's experts contend, signs of bot activity, then *this* lead was submitted by a different bot than the others.

Or, as is far more likely, this lead was submitted by a person on Fluent's website through the normal process of obtaining leads—the identity and motive of that person remain to be established.

### 2.  *Kelsey Forsch* ███-*2068*

62. The lead for "Kelsey Forsch" is among the 100 sample numbers requested by plaintiff for which expanded lead information was separately produced. None of the data fields in her lead contain any placeholders or special characters. All of the personal information in this lead is corroborated by public records. Both LexisNexis and TLO independently corroborated that a Kelsey Forsch lives at 906 Yale Avenue, Billings, Missouri 59102, and uses the email address kelsey.forsch73@gmail.com.[40] Neither service connected the phone number ███-2068 to her, but they also did not connect that phone number to anyone else either—the technical term for this is "no append." A "no append" means the data vendors have no records pertaining to that phone number. This is a common occurrence with cellular numbers, because there is no nationwide directory of cell numbers. The lead was logged from an iPhone on February 17, 2018 on an IP address associated with Spectrum/Charter Communications, a telecommunications provider that serves Missouri (and other regions).

63. This particular lead is in many ways representative of the majority of the leads in Fluent's system. In my prior report I conducted research on a sample of 16,270 registrations to demonstrate that the personal data they contained was consistent with actual personal data for the people identified in the leads. As I previously reported, my analysis of that statistically valid sample found that 88.89% of the sample leads I tested corroborated the name and/or address from the lead to public records from one or more sources indicating the same person. I also determined that 88.7% of the email addresses in those sample leads are valid email addresses verified by their providers to be associated with actual users to whom emails can be

---

[40] The LexisNexis and TLO records for Ms. Forsch are attached as Exhibit 16.

directed, and none of the emails I tested showed any evidence of having been obtained through any means other than the direct input by actual users.

64.  Therefore, for one or more spam bots to have submitted these leads, any scraping, harvesting, or generating of the associated email addresses would have had to occur without being detected by the compliance tools used to prevent that activity. The bot or bots would also have to have access to an existing database of accurate consumer personal information, correctly associating names and addresses.

### 3.  *Roger Botts* ███████*-1371*

65. The registrations for Roger Botts and telephone number ██████-1371 illustrate the presence of different but equally corroborated personally identifying information in different registrations over time.

66. The first registration for this phone number was logged on September 8, 2017 at 9:21 pm. According to the data produced by Fluent, this registration was made by "Roger Botts" of 1208 Tay Mac Rd, Taylorsville, Georgia, and Mr. Botts supplied the email address doylebotts11@icloud.com. According to records obtained from both LexisNexis and TLO, Roger Botts is associated with telephone number ██████-1371 and with the email address doylebotts11@icloud.com.[41] Most significantly, both LexisNexis and TLO identify his primary address as 1208 Taylorsville Macedonia Road, Taylorsville, Georgia. Neither database renders this as "Tay Mac Road," however this appears to be a colloquial nickname that locals use for that road.

67. In addition to registrations associating this phone number with 1208 Tay Mac or Tay-Mac Road, some of the registrations identify Mr. Botts' address as PO Box 286, Oakman, Georgia. As it happens, both the LexisNexis and TLO reports for Mr. Botts also identify this as an alternate address also associated with that person.

---

[41] The LexisNexis and TLO records for Mr. Botts are attached as Exhibit 17.

68. Some of the registrations give Mr. Botts' first name as "RD" instead of "Roger." The LexisNexis and TLO reports identify Mr. Bott's middle name as "Doyle."

69. There are 74 registrations for Mr. Botts in all, and they cover a range of 62 unique IP addresses, every single one of which is an IP address allocated to Sprint, consistent with the user accessing the Internet from a cellphone as they move around on various networks. This is consistent with the fact that the Fluent data shows that the various registrations for Mr. Botts were logged as coming from an Apple iPhone.

70. Most significantly, one of the registrations for Mr. Botts, dated February 21, 2018, has the following placeholder information for the first name, last name, and address:

> *[subscriber_firstname_capitalized]* *[subscriber_lastname_capitalized]*
> *[subscriber_attribute_address]*

71. Mr. Beecher posits that each instance of these placeholder values is evidence that a bot entered that lead. Even if Mr. Beecher were correct (a conclusion I do not concede), this lead is preceded and followed by dozens of other registrations containing varying renditions of Mr. Botts' names and addresses, each of which is corroborated by third party databases. Mr. Beecher's speculation requires the conclusion that some external force such as a bot obtained a depth of personal information about Mr. Botts including his name, initials, two different addresses, and how his street is nicknamed by locals, and then variously entered this data in different combinations dozens of times over the span of months, only to then stop providing such accurate and nuanced personal detail and replace it with *[subscriber_firstname_capitalized]*    |    *[subscriber_lastname_capitalized]*    |    *[subscriber_attribute_address]* before returning to submitting dozens more leads containing various combinations of his actual personal information.

### 4.   *Andrea Clay (832) 580-6114*

72. The registrations for Andrea Clay and telephone number ███████-6114 resemble the example of Roger Botts in that they contain different but equally corroborated personally identifying information in different registrations over time, but Ms. Clay's situation is distinguishable from Mr. Botts'. In the sample of 100 numbers selected by plaintiff, there are 1,061 registrations pertaining to some variation of "Andrea Clay" associated with phone number ███████-6114. TLO associates Andrea Clay with this phone number, and assigns an 86% likelihood that the number is currently connected to her.[42]

73. Several different email addresses appear throughout these leads. The majority of instances (992, or 93% of the total) use the address andreaclay@ymail.com. This is a Yahoo mail domain that both TLO and LexisNexis associate with her. A fair number of the remaining emails that appear in the leads appear to be typographical errors involving this address.[43] The other emails that appear in these leads are also associated with Ms. Clay through LexisNexis and TLO: andreaclay@gmail.com, bestintheworldclay@gmail.com, and kcclay159@gmail.com.

74. The leads include three different physical addresses in Texas: 9019 Stingray Court, P.O. Box 1497, and 4813 East 27th Street. Each of these three physical addresses is associated with Ms. Clay in records from LexisNexis and TLO.

75. The various names that appear on the leads are:

       a.   Andrea Clay (937 leads, or 88% of the total)

       b.   Andrea undefined (46 leads)

       c.   undefined undefined (43 leads)

       d.   {firstname} {lastname} (19 leads)

       e.   Andreaclay@ymail.com Clay (5 leads)

       f.   Eileen Clay (4 leads)

       g.   Eileen Jackson (1 lead)

---

[42] Lexis Nexis did not return a phone number associated with Ms. Clay. The Lexis Nexis and TLO reports for Ms. Clay are attached as Exhibit 18.

[43] andreaciay@ymail.com, andreaclauy@ymail.com, andreaclay@mail.com, and andreaclay@umail.com

> h. kc clay (2 leads)
>
> i. Andrew Clay (1 lead)

76. Several interesting details emerge from these names. The first is that all of the actual human names that appear in these leads are connected to the same person. As revealed by LexisNexis and TLO records, Andrea Clay's middle name is Eileen, and her mother's maiden name is Jackson. The name "kc clay" is consistent with one of the email addresses that LexisNexis and TLO associate with her. While there is no "Andrew Clay" associated with her in public records, this is likely a typographical error given the proximity of the "w" key to the "a" on a standard keyboard. The name andreaclay@ymail.com Clay is likely a corruption error causing the email address to be shown in the wrong field.

77. The second observation is that two different types of placeholders appear among these leads. One type is a curly bracketed set using lower case letters, and the other is the word "undefined." If these are, as Mr. Beecher claims, evidence that a bot entered these leads, then this signals that _**at least two different bots**_ were involved.

78. Mr. Beecher's speculation that bots are responsible for entering the leads requires the conclusion that at least two different bots were programmed with a depth of personal information about Ms. Clay (including her full name, her mother's maiden name, three different addresses, and four different email addresses), and then variously entered this data in different combinations over a thousand times over the span of years—occasionally inserting typographical errors into various entries—but on a few scattered occasions these remarkably well-informed bots stopped providing such accurate and nuanced personal detail and instead inserted {firstname} {lastname} or "undefined undefined" (depending on which bot was doing the work), and that these bots were be distinct from the one that entered the wholly different placeholders *[subscriber_firstname_capitalized]* | *[subscriber_lastname_capitalized]* | *[subscriber_attribute_address]* in Mr. Botts' lead discussed above.

### 5. *Ashlei Rogers* ▇▇▇▇*-0642*

79. In the sample of 100 numbers selected by plaintiff, there are 44 registrations pertaining to phone number ▇▇▇▇-0642. These registrations however present a variety of different names, physical addresses, and email addresses. Despite this complexity, the Call Log records show that *only* the lead registration for "Ashlei Rogers" was pertinent to Freedom Financial's telemarketing, and the only calls and texts made on this phone number were sent to her.

80. LexisNexis and TLO corroborate that a person named "Ashlei Rogers" is associated with the email address on the lead, ashlei.rogers.0924@gmail.com. Neither LexisNexis nor TLO however associate Ms. Rogers with that telephone number.[44] Further investigation, including direct contact with Ms. Rogers, would be needed to establish her relationship to that phone number and the other personal information set forth in the lead. Nevertheless, Ms. Roger's lead is clearly distinct from the "Dunk Loka" lead insofar as Ms. Rogers is a real person, and some of the personal information in the lead can be readily corroborated as hers through the use of public records.

### J.   <u>Roboform</u>

81. As I previously reported, in my personal testing of the Fluent web sites I observed that the web form does not even permit the consumer to submit a name that contains symbol characters such as {}[]$, nor can a consumer submit a name that is blank. Because the web form rejects text strings formatted with these characters, it does not follow that the process responsible for writing placeholder entries would be most likely to be *outside* of Fluent's database system. The database process that wrote these entries, for whatever reason, most likely occurred within Fluent's systems after the web form accepted a properly formatted entry that was subsequently corrupted or overwritten.

82. That being said, in the interest of exploring all possible explanations for this issue, I observed that the same communities of "sweepers" that encourage sweepstakes enthusiasts to submit

---

[44] The Lexis Nexis and TLO reports for Ms. Rogers are attached as Exhibit 19.

multiple entries as a way of increasing the odds of winning also encourage the use of software tools to facilitate autofilling content into web forms. Although autofill features are built-in to many popular browsers already, installing external autofill software allows the user to customize multiple "identities" so as to be able to autofill webforms using different combinations of names, addresses, and other personal details.

83. In my research into sweepers I identified that the most common external autofill software mentioned is Roboform, but mention is also made of Keyboard Express, LastPass, SweepstakesMax, and SweepersChoice.

84. I installed Roboform versions 7 and 8 on different browsers and tested its use. I found that by manually entering my information into nationalconsumercenter.com, I could complete a submission in about 40 seconds depending on how quickly each page loaded. Using the autofill function of my browser to assist in completing the form, I could complete a submission in about 30 seconds. Using Roboform to autofill the form enabled me to make a single click at the beginning of the process that autofilled the entire sequence, and I could complete a submission in under 20 seconds.

85. The use of Roboform and other autofill technologies may have played a role in the occasional insertion of placeholder values into the web forms. Given the number of data points indicating that sweepers constitute a meaningful proportion of the registrants on Fluent's sites, it is likely that many of them use these tools. This may provide a partial explanation for why so many different types of placeholder values appear, as these may be artifacts of human users deploying different types of technological tools to speed up their entries.

### K.    <u>Analysis of Complaints</u>

86. Defendants produced a spreadsheet listing the opt-out requests received in connection with this marketing campaign.[45] Plaintiff's counsel Jan Fougner reviewed this spreadsheet of 226,434

---

[45] LEADSCIENCE_005228

rows and identified as set of 4,855 unique opt-out requests[46] that are said to have "alerted Defendants that the recipient was not the person Defendants claimed they were trying to reach."[47] Plaintiff describes these "Wrong Number Complaints" as evidence of a "systemic failure to obtain valid consent."[48] Mr. Beecher refers to this work in his Supplemental Expert Report as an indication that "the purported consent to receive telemarketing was not valid or legitimate."[49]

87. Neither Mr. Beecher nor Plaintiff apparently consider the possibility that leads were genuinely submitted to Fluent with consent from the consumer, and then subsequently the phone numbers were reassigned to a new, unrelated party. The problem of reassigned numbers is so significant to TCPA compliance that the FCC recently announced plans to construct a database for call centers to use to check whether numbers have been reassigned, before initiating calls.[50] Presently no such system exists. According to the FCC, approximately 35,000,000 telephone numbers are disconnected each year, and 100,000 numbers are reassigned by wireless carriers every day.[51]  In 2016, the annual industry-wide rate of telephone number reassignment or "churn" was 26.3%.[52]

88. I do not offer any opinion on what constitutes valid consent, or whether Fluent can claim consent when contacting a number that has since been reassigned, but I note that this is a materially different scenario than the implication that the leads were not valid to start with.

89. By way of illustrating that number reassignment is a likely explanation for many of the Wrong Number Complaints, here are some examples from Mr. Fougner's list of opt-out messages he

---

[46] This is rounded up to 5,000 when referred to in the Motion for Class Certification (pp. 4-5) and in Mr. Beecher's Supplemental Expert Report (paragraph 51).
[47] Motion for Class Certification at 4:23-5:7; also Declaration of Jon Fougner pp. 2-3.
[48] Motion for Class Certification at 5:8.
[49] Supplemental Expert Report of Benjamin Beecher paragraph 52.
[50] Press Release: "FCC Establishes Reassigned Phone Numbers Database," accessed at https://docs.fcc.gov/public/attachments/DOC-355526A1.pdf and attached as Exhibit 20.
[51] FCC-17-90A1_Rcd., at 6009, attached as Exhibit 21.
[52] FCC-17-126A1, p. 17 attached as Exhibit 22.

selected, the content of which indicates the consumer claimed to be a new user of a phone number belonging to a prior consumer:

| Phone | Message | Original row number |
|---|---|---|
| 718637 | This number was given out by Boost Mobile it is no longer the number of diamond | 81644 |
| 832406 | Billy no longer has this number. | 82546 |
| 423260 | Please discontinue making contact with this number. It is no longer Chirika's number. Thanks | 18012 |
| 713992 | Johanth changed his number | 102444 |
| 865244 | Kelly no longer has this number | 103383 |
| 530693 | This is not kim number no more | 105675 |
| 917882 | I just got this phone number this is not thomas I keep getting call | 105703 |
| 586339 | This isnt his number anymore | 107335 |
| 951436 | New owner of number , not Chris | 202608 |
| 786908 | This is not jonnell number anymore | 151741 |
| 225397 | This is no longer "Stacey" number | 190158 |
| 520245 | This isn't Nelson's number anymore | 66005 |
| 214724 | This is not Ashley phone anymore. | 121439 |
| 562243 | This is not Brandon's number anymore | 141061 |

90. I analyzed the 4,855 "Wrong Number" opt-outs using the same methodology that I applied to the statistical sample of 16,270 randomly selected numbers I analyzed in my expert report of January 4, 2019. This consisted of a "reverse append" analysis in both LexisNexis and TLO to identify the name(s) and addresses associated with each number; checking the National Change of Address (NCOA) database for matches between names, addresses and email addresses; checking the email addresses in Kickbox for validity and Sendex scoring; and cross-referencing the results to the information provided in the corresponding lead to identify matching values.

91. I found that 3,844 unique phone numbers from which the "wrong number" opt-out messages were received are related to registrations that have corroborating evidence in TLO, Lexis

and/or NCOA.[53] In other words, 80% of the 4,855 "wrong number" opt-outs relate to leads whose consumer information can be corroborated by multiple third-party sources on multiple data points. The email addresses associated with these leads have an average Sendex score of 66%.

92. These figures are comparable to the results I presented in my January 4, 2019 report, and are consistent with the conclusion that the vast majority of the leads contain accurate consumer information, independent of the question of whether the consumer subsequently opted out of communications.

93. The Motion for Class Certification highlights eight particular examples of the "wrong number" opt-out messages.[54] The first of these examples claims to be from a telephone number associated with the Raleigh Police Department: "This number is registered to the Raleigh Police Department this is your first and last time sending a text to this number thank you Raleigh Police."[55] This claim is not backed up by the available documents. The telephone number associated with this opt-out request is (919) 426-████. All of the telephone numbers listed online for the Raleigh Police Department begin with the prefix (919) 996-XXXX, and not (919) 426-XXXX.[56] An online search through Google found no matches associating "Raleigh Police" with that telephone number. According to data from TLO, that telephone number is associated with a person named "Faith Murphy Lashley."[57] There is no indication in the public records data returned for Ms. Lashley that she is a member of the Raleigh Police Department. In fact, Ms. Lashley has numerous criminal convictions for simple assault, trespass, and injury to personal property that would appear inconsistent with being a sworn officer of law enforcement. Further investigation would be needed to establish the

---

[53] My workpapers documenting this analysis are attached in native form as Exhibit 23.
[54] Motion for Class Certification at 5:14-6:2.
[55] Motion for Class Certification at 5:14-15.
[56] See https://www.raleighnc.gov/home/content/ITechWebServices/Articles/CityDepartments.html, also attached as Exhibit 24.
[57] LexisNexis did not return any name associations for the telephone number (919) 426-8876. The TLO report for Ms. Lashley is attached as Exhibit 25.

circumstances under which Ms. Lashley's phone number was registered with Fluent, whether she was the person who received the text messages, and whether she was the person who sent the opt-out message—however, the suggestion that Freedom's text messages were somehow being sent to the Raleigh Police Department is not supported by the evidence I examined.

94. My analysis found that *each* of the remaining opt-out messages highlighted in the Motion involve telephone numbers from leads that can be corroborated in multiple third-party resources.[58] Set forth below, in the order in which these appear in the Motion, are the corroborating details:

        a.  (The first example, allegedly involving the Raleigh Police Department, is discussed above);

        b.  Full name on lead matched to both LexisNexis and TLO; full name and address on lead matched to NCOA database;

        c.  Full name on lead matched to TLO and NCOA; email address on lead has Sendex score of .85;

        d.  Full name and address on lead matched to NCOA database; email address on lead has Sendex score of .9;

        e.  Full name and address on lead matched to TLO and NCOA database;

        f.  Full name and address on lead matched to NCOA database; email address on lead matched to NCOA and has Sendex score of .8;

        g.  Full name and address on lead matched to TLO;

        h.  Full name and address on lead matched to TLO and NCOA database; email address on lead has Sendex score of .82.

While it may be the case that the telephone number registered in any of these lead is no longer associated with the person Freedom apparently intended to contact, the personal information

---

[58] The corresponding analysis for these is contained within the same workpapers previously identified as Exhibit 23.

contained in these leads is corroborated through multiple third-party sources, including the same data sources upon which plaintiff's own expert claims to rely.

95. Although I do not personally present the opinion that TLO and LexisNexis definitively identified the actual users of these telephone numbers, I do note that plaintiff's expert Ms. Verkhovskaya stated in her Expert Report that "LexisNexis and TransUnion [TLO] provide user and subscriber information that identifies the person(s) associated with a particular telephone number as of the date of the call(s)" and that in her experience "they provide accurate and reliable information."[59] If Ms. Verkhovskaya is correct that the information returned by LexisNexis and TLO accurately and reliably identifies the user or subscriber of each telephone number," then the vast majority of the "Wrong Number Complaints" including the ones cited in the Motion are not wrong numbers at all.

96. Ms. Verkhovskaya proposes to rely on this same reverse append methodology for the purposes of class member identification and notification.[60] If it is plaintiff's contention that these 4,855 opt-outs represent individuals who are *not* the persons listed in Fluent's leads, yet the methodology she proposes to use identifies the majority of them as the *same* persons as Fluent's leads, then it is unclear how these individuals can be identified.

97. I also observed examples within Mr. Fougner's list of "Wrong Number Complaints" of opt-out messages that contained obvious jokes or facially illogical statements that cannot be accepted at face value. These instances further call into question the ability to rely on the "wrong number" opt-outs to identify genuine wrong numbers. For example:

| Phone | Message | Original row number |
|---|---|---|
| 832554 | This is not a working number | 62941 |
| 717710 | How do u know my name wrong number | 64390 |
| 91635 | This is not a working number | 202953 |
| 707951 | This is not my phone | 3781 |

---

[59] Expert Report of Anya Verkhosvakaya paragraphs 30 and 33.
[60] Expert Report of Anya Verkhosvakaya paragraphs 66-67.

### L.    Analysis of Call Log Records for 100 Sample Numbers

98. I compared the lead information produced by Fluent for the sample set of 100 numbers to the Call Log records. Of the 100 numbers, two phone numbers do not appear in the Call Logs at all.[61] All of the 98 telephone numbers that did receive calls logged in LEADSCIENCE_000677 correspond to leads produced by Fluent showing the same name as is identified in the Call Logs.[62]

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

MARCH 1   2019

---

[61] Telephone numbers 2813823895 and 8165009872 do not appear in LEADSCIENCE_000677.
[62] My workpaper showing the name comparison is attached as Exhibit 26.

**EXHIBIT 7**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

DANIEL BERMAN,

Plaintiff,

     v.

FREEDOM FINANCIAL NETWORK, LLC,
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC., and LEAD SCIENCE, LLC,

Defendants.

Case No.
4:18-cv-01060-YGR


EXPERT REBUTTAL REPORT
BY JAN KOSTYUN

## Introduction

1.      Counsel for Defendants contacted me for the purposes of an engagement as an expert witness in *Daniel Berman v. Freedom Financial Network, LLC, Freedom Debt Relief, LLC, Fluent, Inc., and Lead Science, LLC*, No. 4:18-cv-01060 (N.D. Cal.).

2.      I have been asked by counsel for Defendants to analyze, review, and consider the opinions stated in the Expert Report of Anya Verkhovskaya ("Verkhovskaya Report"), dated December 7, 2018.

## Background and Experience

3.      I am an independent technology consultant with over 35 years of experience covering the areas of telecommunications, enterprise architecture, and information technologies.  I received both a Bachelor of Science degree (magna cum laude) in Mathematics, as well as a Master of Science degree in Computer Science, from Union College in 1976.  I have been directly employed in various capacities by major telecommunications companies, including Bell Telephone Laboratories, GTE, Verizon, and Syniverse Technologies.  I have also been engaged as a consultant on various telecommunications issues by telecommunications companies and regulatory authorities, including Rogers Wireless (the largest wireless carrier in Canada), CRC (the national telecommunications regulatory agency of Colombia), and Syniverse Technologies.  I have worked at numerous technical levels in software development, database technology, and enterprise architecture. I have worked for over 15 years providing consulting services, software development, and data analysis in the field of telephone number portability.  This experience covers landline, wireless, and intermodal (landline-to-wireless or wireless-to-landline) number portability, as well as telephone number pooling.

I have played lead roles in the technical and organizational processes of porting landline numbers in the U.S. as well as wireless numbers in the U.S., Canada, and Colombia.

4.     As a software architect for Bell Telephone Labs, GTE, Verizon, and Syniverse, I also developed expertise in areas such as landline and wireless number provisioning, including the end-to-end process of establishing service for an initial subscriber; landline and wireless order-entry, including the collection of subscriber contact information; initial implementation of the National Do Not Call registry; technical experience with telecom features such as voice calling, SMS messaging, fax transmissions, voicemail, auto dialer and Interactive Voice Response Unit (IVRU) technology, and switching implementations; and a wide variety of telecommunications industry standards.

5.     I also have extensive experience in database methodologies, data analysis, and data mining. My experience with database technologies includes hierarchical, network and relational database models and implementations. I have instructed working professionals on the use of database programming, support and internal architecture, and have developed database training courses. I am proficient with advanced database modeling, optimization and query techniques, as well as the development of database software applications. I have personally performed database queries and data analysis against hundreds of data stores, including but not limited to Internal and National Do Not Call lists, Wireless Block identifiers, Number Portability transaction lists and telephone call records produced by both wireless carriers and businesses involved in dialing campaigns.

6.     I have extensive experience with call center operations and various dialing

systems, including those used for inbound and outbound calling campaigns. In my tenure with GTE/Verizon, I performed early research with Intel-based Computer Telephony Interfaces (CTI), including text-to-speech translation and automated dialing interfaces. I have worked closely with IVRU engineers and application architects to develop programmatic interfaces used for inbound and outbound calling. I have worked closely with call center personnel at telecom businesses such as GTE, Verizon, Syniverse and Rogers Wireless while supporting Customer Relations Management (CRM) applications that include interfaces to inbound and outbound dialing systems.

7.      For the past nine years I have worked as a consultant and expert witness on cases covering TCPA issues, patent litigation, software copyright infringement and trade secret misappropriation, software value determination, vandalism, and sabotage of application programs.  I have testified both in deposition and in court.

8.      A copy of my curriculum vitae is attached hereto as Exhibit A.

9.      I have not authored any publications in the past 10 years.

10.      In the past nine years, I have been retained to provide deposition testimony as an expert for both Defendant(s) and Plaintiff(s) in the following matters: *Shamblin v. Obama for Am.*, No. 8:13-cv-2428 (M.D. Fla.); *Eisenband v. Schumacher Automotive*, No. 9:18-cv-80911 (S.D. Fla.); *Diaz-Lebel v. Target*, No. 0:17-cv-05110 (D. Minn.); *Garcia v. Target*, No. 1:16-cv-2574 (D. Minn.); *Jackson v. Palm Beach Credit Adjusters*, No. 9:18-cv-80124 (S.D. Fla.); *Williams v. Bluestem*, No. 8:17-cv-1971 (M.D. Fla.); *Wilson v. Badcock*, No. 8:17-cv-02739 (M.D. Fla.); *Schaevitz v. Braman Hyundai*, No. 1:17-cv-23890 (S.D. Fla.); *Green-Mobley v. Capital One Auto Finance*, No. 3:17-cv-764 (S.D. Fla.); *Carpenter v. World Omni Financial*, No. 01-18-0000-6972 (A.A.A.);

*Buja v. Novation Capital, LLC*., No. 9:15-cv-81002 (S.D. Fla.); *Kalmbach v. National Rifle Association of America and InfoCision, Inc*. No. 2:13-cv-01533 (W.D. WA); *Goins v. Walmart and Palmer Recovery Attorneys*, No. 6:17-cv-00654 (M.D. Fla.); *Reyes v. BCA Financial Services*, No. 1:16-cv-24077 (S.D. Fla.); *Jacobs v. Quicken Loans Inc*., No. 15-cv-81386 (S.D. Fla.); *Cook v. Palmer Reifler & Associates*, No. 3:16-cv-00673 (M.D. Fla.); *Ameranth v. Six Continents Hotels*, No. 09-CV-3819 (Ga. Super. Ct. Dekalb Cnty.); *Couser v. Cucamonga Valley Medical Group*, No. 5:14-cv-01528 (C.D. Cal.); *Couser v. Dish One Satellite*, No. 5:15-cv-02218 (C.D. Cal.); *Datamaxx Applied Techs. v. Computer Projects of Ill*., No. 4:09-cv-435 (N.D. Fla.); *Comprehensive Health Care Systems of the Palm Beaches v. M3 USA Corp*., No. 16-cv-80967 (S.D. Fla.); *Lutman v. Harvard Collection Servs*., No. 2:15-cv- 257 (M.D. Fla.); *Moricz v. Google*, No. 10-CV-01240-RSL (W.D. Wash.); *Nece v. Quicken Loans Inc.*, No. 8:16-cv-02605 (M.D. Fla.); *PCS4Less v. Go Mobile*, No. 09- 380-CZ (Mich. Cir. Ct. Washtenaw Cnty.); *Preman v. Pollo Operations*, No. 6:16-cv-00443 (M.D. Fla.); *Resource Acquisition & Mgmt. Servs. v. Mathews*, No. 09-CA 14536 (Fla. Cir. Ct. Hillsborough Cnty.); *Florida v. Poole*, No. 09-CF-016786 (Fla. Cir. Ct. Hillsborough Cnty.).

## Compensation

11.     I am being compensated at the rate of $350 per hour for my study and analysis in this case, as well as $300 per hour for travel and $400 per hour for testimony. My compensation is not dependent on the outcome of this matter.

## Documents Reviewed and Assumptions

12.     In connection with preparing this Report, I have reviewed the materials

identified in Paragraphs 15 to 79 below; Complaint for Damages and Injunctive Relief, Daniel Berman v. Freedom, Fluent, et. al., February 19, 2018; Second Amended Complaint for Damages and Injunctive Relief, Daniel Berman v. Freedom, Fluent, et. al., October 30, 2018 ("SAC"); the case docket for Berman, as of 12/26/2018; Expert Report of Anya Verkhovskaya ("Verkhovskaya Report"), dated December 7, 2018; Stipulated Protective Order For Standard Litigation, Daniel Berman v. Freedom, Fluent, et. al.; Affidavit of TCPA Prior Express Written Consent by Mitenkumar Bhadania, D.E. 16-1; Declaration of Daniel J. Barsky, Esq. In Support of Defendants' Motion to Compel Arbitration, D.E. 16-2; Second Amended Complaint – unredacted, D.E. 90-4; Defendants' Notice of Motion and Motion to Dismiss, D.E. 94; Declaration of Daniel J. Barsky in Support of Motion to Dismiss, D.E. 94-2; Defendant's Reply in Support of Motion to Dismiss, D.E. 104; Declaration of Mitenkumar Bhadania in Support of Reply Motion, D.E 104-1; Declaration of Brian P. Astrup, Esq. and Exhibits, D.E. 104-2,3; the Expert Report of Ken Sponsler, dated 7/22/2016, Newhart v. Quicken Loans; and the Declaration of Dr. Debra J. Aron, dated 8/18/2014, Balschmiter v. TD Auto Finance; as well as the following Source data files:

    a. FLUENT_000441.csv
    b. FLUENT_000441.xls
    c. LEADSCIENCE_000586.csv
    d. LEADSCIENCE_000676.txt
    e. LEADSCIENCE_000676.xlsx
    f. LEADSCIENCE_000677.csv
    g. LEADSCIENCE_000677.txt

13.     It is my practice to regularly research and follow developments in the telecommunications industry. This includes, but is not limited to: review of significant FCC orders; review of TCPA cases and rulings; routine communication with former

telecom associates; comparison of opinions set forth by other TCPA experts; communication with vendors who provide TCPA-related data services; regular review of industry blogs, news feeds and user groups, such as the Association of Credit and Collections Professionals (ACA International) and the Bates Group; and regular research into statistics and trends related to the telecom industry. This review and research has also informed and supported my opinions.

## Methodology

14.    The methodology that I have employed in producing my opinions and this report is based on my business experience in telecommunications, my experience as an expert with other TCPA-related cases, my education and training, and my review of documents and data relevant to this case, as cited above and throughout this report. Based on my experience and that review, I developed hypotheses regarding Verkhovskaya's data analysis and her opinions regarding identification of telephone number users and subscribers – in support of the objectives for which I was engaged. Those hypotheses are fundamental foundations of each of the opinions that I will detail in this report. I have tested and confirmed my hypotheses using a combination of related documentation, research, data analysis, and experience – similar to the techniques that I have used during my career as a telecommunications system architect. I have analyzed the results of my analysis and testing, and used the results of that analysis to form my opinions and document them in this report.

## Statement of Opinions

15.    Based on my methodology, including analysis and review of case-related materials, it is my opinion that:

A.  Verkhovskaya cannot accurately identify telephone numbers that were on the National Do Not Call Registry as of the date(s) that calls or texts were allegedly placed to those numbers.

B.  Analysis of the Leads files performed by Verkhovskaya to determine invalid first and last names and other purported anomalies produced results that are completely unreliable and unsupported.

C.  If a set of telephone numbers contained in the proposed class(es) could be identified, any attempt to accurately and reliably identify the subscribers and/or users of those numbers – particularly a number of years in the past – will require a detailed, account-by-account and number-by-number investigation and analysis across various third-party sources, including, amongst other potential sources, cell phone carriers and the individual subscribers and users.

## Case Background

16.    From my review of the SAC, I understand this case concerns calls and texts allegedly made on behalf of Defendants Freedom Financial Network LLC and Freedom Debt Relief LLC, based on leads allegedly provided by Defendant Fluent, Inc. Plaintiff claims to have received calls and texts to his cellular phone from Defendants as early as December 26th, 2017, and as late as February 14th, 2018 (SAC at ¶¶ 85-148).  In addition to his individual claims, Mr. Berman proposes to bring his claim on behalf of two classes[1]:

---

[1] SAC at ¶¶ 217, 219

<u>Cellular Telephone Class</u>: All persons in the United States to whom: (a) Defendants, any of them and/or a third party acting on any of their behalf, made a call or sent a text message; (b) to a cellular telephone number; (c) using an ATDS or an artificial or prerecorded voice; (d) in order to market Freedom's products; (e) during the period that begins four years before the filing of the original complaint in this matter and ends on the first day of trial.

And

<u>DNC Class</u>: All persons in the United States to whom: (a) Defendants, any of them and/or a third party acting on any of their behalf made a call or sent a text message; (b) to a residential telephone number listed on the NDNCR for at least 31 days before at least two of such communications in a 12-month period; (c) in order to market Freedom's products

## Discussion of Opinions

17.     Opinion A. Verkhovskaya cannot accurately identify telephone numbers that were on the National Do Not Call Registry as of the date(s) that calls or texts were allegedly placed to those numbers.

18.     Verkhovskaya explains that she sampled a portion of 730,000+ Lead Science called numbers (Verkhovskaya Report at ¶ 37), which actually represents both voice calls and text messages. The sample size that she determined to be "adequate" was 16,270 telephone numbers ("16270 Sample") (*Id*. at ¶ 37). Verkhovskaya's technique is to perform various analyses against the 16270 Sample – which represents approximately two percent of the total call data, and extrapolate the results of her analyses back to the total call population using that two percent ratio (*Id*. at ¶¶ 37, 48). Verkhovskaya compares the telephone numbers from the 16270 sample to the National Do Not Call Registry ("NDNCR"), through Nexxa – one of Verkhovskaya's data vendors – in an attempt to identify telephone numbers that were registered on the NDNCR at the date(s) of alleged calls or texts placed to those numbers (Verkhovskaya Report at ¶¶ 38-43). Verkhovskaya purports that 4,533 telephone numbers out of her sample "had been listed on the NDNCR at least 31 days before the date of the first call" and "received more two or more calls in any 12-month period." (Verkhovskaya Report at ¶¶ 42-43)

19.     Verkhovskaya then analyzed the numbers identified to have appeared on the NDNCR at their date(s) of alleged calls or texts, and attempted to identify those that were business numbers as of the date(s) of their call(s) or text(s) – necessary because the NDNCR applies only to residential telephones, but has no process in-place to prevent the registration of business numbers. This analysis was performed by LexisNexis – another vendor regularly used by Verkhovskaya (Verkhovskaya Report at ¶¶ 44-49).

20.     Verkhovskaya's DNC analysis was defective at several levels. As is often the case, Verkhovskaya does not divulge any supporting information regarding data processing performed by her vendors. In this case, there is no description of the specific service provided by Nexxa to purportedly identify the historic status of telephone numbers against the NDNCR. There is also no information provided to support the accuracy of the Nexxa service used by Verkhovskaya.

21.     Even if a service such as Nexxa's is able to identify telephone numbers that existed on the NDNCR as of the date of alleged calls or texts, the procedures used to add and maintain registries in the NDNCR do not prevent registry entries that were created by someone other than the current subscriber or authorized user of the registered number.

22.     When creating NDNCR entries through the FTC's website[2] the user must only satisfy a basic, three-step process: (1) specify up to three phone numbers to be registered, and an email address (2) verify the phone number(s) and email address are correct, and (3) open the specified email account, and click on a link provided in an email from donotcall.gov – thus registering the phone number(s). After clicking the link, the user is directed to a web page with a confirmation message. Throughout this process, there are no validations to ensure that the web user is actually associated with the telephone numbers being registered. There is no verification that the email entered is in any way associated with the phone number(s) being registered. And there are no instructions, directives or restrictions stating that the web user must be the subscriber or authorized user of the phone number(s) being registered. In fact, since the website allows up to three telephone numbers to be registered in a single transaction, it effectively

---

[2] https://www.donotcall.gov/register/reg.aspx

10

invites its users to register numbers on behalf of others. In short, anyone with access to the internet, and access to an email account, may register ANY telephone number that they wish with the National Do Not Call registry.

23.     It is well known in the TCPA arena that telephone number reassignments - in which a subscriber drops her or his number, and that number is subsequently reassigned to another subscriber/user – creates significant problems with identifying current or historic subscribers or authorized users of telephone numbers. FCC Chairman Ajit Pai has commented that "over 37 million telephone numbers are reassigned each year".[3] Recognizing the problems related to number reassignment, some data sources, such as the NDNCR, have implemented measures in an attempt to keep their data current. The FTC uses vendors to perform a hygiene process on its DNC registrations, in which existing registrations for telephone numbers that have been reassigned to new subscribers are removed from the NDNCR. However, these processes are not without their limitations. As explained in the Expert Report of Ken Sponsler, in *Newhart v. Quicken Loans* ("Sponsler Report"), the Do Not Call Improvement Act of 2007 specifies that NDNCR entries are to have no expiration date. To alleviate the problem of unexpired registrations for numbers that have been reassigned, Sponsler's company, PossibleNOW, performs a hygiene process to remove registrations for reassigned numbers from the NDNCR on behalf of the FTC and FCC. However, this hygiene process only removes landline telephone numbers, and there is no reliable data source to track disconnects and reassignments of mobile telephone users. Sponsler continues to explain that there have effectively been no removals or updates of wireless numbers from the NDNCR since its

---

[3] DISSENTING STATEMENT OF COMMISSIONER AJIT PAI Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, WC Docket No. 07-135 at 3.

inception in October 2003.[4] Thus, there is no attempt to remove registrations from the NDNCR for any wireless number that has been reassigned to a new owner. And with 37 million number reassignments each year, the NDNCR is clearly replete with invalid DNC registrations.

24.     There is also further evidence that even with hygiene processes in place to remove expired landline registrations, the registries on the NDNCR are not reliable. For example, my current landline telephone number – 860-XXX-7668 – was assigned to my account in October 2017, and I have been the subscriber of that number since then. However, my telephone number has been registered with the NDNCR since September 19, 2007. This means that during the 14 month period that I have subscribed to this number, a DNC registration has been active, which was established by someone (not even necessarily a previous subscriber) more than 11 years ago. This also means that telemarketing calls to my number during that 14 month period (and possibly longer)[5] would be the object of TCPA/DNC violations, and calls to my number would be reported as violations by processes such as those used by Verkhovskaya, even though I have never registered my number with the NDNCR.

25.     Next, Verkhovskaya states that she processed the 4,533 do not call numbers, in order to determine if any of those numbers were "identified as business numbers during the relevant timeframe" using "a specialized query based upon LexisNexis' proprietary aggregated data sources" (Verkhovskaya Report at ¶ 44). The purpose of this analysis was to eliminate any 4,533 do not call numbers that were

---

[4] Sponsler Report at ¶ 9.h
[5] If multiple parties subscribed to my number before it was assigned to me, there is no guarantee that the subscriber who relinquished the number immediately before I became the owner had been the one to register the number with the NDNCR either. So calls to the prior subscriber of my number could also have been erroneously reported as DNC violations.

classified as business numbers at the date of the call(s) or text(s), since the NDNCR registrations are intended to prevent calls only to residential numbers.

26.     Verkhovskaya's analysis of the 4,533 do not call numbers to determine their business/residential status was defective at several levels. First, the LexisNexis process identified <u>none</u> of the 4,533 telephone numbers as business numbers during the relevant timeframe. Verkhovskaya's only acknowledgement of this condition was to state that "This is unusual, in my experience" (Verkhovskaya Report at ¶ 48). Although Verkhovskaya acknowledged that it was unusual to have none of the 4,533 numbers identified as business, she made no attempt to explain the aberration, and made no attempt to investigate any alternative analysis that might produce results more in line with expected results. Instead, Verkhovskaya simply accepts the results and moves on.

27.     Verkhovskaya then extrapolates the questionable results to the entire population of call data, and purports that, since all 4,533 do not call numbers appear to be residential, and those calls represent 28 percent of her sample, then 28% percent of the total call population – or 203,462 calls – must have been residential numbers. Verkhovskaya would have us believe that <u>out of nearly three quarters of a million telephone numbers, not a single one</u> was a business number that was also on the NDNCR. In other words, using unsound statistical analysis, Verkhovskaya purports that calls were placed to more than 200,000 residential telephone numbers, based on a sample of just 4,533 numbers – which represent just 0.6 percent of the total population of telephone numbers.

28.     Verkhovskaya also never addresses the question of what constitutes or defines a business number. When describing the process used with LexisNexis'

undisclosed, proprietary data sources, Verkhovskaya provides no specifications or criteria used to differentiate between business and residential numbers. Verkhovskaya also states that she has "utilized LexisNexis services in dozens of court-approved settings and found LexisNexis's information to be reliable" (Verkhovskaya Report at ¶ 44). But Verkhovskaya never states that she has ever actually used this specific LexisNexis service to identify residential/business distinctions, or whether she has simply utilized other LexisNexis services, such as address identification. And Verkhovskaya provides no evidence of LexisNexis' reliability, other than her assurance that she "found LexisNexis' information to be reliable" (*Id*. at ¶ 44).

29.    For other services that LexisNexis provides (e.g. name and address identification based on telephone number) that I have analyzed in prior cases, it has been revealed that LexisNexis cannot provide reliable date ranges. For example, LexisNexis may receive a specific telephone number, and report that that number was associated with John Smith for a certain date range. But the dates that LexisNexis typically provides are specified as *first seen date* and *last seen date*. According to LexisNexis, the First and Last Seen dates correspond to the time periods when the source used by LexisNexis published the record, and not necessarily the time period for which the number was actually associated with the identified party (see ¶ 47 below). As such, when LexisNexis identifies that a given telephone number has a residential or business designation at a specific date, this is nothing more than an <u>approximation</u>.

30.    It is also noteworthy that the NDNCR specifies that "The National Do Not Call Registry is only for personal phone numbers. Business-to-business calls and faxes

are not covered"[6], but here also there are no specifications or criteria of the FTC's definition of a business number. A business telephone number could be one that is classified as a business account with that number's carrier, or a business number might be a number on a residential account, that the subscriber uses as their business contact number. And since neither LexisNexis or the FTC's NDNCR provide any such definition, it is my opinion that Verkhovskaya's analysis cannot accurately identify business numbers that the FTC intended to be kept off their DNC Registry, and that her results may very likely include numbers that were not eligible for DNC protection.

31.     <u>Opinion B. Analysis of the Leads files performed by Verkhovskaya to determine invalid first and last names and other purported anomalies produced results that are completely unreliable and unsupported.</u>

32.     In her Lead Files Analysis, Verkhovskaya attempts to question the validity or authenticity of the "Lead" data in the Fluent and Lead Science ("LS") lead files, which consist of various identifying data for leads who registered via web sites. This data in the Fluent lead file includes First and Last Names, registration date, street address, city, state, zip, email, telephone number, and IP address. The LS lead file includes similar but fewer fields.

33.     Verkhovskaya first explains that her understanding is that the quality of the Fluent lead file is better than that of the LS file, so she chose the most "conservative" approach, and analyzed names from the LS lead file (Verkhovskaya Report at ¶ 52). Since her objective was ostensibly to demonstrate problems with the quality of the names

---

[6] National Do Not Call registry – Basics, at https://www.consumer.ftc.gov/articles/0108-national-do-not-call-registry#basics

and other data in these files, a true conservative approach would have been to analyze the Fluent file that she understood to have better quality data. Instead, she chose to analyze the file that believes has poorer quality data, apparently in an attempt to report a greater degree of so-called "problem" data.

34.     Verkhovskaya reports that she analyzed first and last names from the LS lead file, and found "that names and addresses were outside of the industry standards. While it is common to have a small number of records with garbled or blank data (approximately 3% to 5%), it is uncommon to have greater than 50% of names and/or addresses to be garbled, invalid and/or blank—as in LS Leads Appended Records" (Verkhovskaya Report at ¶ 54).

35.     Verkhovskaya provides no basis for her claim that a three to five percent rate of garbled or blank data is common or acceptable, and she provides no basis for her claim that a fifty percent rate of garbled or invalid or blank data is outside industry standards. For example, Verkhovskaya states that "It is not common, however, to find a large number of records with text that is not recognizable as names" (Verkhovskaya Report at ¶ 55). This vague claim provides no perspective of what would be an acceptable or *common* number of records with invalid data. Neither does Verkhovskaya provide any evidence that she has ever analyzed any similar types of *lead* data (such as the leads collected in this matter) that would contribute to her insight that the data variations were acceptable or not. There is no mention of whether Verkhovskaya took into account the type of website and circumstances used to collect the lead data, since the leads might have a tendency to provide just enough valid information to be eligible for sweepstakes or rewards, but leaving other information blank or obfuscated to avoid being fully

16

identified. And Verkhovskaya provides no reference to the purported industry standards that she used to determine that the lead data was uncommonly garbled, invalid or blank.

36.     From my experience with Telecom companies, working with call center personnel fielding calls from customers, developing CRM applications to collect customer data, and reviewing customer data from TCPA cases, I am well aware that there are an abundance of unusual first and last names, and that customer names seem to become more unusual and more creative every day. While Verkhovskaya has not cited any standards or guidelines for the names in the lead data that she found to be invalid, I was able to refer to a number of resources to compare against the so-called name errors found by Verkhovskaya. As examples:

a.     Verkhovskaya lists "Jefff" as an invalid first name[7], yet I was able to find Facebook pages for a "Jefff Rodland" and "Jefff Petty". While it might be argued that Facebook is not an authoritative resource for name definitions (keeping in mind that Verkhovskaya provided no authoritative sources), it also makes sense that if Jefff Rodland creates a Facebook page with his first name spelled as such, then he is certainly apt to use that spelling when registering on websites such as those used by Defendants.

b.     Similarly, Verkhovskaya reports "Jf" as invalid, but when searching Facebook using the phrase people named "Jf", results are returned for "JF Clark", "JF Schneider", "JF Tibio", "JF Aegerter, and even "JF Kennedy".

---

[7] Verkhovskaya Report Exhibit D – Listing of Invalid First Names

c.   "Iya" is listed as one of Verkhovskaya's invalid first names, but the online site *babycenter*, which advertises itself as the world's number one digital parenting resource, lists Iya as a girl's name that means *Violet Flower*.[8]

d.   Verkhovskaya would also have us believe that "JC" and "Ai" are invalid first names. However, the U.S. census reports both of those names among its most commonly found male and female first names from the 1990 census.[9]

e.   Last names reported by Verkhovskaya fare no better when compared to available resources. Just a few of the invalid last names reported by Verkhovskaya but found in reliable resources include "Yu", "Ng", "Yee", "Yi", "Yoo", and "Ye".[10] But the 2010 U.S. Census reports the following approximate occurrences of these purportedly invalid last names across the U.S.: Yu: 52,000 occurrences; Ng: 31,000; Yee: 20,000; Yi: 18,000; Yoo: 13,000; and Ye: 9800.[11] And these examples are just the more frequently occurring names that Verkhovskaya reported as invalid, with many other purportedly invalid names appearing on the census results.

f.   Verkhovskaya also identified many examples of invalid last names that are more obscure, but that still can be identified as valid names. For example, "Aee" is noted as an invalid last name by Verkhovskaya, but according to Forebears – a website specializing in genealogical data – there are 9

---

[8] BabyCenter LLC at https://www.babycenter.com/baby-names-iya-52405.htm (last visited 12/26/2018)
[9] https://www2.census.gov/topics/genealogy/1990surnames/dist.male.first and
https://www2.census.gov/topics/genealogy/1990surnames/dist.female.first (last visited 12/20/2018)
[10] Verkhovskaya Report Exhibit E – Listing of Invalid Last Names
[11] names.zip file, which contains Names_2010Census.csv and Names_2010Census.xls, found at
https://www2.census.gov/topics/genealogy/2010surnames/

people in the U.S. with the last name Aee.[12] Similarly, Verkhovskaya identified "Aia", "Bb", and "EIO" as invalid last names, but Forebears identifies 66 owners of the name Aia in the U.S., 16 people with the last name Bb, and 13 people with the last name Eio.

37.    Verkhovskaya's findings of invalid names fails to consider other obvious factors, such as reporting "Annettte" as an invalid first name, when it may be a simple typo of the name "Annette". In this example, a lead record is found with the name Annettte Maples, which Verkhovskaya's mysterious standards would flag as invalid. However, further inspection of the data reveals no other unusual signs. The street address (XXXX[13] new center rd), city/state/zip (Hartselle, AL 35640), email address (annette.maples50@mail.com) and telephone number (256-318-XXXX[14]) all appear to be normal. The zip code provided is the correct zip code for the given street address, city and state according to the U.S. Postal Service[15] and the area code and exchange (256-318) for the given telephone number corresponds to an exchange in Decatur, AL[16] – just a few miles from Hartselle, AL as provided by the lead.

38.    Verkhovskaya provides an example of "duplicate" records created months apart, where all information, including typos, capitalizations, spacing, misspellings, extra characters, punctuation, etc., are all identical. The only difference is the IP address, implying that such records somehow were illegitimately duplicated (Verkhovskaya

---

[12] https://forebears.io/surnames/ (last visited 12/22/2018)
[13] redacted
[14] redacted
[15] Zip code by address https://tools.usps.com/zip-code-lookup.htm?byaddress

[16] Local Calling Guide at
https://www.localcallingguide.com/lca_prefix.php?npa=256&nxx=318&x=&ocn=&region=&lata=&lir=&switch=&pastdays=&nextdays

Report at ¶ 61.a).

39.    However, the Fluent data is full of records where leads registered multiple times with the same info, sometimes from the same location (IP), sometimes from different locations. Defendant's entry rules effectively invite multiple entries/registrations from the same person, as demonstrated by the Sweepstakes-a-Month 2018 Sweepstakes Official Rules, which state that "There is a daily limit on the number of Entries for each Monthly Drawing per person of three ?Entries per person, per day" while also specifying that there are multiple opportunities to enter in Sweepstakes that run month-to-month.[17] Here's an example where the same person appears to have registered 5 times on different dates with all data identical – as did thousands of leads - without problems of typos, capitalizations, spacing, misspellings, extra characters or punctuation. In this case, it appears that this lead simply registered multiple times from various locations, using the same consistent information.

| First | Last | Date | Address | City | ST | Zip | Email | Phone | IPAddress |
|-------|------|------|---------|------|-----|-----|-------|-------|-----------|
| Amber | Brazee | 9/29/2017 4:12 | 5 Christina ave | Grottoes | VA | 24441 | amberbrazee86@gmail.com | 540560█ | 192.168.100.48 |
| Amber | Brazee | 2/8/2018 7:36 | 5 Christina ave | Grottoes | VA | 24441 | amberbrazee86@gmail.com | 540560█ | 66.87.82.111 |
| Amber | Brazee | 1/2/2018 20:56 | 5 Christina ave | Grottoes | VA | 24441 | amberbrazee86@gmail.com | 540560█ | 172.24.32.94 |
| Amber | Brazee | 3/23/2018 14:22 | 5 Christina ave | Grottoes | VA | 24441 | amberbrazee86@gmail.com | 540560█ | 66.87.82.111 |

---

[17] https://www.sweepstakesamonth.com/path.html?p=rules.htm (last visited 12/22/2018)

40.     Verkhovskaya seems to hold the opinion that it's unusual or notable that there are multiple records with the same lead name and phone number, created months apart, with different addresses and IP locations, as she displays with her example of Aaron Gittens, who registered with the same street address in Virginia and Wisconsin. But she doesn't seem to account for simple data entry errors on the part of the website users. Could it be that lead Gittens spends time both at his home in Wisconsin and away at college in Virginia, and inadvertently entered his home street address while away at college?

41.     A Geolocation comparison was performed by Verkhovskaya, in which she apparently compared the location based on the IP address from lead records to the street address location, and provides statistics based on the purported distances between the two locations (Verkhovskaya Report at ¶¶ 62-63). Verkhovskaya provides no identification of the IP location service that she used, nor does she describe any technique or service or parameters used to compute the distance between the two locations. She also provides no justification or explanation why the distances might be significant. Even if registrations result in a street address that is thousands of miles away from the IP location where the registration was performed, this should be a fully expected and normal condition. When a website registration is performed, there are no instructions or required edits that force the user to enter a street address that is in the vicinity of where they are currently located – and there is certainly no reasonable expectation that this should be the case. If Aaron Gittens registers while away at college in Virginia, but enters his home address in Wisconsin, then naturally his Virginia IP address will translate to a location several hundred miles from his home address.

21

42.     <u>Opinion C. If a set of telephone numbers contained in the proposed class(s) could be identified, any attempt to accurately and reliably identify the subscribers and/or users of those numbers – particularly a number of years in the past – will require a detailed, account-by-account and number-by-number investigation and analysis across various third-party sources, including, amongst other potential sources, cell phone carriers and the individual subscribers and users.</u>

43.     As previously described, since Plaintiff appears to seek to represent putative classes that include all persons in the United States who received a call and/or text messages, I understand that Plaintiff seeks to represent both subscribers and users of telephone services over a period of almost five years.

44.     As I explain below, based on my knowledge, experience and review of materials associated with this case, it is my opinion that any attempt to accurately and reliably identify the subscribers and/or users of any cell phone numbers called (or texted) by Defendant(s) will require a detailed, account-by-account and number-by-number investigation and analysis across various third-party sources, including, amongst other potential sources, cell phone carriers and the individual subscribers and users.  This is primarily because there are no reliable services and data resources available, either publicly or commercially, to identify such persons accurately through a single, uniform method or process.  Rather, apart from individual or entity subscribers themselves, the various cell phone carriers are, in my opinion, the only other potential sources of information about historic subscribers for a particular cell phone number. But, as I discuss below, the cell phone carriers do not always have complete and accurate historic subscriber information dating back to February 2014.  In addition, carriers do not

generally maintain information about historic users of a particular cell phone number as of specific dates.  That information, in my opinion, resides with the subscriber(s) and/or user(s) of a particular number as of the date of a challenged call. And it will be demonstrated that my opinions regarding the inability to accurately identify historic users and subscribers is shared by other reputable experts, by prior case rulings, and by FCC Chairman Ajit Pai.

45.     In my opinion, to attempt to identify historic subscribers and users of any cellphone numbers called - via traditional call or text - by Defendant during the five year period at issue, a call-by-call and number-by-number process must be undertaken.

46.     Cell phone services do not follow a single pattern of ownership and use. Some cell phone accounts may have only one subscriber, who is also the sole user, but several other possible iterations exist.  For example, the subscriber may not be a user of the cell number at all, and there may be multiple authorized users of the number and one or more of the authorized users may not be the subscriber.  This often occurs in the context of business plans (where a corporation or entity is the subscriber of a number with one or more different users) or family plans (where a single family member is the subscriber of an account with several different numbers used by other family members). In some cases, a single wireless number may be shared or accessible by multiple members of a household, and these members may not even share a common surname. Given these and other issues, as well as the lack of a single publicly-available database, directory, or other source accurately identifying historic subscribers and users of cell phone numbers as of particular historic dates, it is my opinion that, any attempt to accurately and reliably determine the historic subscriber of a given cell phone number as

of the date of a particular call will require obtaining and analyzing records and information from third-party sources, including, among other sources, cell phone providers and subscribers.  Those sources will, in my opinion, vary from number to number, depending on various factors such as the date of the call and the cell phone carrier for the number at issue.  For similar reasons, it is also my opinion that the historic user(s) of a cell phone number as of a particular date cannot be accurately and reliably identified without obtaining information from, among other sources, the subscribers and/or users themselves.

47.   **Public identification services and Skip Tracing**:  In my experience, TCPA plaintiffs often suggest they can identify individual cell phone subscribers using public or pay identification services or skip tracing.  There are myriad publicly available databases that purport to perform reverse phone number lookups and provide subscriber—not user—information like name and address, and there are a number of vendors who provide varying levels of commercial data lookups, usually via Application Program Interfaces (API).  Based on my research and my business and expert experience, it is my opinion that these services cannot reliably and accurately identify historic cell phone subscribers because each service is subject to significant limitations and errors.

A.   These services are data aggregators.  As a result, the reliability of these services is entirely dependent on the reliability of their source data.  Many free, web-based services do not identify their data sources, and so it is not possible to evaluate their accuracy.  Issues such as errors in data entry, number reassignment, and out-of-date data multiply these inaccuracies. Data from public records is typically available only with current values,

24

and without the historical records that would be required to identify a subscriber at a given point in time in the past when challenged calls were made.  This is the case for all publicly available data sources of which I am aware, such as web-based reverse number lookups.  As a result, these services cannot assist in identifying historic subscribers.

B.  Commercial databases, such as LexisNexis, that offer paid searches to businesses, do advertise historical searches of their public record information.   However, those data providers must aggregate that data themselves over time in order to store and produce historical results, leading to inaccuracies.  LexisNexis even carries the following disclaimer on its web-site, specifically addressing these limitations: "Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor is it a comprehensive compilation of the data. Before relying on any data, it should be independently verified" (emphasis added)[18]. As a courtesy, a partial image of the LexisNexis disclaimer is attached as Exhibit B. Upon deeper inspection of LexisNexis' various web pages, it is evident that they feel the need to provide ample publication of their disclaimer. My recent

---

[18] See for example, LexisNexis WorldCompliance Data at
https://risk.lexisnexis.com/products/worldcompliance-data  (last visited 1/3/2019)

search of their websites revealed that the LexisNexis accuracy disclaimer appears in some form on more than <u>thirty-five (35)</u> different web locations, including services that cover insurance claims, health records, motor vehicle records, compliance data, and most notably – ***public records*** – and search results indicate that the disclaimer appears on dozens more locations that I did not verify. (See Exhibit D). LexisNexis even provides a whitepaper offering services to improve the accuracy of their customers' data records – including telephone numbers, names and addresses – but includes their standard disclaimer warning that data provided by LexisNexis is prone to errors.[19] It was also quite telling to find the **accuracy disclaimer** on LexisNexis' **Phone Finder** service, which purports to provide customer identity data based on phone number searches.[20] As one can see, LexisNexis' own disclaimer supports many of the limitations that I have already itemized regarding the lack of accuracy in public and commercial data records, and that disclaimer does nothing to support the accuracy or reliability of data provided by LexisNexis. And the accuracy disclaimer that LexisNexis carries on their website is not unique among commercial skip-tracing and public record identification vendors, including well-known vendors such as MicroBilt, Experian and TransUnion. MicroBilt's accuracy disclaimer highlights some of the same pitfalls that LexisNexis and I have both raised: "Public Record

---

[19] White Paper – A Business Case for Fixing Provider Data Issues, available at http://techhubly.com/lexisnexis-resources/files/A%20Business%20Case%20for%20Fixing%20Provider%20Data%20Issues_WPNXR5062-0.pdf (last visited 10/25/2018)

[20] LexisNexis Phone Finder at https://risk.lexisnexis.com/products/phone-finder (last visited 10/25/2018)

Information provided to User from or through MicroBilt is derived solely from public records, which may not be 100 percent (100%) accurate or complete…. Public Record Information contained herein should not be used in legal proceedings; ….Be aware that Information is obtained and managed by fallible sources and that for the Fee charged, MicroBilt does not guarantee or insure the accuracy, completeness, timeliness, depth or continuation of Information"[21] (emphasis added – also, as a courtesy, a partial image of the MicroBilt disclaimer is attached as Exhibit C). Experian and TransUnion also carry their own disclaimers in which they do not warrant the correctness or accuracy of information, products and services.

C.   In past cases, I have analyzed subscriber information by comparing results from LexisNexis against six web-based reverse number services, and a seventh, API-based service.  In many cases, the subscriber names returned by these identification services varied significantly – however, in numerous examples, many of the seven search services produced common subscriber results, but none of the seven services returned the same subscriber name identified by LexisNexis.  These variations are likely the result of differing source data, errors in data entry, variations in historic data, and other issues, but add doubt to the reliability of LexisNexis.

D.   As an additional test of LexisNexis' accuracy, I recently requested a full file disclosure of all information that LexisNexis carries on my personal

---

[21] Microbilt User Agreement at http://www.microbilt.com/user-agreement (last visited 12/23/2018)

identity.[22] LexisNexis provided me with a comprehensive 470 page report, dated November 21, 2018. The report included a section titled "Phone Records", with the following description: "This section contains phone listings. The first and last seen dates correspond to the time periods when the source published the record, and not necessarily to the time period with which you had the phone number". The report provided several telephone numbers for which I have been the subscriber. However, absent from the report were ANY wireless telephone numbers that I have used. The report did not list my current, primary wireless number, for which I've been the sole authorized user since 2005. This primary number is also prominently displayed on my publicly-available business website, and has appeared there for nearly four years[23]. The full file disclosure also did not list a prepaid wireless phone that I have used for the past seven months. For my telephone numbers that it did list, each number was listed on multiple records from multiple data sources that included conflicting dates, and many of the dates provided (*first seen* and *last seen* dates) did not match the actual dates that I was subscribed to those numbers – in some cases being off by a number of years.

E.   To further test the accuracy of reverse-lookup services, I recently performed a web-based reverse phone search using my daughter-in-law's cell phone number.  I am familiar with her number, and I know she has

---

[22] LexisNexis Access Your Full File Disclosure at
https://personalreports.lexisnexis.com/access_your_full_file_disclosure.jsp (last visited 12/23/2018)
[23] See archived version of http://jankostyun.com/contact-info/  captured April 7, 2015, at
https://web.archive.org/web/20150407033904/http://jankostyun.com/contact-info/

been the subscriber of the cell phone service to which that number is assigned and that she has been the sole user of that cell phone number for the past 11 years.  Several search sites provided no results at all.  Using the search site spokeo.com – a site that Verkhovskaya has reportedly used in past cases - the phone number was found, and I paid a small fee to receive the report that should have returned my daughter-in-law's name and address.   The results of the search indicated that the current owner is Duane Darling, and included the names Gerald Darling and Nic Darling as previous owners, all at the same address in Virginia.  Duane Darling is not the name of my daughter-in-law or anyone in her immediate family, and she has lived in Connecticut for the past nine years.  I also performed the same search using an API-based service from searchbug.com, and the results indicated Gerald Darling as the owner at the same Virginia address as provided by spokeo.

F.     In *Goins v. Walmart and Palmer Recovery Attorneys* – for which I provided an expert rebuttal report in support of Defendants – Plaintiff's expert Verkhovskaya claimed that she processed the telephone number belonging to Plaintiff and class representative Amber Goins, using LexisNexis as her vendor, and that this process identified the number as belonging to Ms. Amber Goins. In reality, when Verkhovskaya and her team provided Plaintiff Goins' telephone number to LexisNexis, the results that were returned included only the names "LaShante McCall", "Kenia Ayala" and "Lesley Goins". The purported identification by

LexisNexis was faulty in numerous ways: Plaintiff Amber Goins was never identified by LexisNexis as being associated in any way to the subject telephone number; in identifying Lesley Goins' association with the subject telephone number, LexisNexis provided no data or indication that connected Lesley Goins to Plaintiff Amber Goins; in identifying Lesley Goins' association with the subject telephone number, LexisNexis did not provide a date range that covered the relevant time period of the call(s) at issue; once Verkhovskaya received the information from LexisNexis regarding Leslie Goins, she deviated from her documented methodology, and performed a manual, individualized investigation against other data sources in an attempt to connect Amber Goins with Lesley Goins, and therefore connect Amber Goins with the subject telephone number. And when questioned at deposition, Plaintiff's expert even suggested that she might ask Plaintiff's counsel to help determine the relationship between Lesley Goins and Amber Goins. This example clearly shows how the usage of skip-tracing vendors such as LexisNexis to correlate telephone numbers to users or subscribers has been unsuccessful, and further exhibits the need for individualized inquiries to provide accurate user identification.

G.   In another prior case for which I was engaged as an expert, the defendant utilized a verification service provided by Neustar that provides information on the connection between a name and telephone number. The defendant provided Neustar with the name of one of the defendant's

account holders, along with the telephone number that the defendant believed was associated with that account holder. Neustar's verification service returned a result to the defendant that the number was still in service, and that there was a positive match between the telephone number and the account holder name that was provided. However, carrier records subsequently revealed that the account holder had actually disconnected that telephone number several months before the verification was performed. This example demonstrates that even services provided by a respected telecom vendor such as Neustar can be unreliable.

48. **Name Directories**: CNAM (Caller Name) is a service coupled with caller ID that displays a name associated with the calling phone number on the phone receiving the call. Some plaintiffs may assert that the CNAM database is a reliable source for subscriber data. In my opinion, it is not. The CNAM database exists for both landline and cellular phone numbers, but its content (like other public subscriber databases) is quite limited. Major phone carriers do not have incentives for keeping the CNAM database accurate and up-to-date. This is because there is little demand from customers to provide this service, and carrier participation in updating the CNAM database is voluntary and chargeable to the carrier. Furthermore, the CNAM database, like many of the other public data sources, only provides current subscriber information, and there is no known historical version as would be required to identify a subscriber at a given point in time in the past when any of the challenged calls had been placed.

49. **Reliability of subscriber information from carriers**: While cell phone carriers are a source of historic subscriber information for a given cell phone number,

there were many carriers during the period that dates back to February, 2014—some of which no longer exist or have been combined with others—and their historic subscriber records (assuming they exist) do not always accurately identify historical cell phone subscribers. Cell phone carriers have limited capabilities and varying standards for collecting and maintaining information on subscribers. When a customer initially contracts for cell phone service, the carrier's main objective in procuring subscriber identification is for the purposes of collecting payment. This may immediately result in limited or inaccurate customer information being recorded on the subscribers account. Customers might intentionally provide inaccurate contact information, or subscriber information might be incorrectly recorded via data entry. Since cell phones are not tied to a physical location, there are limitations in verifying that the address provided by the subscriber is accurate. Even if the customer data initially collected and recorded is accurate, changes to that data are common, due to actions like subscribers moving to a new address or changing names, but neglecting to report these to the carrier.

50. In order to procure accurate, historical subscriber identification from carriers via subpoena, it is necessary to identify which subset of telephone numbers should be sent to each individual carrier for identification. Further, in order to subpoena cell phone carriers in an attempt to identify subscribers as of some prior date, one must first identify the specific cell phone carrier that provided service to the given telephone number at the historical time of alleged calls. While there are resources available to identify the current cell phone carrier for a telephone number or block of numbers, I am not aware of any such services that can accurately identify historical cell phone carriers.

51. Plaintiff or Plaintiff's expert might propose sending all telephone numbers

to all carriers via subpoena, without regard to historical carrier ownership based on the dates of the calls. I find this solution impractical and unreliable for several reasons. Sending thousands of telephone numbers to smaller carriers would prove overly burdensome for them, and could very well result in no data being provided by such carriers. Sending the same fully-inclusive list of numbers to all carriers will also undoubtedly result in conflicting data results, which would be effectively impossible to resolve. For example, if all telephone numbers are sent to all carriers, Verizon and Sprint might both respond with historic customer records for that same telephone number. Those responses might identify different subscribers, or what appears to be the same subscriber with different service dates, different addresses, or variations in other key information. There would be no way, short of performing a manual investigation of all conflicting telephone numbers, to reliably determine which carrier's information (if either) was correct.

52.     Plaintiff, or Plaintiff's expert is likely to be unaware (or unconcerned) that the carrier ownership of numbers can change due to porting. In fact, the ported-number data that can be downloaded by vendors to track changes in wireless status due to number porting does not provide any identification of carrier changes as part of that porting activity. For example, any telephone number identified as a wireless number at the date it was allegedly called, might have been serviced by Verizon Wireless at the time of that call, but incorrectly identified as serviced by T-Mobile (based on current ownership due to porting) when attempting to generate a subpoena for that number.

53.     The historical carrier ownership of telephone numbers can also change on a larger scale due to Number Pooling. Introduced at the same time as Number Portability,

carriers are required to participate in Number Pooling, where large blocks of telephone numbers, usually in multiples of 1000 numbers, are donated from the control of one carrier to another. Similar to the number portability scenario, a telephone number that was owned at some point in the past by Verizon Wireless might now be owned by T-Mobile, due to donation of the block containing that number to T-Mobile from Verizon. Without a resource to identify the historical carrier ownership of numbers, a current lookup of the carrier that owns a telephone number would not accurately identify the correct carrier who owned that number at a given date in the past.

54.     The volatility of carrier ownership of telephone numbers over time due to extensive mergers and acquisitions among carriers in the wireless industry, as well as carriers simply going out of business, also prevents accurate identification of historical carrier ownership. Wireless carriers can be classified in two categories: Facilities-based wireless carriers (also known as MNOs – Mobile Network Operators); and Wireless Resellers (also known as MVNOs – Mobile Virtual Network Operators). Facilities-based wireless carriers typically own their own network, equipment, and facilities such as switches and radio frequencies, whereas Wireless Resellers will lease a large portion of network, facilities, and sometimes support services (such as billing, order entry, etc.) from a Facilities-based carrier. Although the top 5 or 6 Facilities-based carriers own a large percentage of wireless telephone numbers and associated customers, there are still many smaller Facilities-based carriers and Resellers in operation responsible for a significant number of customers and wireless numbers. Currently, there are approximately 75 Facilities-based wireless carriers in operation, as well as roughly 100

Wireless Resellers[24]. Over the past several years, there are also some 35 Facilities-based wireless carriers who are no longer in business (due to merger, acquisition, insolvency, etc.), and more than 50 Wireless Resellers who no longer provide service. Many of these former wireless carriers were still in business during the class period of more than four years for this case. Based on this high volume of churn, it is likely that some of the wireless numbers that allegedly received challenged calls during the time period in question were owned and serviced by carriers who are no longer in business. Once again, there is no service or database that I am aware of that would allow for the identification of the carrier of record for those numbers at the historical date of alleged calls. And if any of those carriers could be identified, the fact that they are no longer in business would certainly prevent some or all of the requests to identify subscribers from being fulfilled.

55.   Besides the need to identify the correct carrier for given telephone numbers as of historical dates, there are still significant reasons why the subscriber identification provided via subpoena would be highly suspect. It has already been discussed that many wireless carriers who provided service to customers dating back to February, 2014 are no longer in business, and as such would be unable to identify any subscriber-related data. Carriers who are still active have their own set of limitations related to providing accurate, historical subscriber information.

56.   **Carriers' retention of records**:   Retrieving individual customer usage information (e.g., call detail records and audit trails of text messages) directly from

---

[24] Both facilities-based wireless carriers and wireless resellers are described by a number of resources, including the FCC's Mobile Wireless Competition Report, and CTIA's Wireless Industry Indices Report. For a summary of current and previous wireless carriers and resellers, see Wikipedia's List of United States wireless communications service providers at
https://en.wikipedia.org/wiki/List_of_United_States_wireless_communications_service_providers
and Wikipedia's List of United States mobile virtual network operators at
https://en.wikipedia.org/wiki/List_of_United_States_mobile_virtual_network_operators

wireless carriers potentially could assist in the identification of historic subscribers for that number.   Doing so would likely require a subpoena or other records request connected to individual cell phone numbers.   Through review and analysis of these records on an account-by-account basis, it may be possible to identify subscribers of individual cell phone numbers.   This laborious analysis would, however, be incomplete and inaccurate.   This is because the retention requirements for such types of records among carriers are much less stringent than for landline carriers, and vary widely in the industry.   For example, the U.S. Department of Justice (DOJ) reported that Verizon retains subscriber information for three to five years; T-Mobile for five years; and Sprint, Nextel, and Virgin for an "Unlimited" amount of time.[25]   For AT&T/Cingular, the DOJ reported that retention duration "[d]epends on length of service." More recent reports, such as one from the Massachusetts ACLU in 2014, indicate that those retention periods can be even shorter – with Sprint's retention of subscriber data reported as 18 months, and Verizon's retention reported simply as "more than one year"[26]. Also with respect to data retention, Verizon's privacy policy states that "Personally identifiable and other sensitive records are retained only as long as reasonably necessary for business, accounting, tax or legal purposes."[27], indicating that subscriber data is essentially stored no longer than is absolutely necessary. It is also noteworthy that resellers, or subsidiaries of larger carriers (e.g. MetroPCS as a subsidiary of T-Mobile) are likely to have their own, different retention periods for subscriber and call records. For example, although T-

---

[25] U.S. Department of Justice Report on "Retention Periods of Major Cellular Service Providers" dated August 2010, available at http://www.pcmag.com/article2/0,2817,2393887,00.asp (last accessed 12/12/2017).

[26] PrivacySOS report , dates February 9, 2914 at https://privacysos.org/blog/how-long-does-my-phone-company-store-my-data-how-easily-will-it-give-my-info-up-to-the-cops/

[27] Verizon Wireless' Full Privacy Policy at http://www.verizon.com/about/privacy/full-privacy-policy (last visited 12/11/2017)

Mobile is reported to keep subscriber records for five years, and call detail records for up to five years, it is my understanding that MetroPCS retains subscriber records for only six months, and call detail records for just two years. Based on these observations, attempts to identify subscriber ownership through carriers will encounter numerous problems, including: the scenario where subscriber records are retained for a shorter period than call detail records; the reality that many or all wireless carriers may not carry records back to the date required to identify subscribers for the entire class period; and the strong possibility that some carriers won't have the capability to produce any subscriber records at all for the entire class period.

57.    **Prepaid telephone services**:  Prepaid phones are available to customers from a multitude of sources—traditional cell phone carriers, department stores, convenience stores, online retailers such as Amazon, and online auction sites like Ebay, among others.  This wide variety of sellers makes collection of subscriber information less uniform or non-existent, and further reduces the reliability of any data that is collected by and potentially available from them.  And if any subscriber information were to be collected, the personnel recording that information – store clerks, online sellers, etc. – are not trained or accustomed to collecting subscriber information and more prone to erroneous or incomplete collection. There is no requirement at the federal level for purchasers to provide any verification of name, address or other contact information.  A federal bill was introduced in 2010 to institute an identification requirement for the purchase of prepaid mobile devices, but has never been passed into law.[28] More recently,

---

[28] Pre-Paid Mobile Device Identification Act, S. 3427, 111th Cong. (2010).

a similar bill was introduced to Congress in 2016, and was also never enacted.[29]

58.      And the number of prepaid phones is now a very significant portion of the wireless landscape. According to the FCC's Twentieth Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile Wireless, it is estimated that, as of 4Q2016, roughly 23 percent of retail wireless connections were based on prepaid service, versus 77 percent for postpaid accounts.[30]

59.      As there is no mandated requirement that prepaid phone carriers obtain and maintain subscriber identification data, accurately identifying individual, historic subscribers of prepaid phone services – accounting for nearly one-quarter of wireless phones – would be practically impossible.

60.      **Cell phone number reassignment**:  The generic process used in the mobile industry for deactivation and recycling telephone numbers creates additional problems with the accuracy of historic subscriber data related to a number.  Based on my experience in the provisioning of mobile service, the deactivation process typically follows this pattern:  (1) a subscriber chooses to cancel service with an existing provider, and chooses not to port their number to a new provider; (2) the service provider cancels service and adds the telephone number to a deactivation list; (3) telephone numbers stay inactive for a prescribed number of days, depending on the carrier, before they are recycled and assigned to a new subscriber; and (4) after the deactivation period, the number can be reassigned to a new subscriber.[31]  Typically, the carrier/service provider(s)

---

[29] H.R. 4886 (114th): Closing the Pre-Paid Mobile Device Security Gap Act of 2016
[30] FCC 17-126, Appendix II:Table II.B.ii, p.73
[31] According to Federal guidelines, disconnected numbers must be made available for reassignment  in 90 days or less, but there is no minimum timeframe, indicating that carriers may reassign numbers in as little as one or two days. See 47 CFR § 52.15 at https://www.gpo.gov/fdsys/pkg/CFR-2013-title47-vol3/pdf/CFR-2013-title47-vol3-sec52-15.pdf

will update its internal records to indicate the change of subscribership for the reassigned number.  However, many of the supplemental data sources that have been previously discussed have a high probability of carrying outdated subscriber data.  Public data sources like those used in reverse lookup services, private data sources such as those used by vendors like LexisNexis, the CNAM database, and even the National Do Not Call registry all face the likelihood of including outdated subscriber data due to this reassignment process.

61.    And further supporting the fact that subscribers cannot be accurately identified based on telephone numbers, including those limitations based on number reassignment, FCC Chairman Ajit Pai himself has opined that "no authoritative database … exists to 'track all disconnected or reassigned telephone numbers' or 'link[] all consumer names with their telephone numbers'."[32] And in support of that statement, Chairman Pai referred to documentation from Richard Fruchterman, the Associate General Counsel of telecom industry data leader Neustar.[33] In that same opinion, Chairman Pai noted that "over 37 million telephone numbers are reassigned each year".[34] The FCC as well has acknowledged the problem of incorrectly identifying subscribers due to number reassignment, with its issuance of Notice of Proposed Rulemaking, specifically addressing "the problem of unwanted calls to reassigned numbers" (FCC 18-31, Second Further Notice of Proposed Rulemaking, released March 23, 2018, at ¶ 1). In that same notice, the Commission points out that "Upon disconnecting his or her phone

---

[32] DISSENTING STATEMENT OF COMMISSIONER AJIT PAI Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, WC Docket No. 07-135 at 3.

[33] Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (Feb. 5, 2015).

[34] DISSENTING STATEMENT OF COMMISSIONER AJIT PAI Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, WC Docket No. 07-135 at 3.

number, a consumer may not update all parties who have called him/her in the past, including businesses to which the consumer gave prior express consent to call and other callers from which the consumer expects to receive calls.   When that number is reassigned, the new subscriber of that number may receive unwanted calls intended for the previous subscriber." (*Id*. at ¶ 3). And the Commission further identifies the lack of any reliable resource to identify number reassignments, which includes the inability to identify the newly assigned subscriber of a reassigned number: "While existing tools can help callers identify number reassignments, 'callers lack guaranteed methods to discover all reassignments' " (*Id*. at ¶ 5).   The resulting effect of reassigning more than 100,000 telephone numbers every single day is two-fold: the inaccuracies of any data source that purports to identify subscribers based on telephone numbers are severely compounded; and any organization attempting to call known telephone numbers with prior consent is destined to reach unknown parties at the receiving end of a reassignment, despite that organization's best intentions and practices.

62.   **Authorized user identification**:   The complex, number-by-number process of attempting to reliably and accurately identify the historic subscriber associated with a cell phone number as of the date of a challenged call does not even begin to address the identification of cell phone users.   Because the subscriber and authorized user of a cell phone number are not necessarily the same person, identifying the subscriber does not mean the user has been or can be identified.   Many cell phone accounts have more than one user.   For example, businesses often have a single cellular account and a single telephone number that is shared by several employees, or multiple numbers used by multiple employees – but the subscriber on the account might be the office

administrator.  Families often have a single cell phone account and a single cell phone number shared by different family members, or multiple numbers that are used by multiple family members.  Sometimes, individuals in a single "family plan" are not related and may not have the same surname.  As a result, even if it were possible to use carrier records to identify a number as belonging to an individual family plan, a core family unit (e.g., parents and children, or even grandparents, parents, and children) would not serve as a proxy for all potential users of that number.  Typically, none of this user information is recorded in cell phone provider records.

63.     For example, in the case of *Wilson v. Badcock*, for which I was engaged as an expert, named plaintiff Victoria Wilson has testified that she is the user of the wireless telephone number that allegedly received calls from the defendant. But Wilson's Grandmother, with whom she lives, pays for that telephone service. Subscriber records produced in that case confirmed that: Wilson's Grandmother (Colleen Powell) is the subscriber of the number at issue; there is no indication that anyone other than Wilson's Grandmother is associated with the account; the subscriber name on the account of Colleen Powell bears no similarity to plaintiff Victoria Wilson's name; and the subscriber records report a subscriber address that does not match the residential address that plaintiff Wilson described during her testimony as being shared with her Grandmother. This example clearly describes the common occurrence in which both authorized user names and/or addresses are not associated with their own telephone number.

64.     It would also be foolish to dismiss the effect that scenarios such as family plans have on the issue of user identification, since research has estimated that as many as

75 percent of wireless subscribers are on discounted, multi-line family plans.[35]

65.     As a result, in my opinion, there is no way to reliably and accurately attempt to identify the historic user(s) of a given cellphone number as of a particular date without, at a minimum, first obtaining information from the subscriber(s) and user(s) of that number as of the date of the challenged call.  And, given that the multiple user scenario I have described might be combined with other scenarios, like a prepaid phone, even this level of number-by-number analysis may be insufficient to identify subscribers and user(s) for a given number at the time of the challenged call.

66.     In another telling example of the unreliability of carrier records, cell phone subscriber records were produced via subpoena in *Goins* for the telephone number associated with Plaintiff and class representative Amber Goins. I reviewed the subpoena response from MetroPCS, in which they were asked to provide subscriber information for Plaintiff Goins' wireless telephone number during the relevant time period. Of the documentation produced by MetroPCS, the only subscriber during the relevant period was identified as a person with the name LaShante McCall. Plaintiff's name Amber Goins did not appear anywhere in the documentation produced by MetroPCS in response to the subpoena. Similarly, the surname Goins did not appear anywhere in the documentation produced by MetroPCS.

67.     **Confirmation of my opinions from other sources**: The opinions that I have set forth regarding the lack of reliability in the historic identification of wireless status of telephone numbers, the erroneous nature of identifying historic users and subscribers associated with those numbers, and the pitfalls associated with using third-

---

[35] *Wireless subscribers are finding breaking up is hard to do*, by Andy Vuong, The Denver Post, September 14, 2012, available at https://www.denverpost.com/2012/09/14/wireless-subscribers-are-finding-breaking-up-is-hard-to-do/ last visited 10/19/2018

party vendors for historic identification, are also supported by the opinions of other reputable experts, as well as reasoning documented in prior court rulings.

68.     For example, in the case of Newhart v. Quicken Loans (No. 9:15-cv-81250 S.D. FL), similar issues were addressed in the expert report of Ken Sponsler (DE 123-22 9/2/2016) ("Sponsler Report") when he rebutted the expert report of Plaintiff's expert for that case. When describing Plaintiff's expert's use of third-party vendors, Mr. Sponsler states "Ms. Verkhovskaya has failed to identify the data sources or process used by the third-party vendors with which she contracts.... Ms. Verkhovskaya's report does not define any of the records and sources relied upon to determine whether a telephone number was assigned to a cellphone on a specific date(s)" (Sponsler Report at 13).

69.     Mr. Sponsler also points out – similar to my descriptions above – that there are significant problems with the accuracy of third-party skip-tracing and public identification vendors: "... Ms. Verkhovskaya has not stated (nor could she, based on her report) that she has personal knowledge of these third-party vendors' error rate(s). Her expert report claims that '[i]n [her] experience,' these vendors 'provide accurate and reliable information' " (*Id.* at 15)

70.     Mr. Sponsler does cite his own experience with vendors such as LexisNexis and their lack of accuracy by stating "In my experience, however, when determining the historical subscriber of a mobile telephone number, third-party vendors such as LexisNexis have an error rate that may be as high as 85%" (*Id*. at 15). His opinion on this subject is also in line with the questionable accuracy of LexisNexis results that I described from the Shamblin case.

71.     In the case of *Balschmiter v. TD Auto Finance* (No. 2:13-cv-00186 E.D.

WI), similar issues were addressed in the declaration of Dr. Debra Aron (DE 44 8/29/2014) (the "Aron Report") when rebutting the expert report of Jeffrey Hansen in that case.

72.     "In addition to web-site services, there are also reverse look-up services available from data vendors, to which one can submit a database or list of telephone numbers and that purport to provide a more reliable service than those available on line. I understand that these services may obtain their information from a variety of sources such as lists that are sold when people sign up for magazines, warranties, or other products, or provide their names to web sites. However, these services do not provide a way to test the reliability of their data, and indeed these services typically do not divulge their source(s) of information. In my experience, "reverse look-up" services available from data vendors do not purport to offer historical data on wireless subscribers with which one can determine the subscriber or user of a wireless telephone number on a specific date, and reliability statistics on their current data are not offered. These services also do not warrant the information to be accurate. In one matter in which I testified, the expert witness testifying as a class administrator testified that she believes the data from a particular third-party reverse look-up data vendor that she intended to rely upon for reverse lookup services was 20 to 30 percent inaccurate." (Aron Report at 23).

73.     Other TCPA cases have also produced decisions that confirm my opinions regarding the problems with the practical and accurate identification of potential class members. For example, in *Sherman v. Yahoo*, No. 3:13-cv-00041 (S.D. CA), the court found that records from a cell phone provider and the use of reverse-lookup services failed to demonstrate "an administratively feasible method of identifying the putative

class members" (Order Granting Leave To File Surreply And Denying Motion For Class Certification, D.E. 191 at 12).

74.     When ruling in *Jacobs* (*Jacobs v. Quicken Loans*, No. 9:15-cv-81386 (S.D. Fla.)), the court stated "As explained by Defendant's expert, Jan Kostyun, there is no public database of cell phone subscribers, and private services are often inaccurate and incomplete. (Kostyn [sic] Report ¶¶ 14-15, DE 136-1.) Additionally, even if a carrier-by-carrier investigation was undertaken, it still would not ensure accuracy. (*Id.* at ¶¶ 16-19.)" (Order Denying Class Certification at 7).

75.     And in its decision to deny class certification in *Wilson v. Badcock* (No. 8:17-cv-02739 (M.D. Fla.)), the court similarly remarked that "According to Defendant's expert, there is no public database of cell phone subscribers and private services are often inaccurate and incomplete, and even a carrier-by-carrier investigation would not ensure accuracy" (*Wilson* D. E. 102 at 6). Also in *Wilson*, the court refers to Verkhovskaya's proposal in that case to use "reverse directory database vendors and subpoenas to cell phone carriers to identify those persons whom Defendant called" and states that her proposal "suffers several mechanical shortcomings" (*Id.* at 5-6). The court continues by describing that Verkhovskaya claims that cell phone user identification "is possible, though one of her chief sources is the **unobservable, proprietary "black box" techniques of LexisNexis**" (*Id.* at 6, emphasis added).

## Reservation of Right to Amend

76.     I reserve the right to offer additional opinions and/or to amend this report subject to additional information I receive after issuance of the same.

**Expert Report Summary**

77.     Verkhovskaya's analysis of call data and telephone numbers for Do Not Call violations exhibited numerous problems: non-existent supporting documentation, guidelines or statements of accuracy in the process used by Verkhovskaya's vendor to determine numbers on the NDNCR at the date(s) they were called; the demonstrated lack of controls to ensure that authorized subscribers or users have registered DNC numbers for which they are authorized; the lack of full hygiene processes to remove DNC entries that were registered for numbers that have subsequently been reassigned; a lack of any specifications to determine which numbers on the NDNCR correspond to invalid business entries; and unsound statistical techniques used by Verkhovskaya to inflate the apparent number of Do Not Call telephone numbers, based on her extrapolation of results. Based on these demonstrated problems, it is my opinion that Verkhovskaya's analysis of call data against the NDNCR is of little or no value.

78.     It has also been demonstrated that Verkhovskaya's analysis of the lead data for invalid data and other anomalies produced results that are completely unreliable and unsupported. Verkhovskaya claimed to have identified numerous examples of invalid first and last names – yet she provided no standards or guidelines that were used in determining their validity, and I was able to use several resources – including the U.S. Census – to show that so many of Verkhovskaya's results were clearly wrong. In attempting to describe anomalies in the lead records, Verkhovskaya ignored numerous reasons for the data conditions that she described, including simple data entry typos or intentional obfuscation of the data by website users. And when implying that multiple entries for the same lead might have somehow been automatically or mysteriously generated, Verkhovskaya fails to recognize the intent of the websites used to collect lead

data, and the fact that users were encouraged to provide multiple registrations.

79.    Finally – based on my extensive experience with and observations of subscriber and user data; the overwhelming obstacles described in accurately identifying the historic users and subscribers of telephone numbers; and the concrete examples presented of inaccurate identification – it is my opinion that any attempt to accurately and reliably identify the subscribers and/or users of those numbers – particularly a number of years in the past – will require a detailed, account-by-account and number-by-number investigation and analysis across various third-party sources, including, amongst other potential sources, cell phone carriers and the individual subscribers and users. None of these obstacles are accommodated by Verkhovskaya's proposed reverse append methodology.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 4th day of January, 2019 at Burlington, CT.

_____
Jan Kostyun

# Exhibit A – Jan Kostyun CV



Jan Kostyun has over 35 years of experience in computer systems and software development, enterprise architecture, and telecommunications including extensive experience in the wireless industry.   Mr. Kostyun has broad telecom experience in both wireless and wireline disciplines. His wireless experience includes wireless telecommunications standards, text messaging, voice and voicemail internals, and in-depth experience with the end-to-end cellular provisioning process.  His wireline/landline experience includes development of software systems to support business operations and provisioning of landline services, including overall architectural knowledge of the wireline business. Mr. Kostyun is also recognized as an industry expert in the field of Local Number Portability (LNP) and the process of customer movement between cellular carriers, as well as significant experience in landline number portability and number pooling.   He also has a wide range of experience in database technologies as well as data analysis. Mr. Kostyun has held senior technical positions with Bell Telephone Laboratories, Exxon-USA, GTE and Verizon, as well as consulting positions with Informatics, Syniverse Technologies, BusinessEdge Solutions/EMC and eComp Consultants.

His experience encompasses successful assignments in implementing eCommerce, Business Intelligence & Telecommunications systems in the U.S. and Canada, as well as a collaborative effort with the National Regulatory Agency of Colombia.

Mr. Kostyun's extensive experience has enabled him to provide expert opinions, reports and analysis in legal matters covering trade secret misappropriation, copyright infringement, software financial valuation and damage assessment, patent infringement, and litigation involving the Telephone Consumer Protection Act (TCPA).

**Professional Experience:**

**2012 to present**     *Independent Consultant*                                    *Middletown, NJ*

Technology consulting, including
- Expert witness representing defendant under civil case alleging violation of Telephone Consumer Protection Act (TCPA). Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants.
- Expert consultant representing defendant in civil case alleging violation of TCPA. Provided analysis and report of plaintiff telephone numbers, porting activity and subscriber information.
- Expert consultant representing defendant under class action complaint alleging violation of TCPA involving text messaging/SMS activity. Provided analysis and report of CTIA/Wireless Industry best practices for short code messaging campaigns.

- In class action TCPA case, served as expert to provide ATDS evaluation, analysis of express consent and TCPA applicability of contested texts and voice calls.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report.
- Expert witness in class action TCPA complaint, providing in-depth analysis of National and internal Do Not Call (DNC) records and very large volume call record files, and critical assessment of opposing expert's data analysis.
- In class action TCPA case, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of fax telephone numbers. Also developed expert report rebutting opposing expert's opinions regarding successful completion of fax transmissions and identification of fax recipients.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC and wrong number calls, and addressing technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, performed extensive analysis of high-volume call data records against internal and national DNC files.
- In class action TCPA case, analyzed call data records, performed testing and analysis of defendant's telephone calling system and provided opinions addressing defendant's alleged use of an ATDS for telemarketing purposes.
- In class action TCPA case, developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, reliability of opposing expert's data vendors, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action matter involving the Washington Automatic Dialing and Announcing Device (WADAD) statute, provided expert analysis and support regarding carrier records, carrier subpoena responses, and identification of wireless/landline subscribers and calls within specific geographic boundaries.

**2009 to 2011**   **Senior Consultant**
*eComp Consultants*                                                                              *Tampa, FL*

Provided consulting on design and development of software products and wireless technology. Provided technology consulting and expert support for enterprise architecture, software engineering and telecommunications in the areas of:
- Patent portfolio evaluation, market valuation, and prior art analysis.

- Patent litigation consulting for information technology in telecommunications, wireless and enterprise architecture for validity/invalidity and infringement/non-infringement analysis.
- Software contract analysis for disputes involving custom software, software copyright and trade secret infringement, and software valuation.
- Functional analysis, Source Code reviews, Damage Assessment analysis and software tampering evaluation.

**2009 to 2010**          ***Independent Consultant***                                                              ***Tampa, FL***

Collaborated with Value Partners Management Consulting firm in preparation of proposal to the Colombian National Regulatory Agency for implementation of Wireless Number Portability across Colombia.

**Prior experience**      **Senior Consultant**
                          ***BusinessEdge Solutions/EMC***                                ***Toronto, Ontario, Canada***

Provided strategic and tactical guidance to Rogers Wireless, Canada's largest wireless carrier, in the successful, on-schedule implementation of Canadian wireless number portability.

- Developed detailed specifications for Rogers' internal business applications interface to the Syniverse/Telcordia Service Management Gateway (SMG) for communication of wireless port requests & responses to wireless and wireline trading partners.
- Served as Rogers' representative to several industry-level committees, including SMG Defect Management and SMG Testing, acting as liaison between Rogers and all Canadian carriers. Developed detailed specifications for acceptance and regression testing of SMG for entire Canadian industry.
- Provided integration expertise to Rogers' application development, network administratio system testing, production support, and program management teams.
- Provided in-depth knowledge of Telcordia SMG interface, Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation requirements, and post-implementation data analysis to determine customer porting trends and roadblocks.

**Senior Consultant**
***Syniverse Technologies***                                                               ***Tampa, FL***

Served as development specialist & subject matter expert during implementation of U.S. Wireless Number Portability (WNP). Designed the reporting data warehouse and client billing processes which support Syniverse's WNP & ICC Clearinghouse product offerings.

- Provided significant expertise in the technical internals, database design and API requirements of Telcordia's SMG platform; WNP WICIS Industry standards; InterCarrier Communications (ICC) Process; Service Order Administration (SOA)/NPAC interaction; and Tekelec LSMS database access.
- Subject matter consultant to other Syniverse WNP product offerings, including Pre-port Validation, Fallout Management, Wireline Porting and PortFlow Management. Responsible for interaction and consulting with Sales, Business Development, Training and Production Support organizations.
- In-depth experience with Cellular Provisioning, GSM/CDMA technologies, SIM Card provisioning

**Software Engineer**
*Verizon Communications*                                                      *Tampa, FL*

Served as Enterprise Integration Architect for Local Number Portability (LNP) and Telephone Number Pooling (TNP) projects. Responsible for development of enterprise-level architecture and system integration of 38 major applications in order to develop and deploy Wireline LNP and Number Pooling capabilities for the entire former-GTE operating area.

- Managed technical team of 30+ individual project architects, including interaction with program management, functional owners, development teams, system testers and production support personnel.
- Coordinated retail and wholesale ordering, provisioning, billing and service assurance business functionality.
- Developed significant expertise in number portability network element systems (Telcordia's LSMS and SOA), including low-level knowledge and direct access to LSMS internal databases.
- Directly responsible for the successful national deployment of LNP/TNP in GTE/Verizon West. Maintained close working relationship with Network Engineering's TN Administrator, assisting with LSMS extracts for reconciliation processes, TNP block donation and block allocation processing, and creative use of LNP capabilities for special customer requests.

**Senior Advisory Systems Engineer**
*GTE Telephone Operations*                                                    *Tampa, FL*

Provided extensive systems development work as enterprise architect and development team project manager.

- Developed technical specifications for numerous systems across GTE Telephone Operations, primarily within the Customer Contact and Operations domains. Technical specifications established the hardware, software and network architecture with emphasis on a distributed, UNIX-based, client/server environment.
- Established corporate standards for Relational DBMS products, including interaction with Oracle and Informix vendors
- Established corporate standards for UNIX hardware and operating system platforms, including interaction with SUN, HP and IBM vendors.
- Managed application development for TCOM, a distributed, IBM-based bulk mail processing application
- Application technical lead for Central Office personnel dispatch and work allocation application.

**Senior Database Analyst**
*Exxon Company, USA*                                                           *Houston, TX*

Provided database analysis and database administration in large-scale IBM environment, specializing in project team support, implementation of DB2/SQL and use of IBM utilities, IBM Dialog Management Services.

**Senior Database Analyst**

51

*Ford Aerospace*                                                                                    *Houston, TX*

Served as key member of application team for NASA contractor responsible for Shuttle Simulator Reconfiguration System.  Responsibilities included data analysis and database design, and application lead.

### Senior Consultant
*Informatics, Inc.*                                                                                 *Houston, TX*

Consulted for major oil & gas and technology clients, offering application conversions, development of new systems, and application optimization.  Conducted international technical training classes in IBM IMS DB/DC, IBM Utilities and IBM Internals

### Senior Systems Analyst
*GTE Data Services*                                                                                  *Tampa, FL*

Served as project lead and technical advisor for development of IBM/IMS-based customer billing application and IBM/CICS online order-entry application.  Specialized in deployment of mini-computer office-automation systems.

### Technical Lead
*Bell Telephone Laboratories*                                                                     *Piscataway, NJ*

Application lead for development of IBM/IMS-based Inventory Management system implemented across entire Bell System.

**Education:**

B.S. Mathematics – Magna Cum Laude                        Union College, Schenectady, NY

M.S. Computer Science                                             Union College, Schenectady, NY

| Wireless Communications | 7 years | Syniverse/Telcordia Service Management Gateway (SMG), Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation, Wireless Number Portability (WNP) & WICIS Industry standards, InterCarrier Communications (ICC), Service Order Administration (SOA)/NPAC,; and Tekelec LSMS database, Wireline Porting and PortFlow Management, Provisioning, GSM/CDMA technologies, SIM Card Provisioning |
|---|---|---|
| Telecommunications | 25 years | Local Number Portability (LNP), Telephone Number Pooling (TNP), Telcordia's LSMS and SOA, Customer Contact, Provisioning & Operations, eCommerce applications |
| Database Technology | 30 years | IBM IMS Database/Data Communication; DB2/SQL database design, Performance Optimization, Query Specialist; Informix; ORACLE; Logical Data Modeling; MS Access |
| Software Engineering | 20 years | Enterprise integration, Order Entry/CRM, Trouble Management, Provisioning, Customer Billing, Work Allocation/Work Management, Inventory Management |

**Tools & Platforms**

| Languages and tools: | IBM Assembler, FORTRAN, COBOL, C, C++, JAVA, Visual Basic, IMS DB/DC, CICS, DB2/SQL, Informix, Oracle, MS Access/SQL, HTML, MS Office, WordPress |
|---|---|
| Platforms: | IBM Mainframe/370, IBM 4300, IBM 9700, IBM RS/6000, HP 9000, Sun SPARC, Windows-based PC |
| Operating Systems: | IBM MVS, IBM DOS/VSE, AIX, HP-UX, UNIX, Solaris, MS-DOS, Windows |
| | |
| Professional: | Published article in *Computerworld*, 9/24/84: "IBM ISPF dialog manager: More than meets the eye" |

**Case Experience:**

**Alex Jacobs et. al. v Quicken Loans, Inc.**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report. |
| Represented by: | Goodwin Procter LLP |

**Amber Goins et. al. v Walmart and Palmer Recovery**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Walmart and Palmer Recovery as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report rebutting opposing expert's data analysis, historic wireless identification and subscriber identification. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. / Sheppard, Mullin, Richter & Hampton, LLP |

**Ameranth v Six Continents Hotels**

| | |
|---|---|
| Jurisdiction: | Superior Court of DeKalb County, State of Georgia |
| Client: | Six Continents as defendant in complaint for web advertising misuse and trade secret infringement of web-based concierge application |
| Nature of Case: | Web Advertising Analysis and Intellectual Property Litigation |
| Nature of Engagement: | Consulting expert analyzing web-based advertising practices, user interfaces, and development models; provided expertise in web marketing, online advertising, and eCommerce technology development standards, design and architecture |
| Represented by: | Alston & Bird |

**Carrie Couser et. al. v Cucamonga Valley Medical Group, Inc.**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Central District of California |
| Client: | Cucamonga Valley Medical Group, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Served as expert to provide ATDS evaluation, analysis of express consent and TCPA applicability of contested texts and voice calls |
| Represented by: | Schmid & Voiles |

**Carrie Couser et. al. v Dish One Satellite, LLC**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Central District of California |
| Client: | Dish One, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Served as expert to provide in-depth analysis of National and internal Do Not Call (DNC) records and very large volume call record files, and critical assessment of opposing expert's data analysis. |
| Represented by: | Benesch, Friedlander, Coplan & Aronoff LLP |

**Comprehensive Health Care Systems of the Palm Beaches et. al. v M3 USA Corporation**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Client: | M3 USA Corp., as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of fax telephone numbers. Also developed expert report rebutting opposing expert's opinions regarding successful completion of fax transmissions and identification of fax recipients. Provided deposition testimony. |
| Represented by: | Sheppard Mullin Richter & Hampton LLP |

**Datamaxx Applied Technologies v Computer Projects of Illinois, Inc.**

| | |
|---|---|
| Jurisdiction: | United States District Court, Northern District of Florida |
| Client: | Datamaxx as plaintiff |
| Nature of Case: | Software Copyright Infringement |
| Engagement: | Prepared expert report assessing infringement of plaintiff's software copyrights, utilizing Abstraction-Filtration-Comparison test. Provided deposition testimony. |
| Represented by: | Pennington, Moore, Wilkinson, Bell & Dunbar, P.A. |

**Eileen Nece et. al. v Quicken Loans, Inc.**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines. |
| Represented by: | Goodwin Procter LLP |

**Estrellita Reyes et. al. v BCA Financial Services, Inc.**

| | |
|---|---|
| Jurisdiction: | United States District Court, Southern District of Florida |
| Client: | BCA Financial Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. |

**Kevin Buja et. al. v Novation Capital LLC, et. al.**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Client: | Novation, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Vedder Price, P.C. |

**Lori Shamblin et. al. v Obama for America et. al.**

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Tampa Division |
| Client: | Obama for America and DNC Services Corp. as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants. |
| Represented by: | Perkins Coie LLP |

**Mark Preman et. al. v Pollo Operations**

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Orlando Division |
| Client: | Pollo Operations as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Pre-trial review of text messaging procedures and data flow analysis. Provided expert report evaluating adherence to CTIA/Wireless Industry best practices for short code messaging campaigns. |
| Represented by: | Akerman LLP |

**Michael Lutman v Harvard Collection Services**

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Ft Myers Division |
| Client: | Harvard Collection Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Provided expert analysis of plaintiff telephone numbers, porting activity, subscriber information, and ATDS evaluation. |
| Represented by: | Wilson Elser Moskowitz Edelman & Dicker LLP |

**Moricz v Google**

| | |
|---|---|
| Jurisdiction: | United States District Court, Western District of Washington at Seattle |
| Client: | Michael Moricz as plaintiff |
| Nature of Case: | Patent infringement of search engine software capabilities |
| Engagement: | Provided technical research into history, evolution and current state of web-based search engine design and functionality. Development of claim construction report. |
| Represented by: | Schwabe, Williamson & Wyatt, P.C. |

**PCS4Less v Go Mobile**

| | |
|---|---|
| Jurisdiction: | State of Michigan, Circuit Court for Washtenaw County |
| Client: | Go Mobile as defendant |
| Nature of Case: | Copyright / Trade Secret on unlocking GSM/CDMA cell phone devices |
| Engagement: | Provided expert analysis of cell phone unlocking methods. |
| Represented by: | Gray Robinson |

**Resource Acquisition and Management Services v Mathews**

| | |
|---|---|
| Jurisdiction: | State of Florida, Circuit Court for Hillsborough County |
| Client: | Resource Acquisition and Management Services, Inc. as plaintiff |
| Nature of Case: | Breach of Contract and Conversion of disputed property including application source code |
| Engagement: | Provided expert report assessing the value of application source code. Provided deposition testimony. |
| Represented by: | Rocke, McLean and Sbar, P.A. |

**State of Florida v Poole**

| | |
|---|---|
| Jurisdiction: | State of Florida, Circuit Criminal Court for Hillsborough County |
| Client: | Poole as defendant |
| Nature of Case: | Criminal complaint involving damage of application components |
| Engagement: | Provided expert analysis and court testimony regarding the feasibility of performing a forensic analysis of hardware and software components. Provided court testimony. |
| Represented by: | Pawuk and Pawuk, P.A. |

**Thomas Cook v Palmer, Reifler & Associates and WALMART**

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | PRA as defendant |

|                  |                                                              |
|------------------|--------------------------------------------------------------|
| Nature of Case:  | Telephone Consumer Protection Act (TCPA) violation           |
| Engagement:      | Developed expert rebuttal report challenging opposing expert's data analysis, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by:  | Shepard, Smith, Kohlmyer & Hand, P.A.                        |

**Victoria Wilson v Badcock Home Furniture**

|                  |                                                              |
|------------------|--------------------------------------------------------------|
| Jurisdiction:    | United States District Court, Middle District of Florida     |
| Client:          | Badcock as defendant                                         |
| Nature of Case:  | Telephone Consumer Protection Act (TCPA) violation           |
| Engagement:      | Developed expert rebuttal report challenging opposing expert's data analysis  and methodology for  identifying users/subscribers of cell phones, contributing to denial of class certification. Provided deposition testimony. |
| Represented by:  | Johnson & Cassidy, P.A.                                       |

**Waddell Williams v Bluestem Brands**

|                  |                                                              |
|------------------|--------------------------------------------------------------|
| Jurisdiction:    | United States District Court, Middle District of Florida     |
| Client:          | Bluestem Brands as defendant                                 |
| Nature of Case:  | Telephone Consumer Protection Act (TCPA) violation           |
| Engagement:      | Developed expert report analyzing Defendant's dialing platform and its characteristics related to Automated Telephone Dialing Systems |
| Represented by:  | Faegre Baker Daniels, LLP                                     |

# EXHIBIT 8
# [FILED UNDER SEAL]

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:17-cv-81270-DMM

**LAURA HILTON, ANNA NIKERINA, EBONIE ORR, JOHN BROOKS**, and **WHITNEY TRZUPEK**, individually and on behalf of all others similarly situated,

        *Plaintiffs*,

*v.*

**FLUENT, LLC,** and
**REWARD ZONE USA, LLC,**

        *Defendants*.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

## <u>PLAINTIFFS' NOTICE OF VOLUNTARY DISMISSAL WITH PREJUDICE</u>

Plaintiffs Laura Hilton, Anna Nikerina, Ebonie Orr, John Brooks, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), hereby voluntarily dismiss the instant action. All claims of Plaintiffs Laura Hilton, Anna Nikerina, Ebonie Orr, John Brooks, individually, are hereby dismissed with prejudice.

Dated: April 11, 2018

Respectfully Submitted,

| HIRALDO P.A. | LAW OFFICES OF STEFAN COLEMAN P.A. |
|---|---|
| */s/ Manuel S. Hiraldo*<br>Manuel S. Hiraldo<br>Florida Bar No. 030380<br>401 E. Las Olas Boulevard<br>Suite 1400<br>Ft. Lauderdale, Florida 33301<br>mhiraldo@hiraldolaw.com<br>Telephone: 954.400.4713<br><br>*Counsel for Plaintiffs and the Putative Class* | Stefan Coleman<br>Florida Bar No. 00030188<br>201 S. Biscayne Blvd., 28th Floor<br>Miami, Florida 333131<br>Telephone: (888) 333-9427<br>Facsimile: (888) 498-8946<br><br><br><br>*Counsel for Plaintiffs and the Putative Class* |
| KAUFMAN P.A.<br>Avi R. Kaufman<br>Florida Bar No. 084382<br>400 N.W. 26th Street<br>Miami, Florida 33127<br>Tel: (305) 469-5881<br>Email: kaufman@kaufmanpa.com<br><br>*Counsel for Plaintiffs and the Putative Class* | |

2

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CETIFY that on April 11, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Manuel S. Hiraldo*
Florida Bar No. 030380
*Counsel for Plaintiff*