**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **DANIEL BERMAN,**<br><br>          Plaintiff,<br><br>     vs.<br><br>**FREEDOM FINANCIAL NETWORK, LLC, ET AL.,**<br><br>          Defendants. | CASE No. 18-cv-01060-YGR<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO LIMIT SUPPLEMENTAL EXPERT REPORT; DENYING CLASS CERTIFICATION WITHOUT PREJUDICE; AND SETTING CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. No. 90, 97, 138, 139, 153, 154, 156, 157, 164, 170 |

In the instant action, plaintiff Daniel Berman, on behalf of himself and a putative class, alleges violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. section 227 *et seq.* by means of autodialed text messages and prerecorded voice calls as part of a telemarketing campaign by Lead Science, LLC (also known as "Drips") and Fluent, Inc. ("Fluent") promoting the services of Freedom Financial Network, LLC and Freedom Debt Relief, LLC (collectively "Freedom"). Berman alleges a total of four claims: one for violation of section 227(b)(1) for "robocalling," *i.e.* placing non-emergency calls or text messages to a cell phone number using and automatic dialing system and/or an artificial or pre-recorded voice without his prior express written consent; a second for violation of section 227(c) for unsolicited telemarketing calls and texts to a residential telephone number listed on the National Do Not Call Registry ("NDNCR"); and two additional claims for willful violations of sections 227(b)(1) and 227(c).

Pending before the Court are: defendants' (1) motion for summary judgment and (2) motion to limit the admissibility of portions of a supplemental expert report by Benjamin H. Beecher; and (3) plaintiff's motion for class certification. Having carefully considered the papers

submitted[1], the admissible evidence[2], and the pleadings in this action, and for the reasons set forth below, the Court rules as follows:

(1) The motion for summary judgment (Dkt. No. 156) is **DENIED**;

(2) The motion to limit admissibility of the supplemental Beecher Report (Dkt. No. 153) is **GRANTED IN PART AND DENIED IN PART** as stated herein; and

(3) With respect to the motion for class certification (Dkt. No. 139), the motion is **DENIED WITHOUT PREJUDICE** to plaintiff renewing the motion to address the matters discussed herein.

## I.    LEGAL PRINCIPLES APPLICABLE TO THE MOTIONS

### A.    Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

---

[1] After the hearing on these motions and plaintiff's motion for class certification, plaintiffs withdrew all their pending motions to seal (Dkt. No. 185) and defendants, per their statement at Dkt No. 184, withdrew their requests to seal any documents other than the following: (1) Access Agreement to Data Transmission, effective as of July 22, 2016, entered into by and between Lead Science, LLC and Fluent, Inc. (Dkt. No. 97-8, pages 9 to 15); and (2) TCPA Indemnification Agreement, dated as of May 15, 2017, entered into by and between Fluent, Inc. and Freedom Financial Network, LLC (Dkt. No. 170-5, pages 8 to 9).  The motion to seal is **GRANTED** as to these two documents only which encompass business agreements between defendants herein and not relevant to any matter presently before the Court.  All other requests to seal at Docket Nos. 90, 97, 138, 154, 157, 164, 170 are **WITHDRAWN** by the parties.

**Within five business days of this Order**, all other documents previously filed provisionally under seal shall be re-filed on the public docket with appropriate references to the ECF docket number of the sealed submittal in connection with the substantive motion.  The Court notes that sealing is granted in connection with the pending motions only and any future request for sealing in connection with other motions or with trial will require an appropriate showing at that time.

[2] The Court addresses the evidentiary objections raised in connection with summary judgment and with class certification in Section II, *infra*.

Rule 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A moving party defendant bears the burden of specifying the basis for the motion and the elements of the causes of action upon which the plaintiff will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the plaintiff to establish the existence of a material fact that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In the summary judgment context, a court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If the plaintiff "produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by" defendants. *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1277 (9th Cir. 2017). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge." *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014) (alteration in original) (quotation omitted). Thus "where evidence is genuinely disputed on a particular issue— such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation mark omitted); *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002) (same).

**B.    Substantive Law Applicable to the Claims Herein**

To prevail on a claim under the TCPA, a plaintiff must establish that a defendant: (i) "made" text message calls (ii) using an automatic telephone dialing system ("ATDS").[3] 47 U.S.C. § 227(b)(1). The Ninth Circuit has determined that proof of "[e]xpress consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the

---

[3] The term ATDS is defined as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator[, and] to dial such numbers." 47 U.S.C. § 227(a)(1).

burden." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017). Under

applicable regulations:

> The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.
> (i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:
> > (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and
> > (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.
> (ii) The term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

47 C.F.R. § 64.1200(f)(8). The regulations require that the written agreement include "a clear and

conspicuous disclosure informing the person signing" that they are "authoriz[ing] . . .

telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded

voice." 47 C.F.R. § 64.1200(f)(8)(i)(A); *see also In re Rules and Regulations Implementing the*

*Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012).[4]

## II.     EVIDENTIARY ISSUES

### A.     Defendants' Motion to Strike Portions of Beecher Report

As a preliminary matter, the Court considers the admissibility of certain opinion evidence

---

[4] The FCC Report on which the regulations are based states:
a consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." *Finally, should any question about the consent arise, the seller will bear the burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained.*
*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 (2012) (emphasis supplied).

4

1    offered by plaintiff in the form of an expert report by Benjamin H. Beecher.  Defendants move to

2    strike portions of portions of paragraphs 10(a), 20, 22, 24, 26, 27, 29, and 31 of the expert report

3    of Beecher pursuant to Federal Rules of Evidence 104, 401, 402, 403, 702 and 704.  Defendants

4    contend the opinions offered by Beecher are not reliable or relevant and should not be considered

5    in connection with the pending motions.  More specifically, defendants contend: (1) Beecher

6    offers opinions on matters as to which he has not demonstrated that he has expertise; (2) his

7    opinions are speculative to the extent they are based upon defendants' undisclosed intent; (3) he

8    offers improper legal conclusions and legal analysis.

9           Under Rule 702, expert opinion evidence must be both reliable and relevant.  *Daubert v.*

10   *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-91 (1993); *Primiano v. Cook*, 598 F.3d

11   558, 567 (9th Cir. 2010).  The district court functions as a gatekeeper, determining the relevance

12   and reliability of expert testimony and deciding whether it will be admitted.  *Ellis v. Costco*

13   *Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho Tire Co. v. Carmichael,* 526

14   U.S. 137, 145, 147–49 (1999)).  The admissibility of an expert opinion requires a three-step

15   analysis:

16          The admissibility of expert testimony, Rule 702, requires that the trial court
             make several preliminary determinations, Rule 104(a).  The trial court must
17          decide whether the witness called is properly qualified to give the testimony
             sought.  A witness may be qualified as an expert on the basis of either
18          knowledge, skill, experience, training, or education or a combination thereof,
             Rule 702.  The trial court must further determine that the testimony of the
19          expert witness, in the form of an opinion or otherwise, will assist the trier of
             fact, i.e., be helpful, to understand the evidence or to determine a fact in issue,
20          Rule 702(a).  Finally the trial court must determine that as actually applied in
             the matter at hand, Rule 702(d), to facts, data, or opinions sufficiently
21          established to exist, Rule 702(b), including facts, data, or opinions reasonably
             relied upon under Rule 703, sufficient assurances of trustworthiness are present
22          that the expert witness' explanative theory produced a correct result to warrant
             jury acceptance, *i.e.*, a product of reliable principles and methods, Rule 702(c).
23

24   Michael H. Graham, 5 HANDBOOK OF FED. EVID. § 702:1 (7th ed.) (footnotes omitted).  The

25   objective "is to make certain that an expert, whether basing testimony upon professional studies or

26   personal experience, employs in the courtroom the same level of intellectual rigor that

27   characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

28          An expert is generally not permitted to opine on an ultimate issue of fact except in limited

circumstances, since such opinions may "invade the province of" the jury. *See Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1060 (9th Cir. 2008) ("evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible"). Nor may an expert opine on questions which are matters of law for the court. *See id.* at 1058 (deciding questions of law is the exclusive province of the trial judge); *McHugh v. United Service Auto Assoc.*, 164 F.3d 451, 454 (9th Cir. 1999) (expert testimony cannot be used to provide the legal meaning or interpretation of insurance policy terms); *Aguilar v. Int'l Longshoremen's Union Local No. 10,* 966 F.2d 443, 447 (9th Cir. 1992) (expert opinion that reliance was reasonable and foreseeable were inappropriate subjects for expert testimony). However, as a practical matter, experts may express opinions based upon hypotheticals and information which would otherwise be inadmissible hearsay on its own.

Defendants contend that Beecher does not have expertise in the areas in which he offers opinions, specifically questions of whether certain website designs may confuse or manipulate users. While conceding that Beecher has expertise in web design, defendants contend that his lack of training and expertise in psychology or consumer behavior preclude his opinions from consideration. They further argue that expressing opinions in terms describing Fluent's web design as deceptive, confusing, or misleading constitutes legal analysis and conclusions that Beecher is not permitted to offer.

Beecher is a web development practitioner and Chief Technology Officer of a web development and design consultancy firm. His daily work includes the design of websites that solicit a user's consent to receive marketing communications. (Fougner Expert Motion Decl., Dkt. No. 163-1, Exh. ["Beecher Depo."] at 28:17-29:12.) He has formal training in business process-focused software engineering, the design of user interface and registration pages, and user-experience design to ensure that users understand how their personal information will be used and disclosed when interacting with a web page. (Beecher Depo. at 20-26, 35; Fougner Decl. in Support of Class Certification ["Fougner CC Decl."], Dkt. No. 144, Exh. G ["Supp. Beecher Report"] ¶¶ 3-5.) Beecher therefore has a foundation for his opinions regarding the deceptiveness of the Fluent web interface "user flow." While Beecher may not opine on the ultimate issues in

the case, such as whether a user's registration constituted express consent to be contacted for purposes of the TCPA, Beecher may offer opinions on the issue of whether the design of the Fluent website would be likely to mislead or confuse a *typical* user. Plaintiff is, however, cautioned that Beecher may not testify as to whether a particular user or group of users was confused or misled absent a factual basis for so stating (*e.g.*, survey data).

For purposes of the motions pending, the Court has construed the following statements to pertain to a typical user based upon Beecher's stated expertise as to standards for webpage design; and the motion to strike these statements is **DENIED** on those grounds:

- portion of paragraph 20 (both the "Fluent makes the user unsure. . . " portion and the ". . . imply that agreeing to the emails is required to continue" portion);
- paragraph 22 fn. 2;
- paragraph 23;
- portion of paragraph 24 ("the screen immediately . . ." and "The screen appears to have been designed . . .");
- paragraph 26; and
- paragraph 29

To the extent that those statements suggest that Beecher is offering an opinion as to a particular user or users, such opinions will not be permitted at trial or in further proceedings.

The motion to strike is **GRANTED** as to the portion of Beecher's report opining on the *intentions* of defendants or legal conclusions, both of which are outside his expertise and not properly within the province of expert testimony. Thus, the objections to the following are **SUSTAINED** and these portions of the supplemental report are **STRICKEN**:

- portion of paragraph 10 stating "unfair and not clear and conspicuous;"
- portion of paragraph 20 stating "with every intention of coercing and manipulating its visitors,"
- portion of paragraph 24 stating "this confusion is intentional;"
- portion of paragraph 27 stating "unfair;"
- portions of paragraph 31 stating "This scheme used by Fluent to obtain purported consent from consumers was unfair" and "not clear and conspicuous."

## B. Plaintiff's Objections

### 1. Newly-Produced User Flow

Plaintiff objects to Exhibit 1 to the Bhadania Declaration in support of defendants' opposition to class certification, Dkt. No. 152-3 (hereinafter, "March 2019 Bhadania Decl.").

Berman argues that defendants failed to produce the entire multi-page "flow" for the purported registration and TCPA consent as to Berman's phone number and therefore cannot rely on it in connection with these motions.

In this litigation, Bhadania previously submitted a declaration dated April 30, 2018 (Dkt. No. 16-1) which described the "flow" by which the plaintiff's phone number was registered on a Fluent website. Bhadania stated that the Fluent website "assigns a unique visitor ID to that user in real time in the Database and then contemporaneously stores several pieces of information about the user including where the user came from before accessing the site, their IP address and their browser user agent . . . .[and] then displays a series of webpages based on the information gathered and information supplied by the user." (*Id*. at ¶ 4.) Bhadania averred that, based upon his research of the user experience and information stored in the database concerning registration of Berman's phone number, the user registered through http://signup.electronics-sweepstakes.com, a website owned and operated by American Prize Center LLC." (*Id.* at ¶ 6.) Bhadania stated that, "[U]pon landing on the site," the user "agreed to the Terms and Conditions of the Site by clicking the 'Enter to Win!' button on the registration page" and "[a]bove the 'Enter to Win!' button the following sentence is produced: 'I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy.'" (*Id*. at ¶¶ 9, 10.) The declaration included a single image that Bhadania described as a "regenerated HTML representation of the page showing the agreement to the Terms and Conditions of the user." (*Id*. ¶ 10.)

Defendants now offer a declaration from Bhadania explaining that his original declaration did not regenerate the entire set of webpages that the user who registered Berman's phone number would have seen. Bhadania states that he has now "replicated and pieced together" all the webpages the registrant would have seen for "the vast majority of the flow related to the Berman lead," the only difference being that the "actual flow" would have included approximately fifty survey questions but the attached exhibit includes only two. (Dkt. No. 152-3 at ¶¶ 4-7.)

In response to motions to compel responses to plaintiff's discovery seeking defendants' evidence that plaintiff and other putative class members expressly consented to be contacted, defendants were warned repeatedly that their failure to produce documents in support of their

express consent defense would mean that they would not be able to rely on those documents in later proceedings. (*See* Dkt. No. 137 [February 6, 2019 Order of Magistrate Judge Corley] at 2:1-3; Dkt. No. 162 [March 13, 2019 Order of Magistrate Judge Corley] at 1:21-22; *see also* hearing transcripts at Dkt. No. 121 at 30:25- 31:3; Dkt. No. 130 at 37:24; and Dkt. No. 132 at 22:13-20.) Based upon defendants' failure to produce this more fulsome "user flow" for the registration of plaintiff's phone number, the Court **SUSTAINS** plaintiff's objection and will not consider it in connection with the pending class certification and summary judgment motions.

### 2. *Sean Cullen Declaration*

Plaintiff objects to the submission of the declaration of Sean Cullen, Executive Vice President, Product & Technology, dated March 1, 2019, discussing lead generation and server logs, as well as Fluent's use of Cloudflare. Plaintiff objects that Cullen was not disclosed as a witness in Fluent's initial disclosures or at all until February 6, 2019, two days before the deadline for filing the class certification motion.[5]

The Court overrules the objection for purposes of the pending motions, given that the scope of Cullen's testimony is limited and not dispositive of any issue herein. This ruling is without prejudice to plaintiff seeking to exclude Cullen's testimony in later proceedings or at trial on these same grounds.

### 3. *Objections to Declarations of Legal Conclusions*

Plaintiff objects that defendants' declarants (Barsky, Cullen and Bhadania) offer legal conclusions in their declarations. Plaintiff is correct that portions of those declarations, particularly portions concerning the manner in which defendants sought TCPA consent from users, are phrased in ways that suggest the declarant is offering a legal conclusion. To the extent those declarations include portions that veer into legal conclusion, the Court has not considered them in connection with the pending motions.

### 4. *Further Objections to Evidence Not Produced in Discovery*

Plaintiff seeks to exclude from evidence the 100-number spreadsheet produced by

---

[5] Discovery closed April 5, 2019.

defendants, arguing that they have waived the right to rely on lead lists in opposition to the pending motions or at trial because the spreadsheet includes far less data than was ordered to be produced by Magistrate Judge Corley. (*See* Supp. Beecher Report, Dkt. No. 144-7, ¶ 37.) Defendants contend they have complied with the order and no such exclusion of evidence is warranted.

The Court notes that, at class certification, the decision to be made is not the merits of a claim or defense, but the propriety of deciding the merits on a class-wide basis. The declarations and documents defendants offer to establish that putative class members registered on the website and provided consent are relevant to the merits of the defenses, not whether there are class-wide or individualized issues. As the Court does not find that defendants have offered any lead list evidence dispositive of the issues raised in the class certification motion, the Court declines to rule at this juncture on its admissibility at trial or in later proceedings. Similarly, the Court denies without prejudice plaintiffs' request for an evidentiary sanction or other instruction at trial on account of Fluent's failure to preserve its server logs since server log evidence is not germane to a ruling on class certification.

### C.     Defendants' Objections

Defendants object to a number of statements in plaintiff's papers on grounds of hearsay and relevance. To the extent that plaintiff is relying on documents submitted by defendants in response to discovery herein, those objections are **OVERRULED** for purposes of these motions. Plaintiffs will need to lay a proper foundation for their admissibility at trial.

However, defendants' objections are **SUSTAINED** to plaintiff's citation of website articles, press releases, population statistics found on the internet, as well as allegations made in other litigation. None of these constitute admissible evidence. They will not be considered in connection with these motions. Plaintiff is cautioned that attempting to offer such evidence at trial—without foundation, relevance, or a basis for admissibility which does not run afoul of the hearsay rule—will not be tolerated.

//

//

1  **III.    SUMMARY OF FACTS**[6]

2      **A.    Fluent's Business**

3      Fluent is a digital marketing company that delivers advertisements and generates sales

4  leads for its customers.  (Declaration of Daniel Barsky, Dkt. No. 152-1 ("Barsky Decl."), ¶ 5.)

5  Fluent obtains consumers' contact information through a number of websites it operates on which

6  users are offered the opportunity to obtain rewards, enter into sweepstakes, receive job listings,

7  receive product samples, or receive other content. (*Id.* ¶ 5.)  On the websites, in order to be eligible

8  for these opportunities, users are required to register by providing certain personal information.

9  (*Id.* at ¶¶ 14, 17.)  The websites collect first-party data from users that Fluent then uses to assist

10  advertisers in targeting and engaging their potential customers by serving ads and generating leads

11  for advertisers. (*Id.* ¶ 5.)  Typically, Fluent is paid by its customers on a per lead basis or a

12  performance basis, such as when the user takes a particular action such as making a purchase,

13  installing an app, or applying for a job. (*Id.*)

14      Fluent uses third-party publishers and affiliates to drive web traffic to Fluent's websites.

15  The third-party publishers and affiliates used by Fluent are paid based on whether a user: (1) visits

16  (*i.e.*, "lands on") a Fluent website; (2) submits an email address; or (3) completes survey questions

17  and clicks the "Continue" button on the Fluent website. (*Id.* ¶ 6.)

18      Fluent's websites include provisions by which, Fluent contends, consumers agree to be

19  contacted by text message or autodialed phone call and to waive any registration on a State or

20  federal Do Not Call list.  (*Id.* ¶ 14.)  According to Fluent's general counsel and chief compliance

21  officer, Fluent's websites typically required users to register by clicking a "Continue" (or "Enter to

22  Win" or "Submit") button with a tick box stating: "I AGREE to receive daily emails from

23  InstantPlayGiveaway, LivingLargeSweeps, GivingTreeSweeps, and Major Sweeps." (*Id.* ¶ 15.)

24  Above that box typically appeared the statement: "I understand and agree to email marketing, the

25

26

27

28        [6] Unless otherwise indicated, the facts stated are undisputed.

<u>Terms & Conditions</u>, which includes mandatory arbitration and <u>Privacy Policy</u>." (*Id.*)[7]  Barsky

states that, throughout the marketing campaign on behalf of defendant Freedom Financial, the tick

box appeared on the website as follows:



(*Id.* ¶15.)[8]  If users clicked the "I Agree" tick box and clicked "Continue," they were displayed a

series of 15 or more survey questions (such as: "do you own a home?" or "are you interested in

saving money on your cellphone plan?"), dynamically populated depending on the user's answers

and Fluent's current clients. (*Id.* ¶ 17.)  After answering all the survey questions, users were

typically sent to another webpage with another tick box and "Continue" button. (*Id.* ¶ 18.)  Fluent

contends that this page was the "TCPA consent" page on which users clicked to agree to receive

texts and telemarketing calls.  (*Id.*)  An example of such a web page follows:

---

[7] The Court notes that, prior to reassignment to the undersigned, Magistrate Judge Donna M. Ryu denied the motion of defendants Freedom Financial Network, LLC and Freedom Debt Relief, LLC to compel arbitration of this matter, finding that defendants had failed to establish the existence of an agreement to arbitrate and "factual disputes exist as to whether Berman or an individual acting on his behalf consented to the terms and conditions at issue."  (*See* Dkt. No. 29 at 7.)

[8] The Court notes that defendants' brief in opposition to class certification displays a screenshot of the "Terms and Conditions"/arbitration agreement webpage which is very different in appearance from the one in the Barsky declaration.  (*Compare* Dkt. No. 152 at ECF pg. 9 to Dkt. No. 152-1 at ECF pg. 5 [different colors, different size font, different contrast levels]).  Given that the brief refers to the sworn declaration of Daniel Barsky for these facts, the Court relies on the screenshots in the Barsky declaration for this statement of facts.

(*Id.* ¶ 21.)  Just above the "I Confirm" box appeared the following text:

> By checking the box below I consent to receive phone sales calls and text messages – Msg. and data rates may apply – from Verde Energy, CAC and our <u>Marketing Partners</u> on the landline or mobile number I provided even if I am on a federal or State do not call registry.  I understand these calls may be generated using an autodialer and may contain pre-recorded messages and that consenting is not required to participate in the offer promoted.
> For SMS message campaigns: Text STOP to stop and HELP for help.  Msg & data rates may apply.  Periodic messages: max. 30/month.

(*Id*.)  Those users who ticked the box and clicked "Continue" on this page had their contact information passed on to one or more of Fluent's advertiser clients, typically one to five clients though Fluent has hundreds of "Marketing Partners."  (*Id.* ¶ 19.)[9]

**B.      The Freedom Campaign At Issue**

Freedom provides debt relief services to consumers.  (Declaration of Dharma Naik, Dkt. No. 152-5 ["Naik Decl."], ¶ 4.)  Freedom engaged Fluent in a marketing campaign to locate potential customers (leads) who had a certain amount of debt.  (Barsky Decl. at ¶¶ 7, 32.)  A certain number of the leads were then contacted, either by phone call or text.  The platform used to

---

[9] If the user clicked the "Marketing Partners" text, a hyperlink, it would take them to a list of well over 100 different entities, including Freedom Financial.  (Barsky Decl. ¶¶ 19, 22.)

send the text messages and telephone calls was provided by defendant Lead Science, LLC, also known as "Drips." (Barsky Decl. ¶ 8.)  The official marketing campaign ran from about September 2017 to April 2018.

### C.     Facts Concerning Berman

In 2003, Daniel Berman placed his phone number on the National Do Not Call Registry ("NDNCR"). (Declaration of Jon Fougner ISO MTD, Dkt. No. 97, Exh. 1 at 2.2).  Starting on December 24, 2017, Fluent and Drips sent 18 text messages and made 3 pre-recorded calls to Berman's phone number, including at least one call and one text on behalf of Freedom. (*Id.* ¶ 19; Fougner CC Decl., Exh. C.)  Berman received a text on February 14, 2018, which read:

> Dêbt-Help [sic]: Need to pay $10,000 + in cc bills? We're here to help! We can save you a ton of money.  Call for more info.  Respond no to quit.

(*Id.*)  Shortly thereafter Berman received a prerecorded robocall bearing the same caller ID, also promoting Freedom. (*Id.*)

Defendants have attempted to identify how plaintiff's phone number came to be registered through one of Fluent's subsidiary websites.  Fluent's records reflect that registration of plaintiff's phone number occurred on December 24, 2017, at 5:39:16 p.m. using a Samsung Galaxy J3 mobile phone. (Astrup Decl., Exh. 2 [Info re Dunk Loka registration].)  Fluent's records also reflect the IP address used to complete the registration was associated with the wireless internet connection at Wescafe, a coffee shop in Alameda, California.  (Astrup Decl., Exh. 3.)[10]  The email address used for the registration (Buffola@gmail.com) was an email account that had been active since 2007.  (*Id.*, Exh. 4.)  The registration occurred on the electronics-sweepstakes.com website, owned and operated by American Prize Center, LLC, a wholly owned Fluent subsidiary. (Bhadania Arbitration Decl., Dkt. No. 16-1, ¶ 6.)

Berman avers that he has never visited a Fluent website prior to this lawsuit.  (Berman Decl. ISO MTD, Dkt. No. 17-1, at ¶¶ 6-8; Ramsey Decl. 157-2, Exh 1. [Berman Depo.] at 34:8-

---

[10] Fluent initially indicated that the geolocation for the IP address used to complete the registration was in Hayward, California.  (Bhadania Decl. ISO Arbitration, Dkt. No. 16-1, ¶ 7.)

17.)  He further avers that he never provided defendants with his phone number or consented to receive telemarketing calls, nor did anyone known to or authorized by him do so.  (Berman Decl. ISO MTD ¶¶ 6-8.)  He further avers that he never used the email address Buffola@gmail.com nor authorized anyone to do so on his behalf.  (*Id.* ¶ 12.)

### D.  Facts Concerning the Class Generally

Defendants made millions of robocalls promoting Freedom's debt-relief services, including 989,295 calls to 149,838 putative class members.  (Fougner CC Decl., Exh. F ["Supp. Verkhovskaya Report"], Dkt. No. 144-6, ¶ 21.)  Defendants received complaints from a large percentage of these putative class members stating that the recipients' prior do-not-call requests had been ignored.  (*See* Fougner CC Decl. at ¶ 10, Exh. A at rows 5314, 19071, 107436, 124519.)  Defendants' call logs show that, for the two-month time period from February 14, 2018, to April 17, 2018, Fluent (through Drips) received 226,434 opt-out messages sent from 195,228 unique telephone numbers, accounting for about 28% of the phone numbers Fluent had contacted for that period of the Freedom Financial campaign.  (Supp. Verkhovskaya Report at ¶ 18.)[11]  Fluent's internal emails indicate that, on the Freedom campaign, Fluent had concerns that a high percentage of the automated calls made were ended before the called party ever spoke with a representative. (Fougner CC Decl., Exh. B at FLUENT_4041).

Fluent's Chief Compliance Officer, Barsky, testified that some clients prefer their true names not be used in telemarketing so that it will not be "easy" for recipients to "find them and sue them."  (Fougner MSJ Decl., Dkt. No. 166-1, Exh. A [Barsky Depo.] at 72:15-21.)  In order to "enhance the deliverability" of texts, defendants added unnecessary accents or spelling errors to the contents of the text messages. (*Id.* at 66:2-67:4.)

---

[11]  Verkhovskaya's report indicates that multiple text messages or calls were sent to the same unique phone number and, by inference, that multiple opt-out responses were sent from the same unique phone number.  Defendants' witnesses provided equivocal testimony regarding opt-outs: one deponent indicating an opt-out response removed the called party from all future Fluent campaigns, and another indicating the called party was removed only from the campaign in which the request was made. (*See* Astrup Reply Decl. 174-1, Exh. A [Laniado Depo.] at 22:8-21; 91:21-92:4; Fougner MSJ Decl., Dkt. No. 166-1, Exh. A, Barsky Depo. at 104:5-17 (policy of honoring do-not-call request for current campaign only).)

Hundreds of thousands of the entries on the lead lists produced by Fluent and Drips are either missing name and address data altogether or filled with obviously erroneous entries. (*See* Initial Verkhovskaya Report, Dkt. No. 120-2, ¶ 56 & Exhs. D, E.)  For example, the lead lists produced included:

- 10,323 entries with invalid first names, such as "{FIRSTNAME}" "Euralissa*grrrrrrhvbb;ggfftrrgcb; vv:gggcfxddftrff" or "blah blah;"
- 363,792 entries with invalid last names, such as "[BLANK]" and "Biiiiiiiiiiiiiiiilllllllllllllkyyyyyyyyyyggggyggggyy"); and
- 60,982 entries with invalid street addresses, such as missing street numbers, street names or filled with nonsense characters.

(*Id.* ¶¶ 54-56, Exh D, E.)[12]  According to plaintiff's expert, the percentage of errors was over 50 percent of the names and/or addresses examined and far exceeded industry standards.  (*Id.* ¶ 54.) Plaintiff's expert also identified well over 100,000 duplicate records in which entries created months apart repeated the exact same registration information—including typos, misspellings, nonsense characters and the like—yet indicated they were from a different IP address or different city.  (*Id.* ¶ 61-62.)  While Fluent's chief compliance officer, Barsky testified that the entries with braces, such as "{FIRSTNAME}" were due to a "technical glitch" (Barsky Depo. at 70-71), defendants offered no explanation as to why other erroneous entries, such as "blah blah" or "Ddmdkdmdkdkdmdk," were considered valid registrations of the associated telephone numbers.

**E.      Procedural History of this Action**

On February 15, 2019, the Court denied defendants' motion to dismiss pursuant to Rule 12(b)(1) based upon lack of standing, finding:

> there are factual issues in dispute that cannot be determined based upon the record here. . . . Defendants contend that there is no injury fairly traceable to their conduct since plaintiff's phone number was registered on Fluent's website,

---

[12] These exhibits were offered in support of a prior motion and cross-referenced by plaintiff in connection with the class certification motion.  Defendants did not object to plaintiff's cross-referencing in this manner.  However, the Court **admonishes** both parties that all evidence they seek to have considered in connection with a motion must be filed **with the briefs** (even if it has been submitted previously), and the briefs/statements of fact must clearly reference the evidence submitted in connection with a motion or response **by name <u>and</u> docket number**. Cross-referencing of evidence unnecessarily creates a burden on the Court and decreases efficiency.

United States District Court
Northern District of California

providing consent to be called. However, defendants concede that plaintiff has stated under oath that he never gave the purported consent upon which defendants rely. Further, plaintiff alleges in the SAC, and offers evidence to suggest, that defendants knew the consents obtained from plaintiff and others were not valid. Although Fluent contends that some third party, yet to be identified, must have entered false registrations on its website, and that it properly relied on those registrations to establish consent to be called, that position has not been supported by undisputed evidence. Thus, the Court defers the standing issue for determination on a more fulsome record.

(Dkt. No. 147.)

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants seek summary judgment on five grounds. As a threshold matter, defendants contend that the TCPA is not a strict liability statute and that their reasonable, good faith belief that they had valid consent when they contacted Berman should preclude liability. In the alternative, they seek summary judgment on four additional grounds: (1) Berman lacks standing because his TCPA injury was caused by a third party not before the Court; (2) he lacks standing to challenge defendants' alleged failure to comply with the E-SIGN Act because he never visited Fluent's website; (3) his claim for injunctive relief is moot; and (4) he cannot establish his entitlement to treble damages for willful violations of the TCPA. The Court addresses each.

### A. Good Faith Defense

"The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012); 47 U.S.C. § 227(b)(1). Defendants urge that there should be no liability where they reasonably relied in good faith on the consent provided to call a phone number and immediately stopped calling upon discovering that the person who provided consent could not be reached at that phone number.

The Ninth Circuit has held, consistent with the statute, that a defendant may avoid liability by establishing that it had prior express consent. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) ("the TCPA exempts those calls 'made with the prior express consent of the called party,'" citing 47 U.S.C. § 227(b)(1)(A); *see Van Patten*, 847 F.3d at 1044 ("[e]xpress consent is not an element of a plaintiff's prima facie case but is an affirmative defense

for which the defendant bears the burden of proof.").  In *Satterfield*, the Ninth Circuit rejected the notion that a defendant could rely on consent given to a third party who supplied defendant with plaintiff's contact information but was not an "affiliate" covered by the terms and conditions under which plaintiff gave that consent.  *Satterfield*, 569 F.3d at 955 (reversing summary judgment because plaintiff's consent to receive promotional material by Nextones could not be read as consenting to contact by defendant).  However, the Ninth Circuit has not addressed whether defendants assert a "good faith" belief that the called party consented in order to avoid TCPA liability.

The circuit courts that have considered whether intent is relevant to TCPA liability have all concluded that good faith error or mistake does not preclude a defendant's liability but is material only to the question of treble damages for willful conduct.  *See Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) ("The TCPA is essentially a strict liability statute . . . . [and] does not require any intent for liability except when awarding treble damages."); *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 641 (7th Cir. 2012) (affirming TCPA liability for calls to phone numbers where the recipient of the call had not given consent, even if the phone number was called due to a typographical error in its entry or because the number previously belonged to a different person); *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 882 n. 3 (8th Cir. 2005) ("The [TCPA] . . . makes no exception for senders who mistakenly believe that recipients' permission or invitation existed.  The issue of intent, or more accurately, the issues of knowledge and willfulness, however, clearly are material to the question of treble damages.").  Similarly, this Court and a number of district courts within the Ninth Circuit have concluded that the defendant's good faith provides no defense to a TCPA claim.  *See, e.g., Perez v. Rash Curtis & Assoc.*, No. 16-cv-3396-YGR, 2019 WL 1491694 at *5 (N.D. Cal. April 4, 2019); *Pieterson v. Wells Fargo Bank, N.A.*, No. 17-CV-02306-EDL, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018) ("In the Ninth Circuit, district courts have generally rejected the "intended recipient" definition, which counsels against a conclusion that Defendant can rely on a good faith exemption to the consent requirement."); *Olney v. Job.com, Inc.*, No. 1:12-CV-01724-LJO, 2014 WL 1747674, at *9 (E.D. Cal. May 1, 2014) ("the [c]ourt declines to

find TCPA provides a good faith exception," distinguishing *Chyba*); *Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. EDCV152057FMOSPX, 2017 WL 5720548, at *3 (C.D. Cal. Nov. 6, 2017) ("there is no good faith defense against a TCPA claim. . . [a]ccordingly, the court will also strike the 'bona fide error' language from defendants' seventeenth affirmative defense); *cf. Springer v. Fair Isaac Corp.*, No. 14-CV-02238-TLN-AC, 2015 WL 7188234, at *3 (E.D. Cal. Nov. 16, 2015) (allowing defendant to raise prior express consent as an affirmative defense, but cautioning that ["[t]he [c]ourt's ruling is not to be read as permitting a general good faith defense under the TCPA . . . [and defendant still] must produce sufficient facts showing [p]laintiff's prior express consent to be contacted."); *see also Jiminez v. Credit One Bank, N.A.*, No. 17 CV 2844-LTS-JLC, 2019 WL 1409425, at *7 (S.D.N.Y. Mar. 28, 2019) (same).

The two contrary district court decisions within the Ninth Circuit on which defendants rely are factually distinguishable and fail to persuade. *See Labau v. Cellco P'ship*, No. 2:13-CV-00844-MCE, 2014 WL 2987767 (E.D. Cal. July 1, 2014) and *Chyba v. First Fin. Asset Mgmt., Inc.*, No. 12-CV-1721-BEN WVG, 2014 WL 1744136 (S.D. Cal. Apr. 30, 2014)[13], *aff'd*, 671 F. App'x 989 (9th Cir. 2016).[14] In *Labau*, the district court denied plaintiff leave to amend to modify her class definition after having previously granted Verizon's motion to deny class certification on the grounds that she was not a customer and therefore could not represent a class of Verizon customers. *Labau*, 2014 WL 2987767 at 4. In that action Verizon contended that it had prior express consent for debt collection calls it made to plaintiff because her brother-in-law had

---

[13] Defendants cite *Chyba v. First Fin. Asset Mgmt.*, 2013 U.S. Dist. LEXIS 165276, at *28 (S.D. Cal. Nov. 20, 2013) which was amended and superseded by the above April 30, 2014 decision.

[14] The out-of-circuit decisions cited by defendants are similarly unpersuasive. *See Danehy v. Time Warner Cable Enterprises*, No. 5:14-CV-133-FL, 2015 WL 5534094 (E.D.N.C. Aug. 6, 2015), *report and recommendation adopted sub nom. Danehy v. Time Warner Cable Enter. LLC*, No. 5:14-CV-133-FL, 2015 WL 5534285 (E.D.N.C. Sept. 18, 2015); *Roark v. Credit One Bank, N.A.*, No. CV 16-173 (PAM/ECW), 2018 WL 5921652, (D. Minn. Nov. 13, 2018), *appeal dismissed*, No. 18-3643, 2019 WL 2447062 (8th Cir. Jan. 4, 2019). They are inapposite because they both concern consent to call phone numbers where the defendant confirmed consent of the original holder of a phone number which subsequently was reassigned. No such evidence has been offered here.

provided plaintiff's phone number when he purchased five iPhones from Verizon, and therefore had called the number "in reasonable, good-faith pursuit of what they were owed" when the brother-in-law stopped paying. *Id.* at *2. The court denied plaintiff leave to amend stating that "no amendment can save Plaintiff's complaint against Verizon from summary judgment, and therefore any amendment would necessarily be futile." *Id.* at *3. The district court's latter statement was, however, dicta given that the only issue before the court was amendment of the class action allegations. Moreover, the court's decision on the pleading motion apparently turned on the fact of the familial relationship between plaintiff and the third-party who provided the phone number and consent, rather than on defendant's good faith belief alone. Here, no evidence has been offered to suggest that Berman authorized or was related to anyone who provided his contact information to defendants.

In *Chyba*, the court dismissed plaintiff's TCPA claims arising from collection calls by defendant where it had relied on information from the creditor, Enterprise, indicating that plaintiff had provided her phone number to Enterprise, and thereby consented to be contacted. *Chyba v. First Fin. Asset Mgmt., Inc.*, No. 12-CV-1721-BEN WVG, 2014 WL 1744136, at *10 (S.D. Cal. Apr. 30, 2014), *aff'd*, 671 F. App'x 989 (9th Cir. 2016) ("plaintiff provided her cellular telephone number to Enterprise, listing it as her home telephone number . . . [w]hen a consumer provides a cellular telephone number to a creditor as part of the underlying transaction, the provision of the number constitutes express consent for the creditor to contact the consumer about the debt"). No similar evidence of Berman's consent has been offered here.[15]

---

[15] The district court stated in *Chyba* that "[e]ven if Plaintiff is correct in stating that she never gave Defendant or Enterprise consent to call, and there was no actual prior consent from Plaintiff, Defendant [debt collector] is not liable for acting in good faith upon the information provided to it." *Id.* at 12. The district court reached this conclusion because the Fair Debt Collection Practices Act does not impose a duty to confirm information from the creditor, and thus the court found such a duty should not be imposed under the TCPA either. *Id.* at 11. The Ninth Circuit's unpublished decision affirmed *Chyba* on the grounds that she "failed to raise a genuine dispute of material fact as to whether she provided prior express consent to Enterprise," not because of defendant's good faith. *Chyba v. First Fin. Asset Mgmt., Inc.*, 671 F. App'x 989 (9th Cir. 2016). The court finds *Chyba* to be unpersuasive both because the record does not disclose actual consent by Berman and because the debt collection reasoning in *Chyba* is inapplicable here.

This Court agrees with the weight of authority holding that TCPA claims do not require any proof of intent to establish liability, only to substantiate an award of treble damages based on a willful or knowing violation. Thus, defendants' contention that it maintained a good faith belief that it had consent to call Berman is not dispositive on the TCPA claims.

**B.      Standing for TCPA Claims**

Defendants argue, in the alternative, that the Court should revisit its prior ruling denying dismissal for lack of standing because the undisputed facts now establish that some other individual registered plaintiff's phone number and is responsible for plaintiff being contacted by defendants. Defendants argue that some unknown party provided plaintiff's phone number to them and therefore that unknown party caused plaintiff's injury, not defendants. Thus, defendants contend that plaintiff does not have an injury "fairly traceable" to them and lacks Article III standing for his claims against them.

"To satisfy Article III standing, '[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Van Patten*, 847 F.3d at 1042 (quoting *Spokeo, Inc. v. Robins*, __U.S. __, 136 S.Ct. 1540, 1547 (2016)). In enacting the TCPA, "Congress identified unsolicited contact as a concrete harm, and gave consumers a means to redress this harm, thus "elevating . . . [such contacts] 'to the status of legally cognizable injuries.'" *Id*. at 1043 (quoting *Spokeo*, 136 S.Ct. at 1549).

Defendants here confuse causation of plaintiff's injury with a defense to liability. To establish the TCPA injury, all Berman need show is that he was contacted by defendants by means of an ATDS. There is no dispute that defendants did so, and therefore that defendants caused the injury. Express consent is an affirmative defense on which defendants bear the burden, in other words, an excuse for an otherwise liable defendant. Should defendants establish Berman's express consent, they can avoid liability to him but will not eliminate this Court's jurisdiction to decide his claim.

**C.      Standing for E-SIGN Act Challenge**

Defendants' argument that summary judgment should be granted because Berman has no

standing to challenge their lack of compliance with the E-SIGN Act, 15 U.S.C. § 7001 *et seq.* likewise fails. Berman does not allege a claim based upon violation of the E-SIGN Act, but simply alleges background facts regarding Fluent's process of obtaining leads, including that the electronic "signatures" used by Fluent do not conform to the standards in the E-SIGN Act. Since plaintiff alleges no claim (and therefore no direct injury) under the E-SIGN Act, lack of standing to bring such a claim is irrelevant here.

**D.     Mootness As To Injunctive Relief**

Defendants argue that plaintiff's request for injunctive relief should be dismissed because his phone number will never be contacted again by Fluent on behalf of Freedom. Defendants submit evidence that the Freedom-Fluent marketing campaign ended in April 2018, and plaintiff's phone number was never contacted thereafter once Fluent and Drips learned that plaintiff had initiated this litigation. (Declaration of Daniel J. Barsky, Dkt. No. 152-1, ¶ 39; Declaration of Tom Martindale, Dkt. No. 152-6, ¶¶ 5-7.) Therefore, defendants argue, plaintiff's claim for injunctive relief is either moot or fails for lack of Article III standing.

Defendants' arguments do not lack merit. As the United States Supreme Court has stated, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v Aladdin's Castle, Inc.,* 455 U.S. 283, 289 (1982)). "[I]f it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *City of Mesquite*, 455 U.S. at 289 n. 10. To compel dismissal of a request for injunctive relief the defendant bears a "heavy burden" to show that it is "absolutely clear" the conduct reasonably cannot be expected to recur. *Id*.

Here, the record establishes that defendants utilized a lead stating that "Dunk Loka" was the person associated with Berman's phone number, and Berman testified he never registered his phone number on any Fluent website. Evidence also suggests that the lead generating system contained many false or questionable leads. (Initial Verkhovskaya Report ¶¶ 54-56, Exh. D, E; Supp. Beecher Report ¶¶ 45-53.) As such, the record does not show that it is "absolutely clear" Berman would never be contacted by defendants without his express consent in the future, at this

22

or some other phone number. *See also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1044 (9th Cir. 2012) (approving injunctive relief for class despite defendants' assurance that it would stop calling named plaintiff since defendants offered no assurance regarding other members of the provisional class); *cf. Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667-68, 670-71 (2016) (offer of judgment unaccepted by TCPA class representative did not moot case when plaintiff sought injunction and defendant failed to offer adequate injunction). To allow those who are potentially in violation of the TCPA to avoid injunctive relief simply by representing they will never call the named plaintiff's number again would effectively eviscerate the goals of the Act.

### E.    Treble Damages

Defendants argue that plaintiff cannot establish willful or knowing conduct for purposes of treble damages under the TCPA. The statute provides that, "[i]f the court finds that the defendant willfully or knowingly violated this subsection . . . the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times" the statutory damages for a violation. 47 U.S.C. § 227(b)(3). Defendants contend that plaintiff is not entitled to treble damages because Fluent's contacts to Berman's phone number were all made based upon the "Dunk Loka" registration on the Fluent website and once defendants learned that Berman was not "Dunk Loka" no further contacts were made to that phone number.

Berman counters this argument on several grounds that the Court finds preclude summary judgment on this issue. First, Berman submits evidence that defendants directed marketing calls and texts to Berman's cell phone, despite his registration on the NDNCR at the time, without taking any steps to verify his identity. (Fougner Decl. in Opposition to Summary Judgment ["Fougner MSJ Decl."], Dkt. No. 166, Exh. A. [Depo. of Barsky] at 23:24-25:19 [no confirmation of identity of cellphone number's owner or two-factor verification required, only that it is a valid cellphone number and the carrier]; *see also* Fougner CC Decl., Exh D [Depo. of Thomas Martindale] at 48:19-49:22 [no confirmation of identity or consent required upon first text message or call].) Indeed, defendants now acknowledge that "Dunk Loka" is an "evidently fictional name." (*See* Astrup Decl. in Opposition to Class Certification, Dkt. No. 152-4, Exh. 6 [Supp. Kalat Report] ¶ 42.)

Plaintiff's expert Beecher, in examining Fluent's "user flow" has opined that the website was designed in a way that would be misleading and confusing to users, obscuring their understanding that they were consenting to receive texts and robocalls. (*See* admissible portions of Supp. Beecher Report ¶¶ 12-31.) In addition, plaintiff's experts offered analysis that "bots" or automated, computer-generated responses rather than actual, unique human users were entering registration information obtained by Fluent's system and forwarding the information for marketing calls. Multiple entries consisted of variable string names and characters such as dollar signs, underscores, brackets and programming keywords. (Supp. Beecher Report, ¶¶ 45-55; Initial Verkhovskaya Report, Dkt. No. 120-2, ¶¶ 54-62.) The data provided by defendants also showed unusually high "conversion rates," *i.e.* registrations per visit, for Fluent websites compared to the industry standard, as well as high percentages of people making do-not-call requests to Fluent to state that the number contacted did not belong to the user name contacted. (Supp. Beecher Report at ¶¶ 45-55.) Barsky testified that Fluent has systems in place to filter out names on leads that look like they are not real names, but that those systems were not "rigorous." (Barsky Depo. 69: 15:20.) No explanation was offered for the entries filled with nonsense responses like "blah blah" or "Biiiiiiiiiiiiiiiillllllllllllkyyyyyyyyyyyggggyggggy."

In sum, the Court agrees that Berman has offered sufficient evidence to create a triable issue on whether defendants were willfully blind to the evidence of erroneous leads and the complaints they received, as well as intentionally misleading and confusing users with their web registration design such that informed, express consent could not be obtained. Thus, summary judgment on the question of willfulness is **DENIED**.

### F. Conclusion

Based upon the foregoing, defendants' motion for summary judgment is **DENIED** on all issues raised therein.

//

//

//

//

24

## V. PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff moves for certification of the following class under Rule 23(b)(2) and (b)(3):

> All persons in the United States to whom: (a) Drips made one or more calls and/or sent one or more text messages reflected in the documents produced in this litigation under Bates stamp LEADSCIENCE_677.csv and/or LEADSCIENCE_677.txt between February 14, 2018, and April 17, 2018, inclusive.

With respect to the Rule 23 requirements for certification, defendants do not contest that the proposed class is sufficiently numerous.[16] However, defendants assert the prerequisites of Rule 23(a) are not met. Defendants contend that, because plaintiff claims he did not register on a Fluent website, he is not typical or adequate: he did not suffer the same injury as putative class members, and and is subject to different affirmative defenses. For the same reasons, defendants contend that plaintiff cannot establish Rule 23(b)(3)'s requirements that common issues predominate and the class mechanism would be superior.

The typicality requirement for class certification is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is "permissive" and requires only that the representative's claims are "reasonably co-extensive with those of absent class members." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998)). "Defenses unique to a class representative counsel against class certification only where they 'threaten to become the focus of the litigation.'" *Id.* (citing *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992). However, where there is a "danger that absent class members will suffer if their representative is preoccupied" with their own unique defenses, class certification should not be granted. *Hanon*, 976 F.2d at 508 (internal citation omitted). The adequacy requirement considers whether a class representative will "fairly and adequately protect the interests of the class," meaning that the representative does not have any conflicts of interest with other class members and will prosecute the action vigorously on behalf of the class. Fed. R. Civ. P. 23(a)(4); *see Ellis*, 657 F.3d at 985.

---

[16] Based on defendants' data, the class as defined includes some 149,838 members. (Supp. Verkhovskaya Report ¶ 21.)

United States District Court
Northern District of California

To the extent that defendants contend that Berman is not typical or adequate because he is subject to an Article III standing defense that others in the class would not be, their argument fails for the reasons set forth in Section IV.B, above.

Second, defendants argue that Berman is not typical or adequate because others in the class are subject to different defenses due to registration on the Fluent website, namely mandatory arbitration and express consent to be contacted for TCPA purposes. For the same reasons, defendants contend that common issues would not predominate and that the class mechanism would not be superior.

Plaintiff responds to defendants' arguments by citing the general rule, as followed by numerous courts in the Ninth Circuit, that the existence of affirmative defenses applicable to some members of the putative class but not the representative, such as execution of a mandatory arbitration agreement, does not render the class representative atypical or inadequate. *See Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 284–85, 314 (N.D. Cal. 2016) (LHK) (fact that some class members other than representatives had arbitration or release agreements with some defendants did not defeat typicality, adequacy, or predominance); *Luviano v. Multi Cable, Inc.*, No. CV1505592BROFFM, 2017 WL 3017195, at *16 (C.D. Cal. Jan. 3, 2017) (merits of arbitration defense were not before the court and did not defeat certification); *Baker v. Castle & Cooke Homes Hawaii, Inc.*, No. CIV. 11-00616 SOM-RL, 2014 WL 1669131, at *10 (D. Haw. Jan. 31, 2014), *adopted as modified,* No. CIV. 11-00616 SOM, 2014 WL 1669158 (D. Haw. Apr. 28, 2014) ("the possibility that C & C may attempt to enforce an arbitration agreement entered into by a portion of the members of the class does not stand in the way of class certification"); *Baker v. Castle & Cooke Homes Hawaii, Inc.*, No. CIV. 11-00616 SOM-RL, 2014 WL 1669131; *Mora v. Harley-Davidson Credit Corp.*, No. 1:08-CV-01453-AWI, 2012 WL 1189769, *12 ("possibility that Harley may seek to enforce agreements to arbitrate with some of the putative Class members does not defeat class certification"); and *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011) ("The fact that some members of a putative class may have signed arbitration agreements or released claims against a defendant does not bar class certification.").

The decisions cited by plaintiff, along with others, suggest that class certification is not precluded by the existence of an arbitration defense as to some putative class members. *See Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 902–03 (N.D. Cal. 2015) ("whether an absent class member is bound by the arbitration clause is a question that can be dealt with on a class-wide basis, as it does not appear that there will need to be an individualized inquiry as to whether the arbitration clause is generally enforceable"); *Barnes v. AT & T Pension Benefit Plan– Nonbargained Program*, 270 F.R.D. 488, 494 (N.D. Cal.2010), *modified by* 273 F.R.D. 562 (N.D. Cal.2011); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 117 (C.D. Cal.2007) (fact that "some potential class members are unlikely to recover because of a unique defense . . . [is] not relevant to typicality"); *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 439 (C.D. Cal.2014) ("there is no authority for the proposition that an affirmative defense, which may affect some members of the class, creates a conflict that otherwise defeats the adequacy of a proposed class representative"); *Winkler v. DTE, Inc.*, 205 F.R.D. 235, 241–42 (D.Ariz. 2001) (holding that typicality was satisfied despite the defendant's argument that "it has valid defenses and counterclaims it may assert against some class members but not the named representatives").

However, other district courts in the Ninth Circuit have decided class certification is properly denied based upon the existence of an arbitration agreement and class action waiver applicable to unnamed class members but not the proposed class representative. *Tan v. Grubhub, Inc.*, No. 15-CV-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016) (named class representative who opted out of arbitration agreement "would be unable to credibly make several procedural unconscionability arguments on behalf of unnamed class members") (citing unpublished decision of Ninth Circuit in *Avilez v. Pinkerton Government Services, Inc.*, 596 Fed.Appx. 579 (9th Cir. 2015)); *Tschudy v. J.C. Penney Corp., Inc.*, No. 11CV1011 JM (KSC), 2015 WL 8484530, at *3 (S.D. Cal. Dec. 9, 2015) ("[p]utative class members with arbitration provisions likely cannot be included in the class because they are uniquely subject to having their disputes resolved in a non-judicial forum," citing unpublished decision in *Avilez*); *Quinlan Macy's Corp. Servs., Inc.*, No. CV1200737DDPJCX, 2013 WL 11091572, at *3 (C.D. Cal. Aug. 22, 2013) (named plaintiff not typical of class where he was a union member and was not enrolled in the

arbitration program applicable to most of the putative class).  Moreover, the Ninth Circuit has suggested, without expressly holding, that a class encompassing members with valid arbitration agreements and others not subject to the arbitration agreements cannot be certified.  *See O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018) (reversing class certification based improper finding of unenforceability of arbitration agreement, and remanding for further class certification proceedings where "[t]he class as certified includes drivers who entered into agreements to arbitrate their claims and to waive their right to participate in a class action with regard to those claims").

The Court agrees that Berman's claims arise from the same course of conduct and are based on the same legal theories as the claims of the proposed class.  All members of the class must establish that they were contacted using an ATDS or artificial/prerecorded voice at a number assigned to a cellular telephone service. 47 U.S.C. § 227(b)(1)(A)(iii); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017) ("Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof.").  Likewise, Berman's injury—being contacted by defendants through means of an ATDS without his consent—is the same as the proposed class.  Plaintiff's expert has identified the calls that were placed to class members. (Supp. Verkhovskaya Report ¶ 21.)  There appears to be no dispute that all calls were made to cell phones for telemarketing purposes by the same autodialer and the same vendor (Drips) on behalf of Fluent as part of the Freedom Financial campaign.

Instead, defendants contend that, with the apparent exception of Berman himself (based on his sworn statements), all individuals whose phone numbers appear in the databases identified in the class definition registered through a Fluent website.  Defendants argue that these individuals are subject to different defenses than Berman because they consented to be contacted, and entered into a mandatory arbitration agreement, by clicking on items on the registration websites.  As defendants note, Berman "has not identified a single other person like himself who was contacted as part of the Freedom campaign but did not visit a Fluent Website."  (CC Oppo. at 20:11-13.) Defendants' proof of its affirmative defense of express consent would be the same for Berman as

for any other putative class member in some respects. However, Berman (and perhaps other members of the class not yet identified) would counter that affirmative defense with evidence that they never visited a Fluent website.

While Berman's claims are "reasonably coextensive" with class members' claims, litigation of the express consent and mandatory arbitration defenses applicable to absent class members threatens to overwhelm other issues in the litigation. *See Hanon*, 976 F.2d at 508. The Ninth Circuit has suggested that a single class should not be certified when it is comprised of members who both are and are not subject to contractual agreements requiring mandatory arbitration and waiver of class action rights. *O'Connor*, 904 F.3d at 1094; *see also Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007) (affirming denial of class certification where defendant's intent to seek arbitration of the class, and necessary state-by-state review of contract conscionability jurisprudence, undermined predominance of common issues). The same reasoning applies to an affirmative defense like express consent here.

Plaintiff has not proposed modifying the class definition or sub-classing to separate those who provided defendants' their phone numbers by visiting Fluent's websites from those whose phone numbers were entered into Fluent's databases based upon suspicious leads. While Berman offers evidence that hundreds of thousands of leads in defendants' databases contained nonsense information, were associated with do-not-call requests, or were suggestive of computer-generated "bot" activity, he does not establish why class members called pursuant to these leads should be treated the same as those who appear to have provided their contact information on the websites. (*See* Initial Verkhovskaya Report, Dkt. No. 120-2, ¶¶ 56-62, Exhs. D, E; Supp. Beecher Report, ¶¶ 45-55.)

Plaintiff likewise has not suggested he can amend to add another class representative or offered other means of addressing the differences between Berman and those class members arguably subject to the arbitration agreement and express consent arguments raised by defendants.[17] Likewise, plaintiff has not offered authority establishing that he, as a party to whom

---

[17] Moreover, neither party addresses the number of putative class members who may have opted out of the arbitration provision. (*See* Barsky CC Decl., Dkt. No. 152-1, at ¶ 16, 6:6-9.)

the arbitration agreement or web-registration consent would *not* apply, can litigate their application to all members of the putative class. *Cf. Tan*, 2016 WL 4721439, at \*3 ("having opted out of two separate agreements . . . [plaintiff] would be unable to credibly make several procedural unconscionability arguments on behalf of unnamed class members, such as that [they] felt compelled to accept the arbitration provisions as a condition of employment or that the opt-out provision was not sufficiently noticeable").

Thus, the Court concludes that Berman has not sufficiently demonstrated his typicality and adequacy with respect to the class as currently defined. Berman offers a plan for litigating the express consent issue on a class-wide basis, arguing lack of contract formation based upon the uniform failure of Fluent's websites to comply with the "signature" and "clear and conspicuous disclosure" requirements under the TCPA.[18] However, he has not offered authority showing that he can properly litigate those issues if he himself never visited the Fluent websites. Similarly, it is not clear that Berman would be able to litigate adequately the enforceability of the arbitration agreement on the Fluent website if he is not subject to it.

Therefore, the motion for class certification is **DENIED WITHOUT PREJUDICE** to a renewed motion addressing these concerns.

## VI. CONCLUSION

(1) The motion for summary judgment (Dkt. No. 156) is **DENIED**.

(2) The motion to limit admissibility of the supplemental Beecher Report (Dkt. No. 153) is **GRANTED IN PART AND DENIED IN PART** as stated herein.

(3) With respect to the motion for class certification (Dkt. No. 139), the motion is **DENIED WITHOUT PREJUDICE** to a renewed motion addressing the issues stated herein.

---

[18] The Court does not agree with defendants' contention that class members' consent or proof of defendants' willfulness necessarily break down into individual inquiries. Evidence of error-ridden lead lists, filled with nonsense or seemingly bot-generated information is relevant to the express consent defense, as well as to the willfulness of the alleged TCPA violations. If defendants' lead databases were filled with "fake leads," such evidence does not precipitate an individualized inquiry on consent, but rather undermines a claim that the registration websites were designed to ensure defendants' obtained express consent.

1      (4) The Court **SETS** this matter for a further case management conference on **September**

2  **30, 2019**, at 2:00 p.m.

3          This terminates Docket Nos.  90, 97, 138, 139, 153, 154, 156, 157, 164, and 170.

4          **IT IS SO ORDERED.**

5  Dated: September 4, 2019

6                                                          **YVONNE GONZALEZ ROGERS**
                                                   **UNITED STATES DISTRICT COURT JUDGE**