Jon B. Fougner (State Bar No. 314097)
Email: Jon@FougnerLaw.com
600 California Street, 11th Fl.
San Francisco, CA 94108
Telephone: (415) 577-5829
Facsimile: (206) 338-0783

[Additional counsel appear on signature page]

*Attorneys for Plaintiffs Daniel Berman,
Stephanie Hernandez, and Erica Russell and the
Proposed Classes*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| DANIEL BERMAN, STEPHANIE HERNANDEZ, AND ERICA RUSSELL, <br><br> Plaintiffs, <br><br> v. <br><br> FREEDOM FINANCIAL NETWORK, LLC, FREEDOM DEBT RELIEF, LLC, FLUENT, INC., and LEAD SCIENCE, LLC, <br><br> Defendants. | Case No. 4:18-cv-01060-YGR <br><br> **THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **Class Action** <br><br> **JURY TRIAL DEMAND** |

Plaintiffs Daniel Berman, Stephanie Hernandez, and Erica Russell, by their undersigned

counsel, for this class action complaint against Defendants Freedom Financial Network, LLC

("Freedom Financial"), Freedom Debt Relief, LLC ("Freedom Debt," and, together with

Freedom Financial, "Freedom"), Fluent, Inc. ("Fluent"), Lead Science, LLC ("Lead Science" or

"Drips") and their present, former, and future direct and indirect parent companies, subsidiaries,

affiliates, agents, and/or related entities, allege as follows:

## I.   INTRODUCTION

1.   <u>Nature of Action</u>: This is a class action on behalf of the hundreds of thousands of people inundated by Defendants' telemarketing without their consent, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

2.   The telemarketing was conducted by Fluent and Drips for Freedom using an automated telephone dialing system ("ATDS") and prerecorded voices, tactics among those that inspired the passage of the TCPA and that most infuriate consumers to this day.

3.   Cellular telephones and numbers listed on the National Do Not Call Registry ("NDNCR") were not spared. To the contrary, the telemarketing includes waves of SMSs, which specifically target cell phones.

4.   Defendants' excuse for the robocalls is that someone, somewhere purportedly typed the targeted phone numbers into a website. But Fluent *pays* its affiliates to cause such phone numbers to be inputted, regardless of whether the person who owns the phone number actually consents to being called. The leads contain at least on the order of 100,000 *facially deficient* leads (let alone the invalid but facially inconspicuous ones), such as one bearing the name "Dunk Loka" and Plaintiff Berman's phone number and stating that he lives at "Grand Street" (no house number), and many containing *no first or last name at all*.

5.   Defendants agree, describing the "Dunk Loka" lead as "patently fictitious." With its "state-of-the-art" platform and "well-trained and well-qualified" professionals, Fluent nevertheless made the determination that such leads should be robocalled repeatedly with telemarketing for Freedom.

6.   Even consumers like Plaintiff Russell who visited Fluent websites and provided phone numbers did not validly consent to calls. Although the TCPA allows consumers to provide prior express written consent to receive robocalls through an electronic signature, the electronic signature must be valid under applicable law. 47 C.F.R. § 64.1200(f)(8). Documents showing prior express written consent must be sufficient to show the consumer received "clear and conspicuous disclosure" of the consequences of providing the requested consent, including clear and conspicuous disclosure of the specific seller on whose behalf robocalls would be sent.

7. Defendants failed to make the required disclosures on the websites. Indeed, Defendants buried their disclosures in small font, used multi-screen bait and switch tactics, overloaded the visitors with pages of distractions, bundled consent pages, and failed to clearly and conspicuously identify the seller on whose behalf the telemarketing calls would be placed.

8. Recipients of this spam told Freedom things like: "I'm trying to figure out why this number keeps calling me." FREEDOM_001525. "I am on the Do Not Call Registry list and I get phone calls from people like you, so how do you think I feel?" FREEDOM_001527. "I would appreciate it if you quit calling this number. I don't know who Lisa is. I've had this number like 3 years and you've been calling this number for over a year now." FREEDOM_001534. "I've called before." FREEDOM_001561. "There is no Lisa here. I've had that number for 5 years." *Id.* "I'm 13 years old. Can I please stop getting calls from you?" FREEDOM_001569. And then, in response to Freedom's reply of "Yeah, I think if you hit the 'stop' on your phone I think it says it would stop," "I fucking did that like 3 times." *Id.*

9. Facing a revolt from its salespeople, Freedom told them that the people Fluent was robocalling had expressed a desire for the sort of debt-assistance services sold by Freedom.

10. They had not.

11. Freedom knew these leads were bogus but kept up the campaign, *even after the filing of this and at least two other lawsuits*, because it was profitable. For example, on March 5, 2018, Freedom employee Cody Longfield wrote to a colleague: "every time I take a lead that is from Fluent marketing it is typically somebody just very angry telling this number to stop calling them. There is no way for me to put them on a DNC list or anything like that, but not sure if this marketing campaign is working so well. Just a heads up. I have already taken two of them today and many in the past that never even want any[ ]information from us. They just want us to leave them alone." FREEDOM_000992.

12. That email was promptly forwarded to Freedom's Senior Director of Sales Operations, who wrote: "No need for action," and then, "when one agent gets one complaint, they believe the sky is falling! I tell them this [] campaign has a good ROI." FREEDOM_000991.

13. Fluent's senior executive on the campaign shared this view. "It's a texting program, ppl gonna complain about texts," [sic] he wrote. He concluded the email: "If we reduce the number of calls, we'll prob lose revenue" [sic]. FLUENT_000421.

## II.    PARTIES

14. Plaintiff Daniel Berman is an individual residing in California, in this District and Division.

15. Plaintiff Stephanie Hernandez is an individual residing in California, in this District.

16. Plaintiff Erica Russell is an individual residing in Oklahoma.

17. Freedom Financial is a limited liability company organized under the laws of Delaware with its principal place of business at 1875 South Grant Street, Suite 400, San Mateo, California 94402.

18. Freedom Debt is a limited liability company organized under the laws of Delaware with its principal place of business at 1875 South Grant Street, Suite 400, San Mateo, California 94402.

19. Freedom Debt is a wholly owned subsidiary of Freedom Financial. Each is the other's alter ego.

20. Fluent is a corporation organized under the laws of Delaware with its principal place of business at 2650 North Military Trail, Suite 300, Boca Raton, Florida 33431.

21. Fluent's alter egos include "Cogint, Inc.," "Fluent, LLC," "American Prize Center, LLC," and "RewardZone USA."

22. Drips is a limited liability company organized under the laws of Ohio with its principal place of business at 24 North High Street, 2nd Floor, Akron, Ohio 44308.

23. Lead Science does business as "Drips." That's a reference to "drip" marketing—the tactic of repeatedly contacting a target: drip, by drip, by drip.

## III.    JURISDICTION AND VENUE

24. <u>Jurisdiction</u>: This Court has federal-question subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

25. <u>Personal Jurisdiction</u>: This Court has personal jurisdiction over Defendants because:

    a.    Freedom is headquartered in California; and

    b.    Defendants' concerted conduct at issue was organized in part from Freedom's California's headquarters; and

    c.    Defendants' conduct at issue intentionally targeted Plaintiffs, two of whom are California residents, while they were in California, at their cellular telephone numbers, which bear California area codes, on the ostensible basis of the submission of lead generation forms from purported California IP addresses and bearing purported California addresses.

26. <u>Venue</u>: Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to Plaintiffs' claims—namely, the coordination of the illegal telemarketing—occurred in this District.

27. <u>Intradistrict Assignment</u>: Assignment to this Division is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events or omissions that give rise to Plaintiffs' claims— namely, Plaintiff Berman's receipt of the illegal telemarketing—occurred in the County of Alameda.

## IV.    FACTS

### A.    The Enactment of the TCPA and its Regulations

28. <u>Robocalls Outlawed</u>: Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1). Calls made by an ATDS or with a prerecorded or artificial voice are referred to as "robocalls" by the Federal Communications Commission ("FCC"). Encouraging individuals to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

29. <u>Rationale</u>: In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an

invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

30. The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

31. Text Messages: For TCPA purposes and as described herein, a text message is a "call." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951-52 (9th Cir. 2009).

32. Prior Express Written Consent: The FCC has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnotes omitted) (internal quotation marks omitted) ("2012 FCC Order").

33. As with most torts, the consent required is that of the alleged victim, not a random third party. *See, e.g.*, *McMillion v. Rash Curtis & Assocs.*, No. 16-cv-03396-YGR, 2018 U.S. Dist. LEXIS 17784, at *13 (N.D. Cal. Feb. 2, 2018) (addressing definition of "called party").

34. <u>E-SIGN Act-Compliant Signatures Acceptable</u>: The consumer's signature on the document memorializing prior express written consent need not be in ink. An electronic signature suffices, if it complies with the E-SIGN Act, 15 U.S.C. §§ 7001, *et seq.* 2012 FCC Order at ¶¶ 33-34.

35. <u>Do Not Call Registry</u>: Additionally, the TCPA outlaws unsolicited telemarketing (robocalls or otherwise) to phone numbers on the National Do Not Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). Encouraging individuals to hold telemarketers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(c)(5).

**B.    The Worsening Problem of Robocalls and Spam Texts**

36. Unfortunately, the problems Congress identified when it enacted the TCPA have grown only worse in recent years.

37. "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the TCPA of 1991*, 30 FCC Rcd. 7961, 7991 ¶ 1 (2015).

38. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

39. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer

Protection, *In re Rules and Regulations Implementing the TCPA of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

40. In 2017, the FTC received 4,501,967 complaints about robocalls, up from 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc.

41. The New York Times recently reported extensively on the surging number of robocall complaints filed by consumers with the FTC and widespread consumer outrage about illegal telemarketing. Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018),  https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

42. For every seven million robocalls, there is one federal lawsuit. *Compare* Herb Weisbaum, *It's Not Just You—Americans Received 30 Billion Robocalls Last Year*, NBC News (Jan. 17, 2018), https://www.nbcnews.com/business/consumer/it-s-not-just-you-americans-received-30-billion-robocalls-n838406 (30.5 billion robocalls); *with* WebRecon, *WebRecon Stats for Dec 2017 & Year in Review* (last visited Oct. 29, 2018), https://webrecon.com/webrecon-stats-for-dec-2017-year-in-review/ (4,392 TCPA complaints).

**C.   Defendant Freedom**

43. Freedom offers debt negotiation and counseling services. It is the largest debt-settlement services provider in the country.

44. Through telemarketing contacts with prospective customers, Freedom learns who their creditors are, the amounts owed to each and the nature of the debts.

45. One of Freedom's marketing strategies involves an ATDS.

46. One of Freedom's marketing strategies involves the use of an ATDS to place telemarketing phone calls.

47. One of Freedom's marketing strategies involves the use of an ATDS to send telemarketing text messages.

48. One of Freedom's marketing strategies involves making telemarketing calls using artificial or prerecorded voices.

49. Freedom uses ATDS equipment that has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator— and to dial such numbers automatically (even if the system must be turned on or triggered by a person).

50. Freedom advertised a job opening in Tempe, Arizona for an "Inside Sales Representative" to "[r]eceive and work fresh leads daily through outbound and inbound calls," requiring "1+ year of call center experience in a high volume, outbound environment."

51. Recipients of these outbound calls, including Plaintiffs, did not consent to receive them.

52. Freedom's telemarketing calls were not necessitated by an emergency.

53. Freedom hired Fluent to place some of its telemarketing calls.

**D.   Defendant Fluent**

54. Fluent runs sweepstakes websites in order to collect contact information of consumers whom it subsequently barrages with SMS and other advertising.

55. Fluent uses materially false and deceptive statements on these websites in order to induce consumers to provide telephone numbers to which Fluent later directs telemarketing.

56. Bots and/or other fraudulent techniques are used to enter some of Fluent's leads.

57. Hundreds of thousands of the entries on the lists of numbers called for the Freedom campaign produced by Fluent and Drips are either missing name and address data altogether or filled with obviously erroneous entries. For example, the lead lists produced included:

   a.      at least 10,323 entries with invalid first names, such as "[FIRSTNAME]," "Euralissa*grrrrrrhvbb;ggfftrrgcb; vv:gggcfxddftrff," or "blah blah;"

b.      at least 363,792 entries with invalid last names, such as "[BLANK]" and "Biiiiiiiiiiiiiiiiillllllllllllllkyyyyyyyyyyyggggyggggyy");

c.      at least 60,982 entries with invalid street addresses, such as those without any street numbers or street names; and

d.      entries purportedly created months apart repeating the exact same registration information—including street address, typos, misspellings, nonsense characters and the like—but stating a different IP address or different city.

58. One of Fluent's marketing strategies involves an ATDS.

59. One of Fluent's marketing strategies involves the use of an ATDS to place telemarketing phone calls.

60. One of Fluent's marketing strategies involves the use of an ATDS to send telemarketing text messages.

61. One of Fluent's marketing strategies involves making telemarketing calls using artificial or prerecorded voices.

62. Fluent uses ATDS equipment that has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person).

63. Recipients of Fluent's telemarketing, including Plaintiffs, did not consent to receive it.

64. Fluent's telemarketing calls were not necessitated by an emergency.

65. Fluent hired Lead Science to place telemarketing calls on Fluent's and Freedom's behalf.

66. The leads obtained by Fluent lack wet-ink signatures.

67. The leads obtained by Fluent lack signatures compliant with the E-SIGN Act inasmuch as the E-SIGN Act requires that, before consenting, the consumer must receive a clear and conspicuous statement that:

a.      informs him of his right to obtain a paper copy of the documents at issue, 15 U.S.C. § 7001(c)(B)(i);

b.      informs him that he may withdraw his consent, *id.* § 7001(c)(B)(i);

c.      states whether the consent applies only to the particular transaction that gave rise to the record at issue or (on the other hand) applies to identified categories of records that may be provided or made available during the course of the parties' relationship, *id.* § 7001(c)(B)(ii);

d.      tells him how to withdraw consent or update his contact information, *id.* § 7001(c)(B)(iii);

e.      tells him how to get a paper copy of the electronic record and if there will be a charge, *id.* § 7001(c)(B)(iv); and

f.      states the hardware and software requirements for access to and retention of the electronic records.

68. The leads obtained by Fluent lack signatures compliant with the E-SIGN Act inasmuch as the E-SIGN Act requires:

a.      The consumer must consent electronically or confirm his electronic consent in a manner that reasonably demonstrates that he can access information in the electronic form that will be used to provide the consent. *Id.* § 7001(c)(C)(ii).

b.      If, after a consumer's electronic consent is obtained, a change is made to the hardware or software requirements for access and retention of the electronic records that creates a material risk that the consumer will not be able to access the electronic record, he must be provided with a statement of the revised hardware and software requirements for access to and retention of the electronic record and must be given the right to withdraw consent without the imposition of fees. *Id.* § 7001(c)(D)(i).

**E.    Defendant Lead Science**

69. Lead Science runs SMS telemarketing campaigns for lead generators, such as Fluent.

70. Lead Science's promotional video encourages lead generators to avoid run-ins with "TELEMARKETING LAWS," the "TCPA" and the "TELEPHONE CONSUMER PROTECTION ACT" by using Lead Science and its "A.I."-based telemarketing platform.

71. One of Lead Science's marketing strategies involves an ATDS.

72. In particular, Lead Science uses the Ytel dialer.

73. The Ytel dialer has the capacity to store, produce and call random or sequential numbers.

74. It is equipment that has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person).

75. Lead Science's contract with Ytel requires Lead Science to comply with the TCPA.

76. One of Lead Science's marketing strategies involves the use of an ATDS to place telemarketing phone calls.

77. One of Lead Science's marketing strategies involves the use of an ATDS to send telemarketing text messages.

78. One of Lead Science's marketing strategies involves making telemarketing calls using artificial or prerecorded voices.

79. Lead Science's contract with Fluent provides that Lead Science may use ATDSs and prerecorded telemarketing.

80. The contract provides that Fluent must obtain prior express written consent to receive automated telemarketing from those people called by Lead Science on Fluent's behalf, and that the signatures manifesting such consents must comply with the E-SIGN Act.

81. Recipients of Lead Science's outbound calls, including Plaintiffs, did not consent to receive them.

82. Lead Science's telemarketing calls were not necessitated by an emergency.

**F.    Plaintiff Berman**

83. Plaintiff Berman resides in Oakland, California.

84. He is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

85. He is the sole user of a phone number that begins "(510) 326." All calls to him referenced herein were to that number.

86. His phone number is assigned to a cellular telephone service. Calls to it make his cell phone ring.

87. His phone number has been listed on the National Do Not Call Registry since 2003.

88. He never consented to receive phone calls or text messages from Defendants.

89. He never gave his phone number to Defendants.

90. He never did business with Defendants.

**G.   Defendants' Unsolicited, Automated Telemarketing to Plaintiff Berman**

The Spam Texts from (786) 808-4370 by Fluent and Lead Science

91. On December 26, 2017, Plaintiff Berman received a text message from (786) 808-4370.

92. It was sent by or on behalf of Fluent and Lead Science.

93. It said: "Cash Help: Dunk have structured settlement and need cash immediately? Have cash approved in 48 hours or less. Call 7868084370 for info. Text 'NO' to remove" [sic].

94. On December 27, 2017, Plaintiff Berman received another text message from (786) 808-4370.

95. It was sent by or on behalf of Fluent and Lead Science.

96. It said: "Have bills piling up? Waiting to settle your case? Find cash from us! If you don't win your case, you don't pay us back. Give me a quick call for details." [sic].

97. On December 27, 2017, Plaintiff Berman received another text message from (786) 808-4370.

98. It was sent by or on behalf of Fluent and Lead Science.

99. It said: "Do you have annuity & need cash ASAP? You may have access to $500-$100K in your bank account by tomorrow! Give me a quick call soon. Reply no to opt out."

100.     On December 28, 2017, Plaintiff Berman received another text message from (786) 808-4370.

101.     It was sent by or on behalf of Fluent and Lead Science.

102.     It said: "Dunk, we have approved cash for the largest number of consumers across the country. If you want the cash ASAP, don't wait. Can we schedule a call this morning?"

103.     On December 28, 2017, Plaintiff Berman received another text message from (786) 808-4370.

104.     It was sent by or on behalf of Fluent and Lead Science.

105.     It said: "Find the most cash for your annuity or structured settlement with us! Have the cash you need in 24-48 hours! When is the best time for a quick call?"

The Spam Texts from (608) 299-6259 by Fluent and Lead Science

106.     On January 5, 2018, Plaintiff Berman received a text message from (608) 299-6259.

107.     It was sent by or on behalf of Fluent and Lead Science.

108.     It said: "**Debt-Help**: Do you have debt + would love support? Now's your opportunity to trim your debt by up to half. Reach out ASAP for your free quote. Write NO to end" [sic] (emphasis added).

109.     On January 8, 2018, Plaintiff Berman received another text message from (608) 299-6259.

110.     It was sent by or on behalf of Fluent and Lead Science.

111.     It said: "Take the 1st step to financial freedom & a chance to lessen your balance in 1/2. Ring soon if you owe at least 10K in debt for a no cost quote & the aid you would like." [sic].

112.     On January 8, 2018, Plaintiff Berman received another text message from (608) 299-6259.

113.     It was sent by or on behalf of Fluent and Lead Science.

114.     It said: "Now's your chance to lessen your bill by half & pay a portion of what you owe. Reach out this afternoon & get a free quote & receive the assistance you need."

115.    On January 9, 2018, Plaintiff Berman received another text message from (608) 299-6259.

116.    It was sent by or on behalf of Fluent and Lead Science.

117.    It said: "Consumed by collections harassing you for money? Now's your opportunity to reduce your balance in half. Pay a portion of the total. Reach out this afternoon."

118.    On January 10, 2018, Plaintiff Berman received another text message from (608) 299-6259.

119.    It was sent by or on behalf of Fluent and Lead Science.

120.    It said: "Keep collectors from annoying you for bills. Now's your chance to trim your debt in 1/2. Call ASAP to get a no cost quote + the help you deserve!" [sic].

The Spam Texts from (910) 370-4211 by Fluent and Lead Science

121.    On January 17, 2018, Plaintiff Berman received a text message from (910) 370-4211.

122.    It was sent by or on behalf of Fluent and Lead Science.

123.    It said: "SaveMore: You're qualified for a FREE no risk security system + $100 Visa Gift Card Dunk. Call at 9103704211 to claim. Write Stop to stop." [sic].

124.    On January 17, 2018, Plaintiff Berman received another text message from (910) 370-4211.

125.    It was sent by or on behalf of Fluent and Lead Science.

126.    It said: "Interested in a risk FREE home security system and a $100 Visa GC from the best in home security? Call us to learn info! Send no to end" [sic].

127.    On January 18, 2018, Plaintiff Berman received another text message from (910) 370-4211.

128.    It was sent by or on behalf of Fluent and Lead Science.

129.    It said: "Ensure safety for your home & family through a free of risk security system + $100 Visa GC. Call in to learn more details!Reply no to quit." [sic].

130.    On January 18, 2018, Plaintiff Berman received another text message from (910) 370-4211.

131.    It was sent by or on behalf of Fluent and Lead Science.

132.    It said: "Don't miss your chance at a house security system with no risk + $100 Visa GC, Connect with us now! Write stop to end" [sic].

133.    On January 22, 2018, Plaintiff Berman received another text message from (910) 370-4211.

134.    It was sent by or on behalf of Fluent and Lead Science.

135.    It said: "Call for details on our home security system + $100 Visa GC. You can easily begin protecting your family and home FREE of risk today! Write Stop to quit." [sic].

The Spam Texts from (404) 600-0537 by Fluent and Lead Science

136.    On January 31, 2018, Plaintiff Berman received a text message from (404) 600-0537.

137.    It was sent by or on behalf of Fluent and Lead Science.

138.    It said: "Òmni Research: You got selected to have the opportunity to win 5K! Call to claim your entry at 4046000537 in the next 24 hrs. Reply no to quit" [sic].

139.    On January 31, 2018, Plaintiff Berman received another text message from (404) 600-0537.

140.    It was sent by or on behalf of Fluent and Lead Science.

141.    It said: "GREAT NEWS Dunk! You could join the plenty of others who have won $5,000 through us. Call right away to hear how you'll be able to win! Respond 'NO' to stop." [sic].

The Spam Text from (409) 359-9066 by Defendants

142.    On February 14, 2018, Plaintiff Berman received a text message from (409) 359-9066.

143.    It was sent by or on behalf of Defendants.

144.    It said: "**Dêbt-Help**: Need to pay $10,000 + in cc bills? We're here to help! We can save you a ton of money. Call for more info. Respond no to quit" [sic] (emphasis added).

The Prerecorded Robocall from (409) 359-9066 by Defendants

145.    Within an hour of receiving the text message from (409) 359-9066, Plaintiff Berman received a phone call from the same caller ID, (409) 359-9066.

146.    He answered. No human promptly came on the other end of the line. Instead, an artificial or prerecorded voice told Plaintiff Berman to press "1" for more information. He did. A male with an American accent promptly came on the line.

147.    The male claimed to be calling from a company with two names: "Freedom Financial Network" and "Freedom Debt Relief."

148.    The purpose of the call was to advertise the goods or services of Defendants.

149.    The male stated that he was in Phoenix, Arizona.

150.    Freedom operates a call center in Arizona.

151.    The male claimed that Freedom would "negotiate the debt down with the creditors, and it ends up saving a lot of money. So, say you had $10,000 of debt, you get out for $5,000, call it a day and you're good to go. You know, sometimes it's even less than that."

152.    Plaintiff Berman asked who had been texting him about debt relief. The male replied non-specifically: "It must have been, it might have been, through whatever that marketing campaign, because I don't know if we usually send out texts . . . ."

153.    Plaintiff Berman said that, should he wish to learn any more about Defendants' products, *he* preferred to call *them*—rather than vice versa. That is, he politely asked Freedom to stop calling him.

154.    In response, the male stated that his name was "Cody Longfield" and that his phone number was (602) 732-3664.

**H.    Plaintiff Hernandez**

155.    Plaintiff Hernandez is the sole user and payor of a phone number that begins "(831) 320."

156.    Fluent's records, reflect the (831) 320 phone number, Plaintiff Hernandez's name, Plaintiff Hernandez's email address, and Plaintiff Hernandez's address.

157.    Plaintiff Hernandez has used the (831) 320 number for approximately 20 years or more.

158.    At all relevant times, Plaintiff Hernandez's phone number has been assigned to a cellular telephone service.

159.    Plaintiff Hernandez frequently receives unwanted telemarketing calls but answers her phone in case a non-telemarketer is trying to reach her.

160.    Plaintiff Hernandez underwent major surgery and in connection with the surgery was hospitalized for nine days. During that time, her phone constantly rang. She answered the calls, believing that they might be loved ones checking in on her or other legitimate callers. Frequently, however, it was an unwanted robocaller on the other end. Her nurses found the constant calls such a problem that they insisted Plaintiff Hernandez turn off her phone. She did. Her family was forced to try to reach her through the hospital's main phone number instead.

161.    Between March 5 and 7, 2018, Fluent and Drips knowingly and willfully used Ytel's dialing system to place two prerecord-voice calls and four text messages to Plaintiff Hernandez's (831) 320 cellular telephone number. Fluent and Drips placed the calls with Freedom's permission in order to sell Freedom's products.

162.    Fluent and Drips placed the calls using an artificial or prerecorded voice.

163.    Plaintiff Hernandez did not provide prior express written consent to receive calls from Defendants on the (831) 320 cellular telephone number.

**I.    Plaintiff Russell**

164.    Plaintiff Russell was the sole user and payor of a phone number that begins "(918) 914."

165.    During the relevant time period, Plaintiff Russell's (918) 914 phone number was assigned to a cellular telephone service.

166.    Plaintiff Russell visited a Fluent website. She entered the (918) 914 telephone number onto a form on the website.

167.    Plaintiff Russell did not believe, and had no reason to believe, that by providing her number, she would receive, or was agreeing to receive, telemarketing robocalls from or on behalf of Freedom Debt.

168.    The Fluent website Plaintiff Russell visited did not disclose to her that Freedom Debt was the specific seller on whose behalf automated telemarketing would be sent.

169.    The Fluent website Plaintiff Russell visited did not disclose to her Freedom Debt was a specific seller on whose behalf automated telemarketing would be sent.

170.    The Fluent website Plaintiff Russell visited did not disclose to her that any affiliate of Freedom was the specific seller on whose behalf automated telemarketing would be sent.

171.    The Fluent website Plaintiff Russell visited did not disclose to her that any affiliate of Freedom was a specific seller on whose behalf automated telemarketing would be sent.

172.    The webpage by which Fluent obtained Plaintiff Russell's contact information was cluttered, confusing, and misleading.

173.    Following her visit to the Fluent website, Plaintiff Russell was inundated with telemarketing robocalls. Her routine practice was to instruct the caller not to call again, but the calls kept coming. Her phone was so besieged by Fluent's telemarketing, to the point of being unusable, that she went to the significant trouble of changing the number.

174.    Between February 7 and 14, 2018, Fluent and Drips knowingly and willfully used Ytel's dialing system to place three prerecord-voice calls and five text messages to Plaintiff Russell's (918) 914 cellular telephone number. Fluent and Drips placed the calls with Freedom's permission in order to sell Freedom's products.

175.    Plaintiff Russell did not provide prior express written consent to receive telemarketing calls from Fluent and Drips, selling Freedom's products.

**J.    Fraudulent Marketing Promoting Fluent**

176.    One of the thousands of other people who received nonconsensual telemarketing from or on behalf of Fluent is Patrick Bonano.

177. For example, on June 25, 2018, Mr. Bonano received a text message from 978-30.

178. It was sent by or on behalf of Fluent.

179. It said: "Melissa, lenders are awaiting your response, your response is appreciated http://1hom.ltd/l1jF8H30431650 Text STOP to quit."

180. Mr. Bonano texted back: "STOP."

181. On June 25, 2018, Mr. Bonano received another text message from 978-30.

182. It was sent by or on behalf of Fluent.

183. It said: "Rto-Listings: You have opted out and will no longer receive messages from this service. Reply RESUME to subscribe. newsletterteam@rto-listings.com." [sic].

184. Mr. Bonano was puzzled. Why should he have to "opt out" of something he had never opted in to?, he wondered. Why would even a spammer think it legal or ethical to respond to an opt-out instruction with instructions for how to subscribe?, he wondered.

185. He became more puzzled still when the texts to Melissa did not abate. Indeed, he received at least 6 more such spam messages.

186. One of them came on July 3, 2018, when Mr. Bonano received a text message from (669) 205-9439.

187. It was sent by or on behalf of Fluent.

188. It said: "Thank you Melissa, here you go a little something just for you plibus.com" [sic].

189. That URL resolves to a webpage a screenshot of which follows:

1



## Well Done!
### Congrats You Are Today's Lucky User!

SPIN

11   Like · Comment · Share · Delete

12   12,068 others like this

View more comments                                                                    7 of 4,356

13    **Monika Meyer** Holy god! I actually got a $1000 Visa gift card!! My friends are gonna freak!  4 minutes ago · Like    267

15    **Mark Hughes**
Hello everyone, you have give rewardzoneusa.com a try. My name is Mark. I am a software engineer by trade. So I am up on what is an internet
scam and what isn't. Trust me, rewardzoneusa.com IS NOT A SCAM. It's a legit company that will honor any rewards as long as you try out some of
the cool product offering from some of their sponsors. Thank you rewardzoneusa.com for introducing me to cool new products to try. As well as
getting a $1000 reward card for doing so.
13 minutes ago · Like    63

17    **Tristan Wuyts**
Taking the surveys is fun. I was in marketing so I find these surveys very interesting. Then, of course, is the shopping -- and who doesn't like that?
It was fun, and I found a lot of great deals. I highly recommend Reward Zone.
29 minutes ago · Like    37

19    **Troy Grainger**
I have to say I was completely overwhelmed by your notification that I had qualified for this reward,and amazed that your company is truly bonafide
and trustworthy. It warms the spirit and restore one's faith in human nature!! I can't thank you enough, this has come at a time of great need!
Thank you again...
35 minutes ago · Like    22

21    **Olivia Henry**
Hello! Yes, I filled out the offers and received my prize as was promised! I also received many wonderful products from the offers I chose. Thank
you!.
41 minutes ago · Like    9

23    **Zachary Lassen**
This note is to confirm the legitamacy of the Reward Zone USA Program. The guidelines for earning the award of your choosing (mine was a $1000
Visa reward Card), are clearly specified and I'm proof that if you follow the directions you will receive the award. I chose my offers as directed,
saved and printed all the confirmations and submitted the required documentation to the Reward Zone Team then waited for their response. It takes
a while for them to verify everything, but if you've simply done what you were directed to do, Reward Zone will honor their end of the deal. In the
attached picture, I'm holding the two $500 reward cards in front of my wonderful new TV, that I purchased with just part of that $1000. Thanks
Reward Zone USA Team!!
46 minutes ago · Like    5

26   **Yasmin Chandler**
Thank you so much for the visa reward cards. Wow! This is the easiest and fastest money I ever made in my life. The customer support are very
helpful and great help always. This company is really awesome.
1 hour ago · Like    1

28

190.    The webpage is designed to appear to be, and thereby invoke the trust and social proof of, a wildly popular Facebook page. Thus, it cribs Facebook's trademark blue top-navigation bar, user interaction types ("Like," "Comment," and "Share"), thumbs-up artwork, "like" counters, comment counter, and blue-and-black-text-on-gray-background-on-white-backdrop commenting interface, among other features.

191.    In fact, the webpage is not a Facebook page. It is a fake. Unlike on Facebook, it is impossible to click to see who its supposed 12,068 fans are. Unlike on Facebook, it is impossible to click on the name or profile picture of the supposed commenters. Unlike on Facebook, it is impossible to click to read the rest of the supposed 4,356 comments.

192.    The webpage tells the visitor: "Well Done! Congrats You Are Today's Lucky User!" [sic]. Immediately below, it shows a wheel of prizes: personal electronics (apparently from Apple) and a $1,000 Visa gift card. Lest the visitor have any doubt, the first "comment," from "Monika Meyer," reads: "Holy god! I actually got a $1000 Visa gift card!! My friends are gonna freak!" [sic]. Lest the visitor dismiss Ms. Meyer's comment as outdated, it is time-stamped "4 minutes ago" (regardless of when the visitor visits).

193.    In fact, the visitor has not won a $1000 Visa gift card or any of the other valuable prizes.

194.    The webpage contains testimonials that RewardZone USA (Fluent's alias and subsidiary) is not a scam. There's "Mark Hughes," attesting: "Hello everyone, you have to give rewardzoneusa.com a try. My name is Mark. I am a software engineer by trade. So I am up on what is an internet scam and what isn't. Trust me, rewardzoneusa.com IS NOT A SCAM" [sic]. And "Troy Grainger," who extols that the company "restore one's faith in human nature!!" [sic]. And the sober endorsement of "Zachary Lassen": "This note is to confirm the legitimacy of the Reward Zone USA Program."

195.    In fact, these endorsements of RewardZone USA are frauds.

196.    When the visitor spins the wheel, the webpage tells him to spin again. When he does, the webpage tells him: "Congratulations! Your reward: $1000 Visa Giftcard. Please follow the instructions to get your reward!"

197. In fact, the visitor has not won a $1000 Visa gift card, and neither Fluent nor anyone else has any intention of giving the visitor a $1000 Visa gift card.

198. Plaintiff Russell's experience was typical of that of other website visitors. Fluent deliberately deceived Plaintiff Russell with a bait-and-switch, promising her a free reward but then burdening her with unexpected and unwanted email spam, telemarketing robocalls, and recurring charges. When it came time to claim her reward, a $1,000 Walmart gift card, Fluent subjected Ms. Russell to a series of hurdles meant to discourage her from getting what Fluent had promised her. For instance, Fluent demanded a "notarized, signed claim form AND supporting proof of residence and valid ID."

**K.     The Nuisance Created by Defendants' Automated Telemarketing**

199. Before directing their automated telemarketing to Plaintiffs, Defendants never did anything to confirm that Plaintiffs had opted in to their telemarketing.

200. It is Fluent's practice to pay "affiliates," or third parties, for leads. It is, unfortunately, common that such arrangements financially incentivize the affiliate to submit leads even though the information in the lead is not accurate.

201. The following characteristics of the text messages to Plaintiff Berman suggest that they were sent by an ATDS rather than manually typed by a human.

       a.     They were not a response to any action he had taken.

       b.     They came from unrecognized caller IDs, or even an SMS short code.

       c.     They did not (correctly) name the recipient.

       d.     They did not name their senders.

       e.     They were not personalized to their recipient.

       f.     They were so sloppy and ungrammatical, they appeared to have been drafted in an over-compensatory way in order specifically to seem that they were written on the fly by a human.

       g.     They, for instance, misspelled the word "Debt" as "Dêbt," used accent marks in inexplicable ways and introduced unusual hyphenation (or lack thereof) between words, in an apparent attempt to evade spam detection.

h.      Some purported to provide mechanical opt-out instructions, something real human beings rarely do when sending each other text messages.

202.    The telemarketing alleged herein:

a.      invaded Plaintiffs' privacy and solitude;

b.      interrupted Plaintiffs' train of thought;

c.      wasted Plaintiffs' time;

d.      annoyed Plaintiffs;

e.      harassed Plaintiffs;

f.      consumed the battery life of Plaintiffs' cellular telephones; and

g.      caused Plaintiff Berman to fear information about him had been stolen and he was a target for a financial fraud.

## V.    FREEDOM'S LIABILITY FOR THE TELEMARKETING CALLS

### A.    Vicarious Liability Under the TCPA

203.    Each of Freedom Financial and Freedom Debt is a "person," as defined by 47 U.S.C. § 153(39).

204.    The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

205.    The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

206.    The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

207.    The FCC confirmed this principle in a declaratory ruling holding that sellers such as Freedom may not avoid liability by outsourcing telemarketing:

[A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

208.   More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

209.   The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

210.   To the contrary, the FCC—armed with extensive data about robocallers and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

211.    Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

212.    The Ninth Circuit follows the FCC's approach to vicarious liability under the TCPA. *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018).

**B.    The Freedom-Fluent Relationship**

213.    Freedom is legally responsible for ensuring that the company that made the telemarketing calls for it complied with the TCPA.

214.    Drips, at the direction of Fluent and Freedom, telemarketed to Plaintiffs.

215.    Freedom knowingly and actively accepted business that originated through illegal telemarketing.

216.    By hiring a company to make calls on its behalf, Freedom "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

217.    Moreover, Freedom maintained interim control over the actions of the party that made the call.

218.    For example, Freedom had absolute control over whether, and under what circumstances, it would accept a customer.

219.    Freedom reviewed, edited and authorized prerecorded telemarketing by Fluent on Freedom's behalf.

220.    In another example, Fluent provided to Freedom a draft of a prerecorded telemarketing message to be deployed by Fluent pitching Freedom by name.

221.    Furthermore, Freedom had day-to-day control over the actions of the party that made the calls, including the ability to prohibit it from using an ATDS or prerecorded messages to contact potential customers of Freedom and the ability to require it to respect the National Do Not Call Registry.

222.    Freedom also gave interim instructions to the company that made the calls by providing the parameters of customers, volume of calling and contracts it would purchase.

223.    In this litigation, Freedom caused Fluent to produce a technically detailed affidavit admitting Fluent's involvement in the telemarketing at issue. Freedom vouched for the affidavit, Dkt. No. 16 at 2-4, CM/ECF pp. 10-12 (repeatedly citing it with approval) and attached it to a motion filed with the Court, Dkt. No. 16-1.

224.    The affidavit admits that Freedom Financial is a "partner" of Fluent and that Fluent holds Freedom Financial out to the public as its partner. Dkt. No. 16-1 at 4 ¶ 12, CM/ECF p. 5.

225.    The affidavit implies that Fluent "promot[es] service offerings from Freedom Financial." *Id.* at 5 ¶ 13, CM/ECF p. 6.

226.    Freedom donned Fluent with apparent authority to make the telemarketing calls at issue.

227.    Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

228.    "[A]pparent authority can arise in multiple ways, and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

229.    A principal can make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

230.    Here, Freedom designated Fluent to generate leads for it, which Fluent did via automated telemarketing conducted in concert with its agents, including Drips.

231.    Over time, Freedom sought to distance itself from Fluent's telemarketing on its behalf. Initially, Freedom and Fluent contemplated telemarketing scripts referencing Freedom by name. To protect its brand from consumer outrage at Fluent's telemarketing and from false-advertising claims, Freedom eventually had the language changed to remove any reference to

Freedom. For instance, with respect to one script, Freedom wrote to Fluent: "We don't usually say half your debt, but since the message is from DebtHelp [rather than "Freedom"], let's test it out."

232.    Only well after the filing of this litigation did Freedom finally terminate Fluent.

233.    The FCC held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Dish*, 28 FCC Rcd. at 6592-93 ¶ 46. Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

## C.    Freedom's Knowledge of Fluent's Dubious Tactics

234.    Fluent has been on the receiving end of TCPA complaints and lawsuits since long before Freedom retained it.

235.    Fluent pitched Freedom on a "call carousel," touting: "these companies generate millions of calls/day through tactics such as buying misdials, running sweepstakes promotions, etc." FREE-394.

236.    Since early 2017, Freedom knew that only 0.5% of leads from Fluent were qualified, compared to Freedom's internal benchmark of 8-10%. FREEDOM_315-16. That is, out of every 200 people sent by Fluent to Freedom (let alone out of the much greater number of people spammed by Fluent on Freedom's behalf but never transferred as leads to Freedom), only *one* is a valid candidate for Freedom's products. That's *twenty times* worse than Freedom's own internal standard.

237.    But it took more than a year after the "0.5%" revelation, and two months after Freedom was served with process in this lawsuit, for Freedom's Senior Director of Sales Operations to email 25 Freedom employees and a sales manager listserv, stating: "Some of you and many of your DCs have bubbled up feedback regarding consumers unhappy with receiving texts from lead generator Fluent."

238.    Similarly, regarding Fluent's telemarketing on its behalf, Freedom admitted to its salespeople: "Consumers feel we have reached out to them and not the other way around."

239.    On the heels of the commencement of this case, two more TCPA suits were filed against Freedom. Dkt. No. 55 at 13.

**D.    Defendants' Conduct Towards Plaintiff Berman during This Litigation Is Consistent with Their Knowledge of the Illegitimacy of Their Leads**

240.    Freedom and Fluent thought it fine to robocall Plaintiff Berman merely because one "Dunk Loka" living at "Grand Street" (no house number), Dkt. No. 16-1 at 2, was purportedly "in possession of," Dkt. No 37 at 12, 13, his phone number and provided it to them. But only Santa Claus can receive mail without a house number, and "possessing" a phone number (unlike, say, a password—large yellow books of which are not dropped on every doorstep) is zero evidence of authority to subject the owner of the phone number to robocalls and telemarketing.

241.    As he has stated under oath, Plaintiff Berman did not submit the lead, visit the website in question, identify himself as "Dunk Loka," use the email address associated with the lead (buffola@gmail.com), or live at "Grand Street," nor has he ever claimed to have done any of those things or authorized anyone to make such representations on his behalf. Dkt. Nos. 17-1; 29.

242.    During this litigation, Freedom filed a motion to compel arbitration, which ran 48 pages including attachments and explained how Freedom and Fluent obtained Plaintiff Berman's phone number. Dkt. No. 16. Among those 48 pages were narrowly framed, partial screenshots of the page(s) bearing the lead generation form and submission button, as well as three screenshots of coding terminals, but, interestingly, *no* screenshots of the rest of the sweepstakes website that purportedly induced a person to provide so much personal information. Dkt. No. 16-1. The URL in question has been taken down.

243.    On or before August 24, 2018, Google produced to Defendants a subpoena response including over 100 pages of email metadata about buffola@gmail.com. Nowhere in any

of these documents is anything indicating that Plaintiff Berman is an owner or user of buffola@gmail.com. To the contrary, Google's subpoena response states:

> Name: ola bello
>
> e-Mail: buffola@googlemail.com
>
> Created on: 2007/02/19-21:59:20-UTC
>
> Terms of Service IP: 82.10.192.86, on 2007/02/19-21:59:19-UTC
>
> Google Account ID: 742075131625

The email address was created more than decade ago from an IP address in Hartlepool, United Kingdom.

244. Nevertheless, and in spite of all the other evidence to the contrary, on September 6, 2018, Defendants filed a letter with the Court still claiming that Plaintiff Berman had submitted the lead. Dkt. No. 60 at 1. This exemplifies Defendants' willful blindness about the invalidity of their leads.

## VI.   CLASS ACTION ALLEGATIONS

245. Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), Plaintiffs brings this case on behalf of the following Classes.

Cellular Telephone Visitor Class

Every person in the United States (1) to whom Defendants placed a
call or sent a text message, (2) to a cellular telephone number listed
in LEADSCIENCE_677, (3) using an ATDS and/or an artificial or
prerecorded voice, (4) in order to sell Freedom's products, (5)
between May 17, 2017, and April 17, 2018, (6) after the person
had entered the phone number on a Fluent website.

Cellular Telephone Non-Visitor Class

Every person in the United States (1) to whom Defendants placed a
call or sent a text message, (2) to a cellular telephone number listed
in LEADSCIENCE_677, (3) using an ATDS and/or an artificial or
prerecorded voice, (4) in order to sell Freedom's products, (5)

between May 17, 2017, and April 17, 2018, (6) but who hadn't entered the phone number on a Fluent website.[1]

#### DNC Non-Visitor Class

Every person in the United States (1) to whom Defendants placed a call or sent a text message, (2) in order to market Freedom's products, (3) between May 17, 2017, and April 17, 2018 (4) to a residential telephone number listed in LEADSCIENCE_677, (5) which telephone number was listed on the NDNCR for at least 31 days before at least two of such communications in a 12-month period, (6) but who hadn't entered the phone number on a Fluent website.

246.    Exclusions: Excluded from the Classes are Defendants, any entity in which Defendants (or any of them) have a controlling interest or that has a controlling interest in Defendants (or any of them), Defendants' legal representatives, assignees, and successors, the judges to whom this case is assigned and the employees and immediate family members of all of the foregoing.

247.    Numerosity: The Classes are so numerous that joinder of all their members is impracticable.  Each Class has at least 40 members.

248.    Freedom is the largest debt settlor in the United States.

249.    Fluent is publicly traded.

250.    Sending a robotext or placing a robocall costs less than one cent, so Defendants could afford to do so at massive scale.

251.    Fluent telemarkets to 720,000 mobile phones daily.

252.    In just three days, Fluent sent Freedom 1981 leads.

253.    For Fluent and Freedom, Drips called at least 778,548 people as part of the campaign that called Plaintiffs.

---

[1] The Cellular Telephone Visitor Class and the Cellular Telephone Non-Visitor Class are referred to in this Third Amended Complaint as the "Cellular Telephone Classes."

254.    On information and belief, more than 40 of those 778,548 phone numbers were cellular.

255.    On information and belief, more than 40 of those 778,548 phone numbers were on the NDNCR for at least 31 days before at least two of such communications in a 12-month period.

256.    <u>Commonality</u>: There are many questions of law and fact common to Plaintiffs and members of the Classes. Indeed, the very feature that makes Defendants' conduct so annoying—its automated nature—makes this dispute amenable to classwide resolution. These common questions of law and fact include, but are not limited to, the following:

a.    What the relationships among Defendants are;

b.    Whether the text messages were sent *en masse* by ATDS (or, instead, individually composed and transmitted);

c.    Whether the voice referenced above was artificial or prerecorded (or, instead, a live person who sounds robotic and asks people to press buttons);

d.    Whether Defendants' desire to sell debt-negotiation services constitutes an "emergency" within the meaning of the TCPA;

e.    Whether, under the TCPA, one may send automated, nonconsensual, telemarketing text messages to cellular telephone numbers provided that they contain opt-out instructions;

f.    Whether Defendants had a pattern and practice of telemarketing to numbers on the National Do Not Call Registry;

g.    Whether Fluent, despite its "state-of-the-art" platform and "well-trained and well-qualified" professionals, had a pattern and practice of knowingly telemarketing to phone numbers obtained from leads that were deficient on their face, for instance, that lacked a first name, lacked a last name, lacked any letter in the street address or lacked any number in the street address;

h.    Whether Freedom knew Fluent's leads were invalid;

i.    Whether Drips knew Fluent's leads were invalid;

j.     Whether Fluent knew its affiliates' leads were invalid; and

k.     Whether Defendants' violations were knowing or willful.

257.   <u>Typicality</u>: Plaintiffs' claims are typical of those of the Classes that they respectively represent. Plaintiff Russell's claims are typical of the Cellular Telephone Visitor Class because they arise out of the same course of conduct by Defendants and are based on the same legal and remedial theories. Plaintiff Berman's claims are typical of the Cellular Telephone Non-Visitor Class and the DNC Non-Visitor Class because his claims arise out of the same course of conduct by Defendants and are based on the same legal and remedial theories. Fluent hides its involvement in obtaining phone numbers and robocalling by operating under a slew of subsidiaries, affiliates, registered aliases, unregistered aliases, and disposable websites, its relationships with its users are superficial, and it has not yet produced the vast majority of what remains of the server logs from the lead generation at issue in this case. Accordingly, Plaintiffs' investigation into whether Plaintiff Hernandez is a member of the Cellular Telephone Visitor Class or Cellular Telephone Non-Visitor Class is ongoing.

258.   <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained competent and capable counsel experienced in TCPA class action litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests contrary to or conflicting with those of the proposed Classes.

259.   <u>Superiority</u>: The common issues arising from this conduct that affect Plaintiffs and members of the Classes predominate over any individual issues, making a class action the superior means of resolution. Adjudication of these common issues in a single action has important advantages, including judicial economy, efficiency for Class members and classwide *res judicata* for Defendants. Classwide relief is essential to compel Defendants to comply with the TCPA.

a.     <u>Control</u>: The interest of individual members of the Classes in individually controlling the prosecution of separate claims against Defendants is small because the damages in an individual action ($500 to $1,500 per violation) are dwarfed by the cost of prosecution.

    b. <u>Litigation</u>: Plaintiffs are not aware of any pending TCPA litigation between Class members and Defendants predating the filing of this case.

    c. <u>Forum</u>: The forum is a desirable, efficient location in which to resolve the dispute because Plaintiffs Berman and Hernandez live in the District and Freedom is headquartered in it.

    d. <u>Difficulties</u>: No significant difficulty is anticipated in the management of this case as a class action. Management of these claims is likely to present significantly fewer difficulties than are presented in many class actions because the calls at issue are automated (and thus uniform) and because the TCPA articulates bright-line standards for liability and damages.

260. <u>Appropriateness</u>: Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief and corresponding declaratory relief with respect to the Classes appropriate on a classwide basis.

## VII. FIRST CLAIM FOR RELIEF

**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)—Robocalling)**
**On Behalf of Plaintiffs and the Cellular Telephone Classes**
**Against All Defendants**

261. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

262. Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to the cellular telephone numbers of Plaintiffs and members of the Cellular Telephone Classes using an ATDS and/or artificial or prerecorded voice without prior express written consent.

263. Plaintiffs and members of that Cellular Telephone Classes are entitled to an award of $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

264. Plaintiffs and members of the Cellular Telephone Classes are also entitled to and do seek an injunction prohibiting Defendants and/or their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to any cellular telephone number using an ATDS and/or artificial or prerecorded voice without prior express written consent.

1

## VIII.   SECOND CLAIM FOR RELIEF

2

**(Knowing and/or Willful Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)—Robocalling)**

3

**On Behalf of Plaintiffs and the Cellular Telephone Classes**
**Against All Defendants**

4

265.   Plaintiffs reallege and incorporate by reference each and every allegation set forth

5

in the preceding paragraphs.

6

266.   Defendants and/or their affiliates or agents knowingly and/or willfully violated

7

the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to

8

the cellular telephone numbers of Plaintiffs and members of the Cellular Telephone Classes

9

using an ATDS and/or artificial or prerecorded voice without prior express written consent.

10

267.   Plaintiffs and members of the Cellular Telephone Classes are entitled to an award

11

of up to $1,500 in damages for each such knowing and/or willful violation. 47 U.S.C.

12

§ 227(b)(3).

13

## IX.   THIRD CLAIM FOR RELIEF

14

**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)—Telemarketing)**

15

**On Behalf of Plaintiff Berman and the DNC Non-Visitor Class**
**Against All Defendants**

16

268.   Plaintiffs reallege and incorporate by reference each and every allegation set forth

17

in the preceding paragraphs.

18

269.   Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. §

19

227(c); 47 C.F.R. § 64.1200(c)(2), by placing unsolicited telemarketing calls (including text

20

messages) to the residential telephone numbers of Plaintiff Berman and members of the DNC

21

Non-Visitor Class even though those numbers had been listed on the NDNCR for at least 31

22

days.

23

270.   Plaintiff Berman and members of the DNC Non-Visitor Class seek an award of

24

$500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

25

271.   Plaintiff and members of the DNC Non-Visitor Class are also entitled to and do

26

seek an injunction prohibiting Defendants and/or their affiliates and agents from violating the

27

28

TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing unsolicited telemarketing calls (including text messages) to any telephone numbers listed on the NDNCR for at least 31 days.

## X.     FOURTH CLAIM FOR RELIEF
**(Knowing and/or Willful Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)—Telemarketing)**
**On Behalf of Plaintiff Berman and the DNC Non-Visitor Class**
**Against All Defendants**

272.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

273.     Defendants and/or their affiliates or agents knowingly and/or willfully violated the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing unsolicited telemarketing calls (including text messages) to the telephone numbers of Plaintiff Berman and members of the DNC Non-Visitor Class even though those numbers had been listed on the NDNCR for at least 31 days.

274.     Plaintiff Berman and members of the DNC Non-Visitor Class are entitled to and seek an award of up to $1,500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of all members of the Classes, pray for judgment against Defendants as follows:

A.     Certification of the proposed Classes;

B.     Appointment of Plaintiffs as representative of the Classes;

C.     Appointment of the undersigned counsel as counsel for the Classes;

D.     A declaration that actions complained of herein violate the TCPA;

E.     An order enjoining Defendants and their affiliates, agents and related entities from engaging in the unlawful conduct set forth herein;

F.     An award to Plaintiffs and the Classes of damages, as allowed by law;

G.     An award to Plaintiffs and the Classes of costs and attorneys' fees, as allowed by law, equity and/or California Code of Civil Procedure section 1021.5;

H.     Leave to amend this Complaint to conform to the evidence presented at trial; and

I.        Orders granting such other and further relief as the Court deems necessary, just, and proper.

## XII.        DEMAND FOR JURY

Plaintiffs demand a trial by jury for all issues so triable.

## XIII.        SIGNATURE ATTESTATION

The ECF user filing this paper attests that concurrence in its filing has been obtained from each of the other signatories.


RESPECTFULLY SUBMITTED AND DATED this 5th day of January, 2020.


By: */s/ Jon B. Fougner*
   Jon B. Fougner

Anthony I. Paronich, *Pro Hac Vice*
anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Edward A. Broderick, *Pro Hac Vice*
ted@broderick-law.com
BRODERICK LAW,  P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Matthew P. McCue, *Pro Hac Vice*
mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Plaintiffs Daniel Berman, Stephanie Hernandez, and Erica Russell and the Proposed Classes*