1
2
3
4
5

Beth E. Terrell, SBN #178181
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray
Email:  jmurray@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

6   [Additional counsel appear on signature page]

7   *Attorneys for Plaintiffs and Proposed Classes*

8
9
10

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

11
12
13
14
15
16
17

DANIEL BERMAN, STEPHANIE
HERNANDEZ, and ERICA RUSSELL,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

FREEDOM FINANCIAL NETWORK, LLC,
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC., and LEAD SCIENCE, LLC,

Defendants.

NO. 4:18-cv-01060-YGR

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION TO COMPEL
ARBITRATION OF THE CLAIMS
ASSERTED BY STEPHANIE
HERNANDEZ AND ERICA RUSSELL**

<u>JURY TRIAL DEMAND</u>

Honorable Yvonne Gonzalez Rogers

18
19
20
21
22
23
24

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ......................................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................................... 3

    A.    Plaintiff Erica Russell did not agree to arbitration .............................................. 4

    B.    Plaintiff Stephanie Hernandez did not agree to arbitration ................................ 4

III.  STATEMENT OF ISSUES ......................................................................................... 5

IV.   AUTHORITY AND ARGUMENT ............................................................................. 5

    A.    There is no agreement to arbitrate ...................................................................... 6

        1.    Fluent's motion should be denied because its "recreated" webpages differ materially from time-stamped copies maintained by the Internet Archive and Plaintiffs' recollections .......... 7

        2.    The design and content of Fluent's recreated webpages do not give reasonable notice of the arbitration provision .......................... 9

            a.    The recreated webpage that Fluent claims Ms. Russell visited did not provide reasonably conspicuous notice of the arbitration provision ........................................................ 12

            b.    The recreated webpage that Fluent claims Ms. Hernandez visited did not provide reasonably conspicuous notice of the arbitration provision .......................................................... 17

        3.    Defendants rely on inapposite cases ................................................... 19

    B.    Neither Freedom nor Drips may compel arbitration ........................................ 21

V.    CONCLUSION ........................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page**

*Ackerberg v. Citicorp USA, Inc.*,
   898 F. Supp. 2d 1172 (N.D. Cal. 2012) ............................................................6

*Anand v. Heath*,
   No. 19-cv-00016, 2019 WL 2716213 (N.D. Ill. June 28, 2019)..........................*passim*

*Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*,
   645 F.3d 522 (2d Cir. 2011)**Error! Bookmark not defined.**........................5

*AT&T Techs., Inc. v. Commc'ns. Workers of Am.*,
   475 U.S. 643 (1986)........................................................................6

*Benson v. Double Down Interactive, Ltd. Liab. Co.*,
   No. 18-36015, 2020 WL 468422 (9th Cir. Jan. 29, 2020)............................18

*Berkson v. Gogo LLC*,
   97 F. Supp. 3d 359 (E.D.N.Y. 2015) ............................................11, 15, 16

*Castro v. ABM Indus., Inc.*,
   325 F.R.D. 332 (N.D. Cal. 2018)..............................................21, 22

*Chen v. Premier Fin. Alliance, Inc.*,
   No. 18-cv-3771 YGR, 2019 WL 280944 (N.D. Cal. Jan. 22, 2019) .................1, 6, 7, 9

*Comedy Club, Inc. v. Improv W. Assocs.*,
   553 F.3d 1277 (9th Cir. 2009) ......................................................22

*Crawford v. Beachbody, LLC*,
   No. 14-cv-1583-GPC, 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014)..........................20

*Cullinane v. Uber Techs., Inc.*,
   893 F.3d 53 (1st Cir. 2018)......................................................11, 19

*Denney v. BDO Seidman, L.L.P.*,
   412 F.3d 58 (2d Cir. 2005)........................................................23

*Estate of Saunders v. C.I.R.*,
   745 F.3d 953 (9th Cir. 2014) ....................................................22

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938, 944 (1995)..........................................................9

*Goldman v. KPMG LLP*,
  92 Cal. Rptr. 3d 534 (Cal. Ct. App. 2009) ............................................................22, 23

*Goldman, Sachs & Co. v. City of Reno*,
  747 F.3d 733 (9th Cir. 2014) ........................................................................................7

*GoPets Ltd. v. Hise*,
  657 F.3d 1024 (9th Cir. 2011) ......................................................................................7

*Graf v. Match.com, LLC*,
  No. CV 15-3911 PA, 2015 WL 4263957 (C.D. Cal. July 10, 2015) ...........................20

*In re Carrier IQ, Inc. Consumer Privacy Litig.*,
  No. C-12-md-2330 EMC, 2014 WL 1338474 (N.D. Cal. Mar. 28, 2014) ..................23

*InterGen N.V. v. Grina*,
  344 F.3d 134 (1st Cir. 2003) ........................................................................................23

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) .....................................................................................22

*Monster Energy Co. v. City Beverages, LLC*,
  940 F.3d 1130 (9th Cir. 2019) ......................................................................................7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*,
  460 U.S. 1 (1983) ...........................................................................................................5

*Mundi v. Union Sec. Life Ins. Co.*,
  555 F.3d 1042 (9th Cir. 2009) .....................................................................................22

*Nevarez v. Forty Niners Football Co.*,
  No. 16-cv-07013, 2017 WL 3492110 (N.D. Cal. Aug. 15, 2017) ..........................19, 20

*Nicosia v. Amazon.com Inc.*,
  834 F.3d 220 (2d Cir. 2016) ....................................................................................6, 15

*Nicosia v. Amazon.com Inc.*,
  384 F. Supp. 3d 254 (E.D.N.Y. 2019) ........................................................................14

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ...........................................................................*passim*

*PDC Laboratories, Inc. v. Hach Co.*,
  No. 09-1110, 2009 WL 260527 (C.D. Ill. Aug. 25, 2009) ...........................................19

*Rojas v. Go Smith, Inc.*,
   No. 2:17-cv-281-JVB-JEM, 2020 WL 831585 (N.D. Ind. Feb. 20, 2020)..................16

*Rodriguez v. Experian Serv. Corp.*,
   No. CV 15-3553-R, 2015 WL 12656919 (C.D. Cal. Oct. 5, 2015).............................20

*Sanford v. MemberWorks, Inc.*,
   483 F.3d 956 (9th Cir. 2007) ...........................................................................................6

*Scherk v. Alberto-Culver Co.*,
   417 U.S. 506 (1974)..........................................................................................................5

*Sgouros v. TransUnion Corp.*,
   817 F.3d 1029 (7th Cir. 2016) ......................................................................................10

*Silverman v. Move Inc.*,
   No. 18-cv-05919-BLF, 2019 WL 2579343 (N.D. Cal. June 24, 2019) ......................21

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
   542 F.3d 354 (2d Cir. 2008)...........................................................................................23

*Spano v. V&J National Enterprises, LLC*,
   264 F. Supp. 3d 440 (W.D.N.Y. 2017) .........................................................................23

*Spear, Leeds & Kellogg v. Central Life Assurance Co.*,
   85 F.3d 21 (2d Cir. 1996) ..............................................................................................23

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002)......................................................................................11, 16

*Starke v. SquareTrade, Inc.*,
   913 F.3d 279 (2d Cir. 2019)............................................................................................6

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
   925 F.2d 1136 (9th Cir. 1991) .........................................................................................9

*Wilson v. Huuuge, Inc.*,
   944 F.3d 1212 (9th Cir. 2019) ...................................................................................5, 6

## FEDERAL RULES AND STATUTES

9 U.S.C. § 4.................................................................................................................................5

Fed. R. Civ. P. 56.......................................................................................................................6

# I.  INTRODUCTION

Plaintiff Daniel Berman filed this lawsuit after receiving a spam text message and robocall marketing the services of defendants Freedom Financial Network, LLC and Freedom Debt Relief, LLC (together "Freedom"). This telemarketing was part of a massive campaign carried out by defendants Fluent, Inc. and Lead Science, LLC ("Drips") targeting people who had purportedly entered their contact information on one or more of Fluent's multitude of sweepstakes websites. In fact, many of the telephone numbers, including Plaintiff Berman's telephone number, were fictitious.

Plaintiffs Stephanie Hernandez and Erica Russell joined the lawsuit as plaintiffs after the Court denied Plaintiff Berman's motion for class certification without prejudice. Defendants have moved to compel arbitration of Plaintiffs Hernandez and Russell's claims based on webpages that Fluent claims to have "recreated" from information in its databases. Plaintiffs dispute the accuracy of these recreations. Neither Ms. Russell nor Ms. Hernandez recalls a notice about agreeing to terms and conditions or arbitration when she visited Fluent's website. Copies of the webpages captured by the Internet Archive shortly before and after the dates on which Fluent contends Ms. Hernandez and Ms. Russell visited them differ from Fluent's recreations. And Fluent has had to retract its claims about "recreated" webpages it previously proffered, including in connection with its prior, and similar, motion to compel arbitration.

The Court must draw all inferences and resolve all doubts in Plaintiffs' favor and find that Defendants have not proven that Plaintiffs were on reasonable notice of the arbitration provision in the Terms & Conditions. *See Chen v. Premier Fin. Alliance, Inc.*, No. 18-cv-3771 YGR, 2019 WL 280944, at *2-3 (N.D. Cal. Jan. 22, 2019). At the very least, Plaintiffs are entitled to a trial on formation, preceded by adequate discovery into the data and techniques

Fluent used to "recreate" its webpages. The parties already have been working cooperatively on a plan for this discovery. As an initial step, Fluent demonstrated how its lead generation system works in an online demonstration. This demonstration took place on February 26, 2020. The demonstration was not intended to generate formal discovery and the parties specifically agreed that the results from the demonstration would not be used to support any dispositive pleading. After the demonstration, Plaintiffs propounded discovery requests, including document requests, interrogatories, and a request for inspection, to formally obtain information learned from the demonstration. Fluent's responses to those requests are due on April 3, 2020.

Even without this discovery, however, the Court can and should rule that the recreated webpages do not evidence an agreement to arbitrate. Under basic contract formation principles, a webpage provides sufficient notice of contract terms only where it presents the full terms of the agreement or, if the terms are located elsewhere, prompts the visitor to examine them or agree that they are binding on her. When a party moving to compel arbitration relies on a hyperlinked reference to terms located elsewhere, courts consider whether the design and content draw the user's attention to the hyperlink, whether the hyperlink is conspicuous, and whether users are informed that by clicking a button they will be agreeing to the hyperlinked terms. Courts do not compel arbitration when the hyperlink is obscured by the webpage's cluttered and distracting design or fails to give the user reasonable notice that she will be bound to the linked terms. As the Ninth Circuit has explained, "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014).

The only evidence Defendants offer to meet their burden of proving that Plaintiffs assented to an arbitration provision is their claim that Plaintiffs clicked buttons on the recreated

1   webpages. But these buttons signified something other than agreement to the arbitration

2   provision or Terms & Conditions. Fluent's recreated webpage for Ms. Russell prompted her to

3   input her name, address, telephone number, date of birth, and gender and then click a "Continue"

4   button. The recreated page for Ms. Hernandez asked her to confirm her zip code by clicking a

5   button that said, "This is correct, Continue!" That the webpages purportedly included a miniscule

6   statement referencing arbitration and hyperlinking Terms & Conditions near (in Ms. Russell's

7   case) or far away from (in Ms. Hernandez's case) the button is insufficient to establish Plaintiffs'

8   assent to the arbitration provision contained in the Terms & Conditions. As a matter of law, even

9   "close proximity of the hyperlink to the relevant buttons users must click on—without more—is

10  insufficient to give rise to constructive notice." *Id*.

11       Finally, even if Fluent were able to prove the existence of an agreement to arbitrate,

12  Freedom and Drips could not enforce it. They are not parties to the Terms & Conditions and their

13  one-paragraph, footnoted assertion that "a non-party may compel arbitration under theories of

14  equitable estoppel and third-party beneficiary" should be rejected out-of-hand. Defendants do not

15  explain why they contend these theories would apply in this case and, in fact, the cases

16  Defendants cite confirm that equitable estoppel does not apply because Plaintiffs' claims are not

17  based on the Terms & Conditions and Fluent and Drips are not third-party beneficiaries because

18  they are not named in the Terms & Conditions.

19       Plaintiffs respectfully request that the Court deny Defendants' motion.

20                          **II.  STATEMENT OF FACTS**

21       The Court is familiar with the factual background of this litigation after ruling on

22  Plaintiff's motion for class certification and Defendants' motion for summary judgment. *See* Dkt.

23  No. 198 at 11-16. In the interest of efficiency, Plaintiffs will not repeat those facts in this brief.

24

Following the Court's ruling, Plaintiffs filed an amended complaint adding Erica Russell and Stephanie Hernandez as plaintiffs. Dkt. No. 220. Defendants have moved to compel arbitration of their claims.

**A.    Plaintiff Erica Russell did not agree to arbitration.**

Ms. Russell recalls visiting a Fluent website but not agreeing to—or seeing anything about—arbitration. She was looking online for coupons to save money for herself and her family. Russell Decl. ¶ 2. On her cell phone, she saw an ad that asked if she wanted to win a Walmart gift card. She clicked on it. That took her to a series of questions. Eventually, she typed her name, address, and email address into a form. *Id.* ¶ 3.

To the best of Ms. Russell's recollection, relevant portions of Fluent's recreation of the website she visited are inaccurate. *Id.* ¶¶ 4-5. For instance, she does not recall a Target gift card being advertised, she didn't see any legal terms or conditions or a hyperlink to see them, and she didn't see anything about arbitration. *Id.* ¶ 5.

**B.    Plaintiff Stephanie Hernandez did not agree to arbitration.**

Ms. Hernandez likewise recalls visiting a Fluent website but not agreeing to—or seeing anything about—arbitration. A couple of years ago, she heard about websites where she could get free samples. Hernandez Decl. ¶ 2. She visited one of them on her phone. The website required her to answer personal questions, including private questions about her health. She did not want to answer these questions, so she left the website. *Id.* ¶ 3. Over the next couple of years, she used her phone to visit other websites to try to get free samples. *Id.*

To the best of Ms. Hernandez's recollection, relevant portions of Fluent's recreation of the website she visited are inaccurate. She does not believe that the screen looked like the recreated webpage Defendants provided with their motion. In particular, she does not recall

1    seeing a screen saying, "Welcome back, stephanie!" or pressing "This is correct, Continue!" She

2    didn't see any legal terms or conditions or a hyperlink to see them. And she didn't see anything

3    about arbitration. *Id.* ¶ 4.

### III.  STATEMENT OF ISSUES

5        Whether Defendants' motion to compel arbitration should be denied because they have

6    not proven the existence of an agreement to arbitrate for three reasons: (1) Fluent's "recreated"

7    webpages are not credible because they differ in material ways from time-stamped copies of the

8    webpages retrieved from the Internet Archive and from Plaintiffs' descriptions of the websites;

9    (2) the "recreated" webpages do not give users reasonable notice of the arbitration provision; and

10    (3) Freedom and Drips' cursory, footnoted argument that they can compel arbitration under

11    theories of equitable estoppel and third-party beneficiary lacks both substance and merit.

### IV.  AUTHORITY AND ARGUMENT

13        The FAA provides that a court may compel arbitration only "upon being satisfied that the

14    making of the agreement or the failure to comply therewith is not at issue." 9 U.S.C. § 4. While

15    the FAA reflects "a liberal federal policy favoring arbitration agreements," *Moses H. Cone*

16    *Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24 (1983), it places arbitration agreements on

17    "the same footing as other contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)

18    (citation omitted). Therefore, the FAA's policy in favor of enforcing valid arbitration clauses

19    plays no role in determining whether an agreement to arbitrate exists in the first place. *Applied*

20    *Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011)**Error!**

21    **Bookmark not defined.**. The district court's role is "to determine '(1) whether a valid agreement

22    to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'"

23    *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019) (citation omitted).

24

**A.      There is no agreement to arbitrate.**

"It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (citation omitted); *see also Wilson*, 944 F.3d at 1219 ("A contract is formed when mutual assent exists, which generally consists of offer and acceptance."). "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Starke*, 913 F.3d at 289. "It is axiomatic that '[a]rbitration is a matter of contract and a party cannot be required to submit any dispute which he has not agreed so to submit.'" *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007) (alteration in original) (quoting *AT&T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 648 (1986)).

These "traditional principles of contract" apply online. *Wilson*, 944 F.3d at 1219. "In the context of online agreements, the existence of mutual assent turns on whether the consumer had reasonable notice of the terms of service agreement." *Id.* An arbitration agreement is only enforceable if the consumer had actual or constructive notice of the provision. *Id.*

The party seeking to compel arbitration "must prove the existence of a valid agreement by a preponderance of the evidence." *Id*. Courts apply a "standard similar to the summary judgment standard of Fed. R. Civ. P. 56" to any dispute of fact. *Chen v. Premier Fin. Alliance, Inc.*, No. 18-cv-3771 YGR, 2019 WL 280944, at *2 (N.D. Cal. Jan. 22, 2019) (quoting *Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172, 1175 (N.D. Cal. 2012)). Courts draw all reasonable inferences in favor of the non-moving party. *Nicosia v. Amazon.com Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). And when the parties "contest the *existence* of an arbitration agreement,

1  the presumption in favor of arbitrability does not apply." *Chen*, 2019 WL 280944, at *2 (quoting

2  *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014)).

3      Defendants do not contend that Plaintiffs had actual notice of the arbitration provisions

4  they purportedly assented to. Defendants' constructive notice argument is without merit because

5  Fluent's "recreated" webpages differ materially from time-stamped copies of the webpages

6  maintained by the Internet Archive and from Plaintiffs' descriptions of the websites and because

7  even if the recreations are faithful, the webpages do not give users reasonable notice of the

8  arbitration provision.

9      1.   Fluent's motion should be denied because its "recreated" webpages differ
        materially from time-stamped copies maintained by the Internet Archive and
10       Plaintiffs' recollections.

11     Defendants filed the declaration of Fluent employee Mitenkumar Bhadania in support of

12  their motion. ECF No. 224-1. Mr. Bhadania says he "recreated" the webpages attached to his

13  declaration from Fluent's proprietary ad serving and lead generation system, which he calls the

14  "System." *Id.* ¶¶ 1, 5; ECF No. 224-2, Exs. 1, 3 & 4. Plaintiffs, however, retrieved time-stamped

15  copies of the webpages that Defendants contend Plaintiffs visited from the Internet Archive.

16  Schexnaydre Decl. ¶¶ 1-11. The Ninth Circuit has relied on this archive. *Monster Energy Co. v.*

17  *City Beverages, LLC*, 940 F.3d 1130, 1140 n.3 (9th Cir. 2019) (Friedland, J., dissenting); *see*

18  *also GoPets Ltd. v. Hise*, 657 F.3d 1024, 1028 (9th Cir. 2011).

19     The archived copies differ in material ways from the recreated webpages Fluent has

20  proffered. The recreated webpages that Defendants claim Ms. Russell visited promoted a Target

21  gift card and asked if the user is "shopping at Target this Fall" whereas the archived screenshots

22  depict an Amazon gift card and ask if the user shops on Amazon.com. *Compare* Dkt. No. 224-2

23  (Jan. 22, 2020 Bhadania Decl.), Ex. 3 *with* Schexnaydre Decl., Exs. 1-2. The recreated webpage

24  that Defendants claim Ms. Hernandez visited shares some text and pictures with the Internet

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION OF
THE CLAIMS ASSERTED BY STEPHANIE HERNANDEZ AND ERICA RUSSELL - 7
CASE NO. 4:18-CV-01060-YGR

Archive's time-stamped copies, but the two look very different; most notably, the archived copy does not include the sentence "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy" above the button for the user to click. *Compare* ECF No. 224-2 (Jan. 22, 2020 Bhadania Decl.), Ex. 1 *with* Schexnaydre Decl., Exs. 1-4. On both archived copies, the only reference to the Terms & Conditions is at the top and bottom of the pages and there is no reference to them in or near the buttons the user must click on the webpage. Schexnaydre Decl., Exs. 1-4.

To the best of their recollections, neither Ms. Russell nor Ms. Hernandez saw a notice about agreeing to Terms & Conditions or arbitration when they visited Fluent's websites. Russell Decl. ¶ 5; Hernandez Decl. ¶ 4. Ms. Russell's recollection tracks more closely to the Internet Archive's time-stamped copy than to Fluent's "recreation" because she recalls that a Walmart gift card was advertised, not a Target gift card. Russell Decl. ¶¶ 3-5.

The materially different archived copies of the webpages and Plaintiffs' recollections about the webpages they saw call into question the accuracy of Fluent's recreated webpages and raise a genuine issue of fact about whether any agreement was formed. The Court is also aware of Mr. Bhadania's past correction of his testimony and webpages he said he "replicated and pieced together" to depict the pages that Fluent claims the user who registered Plaintiff Berman's phone number would have seen—although even the corrected version included only two of approximately fifty survey questions in the "actual flow." Dkt. No. 198 (Order Denying Class Cert.) at 7-9. Mr. Bhadania has not provided the complete "flows" for Ms. Russell and Ms. Hernandez either.

As the Court has recognized, "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did

not enter into such an agreement." *Chen*, 2019 WL 280944, at *2 (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)). "In deciding whether there is a genuine issue of fact concerning formation of an agreement, the party opposing arbitration shall receive 'the benefit of all reasonable doubts and inferences.'" *Id.* (quoting *Three Valleys Mun. Water Dist.*, 925 F.2d at 1141). As in *Chen*, the Court "cannot find that [Plaintiffs were] reasonably on notice of the agreement to arbitrate, and the motion to compel must be denied." *Id.* at *3.

In an effort to make sense of the discrepancies between Ms. Russell's and Ms. Hernandez's recollections and the Internet Archive, on the one hand, and Mr. Bhadania's recreations on the other, the parties agreed that Mr. Bhadania would demonstrate to Plaintiffs how Fluent's system works and how Mr. Bhadania recreated the flows. This demonstration, however, was a first step: the parties agreed that any information obtained through this demonstration could not be used to support any briefing, other than on a discovery issue. Plaintiffs have propounded follow-up discovery to formally obtain the information obtained at the demonstration in a form to use in this litigation.

2.   The design and content of Fluent's recreated webpages do not give reasonable notice of the arbitration provision.

Even if the Court accepts Mr. Bhadania's recreations as accurate representations of the webpages the Plaintiffs visited, it should find that there is no valid agreement because their format and language fail to provide reasonable notice of the arbitration provision. That is so regardless of whether the Court applies California or New York law. To determine whether a valid agreement to arbitrate exists, "courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). The Terms and

Conditions include a choice-of-law provision stating that "New York law controls, without regard to conflicts of law provisions." Dkt. No. 224-2 (Jan. 22, 2020 Bhadania Decl.) at 9, 24. As the Ninth Circuit has recognized, "whether the choice of law provision applies depends on whether the parties agreed to be bound by [the terms of use] in the first place." *Nguyen*, 763 F.3d at 1175. As in *Nguyen*, "we need not engage in this circular inquiry because both California and New York law dictate the same outcome." *Id.*

Courts enforce contracts accepted by an electronic "click" on a website only if "the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-34 (7th Cir. 2016). While "clickwrap" agreements—which require users to click a button signifying their agreement to a list of terms and conditions appearing on the screen—are routinely enforced by courts across the country, "browsewrap" agreements—which merely provide a hyperlink to the terms—are enforced only when "the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen*, 763 F.3d at 1176 (citation omitted). "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Id.* Browsewrap agreements require "a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." *Id.* at 1175-76**Error! Bookmark not defined.**. The Ninth Circuit has emphasized that "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* at 1179.

Courts have come up with different ways of categorizing variations on these two main categories. Some courts, including the Ninth Circuit, describe all online non-clickwrap

1    agreements as browsewraps. *See, e.g., id.* at 1177. Other courts categorize agreements as "sign-

2    in-wraps" when "the website is designed so that a user is notified of the existence and

3    applicability of the site's 'terms of use' when proceeding through the website's sign-in or login

4    process." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015). Still others refer to

5    "hybridwrap" agreements, which "typically prompt the user to manifest assent after 'merely

6    present[ing] the user with a hyperlink to the terms and conditions, rather than displaying the

7    terms themselves.'" *Anand v. Heath*, No. 19-cv-00016, 2019 WL 2716213, at *3-4 (N.D. Ill.

8    June 28, 2019) (alteration in original) (citation omitted).

9         Regardless of the terminology they use, courts agree that "[w]hether a user has inquiry

10   notice of a browsewrap agreement … depends on the design and content of the website and the

11   agreement's webpage." *Nguyen*, 763 F.3d at 1177. "Reasonably conspicuous notice of the

12   existence of contract terms and unambiguous manifestation of assent to those terms by

13   consumers are essential if electronic bargaining is to have integrity and credibility." *Specht v.

14   Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002). Courts consider "the

15   conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of

16   the terms of use, and the website's general design" in determining "whether a reasonably prudent

17   user would have inquiry notice of a browsewrap agreement." *Id*. "Several nonexhaustive

18   examples of general characteristics that make a term conspicuous include using larger and

19   contrasting font, the use of headings in capitals, or somehow setting off the term from the

20   surrounding text by the use of symbols or other marks." *Cullinane v. Uber Techs., Inc.*, 893 F.3d

21   53, 62 (1st Cir. 2018).

22

23

24

a.      The recreated webpage that Fluent claims Ms. Russell visited did not provide reasonably conspicuous notice of the arbitration provision.

Defendants fail to prove that Ms. Russell saw, or reasonably should have seen, the Terms & Conditions hyperlinks in the website's footer. They contend that Ms. Russell visited a series of interconnected webpages on November 20, 2017. Dkt. No. 224-1 (Bhadania Decl.) ¶¶ 12-13. The first three pages have large colorful boxes at the top announcing the availability of a "TARGET $100 Gift Card," a bright red depiction of the gift card, and a large, royal-blue box with survey questions to complete by clicking large buttons. Dkt. No. 224-1 (Bhadania Decl.), Ex. 3. The only hyperlinks to the Terms & Conditions on these recreated webpages appear near the end of a dense block of small-font text at the bottom of the page. This fine print, in contrast to the colorful pictures and prominent text at the tops of the pages, is buried in gray text on gray background. *Id.* Even as enlarged in Defendants' exhibit, it is barely legible. And these Terms & Conditions links would not appear *at all* on the phone unless the user scrolled down—and Fluent offers no evidence that Ms. Russell did. The fourth recreated webpage asks the user to confirm her email address with a large blue "Continue" button; the same gray-on-gray text box with the buried hyperlink to the Terms & Conditions appears at the bottom of the pages. *Id.*

Defendants likewise fail to prove that by clicking the button on the following page Ms. Russell was manifesting her assent to a contract mandating arbitration. The fifth recreated webpage asks the user to "Complete your shipping information to continue towards your reward." Dkt. No. 224-1 (Bhadania Decl.), Ex. 4. The heading of the page states "Shipping Information Required" in blue italics, above an item number and bar code that imply that shipment of the gift card merely awaits the user's contact information." *Id.* The form requires the user to enter her first name, last name, street address, zip code and telephone. *Id.* It also asks for "Date of Birth" and provides drop down boxes to enter the information, as well as buttons to

1   select "Male" or "Female." *Id.* Beneath those buttons, **in tiny, barely legible, washed-out text**,

2   is the sentence, "I understand and agree to the <u>Terms & Conditions</u> which includes mandatory

3   arbitration and <u>Privacy Policy</u>." *Id.* (On page five of their motion, Defendants have depicted this

4   language in a far larger size than it would actually appear on a cell phone or even computer

5   screen.) The form concludes with a large green button stating "Continue >>" in large white font.

6   *Id.* Defendants claim that Ms. Russell visited this website on her mobile phone. Dkt. No. 224-1

7   (Bhadania Decl.) ¶ 13. The tiny-print statement that is barely visible on a large computer monitor

8   or printed page would be even less legible on a cell phone screen.

9       As Defendants acknowledge, another court analyzing a similar Fluent webpage found

10   that no agreement was formed. *Anand*, 2019 WL 2716213, at *5. In *Anand*, the plaintiff

11   "registered on the website www.retailproductzone.com and completed a survey on that website

12   to receive a free gift card." *Id.* When the plaintiff "navigated through the

13   www.retailproductzone.com website in 2017, the words 'I understand and agree to the <u>Terms &</u>

14   <u>Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>' were displayed above a

15   'Continue' button" as depicted in the image displayed in the decision. *Id.* As here, the defendants

16   offered "no evidence that [the plaintiff] clicked on the Terms and Conditions hyperlink, or ever

17   saw the terms and conditions posted on the site, but they do maintain that [the plaintiff] clicked

18   the 'Continue' button and ultimately completed a survey on the website." *Id.* at *1.

19       The court concluded that "Anand was not placed on reasonable notice that she was

20   manifesting assent to the terms and conditions by clicking the 'Continue' button." *Id.* at *3. The

21   court noted that the webpage's "configuration presents what can best be described as a

22   hybridwrap agreement because the terms and conditions were hyperlinked rather than displayed

23

24

1  to the user in full, and the user's ability to continue through the site was not conditioned on her

2  express assent to the terms and conditions." *Id.* at *4. The court explained that

> [c]ourts typically 'will give effect to hybridwrap terms where the button
> required to perform the action manifesting assent … is located directly next
> to a hyperlink to the terms and a notice informing the user that, by clicking
> the button, the user is agreeing to those terms. … The more the hybridwrap
> design diverges from this basic layout—such as by placing the notice
> further away from the action button, cluttering the screen with potentially
> distracting content, or omitting the language explicitly saying that by
> performing [the] action the user agrees to be bound by the terms—the less
> likely courts are to find that inquiry notice has been provided.'

8  *Id.* (ellipses in original) (quoting *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 266

9  (E.D.N.Y. 2019)). The court concluded that Fluent's "hybridwrap agreement here is

10 unenforceable because nothing expressly linked the 'I understand and agree …' language to the

11 'Continue' button. There was no 'notice informing the user that, by clicking the button, the user

12 [wa]s agreeing to' the terms and conditions." *Id.* (alterations in original) (quoting *Nicosia*, 384 F.

13 Supp. 3d at 266).

14       Similarly, the "Continue" button on the recreated webpage that Defendants claim Ms.

15 Russell visited is not expressly linked to the statement about the Terms & Conditions. A

16 reasonable user would understand that by clicking the button she was continuing the signup

17 process after completing her shipping information, not agreeing to a multipage agreement found

18 on a separate webpage with terms that dramatically alter her legal rights. Fluent did nothing to

19 draw the user's attention to the agreement she was purportedly entering into and, in fact, very

20 effectively deemphasized that information by putting the statement about the Terms &

21 Conditions in the smallest and least legible font on the page. Had Fluent wanted to make sure

22 that visitors to the webpage saw the hyperlink, it could have (for instance) provided a checkbox

23 next to text asking the user to signify her agreement to the Terms & Conditions. It did not do so,

24

1  nor did it take any other steps to provide reasonable notice of the terms. As in *Anand*, the

2  agreement is unenforceable.

3      *Anand* is consistent with Ninth Circuit law. In fact, the court relied on the Ninth Circuit's

4  decision in *Nguyen* in observing that "Anand was not, for example, presented with an 'I agree'

5  box after being presented with a list of terms and conditions of use,' nor was she otherwise

6  'require[d] … to manifest assent to the terms and conditions expressly.'" *Anand*, 2019 WL

7  2716213, at *4 (quoting *Nguyen*, 763 F.3d at 1175-76). The Ninth Circuit has emphasized that

8  "the proximity or conspicuousness of the hyperlink alone is not enough to give rise to

9  constructive notice." *Nguyen*, 763 F.3d at 1178; *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d

10  220, 236 (2d Cir. 2016) ("clicking 'Place your order' does not specifically manifest assent to the

11  additional terms, for the purchaser is not specifically asked whether she agrees or to say 'I

12  agree'"). In *Nguyen*, "the 'Terms of Use' link appear[ed] either directly below the relevant

13  button a user must click on to proceed in the checkout process or just a few inches away." 763

14  F.3d at 1178. On some of the pages, "the hyperlink [was] close enough to the 'Proceed with

15  Checkout' button that a user would have to bring the link within his field of vision in order to

16  complete his order." *Id.* The Ninth Circuit held that the plaintiff had not agreed to arbitrate,

17  consistent with "courts' traditional reluctance to enforce browsewrap agreements against

18  individual consumers." *Id.* at 1178-79.

19      *Anand* is also consistent with other cases considering similarly designed webpages. In

20  *Berkson*, for example, the court found unenforceable a "sign-in-wrap" agreement on a webpage

21  that required the user to click a "SIGN IN" button under tiny print stating, "By clicking "Sign In"

22  I agree to the terms of use and privacy policy." 97 F. Supp. 3d at 373-74, 403-04. The court

23  found the statement was "insufficient to give adequate notice" because "the design and content

24

of the website, including the homepage, did not make the 'terms of use' readily and obviously available" to the user, "[t]he hyperlink to the 'terms of use' was not in large font, all caps, or in bold," and "[t]he importance of the 'terms of use' was obscured by the physical manifestation of assent, in this case clicking the 'SIGN IN' button, expected of a consumer seeking to purchase in-flight Wi-Fi." *Id.* at 404. The court held that the plaintiff was unaware that "he was binding himself to more than a one-time offer of service in exchange for money." *Id.*; *see also Specht*, 306 F.3d at 29-30 ("[A] consumer's clicking on a … button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the … button would signify assent *to those terms*." (emphasis added)); *Rojas v. Go Smith, Inc.*, No. 2:17-cv-281-JVB-JEM, 2020 WL 831585, at *3 (N.D. Ind. Feb. 20, 2020) ("Here, the 'click' at issue did not refer to any acceptance or agreement. … Plaintiff, by clicking, only indicated that he wished to 'See Job Matches.' … The separate check box, which Plaintiff attests he did not click, is the means by which a party agrees to the contract.").

As in *Anand*, *Nguyen*, and *Berkson*, the design and content of Fluent's recreated webpage and the lack of explicit connection between the "Continue" button and the link to the Terms & Conditions would not put a reasonably prudent user on notice of the arbitration provision. Defendants have not met their burden of proving a valid agreement to arbitrate with Ms. Russell.

Finally, Defendants wisely do not argue that Ms. Russell's later filling out of a claim form supports their formation theory. Not only did she fill out the claim form more than a week after Defendants claim she agreed to arbitrate, the form does not contain the Term & Conditions, does not attach them, and does not state where she could find them. Dkt. No. 224-1 (Bhadania Decl.), Ex. 6. The claim form makes no reference to arbitration. *Id.* And it does not state that signing it manifests assent to the Terms & Conditions. *Id.* Its only reference to the Terms &

Conditions is a statement that *Ms. Russell* complied with them. In the context of a prize claim form, a reasonable person would understand that to mean that she had fulfilled the requirements to get the prize—for instance, answered the survey questions—not that she would be bound by a multipage agreement with terms that dramatically alter her legal rights.

     b.  The recreated webpage that Fluent claims Ms. Hernandez visited did not provide reasonably conspicuous notice of the arbitration provision.

  The hyperlink to the Terms & Conditions on the recreated webpage that Defendants contend Ms. Hernandez visited on February 16, 2018, is even more obscured by cluttered design and content. The page is filled with eye-catching photos of human faces, the promise that "Getting Free Stuff Has Never Been Easier," the large colorful text "Welcome, back stephanie!" and a comparatively small box containing all of the following text:

- "Confirm your ZIP Code Below:" in the largest font;

- A yellow box with the zip code 93930 in the same size font;

- In black font so tiny it is barely legible, "I understand and agree to the <u>Terms & Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>";

- A green box that says "I AGREE" in white letters to the right of a check box and to the left of the phrase "to receive daily emails from SamplesandSavings and SweepstakesAlerts," printed in black text; and

- A large green button with the following text in large white font: "This is correct, Continue!>>"

Dkt. No. 224-1 (Bhadania Decl.), Ex. 1. Defendants have not provided screenshots of any of the webpages they contend Ms. Hernandez visited before arriving at the recreated webpage, which they say was prepopulated with the zip code she had entered on other (unproduced) websites.

1   The recreated webpage is a case study in misdirection. Rather than focusing the user's

2   attention on the Terms & Conditions hyperlink, the design of the webpage emphasizes

3   everything else. A reasonably prudent user would be distracted by the photos and text

4   announcing "Free Stuff," the request that she confirm her zip code and corresponding colorful

5   button to do so, and the colorful "I AGREE" checkbox adjacent to a statement about receiving

6   daily emails.

7   By contrast, the sentence referencing the Terms & Conditions is in miniscule, barely

8   legible print. It is sandwiched between the pre-populated zip code that the user is asked to

9   confirm and the checkbox to signify agreement to receiving daily emails, and is not even

10  adjacent to the button to click to confirm the zip code. A reasonable user viewing this recreated

11  webpage would understand that she was confirming her zip code by clicking on the "This is

12  correct, Continue" button. The "I AGREE" checkbox can only be read to refer to reference

13  agreement to the statement about daily receipt of emails, not the Terms & Conditions. There is

14  no connection between the statement referencing the Terms & Conditions and either the "I

15  AGREE" checkbox or the "This is correct, Continue! >>" button. In any event, Defendants do

16  not contend that Ms. Hernandez checked the checkbox.

17  Finally, Defendants do not argue that Ms. Hernandez's multiple website visits put their

18  motion on stronger footing than if her sole visit had been to the webpage partially recreated by

19  Mr. Bhadania. For good reason: "Repeated use of a website or mobile application does not

20  contribute to constructive notice because users are no more likely to stumble upon inconspicuous

21  hyperlinks on their hundredth or thousandth visit than they are on their first." *Benson v. Double*

22  *Down Interactive, Ltd. Liab. Co.*, No. 18-36015, 2020 WL 468422, at *2 (9th Cir. Jan. 29, 2020).

23

24

1    Once again, as in *Anand*, *Nguyen*, and *Berkson*, the design and content of Fluent's

2    recreated webpage and the lack of explicit connection between the "Continue" button and the

3    link to the Terms & Conditions would not put a reasonably prudent user on notice of the

4    arbitration provision. Defendants have not met their burden of proving an agreement to arbitrate

5    with Ms. Hernandez.

6         3.    Defendants rely on inapposite cases.

7    Defendants rely on cases in which webpages drew the user's attention to the contract—

8    instead of distracting from it like Fluent's webpages. For example, *all* of the webpages featured a

9    blue hyperlink to the contract. That is not a coincidence. A widely-followed usability convention

10   calls for textual hyperlinks to be blue, popping off the page and signaling to the user that the text

11   is a hyperlink. *See Cullinane*, 893 F.3d at 63 (hyperlinks are typically blue and underlined). As

12   another example, in all of the cases the ratio of the font size of the hyperlink to the contract to the

13   font size of the other text on the page was larger than on Fluent's webpages.

14   In *PDC Laboratories, Inc. v. Hach Co*., "the Terms were hyperlinked on three separate

15   pages of the online … order process in underlined, blue, contrasting text" and were "specifically

16   referenced in the final order step, which read: "STEP 4 of 4: **Review terms**, add any comments,

17   and submit order." No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009) (emphasis

18   added). On Fluent's recreated webpages, by contrast, the hyperlinks are not in colorful,

19   contrasting text and clicking the button was not linked to agreement to the contract. Fluent could

20   have included a button that said (for instance) "Agree to Terms & Conditions" or a bolded

21   header directing the user to "Review Terms," but chose not to.

22   In *Nevarez v. Forty Niners Football Co*., the user had to click on an "Accept and

23   Continue" button that was followed by the statement "By continuing past this page, you agree to

24   our terms of use." No. 16-cv-07013, 2017 WL 3492110, at *2 (N.D. Cal. Aug. 15, 2017). The

statement was in black bold text on white background and "terms of use" was in blue,

contrasting font. *Id.* at *2, 7. There was nothing on the webpage other than the terms of use that

the user could have been "accepting." *Id.* at *2. The user was notified of the terms of use a

second time by a similarly bolded statement with a blue hyperlink to "terms of use" when she

completed her purchase, and another notification was placed next to the "Submit Order" button

that stated "By clicking the 'Submit Order' button, you are agreeing to the Ticketmaster

Purchase Policy and Privacy Policy." *Id.* at *7. The court recognized that the agreement was not

a true browsewrap because "a user of the Ticketmaster Website must take some affirmative

actions to agree to the Ticketmaster Website's [Terms of Use]." *Id.*

Defendants' citation to cases in which the terms were expressly linked to the button users

clicked to signify agreement are equally unhelpful to Defendants' effort to enforce Terms &

Conditions that were *not* expressly linked to the buttons Plaintiffs clicked. *See Rodriguez v.

Experian Serv. Corp.*, No. CV 15-3553-R, 2015 WL 12656919, at *2 (C.D. Cal. Oct. 5, 2015)

(the uncluttered webpage "contains the exact disclosure that the Ninth Circuit found was missing

in *Nguyen*, … an express disclosure and acknowledgement, which stated, 'By clicking the button

above … you agree to our Terms of Use'" (second ellipses in original)); *Graf v. Match.com,

LLC*, No. CV 15-3911 PA, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) ("all users of the

Match.com website during the relevant time period were required to affirmatively agree to the

Terms of Use when they clicked on a 'Continue' or other similar button on the registration page

where it was explained that by clicking on that button, the user was affirming that they would be

bound by the Terms of Use, which were always hyperlinked and available for review"));

*Crawford v. Beachbody, LLC*, No. 14-cv-1583-GPC, 2014 WL 6606563, at *1 (S.D. Cal. Nov. 5,

2014) ("Immediately above the 'Place Order' box, there was language that said, 'By

1    clicking *Place Order* below, you are agreeing that you have read and understand the Beachbody

2    Purchase Terms and Conditions, and Team Beachbody Terms and Conditions.' The words

3    'Terms and Conditions' were in blue font, while the surrounding language was in grey font, and

4    were hyperlinked to the actual Terms and Conditions.").

5         Finally, Defendants are wrong that notice of the arbitration provision was "far less

6    conspicuous" in *Silverman v. Move Inc.*, No. 18-cv-05919-BLF, 2019 WL 2579343 (N.D. Cal.

7    June 24, 2019). In *Silverman*, the initial transaction took place by telephone. *Id.* at *11. The

8    plaintiff, a real estate professional with 16 years in the business who teaches contract and

9    negotiation classes and was therefore not an unsophisticated website user like Plaintiffs, *id.* at *6,

10   called one of the defendants to sign up for a one-year contract for one of its services for realtors.

11   *Id.* at *6, 11. The account executive informed the plaintiff that she would receive written

12   confirmation of the order with "all of the details and important information about [her] purchase"

13   of the "fairly extensive" service that "require[ed] monthly payments in return for specific

14   services available through the website." *Id.* The court found that this verbal admonition was

15   sufficient to put the plaintiff on notice of the terms of the agreement. *Id.* The plaintiff also

16   received an email order confirmation with the terms of the agreement. *Id.* at *7. When the

17   plaintiff called to renew the service for another year, she received a second email with the terms.

18   *Id.* As the court noted, the case was nothing like *Nguyen* because the agreement "was not a

19   '[c]ontract[] formed on the Internet' through an unwitting consumer's use of a website." *Id.* at

20   *11 (alterations in original) (quoting *Nguyen*, 763 F.3d at 1175-76).

21   **B.    Neither Freedom nor Drips may compel arbitration.**

22        Defendants contend that Freedom and Drips may compel arbitration under theories of

23   estoppel and third-party beneficiary. Their cursory argument, made in a footnote without any

24   legal argument or factual support, should be rejected. *See Castro v. ABM Indus., Inc.*, 325 F.R.D.

332, 334 n.3 (N.D. Cal. 2018) ("arguments 'raised only in footnotes … are generally deemed waived'" (alteration in original) (quoting *Estate of Saunders v. C.I.R.*, 745 F.3d 953, 962 n.8 (9th Cir. 2014)). On the merits, moreover, the "strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement," *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (citation omitted), and Fluent and Drips have not met their burden.

Defendants do not explain why they believe Freedom and Drips can assert equitable estoppel and the cases they cite do not support their claim. The Ninth Circuit has stated that it sees "no basis for extending the concept of equitable estoppel of third parties in an arbitration context beyond the **very narrow confines**" of existing jurisprudence. *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) (emphasis added). The doctrine applies to a nonsignatory's effort to enforce an arbitration clause

> in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are "intimately founded in and intertwined with" the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and "the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement."

*Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128–29 (9th Cir. 2013) (alteration in original) (citations omitted). Neither applies in this case. Plaintiffs' claims do not depend on the Terms & Conditions, which are not even mentioned in Plaintiffs' Third Amended Complaint. *See generally* ECF No. 220. Plaintiffs assert only claims for violation of the TCPA. As in *Kramer*, Plaintiffs' claims do not rely upon the existence of the Terms & Conditions—"Plaintiffs do not seek to simultaneously invoke the duties and obligations of [Freedom and Lead Science] under the [Terms & Conditions] … while seeking to avoid arbitration"—and equitable estoppel does not apply. 705 F.3d at 1130-32, 1134; *see also Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d 534,

552 (Cal. Ct. App. 2009) (finding that equitable estoppel did not apply because the plaintiffs did "*not* rely on, or even mention, the terms of the operating agreements"). That is so even though Defendants invoke a defense they claim is rooted in the contract. *In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. C-12-md-2330 EMC, 2014 WL 1338474, at *8 (N.D. Cal. Mar. 28, 2014).[1]

Defendants also do not explain why Freedom and Drips claim to be third-party beneficiaries of the Terms & Conditions, even though "the law requires 'special clarity' to support a finding 'that the contracting parties intended to confer a benefit' on a third party." *InterGen N.V. v. Grina*, 344 F.3d 134, 146 (1st Cir. 2003) (citation omitted). The two cases Defendants cite do not bolster their non-argument. In *Spano v. V&J National Enterprises, LLC*, the defendants were "explicitly listed as 'third-party beneficiaries of th[e] Agreement and have the right to enforce th[e] Agreement.'" 264 F. Supp. 3d 440, 452 (W.D.N.Y. 2017) (alterations in original). Freedom and Lead Science do not claim to be explicitly listed as third-party beneficiaries of the Terms & Conditions—because they are not. And in *Spear, Leeds & Kellogg v. Central Life Assurance Co.*, the Second Circuit held that brokers who joined the New York Stock Exchange had agreed to abide by its Constitution and Arbitration Rules, which created "enforceable contract rights for non-members in certain specified circumstances" even in the absence of an agreement. 85 F.3d 21, 26 (2d Cir. 1996). Defendants have not identified any similar organization's rules that would apply in this case.

## V.  CONCLUSION

Because Defendants have not proven an agreement to arbitrate, their motion should be denied.

---

[1] The Second Circuit affirmed the district court's *denial* of a nonsignatory's motion to compel arbitration in *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361-62 (2d Cir. 2008), and did not decide the issue in *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70-71 (2d Cir. 2005).

1    RESPECTFULLY SUBMITTED AND DATED this 16th day of March, 2020.

2                                    TERRELL MARSHALL LAW GROUP PLLC

3
                                    By: Beth E. Terrell, SBN #178181
4                                        Beth E. Terrell, SBN #178181
                                         bterrell@terrellmarshall.com
5                                        Jennifer Rust Murray, *Admitted Pro Hac Vice*
                                         jmurray@terrellmarshall.com
6                                        936 North 34th Street, Suite 300
                                         Seattle, Washington 98103
7                                        Telephone: (206) 816-6603
                                         Facsimile: (206) 319-5450
8
                                         Jon B. Fougner, SBN #314097
9                                        jon@fougnerlaw.com
                                         600 California Street, 11th Floor
10                                       San Francisco, California 94108
                                         Telephone: (415) 577-5829
11                                       Facsimile: (206) 338-0783

12                                       Anthony I. Paronich, *Pro Hac Vice*
                                         anthony@paronichlaw.com
13                                       PARONICH LAW, P.C.
                                         350 Lincoln Street, Suite 2400
14                                       Hingham, Massachusetts 02043
                                         Telephone: (617) 738-7080
15                                       Facsimile: (617) 830-0327

16                                       Edward A. Broderick, *Pro Hac Vice*
                                         ted@broderick-law.com
17                                       BRODERICK LAW, P.C.
                                         99 High Street, Suite 304
18                                       Boston, Massachusetts 02110
                                         Telephone: (617) 738-7080
19                                       Facsimile: (617) 830-0327

20

21

22

23

24

1

2

3

4

Matthew P. McCue, *Pro Hac Vice*
mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

5

*Attorneys for Plaintiffs and the Proposed Classes*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

<u>CERTIFICATE OF SERVICE</u>

2

I, Beth E. Terrell, hereby certify that on March 16, 2020, I electronically filed the

3

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4

such filing to the following:

5

Jay T. Ramsey, SBN #273160
Email: jramsey@sheppardmullin.com

6

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
1901 Avenue of the Stars, Suite 1600

7

Los Angeles, California 90067-6055
Telephone: (310) 228-3700

8

Facsimile: (310) 228-3701

9

*Attorneys for Defendants Freedom Financial Network, LLC, Freedom Debt
Relief, LLC, Fluent, Inc., and Lead Science, LLC*

10

DATED this 16th day of March, 2020.

11

TERRELL MARSHALL LAW GROUP PLLC

12

13

By: Beth E. Terrell, SBN #178181
Beth E. Terrell, SBN #178181

14

Email: bterrell@terrellmarshall.com
936 North 34th Street, Suite 300

15

Seattle, Washington 98103
Telephone: (206) 816-6603

16

Facsimile: (206) 319-5450

17

*Attorneys for Plaintiffs and the Proposed Classes*

18

19

20

21

22

23

24