1

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
JAY T. RAMSEY, Cal. Bar No. 273160
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:    310.228.3700
Facsimile:    310.228.3701
E mail        jramsey@sheppardmullin.com

Attorneys for Defendants
FREEDOM FINANCIAL NETWORK, LLC,
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC., and LEAD SCIENCE, LLC,

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

12

DANIEL BERMAN, STEPHANIE
HERNANDEZ, and ERICA RUSSELL,

13

                    Plaintiffs,

14

          v.

15

FREEDOM FINANCIAL NETWORK LLC,
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC., and LEAD SCIENCE, LLC,

16

17

                    Defendants.

18

19

FREEDOM FINANCIAL NETWORK, LLC
and FREEDOM DEBT RELIEF, LLC,

20

                    Third Party Plaintiffs,

21

          v.

22

DOES 1 through 5 ,

23

                    Third Party Defendants.

24

Case No. 4:18-cv-01060-YGR

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' RENEWED MOTION FOR
CLASS CERTIFICATION**

*Honorable Yvonne Gonzalez Rogers*

Hearing TBD per Court Order (Dkt. No. 252)

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................1

    A.    Fluent, Freedom, Lead Science, And The Freedom Campaign ..................................1

    B.    Fluent's Lead Generation Process ...........................................................................1

    C.    The Campaign Was Not "Littered With Bogus Leads" ...........................................3

    D.    Plaintiffs Have Dropped Several Arguments ...........................................................6

CLASS CERTIFICATION SHOULD BE DENIED ................................................................7

    A.    Fluent's Arbitration Agreement Precludes Certification Of The Visitor
        Class .........................................................................................................................7

        1.    The Visitor Class agreed to arbitrate as a matter of law ..............................8

        2.    The testimony of Russell and Hernandez makes them atypical and
            inadequate ...................................................................................................9

        3.    Individualized issues as to the arbitration agreement preclude
            certification ...............................................................................................12

    B.    TCPA Consent Precludes Certification Of The Visitor Class.................................15

        1.    The Visitor Class provided TCPA consent as a matter of law....................16

        2.    The testimony of Russell and Hernandez makes them atypical and
            inadequate .................................................................................................19

        3.    Individualized issues as to TCPA consent preclude certification ...............20

    C.    The Non-Visitor Class Fails Numerosity, Predominance, And Superiority ...........22

    D.    The Putative Classes Were Not Contacted With An Autodialer..............................25

CONCLUSION ......................................................................................................................25

APPENDIX A ........................................................................................................................26

APPENDIX B ........................................................................................................................27

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

<u>Federal Cases</u>

4

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*
   2017 WL 1806583 (N.D. Cal. May 5, 2017) ...........................................................................20

5

*Amisil Holdings Ltd. v. Clarium Capital Mgmt. LLC*
   622 F. Supp. 2d 825 (N.D. Cal. 2007) ....................................................................................14

6

7

*Avilez v. Pinkerton Government Servs., Inc.*
   596 Fed. Appx. 579 (9th Cir. 2015) (unpublished) ..................................................................9

8

*Barr v. Am. Ass'n of Political Consultants, Inc*
   140 S. Ct. 2335 (2020) ...........................................................................................................17

9

10

*Bee, Denning, Inc. v. Capital All. Grp.*
   310 F.R.D. 614 (S.D. Cal. 2015) .............................................................................................20

11

*Bennett v. GoDaddy.com LLC*
   2019 WL 1552911 (D. Ariz. Apr. 8, 2019) .............................................................................20

12

13

*Booth v. Appstack, Inc.*
   2015 WL 1466247 (W.D. Wash. Mar. 30, 2015) ...................................................................20

14

*Briseno v. ConAgra Foods, Inc.*
   844 F.3d 1121 (9th Cir. 2017) ................................................................................................23

15

16

*Brown v. DirecTV, LLC*
   330 F.R.D. 260 (C.D. Cal. 2019) ...........................................................................................20

17

*Bustillos v. Bd. of Cty. Comm'rs of Hidalgo Cty.*
   310 F.R.D. 631 (D.N.M. 2015) .........................................................................................15, 18

18

19

*Campbell v. Gen. Dynamics Gov't Sys. Corp.*
   407 F.3d 546 (1st Cir. 2005) ..................................................................................................18

20

21

*Comcast Corp. v. Behrend*
   569 U.S. 27 (2013) ....................................................................................................................7

22

23

*Connelly v. Hilton Grand Vacations Co., LLC*
   294 F.R.D. 574 (S.D. Cal. 2013)............................................................................................17

24

*Crawford v. Beachbody, LLC*
   2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ...........................................................................8

25

26

*Davis v. AT&T Corp.*
   2017 U.S. Dist. LEXIS 46611 (S.D. Cal. Mar. 28, 2017)......................................................25

27

28

*Davis v. AT&T Corp.*
   2017 WL 1155350 (S.D. Cal. Mar. 28, 2017)........................................................6, 20

*Dominguez v. Yahoo, Inc.*
   894 F.3d 116 (3d Cir. 2018) ................................................................................25

*Facebook, Inc. v. Duguid*
   No. 19-511, __ S.Ct. __, 2020 WL 3865252 (U.S. July 9, 2020) ........................25

*Feske v. MHC Thousand Trails Ltd. P'ship*
   2013 U.S. Dist. LEXIS 37232 (N.D. Cal. Mar. 18, 2013) ...............................10, 19

*Fober v. Mgmt. & Tech. Consultants, LLC*
   2016 WL 7626431 (C.D. Cal. July 29, 2016) .......................................................18

*Gadelhak v. AT&T Services, Inc.*
   950 F.3d 458 (7th Cir. 2020)................................................................................25

*Glasser v. Hilton Grand Vacations Co.*
   948 F.3d 1301 (11th Cir. Jan. 27, 2020) ..............................................................25

*Gordon v. Caribbean Cruise Line, Inc.*
   2019 U.S. Dist. LEXIS 20604 (N.D. Ill. Feb. 8, 2019)...........................18, 21, 22

*Gordon v. Caribbean Cruise Line, Inc.*
   2019 WL 498937 (N.D. Ill. Feb. 8, 2019)............................................................21

*Graf v. Match.com, LLC*
   2015 WL 4263957 (C.D. Cal. July 10, 2015) ........................................................8

*Granger v. Sears Roebuck & Co.*
   2008 WL 11424140 (S.D. Ala. Aug. 4, 2008) ......................................................15

*Gutierrez v. Barclays Grp.*
   2011 U.S. Dist. LEXIS 12546 (S.D. Cal. Feb. 9, 2011) ........................................25

*Hilton v. Fluent*
   297 F. Supp. 3d 1337 (S.D. Fla. 2018).................................................................1, 8

*Hunter v. Time Warner Cable Inc.*
   2019 WL 3812063 (S.D.N.Y. Aug. 14, 2019) .....................................................6, 25

*Johnson v. Yahoo! Inc.*
   2018 WL 835339 (N.D. Ill. Feb. 13, 2018)..........................................................20

*Knapper v. Cox Commc'ns, Inc.*
   329 F.R.D. 238 (D. Ariz. 2019) ...........................................................................20

*Kristensen v. Credit Payment Servs.*
   12 F. Supp. 3d 1292 (D. Nev. 2014) ....................................................................20

*Lavigne v. First Cmty. Bancshares, Inc.*
  2018 WL 2694457 (D.N.M. June 5, 2018) ........................................................... passim

*Legg v. PTZ Ins. Agency, Ltd.*
  321 F.R.D. 572 (N.D. Ill. 2017) ........................................................................20, 21

*Lim v. Helio, LLC*
  2012 WL 12884439 (C.D. Cal. Apr. 18, 2012)...............................................................9

*Lozano v. AT & T Wireless Services, Inc.*
  504 F.3d 718 (9th Cir. 2007)...............................................................................15

*Lundbom v. Schwan's Home Serv., Inc.*
  2020 WL 2736419 (D. Or. May 26, 2020) (appeal filed; copy of decision
  attached as Exhibit 22) ..........................................................................18

*Makaron v. Enagic USA, Inc.*
  324 F.R.D. 228 (C.D. Cal. 2018) .........................................................................20

*Marks v. Crunch San Diego, LLC*
  904 F.3d 1041 (9th Cir. 2018)..............................................................................25

*Mazur v. eBay, Inc.*
  257 F.R.D. 563 (N.D. Cal. 2009) ..................................................................15, 18

*Mazza v. Am. Honda Motor Co.*
  666 F.3d 581 (9th Cir. 2012).................................................................7, 15, 18

*McCurley v. Royal Seas Cruises, Inc.*
  331 F.R.D. 142 (S.D. Cal. 2019)....................................................................21, 22

*McMillion v. Rash Curtis & Assocs.*
  2017 WL 3895764 (N.D. Cal. Sept. 6, 2017)...........................................................20

*Molski v. Gleich*
  318 F.3d 937 (9th Cir. 2003)......................................................................10, 19

*Morgan v. Adventist Health System/Sunbelt, Inc.*
  2020 WL 1674307 (M.D. Fla. Jan. 15, 2020) ....................................................6, 24

*Morris v. Modernize, Inc.*
  2018 WL 7076744 (W.D. Tex. Sept. 27, 2018) .......................................................18

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*
  2016 WL 2610107 (S.D. Cal. May 6, 2016) ...........................................................17

*Nevarez v. Forty Niners Football Co., LLC*
  No. 16-CV-07013, 2017 WL 3492110 (N.D. Cal. Aug. 15, 2017)..................................8

*Nguyen v. Barnes & Noble Inc.*
  763 F.3d 1171 (9th Cir. 2014)........................................................................8, 9, 10

*Nicosia v. Amazon.com, Inc.*
    2020 WL 2988855 (2d Cir. June 4, 2020) (unpublished) ..........................................10

*O'Callaghan v. Uber Corp. of Cal.*
    2018 U.S. Dist. LEXIS 112021 (S.D.N.Y. July 3, 2018).........................................18

*O'Connor v. Uber Techs., Inc.*
    904 F.3d 1087 (9th Cir. 2018)...................................................................................9

*O'Shea v. Am. Solar Sol., Inc.*
    318 F.R.D. 633 (S.D. Cal. 2017)..............................................................................20

*Oliver v. TTC-Ameridial, LLC*
    2018 WL 1255017 (N.D. Ill. Mar. 12, 2018) ...........................................................18

*Pablo v. Servicemaster Global Holdings, Inc.*
    2011 U.S. Dist. LEXIS 87918 (N.D. Cal. Aug. 9, 2011) .........................................9

*Register.com, Inc. v. Verio, Inc.*
    356 F.3d 393 (2d Cir. 2004) .....................................................................................9

*Revitch v. Citibank, N.A.*
    2019 WL 1903247 (N.D. Cal. Apr. 28, 2019) ...........................................................6

*Rodriguez v. Experian Servs. Corp.*
    2015 WL 12656919 (C.D. Cal. Oct. 5, 2015) ...........................................................8

*Rodriguez v. Premier Bankcard, LLC*
    2018 U.S. Dist. LEXIS 149225 (N.D. Ohio Aug. 31, 2018) ...................................25

*In the Matter of Rules and Regs. Implementing the Tel. Consumer Protection Act*
    30 FCC Rcd. 7961 (2015) ........................................................................................25

*Siles v. ILGWU Nat'l Ret. Fund*
    783 F.2d 923 (9th Cir. 1986).....................................................................................23

*Simpson v. Pulte Home Corp.*
    2012 U.S. Dist. LEXIS 63889 (N.D. Cal. May 7, 2012) ..........................................14

*Smith v. Microsoft Corp.*
    297 F.R.D. 464 (S.D. Cal. 2014)...............................................................................17

*Southwest Airlines Co. v. BoardFirst, L.L.C.*
    2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) ..........................................................9

*Stemple v. QC Holdings, Inc.*
    2014 U.S. Dist. LEXIS 125313 (S.D. Cal. Sept. 5, 2014) .......................................20

*Ticketmaster Corp. v. Tickets.Com, Inc.*
    2003 WL 21406289 (C.D. Cal. Mar. 7, 2003) ...........................................................9

*Tokoshima v. Pep Boys*
    2014 WL 1677979 (N.D. Cal. Apr. 28, 2014) ..........................................................7

*Torbit, Inc. v. Datanyze, Inc.*
    2013 U.S. Dist. LEXIS 19584 (N.D. Cal. Feb. 13, 2013)........................................14

*Tschudy v. J.C. Penney Corp., Inc.*
    2015 WL 8484530 (S.D. Cal. Dec. 9, 2015)............................................................9

*Vega v. T-Mobile USA, Inc.*
    564 F.3d 1256 (11th Cir. 2009).............................................................................23

*West v. California Services Bureau, Inc.*
    323 F.R.D. 295 (N.D. Cal. 2017) .....................................................................6, 20

*Whitaker v. Bennett Law, PLLC*
    2014 WL 5454398 (S.D. Cal. Oct. 27, 2014)..........................................................20

*Wilson v. Badcock Home Furniture*
    2018 U.S. Dist. LEXIS 213792 (M.D. Fla. Dec. 19, 2018) .....................................24

**Federal: Statutes, Rules, Regulations, Constitutional Provisions**

47 C.F.R. 64.1200 ..........................................................................................7, 16, 17

47 U.S.C. § 227 ............................................................................................................16

**INTRODUCTION**

A careful analysis of the evidence and the law reveals that certification should be denied. The Court conducted such an analysis before and denied certification then.  Plaintiffs' second try mostly repeats what was argued before, with only slight changes, and it ultimately fares no better. In their brief, Plaintiffs cite generic legal standards and make cursory arguments about Rule 23's requirements, but those arguments elide the complexities of the case and the actual evidence developed in discovery.  Rather than seriously grappling with that evidence and the law, Plaintiffs spend pages painting a picture of alleged wrongdoing and deceit by distorting certain facts and leaving others out.  This false narrative does not support class certification or relieve them of their burden of establishing Rule 23's requirements.  Notably, they have dropped many of the salacious arguments that they once pursued, including (i) that all of the leads were fake or manufactured; (ii) that Defendants destroyed evidence; and (iii) that Defendants somehow hid the ball in discovery. Defendants point this out to underscore how often Plaintiffs have shifted course in hopes of finding a viable theory.  They still have not, and so certification should be denied again.

**FACTUAL BACKGROUND**

**A.    Fluent, Freedom, Lead Science, And The Freedom Campaign**

Fluent is a digital marketing company that generates leads for its clients. (Declaration of Mitenkumar Bhadania ("Bhadania Decl.") ¶ 2.)  Freedom is one of Fluent's clients, and it provides debt relief services to consumers. (*Id.*; Declaration of Dharma Naik ("Naik Decl.") at ¶ 3.)  To identify potential customers, Freedom engaged Fluent to locate individuals (leads) who may have needed debt relief services.  (Naik Decl. ¶ 3.)  Fluent did so, and a certain number of the leads were then contacted by phone or text (the "Freedom Campaign"). The platform used to send the texts and calls was provided by Lead Science, LLC. (*See* Bhadania Decl. ¶ 2.)

In this case, Plaintiffs Berman, Hernandez, and Russell claim that they received telephone calls and text messages in violation of the TCPA as a result of the Freedom Campaign.

**B.    Fluent's Lead Generation Process**

To generate leads for its clients, Fluent operates a number of consumer-facing websites through which consumers can obtain rewards, enter into sweepstakes, or receive job listings,

product samples, or other content (each a "Website" and collectively, "Websites"). (Bhadania Decl. ¶ 2.) To be eligible for these opportunities, users must first register with the Website, which includes submitting certain personal information, and then responding to survey questions. (*Id.*) The survey questions presented to each user depends on, among other things, which advertising campaigns Fluent's customers are running. (*Id.* ¶ 8.) Importantly, a user will only be able to obtain rewards and other benefits if they provide accurate contact information. (*Id.* ¶ 3.) For example, Plaintiff Russell earned a $1,000 gift card, which Fluent was able to provide to her because she entered accurate information on the Website. (*Id.* ¶ 8, Ex. 5.)

Fluent's Website flows are described in detail below. Briefly, at the beginning of the process, users are notified about, given easy access to (by clickable hyperlink), and agree to Fluent's Website Terms & Conditions, which include an arbitration clause and class action waiver. (Bhadania ¶¶ 3-4, 20-35, Exs. 1-3.) Users cannot register for any rewards or other benefits without proceeding beyond the registration page. (*Id.*) Users then proceed through a survey, at the end of which, on a page with virtually nothing else on it, Fluent asks that users provide their express written consent to receive autodialed text messages and telephone calls and prerecorded messages by Fluent's "Marketing Partners." (*Id.* ¶ 8-10, 20-35, Ex. 1-3.) The Marketing Partners are identified and listed in a clickable hyperlink, which is conspicuously located right on the same page, right in the consent language. (*Id.*) Users are informed that they need not provide such consent and that such consent is not necessary to obtain the rewards and benefits offered on the Websites. This notice is plain, and many users decide not to provide consent after reading the notice. In fact, roughly 30 percent of users do not provide consent. (*Id.* ¶ 9.) If they do not provide consent, Fluent will not post their information to clients conducting texting or calling campaigns. (*Id.* ¶ 10.)[1]

Fluent's Websites[2] present a clear bargain: users provide contact information and answer survey questions about themselves, their interests, preferences and opinions so that they can be

---

[1] If a user does not provide TCPA consent, the user's information is still valuable to Fluent and its Marketing Partners. (Declaration of Daniel Barsky ("Barsky Decl.") ¶ 4.)

[2] The Court is welcome to view one or more of the Websites itself. *See, e.g.*, www.retailproductzone.com or www.getsamplesonlinenow.com.

marketed to; in return, they receive the opportunity to earn rewards and receive other benefits.  If users don't want this or don't like this, they can stop using the Website.  And if they are concerned about autodialed text messages and phone calls but still want the rewards and benefits, they can register without checking the TCPA consent box.  As noted above, ***30% of users do not provide TCPA consent***, but nonetheless sign up for rewards and benefits.  This is not some set of hapless people visiting a website at random, getting duped into providing TCPA consent.  In fact, as described below, Plaintiffs Hernandez and Russell conceded in sworn testimony that they understood exactly what they were signing up for.

If a user provides TCPA consent, Fluent may post their contact information to one or more of its clients.  (Bhadania Decl. ¶ 10.)  Although Fluent obtains TCPA consent on behalf of all of its Marketing Partners, Fluent may post the lead to only one to five of Fluent's clients, on average. (Barsky Decl. ¶ 3.)  Which Marketing Partner receives the lead depends on what marketing campaigns are running at the time and the user's answers to the survey questions. (*Id.*)  Here, for example, Fluent provided Freedom with information about users who answered survey questions in a manner that identified them as potential Freedom customers. (*Id.*)

Fluent does not scrape the Internet or public records for information about users. (Bhadania Decl. ¶ 11.)  Nor does Fluent buy leads from third parties to provide to its advertiser clients and did not do so for the Freedom Campaign.  (*Id.*)[3]  The information that Fluent provided to Freedom all came from users completing the flows on the Websites and only if those users checked the unchecked TCPA consent box.  (Bhadania Decl.  ¶¶ 11, 14-19.)

**C.      The Campaign Was Not "Littered With Bogus Leads"**

In the past, Plaintiffs flirted with an argument that all of Fluent's leads were fake, either bot generated or manufactured by Fluent.  Plaintiffs never had evidence to support that argument and have now dropped it.  But, in hopes of painting Fluent in an unfavorable light, Plaintiffs continue to claim that the lead list is "littered with bogus leads."  Their claims are unfounded.

---

[3] Fluent uses third-party publishers and affiliates to drive traffic to its Websites, but in all cases the user must still complete the flow on Fluent's Website.  Third-party publishers and affiliates ***are not paid*** based on a user: (i) consenting to be contacted by telemarketing or text message/SMS; or (ii) signing up for any offer advertised on a Fluent website.  (Bhadania Decl. ¶ 12.)

**First**, real people register on Fluent's websites. Hernandez and Russell concede that they visited the Websites, and Russell, like many others, earned a $1,000 gift card as a reward. Two other putative class members (one of whom also earned a reward) have confirmed that they visited Fluent's Websites. (Exs. 14, 15.[4]) Moreover, real people ultimately became Freedom customers as a result of the Freedom Campaign. (Naik Decl. ¶ 4.) By contrast, other than Berman, Plaintiffs have not identified a single person who was contacted without having visited a Website.

**Second**, citing their expert, Anya Verkhovskaya ("A.V." or "Verkhovskaya"), Plaintiffs argue that the lead lists "have hundreds of thousands of entries with missing name and address data or obviously invalid information, including: 10,323 . . . invalid first names . . ., 363,792 . . . invalid last names . . ., and 60,982 entries with street addresses with missing numbers or names or nonsense characters." (Plaintiffs' Motion ("Mot.") at 5:3-11.) This makes up "more than 50% of the leads . . ., which is far in excess of industry standards" (*id.* at 5:14-16), which Verkhovskaya opines is between 3 and 5% (Plaintiffs' Exhibit 10, A.V. Report, ¶ 54). Verkhovskaya's analysis is demonstrably wrong – she relied on a dataset that she admits was less fulsome than other data available to her and, as a result, reached a false conclusion. Fluent produced records relating to the leads posted to the Freedom Campaign. Those records include, among other things, first name, last name, email address, and physical address. Lead Science separately produced a list of the phone numbers that it contacted. The Lead Science list, which Verkhovskaya relied upon, is a subset of the Fluent list and is more limited in the information that it includes – generally just first name, phone number, and Zip code. In many cases, the Lead Science list does not include last name information even though the information is included in the records that Fluent produced. While Verkhovskaya notes that Fluent's data is more complete (A.V. Report ¶ 52 ["It is also my understanding that the quality of name records in the Fluent Leads is better than in the LS Leads."]), she nevertheless opines that there are a large number of "blank" last names in the Lead Science dataset, leading to her conclusion that the lead lists have 363,792 invalid last names (*id.* ¶ 56). Had she relied instead on the Fluent list, she would have concluded that there is only **one**

---

[4] References to Exhibits without a reference to a Declaration refer to Exhibits attached to the Declaration of Jay T. Ramsey (the "Ramsey Decl."), which attaches Exhibits 11-21.

blank last name.  (Ex. 18, 2d Suppl. Kalat, ¶¶ 6-10.)  Fixing just this one error results in a reduction of the total leads with supposedly "invalid" first or last names from 374,115 to 12,602, which represents 1.73% of the leads (*id.*, 2d Suppl. Kalat ¶ 11-16) – well below the 3 and 5% average that Verkhovskaya says is normal.[5]  As to the remainder, a user's failure to provide accurate information does not mean that they didn't agree to arbitration or that they did not consent to contact at the phone number they provided.[6]

     **Third**, Plaintiffs argue that there was a high percentage of opt-outs, and thus the leads must have been invalid.  (*See* Mot. at 5:22-6:1.)  But just because someone opted out does not mean that they did not consent in the first instance.  Moreover, Plaintiffs present no evidence that an opt-out rate of about 25% is unusual for a lead generation business.  If anything, the opt-out rate demonstrates that the system works – users may have answered survey questions that suggested that they might need debt relief services, but, once contacted about debt relief, they opted-out.  At that point, Defendants placed them on a do-not-call list and they were not contacted again.  (Bhadania Decl. ¶ 18.)  *There is no claim in this case by any Plaintiff or other putative class member that they opted out, but then continued to be contacted as part of the campaign.*

     **Fourth**, Plaintiffs argue that the "campaign generated a flurry of complaints," citing "a compilation of more than 5,000 'wrong number' complaints" filed with Plaintiff Berman's "prior certification motion."  (Mot. at 5:20-22.)[7]  Defendants debunked the compilation before.  5,000

---

[5] Verkhovskaya's analysis has numerous other errors – for example, she deems "invalid" several first and last names that are either real names, slight misspellings, or initials.  Fixing these issues drops the percentage even more.  (Ex. 18, 2d Suppl. Kalat ¶¶ 17-25.)  Plaintiffs also cite Verkhovskaya to argue that "There were also more than 100,000 records with the same registration information, including typos and gibberish entries, that were created months apart from different IP addresses or cities."  (Mot. at 5:16-18.)  The cited portions of her report do not support this statement.  The report states that there were duplicate registrations (because people often sign up more than one time), not that all of these duplicates have "typos and gibberish."  In fact, Verkhovskaya cites only one such example and it is an obvious computer translation error (the data shows a "?" in place of an accented "i").  Further, Defendants explained the IP address issue last time (Dkt. No. 152 at 11, n.7), and Plaintiffs have dropped the argument.  Further, if users visit more than once, Fluent may prepopulate certain information, thus explaining why an entry might get carried forward.  (Bhadania Decl. ¶ 7.)

[6] In fact, "[m]any privacy organizations advocate for and defend the use of pseudonyms online." (Ex. 16, Kalat Report at ¶¶ 51, 57.)

[7] Plaintiffs do not attach this compilation again, but refer back to it, violating the Court's order admonishing this practice.  (Dkt. No. 198, Order at 16, n.12.)

"wrong number complaints" in a campaign involving 730,148 unique phone numbers represents an incredibly low percentage of the class – **_0.68%_** – and even that figure is inflated because people lie. Of the over 5,000 individuals on the "compilation" of "wrong number complaints," Kalat was able to demonstrate that 80% were from registrations where the provided-name traced back to the telephone number – meaning it was not a "wrong number." (Ex. 17, Kalat Supp. at ¶ 91.) In any event, a class of "wrong number" claims – **_which Plaintiffs do not seek to certify anyway_** – would not be certifiable given the facts of this case. *See, e.g.*, *Revitch v. Citibank, N.A.*, 2019 WL 1903247, at *4 (N.D. Cal. Apr. 28, 2019); *Hunter v. Time Warner Cable Inc.*, 2019 WL 3812063, at *10-14 (S.D.N.Y. Aug. 14, 2019); *Davis v. AT&T Corp.*, 2017 WL 1155350, at *6 (S.D. Cal. Mar. 28, 2017). *See also Morgan v. Adventist Health System/Sunbelt, Inc.*, 2020 WL 1674307, *3 (M.D. Fla. Jan. 15, 2020) (rejecting argument that a call recipient claiming a wrong number or opting-out is evidence of a lack of consent).[8]

In addition to the above, Plaintiffs direct other *ad hominem* attacks at Fluent,[9] accuse Fluent and Freedom of allegedly deceptive conduct, and present cherry-picked evidence out of context. Defendants do not have the space to address all of it, and instead address only those items arguably relevant to the Court's decision. The failure to address something (particularly misconstrued deposition testimony), is not a concession that Plaintiffs' story is accurate.

## D.      Plaintiffs Have Dropped Several Arguments

In the prior motion for class certification, Plaintiff Daniel Berman advanced a number of arguments that Plaintiffs have dropped. Defendants point this out only because those theories formed the basis for so much of the argument in the earlier briefing and potentially the Court's understanding of the case. Most notably, Plaintiffs no longer argue that the lead list was filled with bot-generated or manufactured leads or that Fluent's website traffic was insufficient to

---

[8] This is not a case, for example, where Defendants were told that they had the wrong number, their records indicated that it was the wrong number, and yet they continued calling nonetheless. *See, e.g.*, *West v. California Services Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017)

[9] Fluent has been involved in other TCPA lawsuits, but that is because of the nature of the industry in which it operates and because the TCPA is the most heavily litigated statute on the federal dockets. Plaintiffs have not cited a single TCPA case in which Fluent settled on a class basis, had a class certified against it, or has otherwise been found to have violated the statute.

1  generate the leads.  Plaintiffs also do not advance any argument that Fluent failed to provide

2  evidence of consent, destroyed evidence of consent, destroyed "server logs," or otherwise

3  withheld something in discovery.  In fact, during the additional months of discovery permitted by

4  the Court, Plaintiffs kicked the tires thoroughly (again), even conducting a virtual (COVID-

5  friendly) demonstration of Fluent's computer systems, on which Plaintiffs' experts participated.

6  Given that, this should be the last opportunity Plaintiffs receive to certify a class.

7  ## CLASS CERTIFICATION SHOULD BE DENIED

8          On a motion to certify a class, the "burden of affirmatively demonstrating that the class

9  meets the requirements of Federal Rule of Civil Procedure 23" is on the class representative.

10  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).  In that regard, a motion for

11  class certification is evidentiary:  "a party must not only be prepared to prove that there are in fact

12  sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses,

13  and adequacy of representation," under Rule 23(a), but "also satisfy through evidentiary proof at

14  least one of the provisions of Rule 23(b)."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

15  Plaintiffs must prove the requirements by a preponderance of the evidence. *Tokoshima v. Pep*

16  *Boys*, 2014 WL 1677979, at *5 (N.D. Cal. Apr. 28, 2014).  They fail to do so here

17          Plaintiffs seek to certify three classes – a "Visitor Class" and two "Non-Visitor Classes,"

18  which really can be considered as one.[10]  The classes cannot be certified for the reasons below.

19  ## A.  Fluent's Arbitration Agreement Precludes Certification Of The Visitor Class

20          Fluent's arbitration clause precludes certification.  First, the design and content of Fluent's

21  Websites create a binding agreement to arbitrate ***as a matter of law***.  As a result, there is no

22  member of the Visitor Class that did not agree to arbitrate on an individual basis.  Second, even if

23  Defendants are wrong, and the Websites did not create a binding agreement as a matter of law, the

24  testimony of both Russell and Hernandez demonstrate that ***they*** agreed to arbitrate (at the very

25

26  [10] The two Non-Visitor Classes include a class of individuals who purportedly did not visit
    Fluent's websites, but who were nonetheless called, and a subset of that group who had also
27  previously registered on the National Do-Not-Call Registry ("NDNCR").  The additional DNC
    class is irrelevant to the Court's analysis on class certification.  If someone consented under the
28  TCPA, they can be contacted, even if they are on the NDNCR.  *See* 47 C.F.R. 64.1200.  As a
    result, the NDNCR class rises or falls with the other classes.

least).  That makes them atypical and inadequate if the rest of class did not so agree.  Third, their testimony, along with the sworn declarations of other putative class members and yet more evidence described below, shows that individualized issues predominate.

### 1.  The Visitor Class agreed to arbitrate as a matter of law

At the start of Fluent's registration process, consumers input certain personal information and then reach a screen on which they are given notice of and access to Fluent's Terms & Conditions.  (Bhadania Decl. ¶¶ 3-4.)  On that screen, each putative class member clicked a button to continue with their registration. Above that button was the phrase:  "I understand and agree to the <u>Terms & Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>."  (*Id.* ¶¶ 3-4, 14-19.)  Not only does this sentence specifically reference the mandatory arbitration provision (which is something Russell actually observed [Ex. 11, Russell Depo at 39:9-19]), both of the underlined phrases <u>Terms & Conditions</u> and <u>Privacy Policy</u> were hyperlinks that, when clicked, displayed the relevant Terms & Conditions and Privacy Policy applicable at that time.  (Bhadania Decl. ¶¶ 3-4, 20-35, Exs. 1, 2, 3).  The full pages from the Website flows for each Plaintiff are included in Exhibits 1, 2, and 3 to the Bhadania Declaration and excerpts are included in Appendix A, for convenience.

As described in Defendants' motion to compel arbitration, courts have consistently held that websites like this result in binding contracts as a matter of law.[11]  Because the Terms & Conditions had an arbitration clause with a class action waiver (Bhadania Decl. ¶ 6, Exs. 1-10), class certification must be denied.  As courts hold, when a significant portion of the class (here, the entire class) is subject to arbitration agreements with class action waivers, certification is

---

[11] *See* Dkt. No. 223, Motion to Compel Arbitration at 7-11; Dkt No. 250, Reply on Motion to Compel Arbitration at 4-10, *citing Garcia v. Enterprise Holdings, Inc.*, 78 F. Supp. 3d 1125, 1129-31, 1137 (N.D. Cal. 2015); *Nevarez v. Forty Niners Football Co., LLC*, 2017 WL 3492110, at *2 (N.D. Cal. Aug. 15, 2017); *Rodriguez v. Experian Servs. Corp.*, 2015 WL 12656919, at *2 (C.D. Cal. Oct. 5, 2015); *Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015); *Crawford v. Beachbody, LLC*, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) *and cf. Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014).)  *See also Hilton v. Fluent*, 297 F. Supp. 3d 1337, 1342-43 (S.D. Fla. 2018) ("Also, to the extent that Plaintiffs claim they should not be bound by the Arbitration Agreement because they did not see or read the Terms and Conditions on the Reward Zone websites before checking the box to provide consent, I would be inclined to reject such arguments.").

1    inappropriate. *Pablo v. Servicemaster Global Holdings, Inc.*, 2011 U.S. Dist. LEXIS 87918 at *5

2    (N.D. Cal. Aug. 9, 2011) (denying certification because the court was "faced with evidence that

3    numerous arbitration agreements were signed by defendants and their employees," and that

4    evidence "supports the Court's finding that a class action is not the superior method of

5    adjudication"); *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018) (reversing

6    class certification based upon improper finding of unenforceability of arbitration agreement, and

7    remanding for further class certification proceedings where "[t]he class as certified includes

8    drivers who entered into agreements to arbitrate their claims and to waive their right to participate

9    in a class action with regard to those claims"); *Avilez v. Pinkerton Government Servs., Inc.*, 596

10   Fed. Appx. 579 (9th Cir. 2015) (unpublished) (finding that certifying subclasses that included

11   members who signed class action waivers constituted an abuse of discretion); *Tschudy v. J.C.*

12   *Penney Corp., Inc.*, No. 11CV1011 JM (KSC), 2015 WL 8484530, at *3 (S.D. Cal. Dec. 9, 2015)

13   ("[p]utative class members with arbitration provisions likely cannot be included in the class

14   because they are uniquely subject to having their disputes resolved in a non-judicial forum," citing

15   unpublished decision in *Avilez*); *Lim v. Helio, LLC*, 2012 WL 12884439, at *4 (C.D. Cal. Apr. 18,

16   2012) (denying certification where "the evidence before the Court strongly suggest[ed] that the

17   vast majority of potential members signed arbitration agreements containing class action

18   waivers").  Plaintiffs notably do not offer any caselaw or argument to the contrary.

19           **2.      *The testimony of Russell and Hernandez makes them atypical and inadequate***

20           Even where a website does not create a binding agreement as a matter of law, courts will

21   enforce such agreements if users had actual notice of the terms, admit that they had actual notice

22   of the terms, or admit that they understood that they were entering into a binding agreement.  *See*

23   *Ticketmaster Corp. v. Tickets.Com, Inc.*, 2003 WL 21406289, at *2 (C.D. Cal. Mar. 7, 2003)

24   (enforcing browsewrap after actual notice); *Southwest Airlines Co. v. BoardFirst, L.L.C.*, 2007

25   WL 4823761, at *2-4 (N.D. Tex. Sept. 12, 2007) (same); *Register.com, Inc. v. Verio, Inc.*, 356

26   F.3d 393, 401-404 (2d Cir. 2004) (finding browsewrap likely enforceable where party "admitted

27   that… it was fully aware of the terms" of the offer).  Indeed, in *Nguyen v. Barnes & Noble Inc.*, in

28   finding a browsewrap agreement to be unenforceable, the Ninth Circuit noted that the outcome

1   "might be different" if there were "any evidence in the record that [plaintiff] had actual notice of

2   the Terms of Use."  763 F.3d at 1176.[12]

3        Here, Hernandez and Russell each admit to such actual notice.  As a result, even if the

4   Websites are insufficient to create a binding agreement as a matter of law, Hernandez and Russell

5   agreed to arbitrate, and so are atypical and inadequate of a putative class that purportedly did not.

6   *Feske v. MHC Thousand Trails Ltd. P'ship*, 2013 U.S. Dist. LEXIS 37232, at *43 (N.D. Cal. Mar.

7   18, 2013) (named classes representatives are atypical and inadequate when they are subject to a

8   unique defense); *Molski v. Gleich*, 318 F.3d 937, 955-956 (9th Cir. 2003) (same).

9        **Russell**.  Russell received a $1,000 gift card from a Fluent Website.  To get her $1,000

10   reward, she had to complete and sign a claim form.  (Bhadania Decl., ¶¶ 3, 34, Ex. 6.)  On that

11   claim form, she acknowledged that she "complied with the Terms & Conditions posted on the

12   Website when [she] entered the Promotional Program."  (*Id.* Ex. 6.)  This alone confirms her

13   agreement to the Terms & Conditions.  But her deposition testimony further confirms the fact.

14   About the Terms & Conditions page, Russel testified that: (i) she knew "you would have to click

15   on" the Terms & Conditions hyperlink to read them; (ii) she is familiar with hyperlinks for terms

16   and conditions – they are "where you click on it and it will pop them up;" and (iii) she "usually

17   do[es]" click on the hyperlinks and regularly reads website terms and conditions.  (*See generally*

18   Ex. 11, Excerpts of Russell Depo.) If that were not enough, Russell noted that the Terms &

19   Conditions page specifically referenced the mandatory arbitration clause (*id.* at 39:9-19) and,

20   when shown the Terms & Conditions page that she visited,[13] Russell confirmed that by "clicking

21   'continue,'" she "underst[ood]. . . that [she] [was] agreeing to the terms and conditions."  (Ex. 11,

22   

23   [12] *Compare also Nicosia v. Amazon. com, Inc.*, 834 F. 3d 220, 233 & 238 (2d Cir. 2016)
     (recognizing that where "reasonable minds could disagree on" the sufficiency of a website, a court

24   cannot compel arbitration as a matter of law, but evidence of actual notice would change the
     result) & *Nicosia v. Amazon.com, Inc.*, 2020 WL 2988855, at *1 (2d Cir. June 4, 2020)

25   (unpublished) (affirming grant of arbitration in the same case once actual notice was established).

26   [13] Russell testified that the website she remembers visiting was slightly different than the Website
     flow that Fluent's records reflect, though she did not recall the specific ways that it differed and, in

27   any event, such differences were immaterial.  Further, while Ms. Russell testified that she visited a
     Fluent Website on only this one occasion, Fluent's records indicate that she made at least 6

28   different visits to a Website. (Bhadania Decl. ¶ 27, Ex. 6.)  These credibility and memory issues
     further underscore her atypicality and inadequacy.

1   Russell Depo at 61:25-62:4.)[14]

2     Despite the above testimony, Russell claimed that she would not have agreed had she seen

3   the Terms & Conditions or the reference to the mandatory arbitration clause.  It is unclear what

4   import this argument has because she does not deny having visited the Website, having seen the

5   Website, or having completed her registration.  At one point, she testified that she "agreed to the

6   terms and conditions" on Fluent's Website "to a degree," but she "still d[i]dn't remember seeing

7   that it would say arbitration on it."  (Ex. 11, Russell Depo at 77:9-14.)  To the extent this

8   testimony raises factual issues regarding her agreement to the Terms & Conditions, it only

9   highlights her atypicality and inadequacy and confirms that individualized issues predominate.

10     **Hernandez**.  Hernandez testified that she is familiar with the practice of websites notifying

11   her of terms and conditions (*see generally* Ex. 12, Hernandez Depo) and that, as a result, she will

12   "quite often" "click on the terms and conditions link and read the terms and conditions" (*id.* at

13   80:23-81:14).  She further testified that while she may not read the terms and conditions for

14   websites with which she is familiar – like Costco, Walmart, and Lowe's – she would do so for

15   website's like Fluent's.  (*Id.* at 80:23-84:9.)  As to the design of Fluent's Website, she understood

16   that clicking on the continue button meant agreeing to the Terms & Conditions.  "Let's say we're

17   on Lowes.com.  You trust them, and you see a screen like this [Fluent's website] and it says 'I

18   understand and agree to the terms and conditions which includes mandatory arbitration and

19   privacy policy.'  Would you click continue and continue on with the website?"  "Yeah, I would do

20   it for Lowe's."  "And by clicking continue and continuing with the website in that circumstance,

21   would you understand that you were agreeing with the Lowe's terms and conditions?"  "Yes."

22   (Ex. 12, Hernandez Depo at 83:21-84:9.)[15]

23

24   [14] This is consistent with her general understanding that when she signs up on a website or makes
a purchase on a website, she is agreeing to a set of terms and conditions.  In fact, because of this
25   understanding, she testified that she regularly reads terms and conditions before signing up
because she does not want to sign up for something she does not agree with.  Russell even
26   confirmed that she has in fact previously stopped using websites because she disagreed with
something in the terms and conditions.  (Ex. 11, Russell Depo at 34:4-35:9.)

27   [15] Despite that testimony, Hernandez claimed that she didn't agree to the Terms & Conditions and
wouldn't have because she doesn't "trust" Fluent.  She testified instead that she closed out of the
28   Website because it asked questions about her medical history.  (Ex. 12, Hernandez Depo at 32:24-

### 3.     *Individualized issues as to the arbitration agreement preclude certification*

The preponderance of the evidence shows that individual issues predominate as to the arbitration agreement.

**First**, even if Fluent's websites were insufficient to create a binding agreement as a matter of law, there is no evidence establishing that the Websites would have failed to provide notice of the Terms & Conditions to all consumers all the time (or even to a specific subset of consumers). Plaintiffs' own expert, Benjamin H. Beecher ("Beecher"), confirms this – he is unaware of any peer reviewed, academic study suggesting that the design of Fluent's websites results in actual confusion about whether consumers are agreeing to the Terms & Conditions, let alone actual confusion in all circumstances. (Ex. 13, BB Depo at 70:13-71:17.)  Beecher also did not perform any type of survey or other analysis to determine what percent of consumers may have been confused (if any at all) by any of Fluent's websites. (*Id.* at 45:14-49:16; 73:21-76:9; 77:8-78:8; 140:11-142:4.)  As the Court previously noted, Beecher is not permitted to "testify as to whether a particular user or group of users was confused or misled ***absent a factual basis for so stating (e.g., survey data)***." (Dkt. 198, Order at 7:3-5 [emphasis added]; *see also id.* at 7:14-24.)  Plaintiffs had the time and chance to conduct such a survey but opted not to.

In fact, Beecher's testimony contradicts Plaintiffs' argument that class members would have uniformly been unaware of the Terms & Conditions.  In Beecher's opinion, aspects of Fluent's Websites could be confusing to some users, but he concedes that they would not be confusing to all users.  (Ex. 13, BB Depo at at 45:14-49:16; 73:21-76:9; 77:8-78:8; 140:11-142:4.) That is because, according to Beecher, the manner in which users interact with and understand websites varies by the individual.  (*Id.*)  Of course, determining whether each putative class member was actually confused, and therefore somehow did not agree to the Terms & Conditions,

---

34:11; 64:11-65:10.)  Even if this were true, as noted, survey questions appear only after registration and agreement to the Terms & Conditions.  Hernandez's internally inconsistent testimony only highlights why she is an atypical and inadequate representative.  As another example, Fluent's records indicate that Hernandez visited a Fluent Website on 31 separate occasions, but she claims a vague memory of only two visits to a website like Fluent's, but denies that the website she visited looked like what Fluent's records reflect.  Of course, she is unable to recall details about the contents of the websites she purportedly remembers.  (*See generally* Ex. 12, Hernandez Depo.)

is inherently individualized – another fact that Beecher concedes.  (*Id.*)  Hernandez and Russel are examples of this, as the testimony described above demonstrates.  Additionally, two other putative class members have confirmed in sworn declarations that they too agreed to the Terms & Conditions.  (Exs. 14, 15.)  Put simply, this is not a case where the Website is either so deficient or so confusing that no user could possibly have agreed to the Terms & Conditions.  To the contrary, the evidence, including admissions by Beecher, Hernandez, and Russell, demonstrates that individuals are likely to understand that they are agreeing to the Terms & Conditions.  Determining who did not (and therefore who is a class member), is an exercise in individual inquiries.  At the very least, Defendants would be entitled to cross-examine every class member so that they can elicit testimony similar to Hernandez's and Russell's.

   ***Second***, adding to the above individualized inquiries, the specific screen that each putative class member would have seen varied.  What the screen looked like depended on, among other things, which Website was visited and when, how the individual landed on the Website (*i.e*, did the user click on a link in an email or were they directed there from another website by, for example, clicking on a banner advertisement), whether the individual had visited the Website before, what type of device the individual was using (computer, tablet, iPhone, Android, etc.), the internet browser and version that the individual was using, and what campaigns were running at the time of the visit.  (Bhadania Decl. ¶ 5.)  Underscoring this point, the website flows associated with the visits relating to just the three Plaintiffs all varied from one another, as reflected in Appendix A.  (*See also* Exhibits 1, 2, 3.)  Were the Court to find that some, but not all, of the Websites give rise to binding agreements as a matter of law, or that some are more likely to provide actual notice of the Terms & Conditions, individual inquiries will be required to determine which version of each website each putative class member saw.  For example, Beecher argues that the Hernandez and Berman flow are potentially confusing because a separate "I Agree" checkbox relating to emails appears between the key phrase regarding the Terms & Conditions and the "Continue" button.  The Russell flow has no similar checkbox.  If the Court were to find that this is a material difference, individual issues would predominate.  Beecher notably agrees on this point – in conducting his analysis, Beecher visited numerous Fluent Websites and completed the

1   flows (Ex. 13, BB Depo at 110:6-112:11); he admits that these different websites were designed

2   differently (*id.* at 116:3-117:16; 119:18-120:14); but he limited his opinions because, as he

3   conceded, if he had included those other Websites, his analysis would have revealed further

4   individualized issues (*id.*).[16]

5       ***Third***, the Terms & Conditions applicable to each putative class member changed over the

6   course of the Freedom Campaign.  (Bhadania Decl. ¶ 6, Exs. 7-10.)  Each iteration of the

7   arbitration agreement expressly mandates that TCPA claims against Fluent be submitted to

8   arbitration,[17] but Plaintiffs dispute whether the scope of the arbitration clause extends to claims

9   against Freedom and Lead Science too.  This issue was addressed in the motion to compel

10   arbitration, and, since that time, in a putative TCPA class action lawsuit in the Western District of

11   Kentucky, one of Fluent's other marketing partners received an order permitting it to enforce

12   Fluent's arbitration provision as a non-signatory.  (*See* Ex. 20.)  While this ruling confirms

13   Defendants' arguments in the motion to compel arbitration that all claims against all Defendants

14   are required to be arbitrated no matter which clause applies,[18] it is nevertheless the case that there

15   are differences in the arbitration clauses applicable throughout the class period.  By way of

16   example, the terms applicable to Website visitors who registered after January 18, 2018

17   specifically require submission to arbitration of "any disputes you may have with us or our

18   affiliates, advertiser clients and marketing partners."  (Bhadania Decl. Exs. 9, 10.)  The language

19   of the arbitration provisions before that time, while sufficient to mandate arbitration of claims

20

21   [16] Moreover, many putative class members visited Fluent's websites on multiple different
22   occasions.  For example, Fluent's records indicate that Hernandez visited Fluent's Websites at
     least 31 times, and that Russell visited at least 6 times.  (Bhadania Decl. ¶¶ 20, 27, Exs. 4, 6.)
23   Other putative class members registered on Fluent's Websites multiple times, sometimes even
     more than 100 times.  (Ex. 17, Kalat Supp. at ¶¶ 6-11.)  Determining whether those individuals
24   agreed to arbitrate on any of their visits only reinforces the significant individualized inquiries.

25   [17] *See* Bhadania Decl. Ex. 7 (capturing disputes "concerning any aspect of these Terms &
     Conditions, the [Websites]. . . ."); Ex. 8 (same, and further noting that mandatory arbitration
26   applies to "any disputes or claims you may have with us"), Ex. 9 (same, and further specifically
     references cases relating to telemarketing or SMS/text messaging"); Ex. 10 (same).

27   [18] *See* Dkt. No. 250, Reply on Motion to Compel Arbitration at 12-15 citing *Temple v. Best Rate
     Holdings LLC*, 360 F. Supp. 3d 1289, 1312 (M.D. Fla. 2018); *Torbit, Inc. v. Datanyze, Inc.*, 2013
28   U.S. Dist. LEXIS 19584, at *12 (N.D. Cal. Feb. 13, 2013); *Simpson v. Pulte Home Corp.*, 2012
     U.S. Dist. LEXIS 63889, at *18 (N.D. Cal. May 7, 2012); *Amisil Holdings Ltd. v. Clarium Capital
     Mgmt. LLC*, 622 F. Supp. 2d 825, 830 (N.D. Cal. 2007).

against non-signatories, do not contain that precise language.  (*Id.* Exs. 7, 8.)  If the Court finds

that the different language leads to different results, there are yet more individualized inquiries.

Further, as the order in *PillPack* notes, whether a "non-party may invoke the FAA and compel

arbitration" depends on whether "state contract law permits" it.  (*Id.* at 4.)  In *PillPack*, arbitration

was ordered under Kentucky law.  If the Court finds that the laws of California or the laws of any

other state do not permit Freedom or Lead Science to compel arbitration under Fluent's clauses,

class certification must be denied based on differences in state laws.  *Mazza*, 666 F. 3d at 590-96;

*Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718 (9th Cir. 2007); *Granger v. Sears Roebuck

& Co.*, 2008 WL 11424140 (S.D. Ala. Aug. 4, 2008).

**B.    TCCPA Consent Precludes Certification Of The Visitor Class**

Defendants contend that as a result of their visits to Fluent's Websites, every member of

the Visitor Class consented to contact under the TCPA ***as a matter of law***.  As with the arbitration

agreement, certification must be denied if Defendants are correct because no one in the Visitor

Class would have a claim, no one would have been harmed, and a class of such individuals cannot

be certified.  *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 596 (2012) (vacating

certification order because class definition included individuals without a claim); *Mazur v. eBay,

Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009) (rejecting class in part because "the class . . . would

include these non-harmed auction winners…" rendering the class "both imprecise and

overbroad").  *See also Bustillos v. Bd. of Cty. Comm'rs of Hidalgo Cty.*, 310 F.R.D. 631, 668

(D.N.M. 2015) (denying certification in part because it was speculative that the named-plaintiffs

could establish their claims, and so there was no showing that claims could be established on a

classwide basis).

Even if Defendants are incorrect, and the websites do not result in TCPA consent ***as a

matter of law***, individualized issues predominate and neither Hernandez nor Russell are typical or

adequate.  That is because Hernandez and Russel (and others) admit that they understood both the

notice provided on the consent page and the result of providing consent.  Determining who among

the class did not share their understanding (and are thus members of the class) requires asking

them all individually.

### 1.   *The Visitor Class provided TCPA consent as a matter of law*

The Visitor Class consented under the TCPA.  As noted above, after a user agrees to the Terms & Conditions, Fluent's Websites display a series of survey questions.  Once the user completes the survey questions, the Website displays a page seeking TCPA consent.  (Bhadania Decl. ¶¶ 8-10.) That page re-states some of the consumer's personal information, as provided earlier in the process, and then has a paragraph with TCPA consent language, asking for consent to be contacted by text message or phone call by Fluent or any of its "<u>Marketing Partners</u>."  (*Id.*) The underlined phrase "<u>Marketing Partners</u>" is a hyperlink that, if clicked, displays the full list of Fluent's Marketing Partners.  (*Id.*)  As the Court noted last time, "Freedom Financial" was listed as one of Fluent's <u>Marketing Partners</u>.  (Dkt. 198, Order at 13, n.9.  *See also* Bhadania Decl. ¶ 9, Exs. 1, 2.)  Immediately below the TCPA consent language is an unchecked box, next to which the Website states: "I CONFIRM that all of my information is accurate and consent to be called and texted as provided above." (*Id.* at ¶ 9, Exs. 1, 2, 3.)  For example, the full pages from the Website flows for each Plaintiff are included in Exhibits 1, 2, and 3 to the Bhadania Declaration.  Excerpts of each are also included at Appendix B, for convenience.

This consent fatally undermines any claims that the Visitor Class may have.  Plaintiffs arguments to the contrary are without merit.  ***First***, the consent language is TCPA compliant.  The statutory text of the TCPA prohibits "any call (other than a call . . . made with the <u>prior express consent</u> of the called party) using an automatic telephone dialing system or an artificial prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). The implementing regulations purport to add a "prior express <u>written</u> consent" standard for marketing calls to cellphones.  *See* 47 C.F.R. 64.1200(a)(2) & (f)(8).  "Prior express <u>written</u> consent" is defined as . . .

> an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller[19] to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded

---

[19] "Seller" is defined as "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. 64.1200(f)(8).  Freedom would thus be the "seller" in this case.

voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

(i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that: (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

(ii) The term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

47 C.F.R. 64.1200(f)(8).  The term "clear and conspicuous" means "a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures."  *Id.* at 64.1200(f)(3).[20]

Fluent's TCPA consent language and form comply.  The TCPA consent page includes the putative class members' contact information, including phone number, and plain language notifying them that by checking the unchecked box they are authorizing Fluent and its Marketing Partners (which are listed by hyperlink and include Freedom) to contact them by telephone, text, or autodialer.  The users are further notified that they are not required to provide consent and, indeed, many do not.  This notice is the only thing on the page other than the person's contact

---

[20] Defendants submit that the application of the "prior express <u>written</u> consent" standard from the regulations, which requires more than the statutory "prior express consent" standard from the statutory text, violates the First Amendment of the United States Constitution because it imposes on one class of calls (telemarketing calls to cellphones) a standard different than that imposed on other classes of calls (marketing calls to landlines, non-marketing calls to cellphones, marketing calls on behalf of non-profits, and "health care" messages on behalf of HIPAA covered entities). *Compare, e.g.*, 47 C.F.R. 64.1200(a)(1) *with id.* (a)(2).  *Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335 (2020) (J. Gorsuch, concurrence) ("Now that most cell phone plans do not charge by the call, the only justification the government cites for its robocall ban is its interest in protecting consumer privacy. No one questions that protecting consumer privacy qualifies as a legitimate and "genuine" interest for the government to pursue[,] . . . [b]ut before the government may censor the plaintiffs' speech based on its content, it must point to a compelling interest."). Under the "prior express consent" standard set forth in the statutory text, courts have repeatedly denied certification of TCPA classes.  *See, e.g.*, *Smith v. Microsoft Corp.*, 297 F.R.D. 464, 473 (S.D. Cal. 2014); *Connelly v. Hilton Grand Vacations Co., LLC*, 294 F.R.D. 574, 578 (S.D. Cal. 2013); *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*, 2016 WL 2610107, at *7 (S.D. Cal. May 6, 2016).

1   information, and there is no advertising or marketing on the page.  Several courts have found that

2   similar website forms, with nearly identical language (or even language less clear and conspicuous

3   than Fluent's), satisfy the TCPA's "prior express written consent" requirement.  *See Lundbom v.*

4   *Schwan's Home Serv., Inc.*, 2020 WL 2736419, at *5-7 (D. Or. May 26, 2020) (appeal filed; copy

5   of decision attached as Exhibit 22); *Morris v. Modernize, Inc.*, 2018 WL 7076744, at *3 (W.D.

6   Tex. Sept. 27, 2018); *Gordon v. Caribbean Cruise Line, Inc.*, 2019 U.S. Dist. LEXIS 20604 (N.D.

7   Ill. Feb. 8, 2019); *Oliver v. TTC-Ameridial, LLC*, 2018 WL 1255017, at *2 (N.D. Ill. Mar. 12,

8   2018).

9       ***Second***, the consent form identities the "specific seller" on whose behalf a putative class

10  would be called, notwithstanding Plaintiffs' argument to the contrary.  As the Court noted in its

11  prior order denying class certification, "Freedom Financial" was identified as a Marketing Partner.

12  "Freedom Financial" is a moniker that refers to all the Freedom entities (Naik Decl. ¶ 2) and it is

13  readily associated with all the Freedom entities, as a simple Google search reveals.  Plaintiffs cite

14  no law that Freedom's specific corporate name must be listed.  To the contrary, courts enforce

15  consent provisions that permit contact by a wide range of entities, even if those entities are not

16  specifically listed.  *See Fober v. Mgmt. & Tech. Consultants, LLC*, 2016 WL 7626431, at *4 (C.D.

17  Cal. July 29, 2016) *aff'd* 886 F.3d 789 (9th Cir. 2018); *Oliver*, 2018 WL 1255017 at *2.

18      ***Third***, Fluent complies with the E-Sign Act.  Courts have repeatedly affirmed that a

19  website user's act of checking a box is an electronic written signature. *Lundbom*, 2020 WL

20  2736419 at *8 (holding that check-box form constituted a signed writing under the TCPA,

21  rejecting argument that it didn't comply with the E-Sign Act); *Morris*, 2018 WL 7076744 at *3

22  (same).  *See also O'Callaghan v. Uber Corp. of Cal.*, 2018 U.S. Dist. LEXIS 112021, at *15 n.9

23  (S.D.N.Y. July 3, 2018) (clicking "YES, I AGREE" complied with the E-Sign Act); *Campbell v.*

24  *Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 557 (1st Cir. 2005) (same); 27 FCC Rcd. 1830,

25  1844 (Feb. 15, 2012).

26      For these reasons, the Court should find that the Visitor Class consented as a matter of law,

27  and thus deny certification.  The Court cannot certify a class of people without claims.  *Mazza*,

28  666 F.3d at 596; *Mazur*, 257 F.R.D. at 567; *Bustillos*, 310 F.R.D. at 668.

2.     **The testimony of Russell and Hernandez makes them atypical and inadequate**

As noted above, a named-class representative is atypical and inadequate when they are subject to a unique defense. *Feske*, 2013 U.S. Dist. LEXIS 37232 at *43; *Molski*, 318 F.3d at 955-956.  Here, as with the arbitration agreement, because Plaintiffs Hernandez and Russell both testified that they understood the consent form, they are atypical and inadequate to represent a class of people who purportedly did not consent.

<u>**Russell**</u>.  Russell understood the TCPA consent form.  As to the "Marketing Partners" hyperlink, she testified that it was "one of those things you press it, and it should have a site pull up to probably say who the marketing partners are."  (Ex. 11, Russell Depo at 47:21-48:3.)  And, if she checked the box next to the "I confirm" language, she understood that she was "agreeing to receive texts or calls by the marketing partners," and that those calls and texts could be made by autodialer – "well, it says it right here, yes."  (*Id.* at 48:4-14.)  Consistent with this, when shown the TCPA consent page that she would have seen, she again confirmed her understanding – "who would you be getting called by if you clicked, 'I confirm?' . . . I would assume the marketing partners."  (Ex. 11, Russell Depo at 63:6-64:13.)  And "to see the list of marketing partners?" – "you would have to click on the link" – the "blue underlined text . . . that says 'Marketing Partners.'"  (*Id.*)

<u>**Hernandez**</u>.  Hernandez likewise testified that she understood the TCPA consent form. "You said that you didn't and wouldn't have checked this box.  Do you understand, though, that if you had checked the box you were providing consent to receive those phone calls?" . . . .  "I understand what that would mean.  I heard you the first time."  It means "I can be harassed for the rest of my life."  (Ex. 12, Hernandez Depo at 68:19-73:13.)

Despite the above testimony, Russell and Hernandez both apparently now deny that they consented because they claim, in hindsight, that they would not have checked the box.  It is unclear if they are denying having checked the box or are just saying that they would not have; either way Fluent's records confirm that they both did check the box.  (Bhadania Decl. ¶¶ 14-19, 20-34.)  Whatever the case, Russell and Hernandez are subject to a unique consent defense and individualized cross-examination about what they remember and understood and what they did,

and are thus atypical and inadequate.[21]

### 3.   Individualized issues as to TCPA consent preclude certification

In TCPA cases, where the evidence demonstrates that a large portion of the class is subject to a potential consent defense, courts deny certification because neither predominance nor superiority can be satisfied.  Importantly, a "defendant does not need to prove consent" as to a large number of class members, it "just needs to show that proving consent requires individualized analysis such that the class does not meet the predominance requirement." *Johnson v. Yahoo! Inc.*, 2018 WL 835339, at *4 (N.D. Ill. Feb. 13, 2018).  Numerous courts across the country have denied certification where either the entire class or a large portion of the class was the subject of a potential consent defense.  *See, e.g.*, *id.*; *Davis v. AT&T Corp.*, 2017 WL 1155350, at *6 (S.D. Cal. Mar. 28, 2017); *Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 578 (N.D. Ill. 2017).[22]

Here, the evidence demonstrates that the entire Visitor Class would be subject to a consent defense, and, to the extent the Court does not find that each consented as a matter of law, the evidence demonstrates that litigating consent as to each individual would result in individual inquiries.  *First*, to the extent Fluent's consent form is somehow unclear, as with the Terms &

---

[21]   Defendants emphasize that there is no evidence or claim that Fluent's records are wrong as to Plaintiffs or the putative class checked the box.  This is not a case alleging a wholesale manufacturing of leads.

[22]   Plaintiffs generically cite a number of TCPA cases that were certified, particularly in footnote 2, page 17, of their brief.  These cases are all irrelevant because there was no evidence of consent as to anyone in the class, let alone a significant portion.  The cases involved: (i) no evidence of consent at all, just speculation that some class members may have consented; (ii) no evidence of the correct type of consent (*e.g.*, no written consent); (iii) no evidence of consent because it no longer existed (because it was destroyed); (iv) no evidence of consent because it was a "wrong number" case (which Plaintiffs are not pursuing here); (v) a holding that the consent evidence was insufficient *as a matter of law* as to everyone; or (vi) a modification of the class definition to exclude individuals who may have consented, including, for example, by visiting a website.  *See McMillion v. Rash Curtis & Assocs.*, 2017 WL 3895764, at *5 (N.D. Cal. Sept. 6, 2017); *Stemple v. QC Holdings, Inc.*, 2014 U.S. Dist. LEXIS 125313, at *4 (S.D. Cal. Sept. 5, 2014); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014); *Bennett v. GoDaddy.com LLC*, 2019 WL 1552911, at *8-10 (D. Ariz. Apr. 8, 2019); *Brown v. DirecTV, LLC*, 330 F.R.D. 260, 267, 270 (C.D. Cal. 2019); *Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238, 244 (D. Ariz. 2019); *Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228, 235 (C.D. Cal. 2018); *O'Shea v. Am. Solar Sol., Inc.*, 318 F.R.D. 633, 639 (S.D. Cal. 2017); *Lavigne v. First Cmty. Bancshares, Inc.*, 2018 WL 2694457, at *4 (D.N.M. June 5, 2018); *West v. California Services Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2017 WL 1806583, at *8 (N.D. Cal. May 5, 2017); *Booth v. Appstack, Inc.*, 2015 WL 1466247, at *11 (W.D. Wash. Mar. 30, 2015); *Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 628 (S.D. Cal. 2015); *Whitaker v. Bennett Law, PLLC*, 2014 WL 5454398, at *5 (S.D. Cal. Oct. 27, 2014).

Conditions page, there is no evidence that the consent disclosure was confusing to all consumers all the time (or even to a specific subset of consumers). Plaintiffs' expert is again unaware of any peer reviewed, academic study suggesting that the design of Fluent's consent form results in actual confusion, let alone actual confusion in all circumstances. (Ex. 13, BB Dep. at 70:13-71:17.) Beecher also did not perform any type of survey or other analysis to determine what percent of consumers may have been confused (if any at all) by the consent form. (*Id.* at 45:14-49:16; 73:21-76:9; 77:8-78:8; 140:11-142:4.) As the Court previously noted, Beecher is not permitted to "testify as to whether a particular user or group of users was confused or misled absent a factual basis for so stating (*e.g.*, survey data). (Dkt. 198, Order at 7:3-5; *see also id.* at 7:14-24.) Plaintiffs had the time and chance to conduct such a survey, but did not do so.

**Second**, on top of that, Beecher again testified that determining what each individual knew and understood would require asking them. (Ex. 13, BB Depo at 45:14-49:16; 73:21-76:9; 77:8-78:8; 140:11-142:4.) This is further confirmed by the testimony of Plaintiffs Hernandez and Russel, who both confirm that they understood precisely what the TCPA consent page was conveying and what checking the "I confirm" box meant. Similarly, two other putative class members have confirmed in sworn declarations that they "checked an unchecked box, by which [they] consented to receive text messages and phone calls to the telephone number that [they] provided." (*See* Exs. 14, 15.)[23] Put simply, the only named-class representatives confirmed their understanding of the consent page, two other putative class members have confirmed their consent, and Plaintiffs have no evidence suggesting that anyone did not consent. The preponderance of the evidence thus requires denial of certification.

In an almost identical case, certification was denied. *Gordon v. Caribbean Cruise Line, Inc.*, 2019 WL 498937 (N.D. Ill. Feb. 8, 2019). In *Gordon*, the defendant submitted a declaration from the lead generation company, Adsource, confirming that it "sent text messages only to those

---

[23] Declarations or testimony from putative class members confirming consent defeats predominance. *Compare Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 578 (N.D. Ill. 2017) (declarations provided, denying certification) *with McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142 (S.D. Cal. 2019) (no evidence of consent because entire lead list was fake, but suggesting that declarations for putative class would result in decertification).

who entered their names and phone numbers on Adsource's landing page and checked the box indicating their consent to receive text messages via an auto-dialer." *Id.* at \*10.  The court held that "individualized factual inquiries will be necessary to determine whether the individuals on the Lead Lists did, in fact, consent, and those issues will predominate the litigation." *Id.*  Plaintiffs do not address *Gordon*, even though it was cited in Defendants' original opposition to class certification.  Instead, Plaintiffs argue that because Fluent's consent form was uniform and because Plaintiffs are arguing it is insufficient, the form presents a common issue, citing *Ikuseghan v. MultiCare Health Sys.*, 2015 WL 4600818 (W.D. Wash. July 29, 2015).  (*See* Mot. at 20:4-10.)  But *Ikuseghhan* did not involve evidence like that presented here, which includes testimony from Plaintiffs themselves that they understood the consent form and from putative class members that they consented.  Put simply, the argument that a standard consent form is a common question is facially attractive, but where, as here, there is evidence that the form resulted in consent as to the named Plaintiffs and as to putative class members, the argument that the form is invalid as to everyone falls apart, thus leaving individualized issues as to consent.[24]

## C.   The Non-Visitor Class Fails Numerosity, Predominance, And Superiority

Class certification is not appropriate unless plaintiffs prove that the class is so numerous

---

[24]   Plaintiffs also cite *McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142 (S.D. Cal. 2019), but not for the proposition that a form consent is a common issue.  In *McCurley*, the main lead generator (Prospects) did not generate leads itself, like Fluent.  *Id.* at 150-51.  Instead, unlike Fluent, it purchased leads from third-parties, called "opt-in" leads.  *Id.* at 151-152.  Notably, one of those third parties was Fluent, but individuals contacted as a result of Fluent's leads ***were not part of the class***.  *Id.*, n.3.  The class that was ultimately certified was limited to leads generated from just two websites.  *Id.* at 163.  As to one, the defendant was not listed as a company on whose behalf consent was obtained.  *Id.* at 176-177.  On the other, the Court held that the evidence presented did not establish consent by any putative class member because there was no evidence that any of the putative class actually visited the website – plaintiff argued that every lead was manufactured (an argument Plaintiffs are ***not*** making here).  *Id.* at 170-171, 177, 178.  As a result, *McCurley* is unlike this case, where there is evidence of consent, including from the deposition testimony of the only two named-Plaintiffs seeking to represent the class and two additional putative class members by way of sworn declarations.  This would have satisfied the *McCurley* court: "A defendant must actually produce evidence which shows prior express consent by the named plaintiffs or at least some putative class members."  *Id.* at 173.  *See also id.* at 175 ("Royal has not provided a single affidavit from a proposed class member who expressly attests that he or she opted to receive calls for Royal's services through the lead generation program.").  Further, since the ruling in *McCurley*, both the plaintiff and the defendant have move to decertify the class (plaintiff only in part), with the defendant arguing that plaintiff has no evidence of the wholesale manufacturing of fake leads.  *See* Dkt. Nos. 132, 143, 172, *McCurley et al. v. Royal Seas Cruises et al.*, S.D. Cal. Case No. 3:17-cv-00986-BAS-AGS.

1   that joinder would be impracticable. Fed. R. Civ. P. 23(a); *Dukes*, 564 U.S. at 348.  Speculation is

2   insufficient to establish numerosity; Plaintiffs must present evidence that other members of the

3   class exist. *Siles v. ILGWU Nat'l Ret. Fund*, 783 F.2d 923, 930 (9th Cir. 1986); *Vega v. T-Mobile*

4   *USA, Inc.*, 564 F.3d 1256, 1267-68 (11th Cir. 2009).  Further, under Rule 23(b)(3), if a class of

5   people cannot be manageably identified, proceeding as a class action is likely not superior.

6   *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1127-28 (9th Cir. 2017).

7         The Non-Visitor Class fails these standards.  As to numerosity, Plaintiffs offer no evidence

8   that any individual other than Berman who is on the lead list did not visit a Website.  There are no

9   declarations from any individuals saying that they did not visit a Website or anything similar.  Nor

10  do Plaintiffs suggest a method that would enable them to identify who did not visit a Website.  As

11  Plaintiffs' counsel candidly admitted to the Court previously, having to figure out which

12  registrations, if any, were not created by the user of a given phone number would "devolve into

13  individual issues about each entry."  (Ex. 21, Dkt. 208 at 12:1-2.)  Defendants explained why this

14  is true last time (Dkt. No. 152 at 13-16) and Plaintiffs offer no response.  The following is a

15  summary of the individual issues that would arise.

16        ***First***, there is no reliable way to identify the person who was actually contacted.

17  Verkhovskaya proposes a "reverse append" process, wherein she searches for the telephone

18  number in public and private databases, which purport to track the owner of the phone number.

19  This process is inherently unreliable because public and private databases do not accurately set

20  forth who uses a particular cell phone number at any given time. (Ex. 19, Expert Report of Jan

21  Kostyun ("Kostyun Report") at ¶¶ 68-75.).  The following specific examples demonstrate this.  **(1)**

22  "Reverse append" does not always identify a purported owner for the phone number.  One

23  example is a registrant that identified herself as Kelsey Forsch and entered the phone number

24  ending in 2068. Third-party records tied Ms. Forsch to the physical and email addresses submitted

25  with her registration, but those records were unable to connect Ms. Forsch to the phone number. In

26  fact, those records could not connect the phone number to anyone. (Ex, 17, Kalat Supp. at ¶ 62.)

27  The phone number almost certainly belongs to Ms. Forsch (unless she was lying during her

28  registration), but no one can say for certain without asking her. There are other examples.  (Ex. 17,

Kalat Suppl. ¶ 79.)  **(2)**  Assuming "reverse append" identifies someone as the owner of the phone, it is not always accurate.  For example, the "reverse append" process does not connect Berman's phone number to him.[25] Instead, a "reverse append" connects Plaintiff's phone number to a person named Ronald Berman. (Ex, 16, Kalat Report at ¶¶ 74-78; Ex. 19, Kostyun Report at ¶¶ 63, 75.)[26] In a case similar to this one, a court rejected the "reverse append" methodology because of this unreliability. *Wilson v. Badcock Home Furniture*, 2018 U.S. Dist. LEXIS 213792, at *6 (M.D. Fla. Dec. 19, 2018) (finding that "reverse append" "[m]ost glaringly . . . would not even have discovered Plaintiff as a class member").  *See also Morgan v. Adventist Health System/Sunbelt, Inc.*, 2020 WL 1674307, *3 (M.D. Fla. Jan. 15, 2020).

 ***Second***, even if "reverse append" identifies the correct user of the phone, and that person's name does not match what is in Fluent's records, that does not mean that the person did not register on Fluent's website.  For example, there are 116 registrations tied to a phone number ending in 6114, a reverse append of which suggests that a woman named Andrea Clay is the user. (Ex. 17, Kalat Suppl. Report ¶ 72.)  Those 116 entries, however, do not list Andrea Clay as the registrant.  But, the same phone number separately registered on Fluent's Websites over 1,000 times, and every other time, the name listed was Andrea Clay.  (*Id.* ¶¶ 72-78.)[27] It is extremely likely that Ms. Clay registered each time, but no one can say for certain without locating Andrea Clay and asking her. There are more examples. (*Id.* ¶¶ 65-71.)

 ***Third***, even if a set of registrations could be identified where the person contacted was not the person who visited the Website, the individual would still need to be asked whether it was (i) that individual; (ii) someone on that individual's friends or family plan with legal authority to

---

[25] Plaintiffs argue that "Defendants concede that . . . [Dunk Loka] is an evidently fictional name." (Mot. at 5:1-2.)  Defendants do not so concede, but just recognize that it is not Berman's name.

[26] Similarly, when Mr. Kostyun performs a reverse-append to find the owner of his daughter-in-law's cell phone (to which she has been the subscriber and sole user for the past 11 years), the search resulted in the identity of a man named Duane Darling. (Ex. 19, Kostyun Report at ¶ 47(e).)

[27] It is not uncommon for users to register on Fluent's websites many times. As Mr. Kalat explains, there are communities of people, referred to as "sweepers," who register on sweepstakes or rewards websites hundreds, if not thousands, of times. (Ex. 17, Kalat Supp. at ¶¶ 6-11.)

1   register the number;[28] or (iii) someone with actual or implied authority acting on that individual's

2   behalf,[29] who had visited Fluent's Website. Even if that individual denied visiting a Fluent Websit

3   – and otherwise denied that anyone else did acting on his or her behalf – Defendants would be

4   entitled to pursue discovery against that person and to cross-examine them.

5   **D.       The Putative Classes Were Not Contacted With An Autodialer**

6          Plaintiffs assert that the putative classes were called and texted with an autodialer.  They

7   rely on the Ninth Circuit's decision in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir.

8   2018), which held that a dialer that places calls from a list of phone numbers violates the TCPA.

9   At least three other circuits have rejected the Ninth Circuit's definition.  *See Gadelhak v. AT&T*

10  *Services, Inc.*, 950 F.3d 458 (7th Cir. 2020); *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d

11  1301 (11th Cir. Jan. 27, 2020); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018).  On July 9,

12  2020, the U.S. Supreme Court granted certiorari in *Facebook, Inc. v. Duguid*, No. 19-511, __ S.Ct.

13  __, 2020 WL 3865252, at *1 (U.S. July 9, 2020), and will resolve the split.

14                                      **CONCLUSION**

15         For the above reasons, class certification should be denied.

16  Dated:  July 31, 2020              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

17

18                          By    _____
                                              */s/ Jay T. Ramsey*
19                                          JAY T. RAMSEY
                                         Attorneys for Defendants
20

21

22

23

---

24  [28] Friends and family plans often employ many different surnames. Moreover, the person who
    gives TCPA consent to be contacted may be (but is not limited to) the non-subscriber customary
25  user included in the calling plan at the relevant time, in addition to the subscriber. *In the Matter of*
    *Rules and Regs. Implementing the Tel. Consumer Protection Act*, 30 FCC Rcd. 7961, 8000-01¶¶
26  73-75 (2015); *see also, e.g., Rodriguez v. Premier Bankcard, LLC*, 2018 U.S. Dist. LEXIS
    149225, at *11 (N.D. Ohio Aug. 31, 2018); *Hunter v. Time Warner Cable Inc.*, 2019 WL
27  3812063, at *16 (S.D.N.Y. Aug. 14, 2019).

28  [29] *See Davis v. AT&T Corp.*, 2017 U.S. Dist. LEXIS 46611, at *15 (S.D. Cal. Mar. 28, 2017);
    *Gutierrez v. Barclays Grp.*, 2011 U.S. Dist. LEXIS 12546, at *7-9 (S.D. Cal. Feb. 9, 2011).

**APPENDIX A**

**Hernandez**



**Russell**



**Berman**



## APPENDIX B

