# **<u>EXHIBIT 11</u>**

# Freedom - Berman

# *Erica Russell - 06-29-2020*

### *6/29/2020*

**Full-size Transcript**

**Prepared by:**

Michael Munroe
Sheppard Mullin

Tuesday, July 7, 2020

1

<pre>
 1                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                         OAKLAND DIVISION


 3

   DANIEL BERMAN, STEPHANIE          )
 4 HERNANDEZ, and ERICA RUSSELL,     )
                                     )
 5               Plaintiffs,         )
                                     )
 6 vs.                               )   Case Number
                                     )   4:18-CV-01060-YGR
 7 FREEDOM FINANCIAL NETWORK,        )
   LLC, FREEDOM DEBT RELIEF, LLC,    )
 8 FLUENT, INC., and LEAD SCIENCE,   )
   LLC,                              )
 9                                   )
                 Defendants.         )
10                                   )
   FREEDOM FINANCIAL NETWORK,        )
11 LLC and FREEDOM DEBT RELIEF,      )
   LLC,                              )
12                                   )
          Third-Party Plaintiffs,   )
13                                   )
   v.                                )
14                                   )
   DOES 1 through 5,                 )
15                                   )
          Third-Party Defendants    )
16 _____


17


18      THE VIDEOTAPED DEPOSITION OF ERICA NICOLE RUSSELL,

19 taken on the 29th day of June, 2020, between the hours of

20 10:42 a.m. and 2:20 p.m., on behalf of the Defendants,

21 pursuant to Federal Rules of Civil Procedure 30, at the

22 Regus Business Center, 321 South Boston Avenue, Suite 300,

23 Tulsa, Oklahoma, before Linda Fisher, Certified Shorthand

24 Reporter, Registered Professional Reporter, and Notary

25 Public in and for the State of Oklahoma.
</pre>

2

```
 1                    A p p e a r a n c e s

 2    For the Plaintiff      MS. JENNIFER R. MURRAY
      /Proposed Class        Terrell, Marshall Law Group
 3    (via Zoom video):      936 North 34th Street
                             Suite 300
 4                           Seattle, Washington  98103
                             (206) 890-5207
 5
      For the Defendants     MR. JAY T. RAMSEY
 6     (via Zoom video):     Sheppard, Mullin, Richter &
                              Hampton, LLP
 7                           1901 Avenue of the Stars
                             Suite 1600
 8                           Los Angeles, California  90067-6055
                             (310) 228-3700
 9                           jramsey@sheppardmullin.com
                                  -and-
10                           MR. NEIL ASNEN
                             Klein, Moynihan, Turco, LLP
11                           450 Seventh Avenue, 40th Floor
                             New York, New York  10123
12                           (516) 312-8249
                             nasnen@kleinmoynihan.com
13
      Also present:          MS. LISA ALLEN, Video Specialist
14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                  * * * * * * * * * * *
                        I-N-D-E-X

2

3                                            Page

4   Direct Examination by Mr. Ramsey...................    4
    Cross-Examination by Ms. Murray....................   97
5   Redirect Examination by Mr. Ramsey.................   98

6

7            DEFENDANTS' DEPOSITION EXHIBITS

8   Exhibit Number 200...............................36,96
    Exhibit Number 201................................   52
9   Exhibit Number 202................................   67
    Exhibit Number 203................................   70
10  Exhibit Number 204................................   78
    Exhibit Number 205................................   74
11  Exhibit Number 206................................   84
    Exhibit Number 207................................   90

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1              THE VIDEOGRAPHER:  We are now going to be

 2   on record.  Today is June 29th, 2020.  The time is

 3   approximately 10:42 a.m.  This is a remote

 4   videoconference.

 5        My name is Lisa Allen.  I'm the video specialist

 6   representing First Legal Deposition Services in the matter

 7   of Daniel Berman, et. al. versus Freedom Financial

 8   Network, LLC, et. al.

 9        The deponent is Erica Russell.  The video deposition

10   is requested by Shepherd Mullin.  Will counsel please

11   identify themselves and affiliation for the record.

12              MR. RAMSEY:  Jay Ramsey from Sheppard,

13   Mullin, Richter & Hampton on behalf of the defendant.

14              MR. ASNEN:  Neil Asnen, Klein, Moynihan,

15   Turco on behalf of the defendants.

16              MS. MURRAY:  Jennifer Murray from Terrell,

17   Marshall Law Group on behalf of the Plaintiff and the

18   proposed class.

19              VIDEOGRAPHER:  The deponent may now be

20   sworn in.

21

22

23

24

25
```

5

```
 1                    * * * * * * * * *
 2                  ERICA NICOLE RUSSELL,
 3      after having been duly sworn to testify the truth, the
 4      whole truth, and nothing but the truth, testified as
 5      follows:
 6                     DIRECT EXAMINATION
 7      BY MR. RAMSEY:
 8           Q.   Okay.  Again, my name is Jay Ramsey.  And I'm
 9      an attorney for the defendants in the case.  And I'll be
10      asking you questions today.  Can you start just by stating
11      your full name.
12           A.   Erica Nicole Russell.
13           Q.   Okay.  Great.  And if anyone can't hear anyone,
14      please speak up and let us know.  Have you been deposed
15      before, had a deposition taken?
16           A.   No.
17           Q.   I'll go over some of the ground rules.  It's a
18      little bit unusual that we're by videoconference.  So it's
19      also my first video conference deposition.  So we'll take
20      it a step at a time.
21           The first thing I want to say is to do our best not
22      to talk over each other.  So if you could let me finish
23      answering my question, and then I will do my best to stop
24      and then let you answer the question.
25           Excuse me, you're going to finish letting me ask my
```

```
 1    have you ever entered into, you know, a sweepstakes

 2    online?

 3         A.   Honestly, I don't know.  I can't recall

 4    specific times if I did.  It's not something, no, I

 5    generally don't do.

 6         Q.   How about, have you ever gone online and

 7    they're offering a reward and you -- let me just back up.

 8    So in this case, you went onto a website and ultimately

 9    got a reward; is that correct?

10         A.   That's one way to put it, yes.

11         Q.   Okay.  What was the reward or gift card?

12         A.   It was supposed to be for a Walmart thousand

13    dollar gift card.  I believe it ended up being a Visa card

14    for a thousand dollars.

15         Q.   And did you -- you spent the thousand dollars?

16         A.   Uh-huh.

17         Q.   All right.  That's a yes?

18         A.   Yes.

19         Q.   Okay.  I don't know how you want to call that,

20    but that type of website where you go on and you're trying

21    to get a reward like that or a gift card, is that

22    something you typically sign up for online?

23         A.   No.

24         Q.   Okay.  How many times would you say you have

25    done it roughly?
```

31

```
 1        A.    That one time.
 2        Q.    And no other times?
 3        A.    No.
 4        Q.    Have you ever entered into a sweepstakes where
 5   you're entering your name, and maybe you will win a prize,
 6   maybe you won't?
 7        A.    Sorry.  Not to my knowledge.  Not -- not that I
 8   can think of offhand.
 9        Q.    Have you ever gone onto a website where you're
10   asked for your personal information in exchange for which
11   you might get, you know, job listings, or education
12   listings, or any sort of advertising?
13        A.    Not intentionally.  I would not do that
14   intentionally, no.
15        Q.    Okay.  Do you shop online?
16        A.    Yes.
17        Q.    Do you have any favorite stores that you shop
18   online from?
19        A.    Amazon.
20        Q.    Amazon.  Okay.  How about any retailers, like
21   Macy's or something like that?
22        A.    No.
23        Q.    How about for your children, Carter's
24   Children's Place?
25        A.    Amazon.  That's about it.
```

32

```
1          Q.    Okay.

2          A.    Maybe Walmart.Com once in awhile.

3          Q.    When you are making purchases on Amazon, for

4    example, or Walmart, do you understand that when you make

5    a purchase, you are agreeing to a set of terms and

6    conditions?

7          A.    Yes.

8                    MS. MURRAY:  Object to the form.

9          Q.    (By Mr. Ramsey) I'm sorry, I didn't hear your

10   answer.

11         A.    Yes.

12         Q.    And do you understand just generally when you

13   make purchases online, that you are often, if not always,

14   agreeing to a set of terms and conditions?

15         A.    If it makes --

16                   MR. RAMSEY:  Objection.  Go ahead.

17         A.    If it makes them clear, yeah.  Usually, they

18   will have, you know, to further, you will have to agree to

19   terms and conditions.  Usually with Amazon, it's in their

20   privacy policy, I believe.

21         Q.    (By Mr. Ramsey) Have you ever -- when you say

22   that, is -- have you ever seen a sentence or something by

23   a button online that says something like, you know, "I

24   agree to the terms and conditions in the privacy policy"

25   or something to that effect?
```

33

```
 1          A.    Yeah, but -- yeah.
 2          Q.    That's something you see fairly regularly when
 3     you're shopping online?
 4          A.    Shopping.  Sure.
 5          Q.    Okay.  And is it usually your experience that
 6     the terms and conditions or terms of use or privacy policy
 7     are a hyperlink?
 8          A.    Usually it will give you the option to scroll
 9     through and read the entire thing.  But no, it's not
10     usually a hyperlink for like Amazon or Walmart, no.
11          Q.    Okay.  Do you know what I mean by a hyperlink?
12          A.    Where you click on it and it will pop them up.
13          Q.    Yes.  Okay.  Yes.  Okay.  So you're saying on
14     Amazon you actually scroll through the terms, you don't
15     click a hyperlink?
16          A.    No.  You usually -- I believe you scroll
17     through the terms.
18          Q.    Okay.  Each time you sign in?
19          A.    If any time -- well, no.  I'm a member.  So,
20     like, if they change their policy, then they email you and
21     notify you what the policy is.
22          Q.    Okay.  And so at the time that you're talking
23     about when you scrolled through the terms, did you
24     actually read them?
25          A.    For the most part, yes.
```

34

```
1         Q.    Okay.  And when you get an email changing them,
2    do you read them?
3         A.    Yeah, usually.
4         Q.    Okay.  Have you ever decided not to make a
5    purchase or sign up for a service or whatever it may be
6    because you've read the terms and --
7         A.    And disagreed with them?
8         Q.    -- said never mind?
9         A.    Yes.
10        Q.    Okay.  Could you tell me -- I'm sorry.
11        A.    I'm --
12              MS. MURRAY:  Just a minute.  Erica, could
13   you just make sure you let Jay finish his question before
14   you answer?
15        A.    Sorry.
16              MS. MURRAY:  Okay.
17        Q.    (By Mr. Ramsey) Okay.  I'm sorry.  So I just
18   asked whether you've ever read the terms and conditions on
19   some site that you're on, and after reading them, decided,
20   you know, not to make a purchase, or not to sign up for a
21   service?  And I believe you said yes, you've done that?
22        A.    Uh-huh.
23        Q.    That's -- can you say yes, that's correct?
24        A.    Yes.
25        Q.    And can you give me an example of when that
```

1    happens?

2         A.   Usually signing up if there was, like, a

3    specific -- it's like a kids site where they had a deal

4    going on for shoes.  And I was looking at shoes for my

5    daughter, Fabletics, I think.

6         They have, like, a kids version.  But I didn't agree

7    with the policy so I didn't sign up.  I didn't want to be

8    charged every month $40 afterwards.  So that's one

9    example.

10        Q.   Any other examples that you can think of?

11        A.   Not off the top of my head, no.

12        Q.   Okay.  And when was this example, Fabletics,

13   roughly?

14        A.   About two months ago.

15        Q.   And it sounds like maybe it was some sort of

16   subscription service where you pay $40 a month and get

17   something a month or something like that?

18        A.   Yeah.

19        Q.   Okay.  And so what you were objecting to was

20   that concept basically?

21        A.   Correct.

22        Q.   Okay.  Have you ever read a set of terms and

23   conditions and seen an arbitration clause?

24        A.   I've seen the -- yeah, I believe.

25        Q.   Okay.  Can you think of a specific example

36

1    right now as we're sitting here?

2         A.    No.

3         Q.    Do you know if Amazon has an arbitration

4    clause, for example?

5         A.    I do not.

6         Q.    Do you know if Walmart, for example, has an

7    arbitration clause?

8         A.    No.   Can we take a break?

9              MR. RAMSEY:  Yes.  Do you want to take a

10   five, 10-minute break?  Okay.  I'm going to mute myself or

11   can we go off the record?

12             THE VIDEOGRAPHER:  We're now going off the

13   record.  The time is 11:25 a.m.

14        (Whereupon, there was a recess taken.)

15             THE VIDEOGRAPHER:  We are now back on the

16   record.  The time is 11:39 a.m.

17        Q.    (By Mr. Ramsey) Welcome back.

18        A.    Thank you.

19        Q.    I am going to share an exhibit with you.  And

20   so it will be coming through in the chat hopefully here in

21   a second.  Please let me know when you have it when you

22   get it.

23        A.    Okay.

24        Q.    And then you should be able to open it.  Let me

25   know if you have problems with that.  Just let me know

1   when you have it open.  Your name is not Stephanie,

2   correct?

3          A.    Correct.

4          Q.    Have you -- this is a website where basically,

5   you can sign up and potentially get free stuff.  Do you

6   understand that, looking at that?

7          A.    Yes.  Uh-huh.

8          Q.    And I should say it's not a website; this is a

9   screen capture of a website so that we can look at it

10  today.

11         A.    Okay.

12         Q.    Have you been on websites like this before?

13               MS. MURRAY:   Form and foundation.

14         A.    Specifically, I don't know.

15         Q.    (By Mr. Ramsey) Have you been on websites like

16  this where you -- where you enter your information and

17  then you may be offered different offers to get free

18  things?

19         A.    I'm sure I have at one point.

20         Q.    Okay.  And by the way, you can scroll through

21  this document.  But I'll be focusing really on this first

22  page.  Okay.  And on my screen, because my computer is

23  small, it's hard to see.  But you see where it says

24  confirm your zip code below?

25         A.    Yes.

```
1    open on the top, there should be a button with a hand and
2    then to the right of it is a plus and minus.  The plus
3    should zoom you in.
4          A.   Oh.  It's not working.
5          Q.   Does that make it easier?
6          A.   It's not working.  It's not showing.  It's just
7    showing all of us.  Yes, it's easier to see.  I can read
8    it now.
9          Q.   Okay.  Okay.  So beneath the box with the zip
10   code, it says, "I understand and agree to the terms and
11   conditions which includes mandatory arbitration and
12   privacy policy."  You see that, right?
13         A.   Yes.
14         Q.   Okay.  Have you seen websites like this before
15   with that type of sentence?
16         A.   Only in seeing this.
17         Q.   You've never before seen a website like this?
18         A.   Not that would say "mandatory arbitration," not
19   to my knowledge, no.
20         Q.   Okay.  But you've seen websites before that
21   say, "I understand and agree to the terms and conditions
22   and privacy policy," for example?
23         A.   Yes, uh-huh.
24         Q.   Okay.  And is it like this where that sentence
25   is sort of near a button but you click to continue?
```

40

```
1                    MS. MURRAY:  Object to the form.

2           A.   I'm not sure.  All -- all websites are

3      different.

4           Q.   (By Mr. Ramsey) Okay.  But have you seen

5      something similar to this, --

6           A.   I'm sure.

7           Q.   -- where there's a sentence like that --

8           A.   Yes.

9           Q.   -- near a button that you have to click?

10          A.   Yes.

11          Q.   Okay.  And do you see here that the terms and

12     conditions and privacy policy language is underlined?

13          A.   Yeah, which is a hyperlink.

14          Q.   Okay.  And what do you understand that to mean,

15     then, like --

16          A.   Then you need to click on them to read them.

17          Q.   I'm sorry.  I cut you off accidentally.  What

18     did you say?

19          A.   You would need to click on them to read them.

20          Q.   Okay.  And when you see websites like this, do

21     you click on them to read them?

22          A.   I usually do, yes.

23          Q.   Okay.  Are there circumstances in which you do

24     not?

25          A.   If it's a site I've already been familiarized
```

1    with or I'm already a member with, then I've already read

2    the terms and conditions usually.

3         Q.   Okay.  But if it's -- so if it's a new site,

4    you generally read them.  If it's not a new site, then you

5    won't read them again; is that fair?

6         A.   Yes.

7         Q.   And you mentioned before -- I think you were

8    talking about Amazon -- and you had remembered having to

9    scroll through the terms and conditions.  Do you remember?

10        A.   I believe so, yes.

11        Q.   And is this what you mean, though, that you

12   would click the link and then scroll through them --

13        A.   Yes.

14        Q.   -- or something?

15        A.   Yes.

16        Q.   So it's -- Amazon, from your memory, looked

17   something like this?

18        A.   Something to a degree of this, yes.

19        Q.   Okay.

20        A.   Granted, --

21        Q.   And you were --

22        A.   -- I've had --

23        Q.   Sorry.  Go ahead.

24        A.   I've had my Amazon account for 15 years; so...

25        Q.   Sure.  That's -- that's fair.  And Walmart.  Do

42

```
1    you remember Walmart looking something like this?
2         A.   I don't specifically, no.
3         Q.   Okay.  Meaning, you remember it looks like
4    something else or you just don't remember?
5         A.   I just don't remember specifically, no.
6         Q.   Okay.  And looking at this one, if you were at
7    this website and you clicked "continue," would you
8    understand that you are agreeing to the terms and
9    conditions?
10        A.   Yes, if you click "agree," it will say that you
11   are agreeing to whatever they are.  Right.
12        Q.   Sure.  So on this screen, it says, "I agree"
13   with a box.  Do you see that?
14        A.   Yes.
15        Q.   Okay.  And you separately see a button that
16   says, "This is correct.  Continue"?
17        A.   Yes.
18        Q.   Okay.  Inside the box, it says, "I agree," --
19   it says right next to it -- "to receive daily emails from
20   samples and savings and sweepstakes alerts."  Did I read
21   that right?
22        A.   Correct.
23        Q.   Okay.  And you see that?
24        A.   Yes.
25        Q.   Okay.  Looking at this, whether you know or not
```

1          Q.    Okay.  And do you always check the box if you

2     see one?

3          A.    It's going to depend on the terms and

4     conditions.

5          Q.    Okay.  So you may or may not check the box if

6     it's there?

7          A.    Correct.

8          Q.    Okay.  And have you been on websites where

9     you're not -- you can continue with a purchase or sale or

10    sign up where you do not have to check a box?

11         A.    I believe eBay is like that.  Like, you don't

12    have to sign, like, for a membership or whatever, you

13    don't have to sign up.  You can continue as a guest.  And

14    I don't know what all that entails as far as --

15         Q.    Okay.  And just so I'm clear, I think you

16    answered it the way I meant it, but so where there is a

17    box on a website, you understand that you may not always

18    have to check it in order to proceed with a purchase or

19    sign up?

20         A.    Yes.

21         Q.    Okay.  Can you -- I will do this on my screen

22    if you are on your document.  I'm going to skip to page 7

23    of this document.  And I will zoom out.  Back up.  So do

24    you see your screen now?  That's an entire page of the

25    document.  Do you see that?

45

```
1          A.   Yes.

2          Q.   It says at the top, "Stephanie, get free

3    samples in three steps"?

4          A.   I need you to zoom in a little bit, though,

5    because I cannot read any of that.

6          Q.   No problem.

7          A.   Okay.

8               MS. MURRAY:  I just want to -- just a

9    minute, Jay.  I'm just going to object to this line of

10   questioning to the extent that you're suggesting that Ms.

11   Russell had seen this before since that hasn't been

12   established.

13              MR. RAMSEY:  Sure.

14         Q.   (By Mr. Ramsey) And I'm sorry, I'm going to go

15   to page 6.  So I went up a page.  Okay.  All right.  Do

16   you have -- do you see this?  Are you able to see the

17   screen now or do I need to zoom in more?

18         A.   Zoom in a little bit more for me, please.

19         Q.   Okay.  No problem.

20         A.   Thank you.

21         Q.   Okay.  So this page, you see at the very top it

22   says, "Stephanie, get free samples in three steps"?

23         A.   Yes.

24         Q.   And then sort of below that top banner, there's

25   an area there with some gray boxes and personal
```

1     information.  You see a name, email, zip code, date of

2     birth, and phone number?

3          A.   Yes.

4          Q.   And below those gray boxes, do you see sort of

5     a paragraph of texts that starts with, "by checking the

6     box below"?

7          A.   Yes.  Can you zoom in one more time, please.

8          Q.   Sure.

9          A.   Sorry.  I'm having a hard time reading that

10    small print.

11         Q.   That's fine.  Good?

12         A.   Yes.

13         Q.   Okay.  And then below that sort of block of

14    texts, you see a green box that says, "I confirm" with a

15    check box next to it?

16         A.   Yes.

17         Q.   Okay.  And next to the "I confirm" sort of

18    within that green box thing, it says that "all of my

19    information is accurate and consents to be called and

20    texted as provided above."  Correct?

21         A.   Yes.

22         Q.   Okay.  Have you seen websites like this before

23    where you are being asked for your consent to be called

24    and texted?

25         A.   No.

1          MS. MURRAY:  Object to the form.

2      Q.   (By Mr. Ramsey) If you saw a website like this

3  one or if you saw this website, would you check the "I

4  confirm" box?

5      A.   No.

6          MS. MURRAY:  Objection.  Calls for

7  speculation.  Go ahead.

8      A.   No.  Because I do not give out my personal

9  information as far as phone number.  I don't want to be

10  called.  I don't want to be texted.  I don't want to be

11  repeatedly called by what looks like an auto dialer and

12  prerecorded message.  I wouldn't confirm.

13      Q.   (By Mr. Ramsey) Okay.  And sort of consistent

14  with what you were saying before, when you are on a

15  website and you see one of these check boxes like the one

16  in green, you don't automatically click them, right?

17      A.   No.

18      Q.   Okay.  You read what you're confirming or

19  consenting to and then either click or don't?

20      A.   Generally, yes.

21      Q.   Do you see in the block of texts sort of

22  beneath the gray boxes and above the, "I confirm" button,

23  the blue underlined text, "marketing partner"?

24      A.   Yes.

25      Q.   And what do you understand that to be?

48

```
 1         A.   One of those things you press it, and it should

 2    have a site pull up to probably say who the marketing

 3    partners are.

 4         Q.   Okay.  And take your time and read those.  But

 5    is it fair to say that if you clicked the "I confirm"

 6    button there, you would understand that you were agreeing

 7    to receive texts or calls by the marketing partners?

 8              MS. MURRAY:  Object to the form.

 9         A.   Do I answer that?

10         Q.   (By Mr. Ramsey) Yes.

11         A.   Okay.  Yeah.  Yes.

12         Q.   And in this instance, those texts or calls

13    could be made with an auto dialer?

14         A.   Well, it says it right here, yes.

15         Q.   Okay.  Do you know what an auto dialer is, by

16    chance, or how would you define that?

17         A.   I would probably think it's some type of

18    computer that will auto dial phone numbers and leave

19    prerecorded messages.  Am I close?

20         Q.   Yeah.  That's -- that's good.  Have you ever

21    received auto dial phone calls?

22         A.   Unfortunately, yes.

23         Q.   How often would you say you receive them?

24         A.   Depending on what number.  That's why I changed

25    my number while I was with Sprint.  I was getting them
```

52

```
 1   you just hang up?

 2        A.   No.

 3        Q.   Or do you --

 4        A.   I usually say, "Take me off your list."

 5        Q.   And then hang up?

 6        A.   Yes.

 7        Q.   Do you ever not do that?

 8        A.   No.

 9        Q.   Okay.  I'm going to send you another exhibit

10   real quick.  And I'll describe it as well just so we can

11   do the same thing.  But I'll send it to you.  This will be

12   Exhibit Number 201.

13        A.   Okay.

14             MR. RAMSEY:   And I -- I apologize, -- I

15   forgot your name, but Ms. Court Reporter -- so I -- you

16   have the exhibits, too, correct?

17             THE COURT REPORTER:   I was not sent the

18   exhibits earlier.

19             MR. RAMSEY:  Okay.  Can I send them to you

20   after?  How would you like to --

21             THE COURT REPORTER:  That would be fine,

22   yes.  We'll talk about it afterwards.  That will be fine.

23        Q.   (By Mr. Ramsey) Okay, great.  It should have

24   gone through.  Let me know if it hasn't.

25        A.   It's downloading.  Okay.
```

1          Q.    Okay.  And you're free to open it.  I'm also

2    happy to share it.  Let me know what you prefer.

3          A.    It's probably easier, honestly, if you just

4    share it.

5          Q.    Okay.

6          A.    I believe that's a little easier for me.  That

7    way I'm not trying to -- I need you to zoom it, though,

8    please.

9          Q.    Yeah, no, no, no.  Okay.  But you -- you -- I'm

10   just making sure I got this right.  Are you seeing at the

11   top sort of a blue thing that says a $100 Target gift

12   card?

13         A.    No, right now I see your desktop.

14         Q.    Ooh.  That's fun.

15         A.    There you go.

16         Q.    Is that better?

17         A.    Uh-huh.  Yes.

18         Q.    Okay.

19         A.    And if you can zoom that all the way in,

20   please, because I am blind.

21         Q.    Sure, no.  That's fine.  Before we zoom in,

22   though, you can see that this is sort of a long tall

23   skinny rectangle?

24         A.    Yes.

25         Q.    Okay.  And I'll represent to you that's because

54

1    this is a screenshot, if you will, of a website as it

2    would appear on a mobile phone.

3         A.   Okay.

4         Q.   And that does not mean that on one screen of

5    your -- do you use an iPhone?

6         A.   Yes.

7         Q.   Okay.  So this does not mean that the entire

8    thing would appear on an iPhone.  It's just that if you

9    were to use your finger to scroll on your phone, you would

10   -- you know, to go all the way up and all the way down,

11   this is what you would see.

12        A.   Okay.

13        Q.   Does that make sense?

14        A.   Yes.

15        Q.   Okay.  I'm going to zoom in.  Okay.  So

16   hopefully, that's enough.  But at the top you see sort of

17   a -- in blue a $100 target gift card?

18        A.   Yes.

19        Q.   Okay.  And then below that is a red picture of

20   a red Target card?

21        A.   Yes.

22        Q.   And then if you scroll down some, which I'm

23   doing, you'll see Question 1 of 3.  And it says:  "Are you

24   shopping at Target this fall?  Yes.  No."  Do you see

25   that?

55

```
 1        A.    Yes.
 2        Q.    Okay.  Have you ever seen -- have you ever been
 3   to a website that looks like this before on your phone?
 4             MS. MURRAY:  Object to the form.
 5        A.    Not -- not for Target.  But I'm sure I've seen
 6   one for the Walmart gift card.
 7        Q.    (By Mr. Ramsey) Okay.  So it would look similar
 8   to this, but you're saying the Target card instead of
 9   Walmart?
10        A.    Correct, for a thousand dollars.
11        Q.    Okay.
12        A.    I believe it was similar.
13        Q.    Okay.  And in this image that you're looking
14   at, beneath the red Target card, the picture of the card,
15   but above the sort of big blue box that starts with
16   Question 1 of 3, there's a little line here.
17        A.    Uh-huh.
18        Q.    I don't know if you can actually see the
19   highlighting that I'm doing.  But it looks like there's a
20   thumbs up on the left, and then a heart, and "2 minutes
21   ago" on the right.  Do you see that?
22        A.    Yes, uh-huh, yes.
23        Q.    What do you understand that to be, if anything?
24        A.    It looks like something off Facebook.
25        Q.    Okay.  And if you saw that, what -- does that
```

56

1   mean anything to you or --

2       A.   No.

3       Q.   -- do you skip right past it?

4       A.   I wouldn't think that meant anything.

5       Q.   Okay.  Okay.  So other than the Walmart -- let

6   me back up.  So I'll represent to you that it is

7   defendant's position that you visited a website on

8   November 20th, 2017, that looked like this.

9       I understand you're saying it was Walmart rather

10  than Target.  And that you went through the website's

11  flow, and ultimately, gave your contact information.  And

12  then that ultimately led to you getting the thousand

13  dollar -- I think it ended up being a Visa card?

14      A.   Yes.

15      Q.   Okay.  Understanding that you may not remember

16  the website as, you know, sitting here today, you don't

17  deny, right, that you did, in fact, do that?

18      A.   No, I did that.

19      Q.   Okay.  And as best as you can remember, it

20  looked -- the website that you went through that day

21  looked something like this, but you're saying it was a

22  Walmart card.  Right?

23      A.   I'm sure it looked somewhat similar.  I don't

24  remember exactly what it looked like.  It's been three

25  years.

57

1          Q.   Okay.  That's fair.

2          A.   But the gist is the same, a thousand dollar

3    Walmart gift card.

4          Q.   Got it.  And do you remember, and again, fine,

5    if not.  Do you remember answering some preliminary

6    questions?  So, for example, on this one, it's Question 1

7    of 3.  And I go --

8          A.   I -- I do not.

9          Q.   -- to page 2, it's 2 of 3.  And if I go to page

10   3, it's Question 3 of 3.  Do you remember doing something

11   like that?

12         A.   I do not.

13         Q.   You could have done it, you just don't remember

14   one way or the other?

15         A.   Yes.  I don't remember one way or the other.

16         Q.   Okay.  I'm going to go to page 4 now.  No, I'm

17   not.  Sorry.  Give me one second.  I'm going to page 6 of

18   the document.

19         And it's still this long -- here I'll zoom out a

20   little bit so you can see the whole thing.  Although it's

21   still the same long skinny rectangle that would appear on

22   a phone if you were to scroll up and down with your

23   finger.

24         A.   Yes.

25         Q.   Okay.  I'll zoom in now.  And at the top it

1    still says -- it says, "Shipping information required" and

2    it has the same sort of red Target gift card.  Do you see

3    that?

4         A.   Yes.

5         Q.   Okay.  Do you remember a screen like this where

6    you were asked to enter your first name, last name, and so

7    forth?

8         A.   I really do not specifically.

9         Q.   Okay.  You're not saying it didn't happen,

10   but--

11        A.   Yes, I do not remember it.

12        Q.   Okay.  Well, then looking at this one today,

13   you understand, right, that you would enter your first

14   name where it says, "First name"?

15        A.   Yes.

16        Q.   Okay.  And same is true with last name, street

17   address, zip code, and telephone?

18        A.   Yes.

19        Q.   And then you would enter your date of birth

20   there where the sort of the three little boxes are?

21        A.   Yes.

22        Q.   Okay.  What is your date of birth, by the way?

23   Sorry.

24        A.   8/17/1989.

25        Q.   Okay.  And then below date of birth, it says,

59

1    "Select gender," male, female.  Do you remember that?

2         A.   No.  But female, obviously.

3         Q.   Okay.  And then below that do you see --

4    there's that sentence again that says, "I understand and

5    agree to the terms and conditions which includes mandatory

6    arbitration and privacy calls."  Do you see that?

7         A.   I see it.

8         Q.   Okay.  Do you remember seeing that that day?

9         A.   I do not.

10        Q.   Okay.  But it could have been there, you just

11   don't remember one way or the other?

12        A.   Well, no, I -- I don't think I would have

13   continued had I seen "mandatory arbitration."  I think

14   that's kind of a weird thing for an official site.

15        Q.   Okay.  So had you seen, or if you saw that that

16   day, you would have not pressed "continue"?

17        A.   Had I seen it, yeah, I probably would have not

18   pressed "continue."

19        Q.   Okay.  Any way that you pressed "continue"

20   without having seen -- or, I mean, is there a chance that

21   it was there and you decided to click "continue"?

22        A.   No.  Because I'm -- I'm pretty good about

23   reading terms and conditions.  And I feel it's kind of odd

24   to have to have a mandatory arbitration if it's a

25   legitimate company.

60

1       Q.   Okay.  So -- and in this instance, how would

2   you have gotten to the terms and conditions?

3       A.   And, well, in looking at this, you would have

4   to click on them.

5       Q.   The link that -- the underlined text --

6       A.   Yes.

7       Q.   -- that says, "Terms and Conditions"?

8       A.   Yeah, correct.  Now, I don't specifically

9   remember seeing "mandatory arbitrations."  But I -- that's

10  to the best of my recollection.  I do not remember seeing

11  it.

12      Q.   Okay.  And had this sentence simply said, "I

13  understand and agree to the terms and conditions and

14  privacy policy," so if we sort of took out which includes

15  "mandatory arbitration" in the sentence, would you have

16  clicked -- do you think you would have clicked "continue"?

17              MS. MURRAY:  Object.  It calls for

18  speculation.

19              THE COURT REPORTER:  Ms. Murray, I'm having

20  a trouble hearing you a little.

21              MS. MURRAY:  Okay.  Objection.  Calls for

22  speculation.  Can you hear me better now?

23              THE COURT REPORTER:  Yes.

24      A.   I -- I --

25      Q.   (By Mr. Russell) Let me know if you want me to

1    repeat the question.

2         A.   Can you please repeat.

3         Q.   Sure.  So you said that you would not have

4    clicked "continue" if you had seen "mandatory

5    arbitration."  And so what I was asking is if this said,

6    "I understand and agree to the terms and conditions and

7    privacy policy," so if we took out the reference to

8    mandatory arbitration, do you believe you would have

9    clicked "continue"?

10                   MS. MURRAY:  Same -- same objection.

11        A.   I probably would have went through the terms

12   and conditions in privacy policy.  And I probably would

13   have clicked, probably.  I'm sure I --

14        Q.   (By Mr. Ramsey) Okay.  Fair.  And if you saw in

15   the terms and conditions when you clicked on them, an

16   arbitration, a mandatory arbitration clause, would you

17   still have not clicked or --

18        A.   No, I probably wouldn't have clicked.  Like I

19   said, I don't feel like mandatory arbitration is necessary

20   if it's a legitimate company, in my opinion.

21        Q.   Okay.  Fair.  And looking at this today, if you

22   were clicking "continue," would you, assuming you decide

23   to click "continue," right?

24        A.   Yes.

25        Q.   I understand that you may opt not to.  But

62

1    assuming you decide to click "continue," you understand,

2    right, that you are agreeing to the terms and conditions?

3                MS. MURRAY:  Object to the form.

4        A.   Yes.

5        Q.   (By Mr. Ramsey) I'm going to zoom out again.

6        A.   Okay.

7        Q.   And then I'm going to go to this page, page 11

8    of the pdf.

9        A.   Okay.

10       Q.   And I'll zoom out again.  Again, you can see

11   the sort of a long, skinny rectangle.

12       A.   Okay.

13       Q.   And again, that's because it's on a phone.

14   It's a replication of what it might look like on a phone.

15       A.   Okay.

16       Q.   And I'll zoom in again.  And at the top it

17   says, "Take survey, 20 points."  Do you see that?

18       A.   Yes.

19       Q.   Okay.  Do you remember, by the way, taking a

20   survey in order to get your what ended up being a Visa

21   gift card?

22       A.   There was a lot of different things that I had

23   to do to get that gift card.  I know a lot of it was

24   signing up for supposedly free things that wound up not

25   being free.  So I don't remember specifically taking a

```
 1   survey, no.
 2        Q.   Okay.  But you could have, you may --
 3        A.   I -- I --
 4        Q.   You just don't remember?
 5        A.   Yeah, I might have.  I -- I don't remember.
 6        Q.   Sure.  Okay.  Okay.  So looking at this, you
 7   see it's much like the website before.  You see gray boxes
 8   for your first, last name, email address, zip code, date
 9   of birth, and phone number.  Do you see that?
10        A.   Yes.
11        Q.   Okay.  And then below that, there is two
12   paragraphs of texts.  And then below that, there's that
13   button that says -- or check box that says, "I confirm,"
14   and then at the very bottom, continue.  Do you see that?
15        A.   Yes.
16        Q.   Okay.  Do you remember seeing this screen when
17   you signed up on the website?
18        A.   I -- I don't remember seeing it, no.
19        Q.   You could have seen it; you just don't remember
20   one way or the other?
21        A.   Yes.
22        Q.   Looking at it today, would you have checked the
23   "I confirm" box?
24             MS. MURRAY:  Object to the form.
25        A.   Let me read it.  No, because I don't -- I
```

1    wouldn't want to be called by different companies.

2         Q.    (By Mr. Russell) And this one like before, you

3    see the -- who would you be getting called by if you

4    clicked, "I confirm"?

5         A.    I would assume the marketing partners.

6    Correct?

7         Q.    Okay.  And to see the list of marketing

8    partners, what would you have to do based on your --

9         A.    You would have to click on the link.

10        Q.    Okay.  The link, the blue underlined text --

11        A.    Correct.

12        Q.    -- that says, "Marketing Partners"?

13        A.    The hyperlink, yes.

14        Q.    Looking at this today, do you -- if you did not

15   click the box that says, "I confirm," the check box next

16   to "I confirm," do you believe that you could just click

17   "continue"?

18        A.    I'm not sure.

19              MS. MURRAY:  Objection.  Foundation.

20        Q.    (By Mr. Russell) I'm sorry, I couldn't hear

21   that.

22              MS. MURRAY:  Erica, make sure you give me a

23   chance to object and then go ahead and answer.

24        A.    Okay.

25        Q.    (By Mr. Ramsey) Do you want me to ask the

65

1   question again?

2          A.   I'm really not sure whether you would have to

3   press "confirm" to continue or not.

4          Q.   Okay.  And if you did not want to click "I

5   confirm," so if you read this, you decide I do not want to

6   click "I confirm" because I don't want to consent, would

7   you just X out of the website, or would you leave it

8   unchecked and click "continue"?

9               MS. MURRAY:  Object to the form.

10         A.   I'm not sure.

11         Q.   (By Mr. Russell) Have you ever opted not to

12  check a box but tried to click continue or submit or

13  register or something like that on a website before?

14         A.   I don't know.  I'm not sure.

15         Q.   Okay.  I guess what I'm driving at here is if

16  you opt not to click "I confirm" or "I agree" or something

17  like that, do you nonetheless try to continue on websites

18  or do you just sort of give up?

19         A.   It depends on the website.

20         Q.   Okay.  So you may continue, you may -- you may

21  just decide I'm done with this, I'm leaving?

22         A.   Yes.

23         Q.   Okay.  Are there circumstances where you might

24  opt to attempt to continue?

25         A.   If -- if I'm not okay with my information to be

77

```
1     when you read this, think, you know, no, I didn't agree to
2     any terms or conditions?  Or was this statement consistent
3     with what you were understanding?
4               MS. MURRAY:  Same objection.
5          A.   Do I answer that?
6          Q.   (By Mr. Ramsey) Yes.
7          A.   Sorry, I'm confused.  I guess I signed it
8     thinking that I guess I had complied.
9          Q.   So having signed this, I mean, do you -- do you
10    agree, then, that you agreed to the terms and conditions
11    on the website?
12         A.   To a degree.  But I still don't remember seeing
13    it that it would say arbitration on it.  And I don't
14    remember specific terms and conditions.
15         Q.   And okay.  So when you got this form and were
16    filling it out, did you go look for the terms and
17    conditions to check before you signed this form?
18         A.   No, because it -- that website is quite
19    complicated to use, the RewardZone website, and as well as
20    even trying to get to this point of getting this paper was
21    a quite complicated process.  So it wasn't like a user
22    friendly, easily addressable thing.
23              You know, it's not like you could just go in and
24    find everything you're looking for.  This was like quite a
25    process of trying to even get to this point.  So, no, I
```

102

1    Okay.

2              MS. MURRAY:  Great.

3              MR. RAMSEY:  Thank you.

4              THE VIDEOGRAPHER:  This concludes the

5    deposition of Erica Russell.  We are now going off the

6    record.  The time is 2:20 p.m.

7         (Whereupon, the proceedings were concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

103

1                              (Witness excused.)

2

3

4

5
                      Signed:_____
6                             ERICA NICOLE RUSSELL

7
                 Subscribed and sworn to before me this_____
8

9    day of_____, 2020.

10

11
                      _____
12                    Notary Public

13
     My Commission Expires:
14

15   _____

16

17

18

19

20

21

22

23

24

25

104

1                              CERTIFICATE

2    STATE OF OKLAHOMA          )

3    COUNTY OF TULSA            )   ss.

4             I, Linda Fisher, a Certified Shorthand

5    Reporter, Registered Professional Reporter, and Notary

6    Public within and for the State of Oklahoma, do hereby

7    certify that on the 29th day of June, 2020, at the Regus

8    Business Center, 321 South Boston Avenue, Suite 300,

9    Tulsa, Oklahoma, pursuant to Federal Rules of Civil

10   Procedure 30, appeared the above witness, ERICA NICOLE

11   RUSSELL, who was by me first duly sworn to testify the

12   truth, the whole truth, and nothing but the truth in the

13   case aforesaid, and that the deposition by her was reduced

14   to writing by me in stenograph, and thereafter transcribed

15   by me, and is fully and accurately set forth in the

16   preceding pages.

17            I do further certify that I am not related to

18   nor attorney for any of the said parties, nor otherwise

19   interested in the event of said action.

20            WITNESS my hand and official seal this 1st day

21   of July, 2020.

22

23

24       _____
                 Linda Fisher, CSR-RPR #866
25

# **<u>EXHIBIT 12</u>**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


DANIEL BERMAN, STEPHANIE    )
HERNANDEZ, and ERICA RUSSEL, )
                           )
         Plaintiffs,    )
                           )
vs.                       ) Case No. 4:18-cv-01060-YGR
                           )
FREEDOM FINANCIAL NETWORK,   ) VIA ZOOM WEB
                           )     VIDEOCONFERENCE
LLC, FREEDOM DEBT RELIEF,    )
LLC, FLUENT, INC., and LEAD  )
SCIENCE, LLC.,              )
                           ) JOB NO. 52349
         Defendants.    )
                           )


DEPOSITION OF STEPHANIE HERNANDEZ

THURSDAY, JULY 2, 2020

PASO ROBLES, CALIFORNIA


REPORTED BY: Tracey Wiley, CSR #5396

STEPHANIE HERNANDEZ

July 02, 2020

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    OAKLAND DIVISION

 4

 5  DANIEL BERMAN, STEPHANIE     )
    HERNANDEZ, and ERICA RUSSELL,)
 6                               )
              Plaintiffs,        )
 7                               )
    vs.                          ) Case No. 4:18-cv-01060-YGR
 8                               )
    FREEDOM FINANCIAL NETWORK,   ) VIA ZOOM WEB
 9                               )     VIDEOCONFERENCE
    LLC, FREEDOM DEBT RELIEF,    )
10  LLC, FLUENT, INC., and LEAD  )
    SCIENCE, LLC.,               )
11                               )
              Defendants.        )
12                               )

13

14       DEPOSITION OF STEPHANIE HERNANDEZ, taken at

15  Courtyard Marriott, 120 South Vine Street, Harvest

16  Suite, Paso Robles, California, on Thursday, July

17  2, 2020, at 10:00 a.m., before Tracey Wiley,

18  Certified Shorthand Reporter, #5396, in and for the

19  State of California.

20

21

22

23

24

25
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1    APPEARANCES:

 2        For the Plaintiffs:

 3        TERRELL MARSHALL LAW GROUP, PLLC
          BY: JENNIFER RUST MURRAY
 4        (VIA ZOOM WEB VIDEOCONFERENCE)
          936 North 34th Street, Suite 300
 5        Seattle, Washington 98103
          (206) 816-6603
 6        jmurray@terrellmarshall.com

 7                          -and-

 8        BRODERICK LAW, P.C.
          BY:  EDWARD A. BRODERICK, ESQ.
 9        (VIA ZOOM WEB VIDEOCONFERENCE)
          99 High Street, Suite 304
10        Boston, Massachusetts 02110
          (617) 738-7080
11        ted@broderick-law.com

12
          For the Defendants:
13
          SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
14        BY:  JAY T. RAMSEY, ESQ.
          (VIA ZOOM WEB VIDEOCONFERENCE)
15        1901 Avenue of the Stars, Suite 1600
          Los Angeles, California 90067-6055
16        (310) 228-3700
          jramsey@sheppardmullin.com
17
                          -and-
18
          KLEIN MOYNIHAN TURCO, LLP
19        BY:  NEIL ASNEN, ESQ.
          (VIA ZOOM WEB VIDEOCONFERENCE)
20        450 7th Street Avenue
          New York, New York 10123
21        (646) 350-1736
          nasnen@kleinmoynihan.com
22

23

24    (Con't)

25
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1   THE VIDEOGRAPHER:
             COASTAL LEGAL VIDEO SPECIALISTS
 2           (VIA ZOOM WEB VIDEOCONFERENCE)
             BY:  Deborah Alvino, CLVS
 3           805.478.5829

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1                          INDEX

 2

 3  WITNESS:  STEPHANIE HERNANDEZ

 4

 5  EXAMINATION                              PAGE

 6  BY MR. RAMSEY                              8

 7

 8          I N D E X   T O   E X H I B I T S

 9

10  DEFENDANTS'...........DESCRIPTION...........PAGE

11  EXHIBIT 200 - Welcome Back, Stephaine Ad        54

12  EXHIBIT 208 - E-mail Dated Friday, March 27th,
                  2020, from verify@donotcall.web   23
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              PASO ROBLES, CALIFORNIA, THURSDAY
 2                 July 2, 2020,  10:00 a.m.
 3
 4          THE VIDEOGRAPHER:  Good morning ladies and
 5   gentlemen.  We're going on the record at 10:03 a.m.
 6          My name is Deborah Alvino, our
 7   videographer, and I represent First Legal
 8   Depositions located at 333 South Grand Avenue,
 9   Suite 401, Los Angeles, California 90071.  The
10   phone number is (855) 348-4997, extension 3848.
11          Today's date is Thursday, July 2nd, 2020.
12   This is the start of the videotape deposition of
13   Stephanie Hernandez in the matter of Daniel Berman,
14   Stephanie Hernandez and Erica Russell, Plaintiffs
15   versus Freedom Financial Network, LLC, et al.,
16   Defendants, and related cross-actions or related
17   actions the United States District Court, Northern
18   District of California, Oakland Division, Case
19   Number 4:18-cv-01060-YGR.
20          This deposition is taking place via a Zoom
21   web conferencing where the deponent, counsel and
22   the court reporter are attending the deposition via
23   an Internet connection from their separation
24   locations.  This is taken on behalf of the
25   defendants.
```

```
 1          Counsel, would you please identify
 2   yourselves, starting with the questioning attorney.
 3          MR. RAMSEY:  Jay Ramsey from Sheppard,
 4   Mullin, on behalf of the defendants.
 5          MR. ASNEN:  Neil Asnen.  A as in apple, S
 6   as in Sam, N as in Nancy, E as in Eric, N as in
 7   Nancy.  Klein, Moynihan, Turco for the Defendants.
 8          MR. BRODERICK:  Edward Broderick for the
 9   deponent.
10          MS. MURRAY:  Jennifer Murray for the
11   Plaintiff.
12          THE VIDEOGRAPHER:  Today is Tracey Wiley
13   from First Legal Depositions.  Will the court
14   reporter please swear in the witness.
15
16                    STEPHANIE HERNANDEZ,
17   a Plaintiff, having been first placed under oath,
18   testified as follows:
19
20          MR. BRODERICK:  Yeah, I was just going to
21   ask if, I'm not sure what you did on Monday -- I
22   was hoping we could reserve all objections as to
23   the form of the question.  Go a little quicker.
24          MR. RAMSEY:  Sure.  I don't know exactly
25   what you mean, but okay.  As to admissibility, yes,
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1  I think that's fine.
 2          MR. BRODERICK:  Right, or, you know,
 3  questions relying on not evidence.
 4          THE COURT REPORTER:  Ed, you're really
 5  low.  We can't hear you on this end.  It's -- got
 6  three words out of that.
 7          MR. BRODERICK:  Okay.  That's going to
 8  limit the number of objections.  I was saying as
 9  opposed to things like, you know, assumes facts not
10  in evidence and things like that, which isn't
11  really an objection, form of the question.  There's
12  some things that you have to lodge at the time and
13  it drags things out.
14          MR. RAMSEY:  Sure.  I don't have an issue
15  with that.
16          MR. BRODERICK:  Okay.  Great.
17
18                     EXAMINATION
19  BY MR. RAMSEY:
20      Q.  Ms. Hernandez, welcome.  Can you start
21  just by stating your name and spelling it.
22      A.  Stephanie Lee Ann Hernandez.
23  S-t-e-p-h-a-n-i-e.  Capital L-e-e Capital A-n-n.
24  Hernandez, H-e-r-n-a-n-d-e-z.
25      Q.  Have you had your deposition taken before?
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1  you have?
 2       A.  I don't know.  It's through Verizon
 3  because the other phone broke so they haven't given
 4  me an upgraded phone because the other phone they
 5  gave me broke and this phone is bad.  I don't like
 6  it.
 7       Q.  Have you ever owned an iPhone?
 8       A.  No.  If I did, I don't know what an iPhone
 9  is.
10           He's laughing but I'm being honest.  What
11  the heck is an iPhone?
12       Q.  What type of phone does your husband own
13  or use?
14       A.  Again, I don't know.
15       Q.  Do you know if it's iPhone?
16       A.  Hum, I don't know.  The only reason I know
17  it's a Pixel because my kid told me it was a Pixel.
18       Q.  That's fine.  How old are your kids at
19  home?
20       A.  15, 11, and 10.
21       Q.  A lot of work right now I would think.
22       A.  Yeah.  Don't ask me how old my other kids
23  are, you're just going to freak out.
24       Q.  Okay.  Have you ever gone online and
25  signed up on a website that was offering you the
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1   chance to win any type of reward?
 2        A.  A reward?  Like money?
 3        Q.  Yeah, maybe a shopping gift card, money,
 4   something like that?
 5        A.  No.  Not for money.
 6        Q.  What types of website have you visited
 7   then?  When you said not for money, that suggests
 8   something else, and so what would be that be?
 9        A.  I tried to get on for free items.
10        Q.  What types of items if you can remember?
11        A.  Tide.  Thing to clean the house, to help
12   around the house.  And then I didn't finish it.
13        Q.  Didn't finish what?
14        A.  Signing up.
15        Q.  And how many times have you visited a
16   website like this to try and get items?
17        A.  I think twice.  But I didn't --
18        Q.  Other than those two -- I'm sorry.  I cut
19   you off what did you say?
20        A.  I didn't finish it, though.
21        Q.  Other either occasion?
22        A.  (Witness shakes head.)
23        Q.  That's a "No"?
24        A.  That's a "No."
25        Q.  You have to say it --
```

STEPHANIE HERNANDEZ

July 02, 2020

1       A.   It's a "No."

2       Q.   Okay.  And when you say "finish it," I

3   guess can you tell me a bit more by what you mean

4   by "finish it"?

5       A.   They wanted my medical records.

6       Q.   And so when the website presumably asked

7   for your medical records, you decided to -- to do

8   what?

9       A.   Shut it down.

10      Q.   You mean you just closed it out?

11      A.   Closed it out, shut it down.

12      Q.   And do you remember whether you visited

13  this website on your phone or on your computer or

14  something else?

15      A.   On my phone.

16      Q.   Do you own computer?

17      A.   Yes, I do.

18      Q.   Do you use it?

19      A.   No, I don't.

20      Q.   Do you ever access the Internet while on

21  your computer?

22      A.   Okay.  I own a computer, a laptop, and a

23  phone.  My husband has the computer.  I use the

24  laptop to pay bills, and that's it.

25      Q.   So you don't use the computer at all?

STEPHANIE HERNANDEZ

July 02, 2020

```
 1  plan, which you said was Verizon, charges you by
 2  phone call?
 3       A.  No.
 4       Q.  They do not or you don't know?
 5       A.  They don't charge me by phone call.
 6       Q.  Okay.  How about for text messages?  Do
 7  you know if they charge by text messages?
 8       A.  They don't charge me by text messages.
 9       Q.  So is it correct then to say that you were
10  never charged some additional amount that you would
11  otherwise not pay by receiving either the text
12  messages or phone calls that we've been
13  referencing?
14       A.  Excuse me?  Can you repeat that?
15       Q.  I'll start over.
16           The phone calls that we've been talking
17  about, did you ever have to pay more on your cell
18  phone bill because you received those phone calls?
19       A.  No.
20       Q.  Same question about for text messages, did
21  you ever have to pay more on your cell phone bill
22  for having received the text messages that we've
23  talked about?
24       A.  No.
25       Q.  I'm going to send you another exhibit via
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1   the chat function.  It was an exhibit that was
 2   previously marked as Exhibit 200 during a prior
 3   deposition.  Are you able -- do you see it?  Would
 4   you like to open it yourself or would you like me
 5   to share it?
 6        A.   You're going to have to share it.  It's
 7   not opening.
 8        Q.   Okay.  Sure.  Give me one moment.
 9             All right.  One moment.
10             Okay.  Is there a document on your screen
11   now?
12        A.   Yep.
13        Q.   Okay.
14        A.   I never got that.
15             (Defendant's Exhibit Number 200
16             Was marked for identification.)
17             MR. RAMSEY:  Okay.  We'll get there.  Just
18   briefly, for the record, this is an excerpt of a
19   document that Defendants produced.  It includes the
20   images that Defendants produced replicating a visit
21   that we, at least, contend Ms. Hernandez visited.
22   This excerpt is eight pages long.  I'm happy to
23   flip through each page.
24        Q.   We'll go through them as I ask you a
25   question.
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1        A.   Okay.

 2        Q.   Let me know if you want to look through

 3   them now.  I understand -- well, never mind.  I'm

 4   just going to start, is that okay?

 5        A.   Go ahead.

 6        Q.   Okay.  Do you recognize the Page 1 of this

 7   document which is a reproduction of a website?

 8   Have you seen this before?

 9        A.   No.

10        Q.   So you mentioned earlier visiting a

11   website that was advertising a potential to get

12   free products including Tide.  Did that website

13   look something like this (indicating)?

14        A.   No.

15        Q.   Can you tell me what that website looked

16   like that is different from what you're looking at

17   here?

18        A.   It was smaller.  It had less than that.

19        Q.   If I zoomed in, for example, and went like

20   that (indicating), does that -- are you saying that

21   it may be looked more like that?

22        A.   No.  It looked less.  It didn't have all

23   of that (indicating).

24        Q.   When you say, "all of that," what do you

25   mean?
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1        A.   It didn't have the batteries and it didn't
 2   have the -- the Iams and it didn't have most of
 3   some of that stuff that's in that picture.
 4        Q.   Okay.  So the image that you're -- I
 5   assume you're referencing is the one just below the
 6   phrase, "Welcome back, Stephanie," and it has Tide
 7   in it, dog food --
 8        A.   Yeah, it didn't have all of that in it.
 9        Q.   Okay.  So you're saying that image was
10   different?
11        A.   Yeah.
12        Q.   What do you remember the image having?
13        A.   It had Tide and it had a broom and it had,
14   oh, God, a Swifter, a Swifter mop, a Swifter mop
15   thing.  Swifter.  And it had cleaner scrubs, and it
16   had shampoos, conditioners, thing like that.  Not
17   this (indicating).
18        Q.   Have you seen a picture of what you're
19   remembering recently or at any time in the last six
20   months?
21        A.   No.  I don't get on that stuff no more.
22        Q.   You said earlier that you had visited a
23   website like this twice.  But then you just said,
24   "I don't get on that stuff anymore," which suggests
25   to me, at least, that you've been on it more than
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1  two times.  Is it still your testimony that you've

 2  been on a website like this only twice?

 3          MR. BRODERICK:  Objection.

 4          THE WITNESS:  I don't get on them.

 5  BY MR. RAMSEY:

 6      Q.  I understand you don't go to them anymore.

 7  But back in the period in which you went to the

 8  website, did you go to them more than two times?

 9          MR. BRODERICK:  Objection.

10          THE WITNESS:  No.

11  BY MR. RAMSEY:

12      Q.  And the two times that you went, was the

13  website identical as far as you remember?

14      A.  To this one?  No.

15      Q.  No.  But were they otherwise identical?

16  So were they the same -- the two that you remember

17  in your head were they the same?

18      A.  No.

19      Q.  They were different?

20      A.  Yeah.

21      Q.  Okay.  So the one you just described with

22  I think you said a Tide, a broom, a Swifter,

23  shampoo and conditioner, that one, do you have that

24  one in your memory?

25      A.  Kind of.
```

STEPHANIE HERNANDEZ

July 02, 2020

1        Q.   Okay.  Did it otherwise look like this

2   website, just that the images were different?

3           MR. BRODERICK:  Objection.

4           **THE WITNESS:  I don't know.  I don't think**

5   **so.**

6   BY MR. RAMSEY:

7        Q.   The other time you visited the website,

8   what do you remember seeing in the images?

9        **A.   I saw people, but not like this -- all**

10  **these people like you're showing here.  You're**

11  **showing, like, double the people here.  It wasn't**

12  **like that.  It was maybe -- maybe a set of people,**

13  **but not like this one.**

14       Q.   When you say a set of people, you mean

15  only three of the little circles as opposed to six?

16       **A.   Maybe one circle or two.**

17       Q.   When you visited the websites that you're

18  talking about, do you remember it saying "Samples"

19  and "Savings" like this one does at the top?

20       **A.   No regular.  It said free items.**

21       Q.   I'm sorry.  You may have answered this,

22  but do you remember when you visited this website?

23       **A.   A couple years ago.**

24       Q.   Was it before or after your surgery?

25       **A.   Before.**

STEPHANIE HERNANDEZ

July 02, 2020

1  **the same thing for both things.  You know, like**
2  **maybe I just saw the same add for them both.**
3      Q.   Irrespective of what you saw, when you
4  were going on the website that day, was there a
5  particular product you were hoping to get a sample
6  of?
7      **A.   I would say the Swifter.  It had to have**
8  **been a Swifter or the Tide.**
9      Q.   The website you saw --
10     **A.   It would have been the Swifter or the**
11 **Tide.  But it always came down to the medical.  I**
12 **stopped because of the medical.**
13     Q.   Understood.  So we'll get to that.  So on
14 the first screen that you saw that had the images
15 of the Tide and Swifter and --
16     **A.   Yeah.  So the second one had to have had**
17 **the Tide and the Swifter, also.**
18     Q.   I understand.  Let me finish my question.
19         In your head, picturing the website as you
20 remember it.  In addition to the picture that had
21 the Tide and the Swifter and whatever other
22 products were on there, was there anything that
23 asked for your name, let's say?
24     **A.   Yes.**
25     Q.   Your first name and your last name?

STEPHANIE HERNANDEZ

```
 1   Anything else?
 2        A.   No.
 3        Q.   And do you remember entering your name?
 4        A.   No.
 5        Q.   Meaning you may or may not have or you
 6   think you did not at all?
 7        A.   I did not at all.
 8        Q.   Do you remember the website ever asking
 9   for your phone number?
10        A.   I never gave my phone number.
11        Q.   Okay.  But do you remember the website
12   asking for it --
13        A.   Yes.
14        Q.   There being -- okay.  Was that on the same
15   page where your name was asked for?
16        A.   Yes.
17        Q.   But you're saying that you did not enter
18   your phone number?
19        A.   Yes.
20        Q.   Did you enter any phone number --
21        A.   No.
22        Q.   -- even though it wasn't yours?
23        A.   Did you enter any name even though if
24   wasn't yours?
25        A.   No.
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1        Q.  Did the website, as best as you remember,
 2  it ask for your home address?
 3        A.  Yeah, they asked for it.  I wouldn't give
 4  it to them.
 5        Q.  Did you enter a different home address?
 6        A.  No.
 7        Q.  Did the website, as you remember, it ask
 8  for your birth date?
 9        A.  Yeah, they asked.  I wouldn't give it to
10  them.
11        Q.  Did you enter anything into the website,
12  any personal information?
13        A.  In the beginning, when it asked me what I
14  liked, I would enter what I liked.  And then it
15  would go to the next set of questions, and it would
16  ask me what I wouldn't like, what I would like,
17  what kind of magazines would I like, what make-up
18  would I like, you know, and it kept going down.
19  Then it started getting into your medical history.
20            And when you punch out and say, no, I'm
21  not doing medical, then it would say, okay, you're
22  almost done, let's get your info.  And then you'd
23  say, no, I'm not putting this in here.  Okay, well,
24  wait.  It would go back to your medical history and
25  that's when I would log out.
```

STEPHANIE HERNANDEZ

July 02, 2020

1        Q.   So your memory of the website is you saw

2    one or more screens where it was asking you

3    questions, if you liked a magazine or a product or

4    something like that, and then including medical

5    questions?

6        A.   It would go to medical.  I wouldn't do the

7    medical.  Then it would click over and try to get

8    my personal information.  And I would say, no, and

9    it would click back to my medical history.  And

10   that's when I would log out.

11       Q.   Okay.  I'm going to -- in the document in

12   front of you, I'm going to skip to page -- actually

13   let me stop that.  I'm going to skip to Page 3.

14   And then can you see this (indicating)?  Do I need

15   to make it larger?  I don't know what it looks like

16   on your screen.

17       A.   I see it.

18       Q.   In particular, I am talking about this

19   portion that you should see, it's a reproduction of

20   a web page.  Is it these types of questions or is

21   the look of the website that you remember something

22   like this where it's asking you questions?

23            MR. BRODERICK:  Objection.

24            THE WITNESS:  No.

25   ////

STEPHANIE HERNANDEZ

July 02, 2020

```
 1      Q.  Let me finish.  I'd like to finish my
 2  question.  Okay.
 3           The website that you remembered visiting,
 4  you mentioned at the end of a series of questions
 5  there was a page where it asked for your personal
 6  information including your name, your address, and
 7  your date of birth.  Does the page that you
 8  remember asking for that information appear or look
 9  -- did it look like what you see here before you on
10  Page 6 of Exhibit 200?
11           MR. BRODERICK:Objections.
12           THE WITNESS:  No.
13  BY MR. RAMSEY:
14      Q.  Did it look anything like Page 6 of
15  Exhibit 200?
16           MR. BRODERICK:  Objection.
17           THE WITNESS:  No.
18  BY MR. RAMSEY:
19      Q.  I'm going to stay on this page.  Is this
20  large enough on your screen to -- can you read the
21  top where it says, "Stephanie, get free samples in
22  three steps"?  Is that large enough for you to read
23  on your screen?
24      A.  I can read it.
25      Q.  Okay.  I'll zoom in a little bit.  You see
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1  at the bottom what you should be looking at right
 2  now is a big blue button that says, "continue."  Do
 3  you see that?
 4       A.   I see it.
 5            Q.   Okay.  So I understand that you're saying
 6  you never visited this website.  I want you to sort
 7  of put all of that aside.  Okay?  And I want you to
 8  imagine that you are on a website and this is what
 9  you see.  Does that make sense?
10       A.   Okay.
11            Q.   If you were to check the box, do you see
12  the green box above the "continue?"
13       A.   I see it.
14            Q.   That says, "I confirm."  And there's an
15  orange arrow to the left of it.  Do you see that?
16       A.   I see it.
17            Q.   Okay.  If you were to click that box and
18  it -- what would you understand -- have you ever
19  seen -- let me strike all of that.
20            There's a box there next to the "I
21  confirm" that's in light gray.  Do you see that?
22       A.   I see it.
23            Q.   Have you seen boxes like this online
24  before?
25       A.   I have.
```

STEPHANIE HERNANDEZ

July 02, 2020

1        Q.  And what do you understand it to be?  Is
2   that a box that you can check?
3        A.  It's a box I won't check.
4        Q.  Fair.  But if you wanted to check, could
5   you check it?  Do you understand that's what that
6   is?
7        A.  I understand that.
8        Q.  Okay.  Why wouldn't you check that box?
9        A.  That means you own -- you own me.
10       Q.  What makes you say that?
11       A.  The phone calls.  And I exited out, and I
12   still got all the phone calls, and I still got
13   everything done to me, and you guys still wouldn't
14   stop calling me, and I still was treated like crap.
15   And my doctors had to shut my phone off in the
16   hospital, and it still wouldn't stop.  And my house
17   got bombarded when I came home with a box and a
18   whole in my stomach.  And it still didn't stop when
19   the nurse's aide had to disconnect my house phone.
20   It didn't stop.  So you tell me.  And I didn't even
21   check no box.  I -- I exited out and I still got
22   harassed.  So you tell me.
23       Q.  Okay.  I have a few follow-up questions.
24   You mentioned earlier the hospital turning off your
25   phone.  That was during the first surgery, correct,

STEPHANIE HERNANDEZ

July 02, 2020

```
 1  in 2015?
 2        A.   Yeah.   And even in 2017.
 3        Q.   Okay.   You said that you didn't and
 4  wouldn't have checked this box.  Do you understand,
 5  though, that if you had checked the box you were
 6  providing consent to receive those phone calls?
 7             MR. BRODERICK:  Objection.
 8             THE WITNESS:  I didn't check no box.
 9  BY MR. RAMSEY:
10        Q.   I understand you're saying you didn't, but
11  if you did check the box, do you understand that to
12  mean that you were providing consent to being
13  contacted on your cell phone?
14             MR. BRODERICK:  Objection.
15             THE WITNESS:  I did not check no box.
16  BY MR. RAMSEY:
17        Q.   That's not answering to my question.   So
18  I'd like you to answer.
19             Okay.  If you had checked the box, did you
20  understand that that would mean that --
21        A.   I understand what that would mean.   I
22  heard you the first time.
23             (Speaking simultaneously.)
24             MR. BRODERICK: Objection.
25  ////
```

STEPHANIE HERNANDEZ

July 02, 2020

 1  BY MR. RAMSEY:

 2      Q.   Okay.   Thank you.

 3           Looking at this screen again, above the

 4  box that we've been talking about that says, "I

 5  confirm" and has the check box there's a paragraph.

 6  Do you see that?

 7      **A.   I see the paragraph.**

 8      Q.   Okay.   And on the second line of the

 9  paragraph a handful of words in there is something

10  that says, "marketing partners" that is in blue

11  text and it's underlined.   Do you see that?

12      **A.   Yes.**

13      Q.   Tell me your understanding of why that --

14  those two words are in blue and underlined?   What

15  does that mean to you?

16      **A.   I can't read it.**

17           THE COURT REPORTER:   Ed, I can't hear you

18  if you're objecting.   You've got to really speak

19  up, yell.

20           MR. BRODERICK:   All right.   I'll shout.

21  Objection.

22           **THE WITNESS:   He's objecting.   He's**

23  **objecting.**

24  BY MR. RAMSEY:

25      Q.   I'm happy to zoom in more if need be.

STEPHANIE HERNANDEZ

July 02, 2020

```
 1        A.  Says, "marketing partners."
 2        Q.  Yes.  So what do you understand that
 3   that's in blue text and underlined.  You see that;
 4   correct?
 5        A.  That means I can be harassed for the rest
 6   of my life.
 7        Q.  Because "marketing partners" is in blue
 8   and underlined?
 9        A.  Yeah.  That's how I take that.
10        Q.  Harassed by whom?
11        A.  By the people who dial your phone all
12   hours of the day and night and harass your cell
13   phone all hours of the day and night.
14        Q.  Okay.  And it's because you understood
15   this, right, that you just closed out of the
16   website when you visited?
17        MR. BRODERICK:  Objection.
18        THE WITNESS:  No.  I closed out of the
19   website when they started asking me medical
20   questions.
21   BY MR. RAMSEY:
22        Q.  What were those medical questions?
23        A.  Oh, do you have diabetes.  Oh, do you have
24   this disease.  Oh, do you need care for your back.
25   Oh, do you need care for your stomach.  Oh, do you
```

```
 1  visited the website that you remember?
 2       A.  That I remember.
 3       Q.  Okay.  And what I'm asking is, is other
 4  than those two is it possible that you went to a
 5  website like this that you just don't remember?
 6       A.  I didn't go.
 7           MR. BRODERICK:  Objection.
 8           THE WITNESS:  He objected.
 9  BY MR. RAMSEY:
10       Q.  So one of the defendant's records who
11  operates the website says it has your information
12  entered into its website, one or more of them,
13  between May 29th, 2016 and May 23rd of 2019, for a
14  total of 31 times.  You just denied that you ever
15  visited the website or a website like it that many
16  times?
17       A.  No.
18       Q.  You don't deny it or you do deny it?
19       A.  What was that question?
20       Q.  So you mentioned two visits to a website
21  where you were asked -- given an opportunity to get
22  products and asked questions and so forth --
23       A.  Right.
24       Q.  -- I'm telling you -- I'm representing to
25  you that our records, defendant's records, say that
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1  you visited -- someone with your phone number,

 2  e-mail address and home address visited the

 3  website, a website 31 times between the period May

 4  2016 and May 2019.  Are you saying that's just

 5  incorrect?

 6       A.  That's incorrect.

 7           MR. BRODERICK:  Objection.

 8  BY MR. RAMSEY:

 9       Q.  Okay.  I'm going to go back to Page 1 of

10  this document.  This is Exhibit 200 still.  I'm

11  going to zoom in a little bit.  Do you see the box

12  that is to the right of the image, says at the top

13  "confirm your zip code below"?  Do you see that?

14       A.  Yes, I see that.

15       Q.  And you never saw this; correct?

16       A.  No, no.

17       Q.  So correct, you never saw it?

18       A.  No.

19       Q.  Did you ever see this (indicating)?

20       A.  No.

21       Q.  Okay.  Sorry.  I understand you haven't

22  seen this, that's fine.  Below the zip code that

23  says 93930, do you see the sentence that says, "I

24  understand and agree to the terms and conditions

25  which include mandatory arbitration and privacy
```

```
 1  a hyperlink.  Are you following me?
 2       A.  I'm following you.
 3       Q.  Okay.  If you were -- if you were to see
 4  this website and you saw the phrase "terms and
 5  conditions" was underlined, would you understand
 6  that if you put your mouse or your finger, or
 7  whatever it might be, and you clicked on "terms and
 8  conditions" that it would take you to a different
 9  web page?
10       A.  Okay.
11       Q.  Do you understand that?  Is that true or
12  something that you understand or not?
13       A.  I understand.
14       Q.  When you say, "I understand," are you
15  saying you understand what I'm saying or that you
16  understand that if you were to visit a website that
17  looked like this and you saw the phrase "terms and
18  conditions" underlined that you would know if you
19  clicked it you would be taken to a different page?
20           MR. BRODERICK:  Objection.
21           THE WITNESS:  I don't understand.
22  BY MR. RAMSEY:
23       Q.  Have you ever seen a phrase like this when
24  you are shopping online, say, that is above a
25  button that allows you to purchase or sign up for a
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1  website, a phrase like this that says, "I
 2  understand and agree to the terms and conditions"?
 3        A.  Yes, I do.
 4        Q.  Okay.  So you've seen something like this
 5  before?
 6        A.  Yes, I have.
 7        Q.  And when you see something like that, do
 8  you ever click on the terms and conditions link and
 9  read the terms and conditions?
10        A.  Yes, I do.
11             MR. BRODERICK:  Objection.
12  BY MR. RAMSEY:
13        Q.  Do you do that regularly?
14        A.  Quite often.
15        Q.  Do you do that every time you visit a
16  website?
17        A.  No, not every time.
18        Q.  What would cause you not to read -- to
19  click on them and read them?
20        A.  Something like Costco, Walmart, Lowe's.
21  Places like that.
22        Q.  You would not read them?
23        A.  No.
24        Q.  And why is that?
25        A.  Because they're too big in the community.
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1        Q.  So you trust them?
 2        A.  Yeah.
 3        Q.  On a website like this that's offering you
 4  product, would you read the terms and conditions
 5  then?
 6        A.  Yeah.
 7            MR. BRODERICK:  Objection.
 8  BY MR. RAMSEY:
 9        Q.  Would you completed -- complete your
10  registration without reading the terms and
11  conditions?
12        A.  No.
13            MR. BRODERICK:  Objection.
14  BY MR. RAMSEY:
15        Q.  Why did you want to read the terms and
16  conditions?
17        A.  Because it's fraud.
18        Q.  You would be concerned about fraud?
19        A.  Yes.
20        Q.  So you would want to read the terms and
21  conditions to make sure that you're not getting
22  screwed over?
23        A.  Yes.
24        Q.  And if you were to read the terms and
25  conditions and conclude that you were getting
```

STEPHANIE HERNANDEZ

July 02, 2020

```
 1  screwed over, you would not continue with the
 2  website?
 3       A.  Yes.
 4       Q.  Looking at the screen in front of you, if
 5  you were to see this, let's say you went online
 6  today and you were to see this, and you clicked on
 7  the terms and conditions and you read them and you
 8  decided, you know what, I like this.  I trust them.
 9  I'm not getting screwed over.  You would then click
10  this, is this correct, I can continue button?
11          MR. BRODERICK:  Objection.
12          THE WITNESS:  I would not.
13  BY MR. RAMSEY:
14       Q.  Why not?
15       A.  Because of what I've been through.
16       Q.  Okay.  I understand.  What I'm asking you
17  is, if you were to visit this website and conclude
18  after reading the terms and conditions or otherwise
19  that you wanted to go forward, let's say this --
20  let me strike that.
21          Let's say we're on Lowes.com.  You trust
22  them, and you see a screen like this and it says,
23  "I understand and agree to the terms and conditions
24  which includes mandatory arbitration and privacy
25  policy."  Would you click continue and continue on
```

STEPHANIE HERNANDEZ

July 02, 2020

1    with the website?

2         A.   If it was Lowe's?

3         Q.   Yes.

4         A.   Yeah, I would do it for Lowe's.

5         Q.   Okay.  And by clicking continue and

6    continuing with the website in that circumstance,

7    would you understand that you were agreeing with

8    the Lowe's terms and conditions?

9         A.   Yes.

10             MR. BRODERICK:  Objection.

11             THE WITNESS:  He objected again.

12   BY MR. RAMSEY:

13        Q.   Let's take another five-minute break.  I'm

14   going to go through my notes and see if I have any

15   more questions.  We're likely almost done, so if

16   that's okay with everyone, let's do that.

17             THE VIDEOGRAPHER:  We're going off the

18   record at 12:06 p.m.

19             (Recess taken.)

20             THE VIDEOGRAPHER:  We are going back on

21   the record at 12:18 p.m.

22             MR. RAMSEY:  So I actually have no further

23   questions.

24             MR. BRODERICK:  Great.  No questions from

25   us.

STEPHANIE HERNANDEZ

July 02, 2020

```
1              DECLARATION UNDER PENALTY OF PERJURY

2

3         I, STEPHANIE HERNANDEZ, do hereby certify

4   under the penalty of perjury that I have reviewed

5   the foregoing transcript of my deposition taken on

6   Thursday, July 2, 2020; that I have made such

7   corrections as appear noted herein in ink; that my

8   testimony as contained herein, as corrected, is

9   true and correct.

10        DATED this       day of                      ,

11   2020, at                            , California.

12

13

14

15                            ,

16                      STEPHANIE HERNANDEZ

17

18

19

20

21

22

23

24

25
```

```
1                   REPORTER'S CERTIFICATION

2

3           I, Tracey Wiley, CSR NO. 5396, certify:

4           That the foregoing deposition was taken

5   before me at the time and place therein set forth,

6   at which time the witness was put under oath by me;

7           That the testimony of the witness and all

8   objections made at the time of the deposition were

9   recorded stenographically by me and thereafter by

10  computer transcribed;

11          That the foregoing deposition is a true

12  record of the testimony and of all objections made

13  at the time of the deposition.

14          I further certify that I am neither

15  counsel for nor related to any party to said

16  action, nor in any way interested in the outcome

17  thereof.

18          In witness whereof, I have subscribed my

19  name this 4th day of July 2020.

20

21

22                  _____

23                  Tracey Wiley, CSR NO. 5396

24

25
```

# **<u>EXHIBIT 13</u>**

Page 1

1          UNITED STATES DISTRICT COURT

      FOR THE NORTHERN DISTRICT OF CALIFORNIA

2               OAKLAND DIVISION

   - - - - - - - - - - - - - - - -x

3  DANIEL BERMAN,

4          Plaintiff,                    Case No.

                                    4:18-cv-01060-YGR

5          v.

6  FREEDOM FINANCIAL NETWORK, LLC,

   FREEDOM DEBT RELIEF, LLC, FLUENT,

7  INC., and LEAD SCIENCE, LLC,

8          Defendants.

   - - - - - - - - - - - - - - - -x

9

10

11       DEPOSITION OF BENJAMIN BEECHER

12

13           New York, New York

14        Friday, February 22, 2019

15

16

17

18

19

20

21

22

23  Reported by:

24  JEFFREY BENZ, CRR, RMR

25  JOB NO. 156072

Page 2

1
2
3
4                   February 22, 2019
5                   10:09 a.m.
6
7
8         Deposition of BENJAMIN BEECHER, held at the
9  offices of Klein Moynihan Turco LLP, 450 Seventh
10 Avenue, New York, New York, before Jeffrey Benz, a
11 Certified Realtime Reporter, Registered Merit
12 Reporter and Notary Public of the State of New
13 York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   A P P E A R A N C E S:
2
3      BRODERICK & PARONICH
4      Attorneys for Plaintiff
5         99 High Street
6         Boston, Massachusetts  02110
7      BY:  EDWARD BRODERICK, ESQ.
8         JON FOUGNER, ESQ.
9
10
11
12
13
14      SHEPPARD, MULLIN, RICHTER & HAMPTON
15      Attorneys for Defendants
16         1901 Avenue of the Stars
17         Los Angeles, California  90067
18      BY:  JAY RAMSEY, ESQ.
19            -and-
20      KLEIN MOYNIHAN TURCO
21         450 Seventh Avenue
22         New York, New York  10123
23      BY:  BRIAN ASTRUP, ESQ.
24
25

Page 4

1   BENJAMIN BEECHER,
2      called as a witness, having been duly sworn
3      by a Notary Public, was examined and
4      testified as follows:
5   EXAMINATION BY MR. RAMSEY:
6      Q.  My name is Jay Ramsey.  I represent
7   the defendants in this case.  With me is Brian
8   Astrup.
9         Can you state your name for the
10  record?
11     A.  Yes.  It's Ben Beecher.
12     Q.  And can you spell it?
13     A.  Ben, B-E-N, sometimes Benjamin,
14  Beecher, B-E-E-C-H-E-R.
15     Q.  And do you live in New York?
16     A.  I live in Jersey City.
17     Q.  Can you give us your address, please?
18     A.  Yeah, I just moved.  It's 346 Fourth
19  Street, Unit 2.
20     Q.  And do you have a separate business
21  address?
22     A.  I do, yes.  Our business address is
23  Lightmatter, which is at 42 West 24th Street,
24  New York, New York.
25     Q.  Have you been deposed before?

Page 5

1      A.  I have never been deposed before.
2      Q.  Have you testified at a trial or any
3   sort of court proceeding?
4      A.  I've never testified before.
5      Q.  Okay.
6         So I'm going to give you a few ground
7   rules for the deposition, you've probably gone
8   over them with your counsel, but just to get
9   them out of the way.
10        We're in a deposition.  The court
11  reporter here is going to take down everything I
12  say and everything you say.  So that it reads
13  better, I will do my best to not cut you off.
14  So if you're answering a question, I'll wait
15  until you're done and then I'll ask my next
16  question.  If I could just ask you to do the
17  same thing.  It's incredibly hard to do.
18     A.  I believe it.
19     Q.  So it will happen, but I may remind
20  you occasionally.  It just makes it easier to
21  read.
22        We can take a break at any time that
23  you want.  We'll probably take occasional breaks
24  throughout the day.  I would ask that if I've
25  asked a question, that you answer it before we

Page 26

1  around understanding whether the user -- whether
2  the user gets the expected action out of using
3  the site or not or the application.
4     Q. Can you give me an example of that?
5     A. Yeah. So in that UX course I was
6  mentioning my final product was something that
7  someone who suffered from a stroke could use to
8  communicate with a caregiver. And one of the
9  modules within it was something that would
10 verbalize words they had typed into the screen.
11 So you would type in, you know, I'm thirsty and
12 you'd hit a button and you'd get one of those
13 robotic voices saying I would like some water or
14 I'm thirsty, actually. It didn't change the
15 meaning. It was direct.
16     And we spent a certain amount of time
17 trying to understand how best to communicate
18 that like when you clicked this button, it was
19 going to take an action that other people in the
20 surrounding area would perceive it, because we
21 were conscious -- other aspects of this software
22 was for like personal note-taking and health
23 diary, and we wanted to make sure that people
24 understood that they weren't going to
25 accidentally dump some personal data into

Page 27

1  something that would be read out in public. So
2  we wanted to make it clear -- we looked at ways
3  to make it clear that like this part's public
4  and this part's private and when to interact.
5  We spent a while figuring out to make it clear
6  that certain actions would have an effect on the
7  surrounding area.
8     Q. I'm going to sort of switch to a
9  different topic. Do you have any licenses or
10 certifications?
11    A. No. Software engineering is almost
12 completely unlicensed.
13    Q. Have you ever published any sort of
14 article or research about website design or
15 anything? Let's just start with anything.
16    A. I mean, I've written blogs, you know,
17 and participated in online discussions.
18    Q. Let me ask it this way: Any peer-
19 reviewed --
20    A. No. Well, tricky. Right? I mean, if
21 you publish something on Dribbble or a blog,
22 like people are going to read it and other
23 people are going to comment on it. So that's
24 sort of a form of peer review.
25    Q. But not something that's peer-reviewed

Page 28

1  for like an academic journal?
2     A. I've never published something in an
3  academic journal, not specific to design.
4     Q. What did you publish in an academic
5  journal?
6     A. I believe I was listed as an author on
7  a sociology paper that had to do with the -- the
8  Columbia SIRP project.
9     Q. And what was that again? I'm sorry.
10    A. It was -- it was an interesting
11 project. Somebody took a lot of data from some
12 public housings in Chicago and were trying to
13 put together a social graph of relationships
14 between people to understand better the
15 transactions that they were making to get a
16 better feel for the economics of that.
17    Q. In your various work on different
18 websites in your employment or personally have
19 you ever created a page that sought a user's
20 agreement to a set of terms and conditions?
21    A. Yes, I have, commonly. Almost every
22 web page we create has a T&C.
23    Q. How about any page that sought TCPA
24 consent?
25    A. I have never built one that

Page 29

1  specifically had TCPA consent.
2     Q. How about something seeking consent
3  for the individual to receive e-mail marketing?
4     A. Yeah, I have -- I have built -- it's
5  rare to build a page specific to that. I have
6  done that. But more commonly I have built check
7  boxes and sort of interactions with a -- at the
8  larger page around that consent.
9     Q. And the work that you're talking
10 about, is that throughout your experience or is
11 that mostly at Lightmatter?
12    A. Throughout my experience.
13    Q. I'm not asking you to do this, but if
14 I were to ask you to list me every website that
15 you've done a consent page for --
16    A. I don't think I could do that off the
17 top of my head. I could give you a lot, but I
18 wouldn't want to call it comprehensive.
19    Q. That's fine. I won't test your
20 memory.
21     Before I was talking about website
22 design generally and then I was talking about
23 design of pages seeking consent, either to terms
24 and conditions or TCPA consent on the general
25 side.

Page 30

1    Are there any published industry
2    guidelines that you follow in your work when
3    designing a website?
4        A.   When designing a website, yeah.  I
5    mentioned our report, Don't Make Me Think, which
6    I think is a pretty foundational text for that
7    sort of thing.  There's quite a lot of blog
8    posts and just sort of general stuff out there
9    in the -- in the ether.  Unfortunately, there's
10   not a ton of like very rigorous formal website
11   design suggestions outside of the psychology
12   fields, and that is often not focused around the
13   nitty-gritty of where to place something and
14   what to make it look like.
15       Q.   So you mentioned Don't Make Me Think.
16   Is that something you keep at your desk and
17   refer to regularly?
18       A.   I wouldn't say I refer to it
19   especially regularly.  It's definitely more of
20   like a set of high-level principles.  And once
21   you've sort of internalized them, it's not as
22   useful in the day-to-day work.
23       Q.   Other than Don't Make Me Think, is
24   there some sort of text that you would refer
25   to --

Page 31

1        A.   Yeah.  I have a copy of, you know,
2    Understanding User Interfaces that I refer to
3    occasionally.  But that one is definitely more
4    specific and has lots -- lots of little details
5    that are not always appropriate for a website,
6    you know, I'd say a given website I might need
7    to use only 1 or 2 percent of that text.
8        Q.   So other than Don't Make Me Think and
9    Understanding User Interfaces, any other texts
10   that you would refer to?
11       A.   From the blog point of view we make
12   high use of Dribbble.  Right?  We make high use
13   of Smashing Magazine, Talks a Lot.  That's a
14   pretty fantastic resource.
15       Q.   What is Dribbble?
16       A.   Dribbble is a website where people can
17   post design examples.  So it's sort of like a
18   social network for designers.  So say that you
19   are just building something -- say you're
20   building something and you want to elicit sort
21   of community feedback on it.  You could post it
22   on Dribbble and people would have the
23   opportunity to comment or give suggestions or
24   feedback.
25       Q.   And what is Smashing Magazine?

Page 32

1        A.   It's a magazine focused around CSS,
2    which is the language of the web that declares
3    how things are sort of laid out.  So if you
4    want, you know, two pieces of text, you want
5    them to be 20 pixels away from each other, you
6    would specify that at CSS.  So they started more
7    technical and over time they've sort of grown
8    into a more overreaching everything that has to
9    do with online design.
10       Q.   Starting with Dribbble, have you
11   posted a website to that?
12       A.   No.  No, I haven't, because I
13   generally don't create designs as part of my
14   work product.
15       Q.   What is your typical work product?
16       A.   Computer code.  So I will generally
17   create the final product that you personally
18   could go to by typing something into a URL.
19   Dribbble tends to be more in the preparatory
20   stage, you know, like Photoshop and making a
21   mock of what the final thing is going to look
22   like.
23       Q.   I see.  How often do you consult
24   Dribbble?
25       A.   I don't know.  Every other day.  It's

Page 33

1    fun.  So, you know, sometimes I'm just looking
2    at it for inspiration and sometimes you're
3    trying to answer a question.
4        Q.   And anything on Dribbble that you've
5    reviewed about best practices when designing a
6    page seeking consent to a set of terms and
7    conditions?
8        A.   Yeah, I have seen a couple of
9    examples.  I'm not sure I could produce those
10   because the stuff tends to be a little
11   temporary.  But I have seen a couple posts that
12   have talked about, you know, breaking things
13   down into sections and making them sort of
14   understandable and intelligible for users.
15       Q.   Do you remember anything specific
16   about those posts or is that sort of the best
17   you can remember?
18       A.   One thing I do remember specifically
19   was when writing a terms and conditions it's
20   best if you can group like ideas together and
21   provide a table of contents and the ability to
22   jump to any specific region.
23           So a website I built called Dropout
24   Club I advised the entrepreneur, who was doing
25   his own design, about these conditions.  And in

Page 34

1  the current terms and conditions there you can
2  see an example of that, where there's the main
3  body of the T&C and then on the side there's a
4  static contents list that you can jump around
5  using.
6      Q.  Sure.  So what you just described is
7  the actual set of terms and conditions.  Before
8  that presumably there's a page that asks for the
9  user's name or some piece of information and
10 then --
11     A.  Sure.
12     Q.  -- there's something that says I agree
13 to the terms and conditions.
14     A.  Yep.
15     Q.  Just let me finish before you say
16 something.
17         Any posts on Dribbble about that page?
18     A.  Yes.  That page in general is usually
19 called the user registration flow.  And there is
20 exhaustive posts around that.  That tends to be
21 a page that has one of the -- one if not the
22 highest dropoff rates.  And so a lot of people
23 figure out how do you make this clear and easy
24 for users in order to, you know, make sure that
25 people don't get upset halfway through the forum

Page 35

1  and leave the web page, which is, you know, a
2  failure state.
3      Q.  I'm going to go back to some earlier
4  questions now that I have this phrase.  Did you
5  take any coursework that talked about the design
6  of user registration flow pages?
7      A.  Yes, I did.
8      Q.  What was that?
9      A.  That was the Understanding User
10 Interfaces course that I took.
11         I understand what you're asking now.
12     Q.  Was that in college?
13     A.  Yeah.
14     Q.  Any other courses other than that one?
15     A.  No.  Although it was typical to build
16 a user registration page as a part of
17 coursework.  And in the course of critique from
18 professor and classmates it was common to talk
19 about design considerations even if that wasn't
20 the focus.
21     Q.  Is there any set of industry
22 guidelines about the design of user registration
23 flow pages?
24     A.  There is -- I wouldn't say that
25 there's like a specific ironclad gold standard.

Page 36

1  There's a lot of the different ideas on ways to
2  structure that and make it better or worse.  I
3  would say that they share a lot of the common
4  threads, though:  increase clarity, reduce
5  questions that a user has to ask, you know, try
6  to make it clear what they need to -- like
7  information they need to give you up front.
8  Don't require them to jump back and forth
9  between different -- between doing the same kind
10 of information, different locations.
11         It's all sort of focused around the
12 idea that people are going to sit down and do
13 some work around typing into this form and you
14 want to make that as simple and easy as possible
15 for them.
16     Q.  So what you were just talking about
17 generally, how I might summarize it, is how a
18 user and making it easier for that are user to
19 input their information and basically get past
20 that page; is that fair?
21     A.  Yeah, I think that's fair.
22     Q.  Any industry guidelines reflecting
23 what needs to be put on the website to ensure
24 consent, legal consent?
25     A.  I wouldn't say that there's industry

Page 37

1  guidelines on that.  And the reason I'd say that
2  is most people in the programming world don't --
3  they don't necessarily think about the legality
4  of -- of this check box.  They just want to
5  understand how to make it as painless as
6  possible for a user to consent in an ethical
7  way.  So usually that gets kicked other to the
8  lawyer in terms of saying like what is the
9  minimum amount of work that we need to -- like
10 how -- what's the minimum that we need to do
11 here to make sure that people understand what
12 they're confirming consenting to.
13     Q.  Okay.
14         And this is a similar question so it
15 may be the same answer, but I asked you about
16 industry guidelines.  Are there any set of
17 general principles or practices that you're
18 aware of about website design and what you need
19 to ensure legal consent?
20     A.  I would say I'm not as sure about that
21 from the legal point of view.  From an
22 industry point of -- like from a user ease point
23 of view usually what they say is it should be
24 clear and obvious and it shouldn't necessarily
25 require the user to move around too much.

10

Page 42

1  registration.  But there is higher-level
2  thinking that applies.  Lots of time in that
3  book it talks about forms and user inputs, and
4  user registration is one implementation of those
5  sort of more general principles.  And the
6  higher-level principles there are directly
7  applicable:  make it clear, make it concise,
8  make it obvious, make it fast.
9      Q.  Same question:  Are the principles
10  that you're talking about about user
11  registration flow pages specifically listed or
12  written out in, I think the book was,
13  Understanding User Interfaces?
14      A.  I believe they are.  I would need
15  to double-check that.  I haven't used that text
16  for user registrations in a number of years.
17      Q.  So that was going to be my next
18  question.  You then didn't rely on anything
19  necessarily or refer to anything in
20  Understanding User Interfaces in rendering any
21  opinion in this case?
22      A.  No.  I felt it would be too specific.
23      You know, there's a lot of talk on the
24  difference between an e-commerce and a social
25  network registration flow, and that's not

Page 43

1  applicable in this case.
2      Q.  Are there any differences either in
3  that book or that you're aware of between a
4  website that I might visit on a computer and a
5  mobile version of that website?
6      A.  There are.  A lot of the general
7  high-level rules are the same.  You know, the
8  trick with mobile is that you have so much less
9  screen real estate to work with.  So all of the
10  high-level principles are just doubly strong.
11  You know, you have to make double sure that
12  everything is clear and concise because you have
13  less room to make a mistake or use a word that
14  you don't mean.
15      Q.  Gotcha.
16      Anything that you can think of sitting
17  here now in Understanding User Interfaces that
18  you disagree with?
19      MR. BRODERICK:  Objection.
20      Q.  Anything in Understanding User
21  Interfaces that you disagree with that relates
22  to the design of user registration flow pages?
23      MR. BRODERICK:  Objection.
24      A.  I can't think of anything off the top
25  of my head.

Page 44

1      Q.  Anything in Understanding User
2  Interfaces that relates to user registration
3  flows that you believe does not set forth best
4  practices or is not best practices?
5      MR. BRODERICK:  Objection.
6      A.  I would need to look at the text
7  again.  That text was published quite a while
8  ago and it is common for best practices to shift
9  over time.  So my best recollection is that at
10  the time of reading it I agreed with things and
11  have since developed more experience that I
12  might -- might disagree with things, but I
13  wouldn't be able to point to specific points
14  without referencing it directly.
15      Q.  Similar questions.  Anything about the
16  design of user registration flows that is in
17  Don't Make Me Think that you would disagree
18  with?
19      MR. BRODERICK:  Objection.
20      A.  I don't think anything about user
21  registration flows per se.  Some of the
22  specifics in Don't Make Me Think are for older
23  generations of technology, old browsers, you
24  know, flows that people have sort of moved away
25  from entirely.  So sometimes they talk about,

Page 45

1  you know, the best way to tune a sundial would
2  be an equivalent.  Right?  We don't use sundials
3  anymore.  I'm not sure I disagree with that,
4  but, you know, it sort of doesn't matter for the
5  work I'm doing.
6      The high-level principles still apply,
7  though, and it's still useful to be able to sort
8  of walk through the example and understand like
9  what makes this form input unclear and how do I
10  take those lessons and apply it to the stuff I'm
11  doing right now.
12      MR. RAMSEY:  I'll mark as Exhibit 7 an
13  excerpt of Don't Make Me Think, Revisited.
14      Q.  When you get a moment, the question
15  I'm going to ask you is -- and it's page 108 --
16  if there's anything on page 108 that you
17  disagree with.  You'll see.  Don't tell me now.
18  Review it, but that's my question.
19      (Excerpt of Don't Make Me Think,
20  Revisited, was marked Exhibit 7 for
21  identification, as of this date.)
22      (Witness reviewing document.)
23      A.  I don't disagree with this.
24      Q.  Would you agree that different users
25  interact with user registration flow pages

Page 46

1  differently?
2      MR. BRODERICK:  Objection.
3      A.  Can you clarify?
4      Q.  Sure.
5          You render opinions in this case that
6  certain aspects of a user registration flow page
7  are unclear.  Would you agree that they would be
8  unclear to every user that views that page?
9      A.  It is --
10     MR. BRODERICK:  Objection.
11     A.  -- not possible to make a definitive
12  clear like that.  I couldn't say that every
13  single user experiences something the same way.
14     Q.  So some people might find it clear,
15  some people might not?
16     MR. BRODERICK:  Objection.
17     A.  That is true.  That doesn't mean that
18  there aren't best practices.  You know, in the
19  industry we do have ways of being able to say X
20  number -- X percentage of users who land on one
21  page make it to the next page.  So there are
22  ways of putting data against that.  But, you
23  know, just like any generalization it's
24  impossible to say with a hundred percent that
25  everyone understands something and -- you know,

Page 47

1  unless you're not presenting it to them.
2      Q.  Sure.
3          You've also rendered opinions in this
4  case that certain aspects of design of a user
5  registration flow page may be manipulative.
6  Would you agree then that those aspects may
7  manipulate some people but may not manipulate
8  other people?
9      MR. BRODERICK:  Objection.
10     A.  Can you clarify what you mean by
11  "manipulate" in this case?
12     Q.  However you used it in your opinion.
13     A.  I think in my opinion I'm trying to
14  say that people will click a button without
15  understanding what that button is communicating
16  to them.  And I would say that it is not
17  possible to make the claim that every single
18  user who clicked the button didn't understand
19  what it was communicating to them.
20     Q.  So some people may have understood?
21     A.  Some people have understood.  I
22  mean, but you've got to remember that that
23  includes people who built the web page and are
24  bringing a prior knowledge to this.  So, you
25  know, no one's a blank slate.

Page 48

1      Q.  Would you say, though, that at least
2  some people who did not build the web page but
3  are using it would understand what they're
4  checking?
5      MR. BRODERICK:  Objection.
6      A.  Again, it's not -- I'm not sure what
7  those numbers would look like.  If you're
8  telling me that there's like one person in
9  the -- in the entire panoply of users who
10  clicked it, I would probably say that one person
11  did it, did understand what that check box was
12  saying explicitly.  What that relevant
13  percentage was, I couldn't tell you.
14     Q.  If I asked you to try and figure that
15  out, how would you go about doing that?
16     A.  I would need some --
17     MR. BRODERICK:  Objection.
18     A.  -- analytic data around how many
19  people got to that point and then bounce off the
20  page because that would give you a good
21  understanding of people who understood it and
22  declined to -- to sign into it.
23          And then I would also do like UX
24  studies.  Right?  So sometimes you do a -- like
25  a paper prototyping session where you would get

Page 49

1  like a paper version of the website, you'd put
2  it in front of somebody, have them go through
3  it, and then ask them questions about it
4  afterwards.
5      Q.  And this work would tell you, I think
6  what you're saying is, the rough percentage of
7  people that may have understood it or didn't
8  understand it?
9      MR. BRODERICK:  Objection.
10     A.  You'd start to quantify it.  Right?
11  Because nothing is ever complete
12  understandability and nothing is ever completely
13  unundersatandable.  There's always going to be a
14  proportion of users on either side of the
15  spectrum.  So our job is to move it as far in
16  one way as possible.
17     MR. RAMSEY:  Let's take a break.
18     (Recess from 11:03 to 11:15.)
19     (Article titled "When Websites Won't
20  Take No for an Answer" was marked Exhibit 8
21  for identification, as of this date.)
22     Q.  I had marked as Exhibit 8 an article
23  titled "When Websites Won't Take No for an
24  Answer."  Do you recognize this article?
25     A.  I do.