Page 70

1    And then at the final step you would
2  expect some kind of clear language that says
3  this is a shift from what you previously said,
4  you know, drawing a contrast between the two.
5    Q.  The last one in this article, Number
6  5, is "Expanding Shopping Basket."  I think
7  you're going to tell me that's the same concept
8  we've talked about before where you're seeking
9  something into the basket?
10    A.  Right.
11    Q.  Is that correct?
12    A.  Yeah.
13    Q.  We can just skip past that one.
14    Done with 9.
15    So these dark patterns that we've been
16  talking about generally, both the ones we've
17  seen specifically in the articles and any others
18  that you're aware of, have you seen any academic
19  studies or research saying that by employing one
20  of these dark patterns it results in
21  manipulation of a user?
22    A.  I have not seen academic.  I have
23  seen, you know, sort of peer like online blog.
24  You know, earlier we drew the distinction
25  between academic published and just sort of in

Page 71

1  the general web design sphere.  I have not seen
2  something in the academic phrase.  I have seen
3  things in the web design sphere.
4    Q.  And of what you've seen, is any of
5  that a sort of analysis from a psychology
6  perspective?
7    A.  Yes.
8    Q.  In anything that you have seen, is it
9  a formal study where they're interviewing people
10  and drawing conclusions?
11    MR. BRODERICK:  Objection.
12    A.  Not formal because that would require,
13  you know, a significant overhead that isn't
14  often put into these sort of informal studies in
15  terms of consent and all that stuff.  I have
16  seen informal studies where they walk people
17  through these and then perform questionnaires.
18    Q.  Okay.
19    And where did you see that?
20    A.  I'm not sure I could tell you off the
21  top of my head.
22    Q.  How many have you seen that are like
23  that?
24    A.  Often it's mixed in with other
25  critique or design considerations.  So I think

Page 72

1  I've probably seen a fair number.  I wouldn't
2  say that all of them are necessarily applicable
3  to this case.
4    Q.  How many would you say are applicable
5  to this case?
6    A.  I don't know if I could give you an
7  answer off the top of my head.  Maybe ten out of
8  the 50 I've read.
9    Q.  And what would make them applicable to
10  this case, the examples you're thinking of?
11    A.  Focus on user registration, focus on
12  onboarding users, and a focus on sort of form
13  work.  You know, in -- in the user registration
14  flow people are filling out a form.  So
15  sometimes, often, we talk about that as a
16  specific thing.
17    Q.  And do these studies talk about the
18  effect of these dark patterns on whether
19  consumers, you know, complete the page or do the
20  studies focus on whether the use of those dark
21  patterns affect whether those people are
22  consenting?
23    MR. BRODERICK:  Objection.
24    A.  It does two things.  One, it does talk
25  about the percentage of completions.

Page 73

1    And the second, I have seen them talk
2  about you do interviews with users to quiz them
3  if they have understood what they have gone
4  through.  And oftentimes the more -- the larger
5  the ask of the websites, in order to get the
6  conversion higher you try to get the -- the dark
7  pattern is that you get the -- the understand
8  lower.
9    Q.  When you say "conversion," what does
10  that mean?
11    A.  So conversion is often defined
12  differently for different websites because it
13  has different goals.  But a general definition
14  would be a user enters the website and makes it
15  all the way through the registration flow or
16  some kind of flow that you're targeting.  So you
17  go from someone unaffiliated with the website to
18  somebody affiliated with the website.  That
19  would be a successful conversion.
20    Q.  Okay.
21    You mentioned just a moment ago you've
22  seen these examples where there was some set of
23  interviews done of sample users.  Is that fair?
24    A.  Yeah.
25    Q.  Have you ever participated in one of

Page 74

1  those?
2      A.  Giving or on the other side?  It
3  doesn't matter.  Yes, I have done both.
4      Q.  Okay.
5      Have you ever done one where it's a
6  website that you are working on or designing?
7      A.  Yes.
8      Q.  How often?  How many times?
9      A.  I don't know.  I did a significant
10 number when I was participating in a research
11 experiment back in college.  I think I must
12 have -- I don't know.  We did it eight hours a
13 day for three weeks, so a lot.
14     In my role with Lightmatter I would
15 say ten or 15 times.
16     Q.  Okay.
17     Any of the ones just mentioned, were
18 they related to user registration flow pages?
19     A.  Yes.
20     Q.  How many, roughly?
21     A.  With the Lightmatter I'd say all of
22 them.
23     Q.  So in these cases what is your role?
24 Are you interviewing the users?
25     A.  Yeah.  So, generally, we do user

Page 75

1  experience research.  Right?  And so I'm usually
2  not the interviewer, I'm just present.  So
3  oftentimes the lead designer will lead those.
4  And then they'll get a paper prototype and walk
5  someone through it and then ask questions.  And
6  I'm often on hand to provide clarification or,
7  you know, questions.
8      Q.  How many people are typically
9  interviewed when you do something like this?
10     A.  It really depends on the client's
11 budget.  You know, it could be anywhere from
12 three to 30.
13     Q.  If you didn't have a budget concern,
14 is there a certain number that you would want?
15     A.  Like as many as possible.  You know,
16 like it's all data.  It's all good data.
17     Q.  Sure.
18     And you've said you've at least
19 listened in or seen results from these
20 interviews; is that correct?
21     A.  Yeah.  I'm often present when they're
22 given, even if I'm not leading.
23     Q.  Do the results of these interviews
24 show, I think consistent with what you said
25 before, that some folks may be confused about

Page 76

1  something on a website and some folks are not?
2      A.  Yes, that is true.  There's -- I've
3  never seen a question get a hundred percent one
4  way or the other.  That's not true.  I have, but
5  it's rare.
6      Q.  And just to confirm, did you perform
7  or participate any sort of study like that in
8  this case?
9      A.  No.  And I don't have the tools
10 necessary to do so.
11     Q.  Why is that?
12     A.  I would need the entire context of the
13 website, which has not been provided.
14     Q.  Were you asked to perform that and
15 then just couldn't do it or were you just not
16 asked to perform this type of analysis?
17     A.  I was not asked, but did request
18 the -- the comprehensive global web site in
19 order to perform one.
20     THE COURT REPORTER:  Did request the
21 comprehensive what?
22     THE WITNESS:  Wire frames of the
23 website, essentially.
24     Q.  At the end your last answer you said
25 in order to perform that.  Does that mean you

Page 77

1  were going to do that or is that something that
2  you would need that in order so that if you were
3  asked to do that, you would be able to?
4      Do you understand that distinction?
5      MR. BRODERICK:  Objection.
6      A.  I don't think I do.
7      Q.  Okay.  Sorry.
8      So at the end of your last answer you
9  said, I asked for the wire frames --
10     A.  Yeah.
11     Q.  -- in order to perform that.  And what
12 I'm wanting to know is was it your plan to
13 perform that type of analysis or are you just
14 saying that if you wanted to perform that type
15 of analysis, you would need that information?
16     A.  I hoped to perform that type of
17 analysis and -- yeah.
18     Q.  Do you have plans to do that in this
19 case at this time?
20     A.  Again, I don't have the wire frames so
21 I can't.
22     Q.  Okay.
23     If you had them, would you plan to do
24 them between now and, you know, the time of
25 trial?

20

Page 78

1  A.  Probably not, because the report has
2  been created.  But I could at request.
3  Q.  Okay.
4  A.  I don't think that they are necessary
5  for this.  It would help to give specific
6  numbers.  You know, I could start making claims
7  like 80 percent of users were confused by
8  something.
9  Q.  Sure.
10  Switching topics a little bit, in your
11  work on behalf of clients designing websites has
12  Lightmatter employed a dark pattern?
13  MR. BRODERICK:  Objection.
14  A.  Yes, probably.  I don't think we've
15  ever done so knowingly.  Sometimes this state of
16  the art shifts and people say that, you know,
17  this was common and you shouldn't do that
18  anymore.
19  Q.  Same question:  Has Lightmatter in its
20  work on behalf of clients ever used or employed
21  a dark pattern that you're aware of on a user
22  registration flow page?
23  A.  Not that I'm aware of.
24  And we have pretty regularly advised
25  clients not to do so and found creative ways to

Page 79

1  get away from them.
2  Q.  You've actually anticipated my next
3  question, which is if in your work you saw a
4  client employing a dark pattern but perhaps you
5  were not engaged to modify that portion of the
6  website, is it your practice to alert them to
7  that?
8  A.  Yeah, definitely.
9  But we don't always have control.
10  And, you know, in this industry people want new
11  features, they don't want to go back and redo
12  stuff that exists so...
13  Q.  Yeah, clients don't always follow your
14  advice.
15  A.  Clients don't always follow my advice,
16  sadly.
17  (Article called "What is a Good
18  Average Landing Page Conversion Rate in
19  2019?" was marked Exhibit 10 for
20  identification, as of this date.)
21  Q.  Okay.  I'm going to show you what's
22  been marked as Exhibit 10, which is an article
23  called "What is a Good Average Landing Page
24  Conversion Rate in 2019?"
25  Do you recognize this article?

Page 80

1  A.  I do.
2  Q.  If you flip to the second page, it
3  says "Published on November 8th, 2017."  But the
4  article is conversion rates in 2019.  You may
5  not know this, but do you know if it was
6  actually published in 2019?
7  A.  I believe what they did is they update
8  it every year.
9  Q.  Oh, I see.  That makes sense.
10  A.  This is, I think, their attempt to
11  have evergreen content so they publish it and
12  then they review it.
13  Q.  Okay.
14  This is a basic question and you're
15  free to flip through this article, but can you
16  confirm for me that this page does not discuss
17  at all best practices for designing a user
18  registration flow page?
19  A.  You say "this page."  You mean this
20  article?
21  Q.  This article.
22  A.  Let me read it really quick.
23  Q.  Actually, you know, that's a terrible
24  question.  Let's just strike the question.
25  In rendering your opinions in this

Page 81

1  case, specifically the opinions that Fluent's
2  website was deceptive or manipulative, did you
3  rely on anything in this article?
4  A.  No.
5  Q.  What did you rely on this article for?
6  A.  One of the documents that was given
7  purported conversion rates.  And I used this
8  article as a like-for-like comparison.
9  Q.  Got it.
10  The document that you just referenced,
11  that was a conversion rate for a Fluent website?
12  A.  Correct.  That's my understanding.
13  Q.  Given your understanding of Fluent's
14  websites in this case, what would you define as
15  a conversion for a Fluent website?
16  A.  So my definition would be that the
17  user clicks the final submit button.  You know,
18  so there are several submit buttons throughout
19  the flow.  It's not clear to me on what the
20  different buttons do.  So without access to the
21  back end, I would just say that the final submit
22  button is the conversion.
23  Q.  Okay.
24  A.  It's possible that Fluent defines it
25  as something earlier on in the process because

Page 86

1    Do you see that?
2    A.  I do.  It's the one with multiple
3  colors, right?
4    Q.  Yes.  It looks like a rainbow.
5    Tell me if I'm wrong, but it looks to
6  me like some of these websites are getting
7  conversion rates in excess or near 25 percent.
8    A.  That is what it says.
9    Q.  Is it fair to say that different
10  industries may generate higher or lower
11  conversion rates?
12    A.  I think that's true.  One of the
13  takeaways from this study is that it's
14  significantly different across all industries,
15  but the medium was 3 to 5 percent.
16    Q.  Would you agree that if a website is
17  attempting to provide users a reward or allow
18  them to enter into a sweepstakes, that you would
19  expect a conversion rate that is higher than a
20  website that is asking the user to participate
21  in a game?
22    A.  I would not.
23    Q.  Why is that?
24    A.  If you are attempting to use a web
25  application to play a game or any kind of web

Page 87

1  application, you generally have a pressing need.
2  I am completing a task, I am taking action.
3    And, you know, I don't get to check
4  the thing off my to-do list until I have worked
5  through.  Some I would expect users to be much
6  more -- preserve much more in order to get
7  through than what I would say see as something
8  that's like a fun time-killer you don't have a
9  requirement to do.
10    Q.  Would you expect the conversion rate
11  for a website that is offering a reward to be
12  higher or lower than a website where the
13  consumer is purchasing something?
14    A.  I think it depends on the kind of good
15  that a consumer is purchasing.
16    Q.  When you're sort of talking about
17  this, are you relying on some data you've seen
18  or just sort of talking from your general
19  experience?
20    A.  I'm talking about -- well, in that
21  specific example the e-commerce side of things,
22  that would be my personal experience.  I have
23  not built a sweepstakes website so I don't have
24  any data available for conversion rates there.
25    Q.  Okay.  Have you seen any data for a

Page 88

1  website that is offering a reward?
2    A.  A reward of any kind?
3    Q.  Like a monetary, you know, here's a
4  hundred dollar Target card.
5    A.  Yeah, that's a common strategy we've
6  applied to try to get people to -- to sign up
7  for things.  A rebate, a coupon, right, we've
8  definitely done that in the past to try and
9  increase user conversion.
10    Q.  Does that work?  Does it increase user
11  conversion?
12    A.  It definitely does.
13    Let me caveat that.  It works with
14  respect to design.  There is often a messaging
15  challenge to make sure that the user understands
16  what they're getting.  And there are techniques
17  you can use to increase that impact.
18    Q.  So when you look at page 4 of 18 of
19  this article with the rainbow chart, I mean,
20  these conversion rates seem higher than what
21  you're testifying about.
22    Do you have any explanation for that?
23    MR. BRODERICK:  Objection.
24    A.  I don't have any explanation for that.
25    Q.  Do you know if anything in this

Page 89

1  article provides conversion rates for a website
2  that allows users to enter into a sweepstakes?
3    A.  I don't, to the best of my knowledge.
4  But because it's tracking aggregates across
5  industries, I'm not sure that that would be
6  represented.
7    Q.  Why not?
8    A.  If you had two websites in the same
9  industry, one was doing the sweepstake and one
10  wasn't, you'd see the two averaged together.
11    Q.  I see.  Okay.
12    Then you would agree then that there's
13  nothing in the article and you're not aware of
14  any other data that focuses on conversion rates
15  for solely a website that, you know, offers a
16  sweepstakes?
17    A.  That is correct, yeah.  I don't know
18  of any specifics to that.
19    Q.  Same question:  Do you know of any
20  specific data about websites that offer a
21  reward?
22    A.  I have personally seen that, but I
23  don't believe there's anything in this -- in
24  this specific article that draws that
25  distinction.

Page 110

1  documents, I have -- I believe I have never been
2  to one of those sites outside of the work for
3  this, this case.
4      Q.  Understand.  Good answer.
5      Okay.
6      So in your work in this case what did
7  you do to review the flow on Fluent's websites?
8      A.  Yes.  So the first one, and what I
9  based my report on, was I looked at static
10 documents that were given by -- to me, and
11 that's stuff like the screenshots.
12     Q.  Can I stop you for a second?  When you
13 said based your report on, you have a report and
14 a supplemental report.  Does that apply to both
15 or just the original?
16     A.  Just the supplemental.  I narrowed the
17 scope of the report.
18     Q.  I'm sorry; let me back up.  The static
19 shots that you are talking about, did you review
20 those for the purposes of your original report?
21     A.  I did review those as part of the
22 original report.
23     Q.  And you reviewed them for purposes of
24 the supplemental report?
25     A.  That's correct, yeah.

Page 111

1      Q.  Okay.  Other than reviewing those
2  static shots, what did you do?
3      A.  Some of the data that was provided
4  in -- in -- not in the initial itself, but as
5  part of the process we got a list of like a
6  hundred like web logs essentially.  And that
7  included information for numbers that were given
8  to us.  And I took that data, and out of that
9  data I pulled a list of domains that were within
10 that data set.  And I -- and I went to some of
11 those domains to sort of just walk through them
12 and -- and experience that flow there.
13     Q.  Do you remember which domains you went
14 to?
15     A.  Yeah.  I remember RentRentOwn a lot.
16 I think there was one called like Big Money
17 Sweepstakes or -- a lot -- you know, the -- you
18 know, I -- that's a different thing.
19     There was something with like Free Now
20 or Free Reward or Reward Zone or something that
21 I remember checking out as well.  I went to
22 several of these, but I'll -- you know, I wasn't
23 really paying attention to the domain,
24 truthfully.  I was copying it out, putting it
25 into my thing, looking at the flow.  At the time

Page 112

1  what I was trying to figure out was how similar
2  were these campaigns to each other.
3      Q.  Can you tell me roughly -- or if you
4  know an exact number, great -- how many of these
5  domains you went to?
6      A.  30 maybe.
7      Q.  3-0?
8      A.  Yeah, 25 something like that.  I don't
9  think I went through a registration flow on all
10 of them.  You know, there was -- there are many
11 pages within a single domain obviously.
12     Q.  Okay.
13     So when you visited these domains, was
14 it on your computer or some sort of mobile
15 device?
16     A.  Both.  Both.  I do three forms of sort
17 of looking at these flows.  There's the
18 computer, there's the mobile, which is the like
19 native versions of doing it, and then there's
20 something called developer tools built into
21 browsers, and you can have a desktop computer
22 sort of pretend to be a mobile phone and then
23 you can walk through on a desktop computer what
24 it would look like as mobile.  It's not perfect,
25 so you want to do another pass with a mobile

Page 113

1  phone and it -- like the real thing as well.
2  But, you know...
3      Q.  Sure.
4      Did you do all three for each of the
5  domains that you visited?
6      A.  No, I did not.  I did it -- I did all
7  three for a subset.  I don't know.  I would say
8  ten off the top of my head.
9      Q.  And to get to these websites did you
10 Google search them or --
11     A.  No, no.  I had the domain -- I'm sorry
12 for cutting you off.  I had the domain as part
13 of the data so I just put it straight into my
14 browser and went there.
15     Q.  Okay.
16     For any of the domains that you
17 visited, did you finish the flow all the way to
18 the end?
19     A.  Yes.
20     Q.  How many times did you do that?
21     A.  I did it a lot on certain domains.  So
22 can I get a clarification?  Are you saying how
23 many domains did I do this on or how many times
24 did I do this?
25     Q.  Well, we can start with how many

Page 114

1  domains.
2      A.  I think maybe seven or eight.
3      Q.  Okay.
4      A.  I'm pulling that off the top of my
5  head so...
6      Q.  Sure.
7          And how many times overall?  So if
8  seven or eight domains --
9      A.  Yeah, maybe 40, 50 or something.  I
10 wasn't keeping count.  You know, you just sort
11 of -- you do it and you look for a detail and
12 you do it and you sort of like -- part of the
13 way these cites are constructed is there's no
14 way to jump to a specific part of the flow, you
15 have to go through it in totality every time.
16     Q.  On each of the domains that you
17 visited, did you have an opportunity to input
18 your name?
19     A.  Yes.
20     Q.  And when you did that, what name did
21 you put in?
22     A.  Usually I just put like ASDF.
23     Q.  What does that mean?
24     A.  It's just the first four keys if you
25 put your hand in the typing position.

Page 115

1      Q.  That's, what, the first name?
2      A.  Yeah, first name and last name.  I
3  wasn't -- I wasn't faithfully putting my real
4  information in, so I was just trying to put
5  enough data to move through.
6      Q.  Sure.
7          Did you do any other thing or was it
8  always ASDF, to the best of your recollection?
9      A.  It was probably always ASDF.
10 Sometimes it was ASDFASDF, if you drum it twice.
11     Q.  Do you remember when in time this was?
12 early January? late December?
13     A.  I don't off the top of my head.  But I
14 could find that information because I did take
15 some screenshots during that process that have
16 the metadata included in them.
17 RQ      MR. RAMSEY:  I'd ask that they be
18 produced.
19     A.  I did not turn them over so -- I just
20 created them as part of my process.
21     Q.  Okay.
22         Can you give me a rough time?  I mean,
23 was this before the original report or before
24 the supplemental report?
25     A.  Oh, some of both.  So some of them was

Page 116

1  before the original report, some of it was after
2  the original report.
3      Q.  Did you cite any of these examples in
4  either of your reports?
5      A.  No.  We made a conscious decision to
6  only talk about the website in question.
7      Q.  Okay.
8          In reviewing these, were there any
9  differences that you spotted between the URL
10 flows that you went to and the one that you
11 issued your report about?
12     A.  I -- yes.  There were differences.
13 And that's part of the reason why I chose to not
14 include those.
15     Q.  Okay.
16         What were the differences?
17     A.  There were quite a few.  The styling
18 was different on a per-domain basis.  So
19 RentRentOwn would look different than like
20 Reward Zone or -- you know, I can't remember if
21 that's the exact name, but the styling was very
22 different between them.  And that had, you know,
23 various effects, like I think what was going on
24 was -- well, let me -- I'm sorry; can you repeat
25 the question?

Page 117

1      Q.  Yeah.  So you said that there were
2  differences between some of the URLs that you
3  went to and the sort of website flow that you
4  analyzed as part of your reports.
5      A.  Right.
6      Q.  And I was asking what the differences
7  were.
8      A.  Yeah.  The websites that I looked at
9  in person were significantly more complex than
10 the screenshots that I was given just in terms
11 of the number of states that a user had to move
12 through.  For example, there was a -- a survey
13 that you had to answer, you know, that was 12
14 questions between -- you know, in -- different
15 on different sites, but that was not provided to
16 me in screenshots.
17     Q.  In any of the times that you went to
18 the sites to go through the flow, did you check
19 a box to receive e-mails?
20     A.  Yes.
21     Q.  On each time?  Some of the times?  Do
22 you remember?
23     A.  Some of the times.  And let me be
24 clear, this is after I had analyzed and
25 understood that that was what I was consenting

Page 118

1   to.
2       Q.  Sure.
3           Any particular reason you did that?
4       A.  Why I checked it?
5       Q.  Yes.
6       A.  I wanted to see what would happen if
7   you checked it versus not check it.  You know,
8   sometimes some websites do things like change
9   the color of a button to indicate that it's
10  disabled and then you check a box and it becomes
11  colored and you can then check it.  So I would
12  do things like observe that behavior on one of
13  these websites and see if that was, you know,
14  required or not.
15      Q.  Did you see anything like that on the
16  website?
17      A.  Yeah.  I seem to remember in one
18  specific instance there was a button that would
19  start off gray and then you could check the box
20  and it would turn orange, which in normal web
21  parlance means it was disabled and then enabled.
22  Although subsequent testing on my part revealed
23  that the orange -- I'm sorry -- the gray button
24  was not in fact disabled, which is unusual in
25  design language.

Page 119

1       Q.  When you say it was disabled, meaning
2   someone can't click it?
3       A.  Correct.  So usually in the web world
4   if you don't want someone to click a button, you
5   make it gray and then they can't click it.
6       Q.  I see.
7           So in this case was it the box that
8   was gray to orange?
9       A.  The submit button.  There was like a
10  big submit button underneath the check box that
11  was gray.  And then you would click it and it
12  would turn orange.  And I don't remember the
13  specifics of this, which domain this was on.  I
14  could probably find that, if needed.
15      Q.  Well, let me start with a broad
16  question.
17      A.  Sure.
18      Q.  The review that you're talking about
19  of these various different domains, did any of
20  the information you learned on that affect the
21  opinions or play a role in any of the opinions
22  you rendered in your reports?
23      A.  No, I don't think so.  I -- no.
24          I -- I have feelings about those --
25  those -- those pages, but I decided to keep that

Page 120

1   out of the report.  I thought it would be -- it
2   would introduce confounding variables.
3       Q.  What is a confounding variable?
4       A.  Like something that just makes it more
5   complex than it needs to be.
6       Q.  Why would it be making it more
7   complex?
8       A.  Well, because then we get into
9   discussions about like was this website the same
10  as what the defendant looked at, for instance.
11  Right?  And it opens up avenues for discussion
12  of differences between the websites, and I just
13  didn't think that was necessary for a report on
14  the website in question.
15      Q.  Was this your decision or were you
16  instructed to not include those other examples?
17          MR. BRODERICK:  I'm going to object
18      and say you're not to discuss anything
19      you've discussed with us.
20      Q.  For any of the times you've visited
21  the various URLs, did you check the box that we
22  are now referring to as the TCPA consent box?
23      A.  Which box are you referring to with
24  that?  There's two registration flow screens.
25  Are you talking about the first one or the

Page 121

1   second one?
2       Q.  So I believe it's the second one in
3   your report that is the TCPA consent language.
4       A.  Yeah.  Okay.  Yeah.
5       Q.  So you did check that box?
6       A.  I did check that.
7       Q.  Half of the time?  All the time?
8       A.  Maybe half the time.  Maybe a third of
9   the time.
10      Q.  Let me go back.  When you worked on
11  the first page, I assume it was the first page,
12  when you were given the opportunity to enter
13  your personal information, what did you enter
14  for an e-mail?
15      A.  Usually it was ASDF@ASDF.com.  I can't
16  remember now off the top of my head.  I think --
17  sometimes websites do require a valid domain.
18  So sometimes I would put, you know,
19  ASDF@lazersharp.com or something, which is a --
20  an e-mail capture website.
21      Q.  Lazer Sharp?
22      A.  Yeah.  It's -- I think the company is
23  called -- I don't think it's a company.  It's a
24  guy who does this.  It's called like gorilla
25  mail and he sets up these temporary mailboxes so

Page 134

1 come back. I would address it directly to your
2 phone using this 192 address.
3 Q. I see. Okay.
4 A. And then, similarly, the 172 address
5 is another layer outside of the Russian doll, so
6 slightly farther away systemwise than a subnet
7 but still internal.
8 Q. Between the time of your original
9 report and your supplemental report, have you
10 received any information that would call into
11 question or have you changed your opinion with
12 respect to the opinions stated in this
13 paragraph?
14 A. No. I have received the same
15 information with the 192 -- actually, let me
16 amend that. I think there was one small change,
17 which was that in an initial document somebody
18 called out 127 and 192 and didn't mention 172.
19 I think that's right. And then in a -- in a
20 subsequent document they rolled all three
21 together and said those were all the same class.
22 Q. I'm sorry; I did not follow that.
23 A. I -- no, I don't think I received any
24 information that's changed my opinion on that.
25 Q. Okay.

Page 135

1 So then what was that that you just
2 described?
3 A. So there's three numbers here. A
4 document that I had access to going into this
5 process directly mentioned two of them and not
6 the third. And then after one of my
7 conversations or reports, I believe there was a
8 document that -- that also addressed the third
9 number and rolled it into the same explanation
10 as the first two.
11 Q. I see.
12 But despite that explanation, you
13 aren't changing your opinion.
14 A. Yeah. I mean, in my opinion, this is
15 either -- I still think the most likely thing is
16 a misconfiguration. But it's either that or
17 a -- a -- you know, something submitted that is
18 fishy basically that came from the same network.
19 Q. Just give me one moment.
20 A. Can I just take a quick break and run
21 to the bathroom?
22 Q. Of course.
23 (Recess from 1:50 to 2:03.)
24 Q. If I could ask you to look at your
25 supplemental report, which is 16. And,

Page 136

1 actually, that's what we're going to stick with
2 the rest of the time. I don't know what page
3 it's on, but the page with the first page of the
4 flow.
5 A. First page of the flow.
6 Q. That you analyzed.
7 A. This one?
8 Q. Just give me a second; sorry.
9 The supplemental report is page 5.
10 6 of 25.
11 A. Okay.
12 Q. And just for right now I'm trying to
13 get a sense of what you reviewed. So in my
14 understanding -- correct me if I'm wrong -- your
15 understanding is that this is the first page to
16 review or that is shown, and then if you flip
17 the page, what's pictured on this page, page 6
18 of your report, is the second thing that you
19 reviewed.
20 A. Correct.
21 Q. Did you review any other part of the
22 flow other than your work on the other URLs?
23 Did you review any other -- I guess then on page
24 8, sorry, you reviewed that screenshot, I guess.
25 A. Right.

Page 137

1 Q. Okay.
2 Other than those three little
3 pictures, did you review anything else about the
4 flow that you're rendering opinions about in
5 your report?
6 A. No.
7 Q. Let's flip back to page 5. I guess
8 explain to me what it is about this that you
9 would think is a dark pattern or is otherwise
10 manipulative or deceptive?
11 A. I think specifically the space between
12 I agree and I understand the terms and
13 conditions is close enough that I think those
14 two are related. So I particularly object to
15 the arrangement of the two different disclosures
16 with a single check box in this sort of triangle
17 here.
18 Q. So you would prefer basically two
19 check boxes, if you will?
20 A. I think that would have been much
21 clearer.
22 Q. So I guess your opinion then that in
23 some cases some of the people who clicked the "I
24 agree" box believed that they were agreeing to
25 the top statement --

Page 138

1    MR. BRODERICK: Objection.
2    Q.  -- or the statement next to it?
3    MR. BRODERICK: Objection.
4    A.  I'm sorry; can you repeat that?
5    Q.  Sure.
6    I'm trying to come up with what's the
7    effect of having only one.  So if someone clicks
8    "I agree," what is it that you are rendering an
9    opinion about that they are agreeing to?
10   A.  I think many of them are agreeing to
11   the terms and conditions.
12   Q.  Got it.  Okay.
13   Let's flip to the next page.  One of
14   the things you say in your report, and actually
15   I think that may end up on page 7 of your
16   report, is that you understand that the check
17   box here that says I confirm -- do you see that?
18   A.  Uh-huh.
19   Q.  -- that you understood that that was
20   preselected, prechecked.
21   A.  Yes.
22   Q.  If I told you that it wasn't
23   preselected but that someone had to
24   affirmatively check it, would that change your
25   opinion at all?

Page 139

1    A.  What opinion?
2    Q.  Okay.  Let me start over.
3    A.  I'm not trying to be difficult.
4    Q.  No.  This is a good point.
5    In your opinion, if someone clicked
6    continue, as it appears in front of you, with a
7    preselected box, which is what I understood you
8    were assuming, would that person have consented
9    to the TCPA disclosure, which is sort of the
10   middle thing that starts with my checking the
11   box below I consent is to receive, so on and so
12   forth?
13   MR. BRODERICK: Objection.
14   A.  If they clicked continue.  Assuming
15   that this is checked already?
16   Q.  Yes.
17   A.  Yeah, I don't feel like that would be
18   a very strong indication of affirmative consent.
19   Q.  So now to my question.  If I told you
20   to sort of reverse your assumption and that the
21   "I confirm" check box is not checked but
22   somebody has to click it, in that case would
23   that change your opinion with respect to whether
24   they are agreeing to that TCPA consent language?
25   A.  I don't think so.  And I will go into

Page 140

1    detail why.  I think that would be better.  I
2    think having it unchecked by default is
3    definitely a more user-friendly pattern.
4    But something I object to more
5    specifically here is the "I confirm" as the
6    action -- as the -- the label on the check box.
7    I think that it's pretty easy for someone to
8    read I confirm that my information is accurate
9    and to think they're confirming to that rather
10   than the disclaimer above.
11   Q.  So in the screenshot here it says next
12   to "I confirm" that "all of my information is
13   accurate and consent to get called and texted as
14   provided above."
15   You see that?
16   A.  I do see that.
17   Q.  That doesn't change your opinion at
18   all about whether someone who clicks the "I
19   confirm" is also consenting to being called and
20   texted as provided above?
21   A.  I -- I feel that this is an indication
22   of a -- this is an example of a dark pattern
23   called consent bundling where you're taking two
24   separate statements and you're sticking them
25   together in a single -- a single check box, a

Page 141

1    single binary output, when really they need to
2    be split out into two to represent the two
3    different statements you're trying to make.
4    Q.  I see.
5    So I guess -- I'll ask the question
6    better than this -- what I'm going to get at is
7    sort of what is the effect of that consent
8    bundling.  Is it your opinion then that some
9    people are only confirming the first half of
10   that sentence, some people are confirming both,
11   and some people are confirming only the second
12   half?
13   A.  I would say that --
14   MR. BRODERICK: Objection.
15   A.  -- yeah, I think that that -- it --
16   it's -- well, it's tough.  Like what are people
17   actually consenting?  Are they consenting both,
18   neither, either?  I don't think it's clear,
19   based on that.  I don't know what the majority
20   of people are doing.  I'd need to conduct some
21   kind of user interview to figure out what that
22   is.  I will say that -- I will say that the
23   first aspect of the label and text is going to
24   receive a significantly greater amount of focus.
25   So if -- if we were trying to optimize this for

Page 142

1  affirmative acceptance, we would want to switch
2  the order of these two so that it makes it clear
3  that they are consenting and their information
4  is accurate.
5       Q.  Okay.
6       A.  Although I would still prefer that
7  those are two separate check boxes because
8  there's -- there's really no programming reason
9  or design reason to -- bundle them like that.
10      Q.  Okay.
11          Actually, I am not done with the
12  earlier page.  I'm going to go back to that.
13  Page 5.
14          When you visited the various URLs for
15  Fluent's websites, did they have a page that
16  looked like this?
17      A.  I believe they did.
18      Q.  Was there anything else on the page?
19      A.  Yeah.  There was -- this was one small
20  chunk of the page and there was much more stuff
21  on the page.
22      Q.  Was it that same page that you were
23  entering your personal information on?
24      A.  I think that's true.
25      Q.  And where in relation to where you

Page 143

1  were inputting personal information was this
2  sort of box?
3       A.  I believe it was below it and to the
4  right, if I remember correctly.
5       Q.  I mean, essentially that it's touching
6  or like are we talking, you know, way apart?
7       A.  I can't remember the exact distance.
8  I didn't -- I didn't at the moment feel that
9  they were so far apart as to be dis --
10 disassociated.  So nothing about that must have
11 jumped out at me or I would have remembered
12 that.
13      Q.  Was it the same on each website or
14 different?
15      A.  There were differences on the
16 websites.
17      Q.  Would those differences cause you to
18 render different opinions about different
19 websites?
20      A.  They could have.  None of the ones
21 that I visited I think would have changed my
22 mind.  But one of the big complaints I have here
23 is, for instance, the coloring between these,
24 the fact that they're similar colors.  And one
25 of the big differences is that there's a

Page 144

1  different UI paint applied to the different
2  domains.  You know, one of them is orange-
3  focused and another is green-focused.  And the
4  choice of colors in this case could have been
5  used clearer and that would have affected my
6  opinion.
7       Q.  Sure.
8           Just so I understand, are you saying
9  that the brown and the blue is similar?
10      A.  No.  The brown and the brown.  Right?
11 So like the I agree to terms and condition, and
12 then the receive daily e-mails.  Right?  And
13 like the contrast between the daily e-mails and
14 the -- and the brown on top of it.
15      Q.  You're saying it's too close, it's
16 hard to read?
17      A.  Yeah, pretty much.
18      Q.  But did you observe this sort of
19 similar coloring on the other URLs that you
20 visited?
21      A.  Yes, I did.
22      Q.  Anywhere that it was contrasting more
23 than this?
24      A.  There were other ones that did
25 contrast more.

Page 145

1       Q.  Okay.
2           And with that additional contrast,
3  does that change your opinion at all?
4       A.  Not especially, although this stuff is
5  all sort of gradations, and those were clearer.
6       Q.  Okay.
7           Flip back to page 6.  This, what
8  you're looking at here, the screenshot on this
9  one, did you see this or something similar to it
10 in the various flows when you went to the URLs?
11      A.  Yes, I did.
12      Q.  Where in the process did you see this?
13      A.  This was usually after the survey, if
14 I remember correctly.
15      Q.  So the first page is something similar
16 to what we see on 5.  There's a series of survey
17 questions and then you get what you see on page
18 6.
19      A.  That's correct, if I remember
20 correctly.
21      Q.  And what you see on page 6, was this
22 all you saw on the page, if you remember, or
23 were there other things on page?
24      A.  There was much less on the page
25 compared to the distinction in 5.  There is a

Page 170

1    for a computer are different.
2        Q.  Is a bot capable of getting past a
3    CAPTCHA?
4        A.  Yeah, in theory.  CAPTCHA generation
5    is a cat-and-mouse game.  There's two players in
6    this ecosystem, there's the people who don't
7    want bot submitting and then there are the
8    people who want to submit with their bots.  And
9    they're constantly coming up with weapons to
10   outwit each other.
11       So you can come with a CAPTCHA that
12   works, and then a bot can come up with a
13   strategy to defeat it.  Fundamentally, you have
14   to evolve with the times.  But a CAPTCHA can be
15   a pretty effective way to prevent bots.  In my
16   prior example, Drop Out Club, putting a CAPTCHA
17   stops I think all of the bots from coming
18   through.
19       Q.  You also have in your report a mention
20   of HTTPS.
21       A.  Yes.
22       Q.  I guess my question is, my reading of
23   your report -- and tell me if I'm wrong -- is
24   that HTTP is generally useful because it helps
25   stop hacking.

Page 171

1        Does HTTPS have anything to do with
2    dissuading a bot?
3        A.  Probably not.  I mean, it might.  Like
4    everything is conceivable.  You know, I could
5    imagine a bot that -- my program that works with
6    the HTTP and not HTTPS, but a dedicated and
7    skilled programmer could easily create a code
8    path that works for both of those.
9        HTTPS is a gold standard for
10   configuration, though.  And it would be pretty
11   important to be able to authoritatively say that
12   a user saw the content that we're claiming them
13   to see.
14       Q.  Assuming there was a bot that inputted
15   information in Fluent's website, have you seen
16   any evidence in this case that would allow you
17   to identify which of the registrations resulted
18   from a bot versus not a bot?
19       A.  I would -- not definitively.  I would
20   say that the entries that in the FIG, the
21   identity graph, that have one of the three
22   nonpublic IP addresses would be more likely to
23   have come from a bot because they could not have
24   come from a user outside the Fluent network,
25   assuming that that is correct data and not

Page 172

1    misconfigured data.
2        Q.  So if they're in one of the three that
3    are Fluent's, it's more likely that it's a
4    bot --
5        A.  I --
6        Q.  -- or just more likely that it's a bot
7    operated by Fluent?
8        A.  It's less likely it's a real human.
9    Right?  And so that -- that means it could be
10   any other thing.  Right?  But I guess -- yeah,
11   if I added that, it would be.
12       Q.  But even those you can't tell whether
13   it's a bot.
14       A.  You couldn't definitively say and
15   there's no way you would ever be able to
16   definitively say because every aspect of a
17   user's fingerprint could be faked.
18       Q.  So a bot could in theory create a user
19   that looks as if Jay Ramsey went into it and did
20   it?
21       A.  Absolutely, yeah.  If they're loaded
22   with Jay Ramsey's data, there's no reason they
23   couldn't do it.
24       One of the things that you use to
25   identify you is what we call a fingerprint in a

Page 173

1    computer, and that would be things like your
2    browser, the version of Flash you have loaded,
3    you know, like a specific version string
4    attached to your browser, and for specific
5    instances of that you can be uniquely
6    identified.  So if someone had access to that
7    fingerprint, like what that string was, they
8    could pretend to be you so convincingly that
9    it's not possible for someone to have -- you
10   know, figure out that it's not.
11       Q.  Other than the bots -- I'm sorry; I
12   don't remember the word for it right now,
13   something about side?
14       A.  Sideloading.
15       Q.  -- sideloading, have you seen anything
16   in this case that would allow you to identify
17   specific registrations that were sideloaded?
18       A.  Yes.  Some of the signs -- well,
19   either sideloaded or bot, bot delivered.
20       Q.  Okay.
21       A.  And those would be the ones that
22   contain disallowable characters.
23       I'm sorry if I was unclear before.  I
24   think what you were -- what I interpreted what
25   you were asking was if I point to a given entry,

Page 178

1     Q.  If Fluent or someone is sideloading
2   data, in that case do they have to sideload data
3   that has the weird squiggly marks?
4     A.  No.
5       MR. BRODERICK:  Objection.
6     Q.  So you could sideload data that says
7   Jay Ramsey?
8     A.  Absolutely.
9     Q.  Strike you as odd that if Fluent were
10  to do that, they would include a bunch of
11  registrations that have weird squiggly marks?
12    A.  No, because remember the scale of
13  these things.  Right?  We're talking like I
14  think 800,000 names were provided.  I don't
15  think it's reasonable for a human to go through
16  and look at every name and validate it.  So they
17  could have written a program to clean data out
18  first, but, you know, the fact that the data is
19  there, regardless of how it got in there, means
20  that they didn't.
21    Q.  Okay.
22       The analysis you did in this case
23  about the lead Dunk Loka -- remember that?
24    A.  Uh-huh.
25    Q.  -- is that a registration that if you

Page 179

1   knew nothing about it, would point to and say
2   that one's bot or sideloaded?
3     A.  My recollection on that is I -- I --
4   my analysis provided nothing out of the ordinary
5   for that registration.
6     Q.  Okay.
7       So you would assume that somebody did
8   it.
9     A.  Yeah, yeah.
10    Q.  And when I say "somebody," I mean a
11  human.
12    A.  Yeah.  I mean, you know, I'm not
13  making a positive qualification on the human
14  versus bot distinction.  I'm just saying there
15  there's nothing within that that would tell me
16  that this definitely came from one or the other.
17       MR. RAMSEY:  Let's take a five-minute
18  break and then I probably don't have a huge
19  amount more.
20       (Recess from 2:57 to 3:09.)
21    Q.  You mentioned earlier server logs.  I
22  want to talk about that for bit.
23    A.  Yes.
24    Q.  What is a server log and what is
25  stored on it?

Page 180

1     A.  Yeah.  So a web server is a piece of
2   software where if a request comes into a
3   computer, it's responsible for returning a
4   document that was asked for.
5       Fundamentally all the web pages are
6   documents.  Apache is a big one.  NGINX is a big
7   one.  And these things are just basically
8   someone comes in and says I want the home page
9   and they in return say here is the home page,
10  regardless of how the home page is generated or
11  created.
12       When that person comes and says I want
13  the home page, it's been standard practice for
14  quite a while for these servers to write a log
15  of that request.  And you can configure what's
16  in that data, but there's sort of like a
17  standard Apache configuration format, Apache
18  being the largest and longest-lived of these web
19  servers.
20       And I don't think I can tell you
21  everything that's in it off the top of my head,
22  but it's like IP address, date, the file path
23  you accessed, whether it was an HTTP get or put
24  or post or delete, which are different formats
25  of web requests, like the browser string, so

Page 181

1   whether it's like Mozilla or Firefox or Chrome.
2       And then often they include what's
3   called the cookie jar, which is a set of files
4   that a web server will place on a browser to
5   store data between web requests.  So if you've
6   ever seen a page where you like log in and then
7   you go page A to page B, there has to be some
8   way to keep track of that correlation between
9   the two page loads.  So a cookie jar is -- the
10  cookie is how you do that usually.
11    Q.  Okay.
12       So that was a long answer.  Let me
13  pull out a few pieces of information.  And I
14  know you said you may not be able to remember
15  them all.
16       So on a server log is IP address?
17    A.  Yes.
18    Q.  You said it would show you what
19  browser was being used?
20    A.  So it would show you what's called the
21  user agent, which is a string that all browsers
22  carry with them and are required to submit to
23  the web server that uniquely -- not uniquely,
24  but identifies what they are.
25    Q.  Well, whether it's Internet Explorer

Page 198

1    Sorry; let me clarify that. With the
2   database the server logs would be trickier to
3   fake but are still fakable because you would
4   have to fake it in two places and I can't
5   imagine anyone being that dedicated.
6       Q. Okay.
7           On the hundred number IP information,
8   my understanding is that some of the ones that
9   were selected that ended up on that chart were
10  from the three odd IP addresses.
11      A. Uh-huh.
12      Q. After reviewing the hundred numbers,
13  the information provided on the hundred numbers,
14  did that show that it was a different IP
15  address?
16      A. Is it did show that it was a different
17  IP address.
18      Q. Was there ever an instance where it
19  still showed one of the three weird ones?
20      A. Not in the ones that I checked.
21      Q. Not a single time?
22      A. I -- not in the ones I looked for.
23  There were 5,000 entries in that spreadsheet.
24  And I don't want to claim that comprehensive,
25  but I did -- I did quite a few spot-checks on

Page 199

1   that list. And the ones that I spot-checked did
2   not have the internal IP address.
3       Q. Any of the three, the 127 --
4       A. I can't remember spot-checking the 127
5   one, but I did spot-check the 192 and the -- I'm
6   sorry; I -- the 127 and the 192 I spot-checked.
7   I can't remember looking at the 172.
8       Q. Okay.
9           And the 127 is the one where it's your
10  own computer or your own device?
11      A. That's the 127, yeah.
12      Q. Okay.
13          I mean, does that cause you to believe
14  that that entry was not a bot or not sideloaded?
15      A. I'd say that that is greater evidence
16  that it is not a bot.
17      Q. What about sideloading?
18      A. Not -- not definitive. It's a
19  database. Right? And sideload means you're
20  just creating the data in the database without
21  someone submitting it.
22      Q. So is the concept of sideloading if I
23  were to say that someone sophisticated enough
24  could sideload data in a way in which he would
25  never be able to distinguish between the fact

Page 200

1   that it was sideloaded versus someone actually
2   came to the page number and registered?
3       A. That's correct.
4           MR. BRODERICK: Objection.
5       A. The important word there being
6   "sophisticated enough."
7       Q. Could you do something like that? Not
8   that you would. Are you sophisticated enough to
9   do something like that?
10      A. Yeah. Yeah, I could write a script to
11  do that with enough -- with enough sample data.
12  I would not be able to create the data that was
13  submitted out of thin air. So if I had like
14  bought a list e-mails from a referral or some
15  kind of provider, I could use that as a source
16  of material to insert that data in.
17      Q. Sure.
18          After your review of the information
19  about the hundred numbers, did that information
20  in your mind make it more or less likely that
21  there was a bot inputting information into the
22  system?
23      A. A bot less likely; sideloaded more
24  likely.
25      Q. What about it makes sideloading more

Page 201

1   likely? I thought it was a bot or sideloaded
2   and bot now seems like not so much.
3       A. The reason why it seems more likely to
4   be -- let me think here.
5           The reason why it seems less likely to
6   be a bot was the presence of IP addresses
7   outside of the internal network. That struck me
8   as -- to authentically come by that data with
9   bots would have been a much larger enterprise
10  than just running a -- a computer in your own
11  server to submit them. So that seemed less
12  likely given that data.
13          Sideloading, more likely because this
14  data was, to the best of my understanding, the
15  form of server logs or some kind of claim that
16  this data was coming out of the direct
17  user-submitted data and it still contained
18  disallowed characters.
19          Additionally, there were names in the
20  identity graph that I had asked for
21  comprehensive about as part of the
22  hundred number request that were not present in
23  those hundred numbers, which represents people
24  who were in the identity graph with absolutely
25  no audit trail of how they got there.

Page 202

1   Q.  What is the identity graph?
2   A.  That is -- the Fluent identity graph
3  or FIG, as I've heard the Fluent team describe
4  it, is the initial piece of documentation that
5  was provided to me which is some 800,000 names
6  and e-mail addresses.
7   Q.  Got it.
8       So you are saying there was somebody
9  on that 800,000 list, let's just say Jay Ramsey
10  with phone number --
11   A.  555.
12   Q.  -- something.
13   A.  Yeah.
14   Q.  You asked for that phone number and
15  when you got the hundred numbers, suddenly Jay
16  Ramsey wasn't on that list?
17   A.  That's correct.
18       And, interestingly enough, some people
19  were on that list who the claim was that they
20  had given TCPA a confirmation and were not
21  present with that phone number in the FIG
22  identity graph.
23   Q.  Which I guess would include what, if
24  anything?
25   A.  Nothing.  It's just interesting.

Page 203

1   Q.  Okay.
2   A.  I'm assuming there's some kind of
3  process to take the server log and move that
4  over into the FIG identity graph.  That process
5  is black-boxed to me, I don't know what's going
6  on there.  And it's interesting -- it's just
7  trying to understand how that works is part of
8  the job, and so noticing those discrepancies is
9  important.
10   Q.  Okay.
11       Circling back to a question I asked
12  earlier but just to confirm, after reviewing the
13  information from the hundred number list, it's
14  still basically that the ones that are likely to
15  be, in your opinion, sideloaded, are the ones
16  with the sort of squiggly numbers?
17       MR. BRODERICK:  Objection.
18   A.  Right.
19       I guess to put it more specifically,
20  the document that I received, it is unclear to
21  me how they appeared in that document if the
22  claim is that they were entered by users on the
23  website.  There's a missing from website to
24  document that is still unexplained to me.  And
25  we know that it couldn't have been as simple as

Page 204

1  a user puts the data in because of the
2  validation rules.
3   Q.  In your report, paragraph 50 -- you
4  don't have to read it; I mean, you can if you
5  want.  You highlighted at the extraordinary
6  complaint rate.
7   A.  Right.
8   Q.  What's the average complaint rate?
9   A.  So...
10   Q.  I guess what are you basing that
11  judgment on?
12   A.  Right.
13       I -- have run several websites that
14  maintain opt-in mailing lists that e-mail
15  people, and it has been fairly unusual for
16  someone to hand-type a customized complaint to
17  opt out.  I don't know if I can give you a
18  specific number, but it would certainly be, you
19  know, less than 1 percent of every e-mail blast.
20   Q.  When you say hand-typed, what does
21  that mean?  So like on e-mail at the very bottom
22  there's a --
23   A.  Yeah, like you hit reply and you type
24  "Please stop messaging me."
25   Q.  Compared to clicking the button in the

Page 205

1  e-mail.
2   A.  Right, right.
3   Q.  Have your run a text campaign?
4   A.  I have not.
5   Q.  Okay.
6       In that case you have to write
7  something back, right, in order to --
8   A.  You do, is my understanding.
9   Q.  Okay.
10       So odd to you then that there are
11  people who opt out who hand-type a response?
12   A.  It is, because my understanding is
13  that they say type stop to do it, and I would
14  expect the majority, the vast majority, of
15  people to just do that.  It's more effort to
16  type something by hand.  People I believe in the
17  UX world are fundamentally lazy.
18   Q.  Do you have any data that you're aware
19  of about, you know, how often people hand-type
20  more than stop in a text campaign?
21   A.  I don't.
22   Q.  Ever been involved in a telephone call
23  campaign?
24   A.  I have not.
25   Q.  Fair to say then that you wouldn't

Page 206

1    have any data that would show how often people
2    may opt out of telephone campaigns?
3        A.   That is correct.
4        Q.   You also mention sort of under the
5    same section -- not sort of, under the same
6    section -- in paragraph 51, you reference that
7    "There are 5,000 people that told defendants
8    that they were sending texts to the wrong
9    person."
10        Do you see that?
11        A.   Yes.
12        Q.   Other than just sort of seeing the
13    number, did you review the data about the 5,000
14    at all?
15        A.   No.  But the reason I found that
16    interesting was due to the aforementioned
17    duplicate names that I was seeing in the data,
18    which led me to believe that there were some
19    quality issues in associating a person with a
20    phone number, and I saw this as validation.
21        Q.   Got it.
22        Did you happen to see or notice
23    whether any of the 100 numbers show up on this
24    5,000 list?
25        A.   I did not check that.

Page 207

1        Q.   Fair to say that if someone writes
2    back wrong number, they can be lying?
3        A.   Sure.
4        Q.   Sorry; one moment.
5        Never mind.  Okay.
6        MR. RAMSEY:  Let's take a short break
7    and let me just see if I have any more,
8    then we'll probably be done very shortly.
9    Five minutes.
10        (Recess from 3:45 to 3:53.)
11        Q.   When you went through the various
12    URLs, did you ever get to the end and actually
13    click the final button?
14        A.   You -- like submit --
15        Q.   Yes, submit.
16        A.   Yes.
17        Q.   Okay.
18        So if you entered one of those phone
19    numbers, it should be in Fluent's database?
20        A.   Yeah, it should be.
21        (Continued on following page to
22    include jurat.)
23
24
25

Page 208

1        MR. RAMSEY:  I don't have any more
2    questions.
3        MR. BRODERICK:  No questions.
4        (Time noted: 3:54 p.m.)
5
6
7
8
9
10
11        _____
12            BENJAMIN BEECHER
        Subscribed and sworn to before me
13    this    day of        2019.
14
15
16
17
18
19
20
21
22
23
24
25

Page 209

1            C E R T I F I C A T E
2
3    STATE OF NEW YORK   )
            ) Ss.:
4    COUNTY OF NEW YORK   )
5        I JEFFREY BENZ, a Certified Realtime
6    Reporter, Registered Merit Reporter and
7    Notary Public within and for the State of
8    New York, do hereby certify:
9        That BENJAMIN BEECHER, the witness
10    whose examination is hereinbefore set
11    forth, was duly sworn by me and that this
12    transcript of such examination is a true
13    record of the testimony given by such
14    witness.
15        I further certify that I am not
16    related to any of the parties to this
17    action by blood or marriage; and that I am
18    in no way interested in the outcome of this
19    matter.
20        IN WITNESS WHEREOF, I have hereunto
21    set my hand this 27th of February, 2019.
22
23
        _____
24        JEFFREY BENZ, CRR, RMR
25

Page 210

```
 1    --------------------INDEX--------------------
 2    WITNESS        EXAMINATION BY      PAGE
 3    BENJAMIN BEECHER   MR. RAMSEY        4
 4    --------------------EXHIBITS--------------------
 5    NUMBER    DESCRIPTION          PG  LN
 6    Exhibit 1   Subpoena of Mr. Beecher     7   6
 7    Exhibit 2   Letter from Mr. Broderick,   8   8
                  dated February 21, 2019,
 8                to Mr. Ramsey and Mr.
                  Astrup
 9
       Exhibit 3   Letter dated November 30,   10  14
10                 2018, to Mr. Hausheer and
                   Mr. Beecher from Mr.
11                 Broderick
12     Exhibit 4   Invoices 777 and 795 from   13  17
                   Lightmatter Innovation,
13                 LLC to Broderick Law
14     Exhibit 5   Resume of Ben Beecher       15   5
15     Exhibit 6   Printout from LinkedIn for  15  11
                   Ben Beecher
16
       Exhibit 7   Excerpt of Don't Make Me    45  22
17                 Think, Revisited
18     Exhibit 8   Article titled "When        49  22
                   Websites Won't Take No for
19                 an Answer"
20     Exhibit 9   Article called "5 common    61  13
                   UX dark patterns and
21                 user-friendly
                   alternatives"
22
       Exhibit 10  Article called "What is a   79  21
23                 Good Average Landing Page
                   Conversion Rate in 2019?"
24
       Exhibit 11  Page from the New York      92  21
25                 Times website
```

Page 211

```
 1    Exhibit 12   Pages from the website of   95   7
                   Codecademy
 2
       Exhibit 13   Printout of the user flow   98  24
 3                  of General Assembly
 4    Exhibit 14   Check-out flow and terms   102  18
                   of service for Heyday
 5
       Exhibit 15   Expert report of Benjamin  125  16
 6                  Beecher
 7    Exhibit 16   Supplemental expert report  125  19
                   of Benjamin Beecher
 8
 9
10
11                        *******
12    DOCUMENTS AND/OR INFORMATION REQUESTED:
13    Page 115
```

Page 212

```
 1              ERRATA SHEET
 2    Case Name:
 3    Deposition Date:
 4    Deponent:
 5    Pg.  No. Now Reads   Should Read  Reason
 6    ____ ____ _____   _____    _____
 7    ____ ____ _____   _____    _____
 8    ____ ____ _____   _____    _____
 9    ____ ____ _____   _____    _____
10    ____ ____ _____   _____    _____
11    ____ ____ _____   _____    _____
12    ____ ____ _____   _____    _____
13    ____ ____ _____   _____    _____
14    ____ ____ _____   _____    _____
15    ____ ____ _____   _____    _____
16    ____ ____ _____   _____    _____
17    ____ ____ _____   _____    _____
18    ____ ____ _____   _____    _____
19    ____ ____ _____   _____    _____
20
21               Signature of Deponent
22    SUBSCRIBED AND SWORN BEFORE ME
23    THIS ____ DAY OF _____, 2019.
24    _____
25    (Notary Public)  MY COMMISSION EXPIRES:_____
```

# **<u>EXHIBIT 14</u>**

I, David Leidlein, hereby declare:

1.     I am over the age of eighteen and have personal knowledge of all the facts set forth in this Declaration. If called as a witness, I could testify competently to such facts under oath.

2.     I am informed by counsel for Fluent, LLC (which I am informed directly or indirectly owns and operates rewards websites, including websites operated by RewardZone USA) that Fluent, LLC's records reflect that I visited one of Fluent, LLC's websites operated by RewardZone USA in February 2018, where I was offered the opportunity to obtain rewards. I am further informed by counsel for Fluent, LLC that its records reflect that, while on the website:

- I provided my first name, last name, email address, and telephone number (585-734-0051), among other information;

- Upon doing so, I agreed to a set of terms and conditions;

- I answered certain survey questions; and

- I checked an unchecked box, by which I consented to receive text messages and phone calls to the telephone number that I provided.

3.     I ultimately won a reward from my visit to the Fluent website and filed a claim form to receive the reward.

4.     I have no reason to believe that Fluent, LLC's records are incorrect and no basis to say that I did not visit the website and provide my information to Fluent, LLC and consent to be contacted.

5.     The foregoing is true to the best of my recollection.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Livonia, New York on May 26, 2019.

David Leidlein

{00132737;1}

# **EXHIBIT 15**

I, James Derby, hereby declare:

1.    I am over the age of eighteen and have personal knowledge of all the facts set forth in this Declaration. If called as a witness, I could testify competently to such facts under oath.

2.    I am informed by counsel for Freedom Debt Relief ("Freedom") that Fluent, LLC's records indicate that in February 2018 I visited one of Fluent, LLC's directly or indirectly owned or operated websites where I was offered the opportunity to obtain rewards. I am further informed that Fluent, LLC's records reflect that, while on that website:

- I provided my first name, last name, email address, and telephone number (850-496-3096), among other information;

- Upon doing so, I agreed to a set of terms and conditions;

- I answered certain survey questions; and

- I checked an unchecked box, by which I consented to receive text messages and phone calls to the telephone number that I provided.

3.    I was contacted by or on behalf of Freedom as a result of having visited that Fluent website and providing my consent to be contacted.

4.    I ultimately became a customer of Freedom because I was contacted after visiting that website.

5.    I have no reason to believe that Fluent, LLC's and Freedom's records are incorrect and no basis to say that I did not visit the website and provide my information to Fluent, LLC and consent to be contacted by or on behalf of Freedom.

6.    The foregoing is true to the best of my recollection.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Niceville, Florida on May 29, 2019.

_____
James Derby

{00132799;1}

# **<u>EXHIBIT 16</u>**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DANIEL BERMAN,

Plaintiff,

v.                                                        Case No. 4:18-CV-01060-DMR

FREEDOM FINANCIAL NETWORK, LLC,      Hon. Yvonne Gonzalez Rogers
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC, and LEAD SCIENCE, LLC,

Defendants.

## EXPERT REPORT OF DAVID KALAT

**EXPERT REPORT OF DAVID KALAT** ........................................................................ 1

I.      SUMMARY OF OPINIONS ..................................................................... 3

II.     QUALIFICATIONS ................................................................................ 5

III.    DOCUMENTS AND DATA SOURCES CONSIDERED ....................... 8

IV.     ANALYSIS AND OPINIONS ................................................................. 9

   A.    Introduction ......................................................................................... 9

V.      ANALYSIS OF ALLEGED "FACIALLY DEFICIENT" LEADS .................................... 12

   A.    Users of Fluent's web forms have different incentives to enter contact information than
         they do for their name and address ....................................................... 12

   B.    Testing the Integrity of the Registration Information ................................... 14

      1.    Methodology ........................................................................................ 17

      2.    Email Verification ............................................................................... 17

      3.    The "Dunk Loka" Lead ....................................................................... 20

      4.    Duplicate Leads .................................................................................. 22

   C.    Analysis of the IP Address Information Shows No Unexpected Anomalies ................. 23

   D.    Data Security Issues ............................................................................ 27

   E.    Bot activity ........................................................................................ 28

      1.    Leads With "Placeholder" Variables ................................................ 29

      2.    The Origin of the "Dunk Loka" Lead ................................................ 31

   F.    Identification of Business Numbers ....................................................... 32

   G.    Analysis Of Dialer Records To Leads .................................................... 33

## I.    SUMMARY OF OPINIONS

1. Plaintiff's experts Anya Verkhovskaya and Benjamin Beecher claim to have identified various inconsistencies in the lead data produced by Fluent that they imply or directly allege are indications of suspicious activity, data corruption, or other reasons to distrust the integrity and reliability of the leads. As my analysis herein details, these conclusions rest on faulty assumptions and misleading analysis. Each claim alleging "deficiencies" is meritless and evaporates on closer inspection.

2. My analysis of a randomly selected statistically valid sample of 16,270 leads found that at least 88.89% were corroborated by information available in the public records provided by LexisNexis, TLO, and the National Change of Address database. Additional investigation is needed to assess the remaining 18% of the leads.

3. 88.7% of the email addresses in the sample of 16,270 leads are verified by their providers to be valid email addresses associated with actual users to whom emails can be directed. Many of the remaining addresses appear to be previously valid email addresses that were likely discontinued by their users prior to my analysis. Additional investigation is needed to assess the remaining 11.3% of the email addresses.

4. Analyzing the email addresses in the sample of 16,270 leads found no evidence that they had originated from email harvesting, had been generated by email appending or permutations, or showed any evidence of lacking opt-in consent.

5. The LexisNexis and TLO databases, which plaintiff proposes as an authoritative repository of consumer contact information, do not associate plaintiff Daniel Berman with his own phone number, and as such are "deficient" *in the same way that the Fluent lead records alleged to be*. It does not logically follow to conclude that it is a fatal deficiency that the leads associate the 510-326-9945 number with someone other than Daniel Berman, if the plaintiff's preferred resource of reliable information also associate the 510-326-9945 number with someone other than Daniel Berman.

---

Expert Report of David Kalat / <u>Berman v. Freedom Financial, *et al.*</u>                                3 | P a g e

6. Ms. Verkhovskaya claims that 132,867 of the leads are duplicated by one or more additional leads that she implies are untrustworthy. I correlated the lead data to the call logs and confirmed that for every one of the 16,270 telephone numbers in my sample, no calls were logged to that number prior to the date on the *earliest* lead. Even if there was a reason to distrust the validity of the additional leads, none of those leads would be relevant to a determination of whether there was documentation of prior express written consent to initiate calls or texts to those numbers. Furthermore, my own testing of Fluent's websites confirmed Fluent's statement that the web forms autofill customer information for returning registrants. This explains the similarities between the duplicate leads that Ms. Verkhovskaya found noteworthy.

7. Ms. Verkhovskaya's analysis comparing the distance between the physical address recorded in each lead with the geolocation associated with the corresponding IP address is nonsensical, because the geolocation of the IP address identifies the location of the entity that registered the IP address (which is typically a commercial ISP), not the location of the user.

8. The presence of internal private IP addresses associated with Fluent's network in some of the lead records is not an indication of a "misconfigured system" and is consistent with my prior experience with Fluent's documentation.

9. The absence of a CAPTCHA toolbar from Fluent's web sites is irrelevant in light of the fact that other attributes of the web site design provide comparable levels of data security.

10. I see no evidence supporting the contention that any leads were submitted by spam bots instead of by actual human visitors to Fluent's web sites.

11. Ms. Verkhovskaya's methodology for identifying business numbers under-identifies business numbers.

12. I compared the Dialer Logs with the Fluent Leads and determined that every call or text documented in the Dialer Logs was placed to a telephone number previously obtained from a lead, with the exception of 20 telephone numbers not contained on either of these data sets.

---

Expert Report of David Kalat / <u>Berman v. Freedom Financial, *et al.*</u>                    4 | P a g e

## II.    QUALIFICATIONS

13. I am a Director at Berkeley Research Group, LLC ("BRG"), a leading global strategic advisory and expert services firm that provides independent expert testimony, litigation support, data analytics and other services to major law firms, Fortune 500 corporations, government agencies, and regulatory bodies around the world. I am a member of the firm's Global Investigations + Strategic Intelligence practice group. I lead investigations involving data analytics and forensic computer examinations. I joined BRG in April 2015.[1]

14. I received my Bachelor of Arts from the University of Michigan as a James B. Angell Scholar. I received my Master's Degree in Library and Information Science from the University of Illinois at Urbana-Champaign.

15. I am certified by the International Society of Forensic Computer Examiners (ISFCE) as a Certified Computer Examiner (license number 1666). I am also licensed by the International Information System Security Certification Consortium ((ISC)$^2$) as a Certified Information Systems Security Professional (license number 593527). I am a Certified Fraud Examiner (license number 621469). I am a licensed Private Detective in the states of Illinois (license number 115.002487) and Texas (license number 52430601).

16. I am a non-fiction author with a focus on the history of information technology. For example, I write a monthly column for LegalTech News called "Nervous System" that approaches issues of data privacy and cybersecurity from a historical context.

17. I have been retained as a consulting and/or testifying expert in several TCPA actions including many for which I have either not yet been disclosed or not yet provided any written testimony. I have also provided written and/or verbal testimony in the following matters involving TCPA actions and related claims:

>    a.   In the case of <u>Revitch v. Citibank</u> in the Northern District of California, I provided an expert report on the technical capacity and functionality of the communication platform used by the Defendant.

---

[1] My Curriculum Vitae is set forth as Exhibit 1.

b.   In the case of <u>Marcheco v. Jo-Ann Stores, LLC</u> in the Southern District of Florida, I provided an expert report on the technical capacity and functionality of the messaging platform used by the Defendant.

c.   In the case of <u>Braver *et al*. v. NorthStar Alarm Services, LLC</u> in the Western District of Oklahoma, I conducted data analytics and investigative research on behalf of the defendant in a putative TCPA lawsuit involving the use of soundboard avatar technology.

18. I served on the data analysis teams at the direction of testifying expert Peggy Daley analyzing lead lists and other related data sources in the following TCPA matters:

a.   <u>Pieterson v. Wells Fargo Bank, N.A.</u>, No: 3:17-cv-02306-EDL (N.D. Cal.)

b.   <u>McCurley v. Royal Seas Cruises, Inc.</u>, No. 17-cv-1988 AJB (AGS), consolidated with <u>DeForest v. Royal Seas Cruises, Inc.</u>, No. 17-cv-986 AJB (AGS) (S.D. Cal)

c.   <u>Horton v. Navient Solutions, Inc.</u>, No: 1773cv00200 (Mass. Sup. Ct.)

d.   <u>Bakov, *et. al* v. Consolidated World Travel Inc. d/b/a Holiday Cruise Line</u>, No. 1-15-CV-02980, consolidated with No. 1-17-CV-973 (N.D. IL)

e.   <u>Fitzgerald v. Universal Pictures</u>, No: 6:16-cv-01193-CEM-DCI (M.D. Fla)

f.   <u>Flowers v. Twilio, Inc.</u>, No: RG16804363 (Sup. Ct. Cal.)

g.   <u>Zaklit v. Nationstar Mortgage LLC, *et al*.</u>, No: 5:15-cv-02190-CAS-KK (C.D. Cal.)

h.   <u>Lee v. Global Tel * Link Corporation</u>, No.: 2:15- cv-02495-ODW PLA, consolidated with 2:15-cv-03464-ODW-PLA (C.D. Cal.)

i.   <u>Henderson v. United Student Aid Funds, Inc. D/B/A USA Funds</u>, No. 3:13-cv-1845-JLS-BLM (S.D. Cal.)

j.   <u>Johnson v. Navient Solutions, Inc. f/k/a Sallie Mae, Inc.</u>, No 1:15-CV-0716 (S.D. Ind.)

k.   <u>Charvat, *et al*. v. Valente, *et al*.</u>, No. 12-CV-5746 (N.D. Ill.)

19. I have direct experience analyzing dialer systems used by call centers and organizations to manage communications with their customers and prospects. During the course of my work at BRG I have performed a variety of data analysis on numerous putative TCPA class actions as well as similar cases filed under the California Invasion of Privacy Act. My work has included but is not limited to reverse engineering the data schema and design of dialer platforms; forensic examination of web server logs to compare to the URLs and IP addresses in lead lists; analysis in SQL and PostgreSQL of dialer database records, call detail records, and Customer Relationship Management ("CRM") database records; analyzing records produced by the Interactive Marketing Solutions ("IMS") to distinguish wireless telephone numbers from landline telephone numbers; and conducting telephone number reverse lookups using data brokers such as LexisNexis and TLO. I have analyzed the use of dialers from Asteria, Noble Systems, Interactive Intelligence, Genesys, and other vendors. I have also examined the use of soundboard avatar technology by call centers.

20. I provide TCPA compliance consulting services to clients including but not limited to monitoring the use of customer contact databases and/or lead lists to design the recipients of outbound campaigns; scrubbing customer contact databases and/or lead lists to identify and remove cellular telephone numbers; and analyzing post-facto call detail reports to verify cellular telephone numbers were not contacted. In this capacity I have directly accessed the relevant dialer systems to run database queries, extract reports, upload data, and monitor configuration settings.

21. I have also provided prior expert testimony in the following matters:

- <u>Revitch v. Citibank,</u> No. 3:17cv06907 (N.D. Calif., 2017)

- <u>Marcheco v. Jo-Ann Stores, LLC,</u> 1:18cv20564 (S.D. Fla., 2018)

- <u>Kolodziej v. Justice Park District, <i>et al</i>.,</u> 2014 L 775 (Cook Cnty. Cir. Ct., 2014)

- <u>Indeck Energy Services v. DePodesta, <i>et al</i>.,</u> 14 CH 602 (Lake Cnty. Cir. Ct., 2014)

- <u>Braver et al. v. NorthStar Alarm Services, LLC,</u> 5:17cv00383 (W.D. Okla., 2017)

- <u>C.J. Drilling, Inc. v. Welsh</u>, No. 17 CH 001095 (Kane Cnty. Cir. Ct.)

- <u>Western Union v. Kula</u>, 1:17cv00280 (N.D. Ill.)

- <u>Segerdahl Corp. v. Ferruzza</u>, *et al.,* 1:17cv03015 (E.D. Ill.)

- <u>L&W Supply Corp. v. Banks</u> *et al.*, CV16-00816 (Washoe Cnty. Dist. Ct.)

- <u>Bunnet & Co., Inc. and Energy Feeds International, LLC v. Dores</u>, 1:15cv1104 (W.D. Texas); also <u>In Re: Frank Miranda Dores and Mary Anne Souza Dores</u>, No. 16-10169-B-13 (Bankr. E.D. Calif.)

- <u>Pro Sapiens LLC v. Indeck Power Equipment Co.</u>, 14L5730 (Cook Cnty. Cir. Ct.)

- <u>Geophysical Service Inc. v. Anadarko Petroleum Corp. *et al.*,</u> 1201-15228 (Ct. of Queen's Bench of Alberta, 2014)

22. I have been retained by counsel for defense. I am being compensated at my hourly rate of $450.

## III.   DOCUMENTS AND DATA SOURCES CONSIDERED

23. My understanding of the factual matters at issue is based on my review of the documents and data described below. I understand that additional information relevant to my opinions may be disclosed in subsequent productions and depositions. Accordingly, I reserve the right to amend my findings based upon such additional disclosures.

24. Lead/registration records:

     a.  Fluent_00441

     b.  Fluent_00572

25. Call log records:

     a.  LeadScience_000677 (Outbound)

     b.  Freedom_000967 (Inbound)

     c.  Freedom_000968 (Inbound)

     d.  LeadScience_000676 - Call info for Plaintiff Daniel Berman

26. Second Amended Complaint

27. Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery

28. Plaintiff's Production (BERMAN 001-055)

29. Plaintiff's Responses and Objections to Freedom Financial Network, LLC's and Freedom Debt Relief, LLC's First Set of Discovery to Plaintiff

30. Google Account Information for Buffola@gmail.com account

31. Affidavit of TCPA Prior Express Written Consent, by Mitenkumar Bhadania (April 30, 2018)

32. Declaration of Mitenkumar Bhadania in Support of Defendant's Reply Motion (Dec. 4, 2018)

33. Declaration of Brian Astrup (Dec. 4, 2018)

34. Declaration of Dharma Naik in Support of Defendants' Motion to Dismiss (November 13, 2018)

35. Declaration of Daniel J. Barsky in Support of Defendants' Motion to Dismiss (November 13, 2018)

36. Fluent's Supplemental Response to Interrogatory Number 3

37. Expert Report of Anya Verkhovskaya (Dec. 7, 2018)

38. Expert Report of Benjamin Beecher (Dec. 7, 2018)

## IV.   ANALYSIS AND OPINIONS

### A.   <u>Introduction</u>

39. Fluent Inc. ("Fluent") is a digital marketing company that owns and operates consumer-facing websites that offer consumers various opportunities including enrolling in online sweepstakes.[2] These websites collect contact information and first-party data from consumers that Fluent uses to assist advertisers in targeting and potential customers and generating leads for advertisers. Consumers who access a website operated by Fluent are generally prompted to supply their name, address, date of birth, and telephone number ("Registration Information"). The system prompts the consumer to agree to the Terms and Conditions of the website, and to submit their consent to be contacted by one or more of the advertisers ("Marketing Partners")

---

[2] I have encountered Fluent in prior casework and know from experience that their lead generation operations include earning rewards, receiving job listings, obtaining product samples, and other consumer transactions, however the discussion set forth in the pleadings I was provided in this matter specifically reference sweepstakes.

listed on the TCPA consent page displayed by the website. If the consumer checks the boxes to provide their agreement with the Terms and Conditions and their consent to be contacted, then their Registration Information is recorded in Fluent's leads database and may be made available to Fluent's Marketing Partners.[3]

40. On December 24, 2017, customer contact information was submitted through one of Fluent's websites (signup.electronics-sweepstakes.com) that contained the telephone number 510-326-9945, email address buffola@gmail.com, the name "Dunk Loka" and an incomplete street address of "Grand Street" (with no house number).[4]

41. Between December 26, 2017 and February 14, 2018, 18 SMS text messages and three outbound telephone calls were directed to 510-326-9945.[5] These texts and calls were received by plaintiff Daniel Berman, who has stated under oath that he is the sole user of that telephone number.[6]

42. Mr. Berman also stated under oath that he did not submit this Registration Information to Fluent; did not authorize anyone to do it on his behalf; has never used the name "Dunk Loka;" has never used the email address buffola@gmail.com; and has never lived on "Grand Street."[7]

43. Examination of public records databases has failed to yield any records pertaining to anyone by the name of "Dunk Loka." Information supplied by Google has established no connection between Mr. Berman and the buffola@gmail.com address.

44. Based on the evidence that the "Dunk Loka" Registration information does not document Mr. Berman's identity, contact information, or consent, plaintiff proceeds to the conclusion that *all*

---

[3] Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery ("Fluent's Responses") at 3:22-4:24.
[4] Affidavit of TCPA Prior Express Written Consent, by Mitenkumar Bhadania ("Bhadania Affidavit") paragraphs 6-16.
[5] LEADSCIENCE_000676.
[6] Plaintiff's Responses and Objections to Freedom Financial Network, LLC's and Freedom Debt Relief, LLC's First Set of Discovery to Plaintiff ("Plaintiff's Responses"), at 4:24-26.
[7] Second Amended Complaint, paragraph 213.

of the leads collected and supplied by Fluent are "bogus" and "invalid."[8] Plaintiff claims that "the leads contain at least on the order of 100,000 facially deficient leads."[9]

45. Although plaintiff does not define "facially deficient," or clarify exactly how the figure of "100,000" was reached, this appears to represent conclusions from the expert reports of Anya Verkhovskaya and Benjamin Beecher. Together, Ms. Verkhovskaya and Mr. Beecher identify various types of alleged inconsistencies in the lead data produced by Fluent that they imply or directly allege indicate suspicious activity, data corruption, or other reasons to distrust the integrity and reliability of the leads generated by Fluent. The alleged inconsistencies or deficiencies identified in the analysis of Ms. Verkhovskaya and Mr. Beecher are as follows:

    a. Ms. Verkhovskaya claims that "[m]ore than 50% of names and/or addresses are garbled, invalid, and/or blank."[10]

    b. Ms. Verkhovskaya claims that 132,867 of the leads are duplicated by one or more additional leads that differ only in the IP address and in some cases the physical address.[11]

    c. Ms. Verkhovskaya claims that only 84,594 pairs of IP addresses and validated street addresses are within 10 miles of one another, and the others are over 10 miles or even over 300 miles apart.[12]

    d. Mr. Beecher claims that there are hundreds of examples text strings like {FIRSTNAME} {LASTNAME} in the leads that appear to have been inserted by computer programs instead of people.[13]

---

[8] Second Amended Complaint, paragraphs 9 and 231.
[9] Second Amended Complaint, paragraphs 4-5.
[10] Expert Report of Verkhovskaya, paragraph 54.
[11] Expert Report of Verkhovskaya, paragraph 61.
[12] Expert Report of Verkhovskaya, paragraph 63.
[13] Expert Report of Benjamin Beecher, p. 6-7.

      e.  Mr. Beecher claims that his analysis of the IP addresses shows that 59.1% of the leads "came from misconfigured systems," and is "either corrupted or maliciously faked, but cannot be real."[14]

46.  As my analysis below details, these conclusions rest on faulty assumptions and misleading analysis, and each of these alleged "deficiencies" evaporates on closer inspection.

## V.    ANALYSIS OF ALLEGED "FACIALLY DEFICIENT" LEADS

### A.    <u>Users of Fluent's web forms have different incentives to enter contact information than they do for their name and address</u>

47.  Ms. Verkhovskaya opines that "more than 50% of the names and/or addresses are garbled, invalid, and/or blank" and concludes this is "outside of the industry standards."[15] It is unclear here what "industry" Ms. Verkhovskaya means. She is neither a telemarketer nor a lead generator.

48.  Ms. Verkhovskaya states that "[w]hile it is common to have a small number of records with garbled or blank data (approximately 3% to 5%), it is uncommon to have greater than 50% of names and/or addresses to be garbled, invalid, and/or blank."[16] She appears to be drawing a comparison between the condition and composition of the leads and her experience with the formatting and quality of public records and similar records provided by data processing vendors such as LexisNexis and TLO. This is an inapt comparison.

49.  LexisNexis, TLO, and comparable data vendors compile their databases from a variety of data sources including utility bills, credit applications, bankruptcy filings, property records, corporation filings, driver's licenses, hunting and fishing licenses, marriage and divorce records, motor vehicle registrations, professional licenses, voter registrations, and other documents that might associate names of persons with telephone numbers.[17] The consistency

---

[14] Expert Report of Benjamin Beecher, p. 8.

[15] Expert Report of Anya Verkhovskaya, paragraphs 73 (a) and 54.

[16] Ibid, paragraph 54.

[17] For example, the sources used by LexisNexis' Public Records database are described in the LexisNexis Content Listing, which is available online at https://web.lexis.com/help/research/ContentListing.pdf. The relevant excerpt from this 312-page document is attached as Exhibit 2.

of the data records that Ms. Verkhovskaya observes as "common" or "industry standard" reflects the nature of these source records. These are materially different sources from website forms that consumers fill in to win a prize. The likelihood that certain information will be entered intentionally incorrectly is much higher in records of this nature as opposed to credit applications and utility bills.

50. By contrast, it is my understanding from the pleadings and other documents that leads were only generated when consumers registered online at a website operated by Fluent. From the standpoint of a consumer submitting information to a website in order to enroll in a prize drawing, submitting a valid form of contact (such as phone number and/or email address) is the minimal amount of valid information that one would need to provide to effectively engage in the transaction. Submitting pseudonymous information for their identity and demographic details may hinder the usefulness of the results *from the perspective of the marketer*, but does not impede the ability of the consumer to participate in the drawing.

51. Submitting pseudonymous information also does not impede the ability of the consumer to consent to receive marketing communications. It is not a novel observation that users commonly interact online in pseudonymous or anonymous ways.[18] Many privacy organizations advocate for and defend the use of pseudonyms online.[19] If the use of pseudonymous identities were equated with a lack of consent, then numerous Internet users would be unable to consent to basic services such as signing up for email accounts, submitting online comments, purchasing items from ecommerce sites, and other workaday transactions routinely conducted using pseudonymous online "handles."

52. I personally tested two of the Fluent lead generation websites to examine the user experience for myself. I accessed thedailywinnings.com and nationalconsumercenter.com, and on multiple occasions went through all of the steps necessary to submit a lead on each site. I

---

[18] See, for example, Van der Nagel and Frith, "Anonymity, pseudonymity, and the agency of online identity: Examining the social practices of r/Gonewild," *First Monday* (Vol. 20, No. 3, March 2, 2015), attached as Exhibit 3.

[19] For example, see the Electronic Frontier Foundation's "A Case for Pseudonyms," attached as Exhibit 4.

observed that the web form asked for my email address first, then on a second page asked for my name and zip code, and on a third page asked for my street address, city, state, and telephone number. By treating these different components of the consumer's information as discrete questions, the consumer's state of mind may change as the different data fields are submitted. This is significant in understanding how a given individual may be more or less forthcoming and accurate on different components of the information they submit to the site.

### B.   Testing the Integrity of the Registration Information

53. Fluent's General Counsel and Chief Compliance Officer Daniel Barsky stated in his declaration of November 13, 2018 that "Fluent does not have the capacity to determine whether each consumer has entered a name which matches the subscriber name for a telephone number which has been entered. That is because there is no public database of cell phone subscribers and there is no reverse-cellular telephone number lookup provider that can reliably provide cellphone subscriber information."[20]

54. As a professional investigator who has extensive experience using public records databases such as LexisNexis and TLO, I agree with Mr. Barsky's statement. I am aware of no effective or efficient mechanism by which Fluent could test the validity of the lead registrations as they submitted. That being said, the information available in public records databases can be queried in a post-hoc fashion to look for corroborating evidence supporting the information contained in the leads. As detailed more fully below, this examination entailed consulting multiple data systems and comparing numerous data points, the complexity of which required me to conduct this analysis only on a sample.

55. In order to test the integrity of the leads, I conducted my analysis on a randomly selected sample of 16,270 telephone numbers.[21] This statistically sound sample was randomly selected

---

[20] Declaration of Daniel J. Barsky in Support of Defendants' Motion to Dismiss ("Barsky Declaration"), paragraph 40.

[21] I have been involved in a number of TCPA lawsuits in which Ms. Verkhovskaya has served as the opposing expert, and I know from such prior case experience that Ms. Verkhovskaya has previously disclaimed having any expertise in statistical sampling. When deciding on the size of a statistical sample, I generally use the sample size

from the larger population of telephone numbers[22] that received calls and/or texts from Freedom[23], and for each telephone number in the sample population, all corresponding leads were also included.[24]

56. The information on Fluent's lead records can generally be divided into five types or categories of data:

    a.  Identity: This information provides the consumer's name.

    b.  Contact: This information encompasses the email and/or phone number to which communications will be directed.

    c.  Demographic information: This information includes the address and date of birth, and enables marketers to isolate certain populations based on age or geography for certain types of communications.

    d.  Qualification: The survey questions probe different areas such as finances, education, health, reading habits, politics, and other aspects of the consumer's lifestyle and interests that can be used to identify which leads are of special interest to which advertisers.[25]

    e.  Consent: This information includes the combination of web address, IP, and date documenting the moment when the consumer submitted their information and agreed to the posted terms and conditions.

---

calculator provided by Raosoft. For a master population of 730,274, with a 1% margin of error and a 99% level of confidence, the Raosoft sample size calculator recommends a sample of 16,219. For the purposes of consistency with Ms. Verkhovskaya's analysis, I opted to use the same sample size of 16,270.

[22] Ms. Verkhovskaya stated in her expert report that her analysis identified 730,274 unique telephone numbers that received calls or texts (see paragraph 37). This is contrasted with the figure of 778,548 reported in the Second Amended Complaint (paragraph 228). My own examination of the 5,101,700 rows of data in LEADSCIENCE_000677 found 730,167 unique telephone numbers. I do not have an explanation for these discrepancies. For the purposes of my calculations herein I rely on my own count of 730,167 numbers.

[23] The call logs were searched from the data source LeadScience_000677.

[24] The leads were appended from Fluent_00441 and Fluent_000572.

[25] Based on my testing of the Fluent websites I observed that this type of information was gathered through the survey questions, although it was not produced in the lead lists used for my analysis and was not relevant to my analysis.

57. The distinction between these different categories of data is important, because although they make up a lead registration in the aggregate, the different data categories are collected under different circumstances that have an effect on the completeness of the overall record. Plaintiff's experts make no distinction between instances where the various components of the registration information contain inaccurate information that does not point to a single consumer (such as the "Dunk Loka" lead) from instances where a consumer has submitted substantially correct information but together with inaccurate or pseudonymous information. Plaintiff treats these materially different scenarios as being equal examples of "facially deficient" registrations. As discussed above, a consumer registering to win an online prize drawing has a strong incentive to provide a valid means of receiving that prize, but may be less incented to go beyond the minimal interaction necessary to have a shot at winning. Consequently, it is reasonable to expect that with few exceptions the leads would contain valid, accurate *contact information* even if the data fields for identity and/or address were incomplete and/or inaccurate.[26]

58. For the purposes of my analysis, I considered a lead "substantially valid" if the contact information along with the name and/or address can be supported by public records from one or more sources indicating the same person.

59. Using the methodology set forth below, I determined that 88.89% of the sample leads I tested were substantially validated.

60. Only 11.11% of the leads contained information that could not be substantially validated by public records.

61. My analytical methodology is described in detail below.[27]

---

[26] Issues related to the IP address information are discussed in a separate section below.

[27] In my capacity as a Director in BRG's Global Investigations and Strategic Intelligence practice, I work with a team of professional investigators and data analysts whom I supervise. Throughout this Report, when I use the first-person to describe my analysis, I am referring to work conducted by me or by my staff under my direction.

### 1. *Methodology*

62. I submitted the sample set of 16,270 telephone numbers to both the data vendors LexisNexis and TLO to perform a "reverse append" analysis, and return the names and addresses that these data vendors associate with those phone numbers. This is the same methodology that Ms. Verkhovskaya herself proposes in her expert report as a means of identifying names and contact information of class members for class notification.[28]

63. I am familiar with both of these data vendors and have used their public records databases extensively in my capacity as a professional investigator, both in the context of TCPA litigation and other non-TCPA casework. Both data vendors have a strong reputation in the investigative community.

64. This reverse append process created two sets of records, one from LexisNexis and one from TLO, that contained information about the associations between people's names, addresses, and phone numbers that are documented in the various data sources from which these vendors of public records aggregate their results.[29] These LexisNexis and TLO results were then compared to the information in the sample leads to identify where the lead information could be corroborated.

65. Additionally, I submitted the email and physical addresses reported in the leads to the National Change of Address (NCOA) database. The NCOA results allowed me to create standardized formatting that could be electronically matched to the standardized results reported by LexisNexis and TLO. The NCOA results also provided a third source of public records information against which to verify the information in the leads.[30]

### 2. *Email Verification*

66. The sample set of 16,270 telephone numbers correlates to leads containing 16,297 email addresses. As set forth below, I determined that 88.7% of them are valid email addresses

---

[28] Expert Report of Anya Verkhovskaya, par. 64-68.

[29] The raw results returned by LexisNexis and TLO are attached in native form as Group Exhibit 5.

[30] I know from prior casework that Ms. Verkhovskaya has subscriptions to all of these data vendors as well, and was capable of conducting the same comparative analysis that I did, but chose not to.

verified by their providers to be associated with actual users to whom emails can be directed. I also found no evidence that the corpus of emails in the sample had been obtained through any means other than the direct input by actual users. The methodology underlying this conclusion is set forth below.

67. Kickbox is an email verification service developed for marketers and designed to identify undeliverable email addresses.

68. According to its terms of use, Kickbox will not perform validation on lists it suspects have been gathered through email harvesting methods or which show evidence of including non-opted-in addresses. Kickbox will fine its users or even terminate their accounts if their submissions are suspected of being non-opted-in lists or having been harvested from another sources. Kickbox also prohibits use of its service to:

     a.   verify purchased lists (whether they are opt-in or not)

     b.   verify permutations of email addresses, also known as directory harvesting

     c.   verify email addresses generated via email appending.[31]

69. Kickbox's analysis separates the various email addresses it analyzes into four different buckets. "Deliverable" indicates the recipient's mail server confirmed the recipient mailbox exists and Kickbox's algorithm considers the address safe to send mail. "Risky" covers a range of email addresses that are also confirmed to exist, but which have characteristics indicating they are unlikely to be used successfully for commercial communication.[32] "Unknown" means the verification service was unable to get a timely response from the domain, and can be rechecked at a later time. "Undeliverable" indicates the email address does not exist.[33] For the purposes

---

[31] Kickbox Acceptable Use Policy, is attached as Exhibit 6.

[32] "Risky" addresses include email addresses that are assigned to a role (such as info@domain.com); are addresses set up with a disposable email service provider which are typically intended for one-time use to receive a service communication; and email addresses at a domain that accepts any message sent to it regardless of whether that mailbox is separately defined.

[33] See Kickbox Definition of Terminology, available at https://docs.kickbox.com/v2.0/docs/terminology and attached as Exhibit 7.

of this analysis, I considered "Deliverable" and "Risky" to be valid email addresses, because they were reported by the providers to be existing user-created addresses.

70. As an additional verification, Kickbox scores each lead with a Sendex Email Quality score. As explained on their website, "Just because an email exists and is syntactically correct, does not mean it's quality. For example, john.smith@example.com can generally be seen as a higher quality email address than sdfsdfsdf@example.com. Kickbox uses a number of algorithms, derived from the millions of email transactions it performs each hour, to determine the overall quality of an email address."[34] For the purposes of this analysis, I considered a Sendex score of .7 or higher to be an indicator of a high-quality email list validated for use for telemarketing purposes.

71. I submitted 16,297 email addresses to Kickbox for verification. This analysis identified 13,771 as "Deliverable," and 594 as "Risky." Upon further examination of the results, I determined that many of the email addresses that had been initially returned as "undeliverable" appeared to have minor typographical errors in the domain names, such as "gmail.comp" instead of "gmail.com," or "men.com" instead of "msn.com." In fact, Kickbox's own results had suggested corrections for many of these provisionally undeliverable results. After manually correcting the typos, I resubmitted this subset of records. After taking the typos into account, Kickbox verified an additional 86 records. In total, this analysis found that 14,451 (88.7%) were valid email addresses confirmed by their providers to exist and be capable of receiving email.[35]

72. It should be stressed that although 1,550 (9.5%) were identified as "Undeliverable," this does not necessarily indicate anything about whether those emails were in fact submitted by actual users of the Fluent websites as part of their online registrations. For example, I observed that

---

[34] See Kickbox Sendex Email Quality, available at https://docs.kickbox.com/v2.0/docs/the-sendex and attached as Exhibit 8.
[35] The Kickbox results files for both sets of submissions are attached in native form as Group Exhibit 9. For the purposes of this analysis I did not consider the "Unknown" results as either valid or invalid, as the information returned for them was by definition inconclusive.

586 of these supposedly "undeliverable" email addresses were matched by the National Change of Address (NCOA) database to actual users and addresses, suggesting that these addresses were likely valid and deliverable at the time of submission but disabled by their users at some time prior to my checking them with Kickbox.[36] Further investigation would be required to determine which of the remainder failed verification because the address contained either an accidental or intentional misspelling.

73. In light of the allegations put forth by plaintiff and plaintiff's experts regarding the alleged illegitimacy of the origin of these leads, Kickbox's compliance mechanisms *did not identify any evidence* that the list of email addresses I submitted had originated from email harvesting, had been generated by email appending or permutations, or showed evidence of lacking opt-in consent.[37] The aggregate Sendex score for the entire sample list was .785 ("Good").

### 3. The "Dunk Loka" Lead

74. The circumstances under which the "Dunk Loka" lead was entered into Fluent's database have not been established. Plaintiff Daniel Berman has stated under oath that he did not enter that information, nor direct someone else to do so.

75. I conducted a reverse phone lookup on telephone number 510-326-9945 in the records provided by LexisNexis and TransUnion/TLO, using the same methodology that plaintiff's expert Ms. Verkhovskaya proposes to identify class members for class notification purposes. TLO returned no results for this number at all. The only LexisNexis result for this telephone number indicates it as a wireless number associated with a "Ronald Berman" of Oakland,

---

[36] NCOA results for these 586 matches are attached as Exhibit 10.

[37] One of several mechanisms used by Kickbox to identify suspicious email lists is to scan them for the presence of "spam traps" or "honey traps." These are email addresses that are published online in ways that can only be seen by bots and not by humans, and which are not used for any other purpose. If a list contains one of these "spam trap" email addresses, that is evidence that the list contains addresses that were obtained through harvesting methods, because the email address would not be submitted by a user. The sample of 16,297 emails that I researched contained no spam traps, no examples of directory harvesting, no examples of permuted addresses, and no examples of appended addresses.

California between June 2006 and October 2010. LexisNexis provides no address for this user, and no more recent date of association after 2010.[38]

76. I note that using Ms. Verkhovskaya's proposed methodology, Daniel Berman would not be identified as a class member and would not receive class notification. He is only identified as a class member because he has stepped forward to connect himself with this phone number, a connection that is not evident in public records.

77. I understand Mr. Berman is a private person who is concerned that disclosing contact information can expose him to unwanted marketing communications, and has guarded his phone number as a result.[39] His understandable reluctance to disclose his phone number likely explains why there is no record in LexisNexis or TLO associating him with his own phone number—those data vendors derive their association from documents in which a person has voluntarily submitted that association. To the extent Mr. Berman is representative of similarly situated individuals, these people are unlikely to be identified for class notice using this methodology because of a likely lack of records associating them with their phone numbers.

78. In this context, it is striking to note that the LexisNexis and TLO databases, which plaintiff proposes as an authoritative repository of consumer contact information, do not associate Mr. Berman with his phone number, and do not associate the phone number with him. In this respect, the databases of LexisNexis and TLO are "deficient" *in the same way that the Fluent lead records are alleged to be*. It does not logically follow to conclude that it is a fatal deficiency that the leads associate the 510-326-9945 number with someone other than Daniel Berman, if the plaintiff's preferred resource of reliable information also associate the 510-326-9945 number with someone other than Daniel Berman.[40]

---

[38] The LexisNexis reverse append for phone number 510-326-9945 is attached as Exhibit 11. TLO returned no result so there is no corresponding attachment.

[39] Plaintiff's Responses, p. 4 and p. 6.

[40] TLO records do indicate that Daniel Berman is likely related to a Ronald Hollins Berman of Alameda County. In hindsight it seems reasonable to conclude that this is the "Ronald Berman" identified in the LexisNexis record for this phone number, but this does not change the "deficiency" noted above. Both LexisNexis and TLO fail to associate the phone number with the person who has sworn under oath he is the sole user of that phone, and LexisNexis' association of a "Ronald Berman" is provided without any other identifying information such as an

### 4. *Duplicate Leads*

79. Ms. Verkhovskaya claims that 132,867 of the leads are duplicated by one or more additional leads that differ only in the IP address and in some cases the physical address.[41] She makes no direct statement about what conclusion she herself draws from this observation, or what conclusions she thinks the reader should draw, leaving the impression this information is adverse or suspicious in some way. The implication appears to be that the duplicative records are untrustworthy.

80. I correlated the lead data to the call logs and confirmed that for every one of the 16,270 telephone numbers in my sample, no calls were logged to that number prior to the date on the *earliest* lead.[42] Even if there was a reason to distrust the validity of the additional leads, none of those leads would be relevant to a determination of whether there was documentation of prior express written consent to initiate calls or texts to those numbers.

81. As noted in Fluent's response to Interrogatory Number 2, "[i]f the System recognizes that a consumer has already registered on a Website, it may streamline the registration process and tie the previously-supplied information to the consumer."[43] In other words, if a consumer attempts to enroll in the same sweepstakes twice, for example, the System will autofill the original registration information, and in such a circumstance it would be fully in line with expectations to see just the IP address change.[44] I personally witnessed this feature during my testing of both thedailywinnings.com and nationalconsumercenter.com, and both sites autofilled the information I had previously entered.

---

[41] Expert Report of Verkhovskaya, paragraph 61.

[42] Out of the entire universe of over five million calls logged in LeadScience_000677, only 20 show calls prior to the earliest recorded lead registration. See Section G below.

[43] Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery ("Fluent's Responses") at 3:28.

[44] Further discussion of how to understand the significance of IP addresses follows below.

address, date of birth, middle name, or other facet that could disambiguate Ronald Hollins Berman from the 251 other Ronald Bermans LexisNexis identifies in California.

## C.     Analysis of the IP Address Information Shows No Unexpected Anomalies

### a)     *How IP Addresses Work*

82. Both Ms. Verkhovskaya and Mr. Beecher raise issues related to the IP addresses reported on the leads. Before discussing their specific conclusions, it will be useful to understand what IP addresses are.

83. An "Internet Protocol" or "IP" address is a numerical string that identifies each computing device on a network. However, there are different types of networks that operate on different scales, and this influences how the IP addresses are configured and assigned. To use a crude metaphor, the public IP address is like the physical address where the postal service delivers your mail and the private IP address is your location within your house at any given time. For example, in a situation involving a person on a laptop on their home WiFi, the home WiFi is the network and the laptop is a device connected to that service, with a "private" IP address identifying its place within that WiFi network. When that laptop interacts with the larger Internet, however, the Internet is the network, and the home WiFi itself will be identified on that network by its own "public" IP address.

84. In order to avoid any conflicts between different devices/systems attempting to use the same address on the same network, public IP addresses are managed and assigned through public registration. It is therefore possible to look up the registration record (called the "WHOIS" record) for any public IP address.

85. IP addresses are formatted as a series of numbers set apart by periods or dots between them. Certain ranges of IP addresses are set aside for use as private IP addresses, and the rest are available as public IP addresses. Although this distinction is documented, and allows an analyst to easily distinguish private IP addresses from public ones simply by looking at them, there is otherwise nothing else about the string of numbers that identifies one kind of IP from another. That is to say, whereas certain numerical identifiers like ZIP codes or telephone area codes have geographic boundaries encoded into them, a given public IP address could point to any place on the globe.

> b) *Ms. Verkhovskaya's Geolocation Analysis is Irrelevant and Misleading*

86. In order to conduct the kind of geolocation analysis that Ms. Verkhovskaya reports in paragraphs 62 and 63 of her report, one would search for the "WHOIS" registration record for each IP address in one of the many online databases offering this reverse lookup service. This will identify the person or organization to whom that public address is registered, and where that person or organization is located. In practice, this often means identifying the Internet Service Provider ("ISP") that provides the network connection used to access the Internet, and the physical location of where that ISP is registered. This information has no reliable or consistent connection to the physical geographic location of where that *user* is.

87. By way of example, when I am in my office at BRG's Chicago location, my public IP is 38.140.135.27, and the WHOIS record for that IP identifies the geographic location as Washington, DC. This is not because I have masked or obfuscated my IP in any way, but simply that my employer uses an ISP whose corporate headquarters are located in Washington, DC.[45] Similarly, when I access the Internet from my home office in suburban Chicagoland, my public facing IP appears as 73.50.32.204, which points to a WHOIS record for Mount Laurel, NJ, simply because Comcast's corporate registration is located in Mount Laurel.

88. Ms. Verkhovskaya reported that she compared the IP addresses in the Fluent leads with the street addresses for the corresponding individuals who registered those leads, to identify which ones were within 10 miles of one another and which ones were father apart, including a count of how many appeared to be more than 300 miles apart.[46] She provided no comment on why she had conducted this analysis, other than that it was at the direction of counsel, and she offered no expert opinion of her own to explain what this was meant to demonstrate, or what conclusions the reader should take—it was merely one more vague statement meant to suggest something nefarious to an audience without technical experience in this area. To anyone with

---

[45] Records identifying my public IP and its WHOIS record are attached as Exhibit 12.
[46] Expert report of Anya Verkhovskaya, paragraphs 62-63.

experience in how IP addresses are assigned, her geolocation analysis is nonsensical and intentionally misleading on its face.

89. It is completely in line with expectations that the IP addresses on the lead lists will not always correspond geographically to the physical location of the consumers. A technical expert would know this. Instead, Verkhovskaya was asked to conduct this pointless analysis and report on the results as if this finding contributes anything to understanding the validity or integrity of the lead data.

*c)* <u>*Some Leads Were Produced With Internal IP Addresses*</u>

90. Mr. Beecher notes that 59.1% of the leads in Fluent's lead lists were attributed to an internal IP address and not to a public IP address as would be expected from external web traffic from consumer transacting with the Fluent server.[47] He characterized this as meaning "at least 59.1% of the provided data came from ***misconfigured systems***" (emphasis added). This overheated hyperbole mischaracterizes the facts. This issue was addressed in discovery, is a not uncommon issue when analyzing lead lists, and is entirely consistent with the expected design of Fluent's databases.

91. The Declaration of Mitenkumar Bhadania addressed this issue and explained that Fluent's database stored customer contact information separately from IP address data, and when the tables were joined to export the records for discovery, the database populated the IP field with the internal address for certain categories of records.[48]

92. I was involved in data analysis on at least one previous matter involving the production of leads from lead generators including Fluent and others, and have witnessed this very issue arise before. In that prior matter, <u>DeForest v. Royal Seas Cruises</u>, not only did this same issue arise but this same explanation was accepted without controversy.

93. In this case, Mr. Beecher rejected Mr. Bhadania's explanation and characterized it as a "misconfiguration of their internal systems." A "misconfiguration" implies a configuration that

---

[47] Expert Report of Benjamin Beecher, pp. 7-8.
[48] Declaration of Mitenkumar Bhadania in Support of Defendant's Reply Motion ("Declaration of Bhadania") paragraphs 6-13.

is not fit for a particular purpose. The purpose in this situation is the storage of data pertaining to the leads, such that it can be retrieved later.

94. Mr. Beecher is wrong when he states that "[s]oftware and data science professionals organize related information together in the same database and then within the same table in that database."[49] In fact, just the opposite is true. Modern database systems use a "relational database" design to optimize data storage and retrieval efficiency. The aspect that characterizes a "relational database" is that data is separated into numerous tables that relate to one another. The greatest efficiency of data storage and speedy data retrieval occurs when the data is stored in *many relatively small* tables, each of which has the fewest possible number of data fields ("columns" in a spreadsheet), but which can be reconstituted together based on their internal relationships.

95. In the case of the lead data, recall that there are five different sub-types of data that were collected. From the standpoint of the marketers who receive the leads, the actionable aspects are the contact points and the consumer's names and demographic information. The contact information and identity information will be the most frequently used types of data, since every communication must involve some component of that data. The demographic and qualification information will likely be used fairly infrequently, as these types of information are most relevant when identifying which leads are of interest to which advertisers, but may not need to be consulted for every communication. The IP address is captured in the course of documenting the consumer's consent, but this is not a data point that will be accessed or searched with the same frequency as the contact information. On a day to day basis, the IP address information serves no further purpose and plays no role in managing customer communications.

96. It is therefore entirely consistent with the principles of good database design that the IP address information be stored in one or more different tables apart from the contact information of the leads. In my opinion, this does not constitute a "misconfiguration," and Fluent has already

---

[49] Expert Report of Benjamin Beecher, p. 3.

provided a satisfactory explanation for why external IP address information is not populated for all the leads as they have been produced to date.

### D.   **Data Security Issues**

#### a)   *CAPTCHA*

97. Mr. Beecher argues that the absence of a CAPTCHA tool on Fluent's web forms means that it is "less likely that humans, rather than spam bots, made the submissions than if a CAPTCHA were used."[50]

98. For the purposes of this discussion, a "spam bot" refers to a piece of software that can obtain and extract data from a web site (sometimes called "scraping"), or insert data into web forms. There are a variety of software agents or bots that are a necessary and benign part of the Internet, and which are responsible for such positive benefits as gathering data for Google searches or archiving web pages for posterity, so the essential distinction for a "spam bot" is not its automated nature, but its unwanted and intrusive role.

99. Mr. Beecher is correct that a CAPTCHA tool is an *example* of a tool to "distinguish human from machine inputs to thwart spam and automated extraction of information," but in my opinion as a data security professional he materially overstates its significance. Mr. Beecher notes that Google offers a free CAPTCHA service, but it should be noted in this context that Google's own research determined as long ago as 2014 that software could effectively overcome CAPTCHA puzzles "with over 99% accuracy," rendering those tools essentially useless for their stated purpose and serving only to confound legitimate human users.[51]

100.   The design of Fluent's online survey flow is designed to require the consumer to navigate through a series of multiple choice survey questions, the answers to which dynamically trigger which questions are presented to that consumer, before being able to ultimately complete the submission. This variable sequence of steps serves as its own data security mechanism.

---

[50] Expert Report of Benjamin Beecher, p. 5-6.
[51] See Google Security Blog from April 16, 2014, attached as Exhibit 13.

Expert Report of David Kalat / <u>Berman v. Freedom Financial, *et al.*</u>                27 | P a g e

101. I have personally examined the flows on both thedailywinnings.com and nationalconsumercenter.com, and went through those flows multiple times using different responses to the survey questions to observe how the web sites adapted to my actions.

102. On both sites, it was only *after* I had completed several pages of survey questions that I was presented with the option of providing my final consent to submit the information. In the case of thedailywinnings.com, the survey questions occupied as much as 60 discrete pages that had to be responded to in sequence, one by one, before the opportunity to submit the lead was completed. In both cases, in order for a spam bot to have submitted the form data, it would have needed to navigate through a series of questions as part of the form submission.

### E.   Bot activity

103. Mr. Beecher makes a variety of statements in his report that suggest that he thinks some significant portion of the leads were submitted not by human activity but by spam bots. Although never explicitly stated as a direct opinion, this is the undercurrent of much of his report. Whether openly stated or implied, this opinion appears to depend substantially on his belief that the appearance of private IP addresses are indications of "corrupted or maliciously faked" data and the absence of a CAPTCHA toolbar is a serious data security liability.[52] I have already addressed why I consider both of these conclusions to be erroneous and founded on misguided assumptions, but I want to also address the underlying question of whether leads were submitted by spam bots as Mr. Beecher implies or by humans as the sworn statements of the defendants contend.

104. Mr. Barsky submitted a sworn statement listing several examples of Fluent leads that did become customers for Freedom, which is unlikely to have occurred for leads that were invented by some spam bot without any connection to the actual individual.[53]

---

[52] Expert Report of Benjamin Beecher, p. 8.
[53] Barsky Declaration, paragraphs 23-29.

105.    I understand from Fluent's Supplemental Answer To Interrogatory Number 3 that their company is compensated only for actions that occur *prior* to the completion of survey questions and prior to the user consenting to be contacted.[54] As such, Fluent has no financial incentive to operate or allow the operation of a spam bot that involved the additional expense of effort, time, programming, and other resources to be able to complete the survey questions and submit leads with telephone numbers designated for calling.

106.    As discussed in section V. B (2) above, I verified that approximately 88% of the email addresses in the leads are valid email addresses belonging to real consumers, and found no evidence that the email addresses had been scraped, harvested, generated, or obtained from any mechanism other than the organic collection of opt-ins from actual consumers. Therefore, for one or more spam bots to have submitted such leads, it would not have been possible for those bots to be scraping, harvesting, generating, or obtaining these email addresses without detection. Alternatively, a spam bot could have operated if it *already had access* to a database of leads, perhaps obtained from some other lead generation company, and entered that data into Fluent's system. However, this odd idea merely creates a chicken-and-egg dilemma, since whatever characteristics are observed in *Fluent*'s leads must have originated in whatever source database the hypothetical spam bot was deriving its submissions.

### 1.    Leads With "Placeholder" Variables

107.    Mr. Beecher's report draws attention to the subset of leads that have text strings with characteristics distinctive to computer programming variables, such as {FIRSTNAME}|{LASTNAME}, $ADDRESS1$, {address}, {ADDRESS}, and so on.

108.    I not only agree with Mr. Beecher that these strings are *unlikely* to have been entered by the visitors to the landing pages in this form, in my personal testing of the Fluent web sites I observed that the web form does not even permit the consumer to submit a name that contains the symbol characters {}[]$, nor can a consumer submit a name that is blank.

---

[54] Fluent's Supplemental Response to Interrogatory Number 3.

109.    Because the web form rejects text strings formatted with these characters, it does not follow that the program that entered them was anything outside of Fluent's database system itself. The database process that wrote these entries, for whatever reason, likely occurred within Fluent's systems after the web form accepted a properly formatted entry that was subsequently corrupted or overwritten.

110.    I observed that the various instances of these computer variable names appear in scattershot form across the leads. *Sometimes* a lead may have {FIRSTNAME} for the first name but an actual user-created entry for the last name; *sometimes* a lead may have a complete user-created first and last name but {ADDRESS} entered for the address; *sometimes* a lead may have a user-created first name and address but {LASTNAME} for the last name; and so on for any possible combination. As already discussed, there is no evidence that the leads contain randomly-generated information—to the extent there are pieces of data entered, that data was sourced from somewhere. If these variable names reflect the actions of a spam bot, it is a spam bot that has sourced from somewhere the same patchwork quilt we observe here of names and addresses that are occasionally incomplete, and the software running the spam bot substitutes these curly-bracketed placeholders whenever the source data is missing an entry.

111.    Additionally, it is reasonable to surmise that the actions of a hypothetical spam bot would be expected to result in mass submissions, input at or around the same time. Not only is there no evident pattern to the divergent ways these placeholder names are filled in, there is no pattern to when these entries are logged with respect to other leads.

112.    It is far more likely that whatever software that recognizes a data field is empty and fills it in with a placeholder variable is not an external piece of software, but is part of the Fluent database itself. It is a common feature of database design to have a specific default placeholder value such as "NULL," or field-specific placeholder names like {FIRSTNAME} and {LASTNAME} when a field is missing an entry.[55]

---

[55] This is a complex and sometimes controversial issue in database design, but generally speaking the additional data storage needed to include placeholder values like "NULL" where data is absent is negligible but facilitates easier and more precise querying of the data.

113.    The entire universe of Fluent leads contain a total of 890,595 rows of data, out of which only 2,385 rows contain these placeholder-style entries.[56] In other words, the total occurrence of this phenomenon affects less than one-third of one percent of the leads. 99.74% of the lead data are unaffected by this issue, however it occurred.

### 2.    *The Origin of the "Dunk Loka" Lead*

114.    In this vein, consider the "Dunk Loka" lead itself. Notably, this lead contains a real, valid operating cellular telephone number. It contains an incomplete street address that identifies "Alameda, California" when the actual owner of that real telephone number lives in Alameda County, California. The IP address recorded for the registration shows the submission came from a user of a Hayward, California-based affiliate of Comcast Cable in Alameda County. The lead contains a real, valid email address that Kickbox rates as "Deliverable" and with a high Sendex score of .85. Although there is no indication that the email address is connected to the owner of the phone, and the name "Dunk Loka" appears to be made up, the information submitted in this lead does not appear to have been generated randomly, which is significant. Either a person submitted the information and came up with the fake name "Dunk Loka," or a piece of software was programmed to collect these pieces of *real data* from some other location and submit them. For this to have been the work of a spam bot, the real phone number and email address had to be obtained from some other source, meaning that the mystery of who originally submitted them simply moves to a different place on the Internet. Calling this the work of a spam bot does not answer the ultimate question of where the lead originated. It involves fewer assumptions to conclude that a real person entered this information into Fluent's signup.electronics-sweepstakes.com site on December 24, 2017, exactly as Mr. Bhadania's affidavit states.

---

[56] The count of 890,595 comes from analyzing Fluent_000441 and CTRL0007302 where at least one field in either "LastName" or "Address" contained some kind of data.

115.    I observe that Mr. Barsky's declaration states that Fluent intends to pursue third-party claims against the individual who submitted the false "Dunk Loka" lead.[57] Given that whoever this person is, had access to Mr. Berman's otherwise unpublished wireless number and correctly identified the geographic location (if not the street address) associated with that number, it is reasonable to surmise that this person knows Mr. Berman, even if their actions were unbeknownst to and unsanctioned by Mr. Berman.

### F.    Identification of Business Numbers

116.    Telecommunications providers sometimes offer "business" subscriptions as a different category of account from a personal or household consumer, and this information can be ported from the carrier to data vendors such as LexisNexis, who can then identify which telephone numbers are categorized as business subscribers by that provider.

117.    However, this is not to say that carriers have a foolproof, comprehensive process for tracking when phone numbers are used for business purposes.

118.    For example, it is common in contemporary business for employers to have BYOD policies that allow employees to use their own personal mobile phones for work. In many such situations, the employee may have an existing mobile account that is categorized by their carrier as a personal or household account, but the user is then compensated in whole or in part by their employer for the use of that phone number for business purposes. This is true of my mobile number, for example, which is published by my firm as a contact number for me, it appears on business cards and my email signature block. From the perspective of my employers and clients, this is a business number, but it is listed by my carrier as a family plan.

119.    Many Americans also run businesses from their home, and use their existing consumer phone plans as business contacts, publishing the numbers on web sites, directories, advertisements, and distributing them in other ways.

---

[57] Barsky Declaration, paragraph 41.

Expert Report of David Kalat / Berman v. Freedom Financial, et al.                                       32 | P a g e

120. Verkhovskaya's search methodology takes none of this nuance into account and under-identifies business numbers as a result.

## G.   Analysis Of Dialer Records To Leads

121. The dialer records produced as LEADSCIENCE_000677 ("Dialer Logs") document 5,101,700 rows of data reflecting communications with 730,167 unique telephone numbers.

122. I understand that the Defendants originally produced two sets of leads, identified as FLUENT_000441 and FLUENT_000572 ("Fluent Leads").

123. I compared the Dialer Logs with the Fluent Leads and determined that every call or text documented in the Dialer Logs was placed to a telephone number previously obtained from a lead, with the exception of 20 telephone numbers not contained on either of these data sets.[58]

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*David Kalat*

1/4/2019

---

[58] These 20 numbers are attached as Exhibit 14.

# Exhibit 1

# Curriculum Vitae



**David Kalat**
BERKELEY RESEARCH GROUP, LLC
70 West. Madison Suite 5000 | Chicago, IL 60602
Direct: 312.429.7907
dkalat@thinkbrg.com

## EDUCATION

| | |
|---|---|
| M.L.I.S | University of Illinois at Urbana-Champaign, 2011 |
| B.A. | University of Michigan, 1992, *James B. Angell Scholar* |

## EMPLOYMENT

Director, Berkeley Research Group (BRG), 2015–present
Director, Disputes and Investigations, Duff & Phelps, 2011-2015

Mr. Kalat is testifying expert in electronic evidence and digital forensic investigations. He leads the Chicago digital forensics lab for BRG's Global Investigations and Strategic Intelligence practice group. Prior to joining BRG, Mr. Kalat was with Duff & Phelps' Disputes and Investigations practice, where he managed an international team of forensic examiners and eDiscovery support specialists. Mr. Kalat has over 20 years of experience in digital video, and has applied this knowledge to the forensic examination of video evidence in a variety of contexts including investigations into alleged police misconduct.

## PROFESSIONAL CERTIFICATIONS AND AFFILIATIONS

- Licensed Private Detective (License No. 115.002487), State of Illinois
- Licensed Private Detective (License No. 52430601), State of Texas
- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners (License No. 621469)
- Certified Computer Examiner (CCE), International Society of Forensic Computer Examiners (ISFCE) (License No. 1666)
- Certified Information Systems Security Professional (CISSP), International Information System Security Certification Consortium (ISC)2 (License No. 593527)
- Access Data Certified Examiner (ACE)
- Member, Association of Certified Fraud Examiners Greater Chicago Chapter
- Member, Forensic Expert Witness Association (FEWA)
- Member, ECube (formerly the Chicago Association of Litigation Support Managers)
- Member, Sedona Conference
  - Working Group 1 (Electronic Document Retention & Production) Member, Brainstorming Group – E-Discovery Best Practices for Small Cases;
  - Working Group 12 (Trade Secrets) - Member



**REPRESENTATIVE CASEWORK**

*Digital Forensics*

- <u>Bunnet & Co., Inc. and Energy Feeds International, LLC v. Dores</u>, 1:15cv1104 (W.D. Texas, 2016); also <u>In Re: Frank Miranda Dores and Mary Anne Souza Dores</u>, No. 16-10169-B-13 (Bankr. E.D. Calif.)
  Conducted a forensic investigation of defendant's laptop and webmail in an investigation of theft of trade secrets, and provided trial testimony in Bankruptcy Court that the defendant had taken steps to erase and conceal the evidence that he had misappropriated company documents.
  - Based in part on my testimony, the Court found "numerous instances of egregious conduct coupled with bad faith" on the part of the debtor and dismissed his bankruptcy case.
- <u>Pro Sapiens LLC v. Indeck Power Equipment Co.</u>, 14L5730 (Cook Cnty. Cir. Ct., 2015)
  Conducted a forensic investigation of plaintiff's laptop and webmail in a breach of contract case on behalf of the defendant to determine whether key evidence in the matter had been deleted.
  - Relying on my testimony regarding spoliation, the Court granted the defendant's motion for sanctions and dismissed the plaintiff's cause of action with prejudice.

*Video Analysis*

- In a confidential engagement, examined surveillance CCTV and law enforcement dashcam footage in an investigation into a disputed police shooting.
- Examined surveillance footage for prosecutors investigating an alleged assault on a school bus.
  - My analysis was instrumental in the prosecution's decision not to press charges.

*Electronic Discovery*

- Managed the attorney review and deposition coding on behalf of the testifying expert for Irving Picard, the Trustee in the Bernie L. Madoff Investment Securities liquidation investigation. Responsibilities included selecting and supervising a team of contract attorneys to review a database of over 20 million documents hosted in Relativity.
  - As of September 2017, the Trustee had recovered approximately $12.7 billion, or more than 72% of the principal he said Madoff defrauded from his customers.

*Data Analytics*

- On behalf of a marketing company accused of violating the TCPA, analyzed the dialer's PostgreSQL database to determine exactly what records existed for the hundreds of millions of predictive and robocalls in question.
  - Thanks in large part to this analytical work, the case settled for a fraction of the sums other cases with similar fact patterns did.
- <u>Marcheco v. Jo-Ann Stores, LLC</u>, 1:18cv20564 (S.D. Fla., 2018)
  On behalf of a defendant in a putative TCPA class action, submitted an expert report evaluating the "capacity" of the system used to transmit SMS text messages with respect to the TCPA's definition of an "automatic telephone dialing system."
  - After my report was submitted, the plaintiff withdrew their class claims and settled.

**TESTIMONIAL EXPERIENCE**

- <u>Revitch v. Citibank</u>, No. 3:17cv06907 (N.D. Calif., 2017)
- <u>Marcheco v. Jo-Ann Stores, LLC</u>, 1:18cv20564 (S.D. Fla., 2018)
- <u>Kolodziej v. Justice Park District, *et al.*</u>, 2014 L 775 (Cook Cnty. Cir. Ct., 2014)
- <u>Indeck Energy Services v. DePodesta, *et al.*</u>, 14 CH 602 (Lake Cnty. Cir. Ct., 2014)
- <u>Braver *et al.* v. NorthStar Alarm Services, LLC</u>, 5:17cv00383 (W.D. Okla., 2017)
- <u>C.J. Drilling, Inc. v. Welsh</u>, No. 17 CH 001095 (Kane Cnty. Cir. Ct., 2017)
- <u>Western Union v. Kula</u>, 1:17cv00280 (N.D. Ill., 2017)
- <u>Segerdahl Corp. v. Ferruzza, *et al.*</u>, 1:17cv03015 (E.D. Ill., 2017)
- <u>L&W Supply Corp. v. Banks *et al.*</u>, CV16-00816 (Washoe Cnty. Dist. Ct., 2016)
- <u>Bunnet & Co., Inc. and Energy Feeds International, LLC v. Dores</u>, 1:15cv1104 (W.D. Texas, 2016); also <u>In Re: Frank Miranda Dores and Mary Anne Souza Dores</u>, No. 16-10169-B-13 (Bankr. E.D. Calif.)



- Pro Sapiens LLC v. Indeck Power Equipment Co., 14L5730 (Cook Cnty. Cir. Ct., 2015)
- Geophysical Service Inc. v. Anadarko Petroleum Corp. *et al.*, 1201-15228 (Ct. of Queen's Bench of Alberta, 2014)

## BOOKS AND MONOGRAPHS

- *Day One: The Origin Story of Computer Forensics,* [1] Pratt's Privacy & Cybersecurity Law Report [4] (LexisNexis A.S. Pratt).
- *The Trouble With Mobile Forensics*, ThinkBRGTech.com (October 15, 2015)
- *Anti-Forensics Gets An Upgrade: The Hidden Traps In Today's Latest Technology*, ThinkBRGTech.com (June 27, 2016)
- *Dyn and Dash*, SC Media (December 19, 2016)
- *Understanding the Challenges of Strong Encryption*, Law360 (April 10 & 11, 2017)
- *Outrunning the Lion: Advice for Fighting on the Front Lines of Today's Data Breach Attacks,* (Legal Tech News, December 20, 2017)
- *Fighting on Today's Front Lines*, (InfoSecurity Magazine, Jan. 3. 2018)
- *Nervous System: The Story of the First White Hat Hacker* (Legal Tech News, February 5, 2018)
- *Nervous System: Evaluating TCPA Liability in the Actual Wild West* (Legal Tech News, March 1, 2018)
- *Confronting BIPA Liability in the Blink of an Eye* (ThinkBRG Global I Blog, March 8, 2018)
- *Nervous System: The Boy Who Could Talk to Computers* (Legal Tech News, April 5, 2018)
- *Nervous System: Just the Fax, Ma'am* (Legal Tech News, May 3, 2018)
- *Nervous System: The Small Start of Big Data* (Legal Tech News, June 4, 2018)
- *Nervous System: The AIDS Trojan Makes You WannaCry* (Legal Tech News, July 9, 2018)
- *Nervous System: The Glamour Girl's Secret Privacy Weapon* (Legal Tech News, August 6, 2018)
- *Nervous System: The Tech Revolution is Earlier Than You Think* (Legal Tech News, September 4, 2018)
- *How to Recognize Different Types of Dialers From Quite a Long Way Away* (The Consumer Finance Law Quarterly Report, Volume 72, No. 2 (2018))
- *Nervous System: What Hollywood Has Taught the U.S. Government About Cybersecurity* (Legal Tech News, October 12, 2018)
- *Nervous System: Taking Biometrics at Face Value* (Legal Tech News, November 2, 2018)
- *Nervous System: The Computer That Taught HAL to Sing* (Legal Tech News, December 3, 2018)

## CLE and OTHER LECTURE PRESENTATIONS

- *How to Win Cases Using Digital Forensics and E-Discovery* (CLE, October 24, 2018)
- The Conference on Consumer Finance Law – *TCPA Class Actions* (Panelist, May 31, 2018)
- The DC Circuit Finally Phones In--A Complete Guide to its decision in ACC International v. Federal Communications Commission and what it means for your TCPA case and your business (webinar, Apr. 5, 2018)
- ThinkCLE - *The Art of Settling TCPA Lawsuits* (CLE, Feb. 7, 2018)
- *2017 Lessons Learned - Data Breaches, and Preventing Access Failure Attack* (Presenter on Infosecurity Magazine's Webinar, Dec. 21, 2017)
- P&I DC West Conference – Panelist on *Cybersecurity Track* panel (Oct. 9, 2017)
- ThinkCLE - *Is the Party Over for Professional TCPA Plaintiffs? Challenging the Adequacy & Typicality of Class Representatives* (CLE, Oct. 3, 2017)
- National Business Institute – *How to Get Your Social Media, Email and Text Evidence Admitted (and Keep Theirs Out)* (CLE, June 28, 2017)
- Worldwide Employee Benefits Network Chicago - *What Employee Benefit Plan Professionals Need to Know about Cybersecurity* (May 24, 2017)



- ACFE Chicago - _Digital Forensics is Dead, Long Live Digital Forensics_ (CLE, October 23, 2015)
- ThinkCLE - _How to Realize ROI from your Preservation Efforts_ (CLE, October 22, 2015; July 23, 2015)
- E-Discovery – Issues and Developments (CLE, June 24, 2014)
- National Business Institute – _Find It Fast and Free on the Net: Strategies for Legal Research on the Web_  (CLE, June 25, 2015; April 10, 2014; June 6, 2013; May 23, 2012)

# **EXHIBIT 17**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DANIEL BERMAN,

Plaintiff,

v.                                                          Case No. 4:18-CV-01060-DMR

FREEDOM FINANCIAL NETWORK, LLC,        Hon. Yvonne Gonzalez Rogers
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC, and LEAD SCIENCE, LLC,

Defendants.

## SUPPLEMENTAL EXPERT REPORT OF DAVID KALAT

**SUPPLEMENTAL EXPERT REPORT OF DAVID KALAT** ....................................................... 1

I.    INTRODUCTION ...................................................................................................................... 3

II.    DOCUMENTS AND DATA SOURCES CONSIDERED .............................................. 4

III.    FACTUAL BACKGROUND ................................................................................................ 5

    A.    Online Sweepstakes and the Phenomenon of "Sweepers" ........................................... 5

    B.    Bots ............................................................................................................................... 8

    C.    Server Logs and Data Security ..................................................................................... 9

IV.    ANALYSIS AND OPINIONS ............................................................................................ 10

    A.    Data Security ............................................................................................................... 11

    B.    Data Privacy and Alleged "Destruction" of Server Logs .......................................... 15

    C.    Reporting of Metadata ................................................................................................ 17

    D.    "Implausibly High" Conversion Rates ....................................................................... 18

    E.    Analysis Relating To Alleged "Facially Deficient And Patently False Names And Addresses" 19

    F.    The Placeholders Account For a Trivial Number of Leads .......................................... 21

    G.    Structured Databases .................................................................................................. 21

    H.    Pattern Analysis ......................................................................................................... 22

    I.    Individual Analysis of Leads ..................................................................................... 24

        1.    Dunk Loka (510) 326-9945 ................................................................................. 24

        2.    Kelsey Forsch ███████ 2068 ......................................................................... 25

        3.    Roger Botts ██████ -1371 ........................................................................... 26

        4.    Andrea Clay ██████ -6114 ......................................................................... 28

        5.    Ashlei Rogers ███████ -0642 ...................................................................... 30

    J.    Roboform ................................................................................................................... 30

    K.    Analysis of Complaints .............................................................................................. 31

    L.    Analysis of Call Log Records for 100 Sample Numbers ........................................... 37

I respectfully submit this supplemental expert report to supplement the prior expert report I submitted in the above-captioned matter on January 4, 2019. My qualifications are set forth in detail in that January 4, 2019 report and I incorporate them by reference here.[1]

## I.    INTRODUCTION

1. Plaintiff proposes a class definition that includes *all* recipients of calls and texts involving Defendant Freedom Financial Network, LLC ("Freedom")'s products made to Defendant Fluent, Inc. ("Fluent")'s leads. Plaintiff's position appears to be that the alleged identification of individual issues among *some* of the registrations implicates *all* of them by association.[2] This supplemental report explains why the various technological issues plaintiff raises regarding Fluent's leads do not indicate anything nefarious or fraudulent. Before exploring those issues in depth, it is important to first note how fundamentally trivial they are. After two reports apiece from two separate experts, Plaintiff's contention that Fluent's leads are sourced from anything other than consumers visiting Fluent's websites is based almost entirely upon the observation that some leads contain what appear to be computer-generated "placeholder" data. This issue occurs in *less than one third of one percent* of all the leads. The placeholder issue is not even present in the lead that resulted in calls and texts to the plaintiff, and therefore does not even relate to the circumstances that led to this lawsuit.

2. According to Fluent, its database is populated with information provided by consumers who voluntarily submitted it to a Fluent-operated website as they enrolled in online sweepstakes or other promotions.[3] For each such registration in the Fluent system, the database contains a mix of human-created (such as a name and address) and machine-created information (metadata including the IP address of the user and the browser agent used to submit the data) that together document the provision of consent.

---

[1] My current and updated Curriculum Vitae is set forth as Exhibit 1.
[2] See Motion for Class Certification at 9:8-13
[3] Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery ("Fluent's Responses") at 3:22-4:24. See also Affidavit of Mitenkumar Bhadania, paragraph 17.

3. On December 7, 2018, Benjamin Beecher and Anya Verkhovskaya submitted expert reports ("Expert Reports") that set forth purported "deficiencies" in the lead data produced by Fluent. On January 4, 2019, I submitted an expert report that rebutted the Expert Reports of Mr. Beecher and Ms. Verkhovskaya and showed that the alleged "deficiencies" they cited evaporate on closer inspection. Mr. Beecher and Ms. Verkhovskaya filed supplemental expert reports on February 8, 2019 ("Supplemental Expert Reports") that do not refute any of my conclusions, or even mention my report at all. All of my conclusions from the January 4, 2019 report are therefore unrefuted, and I incorporate all of them here by reference.

4. The opinions expressed by Mr. Beecher and Ms. Verkhovskaya in their Expert Reports and Supplemental Expert Reports are rooted in observations of Fluent's data that are variously taken out of context, misrepresented, and/or interpreted according to faulty assumptions. The specific facts that they observed are real attributes of Fluent's data and I do not dispute those observations. Where we disagree is in the significance or even relevance of those observations. The starting point for our disagreement is on the baseline set of expectations one should reasonably have for the lead data produced by Fluent. By way of analogy, if one were to observe that a particular group of people had an average height of 6'5", it would not be appropriate to opine whether that was unusually tall without first establishing what type of population was being observed: 6'5" is shorter than the expected average for a group of basketball players, taller than the expected average for a group of kindergarden children, and exactly the expected average for a group of men from the Netherlands. The problem at the core of Mr. Beecher's and Ms. Verkhovskaya's opinions is their failure to consider Fluent's operations *as a lead generator using sweepstakes and other promotions*.

## II.    DOCUMENTS AND DATA SOURCES CONSIDERED

5. My understanding of the factual matters at issue is based on my review of the documents and data described below. I understand that additional information relevant to my opinions may be

---

disclosed in subsequent productions and depositions. Accordingly, I reserve the right to amend my findings based upon such additional disclosures.

    a.  Fluent_00441 (Lead/Registration Records from 4/27/2017-3/31/2018)

    b.  Fluent_00572 (Lead/Registration Records from 3/31/2018-4/12/2018)

    c.  Fluent 100 Numbers Updated (00132124xCDD31) (Lead/Registration Records for sample of 100)

    d.  LeadScience_000677 (Outbound Call Logs)

    e.  LeadScience_005228 (Opt-Out Responses)

    f.  Fluent_000573 (Metadata Table)

    g.  Second Amended Complaint

    h.  Motion for Class Certification

    i.  Declaration of Jon B. Fougner and Exhibit A: Wrong-Number Complaints

    j.  Expert Report of Anya Verkhovskaya (Dec. 7, 2018)

    k.  Expert Report of Benjamin Beecher (Dec. 7, 2018)

    l.  Supplemental Expert Report of Anya Verkhovskaya (Jan. 8, 2019)

    m.  Supplemental Expert Report of Benjamin Beecher (Jan. 8, 2019)

    n.  Fluent Inc.'s Responses and Objections to Plaintiff's First Set of Discovery

    o.  Affidavit of TCPA Prior Express Written Consent, by Mitenkumar Bhadania

    p.  Declaration of Mitenkumar Bhadania in Support of Defendant's Reply Motion

## III.    FACTUAL BACKGROUND

### A.    <u>Online Sweepstakes and the Phenomenon of "Sweepers"</u>

6.  Fluent is a digital marketing company that owns and operates consumer-facing websites that offer various opportunities including enrolling in online sweepstakes.[4] This fact is a critical precondition for understanding the nature and form of the data that has been produced.

---

[4] I have encountered Fluent in prior casework and know from experience that their lead generation operations include earning rewards, receiving job listings, obtaining product samples, and other consumer transactions, however the discussion set forth in the pleadings I was provided in this matter specifically reference sweepstakes.

7. For example, I understand that there are sub-communities of Americans for whom entering online sweepstakes is a hobby. A 2011 television documentary *High Stakes Sweepers* by the cable network TLC publicized the phenomenon of "sweepers."[5] The law firm Thompson Coburn LLP discussed the implications of this hobby in an October 31, 2017 blog. The authors noted that an "extensive cottage industry has sprung up around sweepstakes and other promotions. Clubs, apps, and various online resources curate instant information about all available sweepstakes and provide consumers with a direct line to enter the promotions. The stated goal is to provide access to as many sweepstakes as quickly as possible."

> "Most Sweepers rely on apps created by sweepstakes companies to find promotions they want to enter. These apps list hundreds of sweepstakes and contests throughout the U.S. and allow Sweepers to search for specific types of sweepstakes and contests… A few of the most popular sweepstakes companies include The Balance Sweepstakes Directory, Online-Sweepstakes.com, and Sweepstakes Sweep.

> There are also companies that provide Sweepers with daily lists of sweepstakes and contests consumers may want to enter, which saves the Sweeper a great deal of time finding the sweepstakes on their own. These companies include: Daily Sweep Lists and Lots of Prize Promotions.

> Most Sweepers also use another valuable tool called "auto-fills" that enable them to enter their name, address, phone number, etc., onto an entry form at the push of a button. All Sweepers have to do is to enter their contact information into the autofill app and then they can enter a sweepstakes in a matter of seconds. The most popular autofill companies appear to be Roboform and LastPass.[6]

---

[5] This August 14, 2011 TLC program can be viewed online at https://www.youtube.com/watch?v=eqfBCGyfp8g.
[6] Dale Joerling, "How Consumers 'Sweepstakes' Today: There's An App For That," Thompson Coburn LLP (October 31, 2017), accessible at https://www.thompsoncoburn.com/insights/blogs/sweepstakes-law/post/2017-10-31/how-consumers-sweepstakes-today-there-s-an-app-for-that, and attached as Exhibit 2.

8.  In my research I have found there are websites that sweepers use to organize their community, exchange advice; and link to sites that offer sweepstakes. Examples of these sites include Sweepstaking.net, SweepstakesAdvantage.net, SweepstakesWorld.com, OnlineSweepstakes.com, and SweepersChoice.com. These sites provide resources and interactive message boards for sweepstakes enthusiasts.

9.  According to the media coverage that these sweepstakes enthusiasts have received, it is not uncommon for sweepers to submit hundreds of online sweepstakes entries every day, in the hopes that increasing the volume of submissions will increase their odds of winning.

   a.  In an article in the *Washington Post*, one such enthusiast recommended that sweepers spend up to two hours a day submitting entries ("That's enough to win plenty, but not so much you cut into work, family time and other obligations" she said) and estimated she herself submitted 36,000 entries a year ("It truly is a numbers game," she said. "You can't win if you don't enter. And the more you enter, the more chances you have to win.")[7]

   b.  Sweeper Cynthia Kendall told the *Chicago Tribune*: "I get up before the kids and spend half an hour or an hour each morning. I created a separate Gmail account for contesting and a separate Facebook account for contesting, and I just go to these contest sites and put in my information. I enter between 50 and 100 a day. But it's autofill, so it's just hitting my e-mail address and saying "send."[8]

   c.  Another "Contest Queen" was profiled by ABC News in 2011 in connection with the afore-mentioned TLC broadcast. This sweeper, Carolyn Wilman, offers sweepstaking advice on her website ContestQueen.com and in her book *You Can't Win If You Don't Enter*. Wilman told ABC News she enters "an

---

[7] Elisabeth Leamy, "Winning Contests and Sweepstakes Isn't Just Luck: Ask the Sweepers," *Washington Post* (September 7, 2017), attached as Exhibit 3.

[8] Anne Ford, "Meet Chicago's Contest Queen: She Enters Up to 100 Sweepstakes a Day—and Once Won $100K," Chicago Tribune (April 2, 2018), attached as Exhibit 4.

average of 100 to 300 contests per day" and offers the advice that "To win, you must enter. The more you enter, the better your odds."[9]

10. Given that Fluent uses social media and other marketing to entice consumers to visit their web pages to enroll in a sweepstakes or other promotion, and enthusiasts actively seek out online sweepstakes, it is reasonable to assume that some number of enthusiasts visited Fluent's web pages. Although the exact proportion of Fluent's leads that originated from sweepstakes enthusiasts is unknown, and difficult to quantify without interviewing the individual consumers themselves, it should reasonably inform the expectations of an analyst observing Fluent's leads to consider the role that enthusiasts may play in shaping that data.

11. In their Expert Reports of December 7, 2018, both Mr. Beecher and Ms. Verkhovskaya draw or imply various adverse conclusions from the observations that Fluent's data contains numerous entries for some of the same names; that some of these multiple leads contain identically formatted information; and that some leads contain artifacts of autofilling processes. In his Supplemental Expert Report, Mr. Beecher questions whether the conversion rate for Fluent's websites appears higher than a supposed "average." Each of these attributes can be explained as the result of a population of especially motivated users being driven to the web sites in question.

### B.   Bots

12. Mr. Beecher's supplemental expert report asserts that "[m]any of Fluent's leads were driven by computer-generated bots (or inserted directly into the database) rather than real people submitting a form on the website."[10] Mr. Beecher further subdivides this opinion into individual issues, which are addressed in section IV below.

13. A "bot" is a popular colloquial term for a piece of software that is programmed to perform autonomously on a computer network, such as the Internet, to execute some predetermined

---

[9] Sabrina Parise and Jennifer Pereira, "The Contest Queen's Five Tips For Sweepstakes Success," ABC News (August 11, 2011), attached as Exhibit 5.
[10] Supplemental Expert Report of Benjamin Beecher p. 11.

task. The typical purpose of a bot is to perform a simple and repetitive task more efficiently than a human would. The most common form of bot is a "web spider" or "web crawler" that visits web sites and collects information about their content and activity, to be used by search engines such as Google to respond to search queries.[11]

14. If Mr. Beecher's premise that bots are responsible for many of Fluent's leads were true, those leads were created because a software application was programmed to perform the steps that entered that information into Fluent's database. As discussed more fully below, there are a wide variety of different types of leads in that database, with a diverse array of distinctive characteristics. No pattern has emerged to support the inference that bot activity created these diverse types of leads. Rather than concluding that finding hundreds of leads that are all formatted differently from one another means they came from the *same* source, it is more likely their differences resulted from originating from *different* sources—that is, the different consumers who visited those websites.

### C.     Server Logs and Data Security

15. Web servers generate logs of activity that record information about every request made to that server. This information will include the IP address from which the request originated, and the "user agent" (in this context, the web browser), along with other details. Some of this information is relevant to documenting the consumer's consent, and some of the information is relevant to the web site's administrator to maintain its security.

16. Reviewing the logs can identify patterns indicative of malicious bots. For example, if the web logs show that a disproportionate volume of traffic is coming from a single IP address located in China, and the user agent field is blank, that would be a potential red flag. Administrators can review logs to identify such patterns and then take action such as blocking that IP address.

17. In a standard web server scenario, a site administrator hosts web content on a computer that they control. That computer, which is the server, receives requests from users over the Internet

---

[11] See, for example, https://www.incapsula.com/blog/know-your-top-10-bots.html.

and responds by sending data. An alternative scenario is for the web administrator to contract with a "Content Delivery Network" or "CDN." A CDN is a company that operates a network of computers across a large geographic area, and places some or all of the website content from its various customers on those many computers. In this way, the content of a website is not hosted on a single computer but is in fact on many computers. When a consumer on the Internet attempts to visit that web page, some or all of the content will be delivered to them from a computer geographically close(r) to them.

18. One of the advantages of using a CDN system is that it makes the user experience better, because web pages load faster. For web sites that experience heavy traffic or spikes in traffic, distributing that traffic across a number of servers balances the demand and helps avoid traffic jams. As an added advantage, a CDN provider may have superior security resources and technology available to it than the smaller organizations that are its customers.

19. I am informed that Fluent uses the CDN provider Cloudflare for the web sites that gathered the lead data at issue in this case. This has several positive consequences for the security of Fluent's sites, that are discussed more fully below.

## IV.    ANALYSIS AND OPINIONS

20. Mr. Beecher's Supplemental Expert Report expresses two different categories of opinions. The first category concerns the circumstances surrounding Fluent's operations and production of data. Specifically, Mr. Beecher argues that Fluent has inadequate data security measures in place, has produced leads in an unsatisfactory format, did not retain certain types of data, and that the leads overall indicate an atypically high conversion rate. None of these arguments, even if they were valid, serve as direct evidence that any of the Fluent leads were not voluntarily submitted by consumers visiting Fluent's web sites.

21. The second category of opinions presented by Mr. Beecher do present specific examples of lead data that he claims are evidence of bot-driven activity. These examples predominantly

involve the presence of "placeholder" values (such as "{FIRSTNAME} | {LASTNAME}") in some leads instead of human-created Personal Information.

22. I address the circumstantial arguments individually below first, and then the issues related to placeholder values and other specific arguments.

### A. <u>Data Security</u>

23. The first argument that Mr. Beecher puts forth in support of his claim that "[m]any of Fluent's leads were driven by computer-generated bots (or inserted directly into the database) rather than real people submitting a form on the website" is his assertion that the absence of a CAPTCHA toolbar on the Fluent websites constitutes a "failure" to "ensure that a human actually entered the data."[12] This is like arguing that if a house is left unlocked, that constitutes proof that it was robbed. Nevertheless, in this case Fluent has not left the house unlocked.

24. As I noted in my prior report, CAPTCHA toolbars are not an infallible mechanism to differentiate humans from machines. Google determined as long ago as 2014 that software could effectively overcome CAPTCHA puzzles "with over 99% accuracy," rendering those tools essentially useless for their stated purpose and serving only to confound legitimate human users.[13]

25. When web designers and site administrators select the desired security mechanisms, several factors go into that decision. These factors include the nature of the data being protected, the risks posed to that data, and the cost-benefit tradeoffs of different security solutions with respect to the intended use of the web site in question. Although the use of a CAPTCHA toolbar would be one possible mechanism by which to ensure that only humans submit information to the database, it is not the only mechanism nor is it the best. Other mechanisms, such as the requirement to complete a multi-page survey in order to submit information, serves as a barrier to bots.

---

[12] Supplemental Expert Report of Benjamin Beecher paragraph 32. This argument also appeared in Mr. Beecher Expert Report of December 8, 2018, pp. 5-6.

[13] See Google Security Blog from April 16, 2014, attached as Exhibit 13 to my expert report of January 4, 2019.

26. By way of comparison, Mr. Beecher's own software consultancy company Lightmatter permits visitors to submit inquiries without first passing a CAPTCHA test:[14]



Consider also that if a reader of Mr. Beecher's Supplemental Expert Report followed his link to the article "When Websites Won't Take No For An Answer" at the *New York Times* and was motivated to send a letter to the editor in response, that person could easily submit a letter online without confronting a CAPTCHA:[15]



---

[14] https://lightmatter.com/contact.html
[15] https://help.nytimes.com/hc/en-us/articles/115014925288-How-to-submit-a-letter-to-the-editor

If a consumer wishes to submit a complaint to the Consumer Financial Protection Bureau, they can do so by filling out a multi-page online form—and no CAPTCHA is used to verify their humanity first.[16]



27. I do not present these anecdotal examples to suggest that Lightmatter, the *New York Times*, or the CFPB are deficient in their information security, but rather to demonstrate that each site makes security decisions based on its own balance of perceived risks versus perceived benefits, and the use of CAPTCHA is not always the most appropriate tool to manage interactions with users.

28. In the case of Fluent's interactions with sweepstakes entrants, the choice of what security solution to use may have been influenced by the ways in which that particular population has been known to interact with CAPTCHA tools. In reviewing the various online forums identified above, I observed that many people who enter online sweepstakes have publicly

---

[16] https://www.consumerfinance.gov/complaint/

voiced their complaints about having to get past CAPTCHAS in order to submit entries.[17] In fact, at least one of the sweepstakes-enthusiast websites I reviewed actually markets anti-CAPTCHA software to other sweepers. For example, Sweepers Choice advertises its anti-CAPTCHA software to its subscribers as a member benefit as follows:

> Usually the software gets the CAPTCHAs 100% correct. If however, it doesn't - it will try again with a new captcha several times until it figures it out. It does this just like a real human would, except you get to avoid the headaches and enjoy seeing it done for you! As well - as old sweepstakes expire, new ones are added in - so you almost always have up to an additional 400 CAPTCHA sweepstakes, every single day![18]

29. As an alternative to CAPTCHA technology, I understand that Fluent uses the Cloudflare platform to manage access to its websites. Among its various offerings, Cloudflare controls IP access to Fluent's sites to block access to IP addresses known to be associated with bots; and dynamically scores ongoing IP and user agent activity to identify "bad behavior." Cloudflare's analytical tools examine the interactions with incoming IP addresses to update that blocklist over time based on traffic analysis.[19]

30. Mr. Beecher also cited the "failure to use HTTPS" as one of his reasons for concluding that the Fluent leads were created by machines rather than people. HTTPS is a protocol for encrypting the traffic between the user and the website to secure it from eavesdropping or tampering. Although it is generally true that using HTTPS is preferable from a security

---

[17] For example, see the discussions "The darn Captchas…" at Online Sweepstakes.com (accessed at http://forums.online-sweepstakes.com/showthread.php?s=8370dc2cd9c0211fe21788eea270828e&t=1431862) and "Captcha Issues" (accessed at http://forums.online-sweepstakes.com/showthread.php?t=1361952, both discussions are set forth as Exhibit 6.) Also see the article "What to do when CAPTCHAS won't work" at thebalanceeveryday.com (accessed at https://www.thebalanceeveryday.com/what-to-do-when-captchas-dont-work-897057 and set forth as Exhibit 7.)

[18] http://sweeperschoice.com/products-captcha.php, set forth as Exhibit 8.

[19] A Cloudflare whitepaper available on Cloudflare's website (www.cloudlfare.com) is attached as Exhibit 9.

standpoint, there are other factors that play into each web administrator's decision making.[20] For example, use of HTTPS can create challenges for administrators using a single server on a single IP address to host multiple domains. It is an additional relevant factor that Fluent's websites do not exchange financial information with their users.

31. While most security experts would likely agree that using secured, encrypted channels of communication over the Internet is preferable, the fact is that much user activity on the Internet, even on popular and well-established sites, is often not over HTTPS. As of August 2018, just 50% of the Alexa ranked Top 1 Million web sites are served over HTTPS.[21] However, the implementation of Cloudflare as a CDN service means that Fluent's traffic is encrypted over part of its journey. As a CDN, Cloudflare sits between the end user and Fluent's web server, and stores its own local copies of some of Fluent's web site content. The traffic that passes through Cloudflare is encrypted and decrypted on that leg of the journey, even if HTPPS is not configured for the site's web server itself.[22]

### B.      Data Privacy and Alleged "Destruction" of Server Logs

32. Plaintiff accuses Defendants of "intentionally destroying" the server logs, and describes this as "spoliation."[23] In light of this harsh accusation, Fluent's responsibilities towards data privacy are relevant. In order to comply with the variety of data privacy regulations and laws, it is best practices for organization to *only* store data for which there is a direct and specific business need, to *only* store that data for the minimum period of time necessary to serve that need, and to *only* store that data in the form and format that can be best protected from unauthorized disclosure or breach.[24]

---

[20] For example, some older browsers cannot interact with HTTPS encrypted sites, and the process of encrypting and decrypting the traffic slows down performance.

[21] https://scotthelme.co.uk/alexa-top-1-million-analysis-august-2018/ attached as Exhibit 10.

[22] See "Cloudflare, SSL and Unhealthy Security Absolutism" at Troy Hunt's blog, accessible at https://www.troyhunt.com/cloudflare-ssl-and-unhealthy-security-absolutism/ and set forth as Exhibit 11.

[23] Motion for Class Certification at 21:19-26.

[24] My firm, Berkeley Research Group, offers GDPR and data privacy compliance consulting. I have worked alongside these compliance consultants and am familiar with their advice and guidance.

33. According to the European Union's General Data Protection Regulation (GDPR), web server logs are classified as protected personal information.[25] The GDPR, and comparable data protection regulations modeled on it such as the California Consumer Privacy Act, A.B. 375, regulate the extent to which companies are permitted to store such information.[26] Each use of personal data requires a legal basis for the processing (Article 6). This includes the *storage* of personal data (Article 4(2)). When all legal bases for using or storing the information have expired, the data *must be deleted*.

34. Fluent has business needs for the information contained in the web server logs, but these needs are bifurcated into security-based needs and marketing-based needs. Fluent's web logs contain far more personal technical information than is required to perform the marketing function for which that data was originally collected. From a security standpoint, some log information is relevant to monitor traffic, prevent fraud, debug systems, and investigate the causes of any attack or a breach. These needs are not indefinite. Once the security-based uses for this additional information have expired, Fluent has an obligation to delete the additional information and only retain the data needed for marketing (and any other ongoing legally justified purposes). In this respect, Fluent copies the specific data needed to support the marketing uses to a more secure location for extended retention.

35. The marketing-based needs require Fluent to maintain records to document the consumer's consent. This does not, however, equate to requiring Fluent to retain this information in its original form if that form is insecure or otherwise violates data privacy protocols. As noted above, the consent information contains personal data that requires protection and which, in accordance with the GDPR and other data privacy regulations, may need to be provided and/or

---

[25] IP addresses are specifically defined as personal data per Article 4, Point 1; and Recital 49. The data regarding the referral and landing page URLs can also be considered personal information in certain circumstances.

[26] The GDPR is extra-territorial, meaning that it applies to the personal data of any European Union subject regardless of whether that data is collected and stored outside of the European Union. Any organization that reasonably expects the possibility that data belonging to Europeans might be obtained is obliged to comply with the GDPR. Because the scope of the GDPR is so expansive, companies that shape their policies to comply with the GDPR are likely to be in compliance with all other data privacy regulations as a result.

destroyed upon request from the individual person. The format of the server logs in which this data is captured is very poor from all of these perspectives—server logs are in unencrypted plaintext and are stored directly on a computer that is connected to the Internet. This makes them more vulnerable to unauthorized access and disclosure than other forms of storage. The logs are also text files not well suited to searching. By transferring the essential data out of the server logs and into a database, Fluent is better suited to manage, document, control, and protect the personal information. The server logs can be purged after whatever time frame meets the needs of the administrator's security management, minimizing the risk of exposure to the personal information they contain and complying with the edict to "Hold on to information only as long as you have a legitimate business need."[27]

### C.     Reporting of Metadata

36. Mr. Beecher accused Fluent of "refus[ing] to produce commonly available data… that would help confirm whether it was indeed obtaining consumer contact data and telemarketing consent from real, unique human beings or not."[28] This information consists of metadata listing the device type and browser associated with each IP address request to Fluent's web servers.[29]

37. This metadata has been produced, for an agreed-upon sample of 100 numbers.[30] I understand that this data sheet contains all of the requested data points for these 100 telephone numbers.

38. Additionally, the prior production of lead data was found to have listed internal IP addresses of Fluent's servers (127.0.0.1, 192.168.100.48 and 172.24.32.94) for a significant portion of the leads, instead of the external IP address from which the user traffic originated. As explained in the Declaration of Mitenkumar Bhadania and which was addressed as unrefuted analysis in my expert report of January 4, 2019, this was a consequence of how the database stored

---

[27] See "Start with Security: A Guide for Business" published by the Federal Trade Commission. This is accessible at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business, and a copy is attached as Exhibit 12.
[28] Supplemental Expert Report of Benjamin Beecher paragraph 38.
[29] Supplemental Expert Report of Benjamin Beecher paragraph 40
[30] Fluent 100 Numbers Updated (00132124xCDD31)

information and how the tables were joined.[31] For the updated production of data of these 100 sample numbers, Fluent has exported the external IP address from which the user traffic was logged, demonstrating that the user IP addresses are maintained in the system and can be produced. I examined the new data production and confirmed that the IP Address field is populated for each of these 100 sample numbers, and does not contain any instances of the IP addresses 127.0.0.1, 192.168.100.48 or 172.24.32.94.

### D.   "Implausibly High" Conversion Rates

39. In paragraph 49 of his Supplemental Expert Report, Mr. Beecher expresses the opinion that the conversion rates represented by Fluent's data (that is, the rate at which visitors to Fluent's websites registered to receive marketing communications) is "implausibly high." To support this opinion, Mr. Beecher cites to a 2017 article by Christine Austin. Mr. Beecher summarized Ms. Austin's article as suggesting the average conversion rate was 2.35% at that time. Mr. Beecher, however, misrepresents the actual conclusions of her article.[32]

40. In fact, Ms. Austin cited that figure in order to *challenge it*. She points out that "Factors like your industry, product or service, and your target audience all weigh in on your ability to convert visitors into leads, and leads into customers." She notes that "[t]he best conversion rate varied significantly across all the industries," and refers her readers to research by Unbounce that studied the performance of 74.5 million visits to more than 64,000 lead generation landing pages. The Unbounce study found that on average a 12% conversion rate is "pretty good for lead generation landing pages," but that for lead generators in the credit and lending space, a conversion rate of 24.3 was possible.[33]

---

[31] Declaration of Mitenkumar Bhadania in Support of Defendant's Reply Motion, paragraphs 6-13

[32] Mr. Beecher cited to this article as his sole support for his conclusion, but did not attach a copy as an Exhibit. The article is accessible online at https://www.impactbnd.com/blog/what-is-a-good-landing-page-conversion-rate, and I have attached a copy as Exhibit 13.

[33] The Unbounce research is accessible online at https://www.conversionbenchmarkreport.com and a copy is set forth as Exhibit 14.

> "The industries that do best at lead gen are Travel, Credit & Lending, Business Consulting and Vocational Studies & Job Training. In these industries, you can realistically target landing page conversion rates over 12%. The very best pages convert over 25% of their visitors."

41. Neither the Austin article nor the Unbounce report directly mentioned the role that sweepstakes offers play in conversion rates, but it is reasonable to conclude that the sweepstakes enthusiasts who regularly submit multiple submissions and repeatedly return to the same lead generation website over time to send additional submissions will boost the conversion rate for certain Fluent websites as compared to lead generators who rely solely on the persuasiveness of their online sales pitch to convince visitors to register.

### E.     Analysis Relating To Alleged "Facially Deficient And Patently False Names And Addresses"

42. This case originated because of communications made to Plaintiff Daniel Berman resulting from a lead registration recorded on December 24, 2017, containing Mr. Berman's telephone number 510-326-9945, along with the apparently unrelated email address buffola@gmail.com, the evidently fictional name "Dunk Loka," and an incomplete street address of "Grand Street" (with no house number).[34] Mr. Berman stated under oath that he did not submit this Registration Information to Fluent; and its disparate contents contain a mix of fictional information and scraps of real but unconnected consumer information.

43. When plaintiff claims that the Fluent leads contain "facially deficient and patently false names and addresses,"[35] and Mr. Beecher claims that "[m]any of Fluent's leads were driven by computer-generated bots (or inserted directly into the database) rather than real people submitting a form on the website,"[36] these statements create the impression that Fluent's lead data is replete with examples similar to the "Dunk Loka" lead. The implication is that the

---

[34] Affidavit of TCPA Prior Express Written Consent, by Mitenkumar Bhadania paragraphs 6-16.
[35] Motion for Class Certification at page 6, footnote 4.
[36] Supplemental Expert Report of Benjamin Beecher p. 11.

database is polluted with leads that cannot have been sourced from consenting consumers because they do not contain real consumer information. However, this is not the case. Indeed, neither Mr. Beecher nor Ms. Vekhovskaya in either one of the two expert reports submitted respectively by each expert identified even a single lead other than the "Dunk Loka" that contained fictional information.

44. The only evidence that Mr. Beecher puts forth to demonstrate what in his estimation are direct examples of machine-submitted leads are the instances of placeholder entries such as {FIRSTNAME} | {LASTNAME} in place of the consumer's name in a trivial number of registrations is the influence of computer-generated bots or comparable software processes at the time the leads were registered.[37] It is Mr. Beecher's personal speculation that ***the only possible explanation*** for the presence of these placeholder entries is that they were written to the database by bots.

45. As I stated in my prior report, while I agree that these entries are likely the result of some kind of software or database process, there is no evidence to suggest that this process or processes *must* be occurring at the time the lead data is registered, as opposed to at any subsequent point in time, nor is there any evidence that the process(es) in question must be malicious software as opposed to technological tools used by humans. Mr. Beecher expresses just his speculative supposition, based on circular logic: he argues that the handful of times he found these {FIRSTNAME} | {LASTNAME}-style entries were evidence that "the computer program likely typically covers its tracks, but failed to do so in these instances."[38] In other words, the times he found these entries are evidence of a bot, and the times he did *not* find them are *also* evidence of a bot.

46. I have conducted an extensive analysis of these entries, as described below, and it is my opinion to a reasonable degree of scientific certainty that these placeholder entries are not indicative of

---

[37] Supplemental Expert Report of Benjamin Beecher paragraphs 45-48.
[38] Supplemental Expert Report of Benjamin Beecher, paragraph 45.

bot activity, but are wholly consistent with the leads being entered by individual consumers as Fluent has stated.

### F.    The Placeholders Account For a Trivial Number of Leads

47. I conducted a search of the 890,595 rows in the lead data produced by Fluent for any instances of so-called "special characters" such as {}[]$#:* and identified that 888,103 of those rows, or 99.72%, do not exhibit any such placeholder values.[39] In other words, the total occurrence of this "placeholder" data issue affects ***less than one-third of one percent*** of the leads. Of the rows of lead data that do contain one or more placeholder values, the majority of these affect only the address field—this occurs in 785 leads, or 0.09% of the total.

### G.    Structured Databases

48. To better understand what these placeholder values are, and what they might represent, some background on relational databases is necessary. The term "structured data" refers to databases designed to be optimized for machine-readability, as distinguished from "unstructured data" designed for human use. Unstructured data has ambiguities that humans resolve through context. For example, "1984" can refer to a number, a year, a book, a movie version of the book…the reader needs context to glean the intended meaning. By contrast, machine-readable databases derive meaning from structure, not context. They sort data values into individual cells whose *position* defines their meaning. Users of spreadsheet programs like Excel will be familiar with the idea that a header row can specify the types of values to be listed underneath in that column, and the data type of the column can be set to only accept certain forms of data.

49.  Databases are electronic software that use special types of binary data to define the boundaries between cells, columns, and rows, and to identify where one row of data ends and another begins. These elements of binary data are used to create and maintain the structure of the database, which is essential to deriving meaning from the values stored in it.

---

[39] My workpapers documenting this analysis are attached in native form as Exhibit 15.

50. All binary data are stored in *physical form* in the system's memory as either electrical or magnetic charges in some kind of media. At the disk level, every 1 and 0 is a physical object. Inevitably, these physical objects sometimes fail or decay. While sophisticated systems employ a variety of error-checking and fail-safe mechanisms to minimize the risk of data loss, some individual physical failure is unavoidable. The technical term for this is "corruption." Depending on the extent and location of the corruption, it may manifest as either garbled data or data that appears in the wrong location.

51. I have experience designing and maintaining various types of relational databases, and in my practice I routinely forensically preserve, extract data from, and analyze data from relational databases. This experience includes open-source systems, proprietary systems, large-scale enterprise systems stored on local data centers, cloud-based database systems, and legacy systems running unusual or obsolete platforms. It is routine and expected to encounter some degree of data corruption in even the best-maintained and up-to-date of systems.

52. Additionally, there is a degree of data distortion that can occur when information is extracted from a database for export. The form in which the database is stored on the database server may be encrypted and/or in a special proprietary file format, with information scattered across multiple tables, and special reserved data elements used to draw the boundaries between cells. When data is extracted from such a system, it may be exported to a common, open-source file format such as a comma-separated-values (csv) spreadsheet. A common problem that I have observed frequently in my case work occurs when the delimiter used for the export file is a character that occurs in the data itself—for example, if a csv file uses commas to separate values, but commas also appear within the fields. This can cause the exported file to show improper data that requires manual scrubbing to correct.

### H.   Pattern Analysis

53. A bot is a software application executing an automated series of steps—it is programmed to do certain things, and so it does those things. By faithfully performing those automated steps

over and over, a bot leaves behind a pattern of activity that can be recognized. One way to identify bot activity is to perform pattern analysis.

54. Mr. Beecher's presumption regarding the placeholder values is that they represent data fields entered by bots. I analyzed the lead data in SQL for patterns evidencing correlations between leads that contained placeholder values and the source IP, the date ranges they were logged, the geographic region of the personal information, or any noteworthy distribution of when and how these placeholder values appear. I found no recognizable pattern.

55. Generally speaking, the most common placeholder values found in Fluent's data are the ones that use curly brackets around capital-letter header names. These are:

    a.  {FIRSTNAME}

    b.  {LASTNAME}

    c.  {ADDRESS}

    d.  {CITY}

    e.  {STATE}

    f.  {ZIPCODE}

56. However, while it is generally the case that in the limited number of leads where a placeholder value is found, it is likelier than not to be one of these, no meaningful pattern emerges. The curly-bracketed placeholders are not associated with any particular time frame, they are not associated with any particular IP address, and they are not even associated with themselves. For example, finding a {FIRSTNAME} in the First Name field does not necessarily mean {LASTNAME} is in the Last Name field, although sometimes it is.

57. The most striking fact about these placeholder values is that there are different types of them in the data. Just considering the types of placeholders that may appear in the Last Name field includes the following:

    a.  *[subscriber_lastname_capitalized]*

    b.  {LASTNAME}

    c.  {last}

     d.  [$LAST_NAME$]

     e.  [last_name]

     f.  *[subscriber_lastname_capitalized]*

     g.  #NAME?

     h.  {lt}

58. If the placeholder values were, as Mr. Beecher argues, the result of bot-entered leads, then the proliferation of these types would mean there were at least eight different types of bots, each programmed differently, that used different placeholders from each other. Accounting for all the many variations of how the placeholders appear in the data would actually tend to suggest that *thousands* of uniquely programmed bots were somehow at work—but that this army of malicious software was used to write less than one-third of one percent of the leads into Fluent's database.

## I.    <u>Individual Analysis of Leads</u>

59. I discuss below five leads to illustrate their diversity in practice. These were selected as representative of key attributes of the data, but are not meant as a comprehensive catalog of the types of data to be found in the leads.

### 1.   *Dunk Loka (510) 326-9945*

60. The "Dunk Loka" lead contains a combination of fictional and incomplete information along with the cellular number used by Mr. Berman. The IP address logged for this lead 73.252.203.130. No other leads are listed as coming from that IP. No other leads use the name "Dunk Loka" or the phone number found on this lead. It is distinctive, even unique.

61. This lead exhibits none of the attributes that Mr. Beecher and Ms. Verkhovskaya listed as signs of bot activity: there are no placeholder values in any of the fields; the IP address is not one of Fluent's internal servers and is geographically consistent with the physical address used in the lead; and it is a single lead with no duplicate entries. If these attributes are, as plaintiff's experts contend, signs of bot activity, then *this* lead was submitted by a different bot than the others.

Or, as is far more likely, this lead was submitted by a person on Fluent's website through the normal process of obtaining leads—the identity and motive of that person remain to be established.

### 2.   *Kelsey Forsch* ████-2068

62. The lead for "Kelsey Forsch" is among the 100 sample numbers requested by plaintiff for which expanded lead information was separately produced. None of the data fields in her lead contain any placeholders or special characters. All of the personal information in this lead is corroborated by public records. Both LexisNexis and TLO independently corroborated that a Kelsey Forsch lives at 906 Yale Avenue, Billings, Missouri 59102, and uses the email address kelsey.forsch73@gmail.com.[40] Neither service connected the phone number ████-2068 to her, but they also did not connect that phone number to anyone else either—the technical term for this is "no append." A "no append" means the data vendors have no records pertaining to that phone number. This is a common occurrence with cellular numbers, because there is no nationwide directory of cell numbers. The lead was logged from an iPhone on February 17, 2018 on an IP address associated with Spectrum/Charter Communications, a telecommunications provider that serves Missouri (and other regions).

63. This particular lead is in many ways representative of the majority of the leads in Fluent's system. In my prior report I conducted research on a sample of 16,270 registrations to demonstrate that the personal data they contained was consistent with actual personal data for the people identified in the leads. As I previously reported, my analysis of that statistically valid sample found that 88.89% of the sample leads I tested corroborated the name and/or address from the lead to public records from one or more sources indicating the same person. I also determined that 88.7% of the email addresses in those sample leads are valid email addresses verified by their providers to be associated with actual users to whom emails can be

---

[40] The LexisNexis and TLO records for Ms. Forsch are attached as Exhibit 16.

directed, and none of the emails I tested showed any evidence of having been obtained through any means other than the direct input by actual users.

64.  Therefore, for one or more spam bots to have submitted these leads, any scraping, harvesting, or generating of the associated email addresses would have had to occur without being detected by the compliance tools used to prevent that activity. The bot or bots would also have to have access to an existing database of accurate consumer personal information, correctly associating names and addresses.

### 3. *Roger Botts* ████-*1371*

65. The registrations for Roger Botts and telephone number ████-1371 illustrate the presence of different but equally corroborated personally identifying information in different registrations over time.

66. The first registration for this phone number was logged on September 8, 2017 at 9:21 pm. According to the data produced by Fluent, this registration was made by "Roger Botts" of 1208 Tay Mac Rd, Taylorsville, Georgia, and Mr. Botts supplied the email address doylebotts11@icloud.com. According to records obtained from both LexisNexis and TLO, Roger Botts is associated with telephone number ████-1371 and with the email address doylebotts11@icloud.com.[41] Most significantly, both LexisNexis and TLO identify his primary address as 1208 Taylorsville Macedonia Road, Taylorsville, Georgia. Neither database renders this as "Tay Mac Road," however this appears to be a colloquial nickname that locals use for that road.

67. In addition to registrations associating this phone number with 1208 Tay Mac or Tay-Mac Road, some of the registrations identify Mr. Botts' address as PO Box 286, Oakman, Georgia. As it happens, both the LexisNexis and TLO reports for Mr. Botts also identify this as an alternate address also associated with that person.

---

[41] The LexisNexis and TLO records for Mr. Botts are attached as Exhibit 17.

68. Some of the registrations give Mr. Botts' first name as "RD" instead of "Roger." The LexisNexis and TLO reports identify Mr. Bott's middle name as "Doyle."

69. There are 74 registrations for Mr. Botts in all, and they cover a range of 62 unique IP addresses, every single one of which is an IP address allocated to Sprint, consistent with the user accessing the Internet from a cellphone as they move around on various networks. This is consistent with the fact that the Fluent data shows that the various registrations for Mr. Botts were logged as coming from an Apple iPhone.

70. Most significantly, one of the registrations for Mr. Botts, dated February 21, 2018, has the following placeholder information for the first name, last name, and address:

> *[subscriber_firstname_capitalized]* *[subscriber_lastname_capitalized]*
> *[subscriber_attribute_address]*

71. Mr. Beecher posits that each instance of these placeholder values is evidence that a bot entered that lead. Even if Mr. Beecher were correct (a conclusion I do not concede), this lead is preceded and followed by dozens of other registrations containing varying renditions of Mr. Botts' names and addresses, each of which is corroborated by third party databases. Mr. Beecher's speculation requires the conclusion that some external force such as a bot obtained a depth of personal information about Mr. Botts including his name, initials, two different addresses, and how his street is nicknamed by locals, and then variously entered this data in different combinations dozens of times over the span of months, only to then stop providing such accurate and nuanced personal detail and replace it with *[subscriber_firstname_capitalized]* | *[subscriber_lastname_capitalized]* | *[subscriber_attribute_address]* before returning to submitting dozens more leads containing various combinations of his actual personal information.

---

#### 4.  Andrea Clay (832) 580-6114

72. The registrations for Andrea Clay and telephone number ███████-6114 resemble the example of Roger Botts in that they contain different but equally corroborated personally identifying information in different registrations over time, but Ms. Clay's situation is distinguishable from Mr. Botts'. In the sample of 100 numbers selected by plaintiff, there are 1,061 registrations pertaining to some variation of "Andrea Clay" associated with phone number ███████-6114. TLO associates Andrea Clay with this phone number, and assigns an 86% likelihood that the number is currently connected to her.[42]

73. Several different email addresses appear throughout these leads. The majority of instances (992, or 93% of the total) use the address andreaclay@ymail.com. This is a Yahoo mail domain that both TLO and LexisNexis associate with her. A fair number of the remaining emails that appear in the leads appear to be typographical errors involving this address.[43] The other emails that appear in these leads are also associated with Ms. Clay through LexisNexis and TLO: andreaclay@gmail.com, bestintheworldclay@gmail.com, and kcclay159@gmail.com.

74. The leads include three different physical addresses in Texas: 9019 Stingray Court, P.O. Box 1497, and 4813 East 27th Street. Each of these three physical addresses is associated with Ms. Clay in records from LexisNexis and TLO.

75. The various names that appear on the leads are:

       a.  Andrea Clay (937 leads, or 88% of the total)

       b.  Andrea undefined (46 leads)

       c.  undefined undefined (43 leads)

       d.  {firstname} {lastname} (19 leads)

       e.  Andreaclay@ymail.com Clay (5 leads)

       f.  Eileen Clay (4 leads)

       g.  Eileen Jackson (1 lead)

---

[42] Lexis Nexis did not return a phone number associated with Ms. Clay. The Lexis Nexis and TLO reports for Ms. Clay are attached as Exhibit 18.

[43] andreaciay@ymail.com, andreaclauy@ymail.com, andreaclay@mail.com, and andreaclay@umail.com

        h.  kc clay (2 leads)

        i.   Andrew Clay (1 lead)

76. Several interesting details emerge from these names. The first is that all of the actual human names that appear in these leads are connected to the same person. As revealed by LexisNexis and TLO records, Andrea Clay's middle name is Eileen, and her mother's maiden name is Jackson. The name "kc clay" is consistent with one of the email addresses that LexisNexis and TLO associate with her. While there is no "Andrew Clay" associated with her in public records, this is likely a typographical error given the proximity of the "w" key to the "a" on a standard keyboard. The name andreaclay@ymail.com Clay is likely a corruption error causing the email address to be shown in the wrong field.

77. The second observation is that two different types of placeholders appear among these leads. One type is a curly bracketed set using lower case letters, and the other is the word "undefined." If these are, as Mr. Beecher claims, evidence that a bot entered these leads, then this signals that ***at least two different bots*** were involved.

78. Mr. Beecher's speculation that bots are responsible for entering the leads requires the conclusion that at least two different bots were programmed with a depth of personal information about Ms. Clay (including her full name, her mother's maiden name, three different addresses, and four different email addresses), and then variously entered this data in different combinations over a thousand times over the span of years—occasionally inserting typographical errors into various entries—but on a few scattered occasions these remarkably well-informed bots stopped providing such accurate and nuanced personal detail and instead inserted {firstname} {lastname} or "undefined undefined" (depending on which bot was doing the work), and that these bots were be distinct from the one that entered the wholly different placeholders  *[subscriber_firstname_capitalized]*  |  *[subscriber_lastname_capitalized]*  |  *[subscriber_attribute_address]* in Mr. Botts' lead discussed above.

---

### 5. *Ashlei Rogers* ███████-*0642*

79. In the sample of 100 numbers selected by plaintiff, there are 44 registrations pertaining to phone number ███████-0642. These registrations however present a variety of different names, physical addresses, and email addresses. Despite this complexity, the Call Log records show that *only* the lead registration for "Ashlei Rogers" was pertinent to Freedom Financial's telemarketing, and the only calls and texts made on this phone number were sent to her.

80. LexisNexis and TLO corroborate that a person named "Ashlei Rogers" is associated with the email address on the lead, ashlei.rogers.0924@gmail.com. Neither LexisNexis nor TLO however associate Ms. Rogers with that telephone number.[44] Further investigation, including direct contact with Ms. Rogers, would be needed to establish her relationship to that phone number and the other personal information set forth in the lead. Nevertheless, Ms. Roger's lead is clearly distinct from the "Dunk Loka" lead insofar as Ms. Rogers is a real person, and some of the personal information in the lead can be readily corroborated as hers through the use of public records.

### J. <u>Roboform</u>

81. As I previously reported, in my personal testing of the Fluent web sites I observed that the web form does not even permit the consumer to submit a name that contains symbol characters such as {}[]$, nor can a consumer submit a name that is blank. Because the web form rejects text strings formatted with these characters, it does not follow that the process responsible for writing placeholder entries would be most likely to be *outside* of Fluent's database system. The database process that wrote these entries, for whatever reason, most likely occurred within Fluent's systems after the web form accepted a properly formatted entry that was subsequently corrupted or overwritten.

82. That being said, in the interest of exploring all possible explanations for this issue, I observed that the same communities of "sweepers" that encourage sweepstakes enthusiasts to submit

---

[44] The Lexis Nexis and TLO reports for Ms. Rogers are attached as Exhibit 19.

multiple entries as a way of increasing the odds of winning also encourage the use of software tools to facilitate autofilling content into web forms. Although autofill features are built-in to many popular browsers already, installing external autofill software allows the user to customize multiple "identities" so as to be able to autofill webforms using different combinations of names, addresses, and other personal details.

83. In my research into sweepers I identified that the most common external autofill software mentioned is Roboform, but mention is also made of Keyboard Express, LastPass, SweepstakesMax, and SweepersChoice.

84. I installed Roboform versions 7 and 8 on different browsers and tested its use. I found that by manually entering my information into nationalconsumercenter.com, I could complete a submission in about 40 seconds depending on how quickly each page loaded. Using the autofill function of my browser to assist in completing the form, I could complete a submission in about 30 seconds. Using Roboform to autofill the form enabled me to make a single click at the beginning of the process that autofilled the entire sequence, and I could complete a submission in under 20 seconds.

85. The use of Roboform and other autofill technologies may have played a role in the occasional insertion of placeholder values into the web forms. Given the number of data points indicating that sweepers constitute a meaningful proportion of the registrants on Fluent's sites, it is likely that many of them use these tools. This may provide a partial explanation for why so many different types of placeholder values appear, as these may be artifacts of human users deploying different types of technological tools to speed up their entries.

### K.    Analysis of Complaints

86. Defendants produced a spreadsheet listing the opt-out requests received in connection with this marketing campaign.[45] Plaintiff's counsel Jan Fougner reviewed this spreadsheet of 226,434

---

[45] LEADSCIENCE_005228

rows and identified as set of 4,855 unique opt-out requests[46] that are said to have "alerted Defendants that the recipient was not the person Defendants claimed they were trying to reach."[47] Plaintiff describes these "Wrong Number Complaints" as evidence of a "systemic failure to obtain valid consent."[48] Mr. Beecher refers to this work in his Supplemental Expert Report as an indication that "the purported consent to receive telemarketing was not valid or legitimate."[49]

87. Neither Mr. Beecher nor Plaintiff apparently consider the possibility that leads were genuinely submitted to Fluent with consent from the consumer, and then subsequently the phone numbers were reassigned to a new, unrelated party. The problem of reassigned numbers is so significant to TCPA compliance that the FCC recently announced plans to construct a database for call centers to use to check whether numbers have been reassigned, before initiating calls.[50] Presently no such system exists. According to the FCC, approximately 35,000,000 telephone numbers are disconnected each year, and 100,000 numbers are reassigned by wireless carriers every day.[51]  In 2016, the annual industry-wide rate of telephone number reassignment or "churn" was 26.3%.[52]

88. I do not offer any opinion on what constitutes valid consent, or whether Fluent can claim consent when contacting a number that has since been reassigned, but I note that this is a materially different scenario than the implication that the leads were not valid to start with.

89. By way of illustrating that number reassignment is a likely explanation for many of the Wrong Number Complaints, here are some examples from Mr. Fougner's list of opt-out messages he

---

[46] This is rounded up to 5,000 when referred to in the Motion for Class Certification (pp. 4-5) and in Mr. Beecher's Supplemental Expert Report (paragraph 51).
[47] Motion for Class Certification at 4:23-5:7; also Declaration of Jon Fougner pp. 2-3.
[48] Motion for Class Certification at 5:8.
[49] Supplemental Expert Report of Benjamin Beecher paragraph 52.
[50]  Press Release: "FCC Establishes Reassigned Phone Numbers Database," accessed at https://docs.fcc.gov/public/attachments/DOC-355526A1.pdf and attached as Exhibit 20.
[51] FCC-17-90A1_Rcd., at 6009, attached as Exhibit 21.
[52] FCC-17-126A1, p. 17 attached as Exhibit 22.

selected, the content of which indicates the consumer claimed to be a new user of a phone number belonging to a prior consumer:

| Phone | Message | Original row number |
|---|---|---|
| 718637 | This number was given out by Boost Mobile it is no longer the number of diamond | 81644 |
| 832406 | Billy no longer has this number. | 82546 |
| 423260 | Please discontinue making contact with this number. It is no longer Chirika's number. Thanks | 18012 |
| 713992 | Johanth changed his number | 102444 |
| 865244 | Kelly no longer has this number | 103383 |
| 530693 | This is not kim number no more | 105675 |
| 917882 | I just got this phone number this is not thomas I keep getting call | 105703 |
| 586339 | This isnt his number anymore | 107335 |
| 951436 | New owner of number , not Chris | 202608 |
| 786908 | This is not jonnell number anymore | 151741 |
| 225397 | This is no longer "Stacey" number | 190158 |
| 520245 | This isn't Nelson's number anymore | 66005 |
| 214724 | This is not Ashley phone anymore. | 121439 |
| 562243 | This is not Brandon's number anymore | 141061 |

90. I analyzed the 4,855 "Wrong Number" opt-outs using the same methodology that I applied to the statistical sample of 16,270 randomly selected numbers I analyzed in my expert report of January 4, 2019. This consisted of a "reverse append" analysis in both LexisNexis and TLO to identify the name(s) and addresses associated with each number; checking the National Change of Address (NCOA) database for matches between names, addresses and email addresses; checking the email addresses in Kickbox for validity and Sendex scoring; and cross-referencing the results to the information provided in the corresponding lead to identify matching values.

91. I found that 3,844 unique phone numbers from which the "wrong number" opt-out messages were received are related to registrations that have corroborating evidence in TLO, Lexis

---

and/or NCOA.[53] In other words, 80% of the 4,855 "wrong number" opt-outs relate to leads whose consumer information can be corroborated by multiple third-party sources on multiple data points. The email addresses associated with these leads have an average Sendex score of 66%.

92. These figures are comparable to the results I presented in my January 4, 2019 report, and are consistent with the conclusion that the vast majority of the leads contain accurate consumer information, independent of the question of whether the consumer subsequently opted out of communications.

93. The Motion for Class Certification highlights eight particular examples of the "wrong number" opt-out messages.[54] The first of these examples claims to be from a telephone number associated with the Raleigh Police Department: "This number is registered to the Raleigh Police Department this is your first and last time sending a text to this number thank you Raleigh Police."[55] This claim is not backed up by the available documents. The telephone number associated with this opt-out request is (919) 426-█████. All of the telephone numbers listed online for the Raleigh Police Department begin with the prefix (919) 996-XXXX, and not (919) 426-XXXX.[56] An online search through Google found no matches associating "Raleigh Police" with that telephone number. According to data from TLO, that telephone number is associated with a person named "Faith Murphy Lashley."[57] There is no indication in the public records data returned for Ms. Lashley that she is a member of the Raleigh Police Department. In fact, Ms. Lashley has numerous criminal convictions for simple assault, trespass, and injury to personal property that would appear inconsistent with being a sworn officer of law enforcement. Further investigation would be needed to establish the

---

[53] My workpapers documenting this analysis are attached in native form as Exhibit 23.
[54] Motion for Class Certification at 5:14-6:2.
[55] Motion for Class Certification at 5:14-15.
[56] See https://www.raleighnc.gov/home/content/ITechWebServices/Articles/CityDepartments.html, also attached as Exhibit 24.
[57] LexisNexis did not return any name associations for the telephone number (919) 426-8876. The TLO report for Ms. Lashley is attached as Exhibit 25.

circumstances under which Ms. Lashley's phone number was registered with Fluent, whether she was the person who received the text messages, and whether she was the person who sent the opt-out message—however, the suggestion that Freedom's text messages were somehow being sent to the Raleigh Police Department is not supported by the evidence I examined.

94. My analysis found that *each* of the remaining opt-out messages highlighted in the Motion involve telephone numbers from leads that can be corroborated in multiple third-party resources.[58] Set forth below, in the order in which these appear in the Motion, are the corroborating details:

> a.  (The first example, allegedly involving the Raleigh Police Department, is discussed above);
>
> b.  Full name on lead matched to both LexisNexis and TLO; full name and address on lead matched to NCOA database;
>
> c.  Full name on lead matched to TLO and NCOA; email address on lead has Sendex score of .85;
>
> d.  Full name and address on lead matched to NCOA database; email address on lead has Sendex score of .9;
>
> e.  Full name and address on lead matched to TLO and NCOA database;
>
> f.  Full name and address on lead matched to NCOA database; email address on lead matched to NCOA and has Sendex score of .8;
>
> g.  Full name and address on lead matched to TLO;
>
> h.  Full name and address on lead matched to TLO and NCOA database; email address on lead has Sendex score of .82.

While it may be the case that the telephone number registered in any of these lead is no longer associated with the person Freedom apparently intended to contact, the personal information

---

[58] The corresponding analysis for these is contained within the same workpapers previously identified as Exhibit 23.

contained in these leads is corroborated through multiple third-party sources, including the same data sources upon which plaintiff's own expert claims to rely.

95. Although I do not personally present the opinion that TLO and LexisNexis definitively identified the actual users of these telephone numbers, I do note that plaintiff's expert Ms. Verkhovskaya stated in her Expert Report that "LexisNexis and TransUnion [TLO] provide user and subscriber information that identifies the person(s) associated with a particular telephone number as of the date of the call(s)" and that in her experience "they provide accurate and reliable information."[59] If Ms. Verkhovskaya is correct that the information returned by LexisNexis and TLO accurately and reliably identifies the user or subscriber of each telephone number," then the vast majority of the "Wrong Number Complaints" including the ones cited in the Motion are not wrong numbers at all.

96. Ms. Verkhovskaya proposes to rely on this same reverse append methodology for the purposes of class member identification and notification.[60] If it is plaintiff's contention that these 4,855 opt-outs represent individuals who are *not* the persons listed in Fluent's leads, yet the methodology she proposes to use identifies the majority of them as the *same* persons as Fluent's leads, then it is unclear how these individuals can be identified.

97. I also observed examples within Mr. Fougner's list of "Wrong Number Complaints" of opt-out messages that contained obvious jokes or facially illogical statements that cannot be accepted at face value. These instances further call into question the ability to rely on the "wrong number" opt-outs to identify genuine wrong numbers. For example:

| Phone | Message | Original row number |
|---|---|---|
| 832554▮ | This is not a working number | 62941 |
| 717710▮ | How do u know my name wrong number | 64390 |
| 91635▮ | This is not a working number | 202953 |
| 707951▮ | This is not my phone | 3781 |

---

[59] Expert Report of Anya Verkhosvakaya paragraphs 30 and 33.
[60] Expert Report of Anya Verkhosvakaya paragraphs 66-67.

**L.      Analysis of Call Log Records for 100 Sample Numbers**

98. I compared the lead information produced by Fluent for the sample set of 100 numbers to the Call Log records. Of the 100 numbers, two phone numbers do not appear in the Call Logs at all.[61] All of the 98 telephone numbers that did receive calls logged in LEADSCIENCE_000677 correspond to leads produced by Fluent showing the same name as is identified in the Call Logs.[62]

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

MARCH 1  2019

---

[61] Telephone numbers 2813823895 and 8165009872 do not appear in LEADSCIENCE_000677.

[62] My workpaper showing the name comparison is attached as Exhibit 26.

# **<u>EXHIBIT 18</u>**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DANIEL BERMAN et al.,

Plaintiffs,

v.                                         Case No. 4:18-CV-01060-YGR

FREEDOM FINANCIAL NETWORK, LLC et
al.,

Defendants.

**SECOND SUPPLEMENTAL EXPERT REPORT OF DAVID KALAT**

## I.      INTRODUCTION

1.  Plaintiff's expert Anya Verkhovskaya has to date submitted an expert report (December 7,
    2018), a supplemental report (February 8, 2019), and a second supplemental report (May 22,
    2020). On January 4, 2019 and March 1, 2019 respectively, I submitted an expert report and a
    supplemental expert report that rebutted the conclusions of Ms. Verkhovskaya's first two
    reports.[1] None of Ms. Verkhovskaya's various supplemental expert reports, including the most
    recent one, refute any of my conclusions, or even mention my opinions at all. All of my
    conclusions from both the January 4, 2019 and March 1, 2019 reports are therefore unrefuted,
    and I incorporate all of them here by reference.

2.  My qualifications are set forth in detail in the January 4, 2019 report and I incorporate them by
    reference here as well.[2]

3.  Ms. Verkhovskaya has opined that her analysis of the Fluent and Lead Science leads found
    that "[m]ore than 50% of names and/or addresses are garbled, invalid and/or blank."[3] She

---

[1] My prior reports also rebutted the analysis and opinions put forth by Benjamin Beecher, who likewise has not
responded to or refuted my conclusions.
[2] My current and updated Curriculum Vitae is set forth as Exhibit 1.
[3] Expert Report of Anya Verkhovskaya (Dec. 7, 2018), p. 25 par. 73.

further opines that "it is uncommon to have greater than 50% of names and/or addresses to be garbled, invalid and/or blank."[4] In support of these conclusions, Ms. Verkhovskaya has appended lists of the supposedly "garbled, invalid and/or blank" names (Exhibits D and E to her report of December 7, 2018) and the addresses she claims have "either no street number or an invalid street number" that "cannot be mailed to" (Exhibit 4 to her report of May 22, 2020).

4.  As I show herein, Ms. Verkhovskaya's analysis is flawed. Her catalog of allegedly "garbled, invalid and/or blank" names and addresses does ___**not**___ reflect 50% of the leads—at best they constitute approximately 10%. Even that figure, however, is inflated by her unwarranted inclusion of names that are not "garbled, invalid and/or blank" and addresses that are deliverable.

## II.    DOCUMENTS AND DATA SOURCES CONSIDERED

5.  My understanding of the factual matters at issue is based on my review of the documents and data described below. I personally conducted or supervised the research and analysis set forth in this report and therefore I have personal knowledge of the matters described in it.[5] I understand that additional information relevant to my opinions may be disclosed as the matter proceeds. Accordingly, I reserve the right to amend my findings based upon such additional disclosures.

      a.  Fluent Lead Registrations:
- Fluent_00441 (4/27/2017-3/31/2018)
- Fluent_00572 (3/31/2018-4/12/2018)

      b.  Fluent 100 Numbers Updated
- Fluent_00574
- Fluent_004052

      c.  LeadScience_000677 (Outbound Call Logs)

      d.  LeadScience_005228 (Opt-Out Responses)

      e.  Fluent_000573 (Metadata Table)

      f.  Second Amended Complaint

---

[4] Id p. 20 par. 54.

[5] Throughout this report, when I use the first person to describe my analysis, I am referring to work conducted by me or by my staff under my direction.

g.  Motion for Class Certification

h.  Declaration of Jon B. Fougner and Exhibit A: Wrong-Number Complaints

i.  Expert Report of Anya Verkhovskaya (Dec. 7, 2018)

j.  Expert Report of Benjamin Beecher (Dec. 7, 2018)

k.  Supplemental Expert Report of Anya Verkhovskaya (Jan. 8, 2019)

l.  Supplemental Expert Report of Benjamin Beecher (Jan. 8, 2019)

m.  Second Supplemental Expert Report of Anya Verkhovskaya (May 22, 2020)

n.  Fluent Inc.'s Responses and Objections to Plaintiff Daniel Berman's First Set of Discovery

o.  Affidavit of TCPA Prior Express Written Consent, by Mitenkumar Bhadania (Document 16-1, filed April 30, 2018)

p.  Declaration of Mitenkumar Bhadania in Support of Defendant's Reply Motion (Document 104-1, filed December 4, 2018)

q.  Deposition of Tom Martindale, 30(b)(6) designee of Lead Science LLC

## III.  ANALYSIS AND OPINIONS

### A.  <u>Fluent Leads and LeadScience Leads</u>

6.  Any inquiry into the accuracy, quality, reliability, or integrity of the personal contact information contained in the lead data in this matter must first take notice of the distinction between the lead data generated by Fluent Inc. ("Fluent") and the derivative by-product of those leads that were transmitted to Lead Science.

7.  As detailed in my prior reports, I understand that Fluent operates consumer-facing websites that collect contact information and first-party data from consumers. For the purposes of my analysis, this first-party consumer registration data is contained in the files FLUENT_000441 and FLUENT_000572.

8.  As Lead Science's 30(b)(6) witness Tom Martindale testified in his deposition, selected data points from selected Fluent registrations were passed to Lead Science for use in the Freedom Financial campaign. When this occurred, Lead Science obtained the first name, phone number, and ZIP code from the first-party consumer information, but **_not_** (in most cases) the last name.[6] For the purposes of my analysis, Lead Science's derivative copies of consumer contact information obtained by Fluent is contained in the file LeadScience_000677.

---

[6] Deposition of Tom Martindale at 26:24-27:25.

9. Ms. Verkhovskaya claims to have appended the customer address and IP information from the Fluent leads onto the Lead Science leads for her analysis[7]—but she evidently did not append the last name information. This critical error in her methodology is the source of her seemingly massive numbers of allegedly problematic names. When Ms. Verkhovskaya observes that a large number of Lead Science leads have "blank" last names, she is merely observing the fact that the last name that was present in the original lead from Fluent was not ported to Lead Science for this campaign. This condition says nothing about the quality or the integrity of the personal contact information originally collected by Fluent.

10. In fact, if only the LeadScience list is examined, there are 385,322 instances of a lead where the last name, in the Lead Science list, is blank.[8] But there is only a *single* instance of a lead on the Fluent list lacking a last name.[9]

11. In order to replicate Ms. Verkhovskaya's analysis but with this error corrected, I began by cross referencing the Fluent leads (FLUENT_000441 and FLUENT_000572) to identify every record that contained a telephone number present in the LeadScience data (LeadScience_000677).[10] Collectively this represents 872,830 rows of data for registrations pertaining to 730,148 unique telephone numbers.[11]

---

[7] Expert Report of Anya Verkhovskaya (Dec. 7, 2018), p. 20 par. 53.

[8] Ms. Verkhovskaya reported finding 363,792 records with an "invalid last name" inclusive of both blank names and "garbled" names. See Expert Report of Anya Verkhovskaya (Dec. 7, 2018), p. 21 par. 56. Because she did not produce any workpapers supporting this analysis nor did she describe her methodology in detail, I have been unable to determine the source of the discrepancy.

[9] The registration concerns telephone number ▮▮▮▮2715 for a "Hasani" of "Brevard," Palm Beach, Florida. This registration was passed to LeadScience. Public records searches at LexisNexis and TransUnion/TLOxp identified a Yousef Alhosani, who has apparently sometimes gone by the name "Hasani," and has been associated with multiple addresses in Palm Bay, Florida in Brevard County.

[10] As I discussed in my January 4, 2019 report, Ms. Verkhovskaya stated in her expert report that her analysis identified 730,274 unique telephone numbers that received calls or texts (see paragraph 37). My own examination of LEADSCIENCE_000677 finds only 730,167 unique telephone numbers. I do not have an explanation for these discrepancies. In light of the fact that Ms. Verkhovskaya has never produced any workpapers to support her count of 730,274, and the difference is just 107 numbers, for the purposes of my calculations herein I rely on my own count of 730,167 numbers.

[11] As addressed in my January 4, 2019 report, there were 20 telephone numbers identified in the LeadScience call records that did not have corresponding Fluent leads.

---

12. I then searched that subset of Fluent leads for any instances of the supposedly "invalid" first or last names identified in Exhibits D and E of Ms. Verkhovskaya's December 7, 2018 report.

13. Whereas Ms. Verkhovskaya claims to have found 363,792 records with an "invalid" last name, once I corrected for the erroneous reliance on the Lead Science last name fields, I found just 8,752, less than 1% of the total volume of leads.

14. Set forth below is a chart of the analytical steps I undertook to investigate Ms. Verkhovskaya's supposed "invalid" names and addresses in the Fluent registrations. A fuller version of this same chart is appended as Exhibit 2, and each step in the analysis is discussed in detail below. As shown in the chart and explained in the following, less than 10% of the unique telephone numbers that were contacted by call or text in the Freedom campaign were sourced from registrations that Ms. Verkhovskaya's stated methodology identifies as "invalid" names and/or addresses.

| | | COUNTS (Fluent Data for Numbers Identified in Lead Science Call and Text Data) | | | |
|---|---|---|---|---|---|
| | | Total Rows of Data | % of Total | Unique Telephone Numbers | % of Total |
| | Identified in FLUENT_000441 and FLUENT_000572 ("Total") | 872,830 | 100.00% | 730,148 | 100.00% |
| CUT 1 | Identified in Exhibit D or E to Anya Verkhovskaya's First Report ("Invalid" First or Last Names) | 15,155 | 1.74% | 12,602 | 1.73% |
| CUT 2 | Identified in Exhibit D or E to Anya Verkhovskaya's First Report ("Invalid" First or Last Names) **with Valid Names Reassessed** | 13,441 | 1.54% | 11,166 | 1.53% |
| CUT 3 | 68,924 Phone Numbers from Verkhovskaya's Secondary Supplemental Expert Report with Addresses Submitted to NCOA Source and Returned with a MAILABILITY_SCORE > 2 | 80,132 | 9.18% | 66,674 | 9.13% |
| CUT 4 | Combined, de-duped leads in CUT 2 or CUT 3 | 88,972 | 10.19% | 73,975 | 10.13% |

| CUT 5 | Phone Numbers that appear in CUT 4, yet Have Valid Name or Address Elsewhere. These are phone numbers WITH ONLY "INVALID" INFORMATION. | 87,548 | 10.03% | 72,732 | 9.96% |
|---|---|---|---|---|---|

### B.    "Bad Name" Analysis

15. In total, searching the Fluent Leads for instances of the supposedly "garbled, invalid and/or blank" names Ms. Verkhovskaya listed in her Exhibits D and E, identified 15,155 affected leads, representing 12,602 unique telephone numbers. In other words, considering both "invalid" first and last names together still only accounts for a mere 1.7% of the total volume of Fluent leads associated with Lead Science call data.[12]  As noted above, the dramatic drop in total "invalid" names based on Ms. Verkhovskaya's analysis comes from correcting the blank Last Name issue discussed above.

16. I note that in her December 7, 2018 report, Ms. Verkhovskaya said that "it is common to have a small number of records with garbled or blank data (approximately 3% to 5%)."[13] The actual occurrence of such issues with respect to the names in the Fluent leads is therefore below the threshold that Ms. Verkhovskaya considers "common."

17. That being said, while conducting this analysis I observed that Ms. Verkhovskaya's identification of supposedly "garbled, invalid and/or blank" names actually included a great many names that were in no way garbled or invalid. Consequently, even that tally of 1.7% is inflated.

18. Ms. Verkhovskaya said in her report that "it is common to find imperfections in demographic data, such as misspelling, reversed names or partial names," yet her workpapers show that she actually made no allowance for that fact. Her list of supposedly "invalid" first names includes Annettte, Ashtonnn, Billl, Ellla, Jefffrey, Jennnifer, Juliettte, Kennneth, Melisssa, Tammmy, and willliam, just to name a few examples of names exhibiting very minor spelling errors.

---

[12] The results of my analysis are set forth in Exhibit 2.
[13] Expert Report of Anya Verkhovskaya (Dec. 7, 2018), p. 20 par. 54.

19. Additionally, her list of "invalid" first names also contains numerous examples of *correctly* spelled names that perhaps she simply did not recognize: Yao, Yee, Yiu, Yeye, Yoyo, Yu, and Yue are all Chinese names; Yia is Greek; Yiya is Native American, Yuyi is Japanese; and Yoo is Korean.[14] While further investigation might be warranted to determine, on a lead-by-lead basis, which of these represent actual consumer names as opposed to "garbled" text, it is clear that Ms. Verkhovskaya has no basis to summarily dismiss these names as invalid without any such further inquiry.

20. Her list of "invalid" names also considers initials like C.R., C.J., G.M., H.S., K.R., L.T., and M.C. to be among the examples she describes as "text that is not recognizable as names."[15]

21. I also observed that she categorized the name "Vargas Ordo???ez" as "invalid." In this instance, the occurrence of question marks in the text string are more likely a substitution error caused by a system struggling to represent the letter "ñ" in a character set that doesn't allow it, rather than an error by a person pressing the "?" key when entering the data.

22. Exhibit 3 to this report sets forth a copy of Ms. Verkhovskaya's Exhibit D, to which I have highlighted in yellow the names that appear to be minor misspellings, correctly spelled names, or initials. In making these determinations, I accepted misspelled names if only one letter was affected (that is, one letter too many, too few, or incorrect. I accepted as initials any instance of one or two capitalized letters, and I also strings of three letters or strings that included lowercase letters when the letters were set apart by periods.

23. Ms. Verkhovskaya's list of supposedly "invalid" last names is equally fraught with errors. For example, she apparently considered any instance of three consecutive copies of the same letter to be an example of "garbled" text. This included three "Is" in a row, the common way that the third generation of a family name is denoted. According to Ms. Verkhovskaya, the following names are so garbled they are not recognizable as names, and yet they plainly are recognizable names:

---

[14] I consulted the website names.org to verify my understanding of which names in Ms. Verkhovskaya's list were correctly spelled names of foreign origin.
[15] Expert Report of Anya Verkhovskaya (Dec. 7, 2018), p. 20 par. 55.

- Angel Rivera III
- Everett R Mattison lll
- Alberto Mendoza III
- Martin Lucero III
- tony Jones III
- houston roberson III
- Galusha March III
- Ray Montgomery iii
- jadarthia johnson iii
- Thomas Odendahl III
- Alex Maples III
- Juanas S Moten III
- Ernest Blalack III
- Jerome L Henry lll
- James Banks III
- Marion Smith III
- Willie Williams lll
- Elton Evans lll
- Lonnie Winder lll
- James Walker iii jd
- Carver D. Jarmon III
- Abraham Marroquin III
- Alvino Reyna III
- Tommy Martin III
- Charles R Tresvant III
- James Taylor III
- Arthur Pizzi III

- o Franklin Brown III
- o Sam Guajardo III
- o Aaron Williams III
- o M.C. Williams III
- o Richard Moore III
- o Thomas Grieger III
- o Therman Mckay iii
- o Mel Mitchell III
- o Gregory Morton III
- o Gildardo Garcia III
- o Robert Smith III
- o Alfred Moore III
- o JOHN LEWIS KING III
- o Lloyd Holland III
- o James Hall III
- o William o Jones III
- o Edward Carr III
- o KEVIN CARTER III
- o Randolph Higgins III
- o Borti Petrich  III
- o Clifton Daye III
- o Richard Stevens III
- o willie jones III
- o Charles Wharmby III
- o ARTHUR CADMANIII
- o Louis Moorer III
- o Dana Tarbox III

- George Koester III
- Alvin Marks III
- Joseph Ciancio III
- carleton brown III
- Charles E. Wade III
- Henry Windham III
- Viviano Vela III
- Richard Cornelias Johnson III
- George Fisher lll
- Lonnie Pratt III
- Anel Marc iii
- Patrick Tisdale III
- Josefat Olguin III
- George Hanstein III
- Pedro Ortiz III
- John Marchant III
- Guillermo Garcia III
- Joe Graciano III
- Adolfo Martinez III
- Amado dean Decastro III
- DANIEL R. GADSDEN III
- Alexander Darnes iii
- Michael Williams lll
- Samuel Puryear lll
- Mario Martinez lll
- John Mattey III
- Henry Walkerlll

- o   Harold Philipp III

- o   Kenneth Harris III

- o   William L Hopkins III

- o   Roger Whiting III

- o   James Paino III

- o   Lewis Glover III

24. Exhibit 4 to this report sets forth a copy of Ms. Verkhovskaya's Exhibit E, to which I have highlighted in yellow the last names that appear to be minor misspellings, or correctly spelled names with the designation "III." As above, my standard for misspelled names was to accept names whose spelling errors affected only one letter (that is, one letter too many, too few, or incorrect). I also found and highlighted two instances of correctly spelled last names that had been accidentally concatenated with a website URL.[16]

25. When I then re-ran the analysis against the Fluent Leads, I found that this revised set of allegedly "invalid" names only affected 13,441 total leads, or 1.5% of the total volume.

### C.   <u>Address Analysis</u>

26. Ms. Verkhovskaya claims that through the use of the "United States Postal Service's National Change of Address database and Delivery Point Validation system" ("NCOA") she found 68,924 records "either with no street number or an invalid street number (56,915 without street number, 12,009 with an invalid street number)."[17]

27. I submitted the same 68,924 records to NCOA myself. NCOA scores each address with a code, designating the "mailability" likelihood of each entry. Exhibit 5 sets forth the data I received from NCOA for these 68,924 records, showing that 3,233 of the records Ms. Verkhovskaya claims are "undeliverable" are in fact scored by NCOA as "accurate, mailable addresses," and a further 348 records are "probably deliverable."

---

[16] Mohnhttp://www.cdn.com/Camplmg//web.jpg and Nelson https://www.facebook.com/deteriorates.mcsc/post
[17] Second Supplemental Expert Report of Anya Verkhovskaya, pp. 3-4 par. 15

28. I found that in fact only 66,674 unique telephone numbers are reflected in leads with addresses that NCOA scored below as "possibly deliverable," "probably undeliverable," or "undeliverable," and this constitutes just 9% of the Fluent lead data associated with LeadScience call data overall. In other words, 91% of the Fluent registrations have addresses that can be easily independently validated as deliverable.

### D.   "Invalid" Leads

29. After removing the errors involving non-garbled names and deliverable addresses, as described above, this leaves a subset of 88,972 total leads from the Fluent lead data where either a "invalid name" and/or a "invalid address" was present, as these terms were defined by Ms. Verkhovskaya.

30. Because some telephone numbers are reflected on multiple leads, there are instances in which a lead with an "invalid" name and/or address exists for a phone number at the same time that a "valid" lead with no such problems exists for the same phone number. Once I accounted for this phenomenon, I had a subset of 87,548 leads reflecting information for 72,732 unique telephone numbers. This is 10% of the entire Fluent lead population associated with Lead Science call data.

31. In this context, I observe that in my January 4, 2019 report I detailed my analysis of a statistically significant sample of 16,270 telephone numbers that had been contacted by in the Freedom campaign. In that analysis I found substantially corroborating information from multiple third-party sources to validate the contact information in 88.89% of the leads that I examined. That analysis has not been refuted, and it is my opinion that a very high percentage of the leads can be independently verified as identifying a specific real person with correct contact information.

### E.   Further Investigation

32. It is important to note Ms. Verkhovskaya's methodology for categorizing "invalid" leads merely identifies certain leads as having specific electronically searchable attributes, but that

does not necessarily mean the registration information is in fact invalid. Put another way, even when a given registration may have a missing or garbled entry in a specific data field, it may still be possible to verify the rest of the registration information as belonging to a specific real person. Set forth below are three examples taken from the 87,548 "invalid" leads that nonetheless contain verifiable contact information pertaining to real persons that can be independently corroborated in third-party records.

### 1.   *Roger Botts (* ███*1371*

33. The set of 87,548 "invalid" leads includes a single registration for a "Roger Botts" and telephone number ███-1371. This lead is considered "invalid" because the address fields are populated by "*[subscriber_attribute_address]*, *[subscriber_attribute_city]*," which was scored by NCOA as undeliverable.

34. As it happens, this telephone number was among the sample of 100 numbers for which plaintiffs requested additional information from Fluent, and I examined that additional data in connection with my supplemental report of March 1, 2019. In that report, I described my analysis of that additional data (contained in FLUENT_00574, updated in FLUENT_04052). Those additional records contained other registrations from Mr. Botts that enabled me to identify him as Roger Botts of ███████████ Road, Taylorsville, Georgia, with the email address ████████@icloud.com. This contact information was independently corroborated with public records data obtained from both LexisNexis and TLO.[18]

35. The information contained in the registration for Mr. Botts can be corroborated from multiple third-party sources, but it is worth noting that my ability to reliably make that association was dependent on additional information not contained in FLUENT_000441, FLUENT_000572, and LeadScience_000677. While it is reasonable to conclude that the experience of Mr. Botts is not unique, and other leads currently marked as "invalid" do in fact point to real people, conducting the necessary investigation into those records will likely require not just the manual

---

[18] The LexisNexis and TLO records for Mr. Botts are attached as Exhibit 6.

searching of third-party public records databases, but also reference to the additional registration information like that reflected in FLUENT_00574, and as updated in FLUENT_04052.

### 2.   Jacarri McClease ( ███████-0006

36. Another example of a supposedly "invalid" lead is Fluent's registration for telephone number ███████-0006. The information includes the name "Jaccari Mcclease" [sic] and an address that reads "███ Virginia Beach, VA 23462." The registration information also contains the email address ███████@gmail.com. This lead was marked as "invalid" because NCOA coded the address as "4C" based on the incomplete street address.

37. Records from third party databases however indicate that this is a real person whose contact information is correctly entered, with the exception that the street name has been omitted. Both TLO and LexisNexis associate the name "Jaccari McClease" with that telephone number and email address, and list the physical address as ███ Onondaga Road, Virginia Beach 23462.[19]

38. In other words, this lead was marked as "invalid" simply because the words "Onondaga Road" were missing from the address line, for reasons not known, but the rest of the information consistently points to the same person in multiple third-party sources.

### 3.   Asteria Tanching ███████-0583

39. By way of a third example, the set of "invalid" leads includes two registrations for the telephone number ███████-0583.[20] Both leads include an address that NCOA scored as deliverable but which lack a first name.

40. Setting aside the absent first name, however, the remaining information in both supposedly "invalid" leads identify a person with the last name Tanching, at ███████████, San Jose, California 95116, with the email address ███████@gmail.com. Both LexisNexis and TLO corroborate that a woman named Asteria Butcon Tanching is associated with the phone

---

[19] The LexisNexis and TLO records for Mr. Botts are attached as Exhibit 7.
[20] This number was also among the 100 selected by plaintiff for further inquiry.

number ██████-0583, the email address ████████@gmail.com, and the physical address ████████████ in San Jose.[21]

41. Based on these examples, it is reasonable to conclude that similar manual searching of public records databases would successfully corroborate some unknown percentage of the remaining "invalid" leads. Without performing that time-intensive individualized analysis, however, it is difficult to know exactly how many records would either be verified or remain unverified.

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

David Kalat

June 5, 2020

---

[21] The LexisNexis and TLO records for Mr. Botts are attached as Exhibit 8.

# **<u>EXHIBIT 19</u>**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

DANIEL BERMAN,

Plaintiff,

    v.

FREEDOM FINANCIAL NETWORK, LLC,
FREEDOM DEBT RELIEF, LLC, FLUENT,
INC., and LEAD SCIENCE, LLC,

Defendants.

Case No.
4:18-cv-01060-YGR


EXPERT REBUTTAL REPORT
BY JAN KOSTYUN

**Introduction**

1.      Counsel for Defendants contacted me for the purposes of an engagement as an expert witness in *Daniel Berman v. Freedom Financial Network, LLC, Freedom Debt Relief, LLC, Fluent, Inc., and Lead Science, LLC*, No. 4:18-cv-01060 (N.D. Cal.).

2.      I have been asked by counsel for Defendants to analyze, review, and consider the opinions stated in the Expert Report of Anya Verkhovskaya ("Verkhovskaya Report"), dated December 7, 2018.

**Background and Experience**

3.      I am an independent technology consultant with over 35 years of experience covering the areas of telecommunications, enterprise architecture, and information technologies.  I received both a Bachelor of Science degree (magna cum laude) in Mathematics, as well as a Master of Science degree in Computer Science, from Union College in 1976.  I have been directly employed in various capacities by major telecommunications companies, including Bell Telephone Laboratories, GTE, Verizon, and Syniverse Technologies.  I have also been engaged as a consultant on various telecommunications issues by telecommunications companies and regulatory authorities, including Rogers Wireless (the largest wireless carrier in Canada), CRC (the national telecommunications regulatory agency of Colombia), and Syniverse Technologies.  I have worked at numerous technical levels in software development, database technology, and enterprise architecture. I have worked for over 15 years providing consulting services, software development, and data analysis in the field of telephone number portability.  This experience covers landline, wireless, and intermodal (landline-to-wireless or wireless-to-landline) number portability, as well as telephone number pooling.

I have played lead roles in the technical and organizational processes of porting landline numbers in the U.S. as well as wireless numbers in the U.S., Canada, and Colombia.

4.      As a software architect for Bell Telephone Labs, GTE, Verizon, and Syniverse, I also developed expertise in areas such as landline and wireless number provisioning, including the end-to-end process of establishing service for an initial subscriber; landline and wireless order-entry, including the collection of subscriber contact information; initial implementation of the National Do Not Call registry; technical experience with telecom features such as voice calling, SMS messaging, fax transmissions, voicemail, auto dialer and Interactive Voice Response Unit (IVRU) technology, and switching implementations; and a wide variety of telecommunications industry standards.

5.      I also have extensive experience in database methodologies, data analysis, and data mining. My experience with database technologies includes hierarchical, network and relational database models and implementations. I have instructed working professionals on the use of database programming, support and internal architecture, and have developed database training courses. I am proficient with advanced database modeling, optimization and query techniques, as well as the development of database software applications. I have personally performed database queries and data analysis against hundreds of data stores, including but not limited to Internal and National Do Not Call lists, Wireless Block identifiers, Number Portability transaction lists and telephone call records produced by both wireless carriers and businesses involved in dialing campaigns.

6.      I have extensive experience with call center operations and various dialing

systems, including those used for inbound and outbound calling campaigns. In my tenure with GTE/Verizon, I performed early research with Intel-based Computer Telephony Interfaces (CTI), including text-to-speech translation and automated dialing interfaces. I have worked closely with IVRU engineers and application architects to develop programmatic interfaces used for inbound and outbound calling. I have worked closely with call center personnel at telecom businesses such as GTE, Verizon, Syniverse and Rogers Wireless while supporting Customer Relations Management (CRM) applications that include interfaces to inbound and outbound dialing systems.

7.      For the past nine years I have worked as a consultant and expert witness on cases covering TCPA issues, patent litigation, software copyright infringement and trade secret misappropriation, software value determination, vandalism, and sabotage of application programs.  I have testified both in deposition and in court.

8.      A copy of my curriculum vitae is attached hereto as Exhibit A.

9.      I have not authored any publications in the past 10 years.

10.      In the past nine years, I have been retained to provide deposition testimony as an expert for both Defendant(s) and Plaintiff(s) in the following matters: *Shamblin v. Obama for Am.*, No. 8:13-cv-2428 (M.D. Fla.); *Eisenband v. Schumacher Automotive*, No. 9:18-cv-80911 (S.D. Fla.); *Diaz-Lebel v. Target*, No. 0:17-cv-05110 (D. Minn.); *Garcia v. Target*, No. 1:16-cv-2574 (D. Minn.); *Jackson v. Palm Beach Credit Adjusters*, No. 9:18-cv-80124 (S.D. Fla.); *Williams v. Bluestem*, No. 8:17-cv-1971 (M.D. Fla.); *Wilson v. Badcock*, No. 8:17-cv-02739 (M.D. Fla.); *Schaevitz v. Braman Hyundai*, No. 1:17-cv-23890 (S.D. Fla.); *Green-Mobley v. Capital One Auto Finance*, No. 3:17-cv-764 (S.D. Fla.); *Carpenter v. World Omni Financial*, No. 01-18-0000-6972 (A.A.A.);

3

*Buja v. Novation Capital, LLC.*, No. 9:15-cv-81002 (S.D. Fla.); *Kalmbach v. National Rifle Association of America and InfoCision, Inc*. No. 2:13-cv-01533 (W.D. WA); *Goins v. Walmart and Palmer Recovery Attorneys*, No. 6:17-cv-00654 (M.D. Fla.); *Reyes v. BCA Financial Services*, No. 1:16-cv-24077 (S.D. Fla.); *Jacobs v. Quicken Loans Inc*., No. 15-cv-81386 (S.D. Fla.); *Cook v. Palmer Reifler & Associates*, No. 3:16-cv-00673 (M.D. Fla.); *Ameranth v. Six Continents Hotels*, No. 09-CV-3819 (Ga. Super. Ct. Dekalb Cnty.); *Couser v. Cucamonga Valley Medical Group*, No. 5:14-cv-01528 (C.D. Cal.); *Couser v. Dish One Satellite*, No. 5:15-cv-02218 (C.D. Cal.); *Datamaxx Applied Techs. v. Computer Projects of Ill*., No. 4:09-cv-435 (N.D. Fla.); *Comprehensive Health Care Systems of the Palm Beaches v. M3 USA Corp*., No. 16-cv-80967 (S.D. Fla.); *Lutman v. Harvard Collection Servs*., No. 2:15-cv- 257 (M.D. Fla.); *Moricz v. Google*, No. 10-CV-01240-RSL (W.D. Wash.); *Nece v. Quicken Loans Inc.*, No. 8:16-cv-02605 (M.D. Fla.); *PCS4Less v. Go Mobile*, No. 09- 380-CZ (Mich. Cir. Ct. Washtenaw Cnty.); *Preman v. Pollo Operations*, No. 6:16-cv-00443 (M.D. Fla.); *Resource Acquisition & Mgmt. Servs. v. Mathews*, No. 09-CA 14536 (Fla. Cir. Ct. Hillsborough Cnty.); *Florida v. Poole*, No. 09-CF-016786 (Fla. Cir. Ct. Hillsborough Cnty.).

## Compensation

11.     I am being compensated at the rate of $350 per hour for my study and analysis in this case, as well as $300 per hour for travel and $400 per hour for testimony. My compensation is not dependent on the outcome of this matter.

## Documents Reviewed and Assumptions

12.     In connection with preparing this Report, I have reviewed the materials

identified in Paragraphs 15 to 79 below; Complaint for Damages and Injunctive Relief, Daniel Berman v. Freedom, Fluent, et. al., February 19, 2018; Second Amended Complaint for Damages and Injunctive Relief, Daniel Berman v. Freedom, Fluent, et. al., October 30, 2018 ("SAC"); the case docket for Berman, as of 12/26/2018; Expert Report of Anya Verkhovskaya ("Verkhovskaya Report"), dated December 7, 2018; Stipulated Protective Order For Standard Litigation, Daniel Berman v. Freedom, Fluent, et. al.; Affidavit of TCPA Prior Express Written Consent by Mitenkumar Bhadania, D.E. 16-1; Declaration of Daniel J. Barsky, Esq. In Support of Defendants' Motion to Compel Arbitration, D.E. 16-2; Second Amended Complaint – unredacted, D.E. 90-4; Defendants' Notice of Motion and Motion to Dismiss, D.E. 94; Declaration of Daniel J. Barsky in Support of Motion to Dismiss, D.E. 94-2; Defendant's Reply in Support of Motion to Dismiss, D.E. 104; Declaration of Mitenkumar Bhadania in Support of Reply Motion, D.E 104-1; Declaration of Brian P. Astrup, Esq. and Exhibits, D.E. 104-2,3; the Expert Report of Ken Sponsler, dated 7/22/2016, Newhart v. Quicken Loans; and the Declaration of Dr. Debra J. Aron, dated 8/18/2014, Balschmiter v. TD Auto Finance; as well as the following Source data files:

    a. FLUENT_000441.csv
    b. FLUENT_000441.xls
    c. LEADSCIENCE_000586.csv
    d. LEADSCIENCE_000676.txt
    e. LEADSCIENCE_000676.xlsx
    f. LEADSCIENCE_000677.csv
    g. LEADSCIENCE_000677.txt

13.    It is my practice to regularly research and follow developments in the telecommunications industry. This includes, but is not limited to: review of significant FCC orders; review of TCPA cases and rulings; routine communication with former

telecom associates; comparison of opinions set forth by other TCPA experts; communication with vendors who provide TCPA-related data services; regular review of industry blogs, news feeds and user groups, such as the Association of Credit and Collections Professionals (ACA International) and the Bates Group; and regular research into statistics and trends related to the telecom industry. This review and research has also informed and supported my opinions.

## **Methodology**

14.     The methodology that I have employed in producing my opinions and this report is based on my business experience in telecommunications, my experience as an expert with other TCPA-related cases, my education and training, and my review of documents and data relevant to this case, as cited above and throughout this report. Based on my experience and that review, I developed hypotheses regarding Verkhovskaya's data analysis and her opinions regarding identification of telephone number users and subscribers – in support of the objectives for which I was engaged. Those hypotheses are fundamental foundations of each of the opinions that I will detail in this report. I have tested and confirmed my hypotheses using a combination of related documentation, research, data analysis, and experience – similar to the techniques that I have used during my career as a telecommunications system architect. I have analyzed the results of my analysis and testing, and used the results of that analysis to form my opinions and document them in this report.

## **Statement of Opinions**

15.     Based on my methodology, including analysis and review of case-related materials, it is my opinion that:

A.  Verkhovskaya cannot accurately identify telephone numbers that were on the National Do Not Call Registry as of the date(s) that calls or texts were allegedly placed to those numbers.

B.  Analysis of the Leads files performed by Verkhovskaya to determine invalid first and last names and other purported anomalies produced results that are completely unreliable and unsupported.

C.  If a set of telephone numbers contained in the proposed class(es) could be identified, any attempt to accurately and reliably identify the subscribers and/or users of those numbers – particularly a number of years in the past – will require a detailed, account-by-account and number-by-number investigation and analysis across various third-party sources, including, amongst other potential sources, cell phone carriers and the individual subscribers and users.

## Case Background

16.    From my review of the SAC, I understand this case concerns calls and texts allegedly made on behalf of Defendants Freedom Financial Network LLC and Freedom Debt Relief LLC, based on leads allegedly provided by Defendant Fluent, Inc. Plaintiff claims to have received calls and texts to his cellular phone from Defendants as early as December 26th, 2017, and as late as February 14th, 2018 (SAC at ¶¶ 85-148).  In addition to his individual claims, Mr. Berman proposes to bring his claim on behalf of two classes[1]:

---

[1] SAC at ¶¶ 217, 219

<u>Cellular Telephone Class</u>: All persons in the United States to whom: (a) Defendants, any of them and/or a third party acting on any of their behalf, made a call or sent a text message; (b) to a cellular telephone number; (c) using an ATDS or an artificial or prerecorded voice; (d)  in order to market Freedom's products; (e) during the period that begins four years before the filing of the original complaint in this matter and ends on the first day of trial.

And

<u>DNC Class</u>: All persons in the United States to whom: (a) Defendants, any of them and/or a third party acting on any of their behalf made a call or sent a text message; (b) to a residential telephone number listed on the NDNCR for at least 31 days before at least two of such communications in a 12-month period; (c) in order to market Freedom's products

## Discussion of Opinions

17.     Opinion A. Verkhovskaya cannot accurately identify telephone numbers that were on the National Do Not Call Registry as of the date(s) that calls or texts were allegedly placed to those numbers.

18.     Verkhovskaya explains that she sampled a portion of 730,000+ Lead Science called numbers (Verkhovskaya Report at ¶ 37), which actually represents both voice calls and text messages. The sample size that she determined to be "adequate" was 16,270 telephone numbers ("16270 Sample") (*Id*. at ¶ 37). Verkhovskaya's technique is to perform various analyses against the 16270 Sample – which represents approximately two percent of the total call data, and extrapolate the results of her analyses back to the total call population using that two percent ratio (*Id*. at ¶¶ 37, 48). Verkhovskaya compares the telephone numbers from the 16270 sample to the National Do Not Call Registry ("NDNCR"), through Nexxa – one of Verkhovskaya's data vendors – in an attempt to identify telephone numbers that were registered on the NDNCR at the date(s) of alleged calls or texts placed to those numbers (Verkhovskaya Report at ¶¶ 38-43). Verkhovskaya purports that 4,533 telephone numbers out of her sample "had been listed on the NDNCR at least 31 days before the date of the first call" and "received more two or more calls in any 12-month period." (Verkhovskaya Report at ¶¶ 42-43)

19.     Verkhovskaya then analyzed the numbers identified to have appeared on the NDNCR at their date(s) of alleged calls or texts, and attempted to identify those that were business numbers as of the date(s) of their call(s) or text(s) – necessary because the NDNCR applies only to residential telephones, but has no process in-place to prevent the registration of business numbers. This analysis was performed by LexisNexis – another vendor regularly used by Verkhovskaya (Verkhovskaya Report at ¶¶ 44-49).

9

20.     Verkhovskaya's DNC analysis was defective at several levels. As is often the case, Verkhovskaya does not divulge any supporting information regarding data processing performed by her vendors. In this case, there is no description of the specific service provided by Nexxa to purportedly identify the historic status of telephone numbers against the NDNCR. There is also no information provided to support the accuracy of the Nexxa service used by Verkhovskaya.

21.     Even if a service such as Nexxa's is able to identify telephone numbers that existed on the NDNCR as of the date of alleged calls or texts, the procedures used to add and maintain registries in the NDNCR do not prevent registry entries that were created by someone other than the current subscriber or authorized user of the registered number.

22.     When creating NDNCR entries through the FTC's website[2] the user must only satisfy a basic, three-step process: (1) specify up to three phone numbers to be registered, and an email address (2) verify the phone number(s) and email address are correct, and (3) open the specified email account, and click on a link provided in an email from donotcall.gov – thus registering the phone number(s). After clicking the link, the user is directed to a web page with a confirmation message. Throughout this process, there are no validations to ensure that the web user is actually associated with the telephone numbers being registered. There is no verification that the email entered is in any way associated with the phone number(s) being registered. And there are no instructions, directives or restrictions stating that the web user must be the subscriber or authorized user of the phone number(s) being registered. In fact, since the website allows up to three telephone numbers to be registered in a single transaction, it effectively

---

[2] https://www.donotcall.gov/register/reg.aspx

10

invites its users to register numbers on behalf of others. In short, anyone with access to the internet, and access to an email account, may register ANY telephone number that they wish with the National Do Not Call registry.

23.    It is well known in the TCPA arena that telephone number reassignments - in which a subscriber drops her or his number, and that number is subsequently reassigned to another subscriber/user – creates significant problems with identifying current or historic subscribers or authorized users of telephone numbers. FCC Chairman Ajit Pai has commented that "over 37 million telephone numbers are reassigned each year".[3] Recognizing the problems related to number reassignment, some data sources, such as the NDNCR, have implemented measures in an attempt to keep their data current. The FTC uses vendors to perform a hygiene process on its DNC registrations, in which existing registrations for telephone numbers that have been reassigned to new subscribers are removed from the NDNCR. However, these processes are not without their limitations. As explained in the Expert Report of Ken Sponsler, in *Newhart v. Quicken Loans* ("Sponsler Report"), the Do Not Call Improvement Act of 2007 specifies that NDNCR entries are to have no expiration date. To alleviate the problem of unexpired registrations for numbers that have been reassigned, Sponsler's company, PossibleNOW, performs a hygiene process to remove registrations for reassigned numbers from the NDNCR on behalf of the FTC and FCC. However, this hygiene process only removes landline telephone numbers, and there is no reliable data source to track disconnects and reassignments of mobile telephone users. Sponsler continues to explain that there have effectively been no removals or updates of wireless numbers from the NDNCR since its

---

[3] DISSENTING STATEMENT OF COMMISSIONER AJIT PAI Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, WC Docket No. 07-135 at 3.

inception in October 2003.[4] Thus, there is no attempt to remove registrations from the NDNCR for any wireless number that has been reassigned to a new owner. And with 37 million number reassignments each year, the NDNCR is clearly replete with invalid DNC registrations.

24.    There is also further evidence that even with hygiene processes in place to remove expired landline registrations, the registries on the NDNCR are not reliable. For example, my current landline telephone number – 860-XXX-7668 – was assigned to my account in October 2017, and I have been the subscriber of that number since then. However, my telephone number has been registered with the NDNCR since September 19, 2007. This means that during the 14 month period that I have subscribed to this number, a DNC registration has been active, which was established by someone (not even necessarily a previous subscriber) more than 11 years ago. This also means that telemarketing calls to my number during that 14 month period (and possibly longer)[5] would be the object of TCPA/DNC violations, and calls to my number would be reported as violations by processes such as those used by Verkhovskaya, even though I have never registered my number with the NDNCR.

25.    Next, Verkhovskaya states that she processed the 4,533 do not call numbers, in order to determine if any of those numbers were "identified as business numbers during the relevant timeframe" using "a specialized query based upon LexisNexis' proprietary aggregated data sources" (Verkhovskaya Report at ¶ 44). The purpose of this analysis was to eliminate any 4,533 do not call numbers that were

---

[4] Sponsler Report at ¶ 9.h

[5] If multiple parties subscribed to my number before it was assigned to me, there is no guarantee that the subscriber who relinquished the number immediately before I became the owner had been the one to register the number with the NDNCR either. So calls to the prior subscriber of my number could also have been erroneously reported as DNC violations.

classified as business numbers at the date of the call(s) or text(s), since the NDNCR registrations are intended to prevent calls only to residential numbers.

26.     Verkhovskaya's analysis of the 4,533 do not call numbers to determine their business/residential status was defective at several levels. First, the LexisNexis process identified <u>none</u> of the 4,533 telephone numbers as business numbers during the relevant timeframe. Verkhovskaya's only acknowledgement of this condition was to state that "This is unusual, in my experience" (Verkhovskaya Report at ¶ 48). Although Verkhovskaya acknowledged that it was unusual to have none of the 4,533 numbers identified as business, she made no attempt to explain the aberration, and made no attempt to investigate any alternative analysis that might produce results more in line with expected results. Instead, Verkhovskaya simply accepts the results and moves on.

27.     Verkhovskaya then extrapolates the questionable results to the entire population of call data, and purports that, since all 4,533 do not call numbers appear to be residential, and those calls represent 28 percent of her sample, then 28% percent of the total call population – or 203,462 calls – must have been residential numbers. Verkhovskaya would have us believe that <u>out of nearly three quarters of a million telephone numbers, not a single one</u> was a business number that was also on the NDNCR. In other words, using unsound statistical analysis, Verkhovskaya purports that calls were placed to more than 200,000 residential telephone numbers, based on a sample of just 4,533 numbers – which represent just 0.6 percent of the total population of telephone numbers.

28.     Verkhovskaya also never addresses the question of what constitutes or defines a business number. When describing the process used with LexisNexis'

undisclosed, proprietary data sources, Verkhovskaya provides no specifications or criteria used to differentiate between business and residential numbers. Verkhovskaya also states that she has "utilized LexisNexis services in dozens of court-approved settings and found LexisNexis's information to be reliable" (Verkhovskaya Report at ¶ 44). But Verkhovskaya never states that she has ever actually used this specific LexisNexis service to identify residential/business distinctions, or whether she has simply utilized other LexisNexis services, such as address identification. And Verkhovskaya provides no evidence of LexisNexis' reliability, other than her assurance that she "found LexisNexis' information to be reliable" (*Id*. at ¶ 44).

29.     For other services that LexisNexis provides (e.g. name and address identification based on telephone number) that I have analyzed in prior cases, it has been revealed that LexisNexis cannot provide reliable date ranges. For example, LexisNexis may receive a specific telephone number, and report that that number was associated with John Smith for a certain date range. But the dates that LexisNexis typically provides are specified as *first seen date* and *last seen date*. According to LexisNexis, the First and Last Seen dates correspond to the time periods when the source used by LexisNexis published the record, and not necessarily the time period for which the number was actually associated with the identified party (see ¶ 47 below). As such, when LexisNexis identifies that a given telephone number has a residential or business designation at a specific date, this is nothing more than an <u>approximation</u>.

30.     It is also noteworthy that the NDNCR specifies that "The National Do Not Call Registry is only for personal phone numbers. Business-to-business calls and faxes

are not covered"[6], but here also there are no specifications or criteria of the FTC's definition of a business number. A business telephone number could be one that is classified as a business account with that number's carrier, or a business number might be a number on a residential account, that the subscriber uses as their business contact number. And since neither LexisNexis or the FTC's NDNCR provide any such definition, it is my opinion that Verkhovskaya's analysis cannot accurately identify business numbers that the FTC intended to be kept off their DNC Registry, and that her results may very likely include numbers that were not eligible for DNC protection.

31.    Opinion B. Analysis of the Leads files performed by Verkhovskaya to determine invalid first and last names and other purported anomalies produced results that are completely unreliable and unsupported.

32.    In her Lead Files Analysis, Verkhovskaya attempts to question the validity or authenticity of the "Lead" data in the Fluent and Lead Science ("LS") lead files, which consist of various identifying data for leads who registered via web sites. This data in the Fluent lead file includes First and Last Names, registration date, street address, city, state, zip, email, telephone number, and IP address. The LS lead file includes similar but fewer fields.

33.    Verkhovskaya first explains that her understanding is that the quality of the Fluent lead file is better than that of the LS file, so she chose the most "conservative" approach, and analyzed names from the LS lead file (Verkhovskaya Report at ¶ 52). Since her objective was ostensibly to demonstrate problems with the quality of the names

---

[6] National Do Not Call registry – Basics, at https://www.consumer.ftc.gov/articles/0108-national-do-not-call-registry#basics

and other data in these files, a true conservative approach would have been to analyze the Fluent file that she understood to have better quality data. Instead, she chose to analyze the file that believes has poorer quality data, apparently in an attempt to report a greater degree of so-called "problem" data.

34.     Verkhovskaya reports that she analyzed first and last names from the LS lead file, and found "that names and addresses were outside of the industry standards. While it is common to have a small number of records with garbled or blank data (approximately 3% to 5%), it is uncommon to have greater than 50% of names and/or addresses to be garbled, invalid and/or blank—as in LS Leads Appended Records" (Verkhovskaya Report at ¶ 54).

35.     Verkhovskaya provides no basis for her claim that a three to five percent rate of garbled or blank data is common or acceptable, and she provides no basis for her claim that a fifty percent rate of garbled or invalid or blank data is outside industry standards. For example, Verkhovskaya states that "It is not common, however, to find a large number of records with text that is not recognizable as names" (Verkhovskaya Report at ¶ 55). This vague claim provides no perspective of what would be an acceptable or *common* number of records with invalid data. Neither does Verkhovskaya provide any evidence that she has ever analyzed any similar types of *lead* data (such as the leads collected in this matter) that would contribute to her insight that the data variations were acceptable or not. There is no mention of whether Verkhovskaya took into account the type of website and circumstances used to collect the lead data, since the leads might have a tendency to provide just enough valid information to be eligible for sweepstakes or rewards, but leaving other information blank or obfuscated to avoid being fully

identified. And Verkhovskaya provides no reference to the purported industry standards that she used to determine that the lead data was uncommonly garbled, invalid or blank.

36.    From my experience with Telecom companies, working with call center personnel fielding calls from customers, developing CRM applications to collect customer data, and reviewing customer data from TCPA cases, I am well aware that there are an abundance of unusual first and last names, and that customer names seem to become more unusual and more creative every day. While Verkhovskaya has not cited any standards or guidelines for the names in the lead data that she found to be invalid, I was able to refer to a number of resources to compare against the so-called name errors found by Verkhovskaya. As examples:

   a.    Verkhovskaya lists "Jefff" as an invalid first name[7], yet I was able to find Facebook pages for a "Jefff Rodland" and "Jefff Petty". While it might be argued that Facebook is not an authoritative resource for name definitions (keeping in mind that Verkhovskaya provided no authoritative sources), it also makes sense that if Jefff Rodland creates a Facebook page with his first name spelled as such, then he is certainly apt to use that spelling when registering on websites such as those used by Defendants.

   b.    Similarly, Verkhovskaya reports "Jf" as invalid, but when searching Facebook using the phrase people named "Jf", results are returned for "JF Clark", "JF Schneider", "JF Tibio", "JF Aegerter, and even "JF Kennedy".

---

[7] Verkhovskaya Report Exhibit D – Listing of Invalid First Names

c.    "Iya" is listed as one of Verkhovskaya's invalid first names, but the online site *babycenter*, which advertises itself as the world's number one digital parenting resource, lists Iya as a girl's name that means *Violet Flower*.[8]

d.    Verkhovskaya would also have us believe that "JC" and "Ai" are invalid first names. However, the U.S. census reports both of those names among its most commonly found male and female first names from the 1990 census.[9]

e.    Last names reported by Verkhovskaya fare no better when compared to available resources. Just a few of the invalid last names reported by Verkhovskaya but found in reliable resources include "Yu", "Ng", "Yee", "Yi", "Yoo", and "Ye".[10] But the 2010 U.S. Census reports the following approximate occurrences of these purportedly invalid last names across the U.S.: Yu: 52,000 occurrences; Ng: 31,000; Yee: 20,000; Yi: 18,000; Yoo: 13,000; and Ye: 9800.[11] And these examples are just the more frequently occurring names that Verkhovskaya reported as invalid, with many other purportedly invalid names appearing on the census results.

f.    Verkhovskaya also identified many examples of invalid last names that are more obscure, but that still can be identified as valid names. For example, "Aee" is noted as an invalid last name by Verkhovskaya, but according to Forebears – a website specializing in genealogical data – there are 9

---

[8] BabyCenter LLC at https://www.babycenter.com/baby-names-iya-52405.htm (last visited 12/26/2018)
[9] https://www2.census.gov/topics/genealogy/1990surnames/dist.male.first and
https://www2.census.gov/topics/genealogy/1990surnames/dist.female.first (last visited 12/20/2018)
[10] Verkhovskaya Report Exhibit E – Listing of Invalid Last Names
[11] names.zip file, which contains Names_2010Census.csv and Names_2010Census.xls, found at
https://www2.census.gov/topics/genealogy/2010surnames/

people in the U.S. with the last name Aee.[12] Similarly, Verkhovskaya identified "Aia", "Bb", and "EIO" as invalid last names, but Forebears identifies 66 owners of the name Aia in the U.S., 16 people with the last name Bb, and 13 people with the last name Eio.

37.     Verkhovskaya's findings of invalid names fails to consider other obvious factors, such as reporting "Annettte" as an invalid first name, when it may be a simple typo of the name "Annette". In this example, a lead record is found with the name Annettte Maples, which Verkhovskaya's mysterious standards would flag as invalid. However, further inspection of the data reveals no other unusual signs. The street address (XXXX[13] new center rd), city/state/zip (Hartselle, AL 35640), email address (annette.maples50@mail.com) and telephone number (256-318-XXXX[14]) all appear to be normal. The zip code provided is the correct zip code for the given street address, city and state according to the U.S. Postal Service[15] and the area code and exchange (256-318) for the given telephone number corresponds to an exchange in Decatur, AL[16] – just a few miles from Hartselle, AL as provided by the lead.

38.     Verkhovskaya provides an example of "duplicate" records created months apart, where all information, including typos, capitalizations, spacing, misspellings, extra characters, punctuation, etc., are all identical. The only difference is the IP address, implying that such records somehow were illegitimately duplicated (Verkhovskaya

---

[12] https://forebears.io/surnames/ (last visited 12/22/2018)
[13] redacted
[14] redacted
[15] Zip code by address https://tools.usps.com/zip-code-lookup.htm?byaddress

[16] Local Calling Guide at
https://www.localcallingguide.com/lca_prefix.php?npa=256&nxx=318&x=&ocn=&region=&lata=&lir=&switch=&pastdays=&nextdays

Report at ¶ 61.a).

39.     However, the Fluent data is full of records where leads registered multiple times with the same info, sometimes from the same location (IP), sometimes from different locations. Defendant's entry rules effectively invite multiple entries/registrations from the same person, as demonstrated by the Sweepstakes-a-Month 2018 Sweepstakes Official Rules, which state that "There is a daily limit on the number of Entries for each Monthly Drawing per person of three ?Entries per person, per day" while also specifying that there are multiple opportunities to enter in Sweepstakes that run month-to-month.[17] Here's an example where the same person appears to have registered 5 times on different dates with all data identical – as did thousands of leads - without problems of typos, capitalizations, spacing, misspellings, extra characters or punctuation. In this case, it appears that this lead simply registered multiple times from various locations, using the same consistent information.

| First | Last | Date | Address | City | ST | Zip | Email | Phone | IPAddress |
|-------|------|------|---------|------|----|----|-------|-------|-----------|
| Amber | Brazee | 9/29/2017 4:12 | 5 Christina ave | Grottoes | VA | 24441 | amberbrazee86@gmail.com | 540560█ | 192.168.100.48 |
| Amber | Brazee | 2/8/2018 7:36 | 5 Christina ave | Grottoes | VA | 24441 | amberbrazee86@gmail.com | 540560█ | 66.87.82.111 |
| Amber | Brazee | 1/2/2018 20:56 | 5 Christina ave | Grottoes | VA | 24441 | amberbrazee86@gmail.com | 540560█ | 172.24.32.94 |
| Amber | Brazee | 3/23/2018 14:22 | 5 Christina ave | Grottoes | VA | 24441 | amberbrazee86@gmail.com | 540560█ | 66.87.82.111 |

---

[17] https://www.sweepstakesamonth.com/path.html?p=rules.htm (last visited 12/22/2018)

40.     Verkhovskaya seems to hold the opinion that it's unusual or notable that there are multiple records with the same lead name and phone number, created months apart, with different addresses and IP locations, as she displays with her example of Aaron Gittens, who registered with the same street address in Virginia and Wisconsin. But she doesn't seem to account for simple data entry errors on the part of the website users. Could it be that lead Gittens spends time both at his home in Wisconsin and away at college in Virginia, and inadvertently entered his home street address while away at college?

41.     A Geolocation comparison was performed by Verkhovskaya, in which she apparently compared the location based on the IP address from lead records to the street address location, and provides statistics based on the purported distances between the two locations (Verkhovskaya Report at ¶¶ 62-63). Verkhovskaya provides no identification of the IP location service that she used, nor does she describe any technique or service or parameters used to compute the distance between the two locations. She also provides no justification or explanation why the distances might be significant. Even if registrations result in a street address that is thousands of miles away from the IP location where the registration was performed, this should be a fully expected and normal condition. When a website registration is performed, there are no instructions or required edits that force the user to enter a street address that is in the vicinity of where they are currently located – and there is certainly no reasonable expectation that this should be the case. If Aaron Gittens registers while away at college in Virginia, but enters his home address in Wisconsin, then naturally his Virginia IP address will translate to a location several hundred miles from his home address.

42.    Opinion C. If a set of telephone numbers contained in the proposed class(s) could be identified, any attempt to accurately and reliably identify the subscribers and/or users of those numbers – particularly a number of years in the past – will require a detailed, account-by-account and number-by-number investigation and analysis across various third-party sources, including, amongst other potential sources, cell phone carriers and the individual subscribers and users.

43.    As previously described, since Plaintiff appears to seek to represent putative classes that include all persons in the United States who received a call and/or text messages, I understand that Plaintiff seeks to represent both subscribers and users of telephone services over a period of almost five years.

44.    As I explain below, based on my knowledge, experience and review of materials associated with this case, it is my opinion that any attempt to accurately and reliably identify the subscribers and/or users of any cell phone numbers called (or texted) by Defendant(s) will require a detailed, account-by-account and number-by-number investigation and analysis across various third-party sources, including, amongst other potential sources, cell phone carriers and the individual subscribers and users.  This is primarily because there are no reliable services and data resources available, either publicly or commercially, to identify such persons accurately through a single, uniform method or process.  Rather, apart from individual or entity subscribers themselves, the various cell phone carriers are, in my opinion, the only other potential sources of information about historic subscribers for a particular cell phone number. But, as I discuss below, the cell phone carriers do not always have complete and accurate historic subscriber information dating back to February 2014.  In addition, carriers do not

generally maintain information about historic users of a particular cell phone number as of specific dates.  That information, in my opinion, resides with the subscriber(s) and/or user(s) of a particular number as of the date of a challenged call. And it will be demonstrated that my opinions regarding the inability to accurately identify historic users and subscribers is shared by other reputable experts, by prior case rulings, and by FCC Chairman Ajit Pai.

45.     In my opinion, to attempt to identify historic subscribers and users of any cellphone numbers called - via traditional call or text - by Defendant during the five year period at issue, a call-by-call and number-by-number process must be undertaken.

46.     Cell phone services do not follow a single pattern of ownership and use. Some cell phone accounts may have only one subscriber, who is also the sole user, but several other possible iterations exist.  For example, the subscriber may not be a user of the cell number at all, and there may be multiple authorized users of the number and one or more of the authorized users may not be the subscriber.  This often occurs in the context of business plans (where a corporation or entity is the subscriber of a number with one or more different users) or family plans (where a single family member is the subscriber of an account with several different numbers used by other family members). In some cases, a single wireless number may be shared or accessible by multiple members of a household, and these members may not even share a common surname. Given these and other issues, as well as the lack of a single publicly-available database, directory, or other source accurately identifying historic subscribers and users of cell phone numbers as of particular historic dates, it is my opinion that, any attempt to accurately and reliably determine the historic subscriber of a given cell phone number as

of the date of a particular call will require obtaining and analyzing records and information from third-party sources, including, among other sources, cell phone providers and subscribers.  Those sources will, in my opinion, vary from number to number, depending on various factors such as the date of the call and the cell phone carrier for the number at issue.  For similar reasons, it is also my opinion that the historic user(s) of a cell phone number as of a particular date cannot be accurately and reliably identified without obtaining information from, among other sources, the subscribers and/or users themselves.

47.    **Public identification services and Skip Tracing**:  In my experience, TCPA plaintiffs often suggest they can identify individual cell phone subscribers using public or pay identification services or skip tracing.  There are myriad publicly available databases that purport to perform reverse phone number lookups and provide subscriber—not user—information like name and address, and there are a number of vendors who provide varying levels of commercial data lookups, usually via Application Program Interfaces (API).  Based on my research and my business and expert experience, it is my opinion that these services cannot reliably and accurately identify historic cell phone subscribers because each service is subject to significant limitations and errors.

   A.    These services are data aggregators.  As a result, the reliability of these services is entirely dependent on the reliability of their source data.  Many free, web-based services do not identify their data sources, and so it is not possible to evaluate their accuracy.  Issues such as errors in data entry, number reassignment, and out-of-date data multiply these inaccuracies.  Data from public records is typically available only with current values,

and without the historical records that would be required to identify a subscriber at a given point in time in the past when challenged calls were made. This is the case for all publicly available data sources of which I am aware, such as web-based reverse number lookups. As a result, these services cannot assist in identifying historic subscribers.

B. Commercial databases, such as LexisNexis, that offer paid searches to businesses, do advertise historical searches of their public record information. However, those data providers must aggregate that data themselves over time in order to store and produce historical results, leading to inaccuracies. LexisNexis even carries the following disclaimer on its web-site, specifically addressing these limitations: "Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor is it a comprehensive compilation of the data. Before relying on any data, it should be independently verified" (emphasis added)[18]. As a courtesy, a partial image of the LexisNexis disclaimer is attached as Exhibit B. Upon deeper inspection of LexisNexis' various web pages, it is evident that they feel the need to provide ample publication of their disclaimer. My recent

---

[18] See for example, LexisNexis WorldCompliance Data at
https://risk.lexisnexis.com/products/worldcompliance-data  (last visited 1/3/2019)

search of their websites revealed that the LexisNexis accuracy disclaimer appears in some form on more than <u>thirty-five (35)</u> different web locations, including services that cover insurance claims, health records, motor vehicle records, compliance data, and most notably – ***public records*** – and search results indicate that the disclaimer appears on dozens more locations that I did not verify. (See Exhibit D). LexisNexis even provides a whitepaper offering services to improve the accuracy of their customers' data records – including telephone numbers, names and addresses – but includes their standard disclaimer warning that data provided by LexisNexis is prone to errors.[19] It was also quite telling to find the **accuracy disclaimer** on LexisNexis' **Phone Finder** service, which purports to provide customer identity data based on phone number searches.[20] As one can see, LexisNexis' own disclaimer supports many of the limitations that I have already itemized regarding the lack of accuracy in public and commercial data records, and that disclaimer does nothing to support the accuracy or reliability of data provided by LexisNexis. And the accuracy disclaimer that LexisNexis carries on their website is not unique among commercial skip-tracing and public record identification vendors, including well-known vendors such as MicroBilt, Experian and TransUnion. MicroBilt's accuracy disclaimer highlights some of the same pitfalls that LexisNexis and I have both raised: "Public Record

---

[19] White Paper – A Business Case for Fixing Provider Data Issues, available at http://techhubly.com/lexisnexis-resources/files/A%20Business%20Case%20for%20Fixing%20Provider%20Data%20Issues_WPNXR5062-0.pdf (last visited 10/25/2018)
[20] LexisNexis Phone Finder at https://risk.lexisnexis.com/products/phone-finder (last visited 10/25/2018)

Information provided to User from or through MicroBilt is derived solely from public records, which may not be 100 percent (100%) accurate or complete…. Public Record Information contained herein should not be used in legal proceedings; ….Be aware that Information is obtained and managed by fallible sources and that for the Fee charged, MicroBilt does not guarantee or insure the accuracy, completeness, timeliness, depth or continuation of Information"[21] (emphasis added – also, as a courtesy, a partial image of the MicroBilt disclaimer is attached as Exhibit C). Experian and TransUnion also carry their own disclaimers in which they do not warrant the correctness or accuracy of information, products and services.

C.   In past cases, I have analyzed subscriber information by comparing results from LexisNexis against six web-based reverse number services, and a seventh, API-based service.  In many cases, the subscriber names returned by these identification services varied significantly – however, in numerous examples, many of the seven search services produced common subscriber results, but <u>none of the seven services returned the same subscriber name identified by LexisNexis</u>.  These variations are likely the result of differing source data, errors in data entry, variations in historic data, and other issues, but add doubt to the reliability of LexisNexis.

D.   As an additional test of LexisNexis' accuracy, I recently requested a full file disclosure of <u>all</u> information that LexisNexis carries on my personal

---

[21] Microbilt User Agreement at http://www.microbilt.com/user-agreement (last visited 12/23/2018)

identity.[22] LexisNexis provided me with a comprehensive 470 page report, dated November 21, 2018. The report included a section titled "Phone Records", with the following description: "This section contains phone listings. The first and last seen dates correspond to the time periods when the source published the record, and not necessarily to the time period with which you had the phone number". The report provided several telephone numbers for which I have been the subscriber. However, absent from the report were ANY wireless telephone numbers that I have used. The report did not list my current, primary wireless number, for which I've been the sole authorized user since 2005. This primary number is also prominently displayed on my publicly-available business website, and has appeared there for nearly four years[23]. The full file disclosure also did not list a prepaid wireless phone that I have used for the past seven months. For my telephone numbers that it did list, each number was listed on multiple records from multiple data sources that included conflicting dates, and many of the dates provided (*first seen* and *last seen* dates) did not match the actual dates that I was subscribed to those numbers – in some cases being off by a number of years.

E.     To further test the accuracy of reverse-lookup services, I recently performed a web-based reverse phone search using my daughter-in-law's cell phone number.  I am familiar with her number, and I know she has

---

[22] LexisNexis Access Your Full File Disclosure at
https://personalreports.lexisnexis.com/access_your_full_file_disclosure.jsp (last visited 12/23/2018)
[23] See archived version of http://jankostyun.com/contact-info/  captured April 7, 2015, at
https://web.archive.org/web/20150407033904/http://jankostyun.com/contact-info/

been the subscriber of the cell phone service to which that number is assigned and that she has been the sole user of that cell phone number for the past 11 years.  Several search sites provided no results at all.  Using the search site spokeo.com – a site that Verkhovskaya has reportedly used in past cases - the phone number was found, and I paid a small fee to receive the report that should have returned my daughter-in-law's name and address.   The results of the search indicated that the current owner is Duane Darling, and included the names Gerald Darling and Nic Darling as previous owners, all at the same address in Virginia.  Duane Darling is not the name of my daughter-in-law or anyone in her immediate family, and she has lived in Connecticut for the past nine years.  I also performed the same search using an API-based service from searchbug.com, and the results indicated Gerald Darling as the owner at the same Virginia address as provided by spokeo.

F.    In *Goins v. Walmart and Palmer Recovery Attorneys* – for which I provided an expert rebuttal report in support of Defendants – Plaintiff's expert Verkhovskaya claimed that she processed the telephone number belonging to Plaintiff and class representative Amber Goins, using LexisNexis as her vendor, and that this process identified the number as belonging to Ms. Amber Goins. In reality, when Verkhovskaya and her team provided Plaintiff Goins' telephone number to LexisNexis, the results that were returned included only the names "LaShante McCall", "Kenia Ayala" and "Lesley Goins". The purported identification by

29

LexisNexis was faulty in numerous ways: Plaintiff Amber Goins was never identified by LexisNexis as being associated in any way to the subject telephone number; in identifying Lesley Goins' association with the subject telephone number, LexisNexis provided no data or indication that connected Lesley Goins to Plaintiff Amber Goins; in identifying Lesley Goins' association with the subject telephone number, LexisNexis did not provide a date range that covered the relevant time period of the call(s) at issue; once Verkhovskaya received the information from LexisNexis regarding Leslie Goins, she deviated from her documented methodology, and performed a manual, individualized investigation against other data sources in an attempt to connect Amber Goins with Lesley Goins, and therefore connect Amber Goins with the subject telephone number. And when questioned at deposition, Plaintiff's expert even suggested that she might ask Plaintiff's counsel to help determine the relationship between Lesley Goins and Amber Goins. This example clearly shows how the usage of skip-tracing vendors such as LexisNexis to correlate telephone numbers to users or subscribers has been unsuccessful, and further exhibits the need for individualized inquiries to provide accurate user identification.

G.    In another prior case for which I was engaged as an expert, the defendant utilized a verification service provided by Neustar that provides information on the connection between a name and telephone number. The defendant provided Neustar with the name of one of the defendant's

account holders, along with the telephone number that the defendant believed was associated with that account holder. Neustar's verification service returned a result to the defendant that the number was still in service, and that there was a positive match between the telephone number and the account holder name that was provided. However, carrier records subsequently revealed that the account holder had actually disconnected that telephone number several months before the verification was performed. This example demonstrates that even services provided by a respected telecom vendor such as Neustar can be unreliable.

48.    **Name Directories**:  CNAM (Caller Name) is a service coupled with caller ID that displays a name associated with the calling phone number on the phone receiving the call.  Some plaintiffs may assert that the CNAM database is a reliable source for subscriber data.  In my opinion, it is not.  The CNAM database exists for both landline and cellular phone numbers, but its content (like other public subscriber databases) is quite limited.  Major phone carriers do not have incentives for keeping the CNAM database accurate and up-to-date.  This is because there is little demand from customers to provide this service, and carrier participation in updating the CNAM database is voluntary and chargeable to the carrier.  Furthermore, the CNAM database, like many of the other public data sources, only provides current subscriber information, and there is no known historical version as would be required to identify a subscriber at a given point in time in the past when any of the challenged calls had been placed.

49.    **Reliability of subscriber information from carriers**:  While cell phone carriers are a source of historic subscriber information for a given cell phone number,

there were many carriers during the period that dates back to February, 2014—some of which no longer exist or have been combined with others—and their historic subscriber records (assuming they exist) do not always accurately identify historical cell phone subscribers.  Cell phone carriers have limited capabilities and varying standards for collecting and maintaining information on subscribers.  When a customer initially contracts for cell phone service, the carrier's main objective in procuring subscriber identification is for the purposes of collecting payment.  This may immediately result in limited or inaccurate customer information being recorded on the subscribers account. Customers might intentionally provide inaccurate contact information, or subscriber information might be incorrectly recorded via data entry.  Since cell phones are not tied to a physical location, there are limitations in verifying that the address provided by the subscriber is accurate.  Even if the customer data initially collected and recorded is accurate, changes to that data are common, due to actions like subscribers moving to a new address or changing names, but neglecting to report these to the carrier.

50.    In order to procure accurate, historical subscriber identification from carriers via subpoena, it is necessary to identify which subset of telephone numbers should be sent to each individual carrier for identification. Further, in order to subpoena cell phone carriers in an attempt to identify subscribers as of some prior date, one must first identify the specific cell phone carrier that provided service to the given telephone number at the historical time of alleged calls. While there are resources available to identify the current cell phone carrier for a telephone number or block of numbers, I am not aware of any such services that can accurately identify historical cell phone carriers.

51.    Plaintiff or Plaintiff's expert might propose sending all telephone numbers

to all carriers via subpoena, without regard to historical carrier ownership based on the dates of the calls. I find this solution impractical and unreliable for several reasons. Sending thousands of telephone numbers to smaller carriers would prove overly burdensome for them, and could very well result in no data being provided by such carriers. Sending the same fully-inclusive list of numbers to all carriers will also undoubtedly result in conflicting data results, which would be effectively impossible to resolve. For example, if all telephone numbers are sent to all carriers, Verizon and Sprint might both respond with historic customer records for that same telephone number. Those responses might identify different subscribers, or what appears to be the same subscriber with different service dates, different addresses, or variations in other key information. There would be no way, short of performing a manual investigation of all conflicting telephone numbers, to reliably determine which carrier's information (if either) was correct.

52.     Plaintiff, or Plaintiff's expert is likely to be unaware (or unconcerned) that the carrier ownership of numbers can change due to porting. In fact, the ported-number data that can be downloaded by vendors to track changes in wireless status due to number porting does not provide any identification of carrier changes as part of that porting activity. For example, any telephone number identified as a wireless number at the date it was allegedly called, might have been serviced by Verizon Wireless at the time of that call, but incorrectly identified as serviced by T-Mobile (based on current ownership due to porting) when attempting to generate a subpoena for that number.

53.     The historical carrier ownership of telephone numbers can also change on a larger scale due to Number Pooling. Introduced at the same time as Number Portability,

carriers are required to participate in Number Pooling, where large blocks of telephone numbers, usually in multiples of 1000 numbers, are donated from the control of one carrier to another. Similar to the number portability scenario, a telephone number that was owned at some point in the past by Verizon Wireless might now be owned by T-Mobile, due to donation of the block containing that number to T-Mobile from Verizon. Without a resource to identify the historical carrier ownership of numbers, a current lookup of the carrier that owns a telephone number would not accurately identify the correct carrier who owned that number at a given date in the past.

54. The volatility of carrier ownership of telephone numbers over time due to extensive mergers and acquisitions among carriers in the wireless industry, as well as carriers simply going out of business, also prevents accurate identification of historical carrier ownership. Wireless carriers can be classified in two categories: Facilities-based wireless carriers (also known as MNOs – Mobile Network Operators); and Wireless Resellers (also known as MVNOs – Mobile Virtual Network Operators). Facilities-based wireless carriers typically own their own network, equipment, and facilities such as switches and radio frequencies, whereas Wireless Resellers will lease a large portion of network, facilities, and sometimes support services (such as billing, order entry, etc.) from a Facilities-based carrier. Although the top 5 or 6 Facilities-based carriers own a large percentage of wireless telephone numbers and associated customers, there are still many smaller Facilities-based carriers and Resellers in operation responsible for a significant number of customers and wireless numbers. Currently, there are approximately 75 Facilities-based wireless carriers in operation, as well as roughly 100

Wireless Resellers[24]. Over the past several years, there are also some 35 Facilities-based wireless carriers who are no longer in business (due to merger, acquisition, insolvency, etc.), and more than 50 Wireless Resellers who no longer provide service. Many of these former wireless carriers were still in business during the class period of more than four years for this case. Based on this high volume of churn, it is likely that some of the wireless numbers that allegedly received challenged calls during the time period in question were owned and serviced by carriers who are no longer in business. Once again, there is no service or database that I am aware of that would allow for the identification of the carrier of record for those numbers at the historical date of alleged calls. And if any of those carriers could be identified, the fact that they are no longer in business would certainly prevent some or all of the requests to identify subscribers from being fulfilled.

55.     Besides the need to identify the correct carrier for given telephone numbers as of historical dates, there are still significant reasons why the subscriber identification provided via subpoena would be highly suspect. It has already been discussed that many wireless carriers who provided service to customers dating back to February, 2014 are no longer in business, and as such would be unable to identify any subscriber-related data. Carriers who are still active have their own set of limitations related to providing accurate, historical subscriber information.

56.     **Carriers' retention of records**:  Retrieving individual customer usage information (e.g., call detail records and audit trails of text messages) directly from

---

[24] Both facilities-based wireless carriers and wireless resellers are described by a number of resources, including the FCC's Mobile Wireless Competition Report, and CTIA's Wireless Industry Indices Report. For a summary of current and previous wireless carriers and resellers, see Wikipedia's List of United States wireless communications service providers at
https://en.wikipedia.org/wiki/List_of_United_States_wireless_communications_service_providers
and Wikipedia's List of United States mobile virtual network operators at
https://en.wikipedia.org/wiki/List_of_United_States_mobile_virtual_network_operators

wireless carriers potentially could assist in the identification of historic subscribers for that number.  Doing so would likely require a subpoena or other records request connected to individual cell phone numbers.  Through review and analysis of these records on an account-by-account basis, it may be possible to identify subscribers of individual cell phone numbers.  This laborious analysis would, however, be incomplete and inaccurate.  This is because the retention requirements for such types of records among carriers are much less stringent than for landline carriers, and vary widely in the industry.  For example, the U.S. Department of Justice (DOJ) reported that Verizon retains subscriber information for three to five years; T-Mobile for five years; and Sprint, Nextel, and Virgin for an "Unlimited" amount of time.[25]  For AT&T/Cingular, the DOJ reported that retention duration "[d]epends on length of service." More recent reports, such as one from the Massachusetts ACLU in 2014, indicate that those retention periods can be even shorter – with Sprint's retention of subscriber data reported as 18 months, and Verizon's retention reported simply as "more than one year"[26]. Also with respect to data retention, Verizon's privacy policy states that "Personally identifiable and other sensitive records are retained only as long as reasonably necessary for business, accounting, tax or legal purposes."[27], indicating that subscriber data is essentially stored no longer than is absolutely necessary. It is also noteworthy that resellers, or subsidiaries of larger carriers (e.g. MetroPCS as a subsidiary of T-Mobile) are likely to have their own, different retention periods for subscriber and call records. For example, although T-

---

[25] U.S. Department of Justice Report on "Retention Periods of Major Cellular Service Providers" dated August 2010, available at http://www.pcmag.com/article2/0,2817,2393887,00.asp (last accessed 12/12/2017).

[26] PrivacySOS report , dates February 9, 2914 at https://privacysos.org/blog/how-long-does-my-phone-company-store-my-data-how-easily-will-it-give-my-info-up-to-the-cops/

[27] Verizon Wireless' Full Privacy Policy at http://www.verizon.com/about/privacy/full-privacy-policy (last visited 12/11/2017)

Mobile is reported to keep subscriber records for five years, and call detail records for up to five years, it is my understanding that MetroPCS retains subscriber records for only six months, and call detail records for just two years. Based on these observations, attempts to identify subscriber ownership through carriers will encounter numerous problems, including: the scenario where subscriber records are retained for a shorter period than call detail records; the reality that many or all wireless carriers may not carry records back to the date required to identify subscribers for the entire class period; and the strong possibility that some carriers won't have the capability to produce any subscriber records at all for the entire class period.

57.   **Prepaid telephone services**:  Prepaid phones are available to customers from a multitude of sources—traditional cell phone carriers, department stores, convenience stores, online retailers such as Amazon, and online auction sites like Ebay, among others.  This wide variety of sellers makes collection of subscriber information less uniform or non-existent, and further reduces the reliability of any data that is collected by and potentially available from them.  And if any subscriber information were to be collected, the personnel recording that information – store clerks, online sellers, etc. – are not trained or accustomed to collecting subscriber information and more prone to erroneous or incomplete collection. There is no requirement at the federal level for purchasers to provide any verification of name, address or other contact information.  A federal bill was introduced in 2010 to institute an identification requirement for the purchase of prepaid mobile devices, but has never been passed into law.[28] More recently,

---

[28] Pre-Paid Mobile Device Identification Act, S. 3427, 111th Cong. (2010).

a similar bill was introduced to Congress in 2016, and was also never enacted.[29]

58.     And the number of prepaid phones is now a very significant portion of the wireless landscape. According to the FCC's Twentieth Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile Wireless, it is estimated that, as of 4Q2016, roughly 23 percent of retail wireless connections were based on prepaid service, versus 77 percent for postpaid accounts.[30]

59.     As there is no mandated requirement that prepaid phone carriers obtain and maintain subscriber identification data, accurately identifying individual, historic subscribers of prepaid phone services – accounting for nearly one-quarter of wireless phones – would be practically impossible.

60.     **Cell phone number reassignment**:   The generic process used in the mobile industry for deactivation and recycling telephone numbers creates additional problems with the accuracy of historic subscriber data related to a number.   Based on my experience in the provisioning of mobile service, the deactivation process typically follows this pattern:   (1) a subscriber chooses to cancel service with an existing provider, and chooses not to port their number to a new provider; (2) the service provider cancels service and adds the telephone number to a deactivation list; (3) telephone numbers stay inactive for a prescribed number of days, depending on the carrier, before they are recycled and assigned to a new subscriber; and (4) after the deactivation period, the number can be reassigned to a new subscriber.[31]   Typically, the carrier/service provider(s)

---

[29] H.R. 4886 (114th): Closing the Pre-Paid Mobile Device Security Gap Act of 2016

[30] FCC 17-126, Appendix II:Table II.B.ii, p.73

[31] According to Federal guidelines, disconnected numbers must be made available for reassignment in 90 days or less, but there is no minimum timeframe, indicating that carriers may reassign numbers in as little as one or two days. See 47 CFR § 52.15 at https://www.gpo.gov/fdsys/pkg/CFR-2013-title47-vol3/pdf/CFR-2013-title47-vol3-sec52-15.pdf

will update its internal records to indicate the change of subscribership for the reassigned number.  However, many of the supplemental data sources that have been previously discussed have a high probability of carrying outdated subscriber data.  Public data sources like those used in reverse lookup services, private data sources such as those used by vendors like LexisNexis, the CNAM database, and even the National Do Not Call registry all face the likelihood of including outdated subscriber data due to this reassignment process.

61.     And further supporting the fact that subscribers cannot be accurately identified based on telephone numbers, including those limitations based on number reassignment, FCC Chairman Ajit Pai himself has opined that "no authoritative database … exists to 'track all disconnected or reassigned telephone numbers' or 'link[] all consumer names with their telephone numbers'."[32] And in support of that statement, Chairman Pai referred to documentation from Richard Fruchterman, the Associate General Counsel of telecom industry data leader Neustar.[33] In that same opinion, Chairman Pai noted that "over 37 million telephone numbers are reassigned each year".[34] The FCC as well has acknowledged the problem of incorrectly identifying subscribers due to number reassignment, with its issuance of Notice of Proposed Rulemaking, specifically addressing "the problem of unwanted calls to reassigned numbers" (FCC 18-31, Second Further Notice of Proposed Rulemaking, released March 23, 2018, at ¶ 1). In that same notice, the Commission points out that "Upon disconnecting his or her phone

---

[32] DISSENTING STATEMENT OF COMMISSIONER AJIT PAI Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, WC Docket No. 07-135 at 3.

[33] Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (Feb. 5, 2015).

[34] DISSENTING STATEMENT OF COMMISSIONER AJIT PAI Re: In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, WC Docket No. 07-135 at 3.

number, a consumer may not update all parties who have called him/her in the past, including businesses to which the consumer gave prior express consent to call and other callers from which the consumer expects to receive calls.  When that number is reassigned, the new subscriber of that number may receive unwanted calls intended for the previous subscriber." (*Id*. at ¶ 3). And the Commission further identifies the lack of any reliable resource to identify number reassignments, which includes the inability to identify the newly assigned subscriber of a reassigned number: "While existing tools can help callers identify number reassignments, 'callers lack guaranteed methods to discover all reassignments' " (*Id*. at ¶ 5).  The resulting effect of reassigning more than 100,000 telephone numbers every single day is two-fold: the inaccuracies of any data source that purports to identify subscribers based on telephone numbers are severely compounded; and any organization attempting to call known telephone numbers with prior consent is destined to reach unknown parties at the receiving end of a reassignment, despite that organization's best intentions and practices.

62. **Authorized user identification**:  The complex, number-by-number process of attempting to reliably and accurately identify the historic subscriber associated with a cell phone number as of the date of a challenged call does not even begin to address the identification of cell phone users.  Because the subscriber and authorized user of a cell phone number are not necessarily the same person, identifying the subscriber does not mean the user has been or can be identified.  Many cell phone accounts have more than one user.  For example, businesses often have a single cellular account and a single telephone number that is shared by several employees, or multiple numbers used by multiple employees – but the subscriber on the account might be the office

administrator.  Families often have a single cell phone account and a single cell phone number shared by different family members, or multiple numbers that are used by multiple family members.  Sometimes, individuals in a single "family plan" are not related and may not have the same surname.  As a result, even if it were possible to use carrier records to identify a number as belonging to an individual family plan, a core family unit (e.g., parents and children, or even grandparents, parents, and children) would not serve as a proxy for all potential users of that number.  Typically, none of this user information is recorded in cell phone provider records.

63.      For example, in the case of *Wilson v. Badcock*, for which I was engaged as an expert, named plaintiff Victoria Wilson has testified that she is the user of the wireless telephone number that allegedly received calls from the defendant. But Wilson's Grandmother, with whom she lives, pays for that telephone service. Subscriber records produced in that case confirmed that: Wilson's Grandmother (Colleen Powell) is the subscriber of the number at issue; there is no indication that anyone other than Wilson's Grandmother is associated with the account; the subscriber name on the account of Colleen Powell bears no similarity to plaintiff Victoria Wilson's name; and the subscriber records report a subscriber address that does not match the residential address that plaintiff Wilson described during her testimony as being shared with her Grandmother. This example clearly describes the common occurrence in which both authorized user names and/or addresses are not associated with their own telephone number.

64.      It would also be foolish to dismiss the effect that scenarios such as family plans have on the issue of user identification, since research has estimated that as many as

75 percent of wireless subscribers are on discounted, multi-line family plans.[35]

65.    As a result, in my opinion, there is no way to reliably and accurately attempt to identify the historic user(s) of a given cellphone number as of a particular date without, at a minimum, first obtaining information from the subscriber(s) and user(s) of that number as of the date of the challenged call.  And, given that the multiple user scenario I have described might be combined with other scenarios, like a prepaid phone, even this level of number-by-number analysis may be insufficient to identify subscribers and user(s) for a given number at the time of the challenged call.

66.    In another telling example of the unreliability of carrier records, cell phone subscriber records were produced via subpoena in *Goins* for the telephone number associated with Plaintiff and class representative Amber Goins. I reviewed the subpoena response from MetroPCS, in which they were asked to provide subscriber information for Plaintiff Goins' wireless telephone number during the relevant time period. Of the documentation produced by MetroPCS, the only subscriber during the relevant period was identified as a person with the name LaShante McCall. Plaintiff's name Amber Goins did not appear anywhere in the documentation produced by MetroPCS in response to the subpoena. Similarly, the surname Goins did not appear anywhere in the documentation produced by MetroPCS.

67.    **Confirmation of my opinions from other sources**: The opinions that I have set forth regarding the lack of reliability in the historic identification of wireless status of telephone numbers, the erroneous nature of identifying historic users and subscribers associated with those numbers, and the pitfalls associated with using third-

---

[35] *Wireless subscribers are finding breaking up is hard to do*, by Andy Vuong, The Denver Post, September 14, 2012, available at https://www.denverpost.com/2012/09/14/wireless-subscribers-are-finding-breaking-up-is-hard-to-do/ last visited 10/19/2018

party vendors for historic identification, are also supported by the opinions of other reputable experts, as well as reasoning documented in prior court rulings.

68. For example, in the case of Newhart v. Quicken Loans (No. 9:15-cv-81250 S.D. FL), similar issues were addressed in the expert report of Ken Sponsler (DE 123-22 9/2/2016) ("Sponsler Report") when he rebutted the expert report of Plaintiff's expert for that case. When describing Plaintiff's expert's use of third-party vendors, Mr. Sponsler states "Ms. Verkhovskaya has failed to identify the data sources or process used by the third-party vendors with which she contracts…. Ms. Verkhovskaya's report does not define any of the records and sources relied upon to determine whether a telephone number was assigned to a cellphone on a specific date(s)" (Sponsler Report at 13).

69. Mr. Sponsler also points out – similar to my descriptions above – that there are significant problems with the accuracy of third-party skip-tracing and public identification vendors: "... Ms. Verkhovskaya has not stated (nor could she, based on her report) that she has personal knowledge of these third-party vendors' error rate(s). Her expert report claims that '[i]n [her] experience,' these vendors 'provide accurate and reliable information' " (*Id.* at 15)

70. Mr. Sponsler does cite his own experience with vendors such as LexisNexis and their lack of accuracy by stating "In my experience, however, when determining the historical subscriber of a mobile telephone number, third-party vendors such as LexisNexis have an error rate that may be as high as 85%" (*Id.* at 15). His opinion on this subject is also in line with the questionable accuracy of LexisNexis results that I described from the Shamblin case.

71. In the case of *Balschmiter v. TD Auto Finance* (No. 2:13-cv-00186 E.D.

WI), similar issues were addressed in the declaration of Dr. Debra Aron (DE 44 8/29/2014) (the "Aron Report") when rebutting the expert report of Jeffrey Hansen in that case.

72.     "In addition to web-site services, there are also reverse look-up services available from data vendors, to which one can submit a database or list of telephone numbers and that purport to provide a more reliable service than those available on line. I understand that these services may obtain their information from a variety of sources such as lists that are sold when people sign up for magazines, warranties, or other products, or provide their names to web sites. However, these services do not provide a way to test the reliability of their data, and indeed these services typically do not divulge their source(s) of information. In my experience, "reverse look-up" services available from data vendors do not purport to offer historical data on wireless subscribers with which one can determine the subscriber or user of a wireless telephone number on a specific date, and reliability statistics on their current data are not offered. These services also do not warrant the information to be accurate. In one matter in which I testified, the expert witness testifying as a class administrator testified that she believes the data from a particular third-party reverse look-up data vendor that she intended to rely upon for reverse lookup services was 20 to 30 percent inaccurate." (Aron Report at 23).

73.     Other TCPA cases have also produced decisions that confirm my opinions regarding the problems with the practical and accurate identification of potential class members. For example, in *Sherman v. Yahoo*, No. 3:13-cv-00041 (S.D. CA), the court found that records from a cell phone provider and the use of reverse-lookup services failed to demonstrate "an administratively feasible method of identifying the putative

class members" (Order Granting Leave To File Surreply And Denying Motion For Class Certification, D.E. 191 at 12).

74.     When ruling in *Jacobs* (*Jacobs v. Quicken Loans*, No. 9:15-cv-81386 (S.D. Fla.)), the court stated "As explained by Defendant's expert, Jan Kostyun, there is no public database of cell phone subscribers, and private services are often inaccurate and incomplete. (Kostyn [sic] Report ¶¶ 14-15, DE 136-1.) Additionally, even if a carrier-by-carrier investigation was undertaken, it still would not ensure accuracy. (*Id.* at ¶¶ 16-19.)" (Order Denying Class Certification at 7).

75.     And in its decision to deny class certification in *Wilson v. Badcock* (No. 8:17-cv-02739 (M.D. Fla.)), the court similarly remarked that "According to Defendant's expert, there is no public database of cell phone subscribers and private services are often inaccurate and incomplete, and even a carrier-by-carrier investigation would not ensure accuracy" (*Wilson* D. E. 102 at 6). Also in *Wilson*, the court refers to Verkhovskaya's proposal in that case to use "reverse directory database vendors and subpoenas to cell phone carriers to identify those persons whom Defendant called" and states that her proposal "suffers several mechanical shortcomings" (*Id.* at 5-6). The court continues by describing that Verkhovskaya claims that cell phone user identification "is possible, though one of her chief sources is the **unobservable, proprietary "black box" techniques of LexisNexis**" (*Id.* at 6, emphasis added).

## Reservation of Right to Amend

76.     I reserve the right to offer additional opinions and/or to amend this report subject to additional information I receive after issuance of the same.

**Expert Report Summary**

77.     Verkhovskaya's analysis of call data and telephone numbers for Do Not Call violations exhibited numerous problems: non-existent supporting documentation, guidelines or statements of accuracy in the process used by Verkhovskaya's vendor to determine numbers on the NDNCR at the date(s) they were called; the demonstrated lack of controls to ensure that authorized subscribers or users have registered DNC numbers for which they are authorized; the lack of full hygiene processes to remove DNC entries that were registered for numbers that have subsequently been reassigned; a lack of any specifications to determine which numbers on the NDNCR correspond to invalid business entries; and unsound statistical techniques used by Verkhovskaya to inflate the apparent number of Do Not Call telephone numbers, based on her extrapolation of results. Based on these demonstrated problems, it is my opinion that Verkhovskaya's analysis of call data against the NDNCR is of little or no value.

78.     It has also been demonstrated that Verkhovskaya's analysis of the lead data for invalid data and other anomalies produced results that are completely unreliable and unsupported. Verkhovskaya claimed to have identified numerous examples of invalid first and last names – yet she provided no standards or guidelines that were used in determining their validity, and I was able to use several resources – including the U.S. Census – to show that so many of Verkhovskaya's results were clearly wrong. In attempting to describe anomalies in the lead records, Verkhovskaya ignored numerous reasons for the data conditions that she described, including simple data entry typos or intentional obfuscation of the data by website users. And when implying that multiple entries for the same lead might have somehow been automatically or mysteriously generated, Verkhovskaya fails to recognize the intent of the websites used to collect lead

data, and the fact that users were encouraged to provide multiple registrations.

79.     Finally – based on my extensive experience with and observations of subscriber and user data; the overwhelming obstacles described in accurately identifying the historic users and subscribers of telephone numbers; and the concrete examples presented of inaccurate identification – it is my opinion that any attempt to accurately and reliably identify the subscribers and/or users of those numbers – particularly a number of years in the past – will require a detailed, account-by-account and number-by-number investigation and analysis across various third-party sources, including, amongst other potential sources, cell phone carriers and the individual subscribers and users. None of these obstacles are accommodated by Verkhovskaya's proposed reverse append methodology.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 4th day of January, 2019 at Burlington, CT.

_____
Jan Kostyun

# Exhibit A – Jan Kostyun CV



Jan Kostyun has over 35 years of experience in computer systems and software development, enterprise architecture, and telecommunications including extensive experience in the wireless industry.   Mr. Kostyun has broad telecom experience in both wireless and wireline disciplines. His wireless experience includes wireless telecommunications standards, text messaging, voice and voicemail internals, and in-depth experience with the end-to-end cellular provisioning process.  His wireline/landline experience includes development of software systems to support business operations and provisioning of landline services, including overall architectural knowledge of the wireline business. Mr. Kostyun is also recognized as an industry expert in the field of Local Number Portability (LNP) and the process of customer movement between cellular carriers, as well as significant experience in landline number portability and number pooling.   He also has a wide range of experience in database technologies as well as data analysis. Mr. Kostyun has held senior technical positions with Bell Telephone Laboratories, Exxon-USA, GTE and Verizon, as well as consulting positions with Informatics, Syniverse Technologies, BusinessEdge Solutions/EMC and eComp Consultants.

His experience encompasses successful assignments in implementing eCommerce, Business Intelligence & Telecommunications systems in the U.S. and Canada, as well as a collaborative effort with the National Regulatory Agency of Colombia.

Mr. Kostyun's extensive experience has enabled him to provide expert opinions, reports and analysis in legal matters covering trade secret misappropriation, copyright infringement, software financial valuation and damage assessment, patent infringement, and litigation involving the Telephone Consumer Protection Act (TCPA).

**Professional Experience:**

**2012 to present**      *Independent Consultant*                                                    *Middletown, NJ*

Technology consulting, including
- Expert witness representing defendant under civil case alleging violation of Telephone Consumer Protection Act (TCPA). Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants.
- Expert consultant representing defendant in civil case alleging violation of TCPA. Provided analysis and report of plaintiff telephone numbers, porting activity and subscriber information.
- Expert consultant representing defendant under class action complaint alleging violation of TCPA involving text messaging/SMS activity. Provided analysis and report of CTIA/Wireless Industry best practices for short code messaging campaigns.

48

- In class action TCPA case, served as expert to provide ATDS evaluation, analysis of express consent and TCPA applicability of contested texts and voice calls.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report.
- Expert witness in class action TCPA complaint, providing in-depth analysis of National and internal Do Not Call (DNC) records and very large volume call record files, and critical assessment of opposing expert's data analysis.
- In class action TCPA case, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of fax telephone numbers. Also developed expert report rebutting opposing expert's opinions regarding successful completion of fax transmissions and identification of fax recipients.
- In class action TCPA matter, developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC and wrong number calls, and addressing technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, performed extensive analysis of high-volume call data records against internal and national DNC files.
- In class action TCPA case, analyzed call data records, performed testing and analysis of defendant's telephone calling system and provided opinions addressing defendant's alleged use of an ATDS for telemarketing purposes.
- In class action TCPA case, developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action TCPA matter, developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, reliability of opposing expert's data vendors, and addressed technical aspects of identifying users/subscribers of cell phones.
- In class action matter involving the Washington Automatic Dialing and Announcing Device (WADAD) statute, provided expert analysis and support regarding carrier records, carrier subpoena responses, and identification of wireless/landline subscribers and calls within specific geographic boundaries.

**2009 to 2011**       **Senior Consultant**
                       ***eComp Consultants***                                    ***Tampa, FL***

Provided consulting on design and development of software products and wireless technology. Provided technology consulting and expert support for enterprise architecture, software engineering and telecommunications in the areas of:
- Patent portfolio evaluation, market valuation, and prior art analysis.

- Patent litigation consulting for information technology in telecommunications, wireless and enterprise architecture for validity/invalidity and infringement/non-infringement analysis.
- Software contract analysis for disputes involving custom software, software copyright and trade secret infringement, and software valuation.
- Functional analysis, Source Code reviews, Damage Assessment analysis and software tampering evaluation.

**2009 to 2010**  ***Independent Consultant***  ***Tampa, FL***

Collaborated with Value Partners Management Consulting firm in preparation of proposal to the Colombian National Regulatory Agency for implementation of Wireless Number Portability across Colombia.

**Prior experience**  **Senior Consultant**
  ***BusinessEdge Solutions/EMC***  ***Toronto, Ontario, Canada***

Provided strategic and tactical guidance to Rogers Wireless, Canada's largest wireless carrier, in the successful, on-schedule implementation of Canadian wireless number portability.

- Developed detailed specifications for Rogers' internal business applications interface to the Syniverse/Telcordia Service Management Gateway (SMG) for communication of wireless port requests & responses to wireless and wireline trading partners.
- Served as Rogers' representative to several industry-level committees, including SMG Defect Management and SMG Testing, acting as liaison between Rogers and all Canadian carriers. Developed detailed specifications for acceptance and regression testing of SMG for entire Canadian industry.
- Provided integration expertise to Rogers' application development, network administratio system testing, production support, and program management teams.
- Provided in-depth knowledge of Telcordia SMG interface, Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation requirements, and post-implementation data analysis to determine customer porting trends and roadblocks.

**Senior Consultant**
***Syniverse Technologies***  ***Tampa, FL***

Served as development specialist & subject matter expert during implementation of U.S. Wireless Number Portability (WNP). Designed the reporting data warehouse and client billing processes which support Syniverse's WNP & ICC Clearinghouse product offerings.

- Provided significant expertise in the technical internals, database design and API requirements of Telcordia's SMG platform; WNP WICIS Industry standards; InterCarrier Communications (ICC) Process; Service Order Administration (SOA)/NPAC interaction; and Tekelec LSMS database access.
- Subject matter consultant to other Syniverse WNP product offerings, including Pre-port Validation, Fallout Management, Wireline Porting and PortFlow Management. Responsible for interaction and consulting with Sales, Business Development, Training and Production Support organizations.
- In-depth experience with Cellular Provisioning, GSM/CDMA technologies, SIM Card provisioning

50

**Software Engineer**
*Verizon Communications*                                                                    *Tampa, FL*

Served as Enterprise Integration Architect for Local Number Portability (LNP) and Telephone Number Pooling (TNP) projects. Responsible for development of enterprise-level architecture and system integration of 38 major applications in order to develop and deploy Wireline LNP and Number Pooling capabilities for the entire former-GTE operating area.

- Managed technical team of 30+ individual project architects, including interaction with program management, functional owners, development teams, system testers and production support personnel.
- Coordinated retail and wholesale ordering, provisioning, billing and service assurance business functionality.
- Developed significant expertise in number portability network element systems (Telcordia's LSMS and SOA), including low-level knowledge and direct access to LSMS internal databases.
- Directly responsible for the successful national deployment of LNP/TNP in GTE/Verizon West. Maintained close working relationship with Network Engineering's TN Administrator, assisting with LSMS extracts for reconciliation processes, TNP block donation and block allocation processing, and creative use of LNP capabilities for special customer requests.

**Senior Advisory Systems Engineer**
*GTE Telephone Operations*                                                                    *Tampa, FL*

Provided extensive systems development work as enterprise architect and development team project manager.

- Developed technical specifications for numerous systems across GTE Telephone Operations, primarily within the Customer Contact and Operations domains. Technical specifications established the hardware, software and network architecture with emphasis on a distributed, UNIX-based, client/server environment.
- Established corporate standards for Relational DBMS products, including interaction with Oracle and Informix vendors
- Established corporate standards for UNIX hardware and operating system platforms, including interaction with SUN, HP and IBM vendors.
- Managed application development for TCOM, a distributed, IBM-based bulk mail processing application
- Application technical lead for Central Office personnel dispatch and work allocation application.

**Senior Database Analyst**
*Exxon Company, USA*                                                                    *Houston, TX*

Provided database analysis and database administration in large-scale IBM environment, specializing in project team support, implementation of DB2/SQL and use of IBM utilities, IBM Dialog Management Services.

**Senior Database Analyst**

***Ford Aerospace***                                                                                      ***Houston, TX***

Served as key member of application team for NASA contractor responsible for Shuttle Simulator Reconfiguration System.  Responsibilities included data analysis and database design, and application lead.

**Senior Consultant**
***Informatics, Inc.***                                                                                   ***Houston, TX***

Consulted for major oil & gas and technology clients, offering application conversions, development of new systems, and application optimization.  Conducted international technical training classes in IBM IMS DB/DC, IBM Utilities and IBM Internals

**Senior Systems Analyst**
***GTE Data Services***                                                                                   ***Tampa, FL***

Served as project lead and technical advisor for development of IBM/IMS-based customer billing application and IBM/CICS online order-entry application.  Specialized in deployment of mini-computer office-automation systems.

**Technical Lead**
***Bell Telephone Laboratories***                                                                         ***Piscataway, NJ***

Application lead for development of IBM/IMS-based Inventory Management system implemented across entire Bell System.

**Education:**

| | |
|---|---|
| B.S. Mathematics – Magna Cum Laude | Union College, Schenectady, NY |
| M.S. Computer Science | Union College, Schenectady, NY |

| | | |
|---|---|---|
| **Wireless Communications** | 7 years | Syniverse/Telcordia Service Management Gateway (SMG), Canadian portability standards (CWNPG and CLOG), Wireless to Wireline (WPR to LSR) translation, Wireless Number Portability (WNP) & WICIS Industry standards, InterCarrier Communications (ICC), Service Order Administration (SOA)/NPAC,; and Tekelec LSMS database, Wireline Porting and PortFlow Management, Provisioning, GSM/CDMA technologies, SIM Card Provisioning |
| **Telecommunications** | 25 years | Local Number Portability (LNP), Telephone Number Pooling (TNP), Telcordia's LSMS and SOA, Customer Contact, Provisioning & Operations, eCommerce applications |
| **Database Technology** | 30 years | IBM IMS Database/Data Communication; DB2/SQL database design, Performance Optimization, Query Specialist; Informix; ORACLE; Logical Data Modeling; MS Access |
| **Software Engineering** | 20 years | Enterprise integration, Order Entry/CRM, Trouble Management, Provisioning, Customer Billing, Work Allocation/Work Management, Inventory Management |

**Tools & Platforms**

| Languages and tools: | IBM Assembler, FORTRAN, COBOL, C, C++, JAVA, Visual Basic, IMS DB/DC, CICS, DB2/SQL, Informix, Oracle, MS Access/SQL, HTML, MS Office, WordPress |
|---|---|
| Platforms: | IBM Mainframe/370, IBM 4300, IBM 9700, IBM RS/6000, HP 9000, Sun SPARC, Windows-based PC |
| Operating Systems: | IBM MVS, IBM DOS/VSE, AIX, HP-UX, UNIX, Solaris, MS-DOS, Windows |
| | |
| Professional: | Published article in *Computerworld*, 9/24/84: "IBM ISPF dialog manager: More than meets the eye" |

**Case Experience:**

**Alex Jacobs et. al. v Quicken Loans, Inc.**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones. Also developed expert report rebutting opposing expert's data analysis and subscriber identification, contributing to denial of class certification and exclusion of Plaintiff's expert report. |
| Represented by: | Goodwin Procter LLP |

**Amber Goins et. al. v Walmart and Palmer Recovery**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Walmart and Palmer Recovery as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report rebutting opposing expert's data analysis, historic wireless identification and subscriber identification. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. / Sheppard, Mullin, Richter & Hampton, LLP |

**Ameranth v Six Continents Hotels**

| | |
|---|---|
| Jurisdiction: | Superior Court of DeKalb County, State of Georgia |
| Client: | Six Continents as defendant in complaint for web advertising misuse and trade secret infringement of web-based concierge application |
| Nature of Case: | Web Advertising Analysis and Intellectual Property Litigation |
| Nature of Engagement: | Consulting expert analyzing web-based advertising practices, user interfaces, and development models; provided expertise in web marketing, online advertising, and eCommerce technology development standards, design and architecture |
| Represented by: | Alston & Bird |

**Carrie Couser et. al. v Cucamonga Valley Medical Group, Inc.**

|  |  |
|---|---|
| Jurisdiction: | U.S. District Court, Central District of California |
| Client: | Cucamonga Valley Medical Group, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Served as expert to provide ATDS evaluation, analysis of express consent and TCPA applicability of contested texts and voice calls |
| Represented by: | Schmid & Voiles |

**Carrie Couser et. al. v Dish One Satellite, LLC**

|  |  |
|---|---|
| Jurisdiction: | U.S. District Court, Central District of California |
| Client: | Dish One, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Served as expert to provide in-depth analysis of National and internal Do Not Call (DNC) records and very large volume call record files, and critical assessment of opposing expert's data analysis. |
| Represented by: | Benesch, Friedlander, Coplan & Aronoff LLP |

**Comprehensive Health Care Systems of the Palm Beaches et. al. v M3 USA Corporation**

|  |  |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Client: | M3 USA Corp., as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of fax telephone numbers. Also developed expert report rebutting opposing expert's opinions regarding successful completion of fax transmissions and identification of fax recipients. Provided deposition testimony. |
| Represented by: | Sheppard Mullin Richter & Hampton LLP |

**Datamaxx Applied Technologies v Computer Projects of Illinois, Inc.**

|  |  |
|---|---|
| Jurisdiction: | United States District Court, Northern District of Florida |
| Client: | Datamaxx as plaintiff |
| Nature of Case: | Software Copyright Infringement |
| Engagement: | Prepared expert report assessing infringement of plaintiff's software copyrights, utilizing Abstraction-Filtration-Comparison test. Provided deposition testimony. |
| Represented by: | Pennington, Moore, Wilkinson, Bell & Dunbar, P.A. |

**Eileen Nece et. al. v Quicken Loans, Inc.**

|  |  |
|---|---|
| Jurisdiction: | U.S. District Court, Middle District of Florida |
| Client: | Quicken Loans, Inc. as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert report addressing the feasibility and technical aspects of identifying users/subscribers of cell phones and residential landlines. |
| Represented by: | Goodwin Procter LLP |

**Estrellita Reyes et. al. v BCA Financial Services, Inc.**

| | |
|---|---|
| Jurisdiction: | United States District Court, Southern District of Florida |
| Client: | BCA Financial Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis methodology, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. |

**Kevin Buja et. al. v Novation Capital LLC, et. al.**

| | |
|---|---|
| Jurisdiction: | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Client: | Novation, as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Nature of Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis results of alleged DNC violations, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Vedder Price, P.C. |

**Lori Shamblin et. al. v Obama for America et. al.**

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Tampa Division |
| Client: | Obama for America and DNC Services Corp. as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Extensive review and critique of plaintiff's expert witness reports; data analysis and research of very large call-record databases, alleged call violations and ported telephone numbers; and ATDS evaluation. Preparation of expert report in support of defendant, contributing to denial of class certification and judgment in favor of defendants. |
| Represented by: | Perkins Coie LLP |

**Mark Preman et. al. v Pollo Operations**

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Orlando Division |
| Client: | Pollo Operations as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Pre-trial review of text messaging procedures and data flow analysis. Provided expert report evaluating adherence to CTIA/Wireless Industry best practices for short code messaging campaigns. |
| Represented by: | Akerman LLP |

**Michael Lutman v Harvard Collection Services**

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida, Ft Myers Division |
| Client: | Harvard Collection Services as defendants |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Provided expert analysis of plaintiff telephone numbers, porting activity, subscriber information, and ATDS evaluation. |
| Represented by: | Wilson Elser Moskowitz Edelman & Dicker LLP |

**Moricz v Google**

| | |
|---|---|
| Jurisdiction: | United States District Court, Western District of Washington at Seattle |
| Client: | Michael Moricz as plaintiff |
| Nature of Case: | Patent infringement of search engine software capabilities |
| Engagement: | Provided technical research into history, evolution and current state of web-based search engine design and functionality. Development of claim construction report. |
| Represented by: | Schwabe, Williamson & Wyatt, P.C. |

**PCS4Less v Go Mobile**

| | |
|---|---|
| Jurisdiction: | State of Michigan, Circuit Court for Washtenaw County |
| Client: | Go Mobile as defendant |
| Nature of Case: | Copyright / Trade Secret on unlocking GSM/CDMA cell phone devices |
| Engagement: | Provided expert analysis of cell phone unlocking methods. |
| Represented by: | Gray Robinson |

**Resource Acquisition and Management Services v Mathews**

| | |
|---|---|
| Jurisdiction: | State of Florida, Circuit Court for Hillsborough County |
| Client: | Resource Acquisition and Management Services, Inc. as plaintiff |
| Nature of Case: | Breach of Contract and Conversion of disputed property including application source code |
| Engagement: | Provided expert report assessing the value of application source code. Provided deposition testimony. |
| Represented by: | Rocke, McLean and Sbar, P.A. |

**State of Florida v Poole**

| | |
|---|---|
| Jurisdiction: | State of Florida, Circuit Criminal Court for Hillsborough County |
| Client: | Poole as defendant |
| Nature of Case: | Criminal complaint involving damage of application components |
| Engagement: | Provided expert analysis and court testimony regarding the feasibility of performing a forensic analysis of hardware and software components. Provided court testimony. |
| Represented by: | Pawuk and Pawuk, P.A. |

**Thomas Cook v Palmer, Reifler & Associates and WALMART**

| | |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | PRA as defendant |

|  |  |
|---|---|
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis, and addressing technical aspects of identifying users/subscribers of cell phones. Provided deposition testimony. |
| Represented by: | Shepard, Smith, Kohlmyer & Hand, P.A. |

**Victoria Wilson v Badcock Home Furniture**

|  |  |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | Badcock as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert rebuttal report challenging opposing expert's data analysis  and methodology for  identifying users/subscribers of cell phones, contributing to denial of class certification. Provided deposition testimony. |
| Represented by: | Johnson & Cassidy, P.A. |

**Waddell Williams v Bluestem Brands**

|  |  |
|---|---|
| Jurisdiction: | United States District Court, Middle District of Florida |
| Client: | Bluestem Brands as defendant |
| Nature of Case: | Telephone Consumer Protection Act (TCPA) violation |
| Engagement: | Developed expert report analyzing Defendant's dialing platform and its characteristics related to Automated Telephone Dialing Systems |
| Represented by: | Faegre Baker Daniels, LLP |

**<u>EXHIBIT 20</u>**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**

***Filed Electronically***

**CIVIL ACTION NO.: 5:18-CV-66-TBR**

CHRISTINA TURNER, on behalf of herself,                         PLAINTIFF,
and all others similarly situated,

v.

PILLPACK, INC.                                                          DEFENDANT.

<u>**JOINT STATUS REPORT**</u>

Pursuant to the Court's May 26, 2020, Order (Dkt. No. 62), Plaintiff, Christina Turner, and Defendant, PillPack LLC ("PillPack"), by their respective counsel, provide the following Joint Status Report:

1.       The parties proceeded to arbitration pursuant to the Court's September 9, 2019, Agreed Order Granting the Parties' Joint Request to Proceed to Arbitration ("Arbitration Order") (Dkt. No. 58), and the Court's January 8, 2020, Agreed Order to Amend Order Granting the Parties' Joint Request to Proceed to Arbitration (Dkt. No. 60).

2.       On January 22, 2020, the AAA confirmed receipt of Ms. Turner's demand for arbitration, and on February 5, 2020, PillPack filed its answer to Ms. Turner's arbitration demand.  The AAA appointed an Arbitrator, and on March 24, 2020, the Arbitrator held a preliminary management hearing and issued a scheduling order.  The parties agreed to have the Arbitrator's decision based on a paper record only without a hearing.  PillPack filed its opening arbitration brief on April 24, 2020, Ms. Turner filed her response brief on June 5, 2020, and PillPack filed its reply brief on June 19, 2020.

3.      On July 8, 2020, the Arbitrator issued his Award and his Findings of Fact and

Conclusions of Law, attached as **Exhibit A** to this Joint Status Report.  The Arbitrator concluded

that PillPack may enforce the arbitration agreement and that Plaintiff's claims fall with the scope

of that agreement.  Accordingly, pursuant to the Arbitration Order, this matter shall remain

stayed under 9 U.S.C. § 3 pending arbitration of the merits of Plaintiff's individual claims.  *See*

Dkt. No. 58 at 2.

4.      However, the parties are currently discussing the possibility of settling Plaintiff's

individual claims.  The parties expect to be able to provide a further status report within 21 days

to advise whether they have settled or will proceed to arbitrate the merits of her claims.

Respectfully submitted,

<table>
<tr><td>

*/s/  Kenneth E. Payson*

Kenneth E. Payson (admitted *pro hac vice*)
Sara A. Fairchild (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Fax: (206) 757-7700
kenpayson@dwt.com
sarafairchild@dwt.com


R. Kent Westberry
Bridget M. Bush
LANDRUM & SHOUSE LLP
220 W. Main St., Ste. 1900
Louisville, KY 40202-1395
Telephone: (502) 589-7616
Fax: (502) 589-2119
kwestberry@landrumshouse.com
bbush@landrumshouse.com


**Attorneys for PillPack LLC**

</td><td>

*/s/ Kas L. Gallucci*

Alexis M. Wood (CA Bar No. 270200)
(admitted *pro hac vice*)
Kas L. Gallucci (CA Bar No. 288709)
(admitted *pro hac vice*)
Ronald A. Marron (CA Bar No. 175650)
(admitted *pro hac vice*)
LAW OFFICES OF RONALD A. MARRON
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Fax: (619) 564-6665
alexis@consumersadvocates.com
kas@consumersadvocates.com
ron@consumersadvocates.com


**Attorneys for Plaintiff**

</td></tr>
</table>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of July, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court of the CM/ECF system which will send a notice of electronic filing to all counsel of record.

I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants:

<u>N/A</u>

*  /s/ Kenneth E. Payson*
**Counsel for PillPack LLC**

# EXHIBIT A



Western Case Management Center
Neil Currie
Vice President
45 E River Park Place West, Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

July 8, 2020

Ronald A. Marron, Esq.
Law Offices of Ronald A. Marron, APLC
651 Arroyo Drive
San Diego, CA 92103
Via Email to: ron@consumersadvocates.com

Sara A. Fairchild, Esq.
Davis Wright Tremaine, LLP
920 5th Avenue
Suite 3300
Seattle, WA 98104-1610
Via Email to: sarafairchild@dwt.com

Case Number: 01-20-0000-1512

Christina Turner
-vs-
PillPack, Inc.

Dear Parties:

By direction of Arbitrator West, we herewith transmit to you the duly executed Award in the above matter.

There is to be no direct communication with the Arbitrator, even if such was allowed previously on this case. All communication shall be directed to the American Arbitration Association (AAA).

Additionally, on this date, the AAA completed the financial reconciliation, closed this case, and marked the file as Awarded.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system.  Such electronic documents may not constitute a complete case file.  Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after today's closing date.

We thank Arbitrator West for serving on this matter.

We appreciate your selection of the AAA as your alternative dispute resolution provider.

Sincerely,
/s/
Janelle Manuel/cs

Case Administrator
Direct Dial: (559)490-1887
Email: JanelleManuel@adr.org
Fax: (855)433-3046

Enclosure

bcc:
Jan M. West, Esq.

cc:
Alexis Wood, Esq.
Kenneth E. Payson, Esq.
Kas Gallucci, Esq.
Lauren Rainwater, Esq.
Lesley Smith



## AMERICAN ARBITRATION ASSOCIATION
### Consumer Arbitration Tribunal

In the Matter of the Arbitration between:

Case Number: 01-20-0000-1512

Christina Turner,
     Claimant
V.

PillPack, Inc.
     Respondent

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

I, Jan M. West, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with an Agreed Order of the Parties dated September 6, 2019 entered in *Christina Turner, on behalf of herself and all others similarly situated v. PillPack, Inc.* 5:18CV-66-TBR (W.D.Ky. 2018). ; and having been duly sworn, and oral hearings having been waived in accordance with the Rules, and having considered the briefs submitted by the Claimant and the Respondent, hereby find as follows:

The Claimant, Christina Turner ("Turner"), initially filed this action against Respondent, PillPack, Inc. ("PillPack") in the U.S. District Court for the Western District of Kentucky.   Turner alleged that she received an automated text message without her consent in violation of the Telephone Consumer Protection Act of 1991, 47 U.S.C. 227(b)(1)(A)(iii)(the "TCPA").  Turner and PillPack entered into an Agreed Order on September 6, 2019 in the federal court action, whereby the parties agreed to submit two issues to the Arbitrator:  whether Turner's claims fall within the scope of an arbitration clause and whether PillPack can enforce the arbitration agreement against Turner.

The Agreed Order required the Arbitrator to issue Findings of Fact and Conclusions of Law on the two specific issues set forth in the Agreed Order.

## **FINDINGS OF FACT**

PillPack is a pharmacy that provides home delivery of medications in patient-specific multi-dose packaging.  PillPack engaged a marketing company, Fluent as an independent contractor to provide customer lead-generation services for PillPack.  Fluent and its sister company, RewardZone, are wholly owned subsidiaries of Fluent, Inc.  Together these companies operate Reward Websites to generate customer leads for clients such as PillPack.  The Reward Websites require users to register and agree to Terms & Conditions, including arbitration provisions before participating in a promotion.  Fluent's systems do not allow calls or text messages unless users provide "click through" acknowledgements of the Terms & Conditions.

The Terms & Conditions state as follows:

> We (RewardZone USA, LLC) operate RewardZoneUSA.com, NationalConsumerCenter.com and other websites …

Below that is an Arbitration Provision that states:

> If you have a dispute concerning any aspect of these Terms & Conditions, the Website, your participation in a Promotion, or entitlement to an Incentive, you should first contact customer support on our Website or by completing a customer support ticket.

The Arbitration Provision further states that if "we" cannot resolve your dispute, "you can submit your dispute for resolution by arbitration before the American Arbitration Association ("AAA") in the county where you live by filing a separate Demand for Arbitration" and the address for RewardZone is listed.  The Arbitration Provision further states:

> If either party files for arbitration, it will be conducted in accordance with the then current AAA Commercial Arbitration Rules. The arbitrator will have exclusive

2

authority to resolve any dispute including any claim that all or any part of the Terms & Conditions, including this provision, are unenforceable.

The arbitration provision also precludes users from pursuing class-wide relief against RewardZone or "any person related to us".

Turner registered on the Reward Websites that required her to agree to the arbitration and class-waiver provisions. She did not elect to opt-out within a thirty-day window as allowed by the Terms & Conditions. Turner later visited another Reward Website and was not required to agree to the Terms & Conditions as she had already done so. She confirmed her contact information and clicked on a link stating that she provided prior written consent to receive marketing calls or texts. Turner subsequently received a marketing text message from Fluent's SMS provider. When she responded to ask who had sent the message, she received a second message stating, "This is PillPack".

The Arbitration Provision on the original website governs a "dispute concerning any aspect of these Terms & Conditions, the Website, your participation in a Promotion or entitlement to an Incentive". At the time, Turner agreed to the Terms & Conditions, PillPack was not a customer of RewardZone but subsequently did become a customer.

Turner argues that her TCPA claims are not covered by the Arbitration Provision and that PillPack was not a party to the Arbitration Provision; therefore, her claims are not subject to arbitration.

## CONCLUSIONS OF LAW

The Federal Arbitration Act makes agreements to arbitrate "valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract". 9 U.S.C. sec. 2. The FAA reflects an emphatic federal policy in favor of arbitral dispute resolution.

3

*KPMG, LLP v. Cocchi*, 565 U.S. 18, 21 (2011). Under the FAA, a dispute is subject to arbitration where (1) a valid agreement to arbitrate exists between the parties" and (2) the specific dispute falls within the substantive scope of that agreement". *Javitch v. First Union Sec. Inc.*, 315 F.3d 619, 624 (6th Cir. 2003).

The first issue herein is whether PillPack is a party to the Arbitration Provision. The Terms & Conditions that contained the Arbitration Provision only reference RewardZone. The provision does not include Fluent, Inc., PillPack or any marketing partners of RewardZone. The provision stating that acceptance of the Arbitration Provision also waives the ability to file a class action lawsuit applies to "any person related to [Reward Zone]". Based on this language, the arbitrator finds that PillPack is not a party to the Arbitration Provision.

If a person or entity is not a party to an arbitration agreement, a non-party may invoke the FAA and compel arbitration where state contract law permits the non-party to enforce the agreement. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009). PillPack asserts that it can enforce the Arbitration Provision under Kentucky's equitable estoppel doctrine. Under Kentucky law, there are five ways for a non-signatory to an arbitration agreement to enforce the agreement: 1) incorporation by reference, 2) assumption, 3) agency, 4) veil piercing/alter ego and 5) estoppel. *Olshan Foundation Repair v. Otto*, 276 S.W.3d 827, 831 (Ky. App. 2009).

In *Household Finance Corp. II v. King*, 2010 WL 3928070 (Ky. Ct. App., October 8, 2010) the Kentucky Court of Appeals held that plaintiffs were required to arbitrate claims against a non-signatory to the arbitration agreement because the plaintiffs claimed that the non-signatory was acting in concert with the signatory to deny insurance claims". The Court cited *Hagan v. Greenpoint Credit Corp.*, 2007 WL 2258866 (E.D. Ky. August 3, 2007) wherein the court compelled

4

arbitration against a non-signatory after a signatory alleged substantially interdependent and concerted misconduct by the non-signatories and one or more of the signatories. The Court in *Household Finance* also cited *Scherer v. Green Tree Servicing, LLC* 548 F.3d 379 (5th Cir. 2008) wherein the court allowed a non-signatory to enforce arbitration against a company that had a relationship with a signatory, where the arbitration agreement applied to claims arising from relationships that resulted from the agreement.

Turner's claim rests on the assumption that PillPack was acting in concert with Fluent, as PillPack's contract with Fluent requires Fluent and RewardZone to obtain consent from website users prior to contacting them. PillPack had contracted with RewardZone and Fluent to provide marketing services for PillPack products. The Arbitrator finds that under the equitable estoppel doctrine, PillPack may enforce the Arbitration Provision.

Turner also asserted that she is not bound by the Arbitration Provision, as she did not have adequate notice of the provision. However, the disclosure to Turner on the Reward Website stated, "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy". This provision included a link to the arbitration terms and procedures. The Arbitrator finds that this provided Turner with sufficient notice of the Arbitration Provision.

The second issue to be determined is whether Turner's TCPA claim falls within the scope of the Arbitration Provision. The Arbitration Provision states that if "you have a dispute involving any aspect of the Terms or Conditions" or "your participation in a promotion" the arbitration process would apply to resolve that dispute. Turner's TCPA claim relates to a text message that she received from Fluent's SMS provider as a result of her participation in a promotion. Turner was required to agree to text messages being sent to her by Reward Zone's "Marketing Partners", which included

5

PillPack, in order to participate in the promotion.  Turner's claim that she was contacted by text message without her consent in violation of the TCPA arises from her participation in a promotion. Consequently, the Arbitrator finds that the TCPA claim is within the scope of the Arbitration Provision.

Based on the foregoing and pursuant to the Agreed Order entered in the federal court action requiring the Arbitrator to make findings of fact and conclusions of law the Arbitrator finds the following:  PillPack is entitled to enforce the Arbitration Provision under Kentucky law and Turner's TCPA claim is within the scope of the Arbitration Provision.

SIGNED: _____        DATED: 7-8-2020
           Jan M. West, Esq., Arbitrator

6

## **<u>EXHIBIT 21</u>**

PAGES 1 - 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS

DANIEL BERMAN, INDIVIDUALLY AND    )
ON BEHALF OF ALL OTHERS SIMILARLY  )
SITUATED,                               )
                                     )
          PLAINTIFFS,           )
                                     )
  VS.                             )  CASE NO. 18-CV-01060 YGR
                                     )
FREEDOM FINANCIAL NETWORK, LLC,     )
FREEDOM DEBT RELIEF, LLC, FLUENT,  )
INC., AND LEAD SCIENCE, LLC,       )
                                   )  OAKLAND, CALIFORNIA
          DEFENDANTS.          )  MONDAY
                                   )  SEPTEMBER 30, 2019
_____)

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND**

**RECORDING  1:59 P.M. - 2:29 P.M.**

**APPEARANCES:**

**FOR PLAINTIFFS**          BRODERICK AND PARONICH, P.C.
                      99 HIGH STREET, SUITE 304
                      BOSTON, MASSACHUSETTS 02110
              BY:  **EDWARD A. BRODERICK, ESQUIRE**


                      **JON BERNHARD FOUGNER, ESQUIRE**
                      600 CALIFORNIA STREET, 11TH FLOOR
                      SAN FRANCISCO, CALIFORNIA 94108


(FURTHER APPEARANCES ON FOLLOWING PAGE)


**TRANSCRIBED BY:**  *JOAN MARIE COLUMBINI, CSR #5435, RPR*
                     *RETIRED OFFICIAL COURT REPORTER, USDC*

**APPEARANCES (CONTINUED):**

**FOR DEFENDANTS**                SHEPPARD, MULLIN, RICHTER, AND HAMPTON
                                  1901 AVENUE OF THE STARS, SUITE 1600
                                  LOS ANGELES, CALIFORNIA 90035
                           **BY:  JAY THOMAS RAMSEY, ESQUIRE**

1    MONDAY, SEPTEMBER 30, 2019                          1:59 P.M.

2    (TRANSCRIBER'S NOTE: DUE AT TIMES TO COUNSELS' FAILURE TO

3    IDENTIFY THEMSELVES WHEN SPEAKING, CERTAIN SPEAKER

4    ATTRIBUTIONS ARE BASED ON EDUCATED GUESS.)

5                           ---oOo---

6              ELECTRONICALLY RECORDED PROCEEDINGS?

7         **THE CLERK:**  CIVIL ACTION CIVIL 18-1060, DANIEL BERMAN

8    VERSUS FREEDOM FINANCIAL NETWORK.

9              COUNSEL, PLEASE STATE YOUR APPEARANCES.

10        **MR. BRODERICK:**  GOOD AFTERNOON, YOUR HONOR.  EDWARD

11   BRODERICK FOR THE PLAINTIFFS, AND WITH ME IS JON FOUGNER.

12        **MR. RAMSEY:**  AND GOOD AFTERNOON, YOUR HONOR.  JAY

13   RAMSEY FOR ALL OF THE DEFENDANTS.

14        **THE COURT:**  ALL RIGHT.  GOOD AFTERNOON.  ALL RIGHT.

15   SO I AM CURIOUS WHAT PLAINTIFFS' PLAN IS.  AND I WOULD HAVE

16   JUST ISSUED AN ORDER THAT -- AND I'LL RUBBER STAMP THE

17   AGREED-UPON PROCEDURE FOR THE BRIEFING SCHEDULE.  BUT IT GAVE

18   ME CONCERN BECAUSE WHAT I DON'T WANT TO HAVE HAPPEN IS A

19   REARGUING OF WHAT'S ALREADY BEEN ARGUED.  AND I DON'T KNOW HOW

20   YOU PLAN ON GETTING TO WHERE YOU NEED TO BE, SO I KEPT IT ON

21   CALENDAR.

22        **MR. BRODERICK:**  OKAY.  THANK YOU, YOUR HONOR.

23             THERE ARE A COUPLE OF REASONS THAT WE THINK WE CAN

24   ADDRESS THE ISSUES THAT YOUR HONOR RAISED IN THE DENIAL WITHOUT

25   PREJUDICE.  I THINK WE DIDN'T ADEQUATELY ADDRESS THE ISSUE OF

1    BOUND BY THE CONSENT LANGUAGE ON THE WEBSITE.  THEY MOVED TO

2    COMPEL ARBITRATION.  THEY MOVED TO DISMISS SAYING, WE CAN'T --

3    HE CAN'T LITIGATE AT ALL BECAUSE THEY CLAIM HE VISITED A

4    WEBSITE OR SOMEBODY ACTING ON HIS BEHALF.

5              **THE COURT:**  WE ARE HERE, AREN'T WE?  HE PASSED THAT

6    HURDLE.  I DON'T CARE, FRANKLY, WHAT IT IS THEY SAY IN THAT

7    REGARD.  HE HIMSELF HAS DECLARED -- AND HE IS THE ONE WHO IS

8    ASKING ME TO APPOINT HIM, AND HE HIMSELF HAS DECLARED HE NEVER

9    VISITED THE WEBSITE.

10             THE ISSUE WITH RESPECT TO THESE CLICK WRAP

11   ARBITRATION AGREEMENTS ARE COMPLICATED.  AND THEY ARE IN --

12   SOMETIMES THEY ARE QUITE FACT INTENSIVE, AND HE HAS ZERO

13   FOUNDATION TO OPINE ON ANY OF THAT BECAUSE HE DIDN'T GO, HE

14   DIDN'T ENGAGE, HE DID NOTHING THAT THOSE OTHER POTENTIAL CLASS

15   MEMBERS DID.

16             IS THERE -- IS THERE A WAY TO IDENTIFY OR DISCOVERY

17   THAT IS IN THE RECORD OR THAT HAS BEEN ASKED FOR WHERE YOU CAN

18   DETERMINE THE GROUP OF PEOPLE WHO SAY THEY NEVER VISITED?  I

19   MEAN, YOU'VE GOT ALL OF THAT -- THOSE BOT POTENTIAL -- WHICH

20   YOU ARGUE IN THE EVIDENCE ABOUT ALL OF THESE INDIVIDUALS WHO --

21   NOT INDIVIDUALS -- CALLS THAT WERE MADE WITH NONSENSE

22   IDENTIFIERS.  IS THERE ANY WAY TO DEAL WITH THAT GROUP OF

23   EVIDENCE?

24             **MR. BRODERICK:**  THERE COULD BE, YOUR HONOR.  THERE

25   CERTAINLY COULD BE.

```
 1              MY FEAR OF THAT TACTICALLY IS DOES THAT POSSIBLY
 2   DEVOLVE INTO INDIVIDUAL ISSUES ABOUT EACH ENTRY THAT --
 3          THE COURT:  I DON'T KNOW.  THAT'S WHAT EXPERTS ARE
 4   FOR.
 5          MR. BRODERICK:  THAT'S TRUE, BUT I THINK IT SKIPS
 6   OVER THE FACT THAT THEY HAVEN'T PROVEN WHERE THE LEADS CAME
 7   FROM AND THAT WE HAVE AN EXPERT WHO SAYS:  THESE LEADS ARE FAR
 8   MORE CONSISTENT WITH SIDE LOADING OR ENTRIES BY BOTS THAN THEY
 9   ARE WITH A SYSTEM THAT WORKS THE WAY THEY CLAIM IT DID.
10              AND TO NOT HAVE ALLOWED US ACCESS TO THEIR SYSTEM IN
11   THE FACE OF MANY WARNINGS FROM MAGISTRATE JUDGE CORLEY, I THINK
12   YOU'RE GIVING THEM A HUGE BENEFIT OF THE DOUBT BY SAYING, WELL,
13   SOME PEOPLE DID.  THERE HAS TO BE EVIDENCE THAT SOME PEOPLE
14   DID, AND THEY HAVEN'T COME FORWARD WITH THAT EVIDENCE, AND,
15   INDEED, REFUSED TO GIVE IT TO US.  AND THAT'S REALLY THE ISSUE.
16              THE CASES THAT TALK ABOUT --
17          THE COURT:  WELL, I DIDN'T SEE YOUR EXPERT OPINE THAT
18   NONE -- AND THAT'S EFFECTIVELY WHAT YOU'RE TRYING TO ARGUE TO
19   ME NOW.  IF YOUR EXPERT OPINED THAT -- THAT NONE OF THESE LEADS
20   CAME THROUGH THAT PROCESS, PERHAPS IT WOULD BE DIFFERENT, BUT
21   THAT'S NOT WHAT THE EXPERT OPINED.
22          MR. BRODERICK:  BUT IF -- I WOULD REDUCE THIS DOWN A
23   LITTLE BIT TO IT'S A QUESTION -- IT'S THEIR BURDEN TO PROVE,
24   AND THEY HAVE A SERIOUS CREDIBILITY PROBLEM IN FRONT OF A JURY
25   TELLING THEM, THIS IS HOW OUR SYSTEM WORKS, YOU GOT TO TRUST ME
```

1        MR. BRODERICK:  I'M NOT -- I MEAN, WE'VE GOT A CASE

2   THAT SAYS THIS WHOLE SYSTEM IS BOGUS.

3        THE COURT:  YOUR EXPERT DID NOT SAY THAT.

4        MR. BRODERICK:  I THINK WE'VE GOT -- HE SAID THIS --

5   THESE LEADS APPEAR TO BE SIDE LOADED.

6        THE COURT:  NOT ALL -- I MEAN, HE'S TALKING ABOUT

7   29 PERCENT.

8        MR. BRODERICK:  NO.  TWENTY-NINE PERCENT WAS THE

9   NUMBER OF PEOPLE WHO TOOK THE TIME TO SEND AN ANGRY TEXT

10  MESSAGE BACK.  THAT'S NOT A 71 POSITIVE FOR THEM.

11        THE COURT:  OKAY.

12        MR. BRODERICK:  YOU GET TEXT MESSAGES, YOU DON'T

13  ALWAYS TAKE THE TIME OUT OF YOUR DAY --

14        THE COURT:  YOUR EXPERT -- CERTAINLY, WHEN I READ THE

15  REPORT, I DID NOT COME AWAY WITH THE PERSPECTIVE THAT THIS IS

16  ALL A HOAX, WHICH IS WHAT EFFECTIVELY YOU'RE SAYING.

17        MR. BRODERICK:  WHEN HE SAYS THIS IS MORE CONSISTENT

18  WITH SIDE LOADING OR BOTS AS TO SOMETHING THEY HAVE THE BURDEN

19  OF PROVING, WHAT IS THE PROOF THAT THEY HAVE -- THAT THEY HAVE

20  PRIOR EXPRESSED CONSENT IN HAND?

21        THE COURT:  WHAT DO YOU HAVE?  WHAT DO YOU HAVE?

22        MR. RAMSEY:  WITH RESPECT TO PROOF THAT PEOPLE CAME

23  TO THE WEBSITE?

24        THE COURT:  YES.

25        MR. RAMSEY:  SURE.  WE HAVE THE MAJORITY OF THE

1          **THE COURT:**  -- AS TO WHERE YOU ARE.

2          **MR. RAMSEY:**  THAT'S FINE, YOUR HONOR.

3          **THE COURT:**  SO YOU WANT TO FILE SOMETHING ON THE 11TH

4    OR THE 18TH?

5          **MR. BRODERICK:**  MAYBE THE 18TH, YOUR HONOR.

6          **THE COURT:**  ALL RIGHT.  SO I WILL PUT YOU ON A

7    COMPLIANCE CALENDAR FOR OCTOBER 25TH AT 9:01 A.M.  I DO NOT

8    EXPECT TO SEE YOU HERE THAT DAY.  THE ORDER WILL JUST INDICATE

9    THAT YOU SHOULD HAVE A JOINT FILING DOCKETED BY FRIDAY,

10   OCTOBER 18TH, AND I WILL PROCEED FROM THERE ONCE I HEAR BACK

11   WHAT YOU'RE THINKING ABOUT DOING.

12         **MR. BRODERICK:**  VERY GOOD.  THANK YOU, YOUR HONOR.

13         **THE COURT:**  ALL RIGHT.

14         **MR. RAMSEY:**  THANK YOU, YOUR HONOR.

15             (PROCEEDINGS ADJOURNED AT 2:20 P.M.)

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF TRANSCRIBER**

    I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE ABOVE MATTER.

    I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

JOAN MARIE COLUMBINI

OCTOBER 8, 2019