# **Exhibit 22**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**AMANDA LUNDBOM**, individually and on behalf of all others similarly situated,

        Plaintiff,

   v.

**SCHWAN'S HOME SERVICE, INC.**; and **SCHWAN'S COMPANY**,

        Defendants.

Case No. 3:18-cv-02187-IM

**OPINION AND ORDER**

Jennifer Rust Murray, TERRELL MARSHALL LAW GROUP PLLC, 936 North 34th Street, Suite 300, Seattle, WA 98103-8869. Frank S. Hedin, HEDIN HALL LLP, 1395 Brickell Ave, Suite 900, Miami, FL 33131. Attorneys for Plaintiff.

Kristen G. Hilton and Kimberlee M Petrie Volm, SUSSMAN SHANK LLP, 1000 SW Broadway, Suite 1400 Portland, OR 97205-3089. Thomas M. Schehr and Andrew J. Kolozsvary, DYKEMA GOSSETT, 400 Renaissance Center, Detroit, MI 48243. Attorneys for Defendants.

**IMMERGUT, District Judge.**

      Plaintiff Amanda Lundbom brings this action alleging that a series of automated text messages from Defendants Schwan's Home Service, Inc. and Schwan's Company (collectively "Schwan's" or "Defendants") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"). ECF 1. Plaintiff Lundbom claims that Schwan's violated the TCPA by (1)

PAGE 1 – OPINION AND ORDER

sending unsolicited advertising or telemarketing text messages using an automatic telephonic dialing system ("ATDS"); (2) sending text messages outside permissible hours or "after-hours messaging"; and (3) sending text messages to individuals registered on the national do-not-call registry. *Id.* She seeks to represent a class of individuals who received similar text messages from Schwan's.

This matter comes before the Court on Defendants' motion for summary judgment and Plaintiff Lundbom's cross-motion for summary judgment. ECF 44; ECF 53. This Court held a hearing on the parties' motions on December 11, 2019. In her briefing, and during the hearing, Plaintiff Lundbom conceded that her second and third claims for relief—for after-hours messaging and contacting individuals on the do-not-call registry—should be dismissed. *See* ECF 55 at 14–15 n.2. Plaintiff's sole remaining claim alleges that Defendants unlawfully sent unsolicited advertising or telemarketing text messages using an ATDS. ECF 1 at 16–17, ¶¶ 56–60.

Defendants argue that they are entitled to summary judgment because they received "prior express written consent" as required by the TCPA to send Plaintiff the text messages when she registered on the Schwan's website. ECF 53 at 6; 47 C.F.R. § 64.1200(f). Plaintiff disputes whether her agreement with Schwan's meets the standards for "prior express written consent." ECF 50 at 4. After considering all of the evidence, pleadings, and arguments of counsel, this Court finds that there are no material facts in dispute and that as a matter of law, Plaintiff Lundbom provided express written consent to receive advertising and telemarketing messages from Defendants.  For the reasons that follow, this Court grants Defendants' motion for summary judgment and denies Plaintiff's cross-motion for summary judgment.

**STANDARDS**

### A. Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the

PAGE 3 – OPINION AND ORDER

non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

Schwan's Home Services, Inc. is a food delivery provider that sells and delivers frozen food items. Schwan's customers may place orders for delivery through the company's website at www.schwans.com. On May 5, 2018, Plaintiff Lundbom used her smartphone to create an account online using Schwan's account registration webpage. ECF 43 at 2. When registering, she provided Schwan's her cellular telephone number and other contact information. Hedin Decl., Ex. B, ECF 52-2 at 21–23. Plaintiff placed an order online for chicken breast fillets, bacon strips, and shrimp and broccoli alfredo. ECF 43 at 2; Schehr Decl., Ex. C, ECF 47-1 at 23; Schehr Decl., Ex. B, ECF 48-1 at 21.

The registration page offered customers the option to receive certain communications from Schwan's through email or the telephone. *See* Schehr Decl., Ex. E, ECF 47-1 at 49. The communication options were listed on the registration page with corresponding checkboxes and disclosures describing the communications. *See id.* By default, both checkboxes were pre-checked when a customer visited the registration page. ECF 44 at 10 n.3; Hedin Decl., Ex. B, ECF 52-2 at 51. When Plaintiff completed her registration, the checkboxes corresponding with both email and phone communications were checked. The following screenshot reflects the

options and disclosures as they appeared when Plaintiff Lundbom clicked "Complete

Registration." [1]



After creating her account, Plaintiff Lundbom received a text message that stated:

"Schwan's: Welcome and thanks for joining. Shop this week's sale:

http://m.schwn.us/NZIxLPtU Weekly msgs. Msg&data rates may apply. Txt HELP 4 help, STOP

---

[1] For the purpose of summary judgment, the parties agree that Plaintiff Lundbom placed an order on May 5, 2018 via a webpage depicted in Bates #SHS000057. *See* ECF 43 (stipulation that Schwan's records of Lundbom's order be used for summary judgment); ECF 44 at 10 (citing Exhibit E, ECF 47-1 at 49, Bates #SHS000057); ECF 50 at 5–6 (citing Bates #SHS000057). The image included in this opinion is a screenshot from Bates #SHS000057.

to end." Schehr Decl., Ex. F., ECF 47-1 at 50. Plaintiff Lundbom received at least thirty-six

additional messages from Schwan's over the next seven months. ECF 50 at 9. The text messages

included statements such as: "One-Day Sale! Save up to 15 dollars on your order" and "FLASH

SALE! 10% OFF + Product Savings." Schehr Decl., Ex. F, ECF 47-1 at 51. All of the text

messages included a notice that Plaintiff could text "STOP" or "STOPDEALS" to opt out of

receiving additional text messages. *See id.* Plaintiff never responded to opt out of the messages.

Schehr Decl., Ex. C, ECF 47-1 at 12.

Plaintiff Lundbom filed this action on December 19, 2018, alleging that Defendants

violated the TCPA by sending advertising or telemarketing text messages using an ATDS. ECF

1; *see also* 47 U.S.C. §§ 227(b)(1)(A), 227(b)(3)(A). Defendants answered Plaintiff's claim

asserting, *inter alia*, the affirmative defense of express written consent. ECF 25 at 8–9, ¶ 79.

Defendants now move for summary judgment on Plaintiff's ATDS claim, ECF 44 at 8, and

Plaintiff Lundbom moves for summary judgment on Defendants' affirmative defense of express

written consent. ECF 53 at 1.

## DISCUSSION

Plaintiff claims that Defendants sent "advertising" or "telemarketing" text messages

using an ATDS without "prior express written consent" in violation of the TCPA, 47 U.S.C. §§

227(b)(1)(A), 227(b)(3)(A). ECF 1 at 16–17, ¶¶ 56–60. Defendants, on the other hand, contend

that Plaintiff Lundbom provided express written consent to receive the text messages when she

registered her account on Schwan's website. ECF 25 at 8–9, ¶ 79. Express written consent is an

affirmative defense on which Defendants bear the burden of proof and is a complete defense to

Plaintiff's TCPA claim. *See* 47 U.S.C. § 227(b)(1)(A); 47 C.F.R. § 64.1200(a)(1)–(2); *cf. Van*

*Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017) (describing burden of

proof for the affirmative defense of "express consent" before the FCC regulations were amended to require "express written consent").

## A.    Express Written Consent

In 1991, the TCPA was enacted to address consumer complaints that the increasing number of telemarketing phone calls were a nuisance and an invasion of privacy. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). The statute protects the "privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls . . . and automatic dialers." *Id.* (quoting S.Rep. No. 102–178, at 1 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968). The TCPA defines an "automatic telephone dialing system" or "ATDS" as "equipment which has the capacity— (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The TCPA makes it unlawful for any person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any [cellular] telephone number . . . ." 47 U.S.C. § 227(b)(1)(A)(iii). A text message is considered a call within the meaning of the TCPA. *Satterfield*, 569 F.3d at 954.

The Federal Communication Commission ("FCC") possesses authority to issue implementing rules and regulations for the TCPA. 47 U.S.C. § 227(b)(2). Pursuant to that authority, the FCC promulgated regulations for advertising and telemarketing calls that require a party to obtain "express written consent" prior to making such calls. 47 C.F.R. § 64.1200(a)(1)–(2).[2] "Express written consent" is defined in the regulations as:

---

[2] Prior to the promulgation of this regulation, parties would only need "express consent" to deliver advertising or telemarketing text messages via an ATDS. *See In re Rules & Regulations Implementing the Tel. Cons. Prot. Act of 1991*, 7 F.C.C.R. 8752, 8769 (1992).

> an agreement, in writing, bearing the signature of the person called
> that clearly authorizes the seller to deliver or cause to be delivered
> to the person called advertisements or telemarketing messages
> using an automatic telephone dialing system or an artificial or
> prerecorded voice, and the telephone number to which the
> signatory authorizes such advertisements or telemarketing
> messages to be delivered.

47 C.F.R. § 64.1200(f)(8). The parties dispute whether the agreement between Schwan's and

Plaintiff Lundbom meets this standard. Plaintiff first argues that she did not consent to the

advertising text messages because the agreement failed to clearly and conspicuously disclose that

the text messages would include advertising or telemarketing content. Second, Plaintiff asserts

that the affirmative act of completing the registration process without actually checking a box

(because the box is pre-checked) fails to "clearly authorize" the receipt of the text messages.

ECF 50 at 4. Plaintiff does not otherwise dispute that the agreement satisfies the standards for

express written consent in section 64.1200(f). *See generally* ECF 50 at 16–20.

### 1.   The Electronic Agreement

To determine whether Plaintiff provided express written consent, this Court must first

determine which terms are included in the agreement. In the context of web-based agreements,

courts examine the design and content of the website to determine whether an offeree had

sufficient notice of the terms such that the terms may be considered part of the agreement. *See,*

*e.g.*, *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1176–78 (9th Cir. 2014); *Starke v.*

*SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019).Web-based agreements generally come in

three formats: "clickwrap," "browsewrap," and hybrid agreements. *See, e.g., Nguyen*, 763 F.3d at

1176; *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019). Clickwrap

agreements generally require users to click on an "I agree" box after being presented with the

terms of use or privacy policy. *Nguyen*, 763 F.3d at 1175–76. Browsewrap agreements, on the

other hand, typically consist of a hyperlink on the website that links to the relevant terms of use or policies. *Id.* at 1776. (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 429–30 (2d Cir. 2004)). "Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly . . . [a] party instead gives his assent simply by using the website." *Id.* (quoting *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366–67 (E.D.N.Y. 2009)).

Because browsewrap agreements require no affirmative action other than use of the website, the validity of the browsewrap depends on whether the user has actual or constructive knowledge of the policies. *Id.* Where there is no evidence that a user had actual knowledge of an agreement, "the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1177 (citing *Specht v. Netscape Comms. Corp.*, 306 F.3d 17, 30–31 (2d Cir. 2002)). The court examines the conspicuousness of the policy hyperlinks, other notices regarding the policies, and the general design of the website to determine whether a reasonably prudent user would have inquiry notice of the agreement. *Id.*

Hybrid internet agreements, sometimes referred to as "hybridwrap" or "sign-in-wrap" agreements, "prompt the user to manifest assent to particular terms by engaging in some dual-purpose action, such as creating an account" or making a purchase. *Nicosia*, 384 F. Supp. 3d at 266 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 70–71, 81–82 (2d Cir. 2017)); *see also Colgate v. JUUL Labs, Inc*., 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019) (describing "sign-in-wrap" agreements as agreements "in which a user signs up to use an internet product or service, and the signup screen states that acceptance of a separate agreement is required before the user can access the service"). The terms in hybrid agreements will be given effect if an offeree has

PAGE 9 – OPINION AND ORDER

inquiry notice of the terms and assents to the terms through conduct, such as creating an account, that a reasonable person would understand to constitute consent. *Nicosia*, 384 F. Supp. 3d at 266 (citing *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019); *Colgate*, 402 F. Supp. 3d at 764.

The parties have stipulated that Plaintiff created an account on Schwan's registration page with the check-box next to the text message disclosure statement checked. ECF 43 at 2. The text message disclosure statement states: "You agree and consent via your electronic signature by clicking the check box to receive calls at the provided number which will deliver automated, live and/or prerecorded messages, text messages, and text alerts by or on behalf of Schwan's Home Service." *See* Schehr Decl., Ex. E, ECF 47-1 at 49. To complete the registration process, Plaintiff clicked a button below the text disclosure, near the bottom of the webpage that states "Complete Registration." *Id.*; ECF 52-3 at 38. Based on the facts in this case, the web-based agreement at issue most closely resembles the hybrid agreement.

### 2. Disclosures in the Agreement

To determine whether Plaintiff provided express written consent requires analysis of the terms of the parties' agreement. Plaintiff argues that the agreement fails to meet the TCPA standard for express written consent because the agreement does not "include a clear and conspicuous disclosure" that informs the person consenting to the agreement that the agreement authorizes the seller to deliver or cause to be delivered advertising or telemarketing call or texts. 47 C.F.R § 64.1200(f)(8)(i). "The term clear and conspicuous means a notice that would be apparent to the *reasonable consumer*, separate and distinguishable from the advertising copy or other disclosures." *Id.* at § 64.1200(f)(3) (emphasis added). Ninth Circuit precedent demonstrates that the "reasonable consumer" standard is an objective standard. *Satterfield*, 569 F.3d at 954–55 (examining the "plain and ordinary meaning" of the terms of the contract). Other courts have

similarly held that the reasonable consumer standard is objective in the context of TCPA claims.

*See, e.g.*, *Karpilovsky v. All Web Leads, Inc.*, No. 17 C 1307, 2018 WL 3108884, *5 (N.D. Ill. June 25, 2018) (clarifying that the standard for whether TCPA disclosures are clear and conspicuous "is not a user-dependent inquiry" but whether a notice would be apparent to a reasonable consumer). Because the agreement resembles a hybrid web-based agreement, this Court analyzes whether Plaintiff had inquiry notice of the terms and whether the terms provided clear and conspicuous notice that Defendants would send advertising or telemarketing text messages.

### a.   Telephone Disclosure

On Schwan's registration page, consumers are presented with the option of agreeing to receive phone communications with the following disclosure: **"Stay connected - Receive delivery notifications, important updates and program news sent straight to your phone."** Schehr Decl., Ex. E, ECF 47-1 at 49.

Plaintiff argues the "Stay Connected" disclosure is ineffective because the terms "important updates and program news" indicate that the communications have an informative rather than advertising purpose. ECF 55 at 21–22. Defendants, on the other hand, ask this Court to analyze whether the disclosure is clear and conspicuous in its context—"important news" and "program updates" from an online frozen-food retailer. *See* ECF 61 at 20–21. When read in its context, Defendants contend that a reasonable consumer would discern that "important updates" and "program news" from an online frozen-food retailer would refer to products available for purchase and be advertising in purpose. *Id.* at 21.

The parties agree that the words "advertisement" or "telemarketing" need not be used verbatim in a disclosure to satisfy the "express written consent" standard. ECF 53 at 15; ECF 62 at 15. Indeed, other courts have found specific language unnecessary for consent under the

PAGE 11 – OPINION AND ORDER

TCPA. *See, e.g.*, *Winner v. Kohl's Dept. Stores, Inc.*, No.-16-1541, 2017 WL 3535038, at *7 (E.D. Pa. Aug. 17, 2017) (finding the phrase "Text SAVE30 to opt in to our Mobile Sales Alerts" sufficiently clear and conspicuous for "express written consent"); *see also Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1101 (11th Cir. 2019) (holding "agreements need not use magic words" to establish express consent).

Plaintiff registered with Schwan's to initiate an account with a frozen food delivery service. When viewed in context, this Court finds that a reasonable consumer would understand that "important updates" and "program news" from a frozen food delivery company, whose sole purpose is to sell food products, is likely to include promotional or advertising content related to those services. The "Stay Connected" disclosure therefore was reasonably conspicuous when conveying to consumers that the calls or texts may include advertising or telemarketing messages. This conclusion should not be taken to suggest that terms such as "important updates" and "program news" will constitute adequate notice of advertising content in all circumstances. But, under the facts presented in this case, this Court finds that a reasonable consumer would understand the "Stay Connected" disclosure to mean that Schwan's may communicate advertising or telemarketing content via the phone.

### b.  Mobile Terms and Privacy Policy Are Part of the Agreement

Directly below the "Stay Connected" disclosure, next to the check-box for phone communications, the website includes a short paragraph with hyperlinks to the Mobile Terms and the Schwan's Privacy Policy:

> You agree and consent via your electronic signature by clicking the check box to receive calls at the provided number which will deliver automated, live and/or prerecorded messages, text messages, and text alerts by or on behalf of Schwan's Home Service. This agreement is not entered into as a term or requirement of purchase. You will receive recurring messages. Msg & Data Rates May Apply. Mobile Terms: schwans.com/tc

> Schwan's Privacy Policy: schwans.com/privacy. Reply HELP for
> help. Reply STOP to cancel.

Schehr Decl., Ex. E., ECF 47-1 at 49. When clicked, the hyperlinks take consumers to the full

text of the policies. Consumers are not required to view the policies to complete registration, but

the consumer must click the "Complete Registration" button below the hyperlinks to finish the

registration process. These policies are therefore best characterized as hybrid internet

agreements. *See Nicosia*, 384 F.Supp. 3d at 266; *Fteja v. Facebook, Inc.* 841 F. Supp. 2d 829,

835–36 (S.D.N.Y. 2012). The terms in these policies will be incorporated into the agreement if

Plaintiff had inquiry notice of the terms and manifested assent through some conduct that a

reasonable person would understand to constitute consent. *Nicosia,* 384 F. Supp. 3d. at 266

(citing *Starke*, 913 F.3d at 289); *Colgate*, 402 F. Supp. 3d at 764.

    This Court finds that both the Mobile Terms and Schwan's Privacy Policy are

incorporated into the agreement. First, a reasonable consumer would have inquiry notice of the

policies. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017) ("As long as the

hyperlinked text was itself reasonably conspicuous . . . a reasonably prudent smartphone user

would have constructive notice of the terms."). Here, the hyperlinks appear above the "Complete

Registration" button in a short paragraph beginning with the statement "[y]ou agree and consent

via your electronic signature . . . ." Schehr Decl., Ex. E, ECF 47-1 at 49. That statement

reasonably prompts users to be aware that phone communications would be subject to the terms

linked within that paragraph. In addition, the user must manifest assent by taking the affirmative

action of registering for an account with the check-box for phone communications selected.

Plaintiff cites three cases for the proposition that the mere presence of the hyperlinks in the

disclosure does not bind consumers to the hyperlinked terms, all of which are distinguishable.

ECF 55 at 29 (citing *Nicosia*, 834 F.3d at 233; *Motley v. ContextLogic, Inc.*, No. 3:18-cv-02117-SD, 2018 WL 5906079 (N.D. Cal. 2018); *Savetsky v. Pre-Paid Legal Servs., Inc.*, No. 14-03514 SC, 2015 WL 604767 (N.D. Cal. Feb. 12, 2015)).

First, the cited cases used less conspicuous language in the hyperlinks than Schwan's website, *i.e.* "Mobile Terms" and "Schwan's Privacy Policy." Schehr Decl., Ex. E, ECF 47-1 at 49. For example, in *Motley*, the district court refused to find that a hyperlink provided constructive notice that a user was bound to the terms of service when the link appeared in the statement: "Messages and data rates may apply. Click here for more details." 2018 WL 5906079, *2. The hyperlink appeared next to a check box which asked whether the user would like to receive text messages. *Id.* The link to the terms of the agreement was the word "here," which appeared in blue. *Id.* The district court held that the use of the word "here" in connection with the "more details" language suggested that the link would likely be understood as referring to message and data charges for users that opt to receive text messages, rather than the terms of service. *Id.* In this case, the disclosure clearly states that the links are to the "Mobile Terms" or the "Privacy Policy." Schehr Decl., Ex. E, ECF 47-1 at 49. In addition, the URLs are listed next to the relevant policies, indicating that additional terms are accessible through the link. *Id.*

Moreover, the hyperlinks in this case are not buried in distracting content. The design of Schwan's registration page is not cluttered, but rather contains only fields for the users to enter their personal information, the communication disclosures, and registration button in the body of the webpage. *See id.* This design differs starkly from the screen in *Nicosia*, where the court found the website contained up to twenty-five links in six colors, various buttons, and promotional material that detracted from the notice of the hyperlink to additional terms. *See Nicosia*, 834 F.3d at 237.

### c. Terms of the Mobile Terms and Privacy Policy Are Clear and Conspicuous

Plaintiff argues that, even if the policies are incorporated into the agreement, the policies do not provide "clear and conspicuous" notice because the relevant statements are not "separate [or] distinguishable" from other disclosures in the policies. ECF 55 at 26–27 (citing 47 C.F.R. § 64.1200(f)(3)); *see also* Griebel Decl., Ex. I–J, ECF 46-1. She claims that the disclosures would not be "apparent to a reasonable consumer" because the policies include information unrelated to the text messages as described on the registration page. ECF 55 at 27.

Plaintiff cites *Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883 (9th Cir. 2009), for the proposition that the terms were not sufficiently "separate and distinguishable." ECF 55 at 27. But *Barrer* may also be distinguished. In *Barrer*, a Truth in Lending Act case, the Ninth Circuit examined whether a credit card company adequately disclosed that the Annual Percentage Rate ("APR") may be increased at the creditor's discretion. *Barrer*, 566 F.3d at 888. The court concluded the disclosure was inadequate, noting that the provision appeared "five dense pages after the disclosure of the APR," was not referenced with the other APR information, and appeared in fine print on pages 10–11 of the agreement. Id. at 892. Here, the Mobile Terms information about the text program appeared in large font, in a question and answer format. Griebel Decl., Ex. J, ECF 46-1 at 5. On the first page of the Mobile Terms policy, the first question reads as follows:

> What are Schwan's Home Service Mobile Alerts?
>
> Schwan's Home Service Mobile Alerts are SMS messages that contain delivery-specific notifications and *promotions* for Schwan's Home Service and our *products and services*.

*Id.* (emphasis added). Unlike *Barrer*, the relevant disclosures are not buried deep within the fine print, several pages into a policy agreement. The Mobile Terms policy layout lists the questions

PAGE 15 – OPINION AND ORDER

spaced apart, bold, and in large font. *See id.* Furthermore, the first question in the Mobile Terms

policy states that the text messages will include "promotions for . . . products and services," thus

disclosing at the very beginning of the policy that text messages will include advertising. *Id.* This

Court finds that the disclosures listed in the Mobile Terms section of the agreement are

sufficiently separate and distinct to satisfy the regulatory standards for clear and conspicuous

disclosures under the TCPA regulations. *See* 47 C.F.R. § 64.1200(f)(3).

Because this Court finds that the "Stay Connected" disclosure and the Mobile Terms in

this case provided clear and conspicuous notice that phone communications may include

advertising or telemarketing content under the TCPA, this Court does not address whether the

Privacy Policy meets TCPA standards.

### 3.  Signed Writing

Express written consent requires that the party "clearly authorizes" the seller to deliver

advertising or telemarketing messages via ATDS in an agreement that bears the signature of the

party providing consent. *See id.* at § 64.1200(f)(8). "The term 'signature' shall include an

electronic or digital form of signature, to the extent that such form of signature is recognized as a

valid signature under applicable federal law or state contract law." *Id.* at § 64.1200(f)(8)(ii). The

FCC has ruled that consent obtained in compliance with the E-SIGN Act, including consent via

website form, satisfies the standards for consent under the TCPA. *In the Matter of Rules and

Regulations Implementing the TCPA of 1991*, 277 F.C.C.R. 1830 ¶ 34 (Feb. 15, 2012); 15 U.S.C.

§ 7001. The E-Sign Act defines "electronic signature" as "an electronic sound, symbol, or

process attached to or logically associated with a contract or other record and executed or

adopted by a person with the intent to sign the record." 15 U.S.C. § 7006(5).

To evidence assent to the phone agreement and associated terms at issue in this case, a

consumer must click the "Complete Registration" button located beneath the check

corresponding to phone communications. In this case, the check-box regarding phone

communications was pre-checked. Hedin Decl., Ex. B, ECF 52-2 at 51. Plaintiff does not dispute

that the completion of the registration process may constitute an electronic signature under the

TCPA. Plaintiff argues, however, that this action cannot evidence that Plaintiff affixed her

signature to an agreement for text messages in this context because the check-box was pre-

checked. ECF 55 at 35; ECF 66 at 9. This Court has identified no controlling precedent where a

court determined that submitting an order or registration with a pre-checked box fails to

constitute a signed writing under the TCPA.

As support for her argument, Plaintiff relies on *Snyder v. iCard Gift Card, LLC*, No.

0:15-CV-61718-WPD, 2016 WL 7507994 (S.D. Fla. May 16, 2016), and *Ramos v. PH

Homestead, LLC*, 358 F. Supp. 3d 1355 (S.D. Fla. 2019)). ECF 55 at 36. In *Snyder*, the district

court determined that the defendant failed to obtain express written consent as defined by the

TCPA because the relevant disclosures failed to include: (1) that the recipient may receive phone

calls placed by an ATDS, and (2) consent was not required for making a purchase. 2016 WL

7507994 at *5. Although not the basis for its decision, and without explanation, the court went

on to state that the defendant would be unable to establish consent for summary judgment

because "the consent box is checked off by default when the 'New Customer Account Set-Up'

webpage loads, so there is no evidence that Plaintiff affirmatively opted to receive any marketing

messages from Defendant." *Id.* at *6. *Ramos*, is also distinguishable from the present action. In

*Ramos*, the defendant failed to establish consent under the TCPA because the consumers were

required to check a box to opt-out of communications rather than opt-in to communications. 358

F. Supp. 3d at 1363. The district court held that an unmarked box was insufficient to evidence

consent. *See id.*

PAGE 17 – OPINION AND ORDER

More recently, however, in *La Force v. GoSmith, Inc.*, No. 17-cv-05101-YGR, 2017 WL 9938681 (N.D. Cal. Dec. 12, 2017), the district court held that a plaintiff was bound by a website's mandatory arbitration provision when the website presented the relevant disclosure box pre-checked by default and the user completed the registration process with the box checked. The disclosure next to the checked box stated, "I have read and agree to the terms & privacy policy." *Id.* at *1. The court determined that the user agreed to the website's terms and arbitration provision therein by his online registration with the box checked. *Id.* at *4. In light of the holding in *La Force*, and without controlling precedent to the contrary, this Court finds that Plaintiff authorized Defendants to contact her on the phone when she clicked the "Complete Registration" button with the check-box corresponding to phone communications checked. The disclosures and corresponding check-boxes were listed above the "Complete Registration" button. A reasonable consumer would have notice of the check-box because a user would necessarily have to scroll past those disclosures in order to submit a registration. Plaintiff chose to click "Complete Registration." The Court finds this affirmative act sufficient to constitute clear authorization.

Plaintiff further argues that consent is not demonstrated by a checked box next to the text message disclosure because the disclosure states the consumer must click the pre-checked box. ECF 55 at 38; ECF 62 at 10. The text message disclosure that appears next to the check-box states:

> You agree and consent via your electronic signature *by clicking the check-box* to receive calls at the provided number which will deliver automated, live and/or prerecorded messages, text messages, and text alerts by or on behalf of Schwan's Home Service.

PAGE 18 – OPINION AND ORDER

Schehr Decl., Ex. E, ECF 47-1 at 49 (emphasis added). Because the box next to the phone

disclosure was pre-checked by default, clicking on the box would actually uncheck the box. *Id.*

*See* ECF 55 at 37 (citing Pearthree Depo. Tr., Ex. 6 at 1 (Bates SHS000057); *see also id.* at

52:22–53:19). This argument is unavailing. As previously stated, TCPA disclosures are analyzed

from the perspective of a reasonable consumer. *See* 47 C.F.R. § 64.1200(f)(3). Because Plaintiff

registered on her smartphone, the court should consider the perspective of a reasonably prudent

smartphone user. *See Meyer*, 868 F.3d at 77 (analyzing TCPA disclosures from the perspective

of a reasonable smartphone user in the position of the plaintiff). Smartphones are a pervasive part

of daily life, and a significant majority of American adults own smartphones. *Riley v. California*,

573 U.S. 373, 385 (2014). Recent studies indicate that the vast majority of smart phone users

access the internet using their phones. *Meyer*, 868 F.3d at 77 (citing 2015 study which shows that

approximately 89 percent of surveyed smartphone users reported accessing the internet during

the weeklong study period). Check-boxes are commonly used to express consent in web-based

agreements. *See, e.g.*, *La Force*, 2017 WL 9938681, at *1 (enforcing arbitration clause where

user registered with check box pre-checked); *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 451–52

(E.D.N.Y. 2013) (enforcing forum selection clause where consumer had to check a

box manifesting consent). This Court finds that the phone disclosure in this case reasonably

conveyed that registering an account with the phone communications box checked would

indicate consent to phone communications regarding advertising.

## CONCLUSION

For the reasons stated above, this Court GRANTS Defendants' motion for summary

judgment and DENIES Plaintiff's cross-motion for summary judgment.

**IT IS SO ORDERED**.

DATED this 26th day of May, 2020.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge