# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


DANIEL BERMAN, STEPHANIE )
HERNANDEZ, and ERICA RUSSEL, )
                              )
         Plaintiffs,          )
                              )
vs.                           ) Case No. 4:18-cv-01060-YGR
                              )
FREEDOM FINANCIAL NETWORK,    ) VIA ZOOM WEB
LLC, FREEDOM DEBT RELIEF,     )      VIDEOCONFERENCE
LLC, FLUENT, INC., and LEAD   )
SCIENCE, LLC.,                )
                              ) JOB NO. 52349
         Defendants.          )
                              )


DEPOSITION OF STEPHANIE HERNANDEZ

THURSDAY, JULY 2, 2020

PASO ROBLES, CALIFORNIA


REPORTED BY: Tracey Wiley, CSR #5396

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    OAKLAND DIVISION

 4

 5 DANIEL BERMAN, STEPHANIE     )
   HERNANDEZ, and ERICA RUSSELL,)
 6                              )
            Plaintiffs,         )
 7                              )
   vs.                          ) Case No. 4:18-cv-01060-YGR
 8                              )
   FREEDOM FINANCIAL NETWORK,   ) VIA ZOOM WEB
 9                              )      VIDEOCONFERENCE
   LLC, FREEDOM DEBT RELIEF,    )
10 LLC, FLUENT, INC., and LEAD  )
   SCIENCE, LLC.,               )
11                              )
            Defendants.         )
12                              )

13

14      DEPOSITION OF STEPHANIE HERNANDEZ, taken at

15 Courtyard Marriott, 120 South Vine Street, Harvest

16 Suite, Paso Robles, California, on Thursday, July

17 2, 2020, at 10:00 a.m., before Tracey Wiley,

18 Certified Shorthand Reporter, #5396, in and for the

19 State of California.

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2       For the Plaintiffs:

 3       TERRELL MARSHALL LAW GROUP, PLLC
         BY: JENNIFER RUST MURRAY
 4       (VIA ZOOM WEB VIDEOCONFERENCE)
         936 North 34th Street, Suite 300
 5       Seattle, Washington 98103
         (206) 816-6603
 6       jmurray@terrellmarshall.com

 7                       -and-

 8       BRODERICK LAW, P.C.
         BY:  EDWARD A. BRODERICK, ESQ.
 9       (VIA ZOOM WEB VIDEOCONFERENCE)
         99 High Street, Suite 304
10       Boston, Massachusetts 02110
         (617) 738-7080
11       ted@broderick-law.com

12
         For the Defendants:
13
         SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
14       BY:  JAY T. RAMSEY, ESQ.
         (VIA ZOOM WEB VIDEOCONFERENCE)
15       1901 Avenue of the Stars, Suite 1600
         Los Angeles, California 90067-6055
16       (310) 228-3700
         jramsey@sheppardmullin.com
17                       -and-
18
         KLEIN MOYNIHAN TURCO, LLP
19       BY:  NEIL ASNEN, ESQ.
         (VIA ZOOM WEB VIDEOCONFERENCE)
20       450 7th Street Avenue
         New York, New York 10123
21       (646) 350-1736
         nasnen@kleinmoynihan.com
22


23


24   (Con't)


25
```

```
1    THE VIDEOGRAPHER:
              COASTAL LEGAL VIDEO SPECIALISTS
2             (VIA ZOOM WEB VIDEOCONFERENCE)
              BY:  Deborah Alvino, CLVS
3             805.478.5829

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2

 3  WITNESS:  STEPHANIE HERNANDEZ

 4

 5  EXAMINATION                              PAGE

 6  BY MR. RAMSEY                              8

 7

 8            I N D E X   T O   E X H I B I T S

 9

10  DEFENDANTS'...........DESCRIPTION...........PAGE

11  EXHIBIT 200 - Welcome Back, Stephaine Ad      54

12  EXHIBIT 208 - E-mail Dated Friday, March 27th,
                  2020, from verify@donotcall.web  23
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          PASO ROBLES, CALIFORNIA, THURSDAY

2              July 2, 2020,  10:00 a.m.

3

4          THE VIDEOGRAPHER:  Good morning ladies and

5    gentlemen.  We're going on the record at 10:03 a.m.

6          My name is Deborah Alvino, our

7    videographer, and I represent First Legal

8    Depositions located at 333 South Grand Avenue,

9    Suite 401, Los Angeles, California 90071.  The

10   phone number is (855) 348-4997, extension 3848.

11         Today's date is Thursday, July 2nd, 2020.

12   This is the start of the videotape deposition of

13   Stephanie Hernandez in the matter of Daniel Berman,

14   Stephanie Hernandez and Erica Russell, Plaintiffs

15   versus Freedom Financial Network, LLC, et al.,

16   Defendants, and related cross-actions or related

17   actions the United States District Court, Northern

18   District of California, Oakland Division, Case

19   Number 4:18-cv-01060-YGR.

20         This deposition is taking place via a Zoom

21   web conferencing where the deponent, counsel and

22   the court reporter are attending the deposition via

23   an Internet connection from their separation

24   locations.  This is taken on behalf of the

25   defendants.

1        Counsel, would you please identify

2  yourselves, starting with the questioning attorney.

3        MR. RAMSEY:  Jay Ramsey from Sheppard,

4  Mullin, on behalf of the defendants.

5        MR. ASNEN:  Neil Asnen.  A as in apple, S

6  as in Sam, N as in Nancy, E as in Eric, N as in

7  Nancy.  Klein, Moynihan, Turco for the Defendants.

8        MR. BRODERICK:  Edward Broderick for the

9  deponent.

10        MS. MURRAY:  Jennifer Murray for the

11  Plaintiff.

12        THE VIDEOGRAPHER:  Today is Tracey Wiley

13  from First Legal Depositions.  Will the court

14  reporter please swear in the witness.

15

16            STEPHANIE HERNANDEZ,

17  a Plaintiff, having been first placed under oath,

18  testified as follows:

19

20        MR. BRODERICK:  Yeah, I was just going to

21  ask if, I'm not sure what you did on Monday -- I

22  was hoping we could reserve all objections as to

23  the form of the question.  Go a little quicker.

24        MR. RAMSEY:  Sure.  I don't know exactly

25  what you mean, but okay.  As to admissibility, yes,

1  I think that's fine.

2       MR. BRODERICK:  Right, or, you know,

3  questions relying on not evidence.

4       THE COURT REPORTER:  Ed, you're really

5  low.  We can't hear you on this end.  It's -- got

6  three words out of that.

7       MR. BRODERICK:  Okay.  That's going to

8  limit the number of objections.  I was saying as

9  opposed to things like, you know, assumes facts not

10 in evidence and things like that, which isn't

11 really an objection, form of the question.  There's

12 some things that you have to lodge at the time and

13 it drags things out.

14      MR. RAMSEY:  Sure.  I don't have an issue

15 with that.

16      MR. BRODERICK:  Okay.  Great.

17

18                 EXAMINATION

19 BY MR. RAMSEY:

20    Q.  Ms. Hernandez, welcome.  Can you start

21 just by stating your name and spelling it.

22    **A.  Stephanie Lee Ann Hernandez.**

23 **S-t-e-p-h-a-n-i-e.  Capital L-e-e Capital A-n-n.**

24 **Hernandez, H-e-r-n-a-n-d-e-z.**

25    Q.  Have you had your deposition taken before?

1      A.  No.

2      Q.  Have you testified at trial or in -- or

3  some other court proceeding before?

4      A.  No.

5      Q.  Have you been involved in any type of

6  lawsuits or court proceeding at all before?

7      A.  No.

8      Q.  So I'm going to start just by going over

9  some basic ground rules since you haven't done this

10  before.  Your counsel may have gone over these as

11  well, but it's good to get a reminder.

12          So I will be asking you questions.  The

13  court reporter sitting next to you is taking down

14  everything you say and that will result in a

15  transcript.  It is best if we can do our best to

16  not talk over each other, and that way the

17  transcript will read cleanly as opposed to there

18  being interjections.  So if you could do your best

19  to let me finish asking my question before you

20  start talking, and then I'll do my best to let you

21  finish answering before I ask another question.

22          You're doing a very good job right now.

23  Natural instinct is to say uh-huh or yes or uh-huh,

24  you are just nodding along so that's perfect.  It

25  will happen.  I'll just remind you it's not a big

1  deal, but I would ask that we do our best to do

2  that.

3          It is also a transcript is being taken and

4  the court reporter can't take down head nods so if

5  you are answering a question, it will need to be a

6  verbal "Yes" or "No" or some other answer.

7          Does that make sense?

**8**     **A.  Yes.**

9     Q.  Your counsel may have some objections to

10  my questions.  That's fine.  You, though, will

11  still need to answer the question unless your

12  counsel tells you not to -- not to answer.  I

13  suspect he'll be very clear when that comes up.

14          Does that make sense?

**15**    **A.  Yes.**

16    Q.  Okay.  If you don't have -- if you have

17  any questions as we go, maybe you don't understand

18  what I've asked or something else, please just

19  raise those with me and I'll do my best to address

20  them.

21          We will probably take a break or two as we

22  go.  If you need to take a break, use the restroom

23  or just take a break, that's fine.  Please just let

24  us know.  The only thing I would ask is you finish

25  answering a question before we take a break.  So if

1  I ask a question, you'll have to answer.  Then

2  we'll go off the record.

3         Does that make sense?

**4    A.  Yes.**

5     Q.  And then, it's 10 o'clock right now, I

6  frankly think we'll be done in a couple of hours.

7  Hopefully, before lunch but if you do get hungry

8  and we need to take a break for lunch, just let us

9  know as well.

**10     A.  I would rather finish.**

11     Q.  That's perfectly fine.  I explained before

12  we got on, but if I do need to show you any

13  documents I will send them through the chat

14  function that we talked about before.  So with

15  that, is there any reason your deposition can't go

16  forward today?

**17     A.  No.**

18     Q.  You're not on any medication or anything

19  else that would hamper your ability to testify?

**20     A.  No.**

21     Q.  Okay.  I didn't think so, but we have to

22  ask.

23         So okay, first question, did you do

24  anything to prepare for this deposition?

**25     A.  No.**

1    Q.  Okay.  Without telling me any
2  conversations you may have with your attorneys, did
3  you discuss the deposition at all with them in
4  advance?
5    **A.  Yes.**
6    Q.  Okay.  Can you tell me when and for how
7  long, again, without telling me what may have been
8  said?
9    **A.  On the phone and for approximately, maybe**
10  **an hour.**
11    Q.  Okay.  And was that in the last few days?
12    **A.  Yes.**
13    Q.  Other than that discussion, did you do
14  anything else to prepare for the deposition?
15    **A.  I read it on my phone.**
16    Q.  What did you read on your phone?
17    **A.  What my attorney sent over, what I signed**
18  **for.**
19    Q.  I see, okay.  Was it your Declaration?
20  Something you had signed in this case in the past?
21    **A.  Yes.**
22    Q.  Other than your Declaration, did you
23  review any documents?
24    **A.  No.**
25    Q.  Okay.  Are you -- do you live alone?

1  A. No.

2  Q. Who do live with?

3  A. **My husband and my children.**

4  Q. And what is your husband's name?

5  A. **Abraham Hernandez.**

6  Q. And how many children do you have?

7  A. **Total?  Six.**

8  Q. Okay.  And how many live with you?

9  A. **Three.**

10  Q. Can you start by telling me the names of

11 the three who live with you?

12  A. **Isaiah, Matthew and Jayden.**

13  Q. How about the three who do not live with

14 you?

15  A. **Nathan, Tony and Kimberlin.**

16  Q. And I'm sorry, can you tell me your

17 current address?

18  A. **809 King Street, King City, California**

19 **93930.**

20  Q. And how long have you lived there?

21  A. **Oh, shoot.  Over 11 years.  Let's see.**

22 **How old is my son?  He's 15.  Graduated.  It's been**

23 **over 11 years.  You got me stumped on that one.**

24  Q. That's fine.  11 years is more than enough

25 for my purposes.

1    **A.  Okay.**

2    Q.  Did you graduate high school?

3    **A.  Yes.**

4    Q.  Can you tell me when and where from?

5    **A.  In 1989, in Atascadero.**

6    Q.  From Atascadero High?

7    **A.  No.  From the continuation.**

8    Q.  Can you tell me -- can you tell me your

9    birth date?

10   **A.  9/4/71.**

11   Q.  And after you completed your high school

12   degree -- or did you receive a high school degree?

13   **A.  Yes, I did.**

14   Q.  After you received your degree, did you go

15   to any further schooling of any type?

16   **A.  I tried, but then I had a baby.**

17   Q.  Are you currently employed?

18   **A.  Yes, I am.**

19   Q.  Can you tell me where?

20   **A.  Through the VA hospital.**

21   Q.  Where is that?

22   **A.  I get paid to take care of my husband.**

23   Q.  So at home?

24   **A.  At home.**

25   Q.  And how long have you been doing that?

1    A.  For over a year.

2    Q.  Prior to starting to take care of your

3 husband, were you employed?

4    A.  Hum, yeah.  I was a foster parent a long

5 time ago, until -- well, yeah.

6    Q.  Other than being a foster parent, were you

7 employed in the last 15 years?

8    A.  In the last 15 years, I was a foster

9 parent.

10   Q.  Other than that, you didn't have another

11 job, for example?

12   A.  A long, time ago.  I was a housewife.

13   Q.  Okay.  Have you ever been in debt such

14 that you have sought out services for debt relief?

15   A.  No.

16   Q.  Have you ever -- maybe you didn't seek out

17 services, but have you ever wanted services for

18 debt relief?

19   A.  No.

20   Q.  Can you tell me how you first met your

21 legal counsel in this case?

22   A.  A letter.

23   Q.  You received a letter?

24   A.  Yes.

25   Q.  Do you remember about when that happened?

1     A.  I don't know.  Over a year ago.

2     Q.  Do you remember what that letter said?

3     A.  Truthfully, it said, hum, that basically

4 my phone had been picked up because of the damages

5 I had been going through, and I was still going

6 through with the phone calls and the texts and they

7 wouldn't stop, and I was still going through them

8 from the -- I was still going through it.  So I

9 called him to see if they would help me.

10    Q.  Do you remember who the letter was from?

11    A.  Jon?

12    Q.  I'm sorry.  I missed that?

13    A.  From Jon.

14         THE COURT REPORTER:  From who?  Spell it?

15         THE WITNESS:  From Jon, J-o-n.  That's is

16 how you say it.

17 BY MR. RAMSEY:

18    Q.  Yeah.  He goes by "Yon" but it's Jon?

19    A.  It's J-o-n.

20         THE COURT REPORTER:  Okay.  Thank you.

21         THE WITNESS:  You're welcome.  I like you.

22 BY MR. RAMSEY:

23    Q.  Do you remember -- so you said it was

24 about a year ago.

25    A.  Yeah.

 1      Q.  You said your birthday is September 4th.
 2  Do you remember if it was before that or after that
 3  last year?
 4      **A.  Before.**
 5      Q.  Was it, I mean, in January or February of
 6  2019?
 7      **A.  I have to think.  I honestly don't know.**
 8      Q.  Do you still have a copy of this letter?
 9      **A.  At my house, I think.**
10      MR. RAMSEY:  This isn't to you, but I
11  don't believe I have a copy of that letter, and I'm
12  not sure why it wouldn't have been produced.  So I
13  would ask for a copy.  That's for Jen and Tim.
14      Q.  After you received this letter, did you
15  ever speak by phone with Jon?
16      **A.  Yes.**
17      Q.  And was it, if you remember, shortly after
18  receiving the letter, a long time after receiving
19  the letter?
20      **A.  Did I talk to him?**
21      Q.  Yes.  I'm trying to figure out how --
22      **A.  Yes, yes.  Yes.**
23      Q.  So I understand you spoke with him.  I'm
24  trying to find out how long after you received the
25  letter that you spoke to him?

1      A.   Oh.  I called him the next day.

2      Q.   After that conversation, did you have any
3  further conversation with him?

4      A.   Yes.

5      Q.   About how many?

6      A.   Hum, quite a bit.

7      Q.   Would you say more or less than 10?

8      A.   Hum, less than 10.

9      Q.   When you called him the first time after
10  receiving the letter, what was the purpose of your
11  call?

12      A.   To find out if he can help me with my
13  phone.

14      Q.   And what was the issue you were having
15  with your phone at that time?

16      A.   I was being harassed.

17      Q.   By whom?

18      A.   By you.

19      Q.   Not me personally, I assume --

20      A.   Not you personally.

21      Q.   Do you mean the defendants in this case?

22      A.   Yes, sir.

23      Q.   How many -- I take that back.

24           How were the defendants harassing you?

25      A.   They wouldn't stop calling.

1      Q.  How many times did they call you?

2      A.  A lot.

3      Q.  More than once a day?

4      A.  Yes.

5      Q.  About how many times a day?

6      A.  I had to shut my phone off.

7      Q.  I'm sorry.  About how many times a day?

8      A.  Two.

9      Q.  And how do you know that it was the

10 defendants calling you?

11     A.  Because they kept asking me for stuff.

12 They would call and ask me for things.

13     Q.  What would they ask you for?

14     A.  Money.  Sign up for things.  And I would

15 have to hang up.  I'd tell them not to call, but

16 then they'd hang up on me.

17     Q.  Do you remember them identifying a company

18 on whose behalf they were asking you to either sign

19 up for or for money?

20     A.  I don't recall.  I would have to look.

21     Q.  What would you have to look at?

22     A.  I would have to go back on my paperwork.

23     Q.  Which paperwork?

24     A.  I've got to see if I wrote it down.

25     Q.  Do you believe that you wrote it down?

1    A.  I might have.

2    Q.  Where would you have wrote it down if you
3  did?

4    A.  In my diary.  Because I was frustrated.

5    Q.  Do you keep a daily diary?

6    A.  I have a diary.

7    Q.  Do you write in it daily?

8    A.  Hum, sometimes.

9    Q.  At least a couple times a week?

10    A.  Hum, maybe.

11    Q.  And is it your practice to write in your
12  diary if you were -- sorry, my light will go off
13  occasionally.

14        Is it your practice to record in your
15  diary when you've received a call or an unwanted
16  telephone call?

17    A.  Only when I'm really frustrated, but I was
18  going through a lot of stuff at the time, so when
19  I'm frustrated I write things down.

20    Q.  When you say at the time, can you -- can
21  you tell me what time period you're talking about?

22    A.  I was going through a lot of surgeries and
23  stuff.  A lot of doctors and a lot of things.

24    Q.  Was this surgery for you or for your
25  husband?

1      A.   Me.

2      Q.   Do you remember when that surgery was?

3      A.   I've had a lot.

4      Q.   Do you remember the last time you had

5  surgery?

6      A.   The last one was in 2017 and -- 2017.

7      Q.   So you remember at about the time you were

8  having this surgery, you were receiving a number of

9  phone calls?

10     A.   Yeah.

11     Q.   After you had your surgery, did the phone

12  calls continue or did they stop at some point?  Can

13  you tell me what happens?

14     A.   The phone calls didn't stop until Jon

15  stopped them.

16     Q.   So after you spoke with Jon, you're saying

17  the calls stopped?

18     A.   Yeah.  I asked him to help me stop the

19  calls.

20     Q.   Do you know what he did to help stop the

21  calls?

22     A.   No.  But I asked him to and he made them

23  stop.

24     Q.   Do you remember -- let me take that back.

25          Do you know if you ever signed up for

1  what's called the National Do Not Call Registry?

**2      A.  I think Jon signed me up for that.**

3      Q.  And do you believe that he signed you up

4  for that shortly after you spoke with him?

**5      A.  Yeah.  I think I asked him to sign me up**

**6  for that.**

7      Q.  And do you know if he did?

**8      A.  I think he did.**

9      Q.  Do you know if you personally had to do

10  anything in order to sign up for that or did he

11  handle it entirely himself?

**12      A.  I honestly don't know that answer.  I**

**13  don't remember.**

14      Q.  And I'm sorry if I already asked this, but

15  you received a letter, you spoke to him, Jon, the

16  following day, and then how long after that,

17  roughly, if you remember, did you sign up or were

18  you signed up for the Do Not Call Registry?

**19      A.  We met at the VA Hospital and we did all**

**20  kinds of stuff that day.**

21      Q.  You and Jon then?

**22      A.  Yeah.**

23      Q.  How long did you meet?

**24      A.  Oh, a couple of hours.**

25      Q.  Did you sign any documents that day?

1      **A.  Yes.**

2      Q.  Was that an agreement between you and

3  Jon for him to represent you, as best you can

4  remember?

5      **A.  Yes.**

6      Q.  How long after you received the letter and

7  spoke to him the following day was it before you

8  met him in person?

9      **A.  Probably a week or two.**

10      Q.  Give me just one moment.

11          (Defendant's Exhibit Number 208

12          Was marked for identification.)

13  BY MR. RAMSEY:

14      Q.  I am going to send you via the chat

15  option, what will be marked as Exhibit 208.  You

16  should get it in the chat.  I will also share my

17  screen in case you want to look at it that way.  It

18  is an e-mail dated Friday, March 27th, 2020, from

19  verify@donotcall.web and it's to you at I believe

20  D-a-l-l-a-n-d at att.net.  Is that your e-mail

21  address?

22      **A.  Yes.**

23      Q.  I'll go ahead and share it right now, give

24  me a second.

25          You should see it on your screen.  Are you

1  able to see that?

2      **A.  I see it, but it's too small to read it.**

3      Q.  That's fine.  I'll zoom in, but you can

4  also view it if you just double click on the

5  exhibit icon in the chat.  I don't know that you

6  need to read it.  I just want to use it as a date

7  timeframe for you.

8          So the e-mail is dated March 27th, 2020,

9  and the subject line says, National Do Not Call

10  Registry, your registration is confirmed.

11      **A.  I understand that, but we did that before.**

12      Q.  I understand.  And so if you're able to

13  read the body of the e-mail, you can.  I will read

14  it for you, but the key part says that you

15  successfully registered your phone number ending in

16  5244 on November 7th, 2019.  So does that date --

17  earlier you said that you met with Jon or spoke

18  with Jon for the first time before your birth date,

19  which would have been September 4th, I believe.

20          This seems to indicate that he registered

21  your phone number in November of 2019.  Does that

22  refresh your recollection that perhaps you received

23  the letter later in 2019 than you may have

24  originally thought?

25      **A.  Did I meet him before my birthday?  Hayden**

1 was there.  He was still with him.  Still with

2 that.  Still in with that.  We're at the VA.

3     Q.  I'm sorry?

4     A.  I'm trying to think in my head.

5     Q.  Let me ask this more generally.  Do you

6 think that you received the letter from Jon within,

7 maybe, a month or so prior to the National Do Not

8 Call Registry which was November of 2019, or do you

9 think there was a longer period of time between

10 those two?

11     A.  No.  He's the one who got the calls to

12 stop on my phone when we met.  They stopped on my

13 phone when we met.

14     Q.  And I think you said before that you met

15 not that long after you spoke with him on the

16 phone?

17     A.  Correct.

18     Q.  Okay.  And is that, you know, a couple of

19 weeks or was it the next day?  Do you know?  If you

20 remember?

21     A.  It was in -- I'm not like -- it was within

22 weeks that we met and he stopped the calls on my

23 phone.

24     Q.  I'm going to stop sharing a little bit.

25 Give me one moment.

1          After meeting with Jon, did you meet with

2    him in person ever again?

3          **A.   No.**

4          Q.  Have you spoken with anyone other than Jon

5    about this case?

6          **A.   Yes.**

7          Q.  Can you tell me who those people would be?

8          **A.   Jennifer and Ted.**

9          Q.  Were they both, Jennifer and Ted, on the

10   call this week preparing for this deposition?

11         **A.   Yes.**

12         Q.  And was that the first time that you spoke

13   with Jennifer and Ted?

14         **A.   No, I spoke with them before.**

15         Q.  About how many times?

16         **A.   A few times.**

17         Q.  And without, again, telling me what you

18   talked about, was it generally in connection with

19   your Declaration which we talked about before?

20         **A.   It was about this case.**

21         Q.  Okay.  Okay.  I am going to ask you to

22   confirm that certain e-mails and phone numbers that

23   I have for you are actually e-mails and phone

24   numbers --

25         **A.   Okay.**

1          Q.   -- that are yours.

2               We've already covered your address which I

3    believe you told me was 809 King Street, King City,

4    California; is that correct?

5          A.   Yes.

6          Q.   If I were to address a letter, if you

7    know, to 809 King Street but instead of labeling it

8    King City, I labeled it Carmel, do you know if it

9    would still go to your house?

10         A.   I don't think it would go to my house.

11         Q.   Have you ever listed your address as being

12   in Carmel as opposed to King City?

13         A.   No.

14         Q.   What is your current cell phone number?

15         A.   831-320-5244.

16         Q.   Do you also have a number that is

17   831-320-7521?

18         A.   That's not mine.   That's my husband's.

19         Q.   Is that a cell phone number?

20         A.   Yes.

21         Q.   And how about the phone number

22   831-385-1506, is that your phone number?

23         A.   That's the house number.

24         Q.   Is that -- that's a landline as opposed to

25   a cell phone?

1    A.  Yes.

2    Q.  Has that been your house number for as

3  long as you've lived there?  I think you've said 11

4  years or so?

5    A.  That's been our house number for two

6  decades.

7    Q.  And how about your cell phone number, the

8  one ending in 5244, tell me about how long you've

9  had that phone number?

10    A.  Over two decades.

11    Q.  And your husband's number, the one that

12  ended 7521, do you know roughly how long he's had

13  his number?

14    A.  Over two decades.

15    Q.  Okay.  Your e-mails, you already told me

16  that -- is it dalland?  Is that how you would say

17  that?

18    A.  Dalland.

19    Q.  Dalland.  I'm sorry.  You may have told

20  me, is that your middle name, maiden name?  What is

21  that?

22    A.  It's just a name we made up.

23    Q.  Who's "we"?

24    A.  Me and my husband.

25    Q.  Do you share e-mail addresses?

1      A.  No.  Dalland --

2      Q.  So the -- I'm sorry.  Go ahead.

3      A.  No, that's okay.  Go.

4      Q.  Okay.  So the Dalland@att.net, that is

5  your e-mail address?

6      A.  Yes.

7      Q.  Is that your primary e-mail address?

8      A.  Mine.

9      Q.  Do you use any other e-mail addresses?

10     A.  There's dalland@redship.com.

11     Q.  And is that your e-mail address?

12     A.  No.

13     Q.  Whose e-mail address is that?

14     A.  My husband's.

15     Q.  And do you ever use your husband's e-mail

16  address?

17     A.  I did before I got mine.

18     Q.  Do you remember about when you got yours?

19     A.  About a year, two years ago.  Year and a

20  half ago.  Two years ago.

21     Q.  Okay.  And so, currently, you use the @att

22  e-mail address and he uses the redship?

23     A.  Yes, sir --

24     Q.  Just say yes?

25     A.  Yes.

1    Q.  Prior to you getting your own e-mail

2  address, did you share an e-mail address?

3    **A.  Yes.**

4    Q.  Okay.  So prior to about a year and a half

5  ago, you guys shared the dalland@redship.com e-mail

6  address?

7    **A.  Yes.  I'm going to say it's over two years**

8  **ago, though.**

9    Q.  Okay.  Do you know if your husband ever

10 writes your home address as in Carmel as opposed to

11 King City?

12   **A.  No.**

13   Q.  You don't know whether he does or doesn't

14 or he does not?

15   **A.  He does not.**

16   Q.  Sorry.  Just give me one moment.

17       Do you shop online at all?

18   **A.  Yes.**

19   Q.  Where do you typically by things from?

20   **A.  Amazon.**

21   Q.  Other than Amazon, do you buy anything

22 online?

23   **A.  No.**

24   Q.  Not from say Walmart.com?

25   **A.  Not really, no.**

 1      Q.  Or Target.com or anything like that?

 2      **A.  No.**

 3      Q.  When you shop online, do you use your

 4 computer typically or do you use a phone or iPad or

 5 anything else?

 6      **A.  (Indicating.)**

 7      Q.  I think you're showing me an iPhone; is

 8 that correct?

 9      **A.  Yeah.**

10      Q.  Do you always shop on your phone or do you

11 switch it out between phone and computer?

12      **A.  Phone.**

13      Q.  Okay.

14      **A.  It got a little icon thing.  That's it.**

15 **Because that's it.  Amazon, that's it.**

16      Q.  It's all right.  Just one second.

17          Is it an iPhone that you use or something

18 else?

19      **A.  It's Pixel.**

20      Q.  Pixel is -- that's a type of phone that

21 you use?

22      **A.  Yeah.**

23      Q.  And how long have you had that phone?

24      **A.  A year and a half.**

25      Q.  And prior to that, what type of phone did

1 you have?

2　　A. I don't know. It's through Verizon

3 because the other phone broke so they haven't given

4 me an upgraded phone because the other phone they

5 gave me broke and this phone is bad. I don't like

6 it.

7　　Q. Have you ever owned an iPhone?

8　　A. No. If I did, I don't know what an iPhone

9 is.

10　　He's laughing but I'm being honest. What

11 the heck is an iPhone?

12　　Q. What type of phone does your husband own

13 or use?

14　　A. Again, I don't know.

15　　Q. Do you know if it's iPhone?

16　　A. Hum, I don't know. The only reason I know

17 it's a Pixel because my kid told me it was a Pixel.

18　　Q. That's fine. How old are your kids at

19 home?

20　　A. 15, 11, and 10.

21　　Q. A lot of work right now I would think.

22　　A. Yeah. Don't ask me how old my other kids

23 are, you're just going to freak out.

24　　Q. Okay. Have you ever gone online and

25 signed up on a website that was offering you the

1  chance to win any type of reward?

**2**      A.  A reward?  Like money?

3      Q.  Yeah, maybe a shopping gift card, money,

4  something like that?

**5**      A.  No.  Not for money.

6      Q.  What types of website have you visited

7  then?  When you said not for money, that suggests

8  something else, and so what would be that be?

**9**      A.  I tried to get on for free items.

10      Q.  What types of items if you can remember?

**11**      A.  Tide.  Thing to clean the house, to help

**12**  around the house.  And then I didn't finish it.

13      Q.  Didn't finish what?

**14**      A.  Signing up.

15      Q.  And how many times have you visited a

16  website like this to try and get items?

**17**      A.  I think twice.  But I didn't --

18      Q.  Other than those two -- I'm sorry.  I cut

19  you off what did you say?

**20**      A.  I didn't finish it, though.

21      Q.  Other either occasion?

**22**      A.  (Witness shakes head.)

23      Q.  That's a "No"?

**24**      A.  That's a "No."

25      Q.  You have to say it --

1      A.  It's a "No."

2      Q.  Okay.  And when you say "finish it," I

3  guess can you tell me a bit more by what you mean

4  by "finish it"?

5      **A.  They wanted my medical records.**

6      Q.  And so when the website presumably asked

7  for your medical records, you decided to -- to do

8  what?

9      **A.  Shut it down.**

10      Q.  You mean you just closed it out?

11      **A.  Closed it out, shut it down.**

12      Q.  And do you remember whether you visited

13  this website on your phone or on your computer or

14  something else?

15      **A.  On my phone.**

16      Q.  Do you own computer?

17      **A.  Yes, I do.**

18      Q.  Do you use it?

19      **A.  No, I don't.**

20      Q.  Do you ever access the Internet while on

21  your computer?

22      **A.  Okay.  I own a computer, a laptop, and a**

23  **phone.  My husband has the computer.  I use the**

24  **laptop to pay bills, and that's it.**

25      Q.  So you don't use the computer at all?

1      A.  No.

2      Q.  Okay.  You use the laptop?

3      **A.  Only to pay my bills and it goes right**

4  **back in the case.  I use --**

5      Q.  Does your husband use a laptop at all?

6      **A.  No.**

7      Q.  Does he access the Internet from his

8  computer?

9      **A.  Yes.**

10     Q.  You mentioned earlier that you're taking

11  care of him.  Is he still able enough to use the

12  computer?

13     **A.  Yes.**

14     Q.  Do you know if he also accesses the

15  Internet from his phone?

16     **A.  No.**

17     Q.  You don't know or he doesn't?

18     **A.  He doesn't.**

19     Q.  Do you know if he -- I take that back.

20         Other than visiting a website I think you

21  said you remembered on two occasions to try and get

22  some free items like Tide and housecleaning

23  supplies --

24     **A.  He doesn't do that.**

25     Q.  Okay, fine.  Talking about you for now.

1  Have you ever visited a website that is offering a

2  sweepstakes?  So enter your name and you may get

3  drawn out of a hat and win a trip or money or

4  something else?

**5**      A.  No.

6      Q.  You've never done that?

**7**      A.  No.

8      Q.  Do you know if your husband has visited a

9  website like that?

**10**      A.  No.

11      Q.  How about any of -- let me back up.

12          You answered a question previously and

13  I'll just -- so it's clean, I think you were going

14  to say that your husband, to your knowledge, does

15  not and has not visited websites seeking, you know,

16  free samples of products like Tide; is that

17  correct?

**18**      A.  **He does not.**

19      Q.  Do your -- any of your three children own

20  cell phones?

**21**      A.  No.

22      Q.  And by the three children, I mean the ones

23  that live with you?

**24**      A.  No.

25      Q.  Do they own or have access to any computer

1  that is not the computer that your husband uses or

2  the laptop that you use?

3       **A.  What do you mean by computer?**

4       Q.  So there's the computer that your husband

5  uses in your house.  Do any of your children use

6  that computer?

7       **A.  No.**

8       Q.  There's the laptop that you use.  Do any

9  of the three children who live with you use that

10 laptop?

11      **A.  No.**

12      Q.  Is there any other sort of computer device

13 or tablet that the three children may use?

14      **A.  Yes.**

15      Q.  Okay.  What is that?

16      **A.  It's a gaming thing.  It's a game.**

17      Q.  So like a video game program?

18      **A.  Yes.**

19      Q.  They play it on a television?

20      **A.  Yeah.**

21      Q.  Other than that, is there any type of

22 computer that they may use?

23      **A.  I don't know.  It's a tablet.**

24      Q.  The court reporter can't answer, so --

25      **A.  Oh, it's a tablet.**

 1     Q.  Okay.  Like an iPad?

 2     **A.  Yeah.**

 3     Q.  Do you know if they access the Internet

 4  using the iPad or other tablet that you're

 5  referencing?

 6     **A.  No.**

 7     Q.  You don't know one way or the other or

 8  they don't?

 9     **A.  They don't.**

10     Q.  How do you know that?

11     **A.  I trust them.**

12     Q.  So they may be accessing the Internet and

13  you may just not know about it; is that fair?

14     **A.  That's fair.**

15     Q.  Could I say the same thing about your

16  husband's use of the Internet?  Is it possible that

17  he has signed up on websites that may offer the

18  opportunity for free samples and you just don't

19  know about it?

20     **A.  My husband doesn't get on those sites**

21  **because of the damage this has caused.**

22     Q.  Did he ever in the past?

23     **A.  No.  He's military.  That's a big no.**

24     Q.  So the two times that you remember

25  accessing a website, where you were offered chances

1  to get free products, do you remember approximately

2  when that was?

3      **A.  A while ago.  It's been a while.**

4      Q.  A couple of months?  A couple of years?

5  What does a while mean?

6      **A.  Years.**

7      Q.  I'm sorry, I missed that.

8      **A.  Years.**

9      Q.  Apologies.  Do you remember what this

10  website looked like?

11     **A.  I just remember it said free items, Tide,**

12  **cleaners, all that kind of stuff.  And then it just**

13  **kept going.  And you thought, oh, wow, you know,**

14  **and then it started asking medical questions, and I**

15  **got out of it.**

16     Q.  Do you remember what color it was?

17     **A.  No.**

18     Q.  Do you remember any of the words that were

19  on the screen?

20     **A.  Just get free items for your house.  Try**

21  **it out for free.**

22     Q.  Let me back up to a topic that we

23  discussed earlier.  You said you buy things from

24  Amazon on your phone?

25     **A.  Yep.**

1      Q.  Do you have an Amazon account?

**2      A.  Yep.**

3      Q.  Are you a Prime member?

**4      A.  Yep.**

5      Q.  And how long have you had an Amazon

6  account?

**7      A.  Oh, years.**

8      Q.  And how long have you been a member of

9  Prime?

**10      A.  Years.**

11      Q.  How often would you say you purchase

12  something on Amazon?

**13      A.  Every other day.**

14      Q.  Okay.  When you purchase something on

15  Amazon, do you understand that when doing so you

16  are agreeing to a set of Amazon's terms and

17  conditions?

**18      A.  Okay.**

19      Q.  I'm not telling you that.  I'm asking

20  whether you understand if that's true or not?

21          MR. BRODERICK:  Objection.

22          THE COURT REPORTER:  Who said objection?

23          MR. BRODERICK:  I'm sorry.  It's Ed.  The

24  objections will come from me.

25          THE COURT REPORTER:  Yeah.  I just want to

1  make sure.  Thanks.

**2       THE WITNESS:  Did someone say objection?**

3  BY MR. RAMSEY:

4       Q.  Yeah.  So you still have to answer.  If

5  you'd like me to ask the question again, I'm happy

6  to do that.  Do you know the question that was

7  asked?

**8       A.  Do I have to still answer?  Do I still**

**9  answer?**

10       Q.  Yes, you still answer.

**11       A.  Oh.  Yes, I know there's terms and**

**12  conditions with being on Amazon.**

13       Q.  And you understand that by signing up or

14  making purchases that you are agreeing to those

15  terms and conditions?

16       MR. BRODERICK:  Objection.

17  BY MR. RAMSEY:

18       Q.  You still have to answer.

**19       A.  Yes, I do.**

20       Q.  Is that something that you would generally

21  expect that when you sign up on a website or

22  purchase something on a website that you are

23  agreeing to a set of terms and conditions?

24       MR. BRODERICK:  Objection.

**25       THE WITNESS:  I got a credit card.**

1 BY MR. RAMSEY:

2      Q.  I'm sorry.  I don't think that answers my

3 question.  So when you are signing up --

4      **A.  When I signed up, I got a credit card, so**

5 **I agreed to the terms and conditions with the**

6 **credit card account when I signed up with Amazon.**

7 **So everything I signed up when I signed up with**

8 **Amazon came with the credit card and I got the**

9 **Prime with the credit card account.**

10           **So I don't know what kind of question**

11 **you're trying to ask me, because when I signed up**

12 **with Amazon on that day, it all came with the**

13 **credit card account and what affiliates with the**

14 **credit card.**

15      Q.  Did you, if you remember, signing up on

16 the Internet or were you filling out paper, hard

17 copy paper?

18      **A.  Hard copy paper.**

19      Q.  And did you mail that in?

20      **A.  I mailed it all in.**

21      Q.  And the offer to sign up for an Amazon

22 credit card, was that something that you saw online

23 or something you received in the mail?

24      **A.  I received it all in the mail.**

25      Q.  And did you ask that Amazon send you the

1 offer or did you just receive it?

**2      A.  I received it all in the mail.**

3      Q.  Okay.  But did you ask that Amazon send

4 you that in the mail or did you just --

**5      A.  No, I received it.**

6      Q.  Okay.  So you got mail one day from Amazon

7 some sort?

**8      A.  Yes.**

9      Q.  You filled it?

**10     A.  Yes, yes.  And that's how I got Amazon**

**11 Prime.  That's how I got my credit card.  That's**

**12 how I was able to shop on Amazon online.**

13     Q.  Got it.  And when you -- let's say today

14 you went on your phone and you bought something on

15 Amazon --

**16     A.  Yes.**

17     Q.  -- and you logged into the application on

18 your phone and you went through the process and you

19 ultimately click "purchase" --

**20     A.  Yes.**

21     Q.  -- or "buy" or whatever it said.

**22     A.  Yes.**

23     Q.  You do that, do you understand whether or

24 not you are, in making that purchase, agreeing to

25 Amazon's terms and conditions?

1     A.  Ah, I guess.  I don't understand your

2  question.  I agreed to that when I got my Amazon

3  card.  I've already established that question.

4     Q.  Sure.  And let's say Amazon has a

5  different set of terms and conditions online.  I

6  don't know if they do or not, but let's say that

7  they do.  If you were to make a purchase on Amazon

8  today, do you understand whether or not you would

9  be agreeing to that set of terms and conditions?

10     A.  There are no other terms and conditions

11  with my Amazon Prime.

12     Q.  Okay.  Your cell phone that you use, is it

13  -- is it through AT&T?

14     A.  No.  Verizon.

15     Q.  Verizon.  Is your husband's account also

16  through Verizon?

17     A.  It's all mine.

18     Q.  I'm sorry.  I thought you said your

19  husband has a cell phone as well?

20     A.  He does.  It's under mine.

21     Q.  I see.  Same account.  Do you know --

22  well, let me stop.

23          You said that you were receiving a number

24  of phone calls.  Do you know if your husband

25  received phone calls?

1      A.  No.

2      Q.  He did not?

3      A.  No.

4      Q.  He did not, okay.  I'm sorry.  He did not

5  receive phone calls; is that correct?

6      A.  Correct.

7      Q.  How about on your home phone number, the

8  landline, did you receive a number of calls on that

9  ever?

10      A.  Yes.

11      Q.  By -- okay.  And just so I'm clear, calls

12  I'm talking about the types of calls that you

13  described earlier as harassing on your cell phone.

14  Those types of calls that I'm talking about.  Does

15  that make sense?

16      A.  Can you repeat that, please?

17      Q.  Sure.  At the beginning of this, you

18  mentioned that you had received a number of phone

19  calls on your cell phone that you characterized as

20  harassing.  Do you remember that?

21      A.  Yes.

22      Q.  Okay.  Those types of phone calls,

23  whatever you want to call them, but those types,

24  you received the same type of phone calls on your

25  home line?

1     A.  Yes.

2          THE COURT REPORTER:  One moment.  Excuse

3  me, Jay.  I just want you to know that

4  Mr. Hernandez has just entered the proceedings.

5          MR. RAMSEY:  Okay.  I don't think he has a

6  right to be there.

7          Go off the record.

8          **THE WITNESS:  He can leave the room.**

9          MR. RAMSEY:  Okay.  We'll wait then just

10  for a moment.

11          **THE WITNESS:  Please leave the room.**

12          MS. MURRAY:  We'll wait on the record

13  while he leaves or does everyone agree to go off?

14          MR. RAMSEY:  No, why don't we just take a

15  five-minute break --

16          (Speaking simultaneously.)

17          **THE WITNESS:  He's leaving the room.**

18          MR. RAMSEY:  Let's just take a five-minute

19  break.  I need to use the restroom anyway.  Then

20  we'll start again.  Does that sound okay?

21          MR. BRODERICK:  That's fine.

22          MR. RAMSEY:  Okay.  Just so you know,

23  Ms. Hernandez, when you go on break, make sure if

24  you want to talk to someone that's fine, but make

25  sure you click mute so that we don't hear it all.

1          THE WITNESS:  Okay.

2          MR. RAMSEY:  With that I'm going to go on

3    mute and stop my video just don't close.

4          THE WITNESS:  Okay.  How do you click

5    mute?

6          THE COURT REPORTER:  I'll do it.  That's

7    fine.

8          THE WITNESS:  Okay.

9          THE VIDEOGRAPHER:  We're going off the

10   record at 11:04 a.m.

11          (Recess taken.)

12          THE VIDEOGRAPHER:  We are going back on

13   the record at 11:18 a.m.

14          MR. RAMSEY:  Welcome back.

15      Q.  So before we were going out we were

16   talking about the calls that you received on your

17   cell phone that you describe as harassing.  Do you

18   remember those phone calls generally?

19      A.  Yes.

20      Q.  Okay.  And I was asking whether you

21   received those same types of telephone calls on the

22   landline at your house.  Do you?

23      A.  Yes.

24      Q.  And do you still to this day receive those

25   types of phone calls?

1     **A.  Very often; sometimes not often.**

2     Q.  Okay.  Did you ask that Jon try and do

3  anything to stop those phone calls?

4     **A.  I don't know how to stop those phone**

5  **calls.**

6     Q.  That's fine.  Did you ask Jon to try and

7  do anything about it?

8     **A.  I don't think so.  Because I was just -- I**

9  **had my cell phone when I was with Jon, Jon, and I**

10 **should ask him.**

11    Q.  And so the same type of phone calls, do

12 you know whether your husband receives them on his

13 cell phone?

14    **A.  I don't think he does.**

15    Q.  Do you receive any text messages on your

16 cell phone?  Do you know what a text message is?

17    **A.  Yes.**

18    Q.  And do you receive any text messages on

19 your cell phone that you would consider unwanted?

20    **A.  Not now.**

21    Q.  And did you previously --

22    **A.  Yes.**

23    Q.  -- receive?

24        And are these text messages that you're

25 referencing, would they say things, advertise a

1  service, for example, and then say, you know, reply
2  "stop" to stop or "no" to stop or something to that
3  effect?
4      **A.  I don't recall.**
5      Q.  Have you ever received a text message
6  advertising a product or service and in response
7  written something back by text saying, please stop
8  contacting me or stop the contact, anything like
9  that?
10      **A.  Are you asking me did they send me**
11  **something asking me to buy something and then say**
12  **if you don't want it, just say please stop calling?**
13      Q.  Yes.  I'm asking specifically as to the
14  text messages.  Did you ever text something back
15  like that?
16      **A.  No.  I would just ex-nay it.  Because it**
17  **wasn't -- yeah, because it wasn't just, like, one**
18  **thing.  It would come in bulks.  There were so**
19  **many.**
20      Q.  Are we talking about text messages or
21  phone calls right now?
22      **A.  Text messages.**
23      Q.  Okay.  And when you received them, you
24  would just delete them from your phone?
25      **A.  There was too many.**

1    Q.  I understand.  Too many to do what?  To

2 delete them?  You left them on your phone?

**3    A.  There were so many, you had to delete them**

**4 because it was just too many.**

5    Q.  I see.  But you did delete them?

**6    A.  Yeah.**

7    Q.  Okay.  The phone calls that you received,

8 did you always answer the phone when you received a

9 phone call?

**10    A.  Not always, no.  It got annoying.**

11    Q.  When you did answer, would you just hang

12 up immediately, say anything --

**13    A.  I would tell them to stop calling and they**

**14 would hang up.**

15    Q.  And was that every time you received a

16 phone call like that?

**17    A.  Yeah.  And I'd say please stop calling my**

**18 phone.  They would hang up immediately.**

19    Q.  And after you said something like that,

20 did you ever notice whether you received another

21 phone call from the same phone number?

**22    A.  That happened quite often.**

23    Q.  And how do you know that that happened?

**24    A.  Because when you see the phone number**

**25 quite often you remember it, and then you would**

 1  tell them please stop -- click.

 2     Q.  And when something like that happened,

 3  would you go into your phone's recent calls and do

 4  anything with the number, try to block it, delete

 5  it, anything like that?

 6     **A.  That would take someone smarter than me**

 7  **and I'm not smart, sorry.**

 8     Q.  I'm sorry.  What's that?

 9     **A.  Sorry, I'm not that smart.**

10     Q.  That's fine.  You mentioned earlier having

11  a laptop.  Have you had the same laptop for the

12  last three or four years?

13     **A.  Yep.**

14     Q.  Do you know how long you've had the

15  laptop?

16     **A.  Probably the last eight years.**

17     Q.  And you mentioned a computer that your

18  husband uses.  Do you know how long you've that had

19  that computer?

20     **A.  Last eight years.**

21     Q.  Was there ever a time that you used the

22  computer or has it always been separate, where your

23  husband uses the computer and you use the laptop?

24     **A.  I used to pay my bills on the computer,**

25  **but then he kind of, when he -- he kind of took**

1  over the computer.  He does his military stuff and

2  he talks to his buddies on it, and I pay the bills

3  on my laptop and that's it.

4      Q.  Do you know what brand of computer it is?

5      A.  Ah, no.

6      Q.  Do you know if it's an Apple computer?

7      A.  I don't know, but I can go find out.

8      Q.  How would you go find out?

9      A.  I can go ask my husband.

10     Q.  Okay.  We'll ask at the break, but for now

11  that's fine.

12         And then you mentioned -- and I may have

13  asked this already and I apologize, but you mention

14  that your kids have some sort of tablet that

15  they're able to access the Internet on.  Do you

16  know what type of tablet that is?

17     A.  They're --

18         MR. BRODERICK:  Objection.

19         THE WITNESS:  They're cheap little $49

20  tablets they can play their video games on with

21  their friends.

22  BY MR. RAMSEY:

23     Q.  Okay.  When -- when you received the phone

24  calls, the ones we've been talking about that were

25  harassing, do you know whether your cell phone

1 plan, which you said was Verizon, charges you by

2 phone call?

**3      A.  No.**

4      Q.  They do not or you don't know?

**5      A.  They don't charge me by phone call.**

6      Q.  Okay.  How about for text messages?  Do

7 you know if they charge by text messages?

**8      A.  They don't charge me by text messages.**

9      Q.  So is it correct then to say that you were

10 never charged some additional amount that you would

11 otherwise not pay by receiving either the text

12 messages or phone calls that we've been

13 referencing?

**14      A.  Excuse me?  Can you repeat that?**

15      Q.  I'll start over.

16          The phone calls that we've been talking

17 about, did you ever have to pay more on your cell

18 phone bill because you received those phone calls?

**19      A.  No.**

20      Q.  Same question about for text messages, did

21 you ever have to pay more on your cell phone bill

22 for having received the text messages that we've

23 talked about?

**24      A.  No.**

25      Q.  I'm going to send you another exhibit via

1 the chat function.  It was an exhibit that was

2 previously marked as Exhibit 200 during a prior

3 deposition.  Are you able -- do you see it?  Would

4 you like to open it yourself or would you like me

5 to share it?

**6** **A.  You're going to have to share it.  It's**

**7 not opening.**

8 Q.  Okay.  Sure.  Give me one moment.

9 All right.  One moment.

10 Okay.  Is there a document on your screen

11 now?

**12** **A.  Yep.**

13 Q.  Okay.

**14** **A.  I never got that.**

15 (Defendant's Exhibit Number 200

16 Was marked for identification.)

17 MR. RAMSEY:  Okay.  We'll get there.  Just

18 briefly, for the record, this is an excerpt of a

19 document that Defendants produced.  It includes the

20 images that Defendants produced replicating a visit

21 that we, at least, contend Ms. Hernandez visited.

22 This excerpt is eight pages long.  I'm happy to

23 flip through each page.

24 Q.  We'll go through them as I ask you a

25 question.

1      A.  Okay.

2      Q.  Let me know if you want to look through

3  them now.  I understand -- well, never mind.  I'm

4  just going to start, is that okay?

5      A.  Go ahead.

6      Q.  Okay.  Do you recognize the Page 1 of this

7  document which is a reproduction of a website?

8  Have you seen this before?

9      A.  No.

10      Q.  So you mentioned earlier visiting a

11  website that was advertising a potential to get

12  free products including Tide.  Did that website

13  look something like this (indicating)?

14      A.  No.

15      Q.  Can you tell me what that website looked

16  like that is different from what you're looking at

17  here?

18      A.  It was smaller.  It had less than that.

19      Q.  If I zoomed in, for example, and went like

20  that (indicating), does that -- are you saying that

21  it may be looked more like that?

22      A.  No.  It looked less.  It didn't have all

23  of that (indicating).

24      Q.  When you say, "all of that," what do you

25  mean?

1    A.  It didn't have the batteries and it didn't

2  have the -- the Iams and it didn't have most of

3  some of that stuff that's in that picture.

4    Q.  Okay.  So the image that you're -- I

5  assume you're referencing is the one just below the

6  phrase, "Welcome back, Stephanie," and it has Tide

7  in it, dog food --

8    A.  Yeah, it didn't have all of that in it.

9    Q.  Okay.  So you're saying that image was

10  different?

11    A.  Yeah.

12    Q.  What do you remember the image having?

13    A.  It had Tide and it had a broom and it had,

14  oh, God, a Swifter, a Swifter mop, a Swifter mop

15  thing.  Swifter.  And it had cleaner scrubs, and it

16  had shampoos, conditioners, thing like that.  Not

17  this (indicating).

18    Q.  Have you seen a picture of what you're

19  remembering recently or at any time in the last six

20  months?

21    A.  No.  I don't get on that stuff no more.

22    Q.  You said earlier that you had visited a

23  website like this twice.  But then you just said,

24  "I don't get on that stuff anymore," which suggests

25  to me, at least, that you've been on it more than

```
 1  two times.  Is it still your testimony that you've

 2  been on a website like this only twice?

 3          MR. BRODERICK:  Objection.

 4          THE WITNESS:  I don't get on them.

 5  BY MR. RAMSEY:

 6      Q.  I understand you don't go to them anymore.

 7  But back in the period in which you went to the

 8  website, did you go to them more than two times?

 9          MR. BRODERICK:  Objection.

10          THE WITNESS:  No.

11  BY MR. RAMSEY:

12      Q.  And the two times that you went, was the

13  website identical as far as you remember?

14      A.  To this one?  No.

15      Q.  No.  But were they otherwise identical?

16  So were they the same -- the two that you remember

17  in your head were they the same?

18      A.  No.

19      Q.  They were different?

20      A.  Yeah.

21      Q.  Okay.  So the one you just described with

22  I think you said a Tide, a broom, a Swifter,

23  shampoo and conditioner, that one, do you have that

24  one in your memory?

25      A.  Kind of.
```

 1      Q.  Okay.  Did it otherwise look like this

 2  website, just that the images were different?

 3          MR. BRODERICK:  Objection.

 4          **THE WITNESS:  I don't know.  I don't think**

 5  **so.**

 6  BY MR. RAMSEY:

 7      Q.  The other time you visited the website,

 8  what do you remember seeing in the images?

 9      **A.  I saw people, but not like this -- all**

10  **these people like you're showing here.  You're**

11  **showing, like, double the people here.  It wasn't**

12  **like that.  It was maybe -- maybe a set of people,**

13  **but not like this one.**

14      Q.  When you say a set of people, you mean

15  only three of the little circles as opposed to six?

16      **A.  Maybe one circle or two.**

17      Q.  When you visited the websites that you're

18  talking about, do you remember it saying "Samples"

19  and "Savings" like this one does at the top?

20      **A.  No regular.  It said free items.**

21      Q.  I'm sorry.  You may have answered this,

22  but do you remember when you visited this website?

23      **A.  A couple years ago.**

24      Q.  Was it before or after your surgery?

25      **A.  Before.**

1    Q.  Did you ever -- the two -- was the second

2 time that you visited the website at or around sort

3 of near in time to the first time you visited the

4 website?

5    **A.  At or around or near what?**

6    Q.  All right.  You visited the website two

7 times --

8    **A.  Right.**

9    Q.  -- were those on the same day, same week?

10 Were they years apart?

11    **A.  No, they were apart.**

12    Q.  By about how long?

13    **A.  Hum, shoot.  I'm going to say apart by --**

14 **I honestly don't know, but they were weren't at the**

15 **same.  But they were apart, though.**

16    Q.  Do you think it was more than year apart?

17    **A.  Yeah.**

18    Q.  More than two years apart?

19    **A.  I don't know.**

20    Q.  But the last time, of the two times that

21 you visited that you remember, the last time was

22 before your surgery?

23    **A.  The last time was before surgery.**

24    Q.  Okay.  And I think you told me that your

25 surgery was in 2016, was it?

1     A.  No.  The major surgery was 2015.  That's

2  when the hospital shut my phone down because it was

3  so -- I was so harassed in 2015.  But then

4  something else happened.  I don't remember.

5     Q.  So you had a major surgery in 2015.  Did

6  you have any surgeries after that?

7     A.  Yeah.

8     Q.  How many?

9     A.  Two.

10     Q.  And you remember when those were?

11     A.  2017 and 2016.  '16, '17.  '16 and '17.

12     Q.  '16 and '17?

13     A.  I do believe so.  I have to look.  But I

14  know '17 for sure.  '16 was shots.  '17 was

15  surgery.  So, yeah.

16     Q.  Okay.  But since 2017, have you had any

17  further surgeries?

18     A.  No.

19     Q.  So getting back to the website visits, do

20  you remember whether they were before or after that

21  surgery in 2017?

22     A.  I want to say before.  Before.

23        (Clarification by the court reporter.)

24  BY MR. RAMSEY:

25     Q.  And then after the surgery, then you never

1 visited the website again or don't remember a visit

2 to the website?

3 **A.  I don't remember a visit to a website like**

4 **it.**

5 Q.  Is it possible that you did visit a

6 website like it or you did not?

7 **A.  I did not.  I do not recall going to a web**

8 **site, no.**

9 Q.  So you mentioned again there were two

10 visits.  On the first one the image had Tide, a

11 broom, a Swifter, shampoo and conditioners, and the

12 second one we started talking about but that you

13 didn't finish.  Do you remember any products the

14 second time you visited the website?

15 **A.  I do not recall.**

16 Q.  And let me be clear.  I call it the second

17 time, but the time that you remember seeing the

18 Tide, would you remember whether that was the first

19 visit or the second visit?

20 **A.  I don't recall.**

21 Q.  Why is it that you remember -- why do you

22 think it is that you remember --

23 **A.  I don't know.  I don't know.**

24 Q.  When you were going in the website --

25 **A.  I'm wondering if it's the same.  If I saw**

1  the same thing for both things.  You know, like

2  maybe I just saw the same add for them both.

3      Q.  Irrespective of what you saw, when you

4  were going on the website that day, was there a

5  particular product you were hoping to get a sample

6  of?

7      A.  I would say the Swifter.  It had to have

8  been a Swifter or the Tide.

9      Q.  The website you saw --

10     A.  It would have been the Swifter or the

11 Tide.  But it always came down to the medical.  I

12 stopped because of the medical.

13     Q.  Understood.  So we'll get to that.  So on

14 the first screen that you saw that had the images

15 of the Tide and Swifter and --

16     A.  Yeah.  So the second one had to have had

17 the Tide and the Swifter, also.

18     Q.  I understand.  Let me finish my question.

19         In your head, picturing the website as you

20 remember it.  In addition to the picture that had

21 the Tide and the Swifter and whatever other

22 products were on there, was there anything that

23 asked for your name, let's say?

24     A.  Yes.

25     Q.  Your first name and your last name?

1  Anything else?

**2      A.  No.**

3      Q.  And do you remember entering your name?

**4      A.  No.**

5      Q.  Meaning you may or may not have or you

6  think you did not at all?

**7      A.  I did not at all.**

8      Q.  Do you remember the website ever asking

9  for your phone number?

**10      A.  I never gave my phone number.**

11      Q.  Okay.  But do you remember the website

12  asking for it --

**13      A.  Yes.**

14      Q.  There being -- okay.  Was that on the same

15  page where your name was asked for?

**16      A.  Yes.**

17      Q.  But you're saying that you did not enter

18  your phone number?

**19      A.  Yes.**

20      Q.  Did you enter any phone number --

**21      A.  No.**

22      Q.  -- even though it wasn't yours?

**23      A.  Did you enter any name even though if**

**24  wasn't yours?**

**25      A.  No.**

1      Q.  Did the website, as best as you remember,
2 it ask for your home address?
3      A.  Yeah, they asked for it.  I wouldn't give
4 it to them.
5      Q.  Did you enter a different home address?
6      A.  No.
7      Q.  Did the website, as you remember, it ask
8 for your birth date?
9      A.  Yeah, they asked.  I wouldn't give it to
10 them.
11      Q.  Did you enter anything into the website,
12 any personal information?
13      A.  In the beginning, when it asked me what I
14 liked, I would enter what I liked.  And then it
15 would go to the next set of questions, and it would
16 ask me what I wouldn't like, what I would like,
17 what kind of magazines would I like, what make-up
18 would I like, you know, and it kept going down.
19 Then it started getting into your medical history.
20           And when you punch out and say, no, I'm
21 not doing medical, then it would say, okay, you're
22 almost done, let's get your info.  And then you'd
23 say, no, I'm not putting this in here.  Okay, well,
24 wait.  It would go back to your medical history and
25 that's when I would log out.

1      Q.  So your memory of the website is you saw

2  one or more screens where it was asking you

3  questions, if you liked a magazine or a product or

4  something like that, and then including medical

5  questions?

6      **A.  It would go to medical.  I wouldn't do the**

7  **medical.  Then it would click over and try to get**

8  **my personal information.  And I would say, no, and**

9  **it would click back to my medical history.  And**

10 **that's when I would log out.**

11     Q.  Okay.  I'm going to -- in the document in

12 front of you, I'm going to skip to page -- actually

13 let me stop that.  I'm going to skip to Page 3.

14 And then can you see this (indicating)?  Do I need

15 to make it larger?  I don't know what it looks like

16 on your screen.

17     **A.  I see it.**

18     Q.  In particular, I am talking about this

19 portion that you should see, it's a reproduction of

20 a web page.  Is it these types of questions or is

21 the look of the website that you remember something

22 like this where it's asking you questions?

23          MR. BRODERICK:  Objection.

24          **THE WITNESS:  No.**

25 *////*

1 BY MR. RAMSEY:

2     Q. Okay. What about this is different than

3 what you remember?

4     **A. That has nothing to do with the questions**

5 **that I was asked.**

6     Q. So I understand the content of the

7 question may have been different, but the design,

8 the look and the feel of the website, was it

9 similar to this?

10         MR. BRODERICK: Objection.

11         **THE WITNESS: Ah, no.**

12 BY MR. RAMSEY:

13     Q. I'm going to go to the next page, Page 4.

14 This one again looked the same but it's asking what

15 kind of content do you enjoy most. Does this look

16 at all like the website that you're remembering?

17         MR. BRODERICK: Objection.

18         **THE WITNESS: Okay.**

19 BY MR. RAMSEY:

20     Q. I'm sorry. I don't know what "okay"

21 means. Does this look at all like the website that

22 you remember?

23         MR. BRODERICK: Objection.

24         **THE WITNESS: Yeah, you're asking me a**

25 **bunch of questions.**

1  BY MR. RAMSEY:

2     Q.  Do you remember there being one question

3  per page?

**4     A.  Yeah.  And then it went to multiple**

**5  questions per page.**

6     Q.  Okay.  I'm going to go to Page 6 of this

7  document.  Feel free to take a look at this screen.

8  You can see that it has boxes for personal

9  information including name, e-mails, zip code, date

10 of birth and phone number.  Does this look like a

11 page that you've seen before and what you remember,

12 the one you described where you would enter your

13 information?

14         MR. BRODERICK:  Objection.

**15         THE WITNESS:  I wouldn't have done this.**

16 BY MR. RAMSEY:

17    Q.  I understand you're saying you wouldn't

18 have entered your information.  I'm asking though

19 is this what your memory of the website that you

20 visited --

**21    A.  No.**

22    Q.  -- mentioned there was a page at the end

23 -- let me --

24         (Simultaneously talking.)

**25    A.  No.**

1      Q.  Let me finish.  I'd like to finish my

2  question.  Okay.

3          The website that you remembered visiting,

4  you mentioned at the end of a series of questions

5  there was a page where it asked for your personal

6  information including your name, your address, and

7  your date of birth.  Does the page that you

8  remember asking for that information appear or look

9  -- did it look like what you see here before you on

10  Page 6 of Exhibit 200?

11          MR. BRODERICK:Objections.

12          **THE WITNESS:  No.**

13  BY MR. RAMSEY:

14      Q.  Did it look anything like Page 6 of

15  Exhibit 200?

16          MR. BRODERICK:  Objection.

17          **THE WITNESS:  No.**

18  BY MR. RAMSEY:

19      Q.  I'm going to stay on this page.  Is this

20  large enough on your screen to -- can you read the

21  top where it says, "Stephanie, get free samples in

22  three steps"?  Is that large enough for you to read

23  on your screen?

24      **A.  I can read it.**

25      Q.  Okay.  I'll zoom in a little bit.  You see

1 at the bottom what you should be looking at right

2 now is a big blue button that says, "continue."  Do

3 you see that?

4     A.  I see it.

5     Q.  Okay.  So I understand that you're saying

6 you never visited this website.  I want you to sort

7 of put all of that aside.  Okay?  And I want you to

8 imagine that you are on a website and this is what

9 you see.  Does that make sense?

10     A.  Okay.

11     Q.  If you were to check the box, do you see

12 the green box above the "continue?"

13     A.  I see it.

14     Q.  That says, "I confirm."  And there's an

15 orange arrow to the left of it.  Do you see that?

16     A.  I see it.

17     Q.  Okay.  If you were to click that box and

18 it -- what would you understand -- have you ever

19 seen -- let me strike all of that.

20         There's a box there next to the "I

21 confirm" that's in light gray.  Do you see that?

22     A.  I see it.

23     Q.  Have you seen boxes like this online

24 before?

25     A.  I have.

1      Q.  And what do you understand it to be?  Is
2  that a box that you can check?
3      A.  It's a box I won't check.
4      Q.  Fair.  But if you wanted to check, could
5  you check it?  Do you understand that's what that
6  is?
7      A.  I understand that.
8      Q.  Okay.  Why wouldn't you check that box?
9      A.  That means you own -- you own me.
10      Q.  What makes you say that?
11      A.  The phone calls.  And I exited out, and I
12  still got all the phone calls, and I still got
13  everything done to me, and you guys still wouldn't
14  stop calling me, and I still was treated like crap.
15  And my doctors had to shut my phone off in the
16  hospital, and it still wouldn't stop.  And my house
17  got bombarded when I came home with a box and a
18  whole in my stomach.  And it still didn't stop when
19  the nurse's aide had to disconnect my house phone.
20  It didn't stop.  So you tell me.  And I didn't even
21  check no box.  I -- I exited out and I still got
22  harassed.  So you tell me.
23      Q.  Okay.  I have a few follow-up questions.
24  You mentioned earlier the hospital turning off your
25  phone.  That was during the first surgery, correct,

 1  in 2015?

 **2      A.  Yeah.  And even in 2017.**

 3      Q.  Okay.  You said that you didn't and

 4  wouldn't have checked this box.  Do you understand,

 5  though, that if you had checked the box you were

 6  providing consent to receive those phone calls?

 7          MR. BRODERICK:  Objection.

 **8          THE WITNESS:  I didn't check no box.**

 9  BY MR. RAMSEY:

10      Q.  I understand you're saying you didn't, but

11  if you did check the box, do you understand that to

12  mean that you were providing consent to being

13  contacted on your cell phone?

14          MR. BRODERICK:  Objection.

**15          THE WITNESS:  I did not check no box.**

16  BY MR. RAMSEY:

17      Q.  That's not answering to my question.  So

18  I'd like you to answer.

19          Okay.  If you had checked the box, did you

20  understand that that would mean that --

**21      A.  I understand what that would mean.  I**

**22  heard you the first time.**

23          (Speaking simultaneously.)

24          MR. BRODERICK: Objection.

25  ////

1 BY MR. RAMSEY:

2    Q.  Okay.  Thank you.

3        Looking at this screen again, above the

4 box that we've been talking about that says, "I

5 confirm" and has the check box there's a paragraph.

6 Do you see that?

7    **A.  I see the paragraph.**

8    Q.  Okay.  And on the second line of the

9 paragraph a handful of words in there is something

10 that says, "marketing partners" that is in blue

11 text and it's underlined.  Do you see that?

12   **A.  Yes.**

13   Q.  Tell me your understanding of why that --

14 those two words are in blue and underlined?  What

15 does that mean to you?

16   **A.  I can't read it.**

17       THE COURT REPORTER:  Ed, I can't hear you

18 if you're objecting.  You've got to really speak

19 up, yell.

20       MR. BRODERICK:  All right.  I'll shout.

21 Objection.

22   **THE WITNESS:  He's objecting.  He's**

23 **objecting.**

24 BY MR. RAMSEY:

25   Q.  I'm happy to zoom in more if need be.

1      A.  Says, "marketing partners."

2      Q.  Yes.  So what do you understand that

3   that's in blue text and underlined.  You see that;

4   correct?

5      A.  That means I can be harassed for the rest

6   of my life.

7      Q.  Because "marketing partners" is in blue

8   and underlined?

9      A.  Yeah.  That's how I take that.

10      Q.  Harassed by whom?

11      A.  By the people who dial your phone all

12   hours of the day and night and harass your cell

13   phone all hours of the day and night.

14      Q.  Okay.  And it's because you understood

15   this, right, that you just closed out of the

16   website when you visited?

17          MR. BRODERICK:  Objection.

18          THE WITNESS:  No.  I closed out of the

19   website when they started asking me medical

20   questions.

21   BY MR. RAMSEY:

22      Q.  What were those medical questions?

23      A.  Oh, do you have diabetes.  Oh, do you have

24   this disease.  Oh, do you need care for your back.

25   Oh, do you need care for your stomach.  Oh, do you

1 need care for your head.  Oh, do you have insomnia.

2          Oh, sorry.  I don't answer medical

3 questions.  I have enough medical problems of my

4 own.  I ex-nayed out of there.

5     Q.  So you just listed seven or eight

6 questions.  Were all of them on a single page or

7 were you -- or were you answering some of them and

8 ultimately decided to stop?

9     A.  Oh, no, I just quit.

10    Q.  Okay.  Let me repeat that.  So you listed

11 seven or eight questions.  Did you see them all on

12 a single page or did you see them on a series of

13 pages?

14    A.  No.  They were on two different pages and

15 I was out of there.

16    Q.  On the first page, do you remember

17 answering any of the questions?

18    A.  No.  I didn't answer none of them.

19    Q.  So you were able to go to the second page

20 without answering them?

21    A.  Yeah.  And I ex-nayed out of there.  I

22 don't answer medical questions.

23    Q.  You mentioned before the major surgery in

24 2015.  What was that for?

25    A.  I can't tell you that.

1      Q.  Why not?

**2      A.  Hum, because that's between me and**

**3  Stanford.**

4      Q.  Stanford was the hospital where you had

5  the surgery?

**6      A.  Stanford is the hospital where I had four**

**7  major surgeries and almost died twice.  So that's**

**8  as far as I'm going.**

9      Q.  Okay.  After the surgery in 2015, were you

10  required to pay a hospital bill for the surgery?

**11     A.  For all four surgeries?  No.**

12     Q.  For any of the four surgeries?

**13     A.  No.**

14     Q.  So you didn't pay any amount?

**15     A.  No.**

16     Q.  Who paid?

**17     A.  Stanford paid.  And my insurance paid.**

18     Q.  What insurance did you have?

19         MR. BRODERICK:  Objection.

20  BY MR. RAMSEY:

21     Q.  Is it through your husband's military?

**22     A.  Yes.**

23     Q.  Any insurance other than your husband's

24  military?

**25     A.  No.**

1      Q.  Just give me a second.

2          So you mentioned visiting the website

3  twice.  Looking at the screen that's in front of

4  you now, the page where your information is and

5  there's the box.  Setting aside the two times that

6  you remember, do you ever remember visiting a

7  website and checking a box like this where you were

8  consenting to receive phone calls?

9      **A.  No.**

10         MR. BRODERICK:  Objection.

11  BY MR. RAMSEY:

12     Q.  Do you ever remember visiting a website,

13  seeing a page like this and choosing not to check

14  the box but still clicking the "continue" button?

15     **A.  No.**

16         MR. BRODERICK:  Objection.

17         **THE WITNESS:  He's objecting.  Okay.**

18  BY MR. RAMSEY:

19     Q.  Meaning you don't remember that or that

20  never happened?

21     **A.  I didn't -- I didn't continue.**

22     Q.  You would have just closed out of the

23  website?

24     **A.  I closed out.**

25     Q.  And that's true of the two times that you

1 visited the website that you remember?

2      A.   **That I remember.**

3      Q.   Okay.   And what I'm asking is, is other

4 than those two is it possible that you went to a

5 website like this that you just don't remember?

6      A.   **I didn't go.**

7           MR. BRODERICK:   Objection.

8           **THE WITNESS:   He objected.**

9 BY MR. RAMSEY:

10      Q.   So one of the defendant's records who

11 operates the website says it has your information

12 entered into its website, one or more of them,

13 between May 29th, 2016 and May 23rd of 2019, for a

14 total of 31 times.   You just denied that you ever

15 visited the website or a website like it that many

16 times?

17      A.   **No.**

18      Q.   You don't deny it or you do deny it?

19      A.   **What was that question?**

20      Q.   So you mentioned two visits to a website

21 where you were asked -- given an opportunity to get

22 products and asked questions and so forth --

23      A.   **Right.**

24      Q.   -- I'm telling you -- I'm representing to

25 you that our records, defendant's records, say that

1  you visited -- someone with your phone number,

2  e-mail address and home address visited the

3  website, a website 31 times between the period May

4  2016 and May 2019.  Are you saying that's just

5  incorrect?

**6**      **A.  That's incorrect.**

7          MR. BRODERICK:  Objection.

8  BY MR. RAMSEY:

9      Q.  Okay.  I'm going to go back to Page 1 of

10  this document.  This is Exhibit 200 still.  I'm

11  going to zoom in a little bit.  Do you see the box

12  that is to the right of the image, says at the top

13  "confirm your zip code below"?  Do you see that?

**14**     **A.  Yes, I see that.**

15     Q.  And you never saw this; correct?

**16**     **A.  No, no.**

17     Q.  So correct, you never saw it?

**18**     **A.  No.**

19     Q.  Did you ever see this (indicating)?

**20**     **A.  No.**

21     Q.  Okay.  Sorry.  I understand you haven't

22  seen this, that's fine.  Below the zip code that

23  says 93930, do you see the sentence that says, "I

24  understand and agree to the terms and conditions

25  which include mandatory arbitration and privacy

1 policy."  Do you see that?

**2**      **A.  Okay.**

3      Q.  Do you see it?

**4**      **A.  I see it.**

5      Q.  Okay.  Do you see that "terms and

6 conditions" is underlined?

**7**      **A.  Okay.**

8      Q.  Do you know what a hyperlink is?

**9**      **A.  No.**

10      Q.  When you're navigating the Internet on

11 your phone and you click some text and it takes you

12 to a different page of a website, that's a

13 hyperlink.  Okay.  Can you just understand that in

14 your mind for a moment?  Or let me take that back.

15          Have you ever been on the website and you

16 click a button or you click some text and it takes

17 you to a different web page?

**18**      **A.  Okay.**

19      Q.  Have you had that experience?

**20**      **A.  Okay.**

21      Q.  Sorry.  I need a "Yes" or "No."  Have you

22 had that experience?

**23**      **A.  Yes.**

24      Q.  The button that you click that causes the

25 website to go to a different page, I'm calling that

1 a hyperlink.  Are you following me?

**2       A.  I'm following you.**

3       Q.  Okay.  If you were -- if you were to see

4 this website and you saw the phrase "terms and

5 conditions" was underlined, would you understand

6 that if you put your mouse or your finger, or

7 whatever it might be, and you clicked on "terms and

8 conditions" that it would take you to a different

9 web page?

**10      A.  Okay.**

11      Q.  Do you understand that?  Is that true or

12 something that you understand or not?

**13      A.  I understand.**

14      Q.  When you say, "I understand," are you

15 saying you understand what I'm saying or that you

16 understand that if you were to visit a website that

17 looked like this and you saw the phrase "terms and

18 conditions" underlined that you would know if you

19 clicked it you would be taken to a different page?

20          MR. BRODERICK:  Objection.

**21          THE WITNESS:  I don't understand.**

22 BY MR. RAMSEY:

23      Q.  Have you ever seen a phrase like this when

24 you are shopping online, say, that is above a

25 button that allows you to purchase or sign up for a

1  website, a phrase like this that says, "I

2  understand and agree to the terms and conditions"?

3      **A.  Yes, I do.**

4      Q.  Okay.  So you've seen something like this

5  before?

6      **A.  Yes, I have.**

7      Q.  And when you see something like that, do

8  you ever click on the terms and conditions link and

9  read the terms and conditions?

10      **A.  Yes, I do.**

11          MR. BRODERICK:  Objection.

12  BY MR. RAMSEY:

13      Q.  Do you do that regularly?

14      **A.  Quite often.**

15      Q.  Do you do that every time you visit a

16  website?

17      **A.  No, not every time.**

18      Q.  What would cause you not to read -- to

19  click on them and read them?

20      **A.  Something like Costco, Walmart, Lowe's.**

21  **Places like that.**

22      Q.  You would not read them?

23      **A.  No.**

24      Q.  And why is that?

25      **A.  Because they're too big in the community.**

1        Q.  So you trust them?

2        A.  Yeah.

3        Q.  On a website like this that's offering you

4   product, would you read the terms and conditions

5   then?

6        A.  Yeah.

7             MR. BRODERICK:  Objection.

8   BY MR. RAMSEY:

9        Q.  Would you completed -- complete your

10  registration without reading the terms and

11  conditions?

12       A.  No.

13            MR. BRODERICK:  Objection.

14  BY MR. RAMSEY:

15       Q.  Why did you want to read the terms and

16  conditions?

17       A.  Because it's fraud.

18       Q.  You would be concerned about fraud?

19       A.  Yes.

20       Q.  So you would want to read the terms and

21  conditions to make sure that you're not getting

22  screwed over?

23       A.  Yes.

24       Q.  And if you were to read the terms and

25  conditions and conclude that you were getting

1    screwed over, you would not continue with the

2    website?

3         A.  Yes.

4         Q.  Looking at the screen in front of you, if

5    you were to see this, let's say you went online

6    today and you were to see this, and you clicked on

7    the terms and conditions and you read them and you

8    decided, you know what, I like this.  I trust them.

9    I'm not getting screwed over.  You would then click

10   this, is this correct, I can continue button?

11             MR. BRODERICK:  Objection.

12             THE WITNESS:  I would not.

13   BY MR. RAMSEY:

14        Q.  Why not?

15        A.  Because of what I've been through.

16        Q.  Okay.  I understand.  What I'm asking you

17   is, if you were to visit this website and conclude

18   after reading the terms and conditions or otherwise

19   that you wanted to go forward, let's say this --

20   let me strike that.

21             Let's say we're on Lowes.com.  You trust

22   them, and you see a screen like this and it says,

23   "I understand and agree to the terms and conditions

24   which includes mandatory arbitration and privacy

25   policy."  Would you click continue and continue on

1  with the website?

**2      A.  If it was Lowe's?**

3      Q.  Yes.

**4      A.  Yeah, I would do it for Lowe's.**

5      Q.  Okay.  And by clicking continue and

6  continuing with the website in that circumstance,

7  would you understand that you were agreeing with

8  the Lowe's terms and conditions?

**9      A.  Yes.**

10      MR. BRODERICK:  Objection.

**11      THE WITNESS:  He objected again.**

12  BY MR. RAMSEY:

13      Q.  Let's take another five-minute break.  I'm

14  going to go through my notes and see if I have any

15  more questions.  We're likely almost done, so if

16  that's okay with everyone, let's do that.

17      THE VIDEOGRAPHER:  We're going off the

18  record at 12:06 p.m.

19      (Recess taken.)

20      THE VIDEOGRAPHER:  We are going back on

21  the record at 12:18 p.m.

22      MR. RAMSEY:  So I actually have no further

23  questions.

24      MR. BRODERICK:  Great.  No questions from

25  us.

1          MR. RAMSEY:  So, Ms. Hernandez, just
2    before we sign off, because I think I forgot to
3    tell you earlier, you will have an opportunity to
4    review the transcript of your deposition and make
5    any changes that you want and then sign it under
6    penalty of perjury.
**7          THE WITNESS:  Okay.**
8          MR. RAMSEY:  If you do make any changes, I
9    have the right, all parties have the right to
10   comment on that.  So, for example, if you change an
11   answer from "yes" to "no" or something like that,
12   we can note the fact that you did that.
**13         THE WITNESS:  Okay.**
14         MR. RAMSEY:  Otherwise, Ted, like last
15   time, I said that I would take custody of the
16   original transcript but send you guys a copy for
17   her to comment, and that she would -- to make that
18   change and sign, and she would have 30 days to do
19   so.  But otherwise, we can use a certified copy in
20   lieu of the final signed copy in motion of
21   proceedings and, so forth, if she ends up not
22   signing it.
23         MR. BRODERICK:  That's good.  Agreed.
24         MR. RAMSEY:  Okay.  Great.  I think with
25   that we are done.

1          **THE WITNESS:  Oh thank you.  It was nice**

2  **meeting all of you.**

3          (Simultaneously talking.)

4          **THE WITNESS:  It was nice meeting you all.**

5          MR. RAMSEY:  You, too.

6          THE COURT REPORTER:  Neil, do you want a

7  copy of anything?

8          MR. RAMSEY:  I'll just take a copy.

9          THE COURT REPORTER:  Neil, one at a time.

10  Neil, do you want a copy of this?

11          MR. ASNEN:  No, that's okay.

12          THE COURT REPORTER:  And Jen, what about

13  you?

14          MS. MURRAY:  We'll want a copy.  Whatever

15  time frame allows us to get it by next Wednesday.

16          THE COURT REPORTER:  By next Wednesday.

17  Okay.  Then I'll have the office contact you.

18          MS. MURRAY:  Okay.  Thank you.

19          MR. RAMSEY:  I will send a e-mail after

20  this.  I think I only used one exhibit with you,

21  but I will send an e-mail to the other people and

22  copy everyone like I did last time.

23          THE COURT REPORTER:  Okay.  Thank you.

24          MS. MURRAY:  Thank you.

25          THE VIDEOGRAPHER:  There the concludes the

1  video deposition of Stephanie Hernandez on July

2  2nd, 2020.  We're now going off the record.  The

3  time is 12:21 p.m.

4            THE WITNESS:  Thank you.

5            (Proceeding concluded at 12:20 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          DECLARATION UNDER PENALTY OF PERJURY

2

3          I, STEPHANIE HERNANDEZ, do hereby certify

4     under the penalty of perjury that I have reviewed

5     the foregoing transcript of my deposition taken on

6     Thursday, July 2, 2020; that I have made such

7     corrections as appear noted herein in ink; that my

8     testimony as contained herein, as corrected, is

9     true and correct.

10         DATED this        day of                          ,

11     2020, at                              , California.

12

13

14

15                                 ,

16                         STEPHANIE HERNANDEZ

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATION

2

3            I, Tracey Wiley, CSR NO. 5396, certify:

4            That the foregoing deposition was taken

5    before me at the time and place therein set forth,

6    at which time the witness was put under oath by me;

7            That the testimony of the witness and all

8    objections made at the time of the deposition were

9    recorded stenographically by me and thereafter by

10   computer transcribed;

11           That the foregoing deposition is a true

12   record of the testimony and of all objections made

13   at the time of the deposition.

14           I further certify that I am neither

15   counsel for nor related to any party to said

16   action, nor in any way interested in the outcome

17   thereof.

18           In witness whereof, I have subscribed my

19   name this 4th day of July 2020.

20

21

22                    *Tracey Wiley*
                      _____
23                    Tracey Wiley, CSR NO. 5396

24

25