**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

DANIEL BERMAN; STEPHANIE HERNANDEZ; ERICA RUSSELL,
*Plaintiffs-Appellees*,

v.

FREEDOM FINANCIAL NETWORK, LLC; FREEDOM DEBT RELIEF, LLC; FLUENT, INC.; LEAD SCIENCE, LLC,
*Defendants-Appellants.*

</td>
<td>

No. 20-16900

D.C. No.
4:18-cv-01060-YGR

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted October 21, 2021
San Francisco, California

Filed April 5, 2022

Before: Paul J. Watford and Andrew D. Hurwitz, Circuit Judges, and M. Miller Baker,* International Trade Judge.

Opinion by Judge Watford;
Concurrence by Judge Baker

---

* The Honorable M. Miller Baker, Judge for the United States Court of International Trade, sitting by designation.

## SUMMARY[**]

### Arbitration

The panel affirmed the district court's order denying defendants' motion to compel arbitration in a putative class action under the Telephone Consumer Protection Act.

In Part I of its opinion, the panel summarized the facts and procedural history.  Plaintiffs used defendants' websites but did not see a notice in fine print stating, "I understand and agree to the Terms & Conditions which includes mandatory arbitration."  When a dispute arose and plaintiffs filed this lawsuit, defendants moved to compel arbitration, arguing that plaintiffs' use of the websites signified their agreement to the mandatory arbitration provision found in the hyperlinked terms and conditions.

In Part II, the panel held that plaintiffs did not unambiguously manifest their assent to the terms and conditions when navigating through the websites, and as a result they never entered into a binding agreement to arbitrate their dispute, as required under the Federal Arbitration Act.  The parties agreed that either New York or California contract law governed.  To form a contract under New York or California law, including a contract formed online, the parties must manifest their mutual assent to the terms of the agreement, and they may do so through conduct. The panel explained that the courts have routinely found enforceable "clickwrap" agreements, in which a website presents users with specified contractual terms on a pop-up

_____

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

screen and users must check a box explicitly stating "I agree" in order to proceed.  Courts are more reluctant to enforce "browsewrap" agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website.

The panel held that unless the web operator can show that a consumer has actual knowledge of an arbitration agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms. The panel concluded that defendants' webpages did not provide reasonably conspicuous notice because of the small font size and format and because the fact that a hyperlink was present was not readily apparent.  The panel further concluded that by clicking on a large green "continue" button, plaintiffs did not unambiguously manifest their assent to be bound by the terms and conditions.

In Part III, the panel held that the district court properly exercised its discretion in denying defendants' motion for reconsideration based on deposition testimony taken two months prior to the district court's ruling on the motion to compel arbitration.

Concurring, Judge Baker wrote that he joined Parts I and III of Judge Watford's opinion, and he would reach the same result by a different route.  Judge Baker wrote that he would conduct a choice-of-law analysis and, pursuant to Supreme Court precedent, would utilize the forum state of California's choice-of-law rules and apply California law.

He would conclude that under recent decisions of the California Court of Appeal, defendants' websites contained "sign-in wrap" agreements, which fall within a gray zone in which enforceability requires conspicuous textual notice that completing a transaction or registration signifies consent to the site's terms and conditions. Under this standard, defendants' notices were insufficiently conspicuous and were not unambiguously tied to some act of the website user that manifested assent to the site's terms and conditions. Accordingly, defendants' sign-in wrap agreements were not enforceable.

## COUNSEL

Jay T. Ramsey (argued), Sheppard Mullin Richter & Hampton LLP, Los Angeles, California; Matthew G. Halgren, Sheppard Mullin Richter & Hampton LLP, San Diego, California; for Defendants-Appellants.

Matthew W.H. Wessler (argued), Gupta Wessler, Washington, D.C.; Anthony I. Paronich, Paronich Law P.C., Hingham, Massachusetts; Beth E. Terrell, Terrell Marshall Law Group PLLC, Seattle, Washington; for Plaintiffs-Appellees.

## OPINION

WATFORD, Circuit Judge:

We revisit an issue first addressed by our court in *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014): Under what circumstances can the use of a website bind a consumer to a set of hyperlinked "terms and conditions" that the consumer never saw or read?

In this case, plaintiffs used defendants' websites but did not see a notice in fine print stating, "I understand and agree to the Terms & Conditions which includes mandatory arbitration." When a dispute arose and plaintiffs filed this lawsuit, defendants moved to compel arbitration, arguing that plaintiffs' use of the websites signified their agreement to the mandatory arbitration provision found in the hyperlinked terms and conditions. The district court rejected this argument, and so do we. Plaintiffs did not unambiguously manifest their assent to the terms and conditions when navigating through the websites, and as a result they never entered into a binding agreement to arbitrate their dispute. We therefore affirm the district court's order denying defendants' motion to compel arbitration.

I

Defendant Fluent, Inc. is a digital marketing company that generates leads for its clients by collecting information about consumers who visit Fluent's websites. Fluent's websites offer rewards like gift cards and free product samples as an enticement to get consumers to provide their contact information and answer survey questions. Fluent then uses the information it collects in targeted marketing campaigns conducted on behalf of its clients.

The plaintiffs involved in this appeal, Stephanie Hernandez and Erica Russell, each visited a website operated by Fluent. The two websites differed in certain respects, but as described below, both contained a set of hyperlinked terms and conditions that included a mandatory arbitration provision, the enforceability of which is the principal issue raised on appeal.

According to Fluent's records, Hernandez visited the Fluent website www.getsamplesonlinenow.com from a desktop computer. Because Hernandez had visited a Fluent website before and had previously entered some of her contact information, the webpage she saw stated, in large orange letters across the top of the page, "Welcome back, stephanie!" *See* Appendix A.[1] In the middle of the screen, the webpage proclaimed, "Getting Free Stuff Has Never Been Easier!" and included brightly colored graphics. In between those two lines of text appeared a box that stated at the top, "Confirm your ZIP Code Below," followed immediately by a pre-populated text box displaying the zip code 93930. Below that, the page displayed a large green button inviting Hernandez to confirm the accuracy of the zip code so that she could proceed to the next page in the website flow. The text inside the button stated, in easy-to-read white letters, "This is correct, Continue! >>." Clicking on this button led to the next page, which asked Hernandez to

---

[1] Appendix A is a recreation of the key webpage that defendants contend Hernandez saw when she visited Fluent's website. For purposes of this opinion, we will assume that the recreations produced by defendants accurately depict the relevant webpages viewed by each plaintiff, although plaintiffs contested that fact below. Given our disposition, we need not address the district court's alternative holding that material disputes of fact exist as to the accuracy and completeness of defendants' webpage recreations.

provide personal information in order to obtain free product samples and promotional deals.

Between the comparatively large box displaying the zip code and the large green "continue" button were two lines of text in a tiny gray font, which stated: "I understand and agree to the <u>Terms & Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>."[2]  The underlined phrases "Terms & Conditions" and "Privacy Policy" were hyperlinks, but they appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink.  If Hernandez had seen the "Terms & Conditions" hyperlink and clicked on it, she would have been taken to a separate webpage displaying a lengthy set of legal provisions, one of which stated that any disputes related to telemarketing calls or text messages received from Fluent or its marketing partners would have to be resolved through arbitration.

According to Fluent's records, Russell visited a different Fluent website, www.retailproductzone.com, using a mobile phone.  The key webpage she viewed while registering to receive a free gift card stated at the top, "Shipping Information Required," and below that, "Complete your shipping information to continue towards your reward."  *See* Appendix B.  What followed were several fields requiring Russell to input her name, address, telephone number, and date of birth.  Below a line instructing the user to "Select Gender," two buttons appeared side by side marked "Male" and "Female."  Below that was a large green button with text

---

[2] A declaration submitted by one of plaintiffs' experts states that the text displayed in defendants' webpage recreation, which is reproduced without alteration in Appendix A, would not have appeared any larger when displayed on a typical desktop or laptop computer screen.

that stated, in easy-to-read white letters, "Continue >>." Russell had to click on the "continue" button to proceed to the next page in the website flow.

As with the webpage Hernandez viewed, sandwiched between the buttons allowing Russell to select her gender and the large green "continue" button were the same two lines of text in tiny gray font stating, "I understand and agree to the <u>Terms & Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>." The hyperlinks were underlined but again appeared in the same gray font as the rest of the sentence. The "Terms & Conditions" contained a mandatory arbitration provision similar to the one described above.

Fluent and defendant Lead Science, LLC used the contact information provided by consumers like Hernandez and Russell to conduct a telemarketing campaign on behalf of defendants Freedom Financial Network, LLC and Freedom Debt Relief, LLC (collectively, Freedom). As part of the campaign, Fluent and Lead Science allegedly placed unsolicited telephone calls and text messages to hundreds of thousands of consumers, including Hernandez and Russell, marketing Freedom's debt-relief services.

Plaintiffs filed this putative class action on behalf of consumers who received unwanted calls or text messages from defendants during the telemarketing campaign conducted on Freedom's behalf. They allege that the calls and text messages were made or sent without their consent and therefore violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 *et seq.*

Defendants moved to compel arbitration, arguing that, by clicking on the "continue" buttons, Hernandez and Russell had agreed to the hyperlinked terms and conditions,

including the mandatory arbitration provision.  The district court denied defendants' motion.  The court concluded that the content and design of the webpages did not conspicuously indicate to users that, by clicking on the "continue" button, they were agreeing to Fluent's terms and conditions.

Shortly after the district court denied defendants' motion to compel arbitration, defendants filed a motion for reconsideration.  They asserted that testimony given by plaintiffs in depositions taken two months earlier was material to the motion to compel.  The district court denied the reconsideration motion, concluding that defendants had failed to act with reasonable diligence in producing the new evidence and, alternatively, that plaintiffs' deposition testimony was not materially different from the facts the district court had previously considered.

On appeal, defendants challenge the denial of both motions.  We review *de novo* the denial of a motion to compel arbitration, while underlying factual findings are reviewed for clear error.  *Nguyen*, 763 F.3d at 1175.  We review the denial of a motion for reconsideration for abuse of discretion. *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 883 (9th Cir. 2000).

II

The Federal Arbitration Act (FAA) requires district courts to compel arbitration of claims covered by an enforceable arbitration agreement.  9 U.S.C. § 3.  The FAA limits the court's role to "determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Services, Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  Plaintiffs do not contest that the arbitration

provision in the websites' terms and conditions encompasses their TCPA claims. Thus, the only issue we must resolve is whether an agreement to arbitrate was validly formed.[3]

In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, the parties agree that either New York or California law governs. "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)). As in *Nguyen*, we need not decide which State's law governs "because both California and New York law dictate the same outcome." 763 F.3d at 1175.

To form a contract under New York or California law, the parties must manifest their mutual assent to the terms of the agreement. *See id.* (applying New York law); *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law). Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct. *Specht*, 306 F.3d at 29. However, "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer

---

[3] While plaintiffs do not dispute that the arbitration provision is broad enough to cover their claims, they do contend that even if the provision is enforceable, it cannot be enforced by Freedom and Lead Science as they were not signatories to any agreement. Because we affirm the district court's denial of the motion to compel arbitration on other grounds, we need not decide whether Freedom and Lead Science could compel arbitration in this case.

from his conduct that he assents."  Restatement (Second) of Contracts § 19(2) (1981).

These elemental principles of contract formation apply with equal force to contracts formed online.  Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed.

The most straightforward application of these principles in the online world involves so-called "clickwrap" agreements, in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating "I agree" in order to proceed.  *See Nguyen*, 763 F.3d at 1175–76.  In that scenario, the consumer has received notice of the terms being offered and, in the words of the Restatement, "knows or has reason to know that the other party may infer from his conduct that he assents" to those terms.  Restatement (Second) of Contracts § 19(2).  As a result, courts have routinely found clickwrap agreements enforceable.  *See Meyer*, 868 F.3d at 75.

At the other end of the spectrum are so-called "browsewrap" agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website.  *See Nguyen*, 763 F.3d at 1176.  Courts are more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms.  *Id.* at 1178 (noting "courts' traditional reluctance to enforce browsewrap agreements against individual consumers").

To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements such as those at issue here have devised rules to determine whether meaningful assent has been given.  Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.  *See Meyer*, 868 F.3d at 75; *Nguyen*, 763 F.3d at 1173 (refusing to enforce an arbitration provision to which the consumer "did not unambiguously manifest assent").  As the Second Circuit has explained, "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Specht*, 306 F.3d at 35.

Defendants did not contend, in their motion to compel arbitration, that plaintiffs had actual knowledge of an agreement to arbitrate.  And, as explained below, defendants failed to show that either of the conditions necessary for finding an enforceable agreement based on inquiry notice were satisfied.

*Reasonably conspicuous notice.*   The webpages reproduced in Appendix A and Appendix B did not provide reasonably conspicuous notice of the terms and conditions for two reasons.  First, to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.  *See id.* at 30; *Nguyen*, 763 F.3d

at 1177. The text disclosing the existence of the terms and conditions on these websites is the antithesis of conspicuous. It is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye. The comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else. And the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text. Far from meeting the requirement that a webpage must take steps "to capture the user's attention and secure her assent," the design and content of these webpages draw the user's attention away from the most important part of the page. *Nguyen*, 763 F.3d at 1178 n.1.

Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print. Because "online providers have complete control over the design of their websites," *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 16 (Ct. App. 2021), "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers," *Nguyen*, 763 F.3d at 1179. The designer of the webpages at issue here did not take that obligation to heart.

Second, while it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent. Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists. *See Sellers*, 289 Cal. Rptr. 3d at 29. Because our inquiry notice standard demands conspicuousness tailored to the reasonably prudent Internet

user, not to the expert user, the design of the hyperlinks must put such a user on notice of their existence. *Nguyen*, 763 F.3d at 1177, 1179.

A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently "set apart" from the surrounding text. *Sellers*, 289 Cal. Rptr. 3d at 29. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage. *See id.* (finding "Terms of Service" insufficiently conspicuous because it did not use all capital letters or contrasting font color). Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to "ferret out hyperlinks." *Nguyen*, 763 F.3d at 1179. The failure to clearly denote the hyperlinks here fails our conspicuousness test. *Cf. Meyer*, 868 F.3d at 78–79 (finding hyperlinks reasonably conspicuous because they were both in blue and underlined).

*Unambiguous manifestation of assent*. In using the websites, Hernandez and Russell did not take any action that unambiguously manifested their assent to be bound by the terms and conditions. Defendants rely on plaintiffs' act of clicking on the large green "continue" buttons as manifestation of their assent, but merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything. A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement. *See Specht*, 306 F.3d at 29–30. The presence of

"an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound" is critical to the enforceability of any browsewrap-type agreement. *Nguyen*, 763 F.3d at 1177.

The webpages here did provide advisals concerning the terms and conditions in proximity to the "continue" buttons. On the webpage Russell visited, the notice appeared directly above the button, and on the webpage Hernandez visited it appeared above the button separated by several intervening lines of text. But "even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id.* at 1179.

Rather, the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement. The notice did not do so here. Both webpages stated, "I understand and agree to the <u>Terms & Conditions</u>," but they did not indicate to the user what action would constitute assent to those terms and conditions. Likewise, the text of the button itself gave no indication that it would bind plaintiffs to a set of terms and conditions. This notice defect could easily have been remedied by including language such as, "By clicking the Continue >> button, you agree to the <u>Terms & Conditions</u>." *See, e.g.*, *Meyer*, 868 F.3d at 78–80 (concluding that an enforceable agreement was formed where the mobile app explicitly warned, "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY").

Defendants assert that the presence of the phrase "which includes mandatory arbitration" in the textual notice distinguishes the webpages at issue here from those rejected by other courts. This argument is unavailing, as it fails to appreciate the key issue in this appeal. The question before us is not whether Hernandez and Russell may have been

aware of the mandatory arbitration provision in particular, but rather whether they can be deemed to have manifested assent to any of the terms and conditions in the first place. Because the textual notice was not conspicuous and did not explicitly inform Hernandez and Russell that by clicking on the "continue" button they would be bound by the terms and conditions, the presence of the words "which includes mandatory arbitration" in the notice is of no relevance to the outcome of this appeal.

We conclude that the design and content of the webpages Hernandez and Russell visited did not adequately call to their attention either the existence of the terms and conditions or the fact that, by clicking on the "continue" button, they were agreeing to be bound by those terms. The district court properly denied defendants' motion to compel arbitration because an enforceable agreement to arbitrate was never formed.

III

Following the district court's denial of their motion to compel arbitration, defendants filed a motion for reconsideration, asserting that testimony from the depositions they took of Russell and Hernandez two months prior to the court's ruling was material to resolution of the motion to compel. The district court denied the reconsideration motion because defendants failed to act with reasonable diligence and, alternatively, because plaintiffs' deposition testimony was not materially different from the facts the court had already considered. Because we agree with the court's first rationale, we need not address the second.

A district court may, in its discretion, reconsider an interlocutory order denying a motion to compel arbitration. *See* Fed. R. Civ. P. 60(b); N.D. Cal. Civ. L.R. 7-9. However, reconsideration of such an order is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enterprises*, 229 F.3d at 890. Reconsideration motions may not be used to raise new arguments or introduce new evidence if, with reasonable diligence, the arguments and evidence could have been presented during consideration of the original ruling. *Id.*

As the district court explained, had defendants acted with reasonable diligence, plaintiffs' deposition testimony could have been presented to the court in connection with the motion to compel arbitration. Defendants could have deposed plaintiffs before filing the motion or before the close of briefing on the motion. During that period, the district court granted each extension of the briefing and discovery schedules the parties requested. Moreover, defendants could have submitted plaintiffs' deposition testimony at any point during the two-month period between the taking of the depositions and issuance of the court's order denying the motion to compel. Instead, defendants waited until after the court had issued its ruling to present the deposition testimony in support of their new theory that plaintiffs had actual knowledge of the hyperlinked terms and conditions. The district court did not abuse its discretion in concluding that defendants' "tactical decision not to submit the deposition testimony until after their motion was denied" failed to provide any basis for seeking reconsideration of the court's earlier ruling.

\*      \*      \*

18      BERMAN v. FREEDOM FINANCIAL NETWORK

We affirm the district court's denial of defendants' motion to compel arbitration and their motion for reconsideration.

**AFFIRMED.**

Appendix A





20      BERMAN v. FREEDOM FINANCIAL NETWORK

## Appendix B

BAKER, Judge, concurring:

I join Parts I and III of Judge Watford's opinion for the Court. Although my colleagues and I reach the same destination, I would take a different route, one that first walks through the applicable choice-of-law analysis and then, based on that analysis, relies more on recent decisions of the California Court of Appeal. Those decisions establish that the websites here contain "sign-in wrap" agreements, which—as this case illustrates—tempt fate under California law.

I

"In determining the validity of an agreement to arbitrate, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010) (cleaned up and quoting *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002)). The first issue here is what body of state law governs whether the parties agreed to arbitration. The parties agree that California and New York are the options and further agree that there is no material difference between the applicable law of those jurisdictions. But when asked at argument which state's law would apply if forced to choose, plaintiffs asserted California and defendants asserted New York. My colleagues decline to decide this issue because, like the parties, they conclude that both California and New York law dictate the same outcome. *Ante* at 10 (citing *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014)).

I am not sure this is correct at the margins in this evolving and fact-bound area. I also think that due respect for state courts should lead us to begin by identifying the relevant jurisdiction and then determining its law as

enunciated by those courts. *Cf.* 19 Wright & Miller, *Federal Practice and Procedure* § 4507 (3d ed. 2021) ("Because of the important federalism concerns implicated in the application of state law by the federal courts, the accurate ascertainment of that law is extremely important."). We are messengers, not catalysts, of state law.

## A

"Before a federal court may apply state-law principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply." *Pokorny*, 601 F.3d at 994. If we were sitting in diversity, it is long-settled that we would apply the choice-of-law rules of the forum statute—here, California—to resolve whether the parties agreed to arbitrate their dispute. *See, e.g.*, *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) ("When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law.").

But because we exercise our federal-question jurisdiction here,[1] the selection of choice-of-law principles is not so straightforward. "[T]here is some inconsistency" in our circuit precedent "as to whether federal courts [in federal-question cases] should apply federal common law choice-of-law principles or the choice-of-law principles of the forum state when the particular issue is governed by substantive state law." *Setty v. Shrinivas Sugandhalaya LLP*, 986 F.3d 1139, 1148 (9th Cir.) (Bea, J., dissenting),

---

[1] Plaintiffs brought this suit under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. It permits concurrent federal and state court jurisdiction over private-party claims such as those brought by plaintiffs here. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 379–87 (2012).

*withdrawn on denial of reh'g en banc*, 998 F.3d 897 (9th Cir. 2021).

"For bankruptcy cases founded on federal question jurisdiction, we have opted to use federal choice-of-law rules to determine which state law to apply to pendent state claims." *Id*. (citing *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995)). And in some federal-question contexts outside of bankruptcy, we have applied federal choice-of-law rules to state-law issues. *See, e.g.*, *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (characterizing circuit precedent as standing for the general proposition that "where jurisdiction is not premised on diversity of citizenship, federal common law governs" and applying that law to determine which state's limitations period to use).

But in other federal-question contexts, "when the particular issue is ultimately determined by state rather than federal law . . . , the Ninth Circuit and the lower courts have sometimes applied the forum state's choice-of-law rule." *Setty*, 986 F.3d at 1149 (Bea, J., dissenting) (citing *SEC v. Elmas Trading Corp.*, 683 F. Supp. 743, 748 (D. Nev. 1987), *aff'd w/o opinion*, 865 F.2d 265 (9th Cir. 1988), and *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996)). *Paracor* involved supplemental state-law claims, and later in *Pokorny* (which, as here, was a federal-question case) we followed *Paracor* in applying forum state choice-of-law rules to the state-law question of whether the parties agreed to arbitrate their dispute. *See Pokorny*, 601 F.3d at 994.

I think analysis of the Supreme Court's decisions resolves our intra-circuit conflict and favors applying forum state choice-of-law rules to state-law issues arising in federal-question cases, at least where Congress has vested concurrent jurisdiction in state and federal courts. In

enacting federal law, "Congress acts . . . against the background of the total *corpus juris* of the states . . . ." *Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (ellipses in original) (cleaned up and quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966)). "Thus, normally, when courts decide to fashion rules of federal common law, 'the guiding principle is that a significant conflict between some federal policy or interest and the use of state law . . . must first be specifically shown." *Id.* (ellipsis in original) (quoting *Wallis*, 384 U.S. at 68); *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) ("Cases in which judicial creation of a special federal rule would be justified" are "few and restricted, limited to situations where there is a significant conflict between some federal policy or interest and the use of state law.") (cleaned up).

Where, as here, Congress vests concurrent jurisdiction in state and federal courts to hear federal causes of action, absent any statutory indication to the contrary it implicitly authorizes state courts to apply their own choice-of-law rules to state-law issues arising in such cases. This implied authorization necessarily signifies that federal courts' application of forum state choice-of-law rules to state-law issues arising under those same statutes does not conflict with any federal policy or interest. *Cf. A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1464 (D.C. Cir. 1995) ("The Supreme Court has decreed that in the absence of federal legislation there shall be what one might call 'vertical uniformity': a suit in federal court shall be handled as it would be in the courts of the state where that federal court sits."). For that reason, given the TCPA's silence on the matter we should apply the choice-of-law rules of the forum state—here, California—to resolve the state-law issue of whether the parties agreed to arbitrate plaintiffs' federal claims. In other words, we should apply the same choice-of-

law rules that we would apply in a diversity case, or to supplemental state-law claims.

## B

Under California choice-of-law principles, "when there is no advance agreement on applicable law, but the action involves the claims of residents from outside California, the trial court may analyze the governmental interests of the various jurisdictions involved to select the most appropriate law." *Wash. Mut. Bank, FA v. Super. Ct.*, 15 P.3d 1071, 1077 (Cal. 2001).[2] This analysis has three steps.

First, a court will apply California substantive law unless the party timely invoking another state's law "show[s] it materially differs from the law of California." *Wash. Mut.*, 15 P.3d at 1080. If the states' laws are identical, the court applies California law. *Id.* Second, if the laws are materially

---

[2] The California Court of Appeal has held that "notwithstanding the application of the governmental interest analysis to other choice-of-law issues," the "choice-of-law rule in Civil Code section 1646 determines the law governing the interpretation of a contract." *Frontier Oil Corp. v. RLI Ins. Co.*, 63 Cal. Rptr. 3d 816, 835 (Ct. App. 2007). Section 1646 provides that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Cal. Civ. Code § 1646. Because § 1646 presupposes the existence of a contract, it is inapplicable to the antecedent question of whether the parties formed a valid contract. *See Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1111 (9th Cir. 2020) ("Section 1646 governs only the interpretation of contractual terms. . . . [A]ll other issues in a contract dispute, including the validity of a contract, are governed by governmental interest analysis."); *Miller v. Stults*, 300 P.2d 312, 318 (Cal. App. 1956) (stating that "[t]he rules stated in" § 1646 and related provisions "govern the interpretation of contracts which might otherwise be uncertain, not the formation of contracts").

different, the court must "determine what interest, if any, each state has in having its own law applied to the case." *Id.* Finally, "[o]nly if the trial court determines that the laws are materially different *and* that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be 'more impaired' if its law were not applied." *Id.* at 1081 (emphasis in original).

Here, step one resolves the issue because while defendants (if forced to choose) urge us to apply New York's law instead of California's, they have not met their burden of identifying differences in the applicable law of both states. We must therefore apply California law.

In so doing, we must apply the law as enunciated by the California Supreme Court. *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001). Absent any such authority, we "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Id.* (quoting *Lewis v. Tel. Emps. Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996)). But "where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Id.* (quoting *Lewis*, 87 F.3d at 1545); *see also Hayes v. Cnty. of San Diego*, 658 F.3d 867, 872 (9th Cir. 2011) (same).

As the California Supreme Court has not yet addressed internet contract formation, and as I am unaware of any evidence suggesting that it would decide these questions any differently, I would decide this case based on two relevant published decisions of the California Court of Appeal.

II

The first relevant state court decision is *Long v. Provide Commerce, Inc.*, 200 Cal. Rptr. 3d 117 (Ct. App. 2016). In that case, a user of ProFlowers.com argued that an arbitration provision in a website's terms and conditions was unenforceable for lack of notice.

*Long* began with first principles. Federal and state policies favoring arbitration cannot compel someone to arbitrate when he has not agreed to do so, *id.* at 122 (citing *Freeman v. State Farm Mut. Auto. Ins. Co.*, 535 P.2d 341, 346 (Cal. 1975)), and e-commerce "has not fundamentally changed the requirement that mutual manifestation of assent, whether by written or spoken word, is the touchstone of contract," *id.* (cleaned up) (citing *Nguyen*, 763 F.3d at 1175). "California law is clear—an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Id.* (cleaned up).

*Long* then noted the distinction between

> "clickwrap" (or "click-through") agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen.

*Id.* at 123 (quoting *Nguyen*, 763 F.3d at 1175–76). "[A]bsent actual notice, 'the validity of a browsewrap agreement turns on whether the website puts a reasonably prudent user on

inquiry notice of the terms of the contract." *Id*. (cleaned up) (quoting *Nguyen*, 763 F.3d at 1177).

*Long* involved a browsewrap agreement where the website's hyperlinked terms of use were buried at the bottom of the relevant webpages and confirming emails. The court noted that "what sort of Web site design elements would be necessary or sufficient to deem a browsewrap agreement valid in the absence of actual notice" was an issue of first impression under California law, and accordingly said it would be "largely guided" by the reasoning in *Nguyen* and *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002). *Id.* at 124. Applying these decisions, *Long* held that the website's hyperlinks to the terms of use—"their placement, color, size, and other qualities relative to the ProFlowers.com Web site's overall design—[were] simply too inconspicuous" to put reasonably prudent users on inquiry notice. *Id.* at 125–26.

"While the lack of conspicuousness" of the terms of use resolved the case, *id.* at 126, *Long* went further and approved *Nguyen*'s conclusion that if browsewrap is to be enforceable, "a textual notice should be required to advise consumers that continued use of a Web site will constitute the consumer's agreement to be bound by the Web site's terms of use." *Id.* at 126 (citing *Nguyen*, 763 F.3d at 1178–79). The court reasoned that merely placing a hyperlink in a "prominent or conspicuous place" is not enough because "the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the Internet-using public." *Id.* at 126–27. *Long* thereby endorsed "the bright line rule established by *Nguyen*" as to textual notice, which "is necessary to ensure that Internet consumers are on inquiry notice of a browsewrap agreement's terms, regardless of each consumer's degree of technological savvy." *Id.* at 127. Thus,

"[o]nline retailers would be well-advised to include a conspicuous textual notice with their terms of use hyperlinks going forward." *Id.*

A recent California Court of Appeal decision builds on *Long* and further develops state law in this area. In *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1 (Ct. App. 2021),[3] *petition for review filed*, No. S273056 (Cal. Feb. 8, 2022), the court—drawing on a scholarly opinion by Judge Weinstein, *see Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394–401 (E.D.N.Y. 2015)—helpfully classifies internet contract formation "by the way in which the user purportedly gives [her] assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Sellers*, 289 Cal. Rptr. 3d at 15. Those four ways are as follows:

> A "*browsewrap*" agreement is one in which an internet user accepts a website's terms of use merely by browsing the site. A "*clickwrap*" agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available. A "*scrollwrap*" agreement is like a "clickwrap," but the user is presented with the agreement and must physically scroll to

---

[3] The Court of Appeal issued *Sellers* after we heard argument in this case. It "involved a $5 'trial' that automatically enrolled allegedly unwitting consumers in a more expensive recurring monthly membership." *Id.* at 5. The California Automatic Renewal Law, Cal. Bus. & Prof. Code §§ 17,600 *et seq.*, therefore applied and the court applied statutory standards. *See* 289 Cal. Rptr. 3d at 26–28. The court, however, also applied *Long* and the relevant federal cases addressing the sufficiency of inquiry notice. *See id.* at 28–30.

> the bottom of it to find the "I agree" or "I
> accept" button. "*Sign-in wrap*" agreements
> are those in which a user signs up to use an
> internet product or service, and the sign-up
> screen states that acceptance of a separate
> agreement is required before the user can
> access the service. While a link to the
> separate agreement is provided, users are not
> required to indicate that they have read the
> agreement's terms before signing up.

*Id.* (cleaned up).

Using these criteria, *Sellers* classified the website before
it as "a sign-in wrap agreement." *Id*. at 16. The website

> purportedly notif[ied] consumers of the
> existence of a separate, hyperlinked webpage
> containing contractual terms, along with a
> textual notice that they agree to the terms by
> clicking the "Start my trial" button. While a
> hyperlink to the separate agreement was
> provided, the consumer was not required to
> click the hyperlink or otherwise read the
> terms to proceed, and was not required to
> affirmatively indicate that [he had] read the
> agreement's terms before signing up.

*Id*. at 17 (cleaned up).

*Sellers* then "set some basic guideposts as to the
enforceability" of the four types of internet contract
formation. *Id.* at 20. First, the court expressly stated what
*Long* implied—"On one end of the spectrum, a browsewrap
agreement like the one at issue in *Long* . . . is not sufficient
to bind the consumer." *Id.* "Toward the other end of the

spectrum, clickwrap agreements . . . are generally considered enforceable." *Id.* at 20–21. "Scrollwrap agreements go one step further and place the contractual terms directly in front of the user . . . . [T]here should be little doubt scrollwrap agreements are enforceable under California law because the consumer is given the contract, a sufficient circumstance to place the consumer on inquiry notice of the contractual terms." *Id.* at 21.

That left sign-in wrap, which *Sellers* described as "fall[ing] somewhere in the middle of the two extremes of browsewrap and scrollwrap agreements." *Id.* The court explained that although sign-in wrap displays a textual notice that the user will be bound by the site's terms, unlike scrollwrap it does not require the user to scroll through the terms before clicking "I agree" or the like. And unlike clickwrap, it does not require a user to click "I agree" or the like to accept the site's hyperlinked terms and conditions. *Id.*

"Instead, the consumer is purportedly bound by clicking *some other* button that [he] would otherwise need to click to continue with [his] transaction or [his] use of the website—most frequently, a button that allows the consumer to 'sign in' or 'sign up' for an account." *Id.* (emphasis in original). *Sellers* doubted whether most consumers know that clicking that "some other button" constitutes agreeing to contract terms, and the court therefore concluded that "the existence of a contract 'turns on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue.' " *Id.* (quoting *Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016)). " 'There is nothing automatically offensive about such agreements, *as long as* the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement.' " *Id.* (emphasis and alterations in original)

(quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).

*Sellers* outlined two other considerations bearing on the validity of sign-in wrap agreements. First, "the full context of the transaction is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms." *Id*. at 26. Specifically, in transactions involving "a consumer signing up for an *ongoing* account," *id*. at 21 (emphasis added), "it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship," *id.* In contrast, where the "transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship," the consumer would be "less likely to be looking for" contractual terms. *Id*. at 25. In short, websites inviting one-off transactions will be held to higher standards than those proposing continuing associations, as the "transactional context . . . is key to determining the expectations of a typical consumer." *Id*. at 29–30.

Second, as "not all internet users are alike," *id*. at 24, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers . . . . [C]onsumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Id*. at 25.

*Sellers* then applied these principles, beginning with the transaction's context. Website users were not asked to "sign up" for an account but were invited to " 'start a trial' to determine whether they wanted to use the service at all and were not likely expecting that their 'trial' would be governed by approximately 26 pages of contractual terms." *Id*. at 29 (cleaned up). Thus, this was "not a situation in which 'the

registration process clearly contemplated some sort of continuing relationship that would require some terms and conditions.' " *Id*. (cleaned up and quoting *Meyer*, 868 F.3d at 80). In the latter case, users might be on the lookout for "small text outside the payment box or at the bottom of the screen linking them to 26 pages of contractual terms." *Id*.

*Sellers* also stated that "[a]bsent such scrutiny, it is not likely a typical consumer would notice the relatively inconspicuous notice of contractual terms that would govern [her] use of the" website at issue:

> [T]he notice appears in extremely small print, outside the white box containing the payment fields where the consumer's attention would necessarily be focused. Although the text of the notice appears in white against a dark background, the font is so small that the contrast is not sufficient to make the text apparent. Further, the hyperlink to the terms of service is underlined, but it is not set apart in any other way that may draw the attention of the consumer, such as with blue text or capital letters.

*Id*. (footnote reference omitted). The court clarified that it "consider[ed] the size of the textual notice in relation to the other text on the screen." *Id*. at 29 n.10.

"Considering all of these factors together," *Sellers* held that the website's notice was not "sufficiently conspicuous to put Plaintiffs on inquiry notice that they would be bound by the terms of service by proceeding with their trial." *Id*. The website's designer "chose to use a textual notice attached to a hyperlink as opposed to a pure clickwrap or scrollwrap form, and then chose to display that notice in

extremely small print and not immediately adjacent to the 'Start my trial' button. By doing so, JustAnswer ran the risk of a court concluding, as we do here, that the notice was not sufficiently conspicuous." *Id*. at 30.

The court warned website owners that "particularly where, as here, *the consumer is not likely expecting to be bound by such terms*," *id.* (emphasis added), "text that is just slightly smaller, or slightly further away from the box or button the consumer must click on must, at some point, exceed the limits of what constitutes adequate notice." *Id*. "The onus is on" website owners "to provide adequate notice of contractual terms." *Id*.

\* \* \*

*Long* and *Sellers* teach that, pending further word from the California appellate courts, browsewrap agreements are unenforceable per se; sign-in wrap agreements are in a gray zone; and clickwrap and scrollwrap agreements are presumptively enforceable. And in the gray zone of sign-in wrap agreements, enforceability requires conspicuous textual notice that completing a transaction or registration signifies consent to the site's terms and conditions. Whether such notice is sufficiently conspicuous will turn on the transactional context, the notice's size relative to other text on the site, the notice's proximity to the relevant button or box the user must click to complete the transaction or register for the service, and whether the notice's hyperlinks are readily identifiable. A court must "[c]onsider[  ] all of these factors" together. *Sellers*, 289 Cal. Rptr. 3d at 29.[4]

---

[4] Given the present state of California law, website designers who knowingly choose sign-in wrap—to say nothing of browsewrap—over

III

Under *Sellers*'s classification scheme, there is no contention that the websites here operate as scrollwrap or clickwrap. Defendants also do not argue that merely *accessing* the websites constitutes agreement to the terms of use, so their sites do not use browsewrap. Instead, defendants argue that their sites' terms and conditions, including mandatory arbitration, are enforceable because of the sites' notices that consumers agree to those provisions. These sites therefore employ sign-in wrap under *Sellers*.

A

To determine whether the sign-in wrap agreements here are sufficiently conspicuous, *Sellers* requires that we first consider the context—whether reasonably prudent users would understand defendants' websites to invite one-off transactions or continued dealings of some kind. As in *Sellers*, defendants' websites—whatever else their hyperlinked terms and conditions may say—do not clearly propose forward-looking relations such as memberships or subscriptions. *See, e.g.*, Appendix B, *ante* (requesting that the website user "complete your shipping information to continue towards your reward," a $100 Target gift card). That in turn means that the conspicuousness of these sites' textual notices must undergo the most rigorous scrutiny, because a reasonably prudent user would not have been on the lookout for fine print.

---

clickwrap and scrollwrap designs practically invite litigation over the enforceability of their sites' terms and conditions, as the fact-intensive inquiry over what "makes a given textual notice sufficiently conspicuous . . . invariably lends itself to a more subjective than objective analysis . . . ." *Id.* at 23.

Also as in *Sellers*, the notices here appeared in "extremely small print" in comparison to "the other text on the screen." 289 Cal. Rptr. 3d at 29 & n.10. But in *Sellers*, the notice was "outside the white box containing the payment fields where the consumer's attention would necessarily be focused." *Id.* at 29. In one of the sites here, the notice was in the same white box and immediately above the "Continue" button. *See* Appendix B, *ante*. In the other site, the notice was also in the same box, but not immediately adjacent to the "This is correct, Continue!" button. *See* Appendix A, *ante*.

Moreover, in *Sellers* "the font [was] so small that the contrast [was] not sufficient to make the text apparent. Further, the hyperlink to the terms of service [was] underlined, but it [was] not set apart in any other way that may [have] draw[n] the attention of the consumer, such as with blue text or capital letters." 289 Cal. Rptr. 3d at 29. Here, the very small text is nonetheless apparent, and the underscored hyperlinks are capitalized, though in title case, not all caps.[5]

Although the notices here are relatively more conspicuous than the one at issue in *Sellers*—to say nothing

---

[5] *Sellers* does not explain whether its reference to "capital letters" in hyperlinks refers to title case or all caps. *See* 289 Cal. Rptr. 3d at 29 (stating that an underscored hyperlink was insufficiently conspicuous in part because it was not "set apart in any other way that may draw the attention of the consumer, such as with blue text or capital letters"). We can infer that *Sellers* meant all caps because the court also found the hyperlinks in the website's mobile device version insufficiently conspicuous, in part because the underscored and title case hyperlinks did not "otherwise draw the user's attention in any way." *See id.*; *see also id.* at 8 (quoting the mobile device hyperlinks as "<u>Terms of Service</u>" and "<u>Privacy Policy</u>").

of *Long*, where the terms of use were buried at the bottom of the relevant webpages—I agree with my colleagues that these notices are still insufficiently conspicuous. Under *Sellers*, we must hold defendants to the most exacting standard because the transactions at issue were one-off, and for that reason the much smaller size of the notices compared to the surrounding text independently suffices to find the notices insufficiently conspicuous. As my colleagues correctly observe, "[t]he comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else." *Ante* at 13. The comparative size of the text is critical because it suggests the designer's intent to minimize the user's attention to the terms and conditions. In this case involving one-off transactions, reasonably prudent users of defendants' sites are unlikely to be on the lookout for fine print.[6]

Moreover, at least on the page Hernandez allegedly viewed, *ante* at Appendix A, an intervening graphical element (an "I agree" button through which a user consents to receiving daily emails) is confusingly placed so that a user who *does* notice the reference to the terms and conditions might think it necessary to click "I agree" before continuing with the transaction. On the page Hernandez allegedly viewed the crucial text is, to use the *Sellers* court's formulation, "not immediately adjacent to" the button the user must click to proceed with the transaction. This is an

---

[6] On the other hand, if defendants' websites invited ongoing dealings, *Sellers* suggests that reasonably prudent users would expect there to be terms and conditions or fine print. It therefore follows in such cases that a textual notice could be somewhat smaller than adjoining text or the relevant button, provided (as discussed below) the notice is immediately adjacent to the relevant button or box. *But see above* note 4.

independent reason to find the notice in the website identified as Appendix A insufficiently conspicuous.

B

As discussed above, *Long* endorsed *Nguyen*'s conclusion that "a textual notice" is "required to advise consumers that continued use of a Web site will constitute the consumer's agreement to be bound by the Web site's terms of use." 200 Cal. Rptr. 3d at 126 (citing *Nguyen*, 763 F.3d at 1178–79); *see also Sellers*, 289 Cal. Rptr. 3d at 25 (observing that website owners must "eliminate *any uncertainty* as to the consumer's notice of contractual terms and *assent to those very terms*") (emphasis added). To that end, *Sellers* explains that the defining feature of sign-in wrap is that "the sign-up screen states that acceptance of a separate agreement is required before the user can access the service." *Id.* at 15.

*Sellers* does not explain what form that statement must take, but *Nguyen* noted that the hyperlink's mere proximity to the relevant button is not enough without "something more to capture the user's attention and secure her consent" like a text warning that stated, "*By clicking and making a request to Activate*, you agree to the terms and conditions . . . ." 763 F.3d at 1179 n.1 (emphasis added). That is a useful example for sign-in wrap agreements because *Sellers* requires that the user's action of accessing the service or completing the transaction be linked to acceptance of the site's terms and conditions.

Thus, I agree with my colleagues that, for an otherwise conspicuous notice to be effective, it must be unambiguously tied to some act of the website user that manifests assent to the site's terms and conditions. Here, neither notice passes that test. They only imply—rather than explicitly state—that consumers signify such assent by clicking the greenish

button with the word "Continue." Neither one says, for example, "By clicking CONTINUE, I agree to the <u>Terms & Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>," or even "By continuing with this transaction, I agree . . ." *See Beland v. Expedia, Inc.*, No. C086061, 2021 WL 3046742, at **6–7 (Cal. App. July 20, 2021) (in unpublished decision[7] finding sign-in wrap[8] enforceable, twice noting the inclusion of the words "[b]y selecting to complete this booking" in the relevant notice). Under *Long* and *Sellers*, the sign-in wrap agreements here are not enforceable because even apart from their insufficient conspicuousness, the relevant notices do not expressly advise users that clicking "Continue" signifies assent to the sites' arbitration provisions and other terms and conditions. Such express warnings are necessary to "eliminate any uncertainty as to the consumer's . . . assent to those very terms." *Sellers*, 289 Cal. Rptr. 3d at 25.

\* \* \*

---

[7] "[W]e may consider unpublished state decisions, even though such opinions have no precedential value." *Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003). Unlike published decisions of the Court of Appeal, however, "we are not bound by them." *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 942 n.4 (9th Cir. 1997).

[8] The *Beland* court characterized the design at issue as "more like a browsewrap agreement." 2021 WL 3046742, at *6. But the court only identified browsewrap and clickwrap as possible choices. *Id.* Viewed through the prism of *Sellers*—and *Berkson*, which the *Beland* court also cited—the design is more accurately classified as sign-in wrap because the Expedia screen notified the user that proceeding with booking also constituted consent to the hyperlinked terms and conditions. *See id.* at *14 (screenshot).

40     Berman v. Freedom Financial Network

For the foregoing reasons, I concur in affirming the decision below.