Michael F. Ram, CSB #104805
Email: mram@forthepeople.com
MORGAN & MORGAN
101 Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone: (415) 358-6913

Beth E. Terrell, CSB #178181
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email: jmurray@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

[Additional counsel appear on signature page]

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| DANIEL BERMAN, STEPHANIE HERNANDEZ, and ERICA RUSSELL,<br><br>Plaintiffs,<br><br>v.<br><br>FREEDOM FINANCIAL NETWORK, LLC, FREEDOM DEBT RELIEF, LLC, FLUENT, INC., and LEAD SCIENCE, LLC,<br><br>Defendants. | NO. 4:18-cv-01060-YGR<br><br>**PLAINTIFFS' NOTICE OF MOTION AND SECOND RENEWED MOTION FOR CLASS CERTIFICATION**<br><br><u>JURY TRIAL DEMAND</u><br><br>Honorable Yvonne Gonzalez Rogers<br><br>DATE:     September 6, 2022<br>TIME:     2:00 p.m.<br>LOCATION:  Oakland Courthouse<br>           Courtroom 1 - 4th Floor |

1

TO:    THE CLERK OF THE COURT; and

2

TO:    FREEDOM FINANCIAL NETWORK, LLC, FREEDOM DEBT RELIEF, LLC,
       FLUENT, INC., LEAD SCIENCE, LLC and THEIR ATTORNEYS OF

3
       RECORD:

4             PLEASE TAKE NOTICE that on September 6, 2022, at 2:00 p.m., in Courtroom 1, 4th

5      Floor, of the United States District Court for the Northern District of California, 1301 Clay

6      Street, Oakland, California, 94612, Plaintiffs will move for class certification. This motion will

7      be made on the grounds that the requirements of Rule 23(a) and (b)(3) are satisfied.

8             The motion will be based on the following memorandum of points and authorities, the

9      accompanying declarations of Beth E. Terrell, Anthony Paronich, Edward Broderick, and

10     Matthew McCue, the record and file in this action and any other matters that may be presented

11     before or at the hearing.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION
CASE NO. 4:18-CV-01060-YGR

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................1

II.    ISSUES TO BE DECIDED .........................................................2

III.   FACTUAL BACKGROUND .......................................................2

    A.   Freedom hired Fluent to telemarket its debt relief services despite knowing Fluent used poor quality leads .......................................2

    B.   The campaign was riddled with bogus leads, including Mr. Berman's cell number..............................................................................4

    C.   Class members who visited a Fluent website, like Ms. Russell and Ms. Hernandez, did not provide prior express written consent to receive calls and text messages .......................................................7

    D.   After millions of calls and texts and hundreds of thousands of requests to stop, Freedom halted the campaign because it targeted ████████████ .................................................9

    E.   Fluent and Drips placed hundreds of thousands of prerecorded calls to cell phones, thousands of which are associated with objectively invalid leads....10

    F.   Fluent and Drips placed two or more calls within a twelve-month period to hundreds of thousands of telephone numbers on the National Do-Not-Call Registry..........................................................11

IV.    AUTHORITY AND ARGUMENT.............................................11

    A.   The Rule 23(a) requirements are satisfied .............................12

        1.   The proposed classes are sufficiently numerous.....................12

        2.   There are issues of law and fact common to all class members ...............13

        3.   Plaintiffs' claims are typical of class members' claims............15

        4.   The classes will be adequately represented .............................17

    B.   The Rule 23(b)(3) requirements are satisfied .........................18

        1.   Common issues predominate over any individual issues ...............19

1

      2.      A class action is a superior method for resolving claims under
the TCPA ................................................................................................. 23

2

V.     CONCLUSION ................................................................................................. 24

3

VI.    SIGNATURE ATTESTATION ......................................................................... 24

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1

## <u>TABLE OF AUTHORITIES</u>

Page

2

3

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
   No. 15-cv-6314-YGR,
   2017 WL 1806583 (N.D. Cal. May 5, 2017) ............................................................ *passim*

4

5

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
   No. 15-cv-06314-YGR, 2018 WL 3707283 (N.D. Cal. Aug. 3, 2018) ...........................21

6

7

*Abdullah v. U.S. Sec. Assoc., Inc.*,
   731 F.3d 952 (9th Cir. 2013) .........................................................................................13

8

9

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)........................................................................................................19

10

11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013)........................................................................................................12

12

*Bee, Denning*, Inc. v. Capital Alliance Group,
   310 F.R.D. 614, 628 (S.D. Cal. 2015) ............................................................................21

13

14

*Bennett v. GoDaddy.com*,
   No. CV-16-03908-PHX-ROS,
   2019 WL 1552911 (D. Ariz. Apr. 8, 2019) ........................................................16, 18, 23

15

16

*Booth v. Appstack, Inc.*,
   2015 WL 1466247 (W.D. Wash. Mar. 30, 2005) ...........................................................20

17

18

*Brown v. DirecTV, LLC*,
   562 F. Supp. 3d 590 (C.D. Cal. 2021) ............................................................................18

19

20

*Bumpus v. Realogy Brokerage Group LLC*,
   No. 3:19-cv-03309-JD,
   2022 WL 867256 (N.D. Cal. Mar. 23, 2022)...................................................................18

21

22

*Edwards v. First Am. Corp.*,
   798 F.3d 1172 (9th Cir. 2015) ........................................................................................12

23

24

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) .............................................................................12, 15, 17

25

26

*Erica P. John Fund, Inc. v. Halliburton*,
   563 U.S. 804 (2011).........................................................................................................19

27

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- iii
CASE NO. 4:18-CV-01060-YGR

*Facebook, Inc. v. Duguid*,
  141 S. Ct. 1163 (2021) ....................................................................................10

*Hanlon v. Chrysler*,
  150 F.3d 1011 (9th Cir. 1988) ..............................................................15, 17, 19

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ..........................................................................15

*Ikuseghan v. Multicare Health Sys.*,
  No. C14-5539 BHS,
  2015 WL 4600818 (W.D. Wash. July 29, 2015) ........................................14, 21

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
  27 FCC Rcd. 1830 (2012)................................................................................14

*Ira Holtzman, C.P.A., & Assocs. v. Turza*,
  728 F.3d 682 (7th Cir. 2013) ...........................................................................18

*Johnson v. Comodo Group*,
  2020 WL 525898 (D. N.J. Jan 31, 2020) ..........................................................20

*Kavu, Inc. v. Omnipak Corp.*,
  246 F.R.D. 642 (W.D. Wash. 2007) ..................................................................23

*Krakauer v. DISH Network L.L.C.*,
  311 F.R.D. 384 (M.D.N.C. 2015) .....................................................................15

*Krakauer v. Dish Network, LLC*,
  925 F.3d 643 (4th Cir. 2019) ...........................................................................18

*Kristensen v. Credit Payment Servs.*,
  12 F. Supp. 3d 1292 (D. Nev. 2014)............................................................14, 21

*Kristensen v. Credit Payment Servs.*,
  879 F.3d 1010 (9th Cir. 2019) ........................................................................18

*Leyva v. Medline Indus., Inc.*,
  716 F.3d 510 (9th Cir. 2013) ...........................................................................11

*McCurley v. Royal Seas Cruises, Inc.*,
  331 F.R.D. 142 (S.D. Cal. 2019) ...........................................................16, 18, 23

*McMillion v. Rash Curtis & Assocs.*,
  No. 16-CV-03396-YGR, 2017 WL 3895764 (N.D. Cal. Sept. 6, 2017) ....................14, 22

*Meyer v. Bebe Stores, Inc.*,
    No. 14-CV-267-YGR, 2016 WL 8933624 (N.D. Cal. Aug. 22, 2016)........................22, 23

*Moser v. Health Ins. Innovations, Inc.*,
    2019 WL 3719889 (S.D. Cal. Aug. 7, 2019) .........................................................18, 21, 23

*Rodriguez* v. Hayes,
    591 F.3d 1105 (9th Cir. 2010) ........................................................................................15

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ...........................................................................................11

*O'Shea v. Am. Solar Sol., Inc.*,
    318 F.R.D. 633 (S.D. Cal. 2017) ....................................................................................24

*Perez v. Rash Curtis & Assocs.*,
    No. 4:16-cv-03396-YGR, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020).......................24

*Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ........................................................................................19

*True Health Chiropractic, Inc. v. McKesson Corp.*,
    896 F.3d 923 (9th Cir. 2018) ..........................................................................................21

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)........................................................................................................19

*Walker v. Life Ins. Co. of the Sw.*,
    953 F.3d 624 (9th Cir. 2020) ..........................................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)........................................................................................................13

*West v. California Servs. Bureau, Inc.*,
    323 F.R.D. 295 (N.D. Cal. 2017)....................................................................................13

*Whitaker v. Bennett Law, PLLC*,
    2014 WL 5454398 (S.D. Cal. Oct 27, 2014) ..................................................................20

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ..................................................................................15, 24

**FEDERAL RULES AND STATUTES**

Fed. R. Civ. P. 23(a) ..................................................................................................................2

Fed. R. Civ. P. 23(a)(1)............................................................................................................12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Fed. R. Civ. P. 23(a)(2) .................................................................................................................. 13

Fed. R. Civ. P. 23(a)(3) .................................................................................................................. 15

Fed. R. Civ. P. 23(b)(3) ............................................................................................................ *passim*

Fed. R. Civ. P. 23(g)(1)(A) ............................................................................................................ 17

47 C.F.R. § 64.1200(f)(8) ................................................................................................... 14, 16, 22

47 C.F.R. § 64.1200(c)(2) ............................................................................................................... 20

47 U.S.C. § 227(b)(3) ..................................................................................................................... 22

47 U.S.C. § 227(b)(1)(A)(iii) ......................................................................................................... 19

47 U.S.C. § 227(c)(5) ..................................................................................................................... 20

1

**I.  INTRODUCTION**

Plaintiffs Daniel Berman, Stephanie Hernandez, and Erica Russell move for certification of three proposed classes of individuals who received texts and robocalls from defendants Fluent, Inc. and Lead Science, LLC (also known as "Drips") marketing the debt relief services of Freedom Financial Network, LLC and its subsidiary Freedom Debt Relief, LLC (together, "Freedom"). Plaintiff Berman received numerous calls and texts out of the blue, having never visited one of the websites that Fluent uses to collect leads to telemarket for companies like Freedom. The lead lists that Fluent and Drips produced revealed that Plaintiff Berman was one of many people whose phone numbers were associated with evidently fake names or addresses. Of the 4,492,433 calls and texts that Defendants placed as part of this campaign, more than 400,000 were made to numbers associated with invalid first and last names or addresses, more than 500,000 were made to wrong numbers, and 777,692 were made to class members who told Fluent to stop calling. On September 4, 2019, the Court denied Defendants' motion for summary judgment as to Berman's claims. Dkt. No. 198 at 24.

The Court denied Plaintiff Berman's prior motion for class certification because he is not subject to the affirmative defenses of express consent and mandatory arbitration that Defendants assert against class members who visited Fluent's websites. The Court concluded that Plaintiff Berman was not a typical or adequate representative of those class members and noted that Plaintiff had not proposed subclasses or adding a class representative to address this concern. *Id.* at 30. This motion requests certification of three classes: (1) a Cellular Telephone Non-Visitor Class, consisting of people who did not visit one of Fluent's websites but received prerecorded calls marketing Freedom's services; (2) a Cellular Telephone Visitor Class, consisting of people who did visit Fluent's websites before receiving prerecorded calls marketing Freedom's services; and (3) a DNC Non-Visitor Class, consisting of people whose residential numbers are listed on the National Do-Not-Call Registry and received calls and texts marketing Freedom's services. Plaintiff Berman proposes to represent the Cellular Telephone Non-Visitor Class and DNC Non-

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 1
CASE NO. 4:18-CV-01060-YGR

1   Visitor Classes and Plaintiffs Hernandez and Russell propose to represent the Cellular Telephone

2   Visitor Class.

3          Plaintiffs request that the Court grant their motion and certify the three classes. TCPA

4   claims are readily amenable to certification because the elements focus primarily on the

5   defendants' conduct. That is true in this case, where common questions of vicarious liability,

6   whether Defendants used an artificial or prerecorded voice to place calls to class members, and

7   determination of damages predominate over any individualized questions. The issue of consent is

8   common in this case as well. There is no dispute that members of the Cellular and DNC Non-

9   Visitor Classes did not consent to calls from Defendants. Although the parties dispute whether

10  members of the Cellular Telephone Visitor Class consented when they clicked the "Continue"

11  button on Fluent's webpage, the issue can be resolved once without any individual inquiries

12  because the question turns on whether the design and content of Fluent's materially uniform

13  webpages are sufficient to establish prior, express, written consent under the TCPA. The same is

14  true for Defendants' arbitration defense. The Ninth Circuit affirmed this Court's decision

15  denying Defendants' motion to compel arbitration, holding that Fluent's materially uniform

16  webpages did not provide reasonably conspicuous notice of an agreement to arbitrate. Because

17  Plaintiffs' claims and Defendants' defenses can be established through classwide proof,

18  resolving the claims of all class members at once is far superior to any alternative.

19                          **II.  ISSUE TO BE DECIDED**

20         Whether Plaintiffs' claims satisfy the requirements for class certification under Federal

21  Rule of Civil Procedure 23(a) and (b)(3).

22                          **III.  FACTUAL BACKGROUND**

23  **A.    Freedom hired Fluent to telemarket its debt relief services despite knowing Fluent
        used poor quality leads.**

24         Freedom sells debt relief services. Dkt. No. 198 at 11. In early 2017, Freedom hired serial

25  TCPA defendant Fluent to generate leads for Freedom to use for telemarketing. Ex. 1 (Omer

26

27

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 2
CASE NO. 4:18-CV-01060-YGR

Dep.) at 26:13-25.[1] Fluent is a digital marketing company that generates leads through websites that entice users with entry into sweepstakes, job listings, product samples, and other rewards like gift cards. Dkt. No. 198 at 11. Users must register their names and addresses to be eligible for the opportunities. *Id.* Fluent uses third parties to drive web traffic to its websites. *Id.* These third parties are paid for users' visits to Fluent's websites, their entry of their email addresses, and their completion of survey questions and clicking a "Continue" button. *Id.*

██████████████████████████████████████████████████. Ex. 1 (Omer Dep.) at 26:13-28:11. ████████████████████████████████████

██████████████████████████████████████████████████████████

████ *Id.* at 27:1-17. ████████████████████████████

████████████████ *Id.* at 28:20-25.

Despite the problems with these leads, Freedom hired Fluent to conduct the campaign at issue, which began in May 2017 and ran through April 2018. Ex. 1 (Omer Dep.) at 29:6-17.

████████████████████████████████████████████████

██████████████████████████████████████████ *Id.* at 42:15-44:8;

*see also* Exs. 2-4; Ex. 5 (Laniado Dep.) at 82:5-83:15 (████████████████████████

████████████████████████████████████████████████████

████████████. Ex. 1 (Omer Dep.) at 17:17-18:13. ████████████████

██████████████████████████████████████████████ *Id.* at

43:20-22; *see also* Ex. 2. Fluent's Chief Compliance Officer, Daniel Barsky, testified that some clients prefer their true names not be used in telemarketing so it will not be "easy" for recipients to "find them and sue them." Ex. 6 (Barsky Dep.) at 72:9-21. ████████████████████

████████████████████. Ex. 5 (Laniado Dep.) at 46:12-19; Ex. 2 at 196-97.

Fluent retained Lead Science LLC ("Drips") to physically send the calls and texts. Ex. 7 at LeadScience_000556 (contract between Drips and Fluent providing that ████████████

---

[1] Unless otherwise noted, exhibits are attached to the Declaration of Beth E. Terrell in Support of Plaintiffs' Second Renewed Motion for Class Certification.

1 ████████████████████████████████████████████████████████

2 ██████████████████████████████████████ Ex. 5 (Laniado Dep.) at 78:18-79:8

3 ████████████████████████████████████████████████████████

4 ████████████████████████ A Drips employee set the parameters for the calling campaign according

5 to instructions received from Fluent. Ex. 8 (Drips 30(b)(6) Dep.) at 82:11-83:17. Drips recorded

6 the interactive voice recognition ("IVR") version of the script to be automatically played, and

7 enabled the Drips computer system to automatically communicate with Fluent. Ex. 9 (Martindale

8 Dep.) at 14:9-15:15. Fluent then electronically sent leads into Drips's system and Drips

9 "interact[ed] with those leads" in a manner Drips touted as "an elegant way to communicate with

10 someone to get them on the phone with" Freedom's call centers so that Freedom could sell them

11 Freedom's debt relief services. Ex. 8 (Drips 30(b)(6) Dep.) at 14:13-15:12.

12        Drips used a dialing platform called Ytel to place texts and prerecorded calls to class

13 members. Ex. 10 (Snyder Report) ¶¶ 32-33; Ex. 8 (Drips 30(b)(6) Dep.) at 34:22-35:5, 50:25-

14 51:6; Ex. 11 (Drips Response to Int. Nos. 3 & 9); Ex. 6 (Barsky Dep.) at 39:8-25. Fluent

15 electronically sent telephone numbers to Drips's system and Drips then would "fire out"

16 instructions to Ytel, telling it to "send this text message" or "send this call." Ex. 8 (Drips

17 30(b)(6) Dep.) at 31:5-33:8. In return, Ytel "fire[d] back and sa[id], 'Did it.'" *Id.*

18        Fluent and Drips worked collaboratively to design the specific way the calls and texts

19 were placed. Drips provided a "basic script" and Fluent added the "particulars." Ex. 8 (Drips

20 30(b)(6) Dep.) at 88:3-89:21 (describing "collaboration" between Drips and Fluent); *see also* Ex.

21 9 (Martindale Dep.) at 15:16-16:20 ("what our [Drips] scripting does it really tweaks out how to

22 get the best response out of the client") and Ex. 12 ████████████████████████████

23 ████████████ Fluent determined the "timing or frequency" of the calls, and Drips was

24 responsible for the time of day the calls were placed. Ex. 8 (Drips 30(b)(6) Dep.) at 89:22-90:7.

25 **B.**    **The campaign was riddled with bogus leads, including Mr. Berman's cell number.**

26        Plaintiff Daniel Berman added his cell phone number to the National Do Not Call

27 Registry in 2003. Dkt. No. 198 at 14. Starting on December 26, 2017, Fluent sent 18 text

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 4
CASE NO. 4:18-CV-01060-YGR

messages and three prerecorded calls to Mr. Berman's cell phone, including at least one call and one text on behalf of Freedom. *Id.* The text Mr. Berman received on February 14, 2018 read:

> Dêbt-Help: Need to pay $10,000 + in cc bills? We're here to help! We can save you a ton of money. Call for more info. Respond no to quit.

*Id.* Mr. Berman then received a prerecorded robocall also promoting Freedom from the same caller ID. *Id.*

Mr. Berman never provided any of the Defendants with his phone number or consented to receive telemarketing texts or calls and did not authorize anyone to do so on his behalf. Ex. 13 (Berman Dep.) at 34:8-17; Ex. 14 (Berman Decl. – Dkt No. 17-1) ¶¶ 6-8. Fluent's records show that Mr. Berman's cell phone number was registered on one of Fluent's websites on December 24, 2017 at 5:39:16 p.m. using a Samsung Galaxy J3 mobile phone at a coffee shop in Alameda, California. Dkt. No. 198 at 14. The registered name was "Dunk Loka" with an email address of Buffola@gmail.com. Dkt. No. 152-4 (Astrup Decl., Ex. 2). Defendants concede that the lead with Mr. Berman's number is an "evidently fictional name." *Id.* Ex. 6 (Supp. Kalat Report) ¶ 42.

The lead lists that Fluent and Drips produced show that Mr. Berman was not alone. The lists have hundreds of thousands of entries with missing name and address data or obviously invalid information, including:

- 10,323 entries with invalid first names, many listed as "{FIRSTNAME}" or "blah blah" and others with gibberish like "Ddmdkdmdkdkdmdk";
- 363,792 entries with invalid last names like "[BLANK]; and
- 60,982 entries with street addresses with missing numbers or names or nonsense characters.

Dkt. No. 198 at 16 (citing Ex. 15 (Verkhovskaya Report) ¶¶ 55-56 & Exs. D & E). When shown some of these entries, Freedom's associate general counsel, Dharma Naik, remarked that ███ ████████████████████████████████████████████████████████ Ex. 16 (Naik Dep.) at 41:21-42:11. Plaintiffs' expert reported that more than 50% of the leads contained these types of errors, which is far in excess of industry standards. Ex. 15 (Verkhovskaya Report)

1 ¶¶ 54-56, 73. There were also more than 100,000 records with the same registration information,

2 including typos and gibberish entries, that were created months apart from different IP addresses

3 or cities. *Id.* ¶¶ 61-62. ████████████████████████████████████████████████████████

4 ██████████████████████ Ex. 1 (Omer Dep.) at 74:5-15; Ex. 16 (Naik Dep.) at 95:11-19.

5      Defendants' expert, David Kalat, maintains that Ms. Verkhovskaya inflated the number

6 of invalid leads, yet concedes that 73,975 leads were sourced from registrations that Ms.

7 Verkhovskaya identified as invalid. *See* Dkt. No. 260-7 (Second Suppl. Kalat Report) ¶ 14. And

8 although Mr. Kalat speculates that some of the leads may actually have been valid, he continues

9 to offer no explanation as to why many of the erroneous entries, such as "blah blah" or

10 "Ddmdkdmdkdmdk" were considered valid registrations of the associated telephone numbers.

11 There is no evidence that a person named "Blah Blah" and "Ddmdkdmdkdmdk" registered to

12 receive robocalls on Fluent's website and there is no evidence that a real person associated with

13 these nonsense leads visited the website and lied.

14      Unsurprisingly, the campaign generated a flurry of complaints and opt outs. Dkt. No. 198

15 at 15. Plaintiff Berman filed a compilation of more than 5,000 "wrong number" complaints with

16 his first certification motion. Dkt. No. 144 (Fougner Decl.) ¶¶ 7-10 & Ex. A. Plaintiffs' expert

17 also found that about 28% of the phone numbers Fluent contacted between February 14, 2018 to

18 April 17, 2018 opted out—sometimes more than once. Ex. 17 (Supp. Verkhovskaya Report)

19 ¶¶ 17-18; *see also* Ex. 18; Ex. 5 (Laniado Dep.) at 91:21-93:12 ████████████████████████

20 ████████████████████████████████████

21      Freedom salespeople reported widespread irritation with the calls and texts. *See* Ex. 19

22 ("Every lead I take is irritated and wants to know why we are calling or texting them. Why are

23 we using this marketing partner?"); Ex. 20 at FREEDOM_000992 ("[E]very time I take a lead

24 that is from Fluent marketing it is typically somebody just very angry telling this number to stop

25 calling them. … I have already taken two of them today and many in the past that never even

26 wanted the information from us. They just want us to leave them alone."). Ms. Omer, Freedom's

27 point person for the Fluent relationship, emailed Fluent about ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 4. Freedom received

complaints like "I'm trying to figure out why this number keeps calling me"; "I am on the Do

Not Call Registry list and I get phone calls from people like you, so how do you think I feel?"; "I

would appreciate it if you quit calling this number. I don't know who Lisa is. I've had this

number like 3 years and you've been calling this number for over a year now."; and "I'm 13

years old. Can I please stop getting calls from you?" Exs. 21-24.

████████████████████████████████████████████ Ex. 1

(Omer Dep.) at 62:6-63:17. ████████████████████████████████ *Id.*

at 53:18-20. █████████████████████████████████████████████

████████████████████████████████████████ Ex. 16 (Naik Dep.) at

36:13-38:1. ██████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████ " Ex. 1 (Omer Dep.)*.* at 64:25-65:13.

**C.     Class members who visited a Fluent website, like Ms. Russell and Ms. Hernandez, did not provide prior express written consent to receive calls and text messages.**

Fluent contends that class members who visited a Fluent website provided prior express

consent under the TCPA. To register for the sweepstakes, gift card, or other reward, class

members had to click a "Continue" (or "Enter to Win" or "Submit") button next to a checkbox

stating "I AGREE to receive daily emails from InstantPlayGiveaway, LivingLargeSweeps,

GivingTreeSweeps, and Major Sweeps." Dkt. No. 198 at 11-12. Class members were then shown

a series of 15 or more survey questions to answer, like "do you own a home?" *Id.* at 12. Class

members were then sent to another webpage to "CONFIRM YOUR INFORMATION" with a

form prepopulated with their name and contact information, a small print disclosure about

consent to receive phone sales calls and text messages "from Verde Energy, CAC, and our

Marketing Partners," a checkbox stating "I CONFIRM that all of my information is accurate and

consent to be called and texted as provided above," and a large "Continue" button. *Id.* at 12-13.

1   Fluent contends that class members provided consent under the TCPA by clicking the

2   "Continue" button on this final webpage. *Id.* at 12.

3        Fluent's websites, however, are confusing and misleading and their disclosures fall far

4   below industry standards and best practices in consumer web design. *See generally* Ex. 25

5   (Second Supp. Beecher Report). The website disclosures are buried in small font, use multi-

6   screen bait and switch tactics, overload visitors with pages of distractions, bundle consent pages,

7   and fail to clearly and conspicuously identify the seller on whose behalf the telemarketing would

8   be done. *Id.* ¶¶ 17-68. Fluent's multi-step disclosure process is confusing (*id.* ¶¶ 15, 30-33) and

9   its hyperlinked list of "marketing partners" runs over 400 names long. *Id.* ¶ 35; Ex. 26.

10       Plaintiff Russell's experience is typical. She was using her cell phone to look online for

11  coupons to save money for herself and her family. Ex. 27 (Russell Decl., Dkt. No. 247) ¶ 2. She

12  saw an ad asking if she wanted to win a Walmart gift card. She clicked on it. That took her to a

13  series of questions that she answered. *Id.* ¶ 3. The webpages that Defendants contend Ms. Russell

14  visited employed Fluent's usual tactics to confuse and distract visitors, including burying

15  disclosures in small and faded fonts while drawing the eye to large and colorful words and

16  images. Ex. 25 (Second Supp. Beecher Report) ¶¶ 40-46. Eventually, Ms. Russell arrived on a

17  webpage where she typed her name, address, and email address into a form. Ex. 27 (Russell

18  Decl., Dkt. No. 247) ¶ 3. The form concluded with a large green "Continue >>" button and tiny,

19  washed-out text referencing the Terms & Conditions, mandatory arbitration, and Privacy Policy.

20  Ex. 25 (Second Supp. Beecher Report) ¶¶ 47-62. This "CONFIRM YOUR INFORMATION"

21  webpage that Defendants say Ms. Russell saw contains the language that Defendants claims

22  provides consent under the TCPA. *Id.* ¶¶ 63-65; *see also id.* ¶¶ 30-39.

23       Ms. Russell testified that as a general rule she does not agree to provide her phone

24  number on websites and would not check an "I confirm" box requesting her number because she

25  doesn't want to be called or texted. Ex. 28 (Russell Dep.) at 46:4-47:12. She would not have

26  pressed "Continue" on the information confirmation screen if she had seen a reference to being

27  called by multiple companies. *Id.* at 63:6-64:1. And she would not have pressed the "Continue"

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 8
CASE NO. 4:18-CV-01060-YGR

button after typing her information into the form if she had seen a reference to mandatory arbitration. *Id.* at 59:3-61:20. When presented with a copy of a webpage with the language Defendants claims constitutes TCPA consent, Ms. Russell testified that her reading of the text next to the "I agree" checkbox was that she would be agreeing to receive email samples and savings and sweepstakes alerts, nothing else. *Id.* at 97:5-20.

Between February 7 and 14, 2018, Fluent and Drips used Ytel's dialing system to place three prerecorded calls and five text messages to Plaintiff Russell's cell phone number. Ex. 29. Ms. Russell had no interest in Freedom's services. She has never looked for debt relief services and has never been in substantial debt. Ex. 28 (Russell Dep.) at 13:15-20. She merely wanted to receive the Walmart gift card she had been offered. *Id.* at 30:8-14, 55:2-12. To do so, Ms. Russell had to sign up for different service and product subscriptions, like a Highlights subscription, a weight loss supplement company, FreedomPop's SIM card; these supposedly "free" offers were not really free and, even though Ms. Russell canceled when she realized they were subscriptions, she was still charged. *Id.* at 67:14-70:13; Ex. 30.

Ms. Hernandez's experience was similar. She heard about websites that offered free samples and visited one on her cell phone. Ex. 31 (Hernandez Decl., Dkt. No. 246) ¶¶ 2-3. The webpages Ms. Hernandez visited employed the same distraction techniques like putting terms in miniscule and faded font contrasted by eye-catching images, as well as "consent bundling," designed to Trojan Horse a telemarketing consent into a confirmation of the accuracy of the user's registration details. Ex. 25 (Second Supp. Beecher Report) ¶¶ 17-39. Between March 5 and 7, 2018, Fluent and Drips used Ytel's dialing system to place two prerecord-voice calls and four text messages to Plaintiff Hernandez's cell phone number. Ex. 29.

**D.    After millions of calls and texts and hundreds of thousands of requests to stop, Freedom halted the campaign because it targeted** ██████████

Fluent placed 4,492,433 calls and text messages to 691,157 wireless numbers. Ex. 15 (Verkhovskaya Report) ¶ 14 & Ex. C. Of those calls and texts, 462,607 were made to leads with patently fictitious addresses and 777,692 to class members who told Fluent to stop calling and

texting. Ex. 32 (Second Supp. Verkhovskaya Report) ¶ 17. An estimated 28% of the non-business numbers that Fluent robocalled were listed on the National Do Not Call Registry. Ex. 15 (Verkhovskaya Report) ¶¶ 37-49.

██████████████████████████████████████████████████████████████

██████ Ex. 1 (Omer Dep.) at 39:11-22. ████████████████████████████

███████████ (*id.* at 39:18-19), █████████████████████████████████

███████████████████████████████ Ex. 16 (Naik Dep.) at 41:5-10. In ████

████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 1 (Omer Dep.) at 46:15-47:18. █

███████████████████████████████████████████████████

██████████████████████████████. *See* Ex. 17 (Supp. Verkhovskaya Report) ¶ 14.

**E.     Fluent and Drips placed hundreds of thousands of prerecorded calls to cell phones, thousands of which are associated with objectively invalid leads.**

Plaintiffs originally sought to certify classes that included all of the calls and texts that Fluent and Drips placed. *See* Dkt. Nos. 139, 255. The Supreme Court has since provided guidance in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), on the type of equipment that qualifies to be an automatic telephone dialing system (ATDS) under the TCPA. In light of *Duguid*, Plaintiffs filed a Fourth Amended Complaint, limiting their claims under section 227(b)(1) of the TCPA to the prerecorded voice calls that Plaintiffs received and eliminating from their proposed cellular class definitions any reference to an ATDS or to automated text messages. Plaintiffs continue to seek damages for the text messages sent in violation of the TCPA's do-not-call provisions because *Duguid* does not affect those claims.

All of the calls Fluent and Drips placed for the Freedom campaign were prerecorded. *See* Ex. 8 (Drips 30(b)(6) Dep.) at 58:23-59:15; Ex. 5 (Laniado Dep.) at 82:5-12. Plaintiffs' expert, Anya Verkhovskaya, analyzed calling records produced by Drips and determined that 1,307,931 calls (exclusive of texts) were placed to 529,201 telephone numbers as part of the Freedom

campaign. Ex. 17 (Verkhovskaya Supp. Report) ¶¶ 5, 20. Of these calls, 305,660 were placed after this lawsuit was filed. *See id.* ¶ 21.

Of the 529,201 telephone numbers that received prerecorded calls, Ms. Verkhovskaya's analysis shows that 51,161 numbers had objectively invalid addresses and 5,979 had objectively invalid names. Declaration of Jodi Nuss (Nuss Decl.) ¶¶ 5. Nearly 200,000 calls were placed to 136,413 numbers where a Do-Not-Call Request was submitted via text message. *Id.* Even if the names Defendants' expert identified as potentially valid are excluded, there still are over 5,000 objectively invalid names. *See id.* at ¶ 11.

**F.  Fluent and Drips placed two or more calls within a twelve-month period to hundreds of thousands of telephone numbers on the National Do-Not-Call Registry.**

Ms. Verkhovskaya also analyzed a sample of the Drips calling records to determine whether any of the numbers appeared on the National Do-Not-Call Registry for at least 31 days before receiving two or more calls within a twelve-month period from Drips and Fluent. Ex. 15 (Verkhovskaya Report) ¶¶ 37-49. Ms. Verkhovskaya randomly selected 16,270 numbers, which she determined was statistically significant using a 99% confidence level. *Id.* ¶ 37. Of those numbers, Ms. Verkhovskaya identified 4,533 telephone numbers that had received two or more calls within a twelve-month period after being listed on the National Do-Not-Call Registry for at least 31 days. *Id.* ¶¶ 42-43. Extrapolating to the entire population of the Drips calling records, Ms. Verkhovskaya determined that approximately 203,462 non-business numbers received two or more calls within a twelve month period after being on the registry for at least 31 days before the date of the first call. *Id.* ¶ 49.

## IV.  AUTHORITY AND ARGUMENT

Plaintiffs seeking class certification must demonstrate "that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). A plaintiff "must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean Wholesale Grocery Coop., Inc. v.*

*Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not 'turn class certification into a mini-trial' on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)).

Plaintiffs request certification of the following classes:

> **Cellular Telephone Visitor Class:** Every person in the United States (1) to whom Defendants placed a call, (2) to a cellular telephone number listed in LEADSCIENCE_677, (3) using an artificial or prerecorded voice, (4) in order to sell Freedom's products, (5) between May 17, 2017, and April 17, 2018, (6) after the person had entered the phone number on a Fluent website.

> **Cellular Telephone Non-Visitor Class:** Every person in the United States (1) to whom Defendants placed a call, (2) to a cellular telephone number listed in LEADSCIENCE_677, (3) using an artificial or prerecorded voice, (4) in order to sell Freedom's products, (5) between May 17, 2017, and April 17, 2018, (6) but who hadn't entered the phone number on a Fluent website before the date of the call.

> **DNC Non-Visitor Class:** Every person in the United States (1) to whom Defendants placed a call or sent a text message, (2) in order to market Freedom's products, (3) between May 17, 2017, and April 17, 2018 (4) to a residential telephone number listed in LEADSCIENCE_677, (5) which telephone number was listed on the NDNCR for at least 31 days before at least two of such communications in a 12-month period, (6) but who hadn't entered the phone number on a Fluent website before the date of the call.

As discussed below, each of the proposed classes satisfies the Rule 23 requirements.

**A.      The Rule 23(a) requirements are satisfied.**

1.      <u>The proposed classes are sufficiently numerous.</u>

A class must be "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). Numerosity is generally satisfied when the class comprises 40 members or more.

1    *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-cv-6314-YGR, 2017 WL 1806583, at

2    *8 (N.D. Cal. May 5, 2017). Plaintiffs' expert concluded that Fluent and Drips placed calls to

3    529,201 cell numbers, including calls and texts to over 50,000 numbers associated with

4    objectively invalid leads. Ex. 17 (Supp. Verkhovskaya Report) ¶¶ 5, 20; Ex. 32 (Second Supp.

5    Verkhovskaya Report) ¶ 17; Nuss Decl. ¶¶ 7-11. The Court can reasonably infer from this data

6    that the Cellular Telephone Visitor and Non-Visitor Classes have thousands of members,

7    satisfying the numerosity requirement. *See West v. California Servs. Bureau, Inc.*, 323 F.R.D.

8    295, 303 (N.D. Cal. 2017) (courts may "make common-sense assumptions and reasonable

9    inferences" in analyzing numerosity (citation omitted)). The DNC Non-Visitor Class also

10   satisfies numerosity, as Plaintiffs' expert analyzed a sample of the numbers Defendants called,

11   identified more than 4,000 non-business numbers that were on the National Do Not Call

12   Registry, and estimates that 28% of the non-business numbers that Fluent and Drips robocalled

13   (approximately 200,000) were listed on the National Do Not Call Registry. Ex. 15

14   (Verkhovskaya Report) ¶¶ 37-49.

15            2.    <u>There are issues of law and fact common to all class members.</u>

16            The second threshold to certification requires that there be "questions of law or fact

17   common to the class." Fed. R. Civ. P. 23(a)(2). Commonality can be satisfied by even a "single

18   *significant* question of law or fact." *Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952, 957 (9th

19   Cir. 2013) (citation and internal quotation marks omitted). As the Supreme Court has explained,

20   "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the

21   same injury,'" such that "all their claims can be productively litigated at once." *Wal-Mart Stores,*

22   *Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted). The common questions must generate

23   common *answers*" that are "apt to drive the resolution of the litigation." *Id*. (citation omitted).

24   Commonality is thus satisfied where the claims of all class members "depend upon a common

25   contention ... of such a nature that it is capable of classwide resolution—which means that

26   determination of its truth or falsity will resolve an issue that is central to the validity of each one

27   of the claims in one stroke." *Id*.

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 13
CASE NO. 4:18-CV-01060-YGR

1      Commonality is satisfied in this case because there are significant questions of fact or law

2   that are common to class members. These questions include the overarching common question of

3   whether Freedom is vicariously liable for the calls it hired Fluent to make. *See Alarm.com*, 2017

4   WL 1806583, at *7 (finding whether defendant was vicariously liable for calls made by an entity

5   it contracted with was a common question and certifying claims under the TCPA). The vicarious

6   liability inquiry raises numerous common questions including whether Fluent and Drips acted as

7   Freedom's agents in making the calls under actual agency, implied actual authority, apparent

8   authority, or ratification principles. These issues will be resolved using common evidence,

9   including the documents and testimony of Freedom, Fluent and Drips summarized above. *See*

10  *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (vicarious

11  liability satisfied commonality because it "turns on the federal common law of agency and can

12  arise from actual authority, apparent authority, or ratification" a determination of which will

13  depend on the defendants' conduct rather than class members' conduct).

14      Whether members of the Cellular Telephone Visitor Class consented to Defendants'

15  robocalls also is a common question because Fluent asserts that visitors to its websites consented

16  in one way—by registering on a Fluent website and clicking on items on various webpages.

17  Plaintiffs maintain that there is no valid consent because those webpages uniformly fail to

18  comply with the "signature" and "clear and conspicuous disclosure" requirements under the

19  TCPA. *See* 47 C.F.R. § 64.1200(f)(8); *In re Rules and Regulations Implementing the Telephone*

20  *Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 34 (2012). Defendants' consent

21  defense therefore presents a common issue that can be resolved on behalf of all Visitor Class

22  members at once and supports class certification. *See McMillion v. Rash Curtis & Assocs.*, No.

23  16-CV-03396-YGR, 2017 WL 3895764, at *5 (N.D. Cal. Sept. 6, 2017) (where the "Defendant

24  engaged in the same practice with respect to all class members, … whether that practice was

25  performed without prior express consent is common to the classes"); *see also Ikuseghan v.*

26  *Multicare Health Sys.*, No. C14-5539 BHS, 2015 WL 4600818, at *7 (W.D. Wash. July 29,

27

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 14
CASE NO. 4:18-CV-01060-YGR

1  2015) (finding that the issue of whether filling out the defendant's standardized forms constituted
2  express consent was a common issue supporting certification).

3      Another common issue is whether Defendants called numbers on the National Do-Not-
4  Call Registry. *See Krakauer v. DISH Network L.L.C.*, 311 F.R.D. 384, 394-95 (M.D.N.C. 2015)
5  (common questions included vicarious liability and determination of whether calls were made to
6  individuals on the National Do-Not-Call Registry). And Drips's recent motion to dismiss raises
7  yet another common issue: Was Drips sufficiently involved in placing the calls at issue to be held
8  liable under the TCPA? *See generally* Dkt. No. 295. There is no evidence that Drips's
9  involvement with the calls varied from one class member to another. To the contrary, Drips used
10 the same system to place all the calls at issue in the case, working collaboratively with Fluent to
11 design the content and timing of the calls. Whether Drips is liable is common to the classes.

12     Because this case raises numerous common issues the answers to which will be the same
13 for all class members, commonality is satisfied.

14     3.   Plaintiffs' claims are typical of class members' claims.

15     Typicality is satisfied if "the claims or defenses of the representative parties are typical of
16 the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality
17 requirement is to assure that the interest of the named representative aligns with the interests of
18 the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)
19 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Typicality exists
20 when the class representatives and the class members are subjected to and injured by the same
21 course of conduct. *Ellis*, 657 F.3d at 984. "Typicality refers to the nature of the claim or defense
22 of the class representative, and not to the specific facts from which it arose or the relief sought."
23 *Id.* (quoting *Hanon*, 976 F.2d at 508). Therefore, "[l]ike the commonality requirement, the
24 typicality requirement is 'permissive' and requires only that the representative's claims are
25 'reasonably co-extensive with those of absent class members; they need not be substantially
26 identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 200) (quoting *Hanlon v. Chrysler*,
27 150 F.3d 1011, 1020 (9th Cir. 1988)).

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 15
CASE NO. 4:18-CV-01060-YGR

1    The permissive typicality standard is satisfied because Plaintiffs' claims arise from the
2    same course of conduct by Defendants and are based on the same legal theories. *See Bennett v.*
3    *GoDaddy.com*, No. CV-16-03908-PHX-ROS, 2019 WL 1552911, at *5 (D. Ariz. Apr. 8, 2019)
4    ("Plaintiff and all putative class members suffered the same injury based on the same conduct by
5    Defendant in the form of unauthorized calls to their cellular telephone lines."); *McCurley v.*
6    *Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 169-70 (S.D. Cal. 2019) (finding typicality where the
7    plaintiffs "raise claims and legal theories typical of the class they seek to represent—a class of
8    individuals who did not consent to receive calls to their cellular phones made by or on behalf of
9    Royal with a prerecorded voice and/or an ATDS"). In ruling on Plaintiff Berman's prior motion
10   for class certification, the Court found his claims arose from the same course of conduct and
11   were based on the same legal theories as the claims of the proposed class. Dkt. No. 198 at 28.
12   However, the Court concluded that Plaintiff was not typical of all members of the proposed class
13   because he could not represent class members who visited Fluent's websites and are subject to
14   Defendants' express consent and mandatory arbitration defenses. *Id.* at 29-30. By adding
15   Plaintiffs Russell and Hernandez as class representatives and proposing three classes, Plaintiffs
16   resolved that problem. *See id.*

17       Plaintiffs Russell's and Hernandez's claims and the Visitor Class claims arise from
18   Defendants' single course of conduct and are based on the same legal theories. Fluent and Drips
19   called Plaintiffs Russell's and Hernandez's cell phones and played prerecorded messages selling
20   Freedom's services, like they did for all other members of the Visitor Class. Ex. 29. None of the
21   Visitor Class members, including Plaintiffs Russell and Hernandez, consented to the calls
22   because the formatting and language of the materially uniform webpages that Defendants claim
23   they used to obtain class member consent do not provide the "clear and conspicuous disclosure"
24   required by the TCPA (47 C.F.R. § 64.1200(f)(8)) and do not comply with the E-Sign Act.
25   Typicality is satisfied.
26
27

1          4.      The classes will be adequately represented.

2          The adequacy requirement is satisfied when the class representatives will "fairly and

3  adequately protect the interests of the class." To make this determination, "courts must resolve

4  two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with

5  other class members and (2) will the named plaintiffs and their counsel prosecute the action

6  vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon*, 150 F.3d at 1020).

7  "Adequate representation depends on, among other factors, an absence of antagonism between

8  representatives and absentees, and a sharing of interest between representatives and absentees."

9  *Id.* In considering the adequacy of plaintiffs' counsel, the court must consider "(i) the work

10 counsel has done in identifying or investigating potential claims in the action; (ii) counsel's

11 experience in handling class actions, other complex litigation, and the types of claims asserted in

12 the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel

13 will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

14         None of the Plaintiffs has an antagonistic or conflicting interest with the members of the

15 proposed classes. To the contrary, Plaintiffs have demonstrated their commitment to the class by

16 actively participating in the litigation. Each of the Plaintiffs has worked with counsel to develop

17 the class claims, respond to discovery, and prepare for their depositions. Terrell Decl. ¶ 7.

18 Plaintiffs have also retained experienced and capable counsel who will vigorously prosecute the

19 class claims. Plaintiffs' counsel have substantial experience in litigating class action lawsuits

20 asserting TCPA claims, and have all been appointed to serve as class counsel in similar cases. *Id.*

21 ¶¶ 1-6; see also Broderick Decl. ¶¶ 3-8; Paronich Decl. ¶¶ 3-7; McCue Decl. ¶¶ 3-11. Plaintiffs'

22 counsel have devoted a significant amount of time to investigating the potential claims and will

23 continue to commit the resources necessary to represent the class. *Id*. ¶ 8. Plaintiffs and their

24 counsel have demonstrated their commitment to prosecuting this case on behalf of all class

25 members and therefore satisfy the adequacy requirement.

26

27

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 17
CASE No. 4:18-CV-01060-YGR

1    **B.    The Rule 23(b)(3) requirements are satisfied.**

2          Class certification is appropriate under Rule 23(b)(3) when "questions of law or fact

3    common to the members of the class predominate over any question affecting only individual

4    members, and … a class action is superior to other available methods for the fair and efficient

5    adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Both requirements are satisfied.

6          Courts routinely certify classes under Rule 23(b)(3) in cases where vicarious liability for

7    TCPA violations is at issue. *See, e.g., Bumpus v. Realogy Brokerage Group LLC*, No. 3:19-cv-

8    03309-JD, 2022 WL 867256, at *8 (N.D. Cal. Mar. 23, 2022) (vicarious liability a common issue

9    that predominated in TCPA class action); *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 608-609

10   (C.D. Cal. 2021) (deciding defendant vicariously liable in part for calls in certified class action

11   and denying decertification); *McCurley*, 331 F.R.D. at 169 (whether cruise line was vicariously

12   liable for calls its vendor live transferred to cruise line is a common question and collecting cases

13   finding questions at issue are "exemplary of common questions identified in TCPA class

14   actions"); *Moser v. Health Ins. Innovations, Inc.*, 2019 WL 3719889, at *7, 11 (S.D. Cal. Aug. 7,

15   2019) (in case involving live transfers to alleged principal, agency determinations were a

16   common question and predominance was satisfied); *GoDaddy.com*, 2019 WL 1552911, at *1, 13

17   (certifying class of individuals who received automated calls on their cell phones); *Alarm.com*,

18   2017 WL 1806583, at *10 (certifying class where common issues predominated, including

19   defendants' vicarious liability for prerecorded message calls; *see also Kristensen v. Credit

20   Payment Servs.*, 879 F.3d 1010, 1013 (9th Cir. 2019) (affirming vicarious liability decision at

21   summary judgment applicable to class); *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 661–62

22   (4th Cir. 2019) (affirming jury verdict on vicarious liability after trial on class claims); *Ira

23   Holtzman, C.P.A., & Assocs. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013) ("Class certification is

24   normal in litigation under [the TCPA], because the main questions . . . are common to all

25   recipients.").

26

27

1       1.    <u>Common issues predominate over any individual issues.</u>

2       The predominance requirement "tests whether proposed classes are sufficiently cohesive

3 to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

4 623-24 (1997). Predominance is satisfied when "the common, aggregation-enabling issues in the

5 case are more prevalent or important than the non-common, aggregation-defeating, individual

6 issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). "[A]

7 common question is one where the same evidence will suffice for each member to make a prima

8 facie showing or the issue is susceptible to generalized, class-wide proof." *Id.* (quotation and

9 internal marks omitted). Courts "focus on whether 'common questions present a significant

10 aspect of the case and they can be resolved for all members of the class in a single adjudication';

11 if so, 'there is clear justification for handling the dispute on a representative rather than on an

12 individual basis.'" *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) (quoting

13 *Hanlon*, 150 F.3d at 1022).

14       The predominance analysis "begins, of course, with the elements of the underlying

15 action." *Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. 804, 809 (2011). "[M]ore important

16 questions apt to drive the resolution of the litigation are given more weight in the predominance

17 analysis over individualized questions which are of considerably less significance to the claims

18 of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). Courts "focus

19 on whether 'common questions present a significant aspect of the case and they can be resolved

20 for all members of the class in a single adjudication'; if so, 'there is clear justification for

21 handling the dispute on a representative rather than on an individual basis.'" *Walker*, 953 F.3d at

22 630 (quoting *Hanlon*, 150 F.3d at 1022).

23       Courts routinely certify TCPA claims because the elements are amenable to classwide

24 proof. Plaintiffs must establish two elements to prove their prerecorded call claim: (1) an

25 artificial or prerecorded voice (2) was used to place a call to a telephone number assigned to a

26 cellular telephone service. 47 U.S.C. § 227(b)(1)(A)(iii). To prove his do-not-call claim, Plaintiff

27 Berman must establish that (1) more than one telephone solicitation call was made (2) within a

twelve-month period (3) to a number that was placed on the National Do Not Call Registry at least 31 days before the call was made. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). For both claims, Plaintiffs also must establish that Freedom is vicariously liable for the calls Fluent and Drips placed. Each of these elements will be proven with common evidence.

Use of a prerecorded voice. Whether Fluent and Drips used a prerecorded voice to make calls on Freedom's behalf is common to all class members. *See, e.g.*, *Booth v. Appstack, Inc.*, 2015 WL 1466247, at *10 (W.D. Wash. Mar. 30, 2005); *Whitaker v. Bennett Law, PLLC*, 2014 WL 5454398, at *5 (S.D. Cal. Oct 27, 2014); *Johnson v. Comodo Group*, 2020 WL 525898, at *10 (D. N.J. Jan 31, 2020). Plaintiffs will use testimony from Fluent's and Drips's employees to prove that Fluent and Drips uniformly used a prerecorded voice to place all the calls in the Freedom campaign. Ex. 8 (Drips 30(b)(6) Dep.) at 58:23-59:15; Ex. 5 (Laniado Dep.) at 82:5-12. Plaintiffs' expert, Anya Verkhovskaya, analyzed calling records produced by Drips and determined that 1,311,047 prerecorded calls were placed to 529,201 telephone numbers as part of the Freedom campaign.

Calls to cell phones. Common evidence—data—shows calls to cell phones. Expert Anya Verkhovskaya has identified the cell phone numbers that received prerecorded calls selling Freedom's debt relief services. Ex. 17 (Verkhovskaya Supp. Report) ¶¶ 5, 20.

Calls to phone numbers registered with the National Do-Not-Call Registry. Common evidence also exists to show that calls were made to phone numbers that were registered with the National Do-Not-Call Registry for at least 31 days. Plaintiffs' expert used information provided by IMS, the country's largest source of cellular identification products and services to identify calls UHC made to cell phones. IMS data is used by the FCC and call centers and has been used by Plaintiffs' expert to identify cell phone numbers in many other TCPA cases. *See* Ex. 17 (Supp. Verkhovskaya Report). Plaintiffs' expert also analyzed a statistically significant sample of the numbers to which Defendants placed calls to identify residential numbers that had been listed on the National Do-Not-Call Registry at least 31 days before the date of the first call, received two or more calls in any twelve-month period, and removed numbers that were

1    identified as belonging to a business. Ex. 15 (Verkhovskaya Report) ¶¶ 37-49. Extrapolated to

2    the entire call record set, over 200,000 individuals received calls that violate the TCPA's NDNC

3    regulations. Ms. Verkhovskaya can replicate her analysis at the class identification phase to

4    identify the remaining numbers to which Defendants placed calls. This court and others have

5    approved this method of identifying class members. *See Alarm.com*, 2017 WL 1806583, at *4;

6    *Bumpus*, 2022 WL 867256 at *2-4; *Krakauer*, 311 F.R.D. at 390-91; *Ikuseghan* 2015 WL

7    4600818, at *4.

8        <u>Vicarious liability</u>. The issue of vicarious liability "turns on the federal common law of

9    agency and can arise from actual authority, apparent authority, or ratification." *Kristensen*, 12 F.

10   Supp. 3d at 1306; *see also Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-cv-06314-

11   YGR, 2018 WL 3707283, at *3 (N.D. Cal. Aug. 3, 2018). These agency theories turn on the

12   relationship between the defendants, "without concern for any conduct by the class members,"

13   and therefore will be decided with common evidence. *Kristensen*, 12 F. Supp. 3d at 1306; *see*

14   *also Moser v. Health Ins. Innovations, Inc.*, No. 17-cv-1127-WQH-KSC, 2019 WL 3719889, at

15   *7 (S.D. Cal. Aug. 7, 2019) (the fact finder will be able to "make a single liability determination

16   for each Defendant after Plaintiff presents evidence of each Defendant's relationship with each

17   other Defendant and the non-party lead generators"); *Alarm.com*, 2017 WL 1806583 at *6

18   (finding that vicarious liability was a common issue that predominated in the case); *Bee,*

19   *Denning, Inc. v. Capital Alliance Group*, 310 F.R.D. 614, 628 (S.D. Cal. 2015) (same).

20       <u>Consent</u>. Defendants' consent defense does not raise individualized issues that preclude

21   class certification. While a plaintiff bears the burden of establishing that the requirements of

22   Rule 23 are met, PillPack's burden of proving its consent defense "strongly affects the analysis."

23   *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018). The only

24   class members who even arguably consented to the telemarketing calls are those who entered

25   their numbers on one of Fluent's websites. Whether filling out this website form constitutes

26   consent is a common issue. *See Ikuseghan*, 2015 WL 4600818, at *7 (finding the issue of

27   whether filling out the defendant's standardized forms constituted express consent was a

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 21
CASE NO. 4:18-CV-01060-YGR

1   common issue). Plaintiffs allege that the purported "consent" obtained through this website form

2   does not comply with the TCPA and the E-Sign Act. Although the TCPA allows consumers to

3   provide prior express written consent to receive robocalls with an electronic signature, the

4   electronic signature must be valid under applicable law. Documents showing prior express

5   written consent must be sufficient to show the consumer received "clear and conspicuous

6   disclosure" of the consequences of providing the requested consent, including clear and

7   conspicuous disclosure of the specific seller on whose behalf robocalls would be placed. 47

8   C.F.R. § 64.1200(f)(8). Defendants, by contrast, contend they did obtain consent from all

9   Cellular Telephone Visitor Class members that complies with the TCPA. Dkt. No. 152 at 8-10.

10  This disputed issue turns on common evidence because the web pages are materially uniform.

11  Predominance is satisfied.

12      <u>Drips's liability</u>. Drips has filed a motion to dismiss on the ground that it is a common

13  carrier and thus exempt from TCPA liability. *See* Dkt. No. 295. There is no indication from

14  Drips's motion that its "involvement" in the calls varied from call to call. And common evidence

15  shows that Drips was heavily involved in both the content of the calls (drafting the script) and

16  the timing of the calls. *See* Ex. 8 at 88:3-90:7; Ex. 9 at 15:16-16:20; Ex. 12. Without

17  certification, the same evidence would have to be presented in tens of thousands of individual

18  actions. Drips's motion presents yet another predominating common issue warranting class

19  certification.

20      <u>Damages</u>. The determination of damages is also a classwide issue because damages for a

21  TCPA claim are proscribed by statute. Plaintiffs will be entitled to $500 for each negligent

22  violation of the TCPA and treble damages—$1,500 for each violation—if Defendants' violations

23  were "willful or knowing." 47 U.S.C. § 227(b)(3). The question of whether Defendants' conduct

24  was willful or knowing will be resolved with common proof since it focuses on Defendants'

25  conduct. *See, e.g.*, *McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2017 WL

26  3895764, at *5 (N.D. Cal. Sept. 6, 2017) ("the question of defendant's willfulness and

27  knowledge is a common question"); *Meyer v. Bebe Stores, Inc.*, No. 14-CV-267-YGR, 2016 WL

PLAINTIFFS' NOTICE OF MOTION AND SECOND
RENEWED MOTION FOR CLASS CERTIFICATION- 22
CASE NO. 4:18-CV-01060-YGR

8933624, at *7 (N.D. Cal. Aug. 22, 2016) ("[A] determination of whether [a defendant's] conduct was willful would appear to depend on [the defendant's] intent, not any unique or particular characteristics related to potential class members."); *see also Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 647 (W.D. Wash. 2007) (finding that the question of whether defendant's "conduct was willful will be common").

        2.    <u>A class action is a superior method for resolving claims under the TCPA.</u>

        The Court should certify the class if it finds that a "class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The purpose of the superiority requirement is to ensure judicial economy and that a class action is the "most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175 (citation omitted). Courts consider four factors in evaluating the superiority requirement: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). All of these factors support class certification in this case.

        Class members rarely have an interest in bringing individual TCPA claims against well-defended litigants like Defendants and are unlikely to have the necessary resources to do so. The damages are rarely high enough to justify the cost of proving their claims, which are most effectively brought en masse as a class action. *See McCurley*, 331 F.R.D. at 178-79 ("Courts recognize that given these damages relative to the costs of litigation, a class action is a superior means of adjudicating TCPA claims against a defendant."); *GoDaddy*, 2019 WL 1552911, at *12 ("The amount of damages available to a single individual is low and for many people a possible award of even the maximum amount of statutory damages would not be enough of an incentive to pursue litigation."); *Moser*, 2019 WL 3719889, at *13 (a class action is superior where "most class members will have relatively small claims").

1    Class treatment will also conserve judicial resources and promote consistency and

2    efficiency of adjudication. Class litigation under the TCPA is easily manageable. Given the

3    predominance of common issues, the case can be tried almost entirely using classwide proof of

4    Defendants' conduct and records. Indeed, this Court oversaw a one-week jury trial of class

5    TCPA claims that resulted in a verdict for the plaintiff and the class. *See generally Perez v. Rash*

6    *Curtis & Assocs.*, No. 4:16-cv-03396-YGR, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020). It is

7    "far more efficient" to litigate Plaintiffs' claims based on a common course of conduct "on a

8    classwide basis rather than in thousands of individual and overlapping suits." *Wolin*, 617 F.3d at

9    1176; *see also O'Shea v. Am. Solar Sol., Inc.*, 318 F.R.D. 633, 639 (S.D. Cal. 2017) ("litigating

10   all of the class members' claims on an individual basis would take a substantially greater toll on

11   limited judicial resources than would class action treatment").

## V.  CONCLUSION

13   Because the Rule 23 requirements are satisfied, Plaintiffs respectfully request that the

14   Court: (1) certify the three proposed classes; (2) appoint Plaintiffs to serve as class

15   representatives; (3) appoint Plaintiffs' counsel to serve as class counsel for the proposed classes;

16   and (4) direct Plaintiffs to submit a proposed notice plan and form of notice.

## VI.  SIGNATURE ATTESTATION

18   The CM/ECF user filing this paper attests that concurrence in its filing has been obtained

19   from its other signatories.

20   RESPECTFULLY SUBMITTED AND DATED this 1st day of July, 2022.

21   TERRELL MARSHALL LAW GROUP PLLC

23   By: _/s/ Beth E. Terrell, CSB #178181_
         Beth E. Terrell, CSB #178181
         Email: bterrell@terrellmarshall.com
         Jennifer Rust Murray, *Admitted Pro Hac Vice*
         Email: jmurray@terrellmarshall.com
         936 North 34th Street, Suite 300
         Seattle, Washington 98103
         Telephone: (206) 816-6603
         Facsimile: (206) 319-5450

Michael F. Ram, CSB #104805
Email: mram@forthepeople.com
MORGAN & MORGAN
101 Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone: (415) 358-6913

Anthony I. Paronich, *Admitted Pro Hac Vice*
Email: anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Edward A. Broderick, *Admitted Pro Hac Vice*
Email: ted@broderick-law.com
BRODERICK LAW, P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Matthew P. McCue, *Admitted Pro Hac Vice*
Email: mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

*Attorneys for Plaintiffs*