- Exhibit 25 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL BERMAN, STEPHANIE HERNANDEZ, AND ERICA RUSSELL, <br><br>    Plaintiffs, <br><br>v. <br><br>FREEDOM FINANCIAL NETWORK, LLC, FREEDOM DEBT RELIEF, LLC, FLUENT, INC AND LEAD SCIENCE, LLC, <br><br>    Defendants. | Case No.: 4:18-cv-01060-YGR |

## SECOND SUPPLEMENTAL EXPERT REPORT OF BENJAMIN H. BEECHER

I, Benjamin H. Beecher, hereby state as follows:

### PROFESSIONAL BACKGROUND

1. My name is Benjamin H. Beecher. I am an adult over the age of 18 and a resident of the state of New Jersey, at 60 Erie Street, Jersey City. I have personal knowledge of each of the matters stated herein. If called to testify, I could and would testify completely about them.

2. I respectfully submit this supplemental expert report to supplement my expert reports of December 7, 2018, and February 8, 2019.

3. I am an IT and software professional. I am co-founder, CTO, and board member of the software consultancy Lightmatter Innovation ("Lightmatter") in New York, New York. Our services include web and mobile application design and development, API development, IT infrastructure consulting, security services, and data forensics services. Our clients include well known institutions such as *The New York Times*, the Robert Wood Johnson Foundation, McCann Global Health, the Los Angeles County Museum of Art, Harvard University, and other institutions and businesses spanning finance, healthcare, non-profits, and startups building cutting-edge technologies. Businesses we have advised and for which we have performed software engineering services in the early stages have gone on to be acquired, at least one for over $400 million dollars. We are trusted software professionals.

4. I began my software-development career over 15 years ago, learning to program before high school. I continued working in software development through college. I received a

dual degree in Computer Science and Economics from Goucher College and have worked for companies such as State Street Capital and MongoDB as a software engineer. Before starting and growing Lightmatter, I served as the interim CTO for several technology startups in New York City. I also advise and invest in technology ventures.

5. I have specialty training and experience with database design, development, and security audits. I have performed architectural evaluations of IT infrastructure, penetration tests, and "white hat hacking" for several clients. I attend regular gatherings of IT security practitioners in New York City.

6. My opinions stated below are based on a reasonable degree of certainty within the fields of web software development, web design, web user experience, data science, and information security.

7. The records that I relied upon in arriving at my opinions are the types of records reasonably relied upon by experts in my field.

8. This supplemental report is based upon my current understanding and the documents available to me. I reserve the right to amend it should additional information or data become available.

## ENGAGEMENT FOR THIS MATTER

9. I have been retained by Broderick & Paronich, P.C. in the matter *Daniel Berman et al. v. Freedom Financial Network, LLC, Freedom Debt Relief, LLC, Fluent, Inc. and Lead Science, LLC* to provide my opinions on, as relevant here, the experience of users who purportedly consent to arbitration and to receive telemarketing calls via Fluent's website and whether the disclosures contained on those websites were confusing and/or misleading.

## OPINIONS

10. In this second supplemental expert report, I have arrived at the following overall conclusion. An analysis of the system from which Defendants purportedly obtained consumers' consent to arbitration and to receive telemarketing calls reveals that the relevant disclosures were confusing and misleading. These disclosures fell far below industry standards and best practices in consumer web design.

## DOCUMENTS REVIEWED

11. I reviewed the following documents, as well as the others expressly referenced in my prior reports and herein:
    Declaration of Mitenkumar Bhadania in Support of Defendants' Motion to Compel Arbitration of the Claims Asserted by Stephanie Hernandez and Erica Russell, Docket number 224-1
    Exhibits, Docket number 224-2
    FLUENT_4132
    FLUENT_4156

## ANALYSIS

12. People rarely read every word of every web page—hence the term "web browsing."

13. I understand that Fluent contends that many users of its websites complete Fluent's surveys—which sometimes run dozens of pages—in just a couple minutes. That is not possible if users read every word.

14. Web design best-practices and usability conventions recognize this reality. A website is not a book. Accordingly, design norms consider organization, density, size, color, brightness, imagery, positioning and a variety of other elements of the overall composition. A guiding principle of my industry is that the overall result of these elements should be transparency. That is, the host of the website and the website's guest should "be on the same page."

15. Relatedly, web designers should take care not to overload users with too many decisions, lest users suffer from "decision fatigue" and begin to click through options without understanding or considering them. As Natasha Singer notes in her *New York Times* article *When Websites Won't Take No For an Answer,* (https://www.nytimes.com/2016/05/15/technology/personaltech/when-websites-wont-take-no-for-an-answer.html?), "User-experience designers and marketers are well aware that many people are so eager to start using a new service or complete a task, or are so loath to lose a perceived deal, that they will often click one 'Next' button after another as if on autopilot — without necessarily understanding the terms they have agreed to along the way."

16. Fluent's website's have custom styling and positioning designed to take advantage of the rules in what we typically call anti-patterns.

### Samples & Savings Website (Plaintiff Stephanie Hernandez)

#### Landing Page

17. Mr. Bhadania maintains that the following is a "true and correct copy of a regenerated image of what Ms. Hernandez would have seen on the website":





*Action Button*

Second Supplemental Expert Report of Benjamin H. Beecher

4

18. A typical user of this webpage would understand that clicking on the "This is correct, Continue! >>" button would have a significance and an effect.

19. The understood <u>significance</u> is to affirm the accuracy of her ZIP Code. Under widely accepted consumer internet usability convention, clicking on a statement about the user affirms the accuracy of the statement. For instance, if a webpage displays "Confirm your age: 47" and then a button "This is correct!," then the interpretation is that clicking on "This is correct!" affirms that the user's age is indeed 47.

20. The understood <u>effect</u> is to continue on to the next page. This result is predictable from the word "Continue", which is commonly understood to mean to load the webpage hosted at the URL hyperlinked by that word, and by the ">>" carrots. The carrots are abbreviated right-pointing arrows. For a reader of a left-to-right language, including English, they are a widely understood metaphor for this same process of loading the hyperlinked webpage.

21. Under web-design best practices, and to a typical user, clicking the "This is correct, Continue! >>" button does not signify agreement to terms and conditions. The principles of clarity and transparency call for at least one of the following two implementations in order to communicate such agreement to the end user: (1) language on the button itself, such as "I agree"; and/or (2) language immediately adjacent to the button disclosing to the user the web designer's interpretation of the button, such as "By clicking the button, You/I agree to . . . ."

22. On the Samples & Savings webpage recreated by Mr. Bhadania, by contrast, not only is there no language tying the button to the terms and conditions, but the two are not even adjacent.

23. The presence of an additional checkbox between the terms and the acceptance button further confuses the context of the button. Its presence makes it impossible to know by context what statement the button applies to.

*Terms and Conditions*

24. The reference to the terms and conditions appears to be in a low- to mid-single-digit font size. On Mr. Bhadania's exhibit, it is so small as to be nearly illegible. Nothing in Mr. Bhadania's declaration leads me to conclude that this text would be rendered larger on a typical user's home desktop or laptop computer screen. The typical rendering on a mobile device, including a personal tablet or smartphone, would be even smaller. While Mr. Bhadania does not disclose the font size in his declaration, inspection reveals that it violates web design standards for usability and readability.

25. Mr. Bhadania asserts that the words "Terms & Conditions" are hyperlinked. I take him at his word. However, a typical user would be unlikely to notice the hyperlink and extremely unlikely to click on it. This is because, in addition to being tiny, it appears in the exact same gray as the adjacent text. If it were instead in color, a typical user would be more likely to notice it, and if that color were blue, the typical user would be more likely to interpret it as a hyperlink. By default links are styled to be a different color than

the surrounding text. Fluent would have needed to add additional styling to turn off that default and force the color to be the same as the surrounding text.

26. After reviewing this and other screenshots provided by Fluent in this case, I have concluded that Fluent is using "dark patterns" in reckless and irresponsible behavior on the behalf of a "well trained" and "professional" IT team. For example, I understand that Defendants assert that clicking the "This is correct, Continue! >>" button means agreeing to the terms and conditions referenced elsewhere on the page in tiny, gray font. Known as "misdirection" as cited in the *When Websites Won't Take No For An Answer* article I mentioned earlier, this tactic occurs when "prominent marketing come-ons may distract users from seeing checkboxes that by default, say, sign them up for a newsletter or membership, spam their contacts or alter their homepages." A more professional software team would make the legal disclaimers larger and easier to read, and potentially require checking a checkbox.

*Imagery*

27. Eye-tracking studies show that human faces, especially if they are making eye contact with the user, are magnetic. A typical user is drawn strongly and repeatedly to them, and fixates on them, distracted from other content on the screen. The Samples & Savings webpage prominently features two human faces in focal circles, including one face looking out directly at the user. Best practice is to minimize such distractions during important 'transactions,' including payment, agreement to terms of service, and submission of personal identifying information. Here, a typical user would focus on the faces and bright imagery to the detriment of the text, especially the smallest text, on the page.

*Layout*

28. Nowhere in the main interactive module of this initial disclosure screen, on which the typical user devotes the lion's share of her attention, is any reference made to consenting to receive telemarketing calls.

29. Nothing in Mr. Bhadania's declaration or its exhibits leads me to conclude that the black-background text appears "above the fold" to the typical user. That is, nothing in his declaration or exhibits leads me to conclude that the typical user would see that text unless she affirmatively scrolled down to it. Such scrolling is less likely when, as here, the action that the user is invited to take—here, clicking the "This is correct, Continue! >>" button is prominently featured above the fold.

<u>Information Confirmation Page</u>

30. Mr. Bhadania's declaration does not disclose how many screens separated the one reproduced above from the one reproduced below. However, I understand that Defendants assert that the following recreation reflects a page that Ms. Hernandez would have eventually seen.



Confidential

FLUENT_004132

*Navigation*

31. Note that the user's information is not obtained during the "CONFIRM YOUR INFORMATION" screen, but at a *previous* step. The result of this approach is to obtain the user's information, especially phone number, before and without disclosing that the person will be the target of marketing, including automated telemarketing by up to hundreds of entities. That way, when (if ever) the user later sees the telemarketing disclosure, it is too late for the user to decline to provide his or her phone number. (In keeping with widely accepted web-design principles, I interpret the gray backgrounds to the user information fields to indicate that the contents cannot be removed or edited.) This is a clever, and extremely user-unfriendly, form configuration.

32. In the disclosure on this second (or third? sixtieth?[1]) screen, Fluent changes not only the entities from which consumers were purportedly consenting to receive communications (now listing Verde Energy and CAC), but also the form of those communications. On the prior screen consumers purportedly consented only to *emails*, but Fluent claims that on this subsequent screen users consented to telemarketing *calls* from the two listed entities as well as from the Site's "Marketing Partners," which are buried behind a further hyperlink.

33. This is a bait and switch. Fluent baited consumers on the prior screen, telling them that by confirming their ZIP code they would receive only (1) sweepstakes-related (2) emails (3) on behalf of two entities closely related to the website. Fluent then defied the user's expectations by switching its purpose to obtaining a record of "consent" to deliver (1) non-sweepstakes-related (i.e. telemarketing) (2) calls (3) on behalf of two other entities plus an unknown number of "Marketing Partners."

*Bundling*

34. Although this screen contains a disclosure that "consenting is not required to participate in the offers promoted," the screen immediately confuses the issue by using the "I CONFIRM" check box to conflate two separate purposes. The small text adjacent to the "I CONFIRM" box contains the surprise that checking it serves both to confirm the accuracy of the entered information and to confirm the user's purported consent to receive certain calls described elsewhere on the page. While the screen explicitly disclaims the need to consent to telemarketing, it does *not* disclaim the need to confirm the accuracy of one's registration details. In other words, a user who understandably believes that she must check the box to confirm the accuracy of her registration details in order to participate in the offer **has no choice but to "consent" to telemarketing**. The

---

[1] It is my understanding that Fluent's websites sometimes comprise at least *60* discrete pages. I understand from Docket Number 97-6 that Plaintiff's counsel, Jon Fougner, received a letter from Fluent's counsel stating: "With respect to the webpage visited by the user who registered with Plaintiff's phone number, Fluent has produced the landing page. It is my understanding that the rest of the 'flow' is dynamic and burdensome to reproduce." Procuring this information should be easy. In order to have developed the site with this data, the software team must have used a blueprint, such as a set of "wireframes." If this information is difficult to reproduce, then Fluent's IT team is neither well-trained nor highly qualified and its system is far from state-of-the-art.

screen appears to have been designed to Trojan Horse a telemarketing consent into a confirmation of the accuracy of the user's registration details—the latter being something that many if not most users may reasonably believe is a requirement of participation. This dark pattern is referred to pejoratively as "consent bundling" in our industry.

### "Marketing Partners" Pop-Over

35. Furthermore, in order to learn who or what the "Marketing Partners" alluded to in small print actually were, the user would need to have clicked on a hyperlink sending her to a new screen listing hundreds of previously undisclosed entities. A screenshot of a (partial) example of the hyperlinked "Marketing Partners" screen has been provided by Defendants as document number FLUENT_4134 and is reproduced below, but it is my understanding that, to this day, Fluent has not produced the full list of marketing partners supposedly agreed to by Fluent's visitors.

*Scroll Bar*

36. The scroll bar shown on the right-hand side of the screenshot above has been pulled down from its starting, top-justified, position. It appears that the person who created this recreation pulled it down before taking a screen capture. Nothing in Mr. Bhadania's declaration or exhibits leads me to believe that any name associated with Freedom Financial Network or Freedom Debt Relief would be visible to the user without such scrolling. The scroll bar is narrow, hard to grab. A more user-friendly scroll bar would be wider, consistent with web design norms.

*Framing*

37. This elusive scroll bar is compounded by how small the modal (or "interstitial") box is. Needlessly, it is so small that only a few letters of the alphabet show at a given time.

*Font Size*

38. Moreover, the font size appears to be low to mid single digits, far smaller than best practices. In short, even if one manages to scroll to the right name, the typical user would struggle to read it. Magnifying the font size, meanwhile, causes the small modal to display an even smaller subset of the names.

*Interaction of Elements*

39. The net effect of these design choices is to deter and prevent the typical user from ever seeing the phrase "Freedom Financial."

**Retail Product Zone Website (Plaintiff Erica Russell)**

40. The overall structure, and many of the specific design choices, of the Retail Product Zone website resemble those of the Samples & Savings website. Accordingly, much of the foregoing analysis applies with equal force to the Retail Product Zone site. In the paragraphs that follow, I summarize certain additional considerations specific to the Retail Product Zone site.

<u>Landing Page</u>

41. Mr. Bhadania maintains that the first of three survey questions that Ms. Russell would have seen looks like this:







*Facebook Mimicry*

42. While Mr. Bhadania does not get into this in his declaration or exhibits, it appears that the middle of this image would actually have rendered as a perpetually scrolling animation to the user. It is a mock "news feed", with rows scrolling showing supposed Facebook "likes" and "loves" along with the time stamp of the action ("2 min ago"). Facebook is the third most popular website in the United States. By mimicking its interface, including its favicons, content, colors, shapes, sizes, and arrangement, this design draws upon the user's expected affinity for Facebook in order to win her trust and attract her attention. Nothing in Mr. Bhadania's declaration or exhibits leads me to conclude that the statements Fluent is making through these elements—for instance, that 1732 people "liked" or "loved" this Fluent website, most recently 2 minutes ago, is true.

*Page Hierarchy*

43. The focal area of the screen is the survey question and the Target gift card above it. Color, richness of color, font size, element size, and punctuation all focus the visitor on this region.

44. The design is telling the user to ignore the dense, small, gray-on-gray text below.

*Mobile Navigation*

45. The dimensions of this screenshot imply and Mr. Bhadania's declaration confirms that it is a mobile screen. Nothing in in Mr. Bhadania's declaration or exhibits leads me to conclude that any reference to terms and conditions would appear above the fold on the mobile phone or that the typical user would scroll down, away from the focal area, to see them.

46. These conclusions apply to the three following screens in Mr. Bhadania's exhibits, too.

<u>Information Gathering Page</u>

47. Mr. Bhadania states that Ms. Russell then arrived at the page depicted below:



Second Supplemental Expert Report of Benjamin H. Beecher
14

*Action Button*

48. A typical user of this webpage would understand that clicking on the bright green "Continue >>" button would result in continuing on to the next page. This result is predictable from the word "Continue", which is commonly understood to mean to load the webpage hosted at the URL hyperlinked by that word, and by the ">>" carrots. The carrots are abbreviated right-pointing arrows. For a reader of a left-to-right language, including English, they are a widely understood metaphor for this same process of loading the hyperlinked webpage.

49. Under web-design best practices, and to a typical user, clicking the "Continue >>" button does not signify agreement to terms and conditions. The principles of clarity and transparency call for at least one of the following two implementations in order to communicate such agreement to the end user: (1) language on the button itself, such as "I agree"; and/or (2) language immediately adjacent to the button disclosing to the user the web designer's interpretation of the button, such as "By clicking the button, You/I agree to . . . ."

50. Additionally, best practices call for forcing the user to actively participate in acceptance of terms and conditions through a checkbox or other active engagement mechanism.

51. On this webpage, by contrast, there is no language tying the button to the terms and conditions and no ability for the user to actively participate in the acceptance process.

*Terms and Conditions*

52. The reference to the terms and conditions appears to be in a low- to mid-single-digit font size. On Mr. Bhadania's exhibit, it is so small as to be nearly illegible. While Mr. Bhadania does not disclose the font size in his declaration, inspection reveals that it violates web design standards for usability and readability.

53. With mobile design these standards are especially stringent - it is best practice in mobile sites to increase font size to accommodate for the smaller screen. This means the smaller font sizes on mobile devices act as a double deterrent.

54. Mr. Bhadania asserts that the words "Terms & Conditions" are hyperlinked. I take him at his word. However, a typical user would be unlikely to notice the hyperlink and extremely unlikely to click on it. This is because, in addition to being tiny, it appears in the exact same gray as the adjacent text. If it were instead in color, a typical user would be more likely to notice it, and if that color were blue, the typical user would be more likely to interpret it as a hyperlink. This styling similarity is actively created as the default styling for links is to color them differently than plain text.

*Imagery*

55. The focal points of this page are the large, rich, red Target gift card, drawn in perspective, and the green "Continue >>" button. The typical user will be drawn to these images rather than the text, especially the smallest text, on the page.

*Layout*

56. Nowhere in the main interactive module and focal area framed by the red gift card at its top and the green "Continue >>" button at its bottom is any reference made to consenting to receive telemarketing calls.

57. Nothing in Mr. Bhadania's declaration or its exhibits leads me to conclude that anything below that main focal area appears above the fold on the typical mobile phone. That is, nothing in his declaration or exhibits leads me to conclude that the typical user would see that text unless she affirmatively scrolled down to it. Such scrolling is less likely when, as here, the action that the user is invited to take--here, clicking the "Continue >>" button.

58. Finally by positioning the button above the small text you create the impression that the two are separated out in some matter. The user is moving through the flow sequentially, form field by form field, completing when they hit the "Continue" button, so looking at the terms breaks that flow and requires the user to know that even though they have no more actions they need to accomplish, there is vital information present. A better layout would present the information as part of the form flow itself, forcing the user to see it before hitting the terminal action.

*Hyperlinks and Mobile Navigation*

59. There are additional concerns here because the user is on her mobile phone. The concerns interact in a predictably problematic way.

60. First, tab management is significantly less user-friendly on a mobile phone than on a desktop or laptop. Going back to the prior page is more cumbersome on a mobile device than a large screen with a mouse and keyboard.

61. Second, the hyperlink leading to the terms and conditions appears on the same screen as, and *below*, the fields containing the user's fully-completed registration information.

62. Accounting for these two factors, typical users would be particularly reluctant to click a hyperlink that appears likely to lead them *off* of the screen containing their registration information—as they may fear that doing so would, annoyingly and time-consumingly, erase their already-entered information. Therefore, in my opinion, even users who might otherwise have been motivated to visit the list the terms and conditions (if any) will be predictably dissuaded from doing so by specific design choices implemented in Fluent's user flow.

<u>Information Confirmation Page</u>

63. A screenshot of the information confirmation page in the Retail Product Zone flow has been provided by Defendants as document FLUENT_4155 as is reproduced below:

Second Supplemental Expert Report of Benjamin H. Beecher
16



Confidential

FLUENT_004155

Second Supplemental Expert Report of Benjamin H. Beecher

17

64. Insofar as the screenshot above closely resembles the corresponding page in the Samples & Savings flow, I incorporate my analysis there, here.

65. I also refer to my foregoing analysis of hyperlinks and mobile navigation—relevant here with respect to the "Marketing Partners" link, in that the "Marketing Partners" link is clearly and obviously a hyperlink.

### Cumulative Effect of Design Tactics across the Pages in Fluent's Flow

66. The totalizing effect on the typical user's experience on Fluent's flow is to overload her with fine print and multiple confusing decisions while hiding the most important information. The sequence of screens begins by baiting the user with the least alarming of the purported consents (receiving emails about something that a number of users may find nice—sweepstakes); it later switches the user to a different purported consent (receiving texts and/or phone calls about something that many users would likely not find so nice—telemarketing), all while slipping the telemarketing consent into an "I CONFIRM" box that serves a deceptive double duty. Finally, the site hides the most alarming disclosure on an optional, third, hyperlinked pop-over interstitial, which users on a mobile phone have extra motivation to avoid—a screen where the "Marketing Partners" are revealed at last to be an eye-watering duplicative tidal wave of names. Taken together, this user flow can be characterized as misleading and confusing.

67. In my opinion, standards for good web design and disclosures are set forth in *Don't Make Me Think* by Steve Krug, first published in 2000. The guiding principle for these disclosures is that disclosures should be transparent, fair, and easy to understand. Mr. Krug writes: "As far as humanly possible, when I look at a web page it should be self-evident. Obvious. Self-explanatory." The design of Fluent's websites, including the disclosures contained on those websites, violates many principles of transparent design. The website, with its multiple screens and links, is misleading and deceptive, fatiguing users with decisions while hiding the most important information, for example, concealing from consumers that by (for instance) confirming their ZIP code they were not consenting to receive sweepstakes emails, but rather were purportedly consenting to receive automated telemarketing from hundreds of different entities. The websites fall far short of industry standards as to web design and transparent disclosures.

### CONCLUSION

68. An analysis of the system from which Defendants purportedly obtained consumers' consent to arbitration and to receive telemarketing calls reveals that the relevant disclosures were confusing and misleading. These disclosures fell far below industry standards and best practices in consumer web design.

Sworn under penalty of perjury in Jersey City, New Jersey on ___05 / 22 / 2020___ .


Benjamin H. Beecher

*Ben Beecher*
_____

Second Supplemental Expert Report of Benjamin H. Beecher